UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No.  8:07-CR-342-T-23MAP

YOUSSEF SAMIR MEGAHED

GOVERNMENT'S RESPONSE AND
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the United States of America, by and through its representative,

the undersigned Assistant United States Attorney, and responds to defendant

Megahed's Motion to Suppress as follows:

1.      On August 29, 2007,  the grand jury returned an indictment in the instant

case, charging both defendants with one count of violating 18 U.S.C. §§ 842(a)(3)(A)

and defendant Mohamed alone with one count of violating 18 U.S.C. § 842(p)(2)(A).

The charges arose from two separate incidents. Count Two arose from the

transportation by the defendants of explosive materials from the Middle District of

Florida to the District of South Carolina which took place on or about August 4, 2007.

2.      On December 21, 2007, defendant Megahed filed the instant Motion to

Suppress. In it, he seeks the suppression of the explosive materials and other items of

evidence which law enforcement authorities seized from the Toyota in which he was

riding as a passenger on August 4, 2007, as well as statements which he made on that

date and thereafter. Those items of evidence from the vehicle gave rise to the charges

contained in Count Two of the instant indictment.

3.      The defendant now seeks suppression of these items and the statements which the defendant ultimately made about them, based upon his claim that police officers lacked a reasonable basis to stop the vehicle in which the defendant was riding on the afternoon of August 4, 2007 and also lacked the necessary probable cause to conduct a warrant-less search of that vehicle on that date and to interview him at that time and thereafter.

4.      For the reasons set forth in the incorporated Memorandum of Law, the United States respectfully urges this Court to deny the defendant's Motion to Suppress in its entirety.

## MEMORANDUM OF LAW

### I.      Factual Background

As it relates to defendant Youssef Samir Megahed, the charge contained in Count Two of the instant indictment arose from an encounter between the vehicle in which he was a passenger and officers of the Berkeley County, South Carolina Sheriff's Office ("BCSO") on the afternoon of August 4, 2007.  As the evidence will reflect, BCSO Deputy Lamar Blakely was on patrol in a marked police vehicle in the town of Goose Creek, South Carolina that afternoon. At approximately 5:15 P.M., he was driving on Highway 176 in Goose Creek when he noticed a light colored Toyota, bearing a Florida license number. As he observed that vehicle, he noticed it contained two occupants. As Blakely came to be behind the Toyota, he noticed that the two occupants of the car appeared to be very intent on looking back at Blakely's car, and he further observed that the passenger, identified later as defendant Megahed, appeared to be looking

down inside of the vehicle. The Toyota sped up and Deputy Blakely soon observed that the Toyota was traveling at a rate of 60 miles per hour in a posted 45 mile per hour zone.

Once he observed the speeding take place, Deputy Blakely turned on his police vehicle's lights and sought to pull the Toyota over for that infraction. The Toyota continued traveling on Highway 176 for approximately one mile after the attempt by Blakely to stop it, even though there was ample space and location for it to pull safely off of the highway. During this same time period, Deputy Blakely observed both the driver and the passenger moving about within the car as if to re-organize things inside the car. After the car had traveled about a mile, both defendants stopped this movement, sat upright inside of the car, and eventually drove the vehicle off of Highway 176 and stopped it on the road shoulder. The weather and lighting conditions at that time of day were excellent.

Deputy Blakely stopped his vehicle a short distance behind the Toyota. This stop occurred at approximately 5:30 P.M. Deputy Blakely got out of his car and approached the Toyota. He observed that co-defendant Ahmed Sheriff Mohamed had been driving the Toyota and defendant Megahed was in the front passenger seat. He also observed defendant Megahed disconnecting the wires of what was later determined to be a laptop computer which he had in his possession and throwing them into the back seat of the car. Deputy Blakely also saw Megahed quickly shut the laptop computer as Blakely approached the car window to talk to the occupants of the car.

Deputy Blakely then started to have a conversation with the car's driver, defendant Mohamed, and asked for his drivers license and all of the relevant vehicle documents. Mohamed provided the license, a temporary foreign drivers license, but could not, at first,  produce the registration. Mohamed advised the officers that the car belonged to Megahed's brother. There was some confusion and interaction between the defendants when Blakely asked for the car registration. A video camera mounted in Deputy Blakely's car recorded the encounter with the two defendants from the point of the vehicle stop onwards.

