UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO.: 8:07-cr-342-T-23-MAP

AHMED ABDELLATIF SHERIF MOHAMED
YOUSSEF SAMIR MEGAHED
_____/

**DEFENDANT MOHAMED'S *AMENDED* OBJECTIONS
TO REPORT AND RECOMMENDATION ON HIS MOTION TO SUPPRESS
EVIDENCE AND STATEMENTS OBTAINED IN VIOLATION
<u>OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION</u>**

Defendant Ahmed Mohamed, by and through his undersigned attorneys, objects to the

Report and Recommendation by United States Magistrate Judge Mark A. Pizzo denying Mr.

Mohamed's Motion to Suppress Evidence and Statements Obtained in Violation of the Fourth

Amendment to the United States Constitution.  In support thereof, Mr. Mohamed states:

I.       <u>Introduction</u>

Defendant Mohamed seeks to suppress evidence and statements obtained by law

enforcement after an illegal traffic stop effectuated with no probable cause.  Assuming arguendo

that the District Court disagrees with Mr. Mohammed's contention that he was illegally stopped,

Mr. Mohammed further asserts that, after the traffic stop was concluded, law enforcement

unconstitutionally detained him.  Lastly, Mr. Mohammed submits that his alleged consent was

illegally obtained based upon the aforementioned conduct of law enforcement and, even if the

Court were to agree with Magistrate Judge Pizzo, there was no consent given by Mr.

Mohammed.

Magistrate Judge Pizzo found that law enforcement had probable cause to stop Mr.

Mohammed because he was driving 55 mph in a 45 mph speed zone; that the detention was not

unreasonably prolonged by law enforcement questioning; that law enforcement had a reasonable suspicion to extend the detention of Mr. Mohammed; and, that Mr. Mohammed consented to the search of the vehicle. Judge Pizzo's recommendation that Mr. Mohammed's motion be denied should be rejected because his factual findings and application of the law are erroneous.

II.       Law Enforcement did not have probable cause to stop Mr. Mohammed

Judge Pizzo contends that "although the Defendants argue [Deputy] Blakely did not have probable cause to stop them for speeding, neither Defendant seriously counters the government's proof that they were speeding." Judge Pizzo further found that the Defendants made "vague arguments" regarding the fact that the Defendants were driving in a 55 mph zone when Deputy Blakely activated his lights and "…that Blakely, given his motivations, should not be believed as to this issue." He found these arguments to be unpersuasive. We respectfully beg to differ.

The Defendants argue that they were in a 55 mph speed zone at the time that Deputy Blakely activated his lights and the objective evidence introduced at the hearing establishes that fact. A review of Mr. Megahed's Exhibit 7[1], introduced at the hearing, clearly demonstrates that at the time Deputy Blakely activated his lights, he was not "in front of the Wal-Mart" as he testified, but, instead, he had just passed the arrow indicating a right hand turn into the Alcoa Plant.[2]

Deputy Blakely testified that he had been patrolling an area and made a right turn onto Highway 176. (Doc. 146, Pg. 45) Upon entering the flow of traffic, Deputy Blakely immediately

---

[1]Megahed's Exhibit 7 is a video taken by his Defense team which captures Highway 176 in Goose Creek beginning several miles south of the Wal-Mart and ending at the area of the stop.

[2] Megahed's Exhibit 7 at minute 4:41. The viewer can clearly see the Water Tower on the right hand side of the roadway as the car travels north on 176. The Wal-Mart is directly across the street on the left hand side of the roadway. There is a thirty-second gap between this point and the point of the video that depicts the area which is seen at 5:28:25 of Government's Exhibit 1. Further, it is clear from viewing Megahed's Exhibit 7 that at the point when Deputy Blakeley's camera activates his vehicle has clearly passed the right hand turn arrow into the Alcoa plant.

noticed the Defendant's car traveling ahead of him.  He noticed that the car had a Florida license plate, the driver continuously looked at him in his rear view mirror, and the car allegedly sped up. (Doc. 146, Pgs. 46, 48)  This action caused him to begin "pacing" the car. (Doc. 146, Pg. 49) Deputy Blakely further testified that, while he was traveling behind the Toyota and before he decided to stop it for *speeding*, he had noticed that the vehicle had Florida tags and the occupants were two males with dark hair and tan skin. (Doc. 146, Pgs. 150, 151)

