UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                                  Case No.  8:07-CR-342-T-23MAP

AHMED ABDELLATIF SHERIF MOHAMED


**SENTENCING MEMORANDUM**

COMES NOW the United States of America, by and through its representatives, the undersigned Assistant United States Attorneys, and respectfully submits this memorandum in aid of this Court's consideration of the sentence to impose on this defendant at his sentencing hearing on November 7, 2008.


I.  PROCEDURAL BACKGROUND

On April 15, 2008, a federal grand jury sitting in Tampa handed down a superseding indictment charging defendant Ahmed Abdellatif Sherif Mohamed with a number of offenses.  Those offenses included unlawful possession of a firearm, distribution of information about the use of explosives, possession of a destructive device, transportation of explosives without a permit, and providing material support for terrorism. Doc.  No. 198.

On June 18, 2008, the defendant entered a plea of guilty to Count One of the superseding indictment.  That count charged him with providing material support to terrorists, in violation of 18 U.S.C. § 2339A.  The defendant pled guilty pursuant to a plea agreement with the United States.  Doc. No. 268.  In that plea agreement, the

defendant agreed to certain facts relating to his arrest on August 4, 2007 in South Carolina and the recovery of evidence by law enforcement from the car which he was driving at that time.  Id. at 8-9.  He further stipulated to his role in the creation and distribution of an instructional video on the conversion of a radio controlled toy car into a remote detonation/ignition device.  Id. at 9-10.   He acknowledged that "he intended the technology demonstrated in his audio/video recording to be used against those who fight for the United States" since he considered them and their allies fighting in Arab countries to be "invaders".  Id. at 11.

The defendant now stands before this Court for sentencing.  To date, the only objection which the defendant has filed to the facts and conclusions which are contained in the Pre-Sentence Report consists of a conclusory and summary objection to the inclusion of information in that report regarding other acts of the defendant.  The defendant's attorney has characterized that information as being irrelevant since it relates to "the charges which were dismissed pursuant to the plea agreement."  Lyann Goudie Letter of September 5, 2008 at 1.

Although the United States has agreed in its plea agreement  to dismiss the charges in CountsTwo through Seven of the superseding indictment, that plea agreement does not preclude the United States from presenting evidence to this Court as to other criminal or bad acts by this defendant.  Indeed, some of that information constitutes component parts and elements of the offense alleged in Count One of the superseding indictment and is thus clearly relevant. As set forth below, the challenged information is relevant and admissible pursuant to 18 U.S.C. § 3553.  It is for this Court to determine the weight which it will give to such information.

This Court must now determine what is a "reasonable" sentence in the instant case.  The Sentencing Reform Act[1] requires judges to consider the factors listed in 18 U.S.C. § 3553(a) in determining a sentence.   After United States v. Booker, 543 U.S. 220 (2005), and pursuant to 18 U.S.C. § 3553(a)(4)(A), the Court must calculate the advisory guideline sentencing range, consider the guidelines, and determine a reasonable sentence taking into account all of the factors set forth in 18 U.S.C. § 3553(a).  In arriving at the Court's decision as to the appropriate sentence in the instant case, those facts to which the defendant does not object are considered to be admitted.  United States v. Williams, 438 F.3d 1272, 1274 (11th Cir.), cert. denied, 127 S. Ct. 195 (2006).  This Court may make findings as to contested issues of fact by a preponderance of the evidence standard.  United States v. Nguyen, No. 07-11996, 2008 WL 4590513 (11th Cir. Oct. 15, 2008) at * 2; USSG § 6A1.3, comment. (Backg'd).

The final adjusted offense level in the defendant's Pre-Sentence Report is Level 42 and his final adjusted criminal history category is Category VI. Pre-Sentence Report (hereinafter "PSR") at paragraph 69.  The upward adjustments which led to that final result derive from the application to this defendant of the "Terrorism" enhancement contained in USSG § 3A1.4. Id. at paragraphs 35 and 42.  By virtue of the statutory classification of the offense charged in Count One as being a "Federal crime of terrorism", the "Terrorism" adjustment applies to this defendant. 18 U.S.C. § 2332b(g)(5)(B), USSG § 3A1.4, comment.  (n.1).  The adjustment applies to a defendant who seeks to promote or bring about the commission of a "federal crime of

---

[1]Pub. L. No. 98-473, 98 stat. 1987 (1984)

terrorism", regardless of his own actual ability to carry out specific terrorist crimes; his purpose in the promotion of any such  offense is all that is necessary to trigger the application of the enhancement. United States v. Mandhai, 375 F.3d 1243, 1247-48 (11th Cir.  2004), cert. denied, 127 S. Ct. 284 (2006).

By operation of law, the defendant's final adjusted sentencing range is 180 months imprisonment, the statutory maximum term of imprisonment for a violation of 18 U.S.C. § 2339A under the circumstances of this case.  A thoughtful consideration of all of the pertinent sentencing factors indicates that an appropriate sentence for this defendant is the sentence indicated in the Pre-Sentence Report – a term of fifteen years imprisonment.   PSR  at paragraph 69.  A lesser sentence is not appropriate in this case.