For the next several minutes, Deputy Blakely, along with another deputy, spoke to Mohamed and, later, to Megahed. During this time period, Deputy Blakely took the drivers licenses of both Mohamed and Megahed and sought information from the BCSO central radio dispatch operator as to the status of the two occupants of the car and of the vehicle's registration as well. He also engaged in separate conversations with both defendants during this period. His questions focused upon their activities from the time they left Tampa, their reason for being in South Carolina, and the ultimate destination of their trip.

Deputy Blakely had initially intended, as he later reiterated, to issue the occupants of the car either a ticket for speeding or a warning notice. Ultimately, he opted for issuing a standard warning citation to Mohamed. However, Blakely noticed almost immediately after his first contacts with Megahed and Mohamed that their accounts of their activities up to that point were inconsistent with regard to such things as where they had been prior to that time and who had been driving.

At approximately 5:36 P.M., Deputy Blakely obtained information from the BCSO central dispatch operator as to the "clear" records of both of the car occupants and of

4

the car registration. He then engaged in some further brief conversation with each of the defendants as to their travel plans and their travel earlier on that date.  Growing more suspicious of their divergent accounts, he returned Megahed's drivers license to him and then asked both Mohamed and Megahed, separately, if there was anything in the car that he (Blakely) "should know about." Blakely mentioned things such as "guns, knives, drugs". Mohamed indicated that the car contained some fuses and "home-made rockets". Upon hearing that, Deputy Blakely spoke briefly with Mohamed and sought and obtained his consent  to search the vehicle at that time. Mohamed did not object and Deputy Blakely commenced the consent search of the Toyota at approximately 5:47 P.M. As of that time, Blakely had not yet had the chance to return Mohamed's drivers license to him.

During the subsequent search of the Toyota, BCSO deputies located a partially full box of .22 caliber ammunition on the floor of the car. Upon that discovery, BCSO deputies decided to handcuff and detain both occupants of the car. During a further search, the deputies also found a quantity of safety fuse and three sections of cut PVC piping, each of which contained what the FBI Laboratory later identified as a potassium nitrate explosive mixture. The discovery of the pipe sections occurred at approximately 6:02 P.M. Deputy Blakely then called for the bomb squad to come to the scene and the BCSO deputies backed away from the car, awaiting their arrival. Mohamed remained inside of Deputy Blakely's vehicle; defendant Megahed was detained separately.

## II.     Legal Analysis

Defendant Megahed has attacked the legality of the search and seizure on August 4, 2007.  He has argued that the officers lacked a legal basis to stop the Toyota

in which he was riding at the time or to detain him for any extended length of time.  He

has further argued that even if they did have a legitimate basis to stop the vehicle, the

deputies lacked the probable cause necessary to search the entire vehicle at that time.

He has also sought to suppress not only the results of the search of the car but any

statements which he made during the traffic stop and detention.

      1)     <u>Lawful basis for the stop of the Toyota</u>

In the instant case, the police officers who encountered the defendant on August

4  stopped the car he was in because they observed it speeding on Highway 176. That

observation formed a legitimate basis for a traffic stop of the car at that time.

It is well settled that police officers may stop and detain an individual if they

have an objectively reasonable suspicion that some "criminal activity may be afoot."

<u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).  Such an investigatory stop requires as justification

"some objective manifestation" that the person subject to the stop "is, or is about to be,

engaged in criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  The

quantum of proof of criminal activity is not as high as that of "probable cause", but it

must be more than a mere "inchoate and unparticularized suspicion or 'hunch.' " <u>Terry</u>

<u>v. Ohio</u>, 392 U.S. at 27.  On the other hand, it is also clear that a decision by law

enforcement to stop a vehicle is reasonable where there is probable cause to believe

that a traffic violation has occurred.  <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996);

<u>Delaware v. Prouse</u>, 440 U.S. 648, 659 (1979); <u>United States v. Mackey</u>, 149 Fed.

Appx. 874, 879 (11th Cir. 2005).