At this point, Deputy Blakely testified that he was approximately two hundred yards south of the Wal-Mart. (Doc. 146, Pg. 50)  He testified further that he paced the car for approximately 15 - 20 seconds. (Doc. 146, Pg. 49)  He activated his lights directly in front of Wal-Mart. (Doc. 146, Pg. 56)  According to him, the car had been traveling 58 to 60 mph in a 45 mph zone[3].(Doc. 146, Pg. 49)  Deputy Blakely further testified that there is a three-second delay between the time he activates his lights and the time that the camera activates. (Doc 146, Pg. 43)

However, a comparison of the two Exhibits irrefutably establishes that, at the time that Deputy Blakely activated his lights, the Defendant's car was well within the 55 mph speed zone. If one simply goes back three seconds from the 5:11 mark on Mr. Megahed's video (Defendant's Exhibit 7), the point at which the video depicts the area when Deputy Blakely's camera activated, it is clear that the Deputy did not activate his lights in front of the Wal-Mart.  There is a thirty-second difference between the time that the camera passes the Wal-Mart and the time when the area depicted in the Government's Exhibit 1 begins.  Even if one goes back ten seconds, instead of three, over-adjusting for speed differences, it remains clear that Deputy Blakely lied when he stated that he activated his lights in front of the Wal-Mart and within the 45 mph speed zone.

---

[3] At 5:03 in Megahed's Exhibit 7 the camera captures the first 55MPH sign clearly before the Alcoa plant right hand turn lane.  In fact, the camera passes the Alcoa plant five seconds later.

Deputy Blakely also lies to Mr. Mohamed when he informs him that the speed limit doesn't change to 55 mph until after the light. (Government's Exhibit 1, 5:32:02)  Once again, a review of Mr. Megahed's video (Defendant's Exhibit 7) establishes that the first 55-mph sign is visible before the Alcoa plant.  The second sign is visible as the camera travels between the plant and the traffic light, clearly establishing that Mr. Mohamed was not speeding at the time of the stop. (Defendant's Exhibit 7, 5:05)

It is not a stretch to conclude that this Deputy would fabricate a reason to stop Mr. Mohamed's car when one considers Deputy Blakely's illegal stop of a vehicle immediately preceding this stop.  Mr. Mohamed submits now, as he did in the hearing, that the prior traffic stop established a pattern of conduct exhibited by Deputy Blakely in which he abuses his authority by illegally stopping individuals based upon his *hunch* rather than the required basis of reasonable suspicion or probable cause.  Furthermore, he testified, under oath, he had seen the vehicle come out from what he considers a high-crime road when the video clearly captures him smiling and advising Deputy Taylor that he wasn't sure if the vehicle had come down the *suspicious* roadway; so, he stopped it to find out "but, he didn't," meaning that he had determined, after illegally stopping the truck, that the driver hadn't come down the roadway. (Government's Exhibit 1, 5:20:48)  In this case, Mr. Mohamed submits that it would be consistent, based on Deputy Blakely's proclivities, for him to have stopped the Toyota based upon the mere fact that it had a Florida license plate and two male occupants with dark hair and tan skin.

Furthermore, it defies all logic and reason that Deputy Blakely would decide to use his *discretion* and issue a warning rather than a speeding citation.  It is incredible that this Deputy, who Judge Pizzo erroneously finds had objective reasonable suspicion that drug activity was underfoot, would choose to issue Mr. Mohamed a warning citation as opposed to a speeding

ticket, considering that South Carolina law authorizes a law enforcement officer to arrest an individual for speeding. (Doc. 146, Pg. 209)  If Deputy Blakely truly and objectively believed that he had reasonable suspicion of drug activity, he would have issued Mr. Mohamed a citation and arrested him, which would have enabled Deputy Blakely to conduct a lawful search of the car incident to the arrest.

For all these reasons, Mr. Mohamed submits that Deputy Blakely illegally stopped his vehicle with no reasonable suspicion or probable cause because he was not speeding nor committing any other criminal activity at the time of the stop.  Therefore, the Fourth Amendment mandates suppression of all of the evidence and statements resulting from this illegal police action.

III.   <u>Assuming arguendo that the District Court disagrees with Mr. Mohammed's contention that he was illegally stopped, Mr. Mohammed further asserts that after the traffic stop was concluded law enforcement unconstitutionally detained him.</u>

Even assuming that Judge Pizzo's decision reference the probable cause to stop the Defendant's vehicle for speeding is correct, he still incorrectly found that Deputy Blakely had sufficient objective reasonable and articulable suspicion to further detain Mr. Mohamed after the traffic stop had concluded.