## II.  OTHER ACTS EVIDENCE RELEVANT

In his plea agreement with the United States, the defendant agreed that he made the video relating to the creation and use of a radio remote controlled ignition system. He acknowledged that he had told FBI agents that his aim in the distribution of that video was to aid persons fighting in the Middle East against "invaders" and that he considered U.S. military forces in the Middle East to be part of the "invading" force.  By doing so, Mohamed's statements constituted admissions that his intention in producing and distributing the recording was to support attempts by terrorists to murder employees of the United States, including members of the uniformed services, while such persons were engaged in or on account of the performance of their official duties.  He admitted no other conduct in his plea agreement or during his plea allocution before the court.

The defendant has entered an objection to the admission and use of any information as to any of his other acts.  This Court is free, however,  to consider any other relevant actions of the defendant, even if they relate to criminal acts which the defendant contests or to which he has not entered a plea of guilty or been found guilty. Congress has indicated that there should be "[n]o limitations...on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. To that end, Congress made clear that among the many factors which a Court should consider "in determining the particular sentence to be imposed"  is " the nature and circumstances of the offense and the history and characteristics of the defendant". 18 U.S.C. § 3553(a), (a)(1).  That statute's catalog of relevant information is a "broad command" as to the type of information which this Court must consider. Gall v. United States, 128 S. Ct. 586, 597 n.6 (2007).     The weight which the Court should accord each of the factors set forth in 18 U.S.C. § 3553 is a matter which is within the sound discretion of the court itself. United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006), cert. denied, 127 S. Ct. 3040 (2007).

A sentencing court may thus consider the other criminal acts of a defendant before it for sentencing, even if they are un-charged or are not directly relevant to the offenses of conviction. United States v. Thomas, No. 07-15020,  2008 WL 2191781, at *5 (11th Cir. May 28, 2008). The Eleventh Circuit has upheld the consideration of such evidence not only as part of the defendant's "history and characteristics" but also as evidence relevant to the court's statutory obligation to fashion a sentence that would

"afford adequate deterrence to criminal conduct...promote respect for the law...[and] protect the public from further crimes of the defendant". Id. See also United States v. Brock, 501 F.3d 762, 773 (6th Cir. 2007).

III.   "HISTORY AND CHARACTERISTICS  OF THE DEFENDANT"

The statute governing sentencing makes clear that a significant factor in the consideration of a just and reasonable sentence is the "history and characteristics of the defendant".  18 U.S.C. § 3583(a)(1).  This defendant entered the United States on or about January 1, 2007.  He entered on a F-1 student visa.  In his application for that visa in October, 2006, he acknowledged that he had previously been "arrested or convicted" of an "offense or crime".  Govt.'s Ex. 10. The defendant has admitted to the Probation Office that he had been arrested in 2003 in Egypt and had been held in custody there for over four months.  PSR  at paragraph 46.  He had previously insisted in interviews with FBI agents in South Carolina in August, 2007 that he had been a political detainee.

During the course of his limited time in the United States, the defendant  reflected a virulent anti-American attitude on repeated occasions.   His landlady has reported that she had heard him make many such statements over the short period of his residence with her in 2007.  She has reported that he repeatedly condemned "stupid Americans" and expressed his dislike of the United States and American law.  She characterized him as being an opportunist and as being an individual who always felt that he was intellectually superior to most persons and thus able to deceive them consistently.

On July 24, 2007, the defendant and a friend received a citation for violation of city ordinances for their discharging a pellet gun at wildlife in Rowlett Park in the city

6

limits of Tampa.  In a videotaped discourse on the events of that date which he recorded later that day, Mohamed expressed similar anti-American attitudes.  He joked about feigning a diabetic attack so that he might get lenient treatment from the Tampa Police officers who responded to the park.  He referred to this ploy as an "Indian movie act" for the police.  Govt's Ex. 4B at 6.  After repeatedly slurring the officers as "dogs", "Christians", "Infidels", "racists", and "enemies of G-D", Mohamed later characterized Americans in that same video as being a "stupid people" and as "one of the most stupid creations of G-D."  Id. at 6, 7, 8, and 9.  To his parents, in a later conversation with them on December 20, 2007, Mohamed termed the United States a "vile nation".  Govt.'s Ex. 8B.

The defendant also supported a radical brand of jihadist thought and often expressed his commitment to that violent ideology.  A cursory examination of the contents of his laptop computer proves that fact. That computer contained numerous images and videos which extolled and endorsed that violent ideology.  It included images of Ossama bin Laden and others connected with violent jihad in the Middle East, as well as caricatures of the President, Vice President, and Secretary of Defense Rumsfeld, all pictured inside of what appears to be a garbage can with a modified image of the seal of the United States above them on which appear the words: "Profiteers of the United States".  Govt.'s Ex. 6.  The images on the defendant's computer also included a photograph of a child aiming a anti-tank weapon while stepping on a military helmet which appears to be of American manufacture and also an image of a map of what appears to be Israel circled in what appears to be blood, being held in the palm of a bleeding hand.  Id.