In the instant case, Deputy Blakely  had a reasonable and lawful basis for

stopping the Toyota on August 4.  He had personally observed the car speeding on

6

Highway 176. He had a legitimate basis not only to stop the Toyota but also to cite its driver for a violation of South Carolina statutes regarding speeding on public roadways. At the time of this incident, that violation was a misdemeanor violation under state law, punishable by a fine of up to $50.00.  S.C. CODE ANN. § 56-5-1520(G)(2).  That violation, for which Deputy Blakely later wrote a warning citation, was the lawful basis of the traffic stop at issue herein.

      2)    <u>Length of traffic stop detention appropriate to circumstances</u>

Both before the stop and during the period of time that officers sought to identify both the driver and the passenger in the Toyota, they had observed indications of suspicious activity.  Not only did they observe a great deal of movement inside of the Toyota and movement about as if re-arranging items inside of the car prior to the car stopping; they also observed that it took almost a mile for the car to come to a stop alongside the highway, even though there was ample shoulder area for it to do so well before the time that it actually came to a stop on the shoulder of the highway. Once the car stopped, officers observed passenger Megahed unplugging a laptop computer from the dash, throwing the wires into the backseat, and slamming the laptop computer shut as the officers approached the Toyota. The BCSO officers also spoke briefly with both occupants about their reasons for being in South Carolina, their route, and their previous activity that day. The answers they obtained from both defendants were inconsistent and led to further inquiry and a request to check their records and that of the car itself.

Defendant Megahed questions the duration of the initial "traffic stop" phase of the encounter on that afternoon. A police officer's activity at the scene of a traffic stop must be " 'reasonably related in scope to the circumstances which justified the interference in

the first place.' " United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting

Terry v. Ohio, 392 U.S. at 20). It must also be of " 'limited duration' " and " 'may not last

any longer than necessary to process the traffic violation unless there is articulable

suspicion of other illegal activity." United States v. Cantu, 227 Fed. Appx. 783, 785 (11th

Cir.), cert. denied, 128 S. Ct. 374 ( 2007) (quoting United States v. Boyce, 351 F.3d at

1106)). Yet it is clear that a traffic stop may legitimately last as long as it takes to

complete a computer check of the driver's license and registration, as well as a criminal

history check of the passengers in the vehicle.  United States v. Purcell, 236 F.3d 1274,

1278 (11th Cir.), cert. denied, 534 U.S. 830 (2001); United States v. Hunter, No. 2:06-

cr-81-FtM-29DNF, 2006 WL 3804833,   at *1 (M.D. FL. Dec. 22, 2006) (Steele, J.).

During that same time period, officers may lawfully ask questions of the car's

occupants, even if they are unrelated to the specifics of the traffic stop, so long as they

do not unduly prolong the stop for completion of vehicle and occupant checks.  United

States v. Cantu, 227 Fed. Appx. at 785. An officer may even ask the occupants of the

car to step out of the car as a precautionary measure. Maryland v. Wilson, 519 U.S.

408, 414-15 (1997). Moreover, reasonable suspicion of criminal activity or consent by

an occupant of the vehicle can lengthen the duration of the stop. United States v. Cantu,

227 Fed. Appx. at 785.

The "reasonable suspicion" necessary to lengthen the time of the traffic stop

encounter depends upon the totality of circumstances and is based upon the collective

knowledge of the officers at the scene. United States v. Arvizu, 534 U.S. 266, 273-74

(2002);  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).  Police officers

may draw upon their own training and experiences to make inferences and deductions

which add to that "totality of circumstances" and that specialized knowledge and training must receive " 'due weight' ". United States v. Arvizu, 534 U.S. at 273-74 (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). Although more than a mere "hunch", "reasonable suspicion" is a level of proof "considerably less" than a preponderance of the evidence and requires at least a " 'minimal level of objective justification' ". Id.; United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003). Such a "reasonable suspicion" can arise from factors not necessarily proof of illegal conduct and even those consistent to some extent with innocent travel; the test is the " 'degree of suspicion that attaches to particular types of noncriminal acts.' " United States v. Tapia, 912 F.2d at 1371 (quoting United States v. Sokolow, 490 U.S.1, 10 (1989)).