A.   Traffic Investigation concluded

Judge Pizzo's reliance on the dicta stated in *Hernandez* is incorrect.  Specifically, Judge Pizzo focused on the length of time of the traffic stop and that it was not unreasonable.  Judge Pizzo quoted the *Hernandez* Court's dicta stating, "We underline that the police are not constitutionally required to move at top speed or as fast as possible."  *Hernandez*, 418 F.3d at 1212 n.7.  He further cites *Hernandez* to support his finding that the stop was not unreasonably long because "at a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so."

However, *Hernandez* is not applicable to this set of facts because, in *Hernandez*, the officer was questioning the Defendant and the driver while his traffic investigation was still **on-going.**  In the case at bar, the traffic investigation had been **completed.**  Mr. Mohammed is not asserting that Deputy Blakely had to move at lightning speed in order to conclude his traffic investigation.  However, at the time that Deputy Blakely ordered Mr. Mohammed to get out of his car and began his one question too many, the traffic stop investigation **had concluded**. Deputy Blakely had received all clear results back from the checks he had run.  He had already obtained the information that both Mr. Mohammed and Mr. Megahed's driver licenses were clean and that the vehicle was registered to Mr. Megahed's brother.  Deputy Blakely had completed writing the warning citation.  He exited his car with the identification cards of the Defendants and the warning in his hand; however, Deputy Blakely refused to return the items to the Defendants and, instead, ordered Mr. Mohammed out of the car to further question him.  As such, *Hernandez* is inapplicable to the case at bar because it dealt with questioning while the traffic investigation was still ongoing, unlike here, where the traffic stop had concluded.

Therefore, Deputy Blakely violated Mr. Mohammed's Fourth Amendment constitutional rights when he began to further question him after the traffic stop had concluded.

B.    No reasonable suspicion

Constitutionally, an officer can detain occupants of a vehicle after the initial traffic stop has concluded only if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring or if the initial detention has become a consensual encounter. *United States v. Pruitt*, 174 F.3d 1215 (11th Cir. 1999).  Obviously, this case does not involve a consensual encounter because Deputy Blakely had not returned Mr. Mohamed or Mr. Megahed's driver licenses or paperwork at the time he ordered Mr. Mohamed out of the vehicle

and began further questioning him. *Pruitt, supra citing United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993)

Instead, Judge Pizzo finds that, even if the traffic stop was completed at the time that Deputy Blakely stepped from his vehicle, Deputy Blakely was, nevertheless, authorized to prolong the detention and order Mr. Mohamed out of the vehicle to conduct further questioning because, at that time, he had an objective reasonable articulable suspicion that criminal activity was underfoot. Judge Pizzo cites Deputy Blakely's "good reasons" for asking the Defendants a few more questions. Those reasons are:

1. the Defendants traveled for a mile before stopping;

2. they moved suspiciously when he approached them;

3. their responses about the car's registration struck him oddly; and

4. their Toyota bore a Florida tag, which he viewed as a source point for drugs.

These, and only these, are the "good reasons" that the Court may examine to determine whether Deputy Blakely had objective reasonable suspicion that criminal activity had occurred or was occurring in order to prolong the stop and ask further questions, rather than return the Defendant's documentation and the warning and allow the Defendants to be on their way. Although Judge Pizzo goes on to cite another set of facts that increased Deputy Blakely's suspicion, the travel of the Defendants, Mr. Mohammed would assert that the questioning of the travel plans came **after** the traffic investigation had concluded, and without objective reasonable and articulable suspicion. Deputy Blakely had no legal basis to prolong the detention and, therefore, that information was obtained illegally. Thus, the only factors that the Court can consider in determining if Deputy Blakely had an objective, articulable reasonable suspicion to prolong the detention after the traffic stop had concluded are factors one through four discussed

above. Mr. Mohamed will address each as follows:

1.     *The Defendants traveled for a mile before stopping*

Deputy Blakely testified that the Defendants traveled one mile after he activated his lights before pulling off to the side of the road.  The objective evidence demonstrates that this is false. According to Deputy Blakely, the Defendants were traveling at a rate of speed of 58 mph. Government's Exhibit 1 clearly depicts that Mr. Mohamed slowed down and applied the brakes while attempting to find a safe spot to pull over.  According to the Government's Exhibit 1, it took Mr. Mohamed approximately 30 seconds to pull over. (Government's 1, 5:28:28) However, in the light most favorable to the Government, a vehicle will travel 851 yards in 30 seconds if its speed is 58 mph.  There are 1760 yards in a mile.  Therefore, the reliable evidence depicts that Mr. Mohamed stopped the vehicle within half a mile, at most, of Deputy Blakely activating his lights.  As pointed out above, this is clearly an overestimation as the video of the stop depicts that Mr. Mohamed slowed the speed of the vehicle and applied the brakes. Therefore, it is obvious that the Toyota did not travel 851 yards since it was traveling less than 58 mph after Deputy Blakely activated his lights.