Nowhere did the defendant make his commitment to jihad more clear than in a 37 line poem which FBI agents discovered on his laptop computer.  It appears to be the defendant's personal poem.  The author of the poem extols various figures such as the "exalted Ossama Bin Laden" and other members of Al Qaeda.  Govt.'s Ex. 7B at 3.  In it, the  author of the poem pledged his "blood", his "neck", and "soul" to his Lord and dreamt of the day that Egypt would lead the world "by G-D's canonical law, and by jihad in the cause of G-D".  Id.  The text of his poetry provides a clear expression of the defendant's disaffection with the current Egyptian government, his disdain for the "infidel," his support for Islamic law, his dislike for torture and prisons, his support for jihad, and his support for current and former jihadi leaders, including Ossama bin Laden, Sayyid Qutb, Hussan al-Banna, Sheikh Abdullah Azzam, Fawzy al-Sa'id, Mohammed bin Abb-al-Maqsud, Abdul-Hamid Kishk al-Zawahry, Ibn al-Qayyim, and Ibn Taymyyah.

Perhaps the coldest statement of this defendant and the most telling as to his hatred and disdain for the United States came in a hand-written letter which the defendant sent to a Hillsborough County jail deputy on April 1, 2008.  Govt.'s Ex. 8B.  In that letter, which he signed, the defendant "congratulated" the jail deputy upon the fact that the Pentagon had recently announced the death of more than 4,000 U.S. troops in the Middle East.  Next to that line, he drew what appears to be a face with a smile on it. He continued on in the letter on the subject of American casualties, stating that the "resistance in Iraq says they are 40,000."  Again, he drew a face with what appears to be a smile on it next to that line.  He then sarcastically stated that 70,000 "veterans from the U.S." "[l]ost their hearing and became deaf, so unfortunately they will keep silent."

8

Next to that last line, he simply drew a pair of eyes and a broad smile below it. He then went on to mock the deputy in the letter by pointing out that the Hillsborough deputy would still have to bring food to the defendant while the defendant was in jail. Id.

The defendant reiterated that theme in other statements and correspondence. In letters from jail, he indicated that he viewed Muslims as having only two choices: "Either Jihad and uprising, fighting, and self-victory, money, family, and fighting for G-D" or sitting at home "praying and fasting". Letter of November 26, 2007 (Govt.'s Ex. 8B). In order to achieve victory, he went on, Muslims needed to "[d]eceive the infidels, and keep them in the dark". Id.

The evidence gathered during this investigation also revealed that the defendant used his admission to the United States in order to focus his attention on gathering information about explosives and acquiring components in this country to construct explosives to cause harm within this country. Government's Sentencing Exhibit Number One is a time line, covering the two month period prior to the defendant's arrest, the period from June 23 through August 4, 2007. This time line shows a direct relationship between the personal computer research which the defendant was conducting on his laptop and the purchases which he made from stores. The defendant researched explosives, explosive mixtures, fireworks, and rockets and then purchased the components that were necessary to construct explosives. This information is probative of the defendant's intention to acquire explosives.

On July 30, 2007, for example, the defendant visited a web site primarily dedicated to providing instructions on how to make acetone peroxide. Acetone peroxide

9

is a primary high explosive that is sensitive to shock, heat, light, and friction.[2]  The materials Mohamed accessed online suggest that the components for that high explosive could be acquired by purchasing hydrogen peroxide and nail polish remover.[3]  This web site also mentioned that acetone peroxide could be used as a "booster" to assist the detonation of ammonium nitrate, which is also a high explosive that is comprised of fertilizer and a fuel oxidizer. That same day, July 30, 2007, shortly after visiting the aforementioned web site, the defendant visited another web site dedicated to information concerning ammonium nitrate.  Ammonium nitrate is a high explosive that was the primary component of the explosive used in the 1995 Oklahoma City bombing.  The next day, on July 31, 2007, the defendant purchased, at the same time, from the same store, and during the same trip, hydrogen peroxide and acetone onyx remover (nail polish remover). Those  items are two of the primary components of the high explosive acetone peroxide.

On June 23, 2007, the defendant visited four web sites dedicated to black powder and/or fireworks.  Black powder is a low explosive, comprised of sulfur, charcoal, and potassium nitrate.  On June 25, 2007, the defendant purchased from Home Depot a bag of garden sulfur and nothing else.  On the same date, about an hour later, he purchased distilled water, stump remover (potassium nitrate)[4] , charcoal, and nothing else.

---

[2]The character of this explosive is disclosed in the web site information.

[3]Nail polish remover contains acetone.

[4] Mohamed made five purchases of stump remover between June 25, 2007 and August 2, 2007.  He had no legitimate use for these materials in carrying out his teaching or work responsibilities. Stump remover is a commercially available source of potassium nitrate.