Facts which give rise to a "reasonable suspicion" are legion and varied. They include a combination of things such as inconsistent accounts of travel plans and purposes (United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005), cert. denied, 127 S. Ct. 303 and 717 (2006); United States v. Boyce, 351 F.3d at 1109; United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir.), cert. denied, 518 U.S. 1023 and 1178 (1999)); empty food containers in the vehicle (United States v. Hernandez, 418 F.3d at 1211); the nervousness of car occupants and the officer's belief that there was something not quite "right" as to explanations of travel plans or reasons (United States v. Simms, 385 F.3d 1347, 1354 (11th Cir. 2004), cert. denied, 544 U.S. 988 (2005)); and a reluctance of the car to come to a stop after the initiation of the traffic stop (United States v. Pruitt, 174 F.3d at 1220). Officers may also consider the furtive nature of conduct by the driver and/or passenger before the stop of the vehicle itself.

Moreover, a police officer has a "duty" to investigate additional suspicious circumstances that come to his attention subsequent to a legal traffic stop. United States v. Mackey, 149 Fed. Appx. 874, 879 (11th Cir. 2005). As the fluid situation of a traffic stop unfolds and more facts emerge, an officer may well be justified in detaining vehicle occupants even for a short time "beyond what might have been reasonable for just a routine traffic stop". United States v. Hernandez, 418 F.3d at 1211. Neither is there any "[r]igid time limitations" or "bright-line rules" as to what amount of time constitutes an "unreasonable" length of time for a routine traffic stop; the amount of time that constitutes an "unreasonably" lengthy traffic stop varies with the facts of each case. United States v. Purcell, 236 F.3d at 1279. The test is one of "[r]easonableness" based upon the "totality of the circumstances". Id.  The nervousness of car occupants and conflicting response from them about where they have been are two significant factors which could serve to justify a brief extension of the minimal time necessary to complete an otherwise routine traffic stop beyond the completion of the license and registration check and the issuance of a warning. United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991).

In the instant case, the information which Deputy Blakely had as of the time of the stop of the Toyota and the information he was gathering from conversations with the car's occupants during the 17 minutes that elapsed after the stop itself gave rise to such a "reasonable suspicion". Although he had received information back from his dispatch operator by 5:36 P.M. as to the "clear" records of both Mohamed and Megahed and the registration of the car to Megahed's brother, the furtive actions of the car's occupants both before and after its stop was just one factor in the "reasonable suspicion" calculus.

Deputy Blakely gathered inconsistent and apparently incorrect information from both Megahed and Mohamed as to where they had been earlier in that day, the time they had spent driving from Tampa, the fact as to who was doing that driving, and the places where they both claimed to have visited beaches during the course of their travels. He also witnessed the effort of defendant Megahed to disconnect and conceal the laptop computer in the car and heard both defendants assert that they had recently gotten gasoline at a nearby Walmart. That fact was especially troubling to Blakely since he was driving behind the Toyota for a distance before the traffic stop and the route which the Toyota was taking led not away from the Walmart gas station but towards it.  These were the very same inconsistencies which Blakely sought to investigate further when he spoke with both Megahed and Mohamed between 5:39 and 5:46 P.M.

After failing to resolve these differences in accounts and facts, Deputy Blakely developed suspicions as to the contents of the car and the plans of its two occupants and thus sought to determine if there was any contraband in the car. When he asked Mohamed that question at approximately 5:46 P.M., Mohamed replied that there were fuse and "home-made rockets" inside the Toyota. Almost immediately, Blakely asked if Mohamed objected to a search of the car. Mohamed did not and that search commenced at approximately 5:48 P.M. Blakely had not yet had time to return Mohamed's drivers license to him before the consent search started.