Furthermore, Mr. Mohamed would point to his earlier argument regarding the actual location in which Deputy Blakely activated his lights to establish that it was perfectly reasonable for him to drive until he could safely pull over.  As stated earlier, a review of the two videos, Mr. Megahed's Exhibit 7 and Government's Exhibit 1, demonstrates that, at the time Deputy Blakely activated his lights, he was either at the right hand turn arrow in front of the Alcoa plant or just past it.  Deputy Blakely testified that he was one car length behind Mr. Mohamed.  Government's Exhibit 1, however, depicts Deputy Blakely more than one car length behind Mr. Mohamed at the time the camera activated.   Either way, whether one car length or more behind, the Defendant's vehicle was past the area that Deputy Blakely described as level and paved.

Thereafter, the roadway available for Mr. Mohamed to stop is depicted in both Exhibit videos and contradicts Judge Pizzo's finding that there were ample opportunities to pull over safely, especially in light of the Defendant's "unfamiliarity" with the area.

Lastly, Deputy Blakely testified that he considered the fact that Mr. Mohamed was not from this area when he used his *discretion* to issue a warning rather than a citation for speeding fifteen mph in excess of the posted speed. (Doc. 146, Pgs. 83, 198, 199)  Therefore, it was clearly duplicitous for Deputy Blakely to state that he found that the length of time it took Mr. Mohamed to stop was suspicious.  Obviously, a person unfamiliar with the area would not only be confused as to the speed limit, but would further be cautious as to where to safely pull over, given that the shoulder was a bumpy, grassy area with a steep slant. (Doc. 159, Pgs. 34, 145)

2. *The Defendants moved suspiciously when he approached them*

Judge Pizzo found that Deputy Blakely could see the two Defendants clearly reach towards the center console as if moving something or hiding something and noted the time at 5:30 p.m. in the video. Actually, at approximately 5:29:20 in Government's Exhibit 1, the Toyota is cautiously pulling over to the side of the road.  The camera captures the movement within the car.  Mr. Mohamed and Mr. Megahed can be seen moving around as if looking for something, which is not an unusual event for motorists when stopped by the police.  Every driver knows that they will have to produce a license, registration and proof of insurance at a traffic stop.  Most people have to look in their wallets, purses, pockets, glove compartment or console for this paperwork.  If this were a basis to establish reasonable suspicion, then every driver would be subjected to prolonged detentions after the traffic stop had ended.  Moreover, the camera clearly shows that neither Defendant is demonstrating furtive movements.  In fact, one can see Mr. Mohamed actually reach for something in the back seat that appears to be a bookbag and place it on his lap.

Next, Judge Pizzo finds that as Deputy Blakely approaches the driver, Mr. Mohamed, he spotted Mr. Megahed, the passenger, "disconnect wires from a laptop, throw them in the backseat, abruptly shut the laptop, and sit upright." A review of the video does depict Mr. Megahed remove an object from somewhere and toss it in the backseat; unfortunately, it does not depict the *suspicious* laptop or whether Mr. Megahed "abruptly" closed it, actions that should not form the basis for an objective reasonable suspicion. Factual recitations in drug cases have little or no references to drug traffickers or couriers and laptops[4]. However, the video does depict that Mr. Megahed does not sit upright afterwards. Instead, the video depicts that Mr. Megahed is attempting to listen to Deputy Blakely, who is at the driver's window, practically in the roadway with cars whizzing by.[5] (Government's Exhibit 1, 5:29:41) Additionally, Deputy Taylor is the *cover* officer, there to further assure the safety of Deputy Blakely. As such, Deputy Taylor approached the passenger's side of the vehicle within seconds of Deputy Blakely approaching the driver's window. The video depicts Deputy Taylor looking in the vehicle through the windows. (Government's Exhibit 1, 5:29:52 - 5:32:16) However, contrary to Deputy Blakely's claim, Deputy Taylor testified at the hearing that he did not see anything suspicious within the vehicle except Mr. Megahed's alleged tight grip on the laptop and two Middle Eastern young men with Korans on their laps. (Doc. 159, Pgs. 17, 87)