On June 30, 2007 and again on July 2, 2007, the defendant conducted computer research concerning rockets, rocket propellants, and how to manufacture them. During the ensuing nine day period, he purchased PVC pipes, pipe caps, PVC adapters and fittings, and a PVC plug. He also purchased two model rocket starter kits and two remote control cars, as well as wire strippers, a voltage meter, a crimping tool, and 2 two-way radios. Most of these tools were useful in constructing the remote detonation device that the defendant built and demonstrated on the Internet.

Government's Sentencing Exhibit Number Two is a visual depiction of some of the relevant information on Mr. Mohamed's laptop computer. It contains information that he downloaded from the Internet and preserved for future reference. When the computer is turned on, the "desktop" is the first thing that appears to the viewer. His desktop contained several file folders, including one labeled "Qassam" and another labeled "---".[5]

A qassam rocket is rudimentary rocket which is in use by terrorists in the Middle East. It consist primarily of a tube or casing crammed with a quantity of rocket propellant. It can be launched with or without a warhead of explosives and from even the most rudimentary or makeshift platforms or pads. The "Qassam" folder contains thirteen video files[6] that relate overwhelming to military matters, including military drills, the use of rockets of different types, and the violent armed resistance to American forces in the Middle East. The forensic analysis of that folder by the FBI revealed a 45 minute video in the "Rm_Saed" folder. That video was the last folder accessed on Mohamed's laptop on the afternoon of August 4, 2007, shortly before the traffic stop of the car he

---

[5]On August 4, 2007, the date of his arrest, Mohamed's computer was not password-protected.

[6]The file folders are separately marked as Government's Exhibit Number 3A.

11

was driving in South Carolina.  That video is an instructional  recording that relates to rockets.  It depicts, among other things, methods of  affixing a warhead to a rocket and the launching of angled rockets.  It shows angled rockets on dirt mounds.  The sputtering of rocket propellents can be heard.  There are small rockets with fuses/wire that are apparent.  Many different rockets are shown. There are assertions of claimed American atrocities and a video that shows the manufacture of rockets.  This video also shows the launching of a rocket against American troops.  Also, there are white pipes shown that look like PVC, that are being used as launching tubes.  There is a depiction of the launching of a crude rocket from what appears to be a white pipe, leaning against earthen mounds.  The video also contains scenes of rockets that are partially underground and other rockets of different levels of sophistication, including some with fuses.  There are notations in the videos that some of  the rockets depicted were being used against Americans, causing massive casualties and the destruction of an American military base.

The sections of PVC pipe filled with a potassium nitrate explosive mixture which law enforcement agents found in the trunk of the car the defendant was driving in South Carolina are smaller exemplars of these larger qassam rockets. They could be made to function in much the same way as the rockets depicted in the "Qassam" folder videos if larger in size and handled correctly. The items which police found in that trunk were thus eerily reminiscent of the nature and function of the qassam rockets which jihadists use to create terror in the Middle East and which the defendant had researched online and videos of which he saved in his laptop computer.

Also part of Exhibit Number Two is another folder from the defendant's computer

desktop.  This  folder contains approximately 80 images of photos or posters, including militants with weapons, images of leaders of the Islamic jihad, including Ayman al–Zawahiri, Ossama bin Laden, Abu Musab al-Zarqawi, and Sheikh Abdullah Azzam.  A number of these contained images of protestors stomping on images of American leaders.  See Govt.'s Ex. 2A and 6.

Also contained within Exhibit Number Two is the "bombshock" folder, a folder within the "mydocuments" folder on Mohamed's computer.  The bombshock folder includes a number of sub-folders, including folders with the following names: "chemicals_", "High-Order Explosives", Ignition-files", "Making KNO3-files", and "Acetone Peroxide."  Some of these sub-files contain further sub-files.  The "Acetone Peroxide" file contains the information on this high explosive which is summarized in Government's Exhibit One.

This evidence demonstrates that the defendant conducted research and sought to develop explosives that could be delivered  remotely, through remote-controlled detonation and through airborne delivery.

We know little of the defendant's contacts with law enforcement prior to his entry into the United States other than what he has reported. PSR at paragraph 46. Mohamed had only been in the United States since January, 2007. Yet during that time, he engaged in criminal conduct other than the limited conduct that he admitted to in his plea agreement. There is evidence, for example,  that on July 19, 2007, Mohamed went to a local WalMart store and inquired about buying a .22 rifle with a scope and a long magazine.  When the clerk asked him for identification, he produced a Florida drivers license and a USF student ID card.  The clerk asked him for more documentation of his

permanent residency in the area and gave him the ATF Form 4473 to complete. Mohamed asked to see a .22 caliber rifle and the clerk gave him one such rifle to examine and handle. As soon as the clerk did so, Mohamed took the rifle from her and placed the stock of the rifle on the floor, holding it against his leg to see how high it came up alongside his body. He then returned the rifle to the clerk. Ultimately, WalMart personnel refused the defendant's request to purchase the rifle due to insufficient documentation of residency and because he could not provide proof of legal alien residency status. Federal law prohibits, with a few limited exceptions, the possession of firearms by aliens who are either illegally present in the United States or present in the U.S. solely on a non-immigrant visa (18 U.S.C. § 922(g)(5)(A) and (B)). None of the exceptions applied to defendant Mohamed.