At worst, only seven minutes had elapsed between the time Blakely had finished writing the speeding warning notice and the commencement of the car search. Those minutes allowed him one final chance to investigate the discrepancies he had before him as to the car and its occupants.  He had a "duty" to investigate them to the best of

11

his ability in his limited time. United States v. Hernandez, 418 F.3d at 1211. Facts such a  car occupants' nervousness and inconsistencies in stories can serve to legitimate and also marginally lengthen the time of the stop. United States v. Ffriend, 151 Fed. Appx. 778, 779, n.2 (11th Cir. 2005). The limited time Deputy Blakely took to do some further follow-up inquiry at the scene did not unduly or impermissibly prolong the traffic stop. Moreover, once he obtained the consent of the driver to search the car, "the clock re-started for purposes of evaluating the reasonableness of the duration of the intrusion." United States v. Hernandez, 418 F.3d at  1210. See also United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir.), cert. denied, 127 S. Ct. 2924 (2007).

The voluntariness of defendant Mohamed's consent to the search of the Toyota depends, again, upon the totality of the circumstances at the time. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).  Factors to look at include the cooperativeness of the defendant, any coercive actions by the officer, the consentor's education and intelligence, and his belief that no incriminating evidence will be found. United States v. Purcell, 236 F.3d at 1281. The fact a consentor has not yet received his drivers license back from the police officer  "is not a litmus test for voluntary consent". Id.  at 1282. See also United States v. Simms, 385 F.3d at 1354-55. Neither is the fact that the officer might not specifically have advised the consentor of his right to refuse a search absent a search warrant. Id.  at 1281-82.

The video recording of the encounter between Mohamed and Deputy Blakely reflects a rational conversation between the two of them. Mohamed's ability to speak English and converse with Blakely reflects the abilities which Mohamed had as a post-graduate level instructor at an American university with a solid command of the English

language. The recording of their conversations reflects the ability of Mohamed and Blakely to communicate with each other. Blakely at no point used any coercive actions or words to intimidate or coerce Mohamed's consent; he asked for verbal consent from Mohamed and voluntarily got it from him. That consent permitted the search to go forward lawfully. The discovery within a few minutes of the PVC sections in the car trunk, coupled with Mohamed's description of them as "rockets", led to the lawful detention of both car occupants until the arrival of the bomb squad. As Deputy Blakely made clear to Mohamed repeatedly, the purpose of that detention was to allow the bomb squad to determine the nature of the PVC sections.  He repeatedly advised Mohamed that if the bomb squad determined those sections not to contain explosive materials, Mohamed and Megahed would be free to leave and be on their way.

      3)      <u>Lack of Racial/Ethnic Profiling</u>

The defendant has further alleged that the stop of both defendants and the investigation of the speeding incident were products of unlawful "racial profiling".

At the time that he stopped the Toyota at approximately 5:30 P.M. on August 4, 2007, there is no indication that Deputy Blakely was even aware of the identity or ethnic background of the occupants of that car. He did not get any sense of that fact until well after he had approached the stopped car and started to speak to its occupants.

While it is true that the recording of the stop does include some reference by Blakely to the Arab ethnicity of the two defendants, there is no evidence in the "totality of the circumstances" of the events that took place after 5:30 P.M. that any BCSO officer acted outside of the normal scope of their routine traffic and law enforcement duties. There is no evidence to suggest any "pretext" in the stop, as knowledge of the

defendants' identities and/or ethnicity was unknown to Blakely before the stop occurred.

The Eleventh Circuit has already articulated the proper method of analysis of such a claim as the defendants makes here with respect to the comments of Deputy Blakely and the inferences which the defense draws from them. Relying upon Supreme Court precedent in Whren v. United States, the court rejected the use of such pretextual stop arguments and shifted the focus of this Court instead to the probable cause for the initial traffic stop itself. Draper v. Reynolds, 369 F.3d 1270, 1275-76 (11th Cir.), cert. denied, 543 U.S. 988 (2004). The reasonableness of a traffic stop "must be determined irrespective of 'intent', whether of the particular officer involved or of the theoretical 'reasonable officer.' " United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (quoting Whren v. United States, 517 U.S. at 811-16).

Here, Deputy Blakely had probable cause to stop the Toyota in which the defendants were riding as he had clocked it speeding, going 60 miles per hour in a 45 miles per hour zone. He thus had a legitimate basis to stop their car, not knowing anything at that point in time as to their identities or backgrounds. The police inquiry which followed led from the defendants' conversations with Deputy Blakely. The investigation which he did of the assertions of the defendants was also proper and not outside of the scope of normal investigation. Any comments which he or other officers may have made about either defendant is, at best, something which this Court may consider as possible indicators of bias and are thus only relevant with respect to the issue of their credibility. Those comments have nothing whatsoever to do with the legality of the initial traffic stop at issue herein.