### 3.    *The responses about the car's registration struck him oddly*

Deputy Blakely testified that, when he asked about the car registration, Mr. Megahed

---

[4] It should be noted again that Deputy Blakely claims that what he had a reasonable articulable suspicion of was drug activity, therefore, it is incomprehensible what relevance the lap top and the manner in which it was closed, whether lightly or abruptly has to do with anything. Further, as testified by Deputy Taylor, it is expected that the occupants of a vehicle during a traffic stop, not speak on cell phones, lower the radio, turn off DVD's or computers while the police officer attempts to communicate with the driver. (Doc. 159, Pgs. 87, 88).

[5] Demonstrating why this roadway did not present many opportunities to safely pull over. There is so little shoulder Deputy Blakely was practically in the roadway. Yet, if Mr. Mohamed would have pulled over anymore he would have potentially flipped the car over because of the steepness of the shoulder. Even Deputy Taylor, born and raised in Berkley county, lost his footing when approaching the passenger side of the car. (Government's Exhibit 1,5:29:42)

replied that he did not have the registration.   When Deputy Blakely asked who the car was registered to, Mr. Megahed responded, "My brother."  When asked what his brother's name was, Mr. Megahed responded by spelling his brothers first name, "Y-A-H-I-A." Government's Exhibit 1 establishes that at this point in the exchange, Deputy Blakely had been handed Mr. Megahed's driver license and proof of insurance for the car.  When Deputy Blakely asked Mr. Megahed for his brother's last name, Mr. Megahed replied, "Megahed."  When Deputy Blakely asked for his brothers address, Mr. Megahed recited his brother's address, which was the same as his.  Deputy Blakely testified that he found it suspicious that Mr. Mohamed was silent and that Mr. Megahed was doing all the talking.   Mr. Mohamed submits that there is nothing suspicious about the person who has the most direct link to ownership of the vehicle answering the questions regarding ownership.  Indeed, it would be suspicious if that wasn't the case. Furthermore, even if objective and reasonable, the suspicion of illegality was dispelled once the check came back verifying that the Defendant's statement regarding the car being registered to Mr. Megahed's brother was true.   Once a potential suspicious circumstance evaporates, then justification for further investigation based on that circumstance dissipates. *See United States v. Boyce*, 351 F.3d 1102 (11ᵗʰ Cir. 2003)  Furthermore, Deputy Blakely himself had dismissed this "good reason" once he learned that the car was, in fact, registered to Yahia Megahed. (Doc. 146, Pg. 82)

4.      *The Toyota bore a Florida tag*

Deputy Blakely testified that the Toyota bore a Florida license tag.   Because he is assigned to the Special Enforcement Unit, he has received substantial training regarding the detection and apprehension of drug traffickers. (Doc. 146, Pgs..33, 37)  His training has taught him that Florida is a hub for narcotics activity.  Therefore, when he saw the tag, it alone raised his suspicions. (Doc. 146, Pgs. 46, 82)  Deputy Blakely repeatedly testified that the criminal

activity he believed he provided reasonable suspicion was drug activity. (Doc. 146, Pgs. 67, 72, 81)  A review of Government's Exhibit 1 establishes the disingenuousness of this testimony.  Not once does Deputy Blakely ever mention drugs, beginning from the time he and Deputy Taylor walk back to the patrol car to the time when he exits his patrol car and announces that he is going to get Mr. Mohamed out of the car and search it.  He never calls for a K-9 unit to respond. Instead, from the moment that he and Deputy Taylor walk back to his patrol car, look at each other and discuss that the Defendants had Korans on their laps, all that he seems concerned with is the fact that they are "damn terrorists."  The comments made by these two deputies are not just crass ethnic comments; they are vile racist comments.  They take us back to the days when it was common in some southern towns, at the time referred to as sunset towns, to see bill boards and signs warning African Americans, "Nigger don't let the sun set on you in this town."  In those days, a black person's presence along the roadway in one of those towns after sunset would also not match an officer's usual roadside encounter.