Mohamed returned to the store the next day and tried again to buy the rifle. He presented what the clerk viewed as very suspicious rent receipts as proof of residency. He continued to ask for a rifle with a larger magazine, but failed to produce a permanent resident card. All he could produce was a foreign passport as proof of his status and the clerk again refused to sell the rifle to him.

On July 11, 2007, Mohamed's co-defendant, Youssef Megahed, purchased a membership at a gun range and gun shop in Tampa. A range employee identified Mohamed as accompanying Megahed when he filled out the application for range membership. Megahed rented a Glock 9mm. pistol and ammunition and went into the

range to shoot it.  A witness reported observing both Mohamed and Megahed  taking turns firing the gun on that date.  This, again, would have been a violation of federal law as to defendant Mohamed.

Youssef Megahed, since he had permanent resident alien status in the United States,  was the "front man" for the attempts to purchase ammunition and firearms for that very reason.  Defendant Mohamed, as a holder of a student visa, could not lawfully possess a firearm due to his alien status.  Later, on the morning of August 4, 2007, as Mohamed and Megahed drove north from Tampa, they stopped at a WalMart in Ocala, Florida in the very early morning hours, where Megahed made another attempt to purchase a firearm.  Megahed inquired of the store employees there about purchasing a Remington 710 and a Savage 270 rifle and asked for the prices of the firearms.  WalMart personnel informed him that he could not purchase any firearms at that hour since store policy required that all weapon display cases be locked at that hour of morning. However, Megahed did record the prices of those two firearms on a piece of paper and law enforcement agents later found a slip of paper reflecting those prices inside of the Toyota in which Mohamed and Megahed  had been driving.

Mohamed admitted his passion  for the possession and use of firearms in the video recording that he made on the evening of July 24, 2007.  In that video, which he made after his detention and citation at Rowlett Park for shooting a pellet gun, he talked about his plans to go "hunting" again and to obtain a shotgun, an M-16 or a Kalashnikov.  Govt.'s Ex. 7B at 8. He talked about having "learned about weapons", having "fired real weapons" and "real bullets", and promised that "we will repeat it." Id. at 9.

On the afternoon of August 4, 2007, of course, local law enforcement officers discovered the "explosive materials" in the trunk of the car the defendant was driving. The potassium nitrate explosive mixture was contained within sections of PVC pipe. Police found another larger quantity of the potassium nitrate explosive mixture in a container in the car.  Mohamed admitted those items belonged to him and that he had made them.  Neither defendant had obtained the permit necessary under federal to transport such "explosive materials" lawfully from the Middle District of Florida to South Carolina or elsewhere. 18 U.S.C. § 842(a)(3)(A).  Mohamed has  acknowledged as much in his plea agreement.  See Plea Agreement at  9.

The over-all portrait that emerges from the sources available to the United States is that the defendant was no mere neophyte or "arm-chair" supporter of violent jihad. He had taken steps in July, 2007 to teach others how to set off remote controlled detonations from a distance; he had engaged in extensive personal research on his laptop computer and had, in fact, manufactured on his own quantities of a potassium nitrate explosive mixture; he had purchased sulfur and other products which would be useful in the manufacture of black powder and, potentially, acetone peroxide; and he had sought to possess firearms unlawfully and attempted to buy them, with the apparent aim to train in their use.

The defendant did all of these things, and others, with the background of an educated post-graduate student immersed in the religious ideology and literature of jihad and armed struggle in the Middle East. He demonstrated that he had both the knowledge and education to use the research he had been doing in explosives to manufacture some of the deadly compounds that he studied. This Court should

16

consider all of these factors about his background and history in determining what is a just and "reasonable" sentence for such an individual.

### IV. <u>"NATURE AND CIRCUMSTANCES OF THE OFFENSE"</u>

The defendant pled guilty to Count One of the Superseding Indictment, which charged a violation of 18 U.S.C. § 2339A, providing material support or resources to terrorists. One aspect of the factual support for that charge relates to the provision of "training, expert advice and assistance" as a component of "material support or resources". 18 U.S.C. § 2339A(b)(1).

Government's Sentencing Exhibit Number 5A is the "Toy to Ignitor" video which the defendant created and Exhibit Number 5B is the English translation of that video. The FBI acquired Exhibit Number 5A from the hard drive of the defendant's laptop computer. In that recording, Mohamed demonstrated and explained, in Arabic, how a remote-controlled toy could be disassembled and how the components of its chassis could be rewired and converted into a remote controlled detonator for an explosive device. In that audio/video recording, the defendant made clear that his intention was to assist "bretheren" in carrying out "martyrdom operations" that involve the murder of American soldiers. The defendant acknowledged as much in his guilty plea agreement.[7]

---

[7] On page ten of his guilty plea agreement, Mohamed agreed that " his intention in producing and distributing the recording was to support attempts by terrorists to murder employees of the United States, including members of the uniformed services, while such persons were engaged in or on account of the performance of their official duties."