14

4)      Statements Admissible

In addition to contesting the illegality of the traffic stop and search of the physical contents, the defendant has also moved to suppress the statements which defendant Megahed made to BCSO deputies after the stop of the Toyota on August 4. He contends that the failure of the BCSO officers to give him warnings as to his right to remain silent must lead to the suppression of any statements which he made on August 4, 2007.

The Eleventh Circuit has suggested two alternative tests for the determination of this issue. United States v. Purcell, 236 F.3d at 1279-81. It has noted that one test might be whether the interview of the defendant was one which was justified by the officers' reasonable suspicion of criminal activity and bound by the nature of that suspicion. This line of analysis emerged from cases in the Tenth Circuit Court of Appeals. The other line of analysis expands the scope and nature of traffic stop interviews and focuses instead upon the effect of the interview upon the duration of the stop. This line of analysis looks to whether the questioning of a defendant about matters unrelated to the reasons for the stop had the effect of unduly prolonging the stop beyond its permissible time limit.

With respect to either test, the pre-arrest interview of defendant Megahed was proper, although it yielded very little of an incriminating nature. Deputy Blakely spoke to Megahed at approximately 5:43 P.M., just after Blakely had completed making a detailed inquiry of Mohamed as to the travel plans and activities of the pair.  As indicated above, Deputy Blakely had reasonable suspicion of criminal activity and was concerned, as his questions demonstrate, as to the presence of contraband inside of

the Toyota. The inconsistent stories which he had heard from Mohamed and Megahed in the first few minutes of his encounter with them led him to make some limited in time inquiry as to these issues prior to Mohamed's rendition of consent to search the car.

Under the Tenth Circuit's analysis, some of the circumstances which arose after the stop of the Toyota by Deputy Blakely gave rise to a legitimate basis for such an interview of defendant Megahed. Applying some of the Tenth Circuit's own precedents, the circumstances which gave rise to a legitimate basis for an interview with these defendants on the scene included the defendants' failure to stop their car for almost a mile after Deputy Blakely turned on his vehicle lights (United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995)), their inconsistent statements about their travel (United States v. Alcaraz-Arellan, 441 F.3d 1252, 1260 (10th Cir. 2006)), and the fact that the car they were in was not registered to either occupant of that car (United States v. Turner, 928 F.2d 956, 959 (10th Cir.), cert. denied, 502 U.S. 881 (1991)).

Using the Eleventh Circuit's alternative line of legal analysis, the brief interviews which Deputy Blakely conducted of both Megahed and Mohamed prior to the initiation of the search of the car and the discovery of the PVC pipe sections in the trunk did not unduly prolong what was still a limited traffic stop. Deputy Blakely had just finished the warning citation and had just received the clearance information from his dispatch operator when he initiated the separate interview of each occupant. That interview took no more than six minutes in time and related to verifying their stories as to their travel and plans. His brief on-scene investigation related only to travel plans and itineraries and was the product of the inconsistencies of the car occupants.  The circumstances before him permitted Deputy Blakely and his brother officers to make that inquiry of both

16

Mohamed and  Megahed. United States v. Cantu, 227 Fed. Appx. at 785; United States v. Harris, 928 F.2d at 1117.

      5)      Attenuation of Taint

Defendant Megahed has argued in his motion that the search of the Toyota which he was in was unlawful and that the interview of him during the traffic stop on Highway 176 was also unlawful and that, as a result, all "fruits" of that stop and interview must be suppressed. He has further contended that the "taint" of this illegality extends to anything that occurred after the initial traffic stop came to its logical and reasonable end with the issuance of a warning citation by Deputy Blakely.