Not even *Whren* and its progeny suggest that it is ever acceptable to find normal reasonable or innocent behavior suspicious because it is engaged in by a person of color.  Judge Pizzo attempts to excise out, as if he was conducting a *Franks* analysis, the *objective* non-racist reasons for Deputy Blakely's *suspicions*. However, Mr. Mohamed submits that it is inappropriate to ignore the racist comments in assessing Deputy Blakely's credibility as to his *objective reasonable and articulable* suspicions[6].  If the actions of the Defendants are not more suspicious because of their ethnicity, then why does Deputy Blakely continually refer to them in such a vile and degrading fashion?  It is not as if he made one or two "unprofessional base and crass ethnic

---

[6] The testimony of Deputy Taylor clearly establishes the deputys' racist perceptions clouded their judgment as to the actions of the Defendants. Deputy Taylor testified, "I think the initial thought that was going through our minds is maybe they're terrorists…" He testified these assumptions were based upon the fact that they assumed that it was a Koran in their lap as opposed to an Arabic dictionary and they were from the Middle East, based on their accent and their appearance. It was due to these assumptions that they made the unprofessional jokes. (Doc. 159, Pgs. 90, 91)

comments." Instead, his true colors cloud every aspect of this so-called investigation and his "good reasons" for prolonging the *investigation* should be called what they really are - unconstitutional, racist interpretations attached to innocent behavior, thereby making the behavior *suspicious*.

Based on all of the above, Mr. Mohamed submits that, at the time Deputy Blakely exited his vehicle, he had, at best, an inchoate hunch which did not justify prolonging the detention. *Untied States v. Pruitt, supra* @1221, "after a traffic citation has been processed, the defendants should have been free to go, as the officer was provided at that time with no reasonable suspicion of their criminal activity." The Court further held that being Hispanic and having an out-of-state license plate was not enough to detain Pruitt beyond the issuance of a speeding ticket. *Id*. "Being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama) … fail to suggest that appellant…[was] engaged in any criminal activity other than speeding on the highway." *United States v. Tapia,* 912 F2d 1367, 1371 (11th Cir. 1990) In *Tapia*, the court further rejected the following additional conduct to equal the constitutionally required reasonable suspicion based upon the totality of the circumstances: "Arturo Tapia's looking away quickly when he passed the trooper on the highway, the Tapias' possessing valid San Antonio driver's licenses, or the bare fact of the car being insured by a third party." *Id*. If the Court in *Tapia* did not believe that the factors enumerated above rose to the level of an objective reasonable and articulable suspicion, then the reasons stated in the instant case must fail as well.

There is no reason to discuss whether the answers given by the Defendants to Blakely's questions after he ordered Mr. Mohamed out of the car did or did not make sense to Deputy Blakely because, absent the stop converting to a consensual encounter, he should not have detained them. With all due respect, Judge Pizzo's interpretation of *Hernandez* is incorrect. In

*Hernandez,* the court held that the trooper had a reasonable suspicion from the inception of the traffic stop[7]. Furthermore, the trooper had not heard back from Customs, who he routinely would call for a check, and he had not yet delivered the citation as he was waiting on the results of the check. Therefore, the traffic stop had not concluded. The court then, in dicta, questions whether a traffic stop lasting 17 minutes or less can ever be unconstitutional. Mr. Mohamed submits that the point that the court was making was that a *legitimate* traffic stop which lasts 17 minutes or less is never going to be found unconstitutional due to duration. That has nothing to do with the facts here, where the traffic stop had concluded. All of the checks had come back clear and the warning citation had been written. If Deputy Blakely had still been waiting for a check or checks to come back or had not yet completed the traffic citation, then arguably Deputy Blakely could have asked Mr. Mohamed additional questions. *Hernandez* should not be read to overturn years of precedent establishing that a traffic stop cannot take longer than necessary to investigate the underlying reason for the stop absent objective reasonable and articulable suspicion to prolong the detention or conversion of the stop into a consensual encounter.

The only arguable suspicion that remained after the traffic investigation was concluded in this case was the length that it took the vehicle to stop (incredible for the reasons submitted above), the movements of the Defendants after the stop (incredible for the reasons outlined above) and Florida tags. The registration issue should not be included as it had dissipated after the check. The cases cited clearly establish that these facts do not rise to the level of an objective reasonable and articulable suspicion.

IV. <u>Consent</u>

---

[7] The Defendant's in that case were speeding in a rural area of Alabama at 3:00 a.m. When asked by the trooper why they were speeding the driver responded that the passenger had diarrhea and that he was trying to get to a bathroom. Yet, the trooper noted that the driver was on a lonely stretch of road with few opportunities to use restroom facilities and had just past a brightly lit restroom exit.