17

The defendant personally uploaded that instructional video onto the Internet to make it accessible to others.  In fact, according to you Tube records, it was viewed almost 800 times before it was removed from YouTube.  Indeed, FBI agents were also able to access this video and view it online on the Internet a few days after the defendant's August 4 arrest.

Richard Stryker, an FBI explosives expert,  has examined the audio/video recording in Exhibit Number 5A and the accompanying translation.  He determined that the instruction provided by the defendant in that recording would in fact  be effective in remotely detonating an explosive device.  He did experiments to confirm that fact. Stryker's experiments to verify the effectiveness of the defendant's instructional video are depicted in the video that constitutes Government's Sentencing Exhibit Number Nine.

In evaluating the "reasonable" sentence which this Court should impose, it should also consider all of the evidence as to the nature of the offense. In addition, the ideological nature and impetus for the crime and the serious consequences of the offense are highly relevant.  Recently, the Third Circuit upheld an extensive sentence in a case involving convictions of numerous offenses, including 18 U.S.C. § 2339A. The court turned aside defense arguments as to the role of government agents in that case, as well as arguments that a lengthy prison  sentence for that defendant would do little to deter a "true terrorist" from future criminal acts.  The court there observed that even if a lengthy prison sentence were unlikely to deter a true terrorist, a lengthy prison

sentence would still serve the statutory goals of both specific and general deterrence and thus achieve the court's "sworn duty in the face of an irrational enemy".  United States v. Lakhani, 480 F.3d 171, 186-87 (3rd Cir. 2007).

How much more true is such an analysis in the instant case. The defendant herein can not blame his actions upon either entrapment or misconduct on the part of government agents, as in Lakhani. He acted entirely of his own volition and on the basis of his own plan and design. He had entered the United States on a student visa just a few months before the offense of conviction and he engaged in such conduct while having been in the United States only a very few months. A sentence of 180 months imprisonment would do much to deter a defendant such as this one and protect the community from his evil designs.

The evidence which the United States will seek to prove at the sentencing hearing herein will also demonstrate that the defendant did more than simply create and upload a video detailing the method of creating a remote controlled ignition device for others engaged in terrorism to use against "invaders" such as United States military forces. The defendant had a desire to use and train for the use of weapons and he acted upon that desire. He participated in a video recording in which he extolled the use of such weapons and made clear his desire to obtain something much more deadly than the pellet gun he used in his escapades at a local Tampa park in July, 2007.

Other evidence will establish that this defendant repeatedly sought to purchase firearms and sought to use fraudulent proof of his residency and background to buy them. He also sought to learn more about radio remote controlled model aircraft which were capable of carrying significant payload amounts. FBI investigation revealed that

19

Mohamed and another person went to a local model shop in or about July, 2007 and inquired about the use and function of such a model airplane and seemed interested in its capabilities. According to the store employee, Mohamed and his comrade were especially interested not in flying the airplane but in crashing it. FBI investigation also revealed that in addition to his vast study of rockets and rocketry (in all its either harmless or militaristic applications), Mohamed also sought to buy large quantities of fuse from a local merchant in early July, 2007. Such fuse could be used in the ignition of fireworks or the detonation of explosives.  Of further interest was the fact that Mohamed's  co-defendant, Youssef Megahed, also happened to be in possession of a radio remote controlled toy boat at the time of the two defendants' arrest on August 4, 2007. Not so coincidentally, Mohamed had, in fact, made reference to the similarity of the toy car's remote control device which he demonstrated in his video to those in other radio controlled toys such as radio remote controlled toy boats and radio remote controlled planes. Govt.'s Ex. 5B at 1.

The evidence from his own laptop computer, which law enforcement seized at the time of his arrest on August 4, 2007, also establishes that the defendant was no mere theorist insofar as an interest in explosives and explosive devices was concerned. His laptop computer's hard drive was jam packed with records of his research into explosive compounds and explosives such as acetone peroxide and ammonium nitrate.

Yet the defendant not only researched these compounds; he also made purchases at or near the time of his research which appear to reflect his desire to experiment in the manufacture of the very same deadly compounds that he was studying online. He bought hydrogen peroxide and acetone and had earlier bought

20

quantities of sulfur, potassium nitrate, a scale, and other tools which could be useful in his explosives manufacture.

All of the above evidence reflects the "true believer" quality of defendant Mohamed. His letters from jail also reflect the venomous rhetoric which impelled his actions and his researches. In the hands of someone with such virulent attitudes of hatred towards the United States and those who did not share his religious or political beliefs, such explosives and information about them posed a serious risk to the safety of the community. This Court should consider those facts in determining an appropriate sentence for this defendant.

## V.  OTHER VARIANCE FACTORS

While it is certainly true that the judicial "emancipation" of the courts from the mandatory nature of the United States Sentencing Guidelines after United States v. Booker gives this Court some freedom in fashioning an appropriate and "reasonable" sentence in a case such as this, there are certain sentencing factors which are still relatively controversial and which should not give the Court the basis to "vary" from the final adjusted guideline range contained in this Pre-Sentence Report.