As the United States has indicated above, BCSO officers had a legitimate basis in the law to lengthen for a few brief minutes the traffic stop which they performed on August 4 and which led to the ultimate consent search of the Toyota.  That search was not a violation of any expectation of privacy on the defendants' part. Yet assuming, arguendo, the illegality of that search and initial interview of the defendants, the defendant has ignored the fact that intervening facts and circumstances attenuated any illegality so as to render the physical evidence from inside of the Toyota and their statements to police voluntary and admissible. To cure or "attenuate" the supposed unlawful nature of the search, the evidence must demonstrate both that the defendants' later consent to talk to the police officers was voluntary and that the consent to speak to them was "obtained 'by means sufficiently distinguishable [from the illegal search] to be purged of the primary taint.' " United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) (quoting United States v. Santa, 236 F.3d 662, 676 (11th Cir. 2000)). In looking at the voluntary nature of a consent which occurs in the aftermath of an unlawful

seizure, the court must look at the time between actions, the intervening circumstances, if any, and the purpose and flagrancy of the initial misconduct. Id.

The attenuation of the supposed taint of the supposedly unlawful search in this case arises primarily from the fact that BCSO officers did obtain the consent of the defendants to interviews. In the case of defendant Mohamed, Deputy Blakely did advise him of his rights in some fashion a short time after the preliminary search of the Toyota. He did so at approximately 7:04 P.M., in response to inquiries of Mohamed and while they waited for the bomb squad to appear. He also did so after advising Mohamed on numerous occasions that he was not under arrest and was merely detained, subject to the search and determinations of the bomb squad. Indeed, Mohamed denied his guilt in the statement and did not admit to any criminal conduct on his part in possessing any of the items in the car, insisting they were harmless rockets and not explosives. In addition, the search, even if unlawful, was not flagrantly so and had a legitimate purpose in light of the unfolding circumstances of the traffic stop and the details which the BCSO deputies were learning as time went on by the side of the road. All of the above factors tend to attenuate and remove the taint of the search of the defendants' Toyota and permit the admission of the entire contents of the defendants' interviews with law enforcement.

### III.    Conclusion

BCSO officers had a legitimate basis to conduct a traffic stop of the Toyota in which both defendants were riding on August 4 due to their personal observation of a speeding violation on Highway 176. During the course of that stop, the deputies had a reasonable basis to investigate the matter further at the scene and to interview both occupants. The information which Blakely and others had there led to the receipt of a

18

consent to a search of the Toyota by defendant Mohamed. During that search, BCSO officers found ammunition and, shortly thereafter, PVC pipe sections which contained an explosive material mixture. This led to the actual arrest of both defendants, after their detention at the scene, for South Carolina state law violations.  The consent which defendant Mohamed gave Deputy Blakely extended the permissible time length of the initial traffic stop and led to the discovery of physical evidence which is thus admissible at the trial herein.

Even assuming the unlawful nature of the search of the car, however, the interview of the defendants was not subject to suppression as a "fruit" of that search since the statements made at the scene were the product of legitimate on-scene inquiry during a traffic stop and those which came later were the result of interviews in the aftermath of a warning and advice of rights. Intervening events after the actual stop itself "purged" any supposed taint to those later statements.

WHEREFORE, based upon the foregoing arguments and authorities, the United States respectfully requests that this Court deny defendant Megahed's Motion to Suppress  in all respects.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By:    /s/ Jay L. Hoffer
JAY L. HOFFER
Florida Bar No. 0910708
Assistant United States Attorney
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
Telephone No. 813-274-6318
Fax No. 813-274-6178
E-mail: jay.hoffer@usdoj.gov

19

**U.S. v.  Mohamed and Megahed**                    **Case No. 8:07-CR-342-T-23MAP**

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2008, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Adam Allen, Esq.
Assistant Federal Public Defender
400 North Tampa Street, Suite 2700
Tampa, Florida  33602

John M. Fitzgibbons, Esq.
707 North Franklin Street, Suite 700
Tampa, Florida 33602

/s/ Jay L. Hoffer
JAY L. HOFFER
Florida Bar No. 0910708
Assistant United States Attorney
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
Telephone No. 813-274-6318
Fax No. 813-274-6178
E-mail: jay.hoffer@usdoj.gov

N:\_Criminal Cases\M\Mohamed, Ahmed Sherif_2007R01848_JLH\p_Response to Motion to Suppress.Megahed.wpd