Mr. Mohamed submits that Judge Pizzo's findings that the prolonged detention of the Defendants was not illegal is clearly erroneous for the reasons set forth above and, therefore, the alleged consent must be invalidated as it is a product of the illegal detention.

Next, Judge Pizzo finds that the video confirms that Mr. Mohamed voluntarily consented to the search. To the contrary, the video confirms that there was no consent given by Mr. Mohamed. After Deputy Blakely orders Mr. Mohamed to step out of the vehicle, Mr. Mohamed shows his unfamiliarity with our country's laws by immediately assuming the position of someone who is going to be searched. (Government's Exhibit 1, 5:39:45) Judge Pizzo inexplicably finds that because Deputy Blakely responds to Mr. Mohamed's question, "Are you going to search me?", by stating that he only asked him to step to the back of the car but will search him only if Mr. Mohamed wants them to, means that from that moment forth, Mr. Mohamed knew he had a right to refuse consent. If that were the case, then Mr. Mohamed would have also known that he had a right to refuse to answer Deputy Blakely's questions.

Knowledge of the right to refuse consent is only one of the factors to consider when determining whether consent was voluntarily given. Judge Pizzo also finds that Deputy Blakely and his backups did not display coercive or verbally abusive tactics. However, a review of the video demonstrates that when asking Mr. Mohamed where he had been, Mr. Mohamed responded that he and Mr. Megahed had been to three beaches. To this Deputy Blakely mocks, "three beach?" Upon hearing this, Deputy Taylor looks at Deputy Blakely and smiles. (Government's Exhibit 1, 5:42) As Judge Pizzo points out, Mr. Mohamed is a bright, well-educated young man who was in the United States teaching at USF and working towards his Ph.D. in Civil Engineering. Certainly, a smart young man such as Mr. Mohamed was capable of picking up that he was being made fun of. Furthermore, although Deputy Blakely wasn't verbally abusive towards the Defendants, he continuously interrupted them, made facial

expressions and was very confrontational with Mr. Megahed.(Government's Exhibit 1, 5:44)

After confronting Mr. Megahed, Deputy Blakely returned to Mr. Mohamed, who this entire time has had Deputy Taylor standing in full uniform next to him and has not had his drivers license returned to him, and asks him questions, by which he informs Mr. Mohamed that Mr. Megahed had denied having driven the Toyota during the trip. A review of the video clearly establishes that Deputy Blakely had never asked Mr. Megahed that question. (Government's Exhibit 1, 5:45) Deputy Blakely then asks Mr. Mohamed whether he has anything that he should know about in the car such as guns, knives or drugs. Mr. Mohamed replies, "Girls?" and Deputy Blakely repeats the question. Mr. Mohamed replies that he does not, but that he has some home-made fireworks/rockets in his car. (Government's Exhibit 1, 5:45:57) Judge Pizzo believes that this answer gives Deputy Blakely probable cause to search the car[8]. Yet, clearly that is not what Deputy Blakely thought at that time. Instead, Deputy Blakely asks, "You don't have a problem if I look then, right?" In response, Mr. Mohamed states, "Excuse me?" Deputy Blakely repeats the question, to which Mr. Mohamed replies, "If you must." At this point, Deputy Blakely begins to turn towards the passenger side of the car but asks Mr. Mohamed again the same question. To this, Mr. Mohamed says nothing. Instead, he makes some movement with his head which Judge Pizzo interprets as giving consent. (Government's Exhibit 1, 5:47:10) Judge Pizzo states that Mr. Mohamed's "answer, "if you must," combined with his gestures, body language (walking away from the Toyota), and his belief that he had done nothing wrong, support a finding that he voluntarily consented to the search."

To the contrary, the words "if you must" imply by their very nature that Mr. Mohamed

---

[8] Mr. Mohamed asserts that Deputy Blakely did not have probable cause at this point because there was no evidence that he had committed any crime. It is not illegal in South Carolina to possess fireworks. It is illegal to possess a destructive device. At that point Deputy Blakely had no reason to believe that Mr. Mohamed had transported the items across state lines or that they were a destructive device under South Carolina law. 16-23-720 (c) of the South Carolina Code of Laws, 1976 As Amended.