One such example is the age or relative youth of a defendant. In the instant case, the defendant is 27 years old. Aside from the circumstances of his prior arrest in Egypt, he has no known prior criminal history, at least in the United States, with the exception of his encounter with the Tampa Police over his use of a pellet gun at Rowlett Park. Even that minor infraction, he turned into a political statement and used to mock law enforcement agents.

21

The defendant may seek to argue for a variance from the statutory maximum sentence of fifteen years by citing his youth. However, as the Fourth Circuit, a court which has dealt with many such types of cases and reviewed the sentences of many defendants convicted of terrorism related offenses, has noted, a court should consider the youth of a defendant only by noting any contrast between the behavior of a young defendant before the offense of conviction and his behavior afterward; if there is no such difference, his youth provides no basis for a sentencing variance or departure. United States v. Abu Ali, 528 F.3d 210, 268 (4th Cir. 2008). Indeed, as the Fourth Circuit rightly observed, a sentencing court must be careful not to allow such a sweeping " 'youth exception' " to result in a sentence that is based on broad generalized factors as opposed to individualized characteristics and circumstances. Id.

The fact that the defendant may not have accomplished his goals, to the extent that the United States is now aware, of educating and instructing others in the manufacture and use of the deadly remote controlled ignition devices he demonstrated in his 12 minute video is also not a relevant factor or a basis for departure or variance. The Fourth Circuit has recently noted that a defendant "should not receive an extreme variance because he did not actually inflict murder on a massive scale." Id. at 267. The fortuitous arrest of this defendant by Berkeley County Sheriff's Office deputies and the resulting discovery and subsequent deletion of his video from You Tube is not a factor in his favor and a basis for variance. In actual fact, it seems clear that this Court should consider, instead, the likely results of this defendant's conduct had law enforcement not

22

arrested him and thwarted his plans. <u>See also</u> <u>United States v. Lakhani</u>, 480 F.3d at 187.

Moreover, it is clear that individuals did view his video almost 800 times online and there

is no way to know how many more people might have viewed it subsequently. Those

factors all compel the conclusion that a 15 year sentence is just and reasonable.

## VI. <u>FIRST AMENDMENT IMPLICATIONS</u>

The charge contained in Count One of the superseding indictment relates, in part,

to defendant Mohamed's creation and ultimate distribution of the "do it yourself" type

instructional recording which he made in or about July, 2007.  In that video recording,

which he ultimately uploaded to the world wide web on or about July 31, 2007, he

appeared and gave advice and instruction as to the manufacture of a radio remote

controlled system for the ignition and/or detonation of an explosive or other similar

destructive device.  Mohamed instructed listeners on how to manipulate a toy car's

circuitry to supply electricity "to produce a detonation."  Govt.'s Ex. 5B at 1.  He further

showed modifications of the remote control in a way that  "it will ignite the detonator" and

thus "make an explosion from a distance".  <u>Id.</u> at 3.  The purpose of the modifications he

demonstrated in the video was that "[i]nstead of the brethren going to, to carry out

martyrdom operations, no, may G-D bless him, he can use the explosion tools from

distance and preserve his life...for the real battles".  <u>Id.</u>  at 1.  He said his effort would aid

a "brother" to carry out operations but not end up by "blowing himself up."  <u>Id.</u> at 3.

Mohamed meant by this modification to save Muslim lives so that they would be

available for the "real battles".  <u>Id.</u> at 1.  He made clear in his narration and

demonstration that this was not merely a theoretical video but a practical one; he even

stated that he would make further videos which would show how to increase the range of

this type of remote control detonation device.  <u>Id.</u> at 3.

23

In a post-arrest statement on August 29, 2007, Mohamed further explained the reason for the recording and for uploading it to the world wide web. In that interview, he admitted that he had made the video so that "those brothers" in Arabic countries could use that knowledge against the infidels and invaders of their countries. He further identified American military forces as among that category of targets.

The jurisprudence of the First Amendment to the Constitution does place some restrictions upon the proper criminalization of speech-type conduct under the holding of Brandenburg v. Ohio, 395 U.S. 444 (1968). However, the limitations which emerge from Brandenburg do not extend nearly so far as to defeat the application of the criminal law to violations of statutes such as 18 U.S.C. § 2339A.

In Brandenburg, the Court made clear that the First Amendment protected the " 'mere abstract teaching...of the moral propriety or even moral necessity for a resort to force and violence' ".   Brandenburg v. Ohio, 395 U.S. 444, 448 (1969) (quoting Noto v. United States, 367 U.S. 290, 297-97 (1961)).  However, the Court made quite clear that the Constitution did not protect conduct such as where "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 447.  The Court consistently drew the distinction, for purposes of the First Amendment, between "mere advocacy" as opposed to "incitement to imminent lawless action". Id. at 449.  The former could not be subject to criminal prosecution; the latter clearly could.  In later striking down a conviction under an Indiana statute, the Supreme Court noted that a criminal statute would pass constitutional muster if the evidence or

24

"rational inference from the import of the language" used by the speaker indicated that the words "were intended to produce, and likely to produce, imminent disorder". Hess v. Indiana, 414 U.S. 105, 109 (1973).