believed that Deputy Blakely "must" take a look. "Must" is a mandatory word, unlike "may," which is a permissive word.  It is at this point that for clarification purposes Deputy Blakely should have explained that Mr. Mohamed had a right to refuse consent.  The words, "If you must," are not sufficient to convey consent.  This statement was a concession, not a consent, and at most, amounts to a failure to object.  The failure to object to a search does not amount to a consent to search.  *United States v. Gonzalez*, 71 F.3d 819, 829 (11th Cir. 1996).  It should also be noted that the Defendant, a foreign national who had been in the United States about eight months at the time of the stop and largely unfamiliar with the laws of the United States, would not be expected to know that he had the right to object under these circumstances, which is a factor to be considered in determining the voluntariness of the consent.  *United States v. Guapi*, 144 F.3d 1393, 1394-95 (11 th Cir. 1998).  Under the totality of the circumstances as depicted on the video recording, the Defendant's "consent" amounted to a failure to object and was not sufficient to establish a consensual search.

Furthermore, there is nothing about Mr. Mohamed's gestures at this point in the video that imply that the words "if you must" equal voluntary consent.  Judge Pizzo states that Mr. Mohamed voluntarily walked away from the Toyota; yet, the video depicts that Mr. Mohamed walked away because Deputy Blakely ordered him to step away from the vehicle to be patted down. (Government's Exhibit 1, 5:47:22)  Lastly, in Judge Pizzo's analysis of the totality of the circumstances surrounding the *consent*, he notes that Mr. Mohamed had a belief that he had done nothing wrong.  However, the question isn't whether the Defendant believes that he has done nothing wrong; instead, it is whether there is anything in the car that the officer should know about.  This is the standard question asked in case after case.  Mr. Mohamed doesn't answer this question with a "No", as many do in the legal precedents cited in these motions.  Instead, Mr.

Mohamed looks towards the trunk and states that he has homemade fireworks/rockets in there. Obviously, his answer suggests that this is something that the officer should know about. Immediately thereafter, Deputy Blakely asks the fateful question to which Mr. Mohamed replies, "If you must." Therefore, the totality of the circumstances confirms that Mr. Mohamed did not give any consent, let alone voluntary consent.

Because the search of the Defendant's vehicle was purely pretextual, because the consent itself was invalid, and because consent was coerced, the warrantless search of the vehicle violated the Fourth Amendment prohibition against unreasonable searches and seizures, and the documents and items seized, and all other evidence relating to them, must be excluded from the trial of this cause.

V.     Conclusion

Mr. Mohamed had not committed a traffic infraction. Accordingly, Deputy Blakely did not have probable cause or reasonable suspicion to stop Mr. Mohamed's vehicle. Therefore, all evidence and statements seized pursuant to the unlawful stop must be suppressed. Assuming arguendo that the court finds that Mr. Mohamed was speeding, the traffic investigation had concluded and no objective reasonable and articulable suspicion existed to prolong the detention. Therefore, all evidence and statements seized pursuant to the unlawful detention must be suppressed. Lastly, Mr. Mohammed submits that his alleged consent was illegally obtained based upon the aforementioned conduct of law enforcement and, even if the Court were to agree with Magistrate Judge Pizzo that the stop was legal and that the further detention was constitutional, there was no consent given by Mr. Mohammed, and, therefore, all of the statements and evidence seized after that point must be suppressed. Judge Pizzo's recommendation should be rejected and Mr. Mohamed's motion granted.

DATED this 12th day of March, 2008.

Respectfully submitted,

/s/ Linda Moreno

Linda Moreno, Esquire
Linda Moreno, P.A.
Florida Bar No.:  112283
P.O. Box 10985
Tampa, Florida  33679
Telephone:  (813) 247-4500
Email:  linbianca@aol.com
Attorneys for Ahmed Mohamed

/s/ Lyann Goudie

Lyann Goudie, Esquire
Goudie & Kohn, P.A.
Florida Bar No.: 789811
400 N. Ashley Street, Suite 2180
Tampa, FL 33602
Telephone: (813) 413-2424
Fax :   (813) 386-6211
Email:   lyann@goudiekohnlaw.com
Attorneys for Ahmed Mohamed

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of March, 2008, a true and correct copy of the foregoing was furnished by the CM/ECF system with the Clerk of the Court, which will send a notice of the electronic filing to the Office of the United States Attorney; and by United States mail to Assistant United States Attorney Jay Hoffer, Office of the United States Attorney, 400 North Tampa Street, Suite 3200,Tampa, Florida, 33602.

/s/ Linda Moreno
Linda Moreno, Esquire
Linda Moreno, P.A.

/s/ Lyann Goudie
Lyann Goudie, Esquire
Goudie & Kohn, P.A.