Similarly, in analyzing other statutes under the lens of the First Amendment, courts have made clear that the use of language and speech as an element of the acts which a criminal statute outlaws does not automatically subject such statutes to constitutional challenge under the First Amendment. In a recent analysis of 18 U.S.C. § 842(p)(2)(A), for example, a statute which made it a federal crime to distribute information relating to explosives and weapons of mass destruction, the court relied upon the history and the background to the drafting and passage of that statute in rejecting a First Amendment challenge. United States v. Coronado, 461 F. Supp.2d 1209, 1210-11 (S.D. Calif. 2006).

In the instant case, the same analysis would apply and would yield the same result. From his own words in the recorded video and in his post-arrest statements, it is clear that the intent of this defendant was not simply to teach or demonstrate the creation of a radio remote controlled ignition or detonation system as an academic exercise. The defendant made that video with the intent to give "instruction or teaching designed to impart a specific skill" intending it to be used in aid of the crimes set forth in Count One. 18 U.S.C. § 2339A(b)(2). His uploading of that video to You Tube and expressed intent to share it with a wider worldwide audience on the world wide web took his actions outside of the scope of "mere advocacy" and placed it squarely within the realm of "incitement to imminent lawless action". Brandenburg v. Ohio, 395 U.S. at 449.

## VII.  DETERRENCE TO CRIMINAL
CONDUCT/PROTECTION OF THE PUBLIC

As all of the above information makes clear, the actions of this defendant, both those which formed the basis for the charge in Count One and his other actions which formed the basis of the other charges in the superseding indictment, represented serious and dangerous conduct which threatened the safety of the community. This defendant was researching methods of manufacturing high explosives and the possible mechanisms to deliver those explosive and detonate them remotely. He was not only learning about these subjects; he was imparting that knowledge and skill to others online. He made use of his education and advanced degree to aid in this nefarious research and development. At the same time, he was seeking to obtain firearms unlawfully and train in their use.  All of these things he did while demonstrating a virulent and violent hatred of the United States and of all who did not share his belief system and ideals. This Court can not and should "not lose sight of the immensity and scale of wanton harm that was and remains [this defendant's] plain and clear intention."  United States v. Abu Ali, 528 F.3d at 269.

The total picture which emerges from a review of Mohamed's entire persona and actions is one of a person devoted to armed struggle and the use of dangerous weapons against those he opposed. He had the knowledge, the ability, and the skill to research and carry out his plans and schemes. The fortuitous interference of local South Carolina law enforcement on the afternoon of August 4, 2007 no doubt prevented future events that could have been catastrophic to the safety and security of the public. In such a case, the "penological goal of specific deterrence" provides ample reason for the imposition of

26

the statutory maximum sentence here. <u>United States v. Lakhani</u>, 480 F.3d at 187. Such a sentence, at the very least, will ensure that this defendant will never again be free to provide material support to terrorists during the period of his incarceration.

VIII.  <u>CONCLUSION</u>

For all of the above reasons, the United States respectfully submits that the sentencing criteria set forth in 18 U.S.C. § 3553(a)(1) all compel this Court to arrive at only one just and reasonable sentence in this case- the Guideline prescribed sentence of 180 months imprisonment.

Respectfully submitted,

A. BRIAN ALBRITTON
United States Attorney

By:    *s/ Jay L. Hoffer*
JAY L. HOFFER
Assistant United States Attorney
Florida Bar Number 0910708
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
Telephone:   (813) 274-6318
Facsimile:    (813) 274-6178
E-mail:  Jay.Hoffer@usdoj.gov

By:    s/ Robert T. Monk
ROBERT T. MONK
Assistant United States Attorney
USA 026
400 North Tampa Street, Suite 3200
Tampa, Florida   33602
Telephone:   813-274-6103
Facsimile:     813-274-6178
E-mail: robert.monk@usdoj.gov

27

**U.S. v. Ahmed Abdellatif Sherif Mohamed**          **Case No. 8:07-CR-342-T-23MAP**

## CERTIFICATE OF SERVICE

I hereby certify that on November 4,  2008, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Linda G. Moreno
P.O. Box 10985
Tampa, Florida   33679

Lyann Goudie
400 North Ashley Drive, Suite 2180
Tampa, Florida 33602

*s/Jay L. Hoffer*
JAY L. HOFFER
Assistant United States Attorney
Florida Bar Number 0910708
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
Telephone:   (813) 274-6318
Facsimile:     (813) 274-6178
E-mail:  Jay.Hoffer@usdoj.gov

N:\_Criminal Cases\M\Mohamed, Ahmed Sherif_2007R01848_JLH\p_Sentencing Memorandum_MOHAMED.wpd