1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION

3    UNITED STATES OF AMERICA

4          vs.            CASE NO. 8:07-cr-342-T-23MAP
                          December 18, 2008
5                         Tampa, Florida

6

    AHMED ABDELLATIF SHEFIF MOHAMED,
7
          Defendant.
8
    ********************************************************
9         TRANSCRIPT OF EXCERPT OF PROCEEDINGS
                  SENTENCING HEARING
10     BEFORE THE HONORABLE STEVEN D. MERRYDAY
              UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Government:   ROBERT MONK
13                        JAY HOFFER
                          Assistant U.S. Attorneys
14                        400 N. Tampa Street, Suite 3200
                          Tampa, Florida 33602
15                        813/274-6000

16   For the Defendant:   LINDA MORENO
                          Attorney at Law
17                        P.O. Box 10985
                          Tampa, Florida 33679
18                        813/247-4500

19                        LYANN GOUDIE
                          Attorney at Law
20                        400 N. Ashley Street, Suite 2180
                          Tampa, Florida 33602
21                        813/413-2424

22   Court Reporter:      Kerry Mercade
                          801 N. Florida Avenue
23                        Suite 15A
                          Tampa, Florida 33602
24                        813/301-5024

25   Proceedings recorded and transcribed by
     computer-aided stenography.

1   Also Present:          Margo Tobgui
                           Arabic Interpreter
2

3
                        **GOVERNMENT'S EXHIBITS**
4

5      **Number**      **Description**                      **Page**

6      1A          Mohamed Internet Summary.......30
       1B          Excerpts of websites...........25
7      1C          Home Depot purchase records....29
       1D          Wal-mart purchase records......28
8      2A          Mohamed desktop depiction......17
       2B          Excerpts of "Bomb Shock".......23
9      3A          Qassam disk....................18
       3B          Qassam disk translations.......18
10     3C          Qassam disk translation (Saed).19
       4A          Camcorder videos...............43
11     4B          Camcorder videos translation...43
       5A          Toy-to-ignitor video...........10
12     5B          Toy-to-ignitor translation.....10
       5D-H        Excerpts of video..............20
13     6           Jihadist material (laptop).....22
       7A          Poem (laptop)..................10
14     7B          Translation of poem............10
       8           Excerpts of letters from jail..34
15     10          Mohamed visa application.......32

16

17

18

19

20

21

22

23

24

25

1    (Excerpt of proceedings as follows:)

2       MR. MONK:  Good morning, sir.  When ruling on

3    the upward adjustment, the 12-level upward

4    adjustment, the Court said that there an explicit

5    issue and an implicit or deferred issue.  That's what

6    we're addressing at this point.  With the -- I

7    believe with the consideration of the 18 U.S.C. §

8    3553 factors, that statute addresses imposition of

9    sentence in criminal cases.  Subsection (a) sets

10   forth the factors the Court should consider in

11   imposing a sufficient sentence.  Those factors

12   include the nature and circumstances of the offense

13   and also the history and the characteristics of the

14   defendant himself.

15       There is one regard in which Ms. Moreno, the

16   defense, and the Government are in complete

17   agreement.  That is the Court in determining what the

18   sentence should be in this case should consider the

19   whole defendant, that is the history and

20   characteristics of the defendant himself.

21        The sentencing factors also include the need to

22   provide deterrence and to protect the public from

23   further crimes and to reflect the seriousness of the

24   offense.

25        I'd submit that this morning, Your Honor, the

1      Court is ultimately going to have before it arguments

2      presenting two very different portraits of Ahmed

3      Mohamed.  The defense's characterization is of

4      aberrant behavior, lack of prior record.  The

5      Government believes that the evidence shows that the

6      defendant is an individual who is violent, who

7      embraces a violent and extreme ideology, and who

8      warrants the sentence set forth in the updated

9      presentence report, that is the 15-year statutory

10     maximum sentence.

11         I'll make a couple of comments a little bit out

12     of order only because they have just been mentioned a

13     few minutes ago.  There were -- part of our proffer

14     will be that there were a total of 782 views of Mr.

15     Mohamed's video on YouTube before it was taken down.

16     Ms. Moreno has asserted that everything that Mr.

17     Mohamed did was transparent.  Well, when he uploaded

18     -- when he created, produced, uploaded that video,

19     you'll see that very much of what he did was not

20     transparent.  As we watch the video itself, he's

21     wearing latex gloves.  The video shows the operation

22     he's performing on the toy car, the remote controlled

23     car, but it doesn't show Mr. Mohamed's face.  Mr.

24     Mohamed carefully keeps his face off of camera.  In

25     order to have uploaded that video onto YouTube, Mr.

1    Mohamed was required to register with YouTube, to

2    provide an email address.  He didn't use the existing

3    email address he had.  Right before he registered, he

4    created a brand new email address for himself using

5    the name Michael Gibral (ph).  Then the information

6    that was required on the registration statement, name

7    and address, he provided fictitious information.

8         Mention was made of the trust that has been

9    given by USF, his employer, to Mr. Mohamed.  By way

10   of proffer, I'd say that trust was repaid in part by

11   the fact that Mr. Mohamed used the USF facilities,

12   the engineering building, in order to upload that

13   video after hours and late at night to upload it onto

14   YouTube.

15        As far as the assertion that nobody's been

16   hurt, nobody's been killed, there is no evidence that

17   anybody else, any of those instances in which others

18   accessed the toy-to-ignitor video, downloaded it.

19   The fact of the matter is, Judge, we wouldn't know.

20   We wouldn't know and we can't know whether or not

21   someone else downloaded that video from YouTube.  It

22   was certainly downloadable.  But the forensic

23   analysis that was available on Mr. Mohamed's computer

24   would not -- in the YouTube analysis would not

25   disclose whether or not anyone else decided to

1    download that video.  Of course, unless the evidence

2    came from some other direction, we also wouldn't know

3    whether anyone acted on the instructional video that

4    Mr. Mohamed created.

5        The information that is set forth in the

6    presentence report and the information that we will

7    provide you to you in brief today will include

8    reference to videos that Mr. Mohamed had on his

9    computer, research that he conducted into explosives

10    that were taken from his computer, and also his

11    statements, statements to the FBI, statements in

12    letters from jail, statements in a poem that he

13    wrote.  Together we believe are going to show this

14    whole person was an individual who was committed to

15    the use of violence to further his extreme views.

16        The evidence will indicate that he has a

17    particular dislike for Americans.  He has expressed

18    that opinion in a number of conversations and

19    letters.  "Americans are pigs.  Americans are stupid.

20    Americans are easily deceived."  And he even provides

21    boastful examples of how he has deceived Americans.

22    "Americans," he said, "are scum."

23        Mr. Mohamed conducted research into the

24    construction of very dangerous explosive materials.

25    He actually acquired components, constituent

1    components of those explosives, we submit, for use
2    against the United States.
3         I will begin by referring to what has been
4    marked as Government's proposed Exhibit 7, 7 A, and 7
5    B, which is a poem that was acquired forensically
6    from Mr. Mohamed's computer.  At this time I'd move
7    for admission into evidence.  I do not intend to
8    publish these, Your Honor, but I'd move for their
9    admission at this time.
10        MS. GOUDIE:  Your Honor, once again, we do not
11   object to the poem coming in and suggesting that it
12   came from Mr. Mohamed's laptop, nor that he wrote it.
13   We're objecting as to the relevancy as far as the
14   sentencing today.
15        THE COURT:  Well, I understand that the defense
16   gives challenge to genuineness and authenticity, but
17   objects based presumably on relevancy and its 403
18   component, which is overruled.
19        Mr. Monk?
20        MR. MONK:  Thank you, Your Honor.  For the
21   record, 7 A is the Arabic of this poem; 7 B is the
22   English translation.  And the forensic analysis of
23   the computer, Judge, indicates that this poem was
24   created on Mr. Mohamed's HP laptop February 10th of
25   2007.  That's important, Your Honor, because Mr.

1    Mohamed applied for and was admitted to the United

2    States on an F-1 Student Visa, came to the United

3    States on January 1st of 2007.  That's when he landed

4    in the U.S, January 1st.  This poem was created on

5    his laptop a little more than a month later.  We

6    would submit that the sentiments expressed in this

7    poem, if in fact it's Mr. Mohamed's product, indicate

8    the state of mind with which he came to the United

9    States and entered this country.  In this poem -- we

10   know that he authored it, Your Honor, because in it

11   he makes reference to his ex-wife Tatyana.

12       In his interview with the probation department

13   of Paragraph 1 of the presentence report, Mr. Mohamed

14   acknowledges that Tatyana was his ex-wife.

15       In this poem, one aspect of its three dozen or

16   so lines is that he asks the Lord to heap bad things

17   on his ex-wife Tatyana.

18       He also -- in the 37 lines of the poem, it's

19   clear that it is political and it is religious in

20   nature.  He exalts Jihad and the cause of God and he

21   refers to violent terrorists as his exalted

22   companions.  He specifically includes the individual

23   that Ms. Moreno named, Abdullah Azam (ph), as one of

24   his exalted companions.  He names Osama Bin Laden as

25   one of his exalted companions, as well as others.

1    The other individuals he names in the catalog of

2    exalted companions, I would proffer to the Court, are

3    also individuals who embrace violent and

4    anti-American ideologies.

5        In addressing God in this poem, Mr. Mohamed

6    states, "You destined my imprisonment before."  And

7    out of the quotation, parenthetically, Your Honor,

8    Mr. Mohamed had been imprisoned in Egypt and he has

9    acknowledged that.

10       "You destined my imprisonment before, so I seek

11   refuge in you from repeating it.  My neck," that is

12   my life, "is for you.  Accept it as an offering by

13   the doors of your ceased Al-Aqsa."  Al-Aqsa, the

14   mosque in Jerusalem.

15       If the Court looks at this poem and

16   particularly that passage that I just cited, it

17   strongly implies a sense that Mr. Mohamed is relating

18   in his prayer, if you will, to God that his behavior

19   in the future, his impending behavior, may put him at

20   risk of imprisonment and he's asking the Lord to

21   prevent that from recurring.  That's 7 A and 7 B,

22   Your Honor.

23       Since I touched on --

24       THE COURT:  If I didn't say so, 7 A and B are

25   received.

1       (Government's Exhibit Nos. 7A and 7B are

2   received into evidence.)

3       MR. HOFFER:  Since I touched on the

4   toy-to-ignitor video, Your Honor, that has been

5   marked as Government's proposed Exhibit 5 A, and

6   translation of that is proposed Exhibit 5 B.  I'd

7   move for admission into evidence of 5 A and 5 B at

8   this time.

9       MS. GOUDIE:  No objection.

10      THE COURT:  5 A and 5 B are received on behalf

11  of the United States.

12      (Government's Exhibit Nos. 5A and 5B are

13  received into evidence.)

14      THE COURT:  Are you going to now show that, Mr.

15  Monk?

16      MR. MONK:  With the Court's permission.

17      THE COURT:  May I see the translation in English

18  first for a moment?

19      MR. MONK:  Yes, Your Honor.  Your Honor, the

20  English translation -- the video itself is in Arabic;

21  however, we have in 5 A dubbed onto the video English

22  subtitles so that the Court can watch the video and

23  see the English at the same time.

24      THE COURT:  Understood.  Thank you.

25      I would like everyone in the courtroom to remain

1    seated, please, while this room is darkened.

2        You may proceed.

3        MR. MONK:  Thank you, Your Honor.

4        (Government's Exhibit 5 A is played in open

5    court.)

6        THE COURT:  Mr. Monk?

7        MR. MONK:  Your Honor, I'd note a couple of

8    things.  First of all, the table on which Mr. Mohamed

9    was conducting the demonstration was identified

10   during the course of the investigation by Mr.

11   Mohamed's landlady Paulette Poliquin as being the

12   furniture in the bedroom in her house that she leased

13   to him.

14       During the course of the demonstration --

15       THE COURT:  His house here in Tampa or his

16   rental house?

17       MR. MONK:  That's correct.  2107 Needro (ph) in

18   Tampa in the area of USF.

19       On the video that we just watched, Mr. Mohamed

20   makes reference to future lessons and greater

21   distances to be achieved.

22       I'll also proffer to the Court that part of the

23   evidence acquired by the Government during the course

24   of this investigation was that Mr. Mohamed went to a

25   store that sells models, including model cars, model

1    airplanes, including remote controlled airplanes.  He

2    and the other individual who accompanied him asked to

3    see remote controlled airplanes, and they were asked

4    whether they would like to receive some instruction

5    in flying, being able to take off and land the plane,

6    and the response that Mr. Mohamed's companion at that

7    time gave was that they were not interested in

8    learning how to fly the plane since all they wanted

9    to do was simply blow it up.

10        Now, I'll also note in connection with this

11   video that when the video was created for uploading

12   and viewing onto YouTube, the producer and the person

13   uploading it is able to identify what is known as

14   tags, key words, that will attract those individuals,

15   a target audience, if you will.  One of the tags that

16   Mr. Mohamed selected to be used in connection with

17   his video was the word "martyrdoms."  YouTube at the

18   time and I believe today was owned by Google, so key

19   words typed into Google will produce YouTube videos

20   as well as other written and other references to the

21   key word.

22        Now, I'll also note, Your Honor, that the

23   evidence in this case acquired shows that after Mr.

24   Mohamed made this video he returned this car to

25   Wal-mart for a credit.

1          Next --

2          THE COURT:  Mr. Monk, if you are going onto

3     another topic, we've been in session about an hour

4     and 45 minutes, perhaps we should take a short

5     recess --

6          MR. MONK:  Yes, Your Honor.

7          THE COURT:  -- and then we'll return.  We'll be

8     in recess for a few minutes.  If the marshals will

9     let me know when you've returned the defendant.

10          THE COURT SECURITY OFFICER:  All rise.

11          (Recess from 10:08 a.m. until 10:29 a.m.)

12          THE COURT:  Mr. Monk?

13          MR. MONK:  Thank you, Your Honor.  One

14     reasonable question is whether the instruction that

15     Mr. Mohamed gave on that instructional video would

16     actually work, and I'm representing to the Court that

17     in a proffer that you'll hear from Mr. Hoffer in a

18     little while Supervisory Special Agent Richard

19     Stryker, a bomb technician and examiner at the

20     examination unit at Quantico, actually tested out the

21     instruction that Mr. Mohamed gave and it in fact

22     works.

23          Now I'll shift gears a little bit with the

24     Court's permission and just add a little bit of

25     context.  I want to go back to the genesis, so to

1    speak, of the investigation and remind the Court on

2    August -- as set forth in the presentence report, on

3    August 4th of 2007, a deputy with the Berkeley County

4    Sheriff's Office in South Carolina stopped the

5    automobile that Mr. Mohamed was driving, a Toyota

6    Camry, for speeding in Goose Creek, South Carolina.

7        Mr. Mohamed did not stop the vehicle

8    immediately but continued on for a distance.  As the

9    deputy approached the car, he observed the passenger

10    in the car disconnecting some power cords from a

11    laptop which were thrown into the back seat of the

12    car.  That laptop computer turned out to be Mr.

13    Mohamed's HP laptop computer.

14        When the occupants of the vehicle were

15    questioned, the deputy became suspicious because of

16    the responses that they gave, and the car -- the

17    automobile was ultimately searched by consent that

18    was given.

19        Pursuant to that consent to search, law

20    enforcement officers found a number of things in the

21    trunk and also in the passenger compartment of the

22    car.  In the trunk they found a number of sections of

23    what turned out to be PVC pipes that they suspected

24    might be some type of pipe bomb.  Bomb experts came

25    to the scene, evaluated the items.  The items were

ultimately found to contain a potassium nitrate

mixture, a low explosive consisting of an oxidizer,

that is the potassium nitrate, and a fuel, either

sugar or Karo Syrup.  That mixture was compacted

between kitty -- cat litter plugs.  Also found in

that car in the trunk was about 20 feet of safety

fuse, an electric drill, a five-gallon gas can that

was about half full.  In any event, it had an amount

of gasoline in it.  Inside the passenger compartment

of the vehicle they found a plastic container

containing additional potassium nitrate explosive

mixture, a box of .22 caliber ammunition, four

cigarette lighters, and Mr. Mohamed's laptop.

Now, during the investigation, the agents were

to an extent able to reconstruct Mr. Mohamed's travel

itinerary through an analysis of a global positioning

system and also through receipts of purchases that

Mr. Mohamed and his travelling companion made.  I'll

proffer to the Court that the investigators

determined from that analysis that Mr. Mohamed left

the Tampa area some time after midnight on August

4th, 2007, stopped in Ocala where Mr. Mohamed's

travelling companion attempted to purchase two

high-powered rifles at Wal-mart at three o'clock in

the morning.  One was a Savage .270 caliber and the

1    other a Remington 710.  The salesperson refused to

2    sell the rifles.  The travelling companion purchased

3    a power inverter and the global positioning system.

4         They then stopped again at a Wal-mart in

5    Jacksonville at 7:15 in the morning where Mr. Mohamed

6    purchased an electric drill and his travelling

7    companion purchased rifle cleaning materials as well

8    as floor mats and seat covers.

9         Now, when the HP laptop, Mr. Mohamed's laptop,

10   was seized, an exact copy of the original hard drive

11   was made.  And although Mr. Mohamed in fact

12   acknowledged that it was his computer, there are also

13   other indicia that it was in fact and it is in fact

14   his computer, aside from his admissions, including

15   USF work-related files that were found on the

16   computer.

17        The FBI did conduct a forensic analysis and

18   that review disclosed a large number of files on the

19   computer containing information relating to the

20   manufacture and use of bombs, rockets, and other

21   explosives.

22        With the Court's permission, I've marked as

23   proposed Exhibit 2 A, a visual depiction of Mr.

24   Mohamed's desktop, which I would move for admission

25   into evidence at this time.

1        THE COURT:  Hearing no objection --

2        MS. GOUDIE:  No objection, Your Honor.

3        THE COURT:  -- Exhibit 2 A is received on behalf

4   of the United States.

5        (Government's Exhibit No. 2 A is received into

6   evidence.)

7        MR. MONK:  With the Court's permission, if we

8   could switch over so I could use the DOAR briefly?

9        THE COURT:  Yes, sir.  Mr. Watts?

10       MR. MONK:  Depicted here on the first page of 2

11  A is Mr. Mohamed's desktop on his laptop computer.

12  When you open the computer up, this is what is

13  depicted on his desktop.

14        In the second row over to the right, the second

15  or third file folder from the end is a file folder

16  labelled "Qassam," Q-A-S-S-A-M.  Your Honor, the

17  "Qassam" file was not and the computer itself was not

18  password protected.  The second page also on -- also

19  of pertinence on this first page, if we take a look

20  at the top row to the left, there is a file that is

21  really unnamed.  We could refer to it as the

22  underscore file.  And if we click on the "Qassam"

23  file folder -- this is Page 2 of 2 A.  If we take a

24  look in the upper left-hand corner, you see we go

25  from desktop to "Qassam."  If we click on the

1    "Qassam" file folder, what we get to are 13 videos.

2    That first item in the upper left that looks like

3    it's entitled "$130" is not a video.  But within the

4    "Qassam" folder are 13 videos.

5        Now, proposed Exhibit 3 A is a disk containing

6    those 13 videos, which I'm going to move for

7    admission into evidence but not publish.  They're

8    cumulatively too long.

9        Exhibit 3 B are written translations of the

10   videos in 3 A.  I will similarly move for admission

11   of those at this time.

12   MS. GOUDIE:  Your Honor, we have the objection

13   that we've previously noted:  Not that this was not

14   on the computer, but as to the relevancy and the

15   materiality as it relates to the sentencing today.

16   THE COURT:  Exhibit 3 A and 3 B are received on

17   behalf of the United States and the objection is

18   overruled.  I'm not ruling that it has any particular

19   level of relevance, but it's genuine and authentic

20   and relevant enough for admissibility under these

21   circumstances.

22       Mr. Monk?

23       (Government's Exhibit Nos. 3 A and 3 B are

24   received into evidence.)

25       MR. MONK:  Yes, Your Honor.  The longest of

1     those 13 videos is in proposed Exhibit 3 C.  That is

2     the Saed video which is in the second row up there,

3     the second from the right, the Saed video.  That's

4     about 45 minutes in length.  The forensic analysis

5     that was conducted resulted in a determination that

6     that approximately 45-minute video was the last thing

7     that was accessed on Mr. Mohamed's computer before

8     the stop by the Berkeley County Sheriff's Office on

9     August 4th.  It was accessed about 45 minutes I

10    believe before the stop.  So I move for admission

11    into evidence of 3 C.  3 C is -- I'm sorry, the

12    translation of the Saed video that is in 3 A.  I'm

13    not going to publish that either.

14       MS. GOUDIE:  Same objection, Your Honor.

15       THE COURT:  I persist in my ruling and Exhibit 3

16    C is received on behalf of the United States.  So the

17    video appears as one of the 13 sub files in Exhibit 3

18    A?

19       (Government's Exhibit No. 3 C is received into

20    evidence.)

21       MR. MONK:  Yes, Your Honor.

22       THE COURT:  And 3 B is a translation?

23       MR. MONK:  Correct.

24       THE COURT:  Or interpretation.  And 3 C is also

25    a translation?

1           MR. MONK:  Correct, Your Honor.

2           Now, Exhibits 3 D, E, F, G, and H are very, very

3    short excerpts from 3 A, from the various -- from

4    several of the Qassam videos in 3 A.  And all

5    together, the excerpts in 3 D, E, F, G, and H will

6    take no more than approximately 14 minutes to

7    publish.  With the Court's permission, I'd move for

8    admission of those excerpts and ask for permission to

9    publish them.

10          MS. GOUDIE:  Your Honor, same objection.

11          THE COURT:  I take it they are excerpts from

12   previously admitted material, so in effect they are a

13   form of exhibit, but we will receive them in the form

14   that they are offered.  I persist in my ruling with

15   respect to the objection.

16          Mr. Monk?

17          MR. MONK:  Yes, sir.

18          THE COURT:  You may proceed.

19          (Government's Exhibit Nos. 5 D, E, F, G, and H

20   are received into evidence.)

21          (Government's Exhibits 5 D, E, F, G are played

22   in open court.)

23          MR. MONK:  Your Honor, may I proceed?

24          THE COURT:  You may, sir.  I think again

25   referring to the proffer relating to Richard Stryker,

1    I mentioned because we just looked at excerpts of

2    videos in the Qassam rocket folder, the Qassam rocket

3    is in effect what one might refer to as a poor man's

4    rocket used in the Middle East.  It's a crude-type

5    rocket.  The sort of propellant that could be used to

6    propel Qassam rockets are mixtures very close to

7    potassium nitrate, the sorts of mixtures found in the

8    trunk of the vehicle.

9        Next, if we could turn back and use the DOAR,

10    please?  I'm again referring to 2 A.  The Court will

11    note that the top left, what's clicked on, if we

12    click on the underscore file on the top line, second

13    from the left, on the very next page of Mr. Mohamed's

14    laptop, that takes us to this file.  We click on that

15    file, it takes us to the auto play file.

16        THE COURT:  As you are speaking, you're

17    referring to which exhibit?

18        MR. MONK:  I'm sorry, Your Honor, 2 A.  The auto

19    play file, if we click on that, brings up this number

20    of folders.  And if we then click on the images file

21    on this page, this brings up a number of marshal

22    anti-American videos, posters.

23        What we've got marked as proposed Exhibit Number

24    6 are excerpts from this page here.  Proposed Exhibit

25    Number 6 are a number of websites found on Mr.

 1    Mohamed's computer.  The excerpts are of prominent

 2    individuals, Jihadists, that include quotations about

 3    armed struggle, engaging in Jihad.  They include

 4    visual depictions of martyrs and anti-American

 5    photos.  I'm not going to publish this, but I move

 6    for admission into evidence of proposed Exhibit 6.

 7         THE COURT:  Without objection, Exhibit 6 --

 8         MS. GOUDIE:  Actually, it's the same objection,

 9    Your Honor.  My client was talking to me, but it's

10    the same objection as I've made.

11         THE COURT:  All right.  I persist in my ruling

12    and Exhibit 6 is received on behalf of the United

13    States.

14         (Government's Exhibit No. 6 is received into

15    evidence.)

16         THE COURT:  What we are looking at, Mr. Monk, is

17    page something of Exhibit 2 A?

18         MR. MONK:  That's correct.

19         THE COURT:  I'm not sure which page it is, but

20    it has, as I see it, a number of what appear to me to

21    be thumbnails, as we say.  If I understand, if we had

22    the laptop and clicked on one of these numbered

23    "thumbnails," we would get a single image or a video?

24         MR. MONK:  I believe a poster, Your Honor.

25         THE COURT:  I see.  Just an image and not a

1    video presentation.

2         MR. MONK:  That's correct.  And Exhibit 6 are

3    excerpts from this page.

4         THE COURT:  Okay.

5         MR. MONK:  Next, Your Honor, the forensic

6    analysis that was conducted of Mr. Mohamed's laptop

7    computer also revealed that his computer contained

8    records of searches that someone conducted on that

9    laptop, searches on the Internet for information

10   relating to explosive materials, including ammonium

11   nitrate, which can be used in combination with other

12   materials to create a high explosive; research into

13   information relating to acetone peroxide, which is a

14   primary high explosive; a file on high order

15   explosives; information, research about fuses, black

16   powder, and the making of potassium nitrate.

17         Proposed Exhibit 2 B is an exhibit that

18   contains excerpts from a file on Mr. Mohamed's

19   computer that he called or titled "bomb shock."  I

20   move for admission into evidence proposed Exhibit 2 B

21        MS. GOUDIE:  Same objection, Your Honor.

22        THE COURT:  I persist in my ruling.  Exhibit 2 B

23   is received on behalf of the United States.

24        (Government's Exhibit No. 2 B is received into

25   evidence.)

1      MR. MONK:  Now, I mentioned a minute ago that

2    acetone peroxide is a primary high explosive, and if

3    we take a look at 2 B, the first page in the upper

4    left -- well, there are numerous references to

5    acetone peroxide, bomb shock, chemicals, high order

6    explosives on Page 1.

7      On Page 2, if we click in the upper left-hand

8    portion, that file entitled "acetone peroxide," it'll

9    take us to this next page.  If we click on that icon

10    entitled "acetone," it will take us to this photo

11    that Mr. Mohamed had on his computer.

12      Now, in one of the letters that we'll reference

13    in a little while, Mr. Mohamed talks about being able

14    to fashion weapons from items that are easily

15    acquired.  Acetone peroxide, a high explosive, the

16    proffer relating to the chemist will disclose is a

17    high explosive that really can be created without too

18    much difficulty from several commonly available,

19    commonly available, ingredients, one of which is

20    acetone, commercially available here.

21      The next page of 2 B.  We click on the icon for

22    hydrochloride or hydrochloric acid, it takes us to a

23    picture that Mr. Mohamed had on his laptop of

24    muriatic acid, which can be used in the manufacture

25    of acetone peroxide.

1          Then the third primary ingredient, if we click

2     on the peroxide icon on his computer, there is a

3     picture of a bottle of commercially available

4     hydrogen peroxide.

5          Exhibit 1 B, proposed Exhibit 1 B, Your Honor,

6     are excerpts from the Internet history on Mr.

7     Mohamed's laptop.  These are printouts of various

8     websites that Mr. Mohamed visited.  I move for

9     admission into evidence.  I'm not going to publish,

10    but move for admission into evidence of proposed

11    Exhibit 1 B.

12         MS. MORENO:  Your Honor, could we just see that

13    very briefly?

14         THE COURT:  You may.

15         (Pause.)

16         MS. GOUDIE:  Same objection, Your Honor.

17         THE COURT:  Thank you.  I persist in my ruling

18    and Exhibit 1 B is received on behalf of the United

19    States.

20         (Government's Exhibit No. 1 B is received into

21    evidence.)

22         THE COURT:  I know that this is clear to

23    counsel.  I'm not sure that it is clear to all

24    present, but the United States would be entitled to

25    proffer any evidence into the record even if

1    excluded.  It would be seen by the Court and all

2    present without respect to any ruling on its

3    admissibility.  So there is no implicit statement of

4    the extent of its relevance or pertinence, or as to

5    what issue it's pertinent, based upon its receipt

6    into evidence, particularly in a format where there

7    is no jurors present.

8         Anyway, Mr. Monk?

9         MR. MONK:  Yes, Your Honor.  Going back to 2 B

10   for a moment.  The ninth page of this exhibit, if we

11   click on the "bomb shock/acetone peroxide" icon, the

12   very next page, Mr. Mohamed has a page containing the

13   menu or formula for making acetone peroxide.

14        THE COURT:  Just turn it right side up, Mr.

15   Monk.  You had it from my vantage sideways.  I see.

16   Okay.  Thank you.

17        MR. MONK:  Now, with respect to 1 B which has

18   just been admitted into evidence, some of the

19   information in 1 B includes the formula for making

20   black powder, information relating to the components

21   of explosives including gunpowder, an article about

22   the history of rockets, an article instructing how to

23   make black powder.  There is a nine-page article that

24   discusses how to make acetone peroxide, a packet of

25   materials concerning rocketry, including a 21-page

1     article on the history of rockets, including their

2     history, use in military matters, and other matters.

3          Now, next, with the Court's permission, take a

4     look at the one series of exhibits.  I move for

5     admission into evidence of proposed exhibit -- I'll

6     first identify what they are, Your Honor.  Proposed

7     Exhibit 1 B are records concerning purchases.  I'm

8     sorry, this is 1 D.

9          THE COURT:  We have a 1 B, I think, already.

10         MR. MONK:  Yes, 1 D, as in David, is a

11    multi-page document that includes -- well, it is a

12    spreadsheet relating to purchases at Wal-mart.  It is

13    a summary schedule relating to purchases that were

14    made at Wal-mart.  This summary schedule was put

15    together by Karen Allen, a financial analyst with the

16    Florida Department of Law Enforcement.  These are

17    purchases from Wal-mart made by either Mr. Mohamed or

18    his travelling companion.

19         MS. GOUDIE:  Your Honor, I would have the same

20    objection.  In addition to that, as far as anything

21    that is concerning Youssef Megahed, I would once

22    again submit to the Court that it's not delineated in

23    this particular spreadsheet.  For the Court's

24    consideration as to Mr. Mohamed, there is no

25    delineation of which purchases that I can see -- I'm

1    beginning to see they are on here.  So what I would

2    ask the Court is to disregard any purchases that were

3    made by Youssef Megahed in regards to this particular

4    case with the exception of perhaps, even though I

5    have the relevancy objection, of the August 4th

6    purchases since we've already heard about the fact

7    that they were in the car together.  There are some

8    purchases in here that predate Mr. Mohamed's even

9    arrival in the United States.  There is no evidence

10    whatsoever that he even knew who Youssef Megahed was

11    prior to arriving in the United States in 2007.  For

12    those reasons, I would make that objection.

13        THE COURT:  For the reasons I stated a minute

14    ago, Ms. Goudie, I think that -- for instance, the

15    latter category that you just mentioned sounds like

16    that it would have only a highly attenuated or no

17    connection to this defendant.  For our purposes, I'll

18    overrule the relevancy objection and receive Exhibit

19    1 D, subject to of course your pointing out any parts

20    that in the view of the defense should not be

21    considered.

22         Mr. Monk?

23        (Government's Exhibit No. 1 D is received into

24    evidence.)

25        MR. MONK:  Yes, Your Honor.  Proposed Exhibit 1

1    C are records acquired pursuant to subpoena from Home

2    Depot, and these are records relating to purchases

3    that were made from Home Depot using -- where the

4    purchase was accomplished by the use of Mr. Mohamed's

5    debit card.  The front --

6        MS. GOUDIE:  Your Honor, as far as those are

7    concerned, I would have the same relevancy

8    objections.

9        THE COURT:  I will persist in my ruling and

10   receive Exhibit 1 C of the United States.

11       (Government's Exhibit No. 1 C is received into

12   evidence.)

13       MR. MONK:  Your Honor, next, with respect to 1

14   A.  1 A is a schedule that has been put together that

15   aligns, so to speak, Mr. Mohamed's Internet research

16   with purchases.  And the schedule shows when an

17   Internet connection or research was conducted in

18   connection with a specific matter that is in 1 B, and

19   then that temporal relation -- the temporal relation

20   between that Internet research and Mr. Mohamed's

21   purchase of an item that is in 1 A from either Home

22   Depot or Wal-mart.  So I move for admission into

23   evidence proposed Exhibit 1 A.

24       MS. GOUDIE:  Your Honor, I would have the same

25   objection except for the items that deal specifically

1    with the video that we're here to have him sentenced

2    on.

3        THE COURT:  I take it from what you said, Mr.

4    Monk, this is in effect a demonstrative exhibit, the

5    contents of which are derivative of earlier exhibits

6    that have been received.

7        MR. MONK:  Yes, sir.

8        THE COURT:  Then the objection is overruled.  I

9    persist in my ruling with respect to it, and I

10   receive this demonstrative exhibit.

11       If I were receiving it before a jury, I would

12   remind them that they should not rely on it to the

13   extent that its contents are not established by other

14   matters of record.  Of course, I would invoke that

15   same standard in reviewing it myself.

16       Mr. Monk?

17       (Government's Exhibit No. 1 A is received into

18   evidence.)

19       MR. MONK:  With the Court's permission, I'm

20   going to point out just two items.

21       THE COURT:  All right, sir.

22       MR. MONK:  If we take a look, first of all, on

23   June 23rd, on Page 1, at -- on that date the Internet

24   history shows the user of this computer making a

25   visit to the United Nuclear website where it was

1    reviewed, as disclosed in the packet of materials in

2    1 B, a page pertaining to black powder manufacture as

3    well as other sites.

4         The next day, or on the 25th, Mr. Mohamed's

5    debit card was used to purchase sulfur, stump

6    remover, and charcoal.  And stump remover, Your

7    Honor, its primary ingredient is potassium nitrate.

8         Next, on July 30th, Mr. Mohamed on July 30th,

9    or someone using this computer looked at a website

10   that contained information on high order explosives.

11   One of them was chemicals.  That website shows that

12   nail polish remover is a source of acetone.  The next

13   day someone using Mr. Mohamed's debit card purchased

14   hydrogen peroxide and acetone remover, nail polish

15   remover, from Home Depot.  The purpose of this

16   exhibit is to show that obviously Mr. Mohamed

17   conducted research and then acted on his research by

18   purchasing components that could be used to make

19   explosives.

20        I'll also proffer to the Court that during the

21   course of this investigation, Mr. Mohamed's Ford

22   Escort was searched and agents found a bag containing

23   organic sulfur, a component of black powder; a number

24   of pieces of PVC pipe, and other items.

25        Now, Government's proposed Exhibit Number 10 is

1    the visa application --

2        THE COURT:  Mr. Monk, before we get too far away

3    from this, the array of sites that were visited a

4    moment ago that you associate in the exhibit with

5    some purchases, it's fairly apparent that each one of

6    those sites was only remained at for a minute or so.

7    Is that of any significance in your analysis of what

8    was underway as that "research" was being conducted?

9        MR. MONK:  I don't -- it may have some

10    significance that escapes me, but no.

11        THE COURT:  All right.  Ford Escort.

12        MR. MONK:  Yes, Your Honor.  The Ford Escort was

13    searched during the course of the investigation, Mr.

14    Mohamed's vehicle, and agents found a bag containing

15    organic sulfur, again a component of black powder, as

16    well as other materials.

17        Proposed Exhibit Number 10 is Mr. Mohamed's

18    visa application.  I'd move for admission into

19    evidence of that.

20        MS. GOUDIE:  We don't have any objection.

21        THE COURT:  Exhibit 10 is received on behalf of

22    the United States.

23        (Government's Exhibit No. 10 is received into

24    evidence.)

25        MR. MONK:  Mr. Mohamed, Your Honor, was admitted

1      to the United States on an F-1 non-immigrant student

2      visa.  And given that status, it was illegal for him

3      to possess firearms or ammunition under 18 U.S.C. §

4      922(g)(5)(B).

5      And the evidence developed during the course of

6      this investigation discloses that not only was he

7      driving the vehicle in which the ammunition was found

8      on August 4th, 2007, but Mr. Mohamed also accompanied

9      another individual to a local gun range where they

10     took turns firing a Glock pistol.

11     And on July 19th of 2007, as captured on a store

12     video and based upon interview with the store clerk,

13     Mr. Mohamed tried to purchase a .22 caliber rifle at

14     Wal-mart but he was unable to provide sufficient

15     documentation and was not successful in purchasing

16     it.

17     Next, I'd -- proposed Exhibit 8 are a number of

18     letters that Mr. Mohamed authored as well as in some

19     instances translations and excerpts of translations.

20     I'd move for admission into evidence of proposed

21     Exhibit 8.

22     THE COURT:  Without objection, Exhibit 8 is

23     received on behalf of the United States.

24     MS. GOUDIE:  Well, Your Honor, I apologize once

25     again.  I was talking to my client.  I have the same

1    objection I have been making.

2    THE COURT: I persist in my ruling and Exhibit 8

3    is received on behalf of the United States. The

4    objection is overruled.

5    (Government's Exhibit No. 8 is received into

6    evidence.)

7    MR. MONK: In this aspect of our proffer, Your

8    Honor, I want to discuss some -- these are matters

9    that relates to Mr. Mohamed's expression of his

10    opinions, his intentions, his sympathies, and his

11    thoughts, to the extent that they can be inferred

12    from what is written or spoken.

13    I mentioned a little while ago that the

14    toy-to-ignitor video was produced in the bedroom that

15    Mr. Mohamed's landlady leased to him. Ms. Poliquin

16    is Canadian and she has reported that she rented a

17    room to Mr. Mohamed in the summer of 2007. From the

18    beginning he in discussions with her repeatedly

19    referred to Americans as being stupid, and she

20    reported that he once gave her an example of a stupid

21    American. He admitted that he had lied to his

22    insurance company by telling his insurance company

23    that he had cancelled his insurance on his car

24    because he sold his car when in fact he had not sold

25    his car. She admittedly did not have a good

1     relationship with Mr. Mohamed.  She asked him to move

2     out after he made unwanted sexual advances toward

3     her, and he did move out just before August 4th of

4     2007.

5           During an interview that Mr. Mohamed initiated

6     with FBI Special Agent Daniel McTavish on August

7     29th, 2007, Mr. Mohamed in referring to a video

8     recording he had made said to Special Agent McTavish,

9     "I said that Americans are more stupid than pigs, but

10    you cannot deny this."  And that's within quotes.

11          He told Special Agent McTavish that, "It is the

12    wish of every Muslim to die in his," that is Mr.

13    Mohamed's, "situation."  That is at the hands of the

14    invaders.  And that he will get credit for that when

15    he dies.

16          He also told Special Agent McTavish, "You don't

17    understand.  You have made me a hero."

18          In letters that Mr. Mohamed wrote to his

19    parents from jail -- in one letter dated November

20    26th, 2007, Mr. Mohamed espouses his view of what the

21    Muslims' alternatives are in this life.  He says that

22    those -- and I'm not quoting now.  He says that the

23    alternatives that a Muslim has in this life are to

24    pray and lead a normal life, or according to Mr.

25    Mohamed, the Muslim can engage in fighting and Jihad.

1    The second path, he says, could lead to going to jail

2    or being killed, but it will definitely lead to

3    paradise.

4        More specifically he tells his parents, and I

5    quote, "Now, now, now, the Muslim has two choices to

6    choose from, either Jihad and uprising, fighting and

7    self-victory, money, family, and fighting for God.

8    And he might end up in jail or get killed or he might

9    win, but his destiny is definitely paradise.  Or he

10   can sit at home and go on with his normal daily life,

11   regardless what it is, and go on by praying and

12   fasting."  In that letter Mr. Mohamed also makes

13   clear that he has no compunction about lying in the

14   name of his beliefs when he says in the same letter,

15   "Deceive the infidels and keep them in the dark.  Do

16   not inform them of the Muslims' plans."

17       In another letter, October 29th, 2007, Mr.

18   Mohamed states that, "If Muslims use their brains and

19   came out heavily armed, and I don't mean here the

20   weapons which are hard to obtain in our countries,

21   but the easy things that could easily be prepared in

22   our homes, even if they were smoke bombs, this will

23   at least force the regimes into submission."  Some of

24   the things that might be comparatively -- he might be

25   referring to would include the acetone peroxide that

1    he was researching and the components of which he was

2    purchasing in 2007. All of this that we've recited,

3    Your Honor, occurred within eight months of entering

4    the United States.

5    In another letter of October 29th, 2007, to

6    Amru Nasser (ph), Mr. Mohamed criticizes the schools

7    in the United States and then states that Americans

8    have no morals, no religion, no conscience, and

9    they're all traitors, and refers to Americans as

10   being like slaves.

11   In another passage of the same translation, he

12   makes a statement that sounds to be critical of his

13   parents, or, that is, what they taught him. He says

14   that his parents told him that in order to have a

15   successful life you have to have a good and

16   respectful job. He says that this is nothing but

17   fantasy, and by doing this you are playing into the

18   hands of the infidels.

19   He states that any person who dies without

20   supporting Jihad fighting or Muslims will die as a

21   hypocrite and dissolute.

22   He says that he wanted to repay God for what

23   God did for him. He wanted to help those who have

24   been killed themselves daily. He felt sorry for

25   them, for their parents and spouses. He said that

1    the Spanish and African Americans in the United

2    States need someone to help them, that is why the

3    religion of God has to take over the whole world, so

4    millions of people can be saved from the infidels and

5    tyrants.

6        He asks Amru (ph) if he doesn't think that God

7    is going to revenge the thousands of Muslim in

8    prisons or the spilled blood of Muslims.

9        He also expresses an opinion that the world

10   should be a single Islamic state.  He states that the

11   world should be one country where everyone follows

12   the Islamic Shariah.  Whoever does not support the

13   Islamic state will go to hell and will never enter

14   Heaven.  In order for these people, that is people

15   who do not follow the Islamic Shariah, to enter

16   heaven, Jihad has to be waged against them.

17       In a letter to his father dated October 31st of

18   2007, he opines that in the United States the media

19   are -- all the media are Jews and they control

20   everything.  He refers to America and Americans as

21   dogs and liars.  But says that thanks to God, he eats

22   and sleeps well.

23       He also says that the American is nothing more

24   than a dirty scum on the surface of a dirty, filthy,

25   washing water.

1    He says, "I swear by the almighty Allah that
2    this country will convert to Islam."
3    Now, the several letters that Mr. Mohamed
4    wrote, authored, that are in Exhibit 8, he wrote in
5    English because they were directed to I believe some
6    employees at the Hillsborough County Jail.
7    With the Court's permission, I would like to
8    publish these.
9    THE COURT:  Parts of Exhibit 8?
10   MR. MONK:  Exhibit 8, Your Honor.
11   THE COURT:  Yes.
12   MR. MONK:  One of them reads, "Congratulations,
13   Deputy Buka (ph).  The Pentagon has announced the
14   death of more than 4,000 U.S. troops."  There is a
15   picture of a face to the right of that.  "While the
16   resistance in Iraq says they are 40,000, but at least
17   they agreed that total veterans from U.S. are half a
18   million, out of which 70,000 lost their hearing and
19   became deaf, so unfortunately they will keep silent."
20   Followed by a smiley face.  "While you are still
21   obliged to bring me my food in my room, desperate
22   housewife or housekeeper.  You guys are seriously
23   pathetic.  I really enjoyed your services, Babes.
24   Mohamed."
25   Another letter he wrote states, "You guys had

better convert to Islam before it's over.  I wish if
you can also tell this to your captain.  I'm really
worried about your future.  The American flag cannot
defend you in front of Allah.  Right here I'm getting
the best food and laundry, even free soap.  Besides,
of course, the great reading I'm doing.  If the best
you can do is this, then you better seriously find
yourself another job."  It's a little bit cut off,
but I believe the last line is, "Congratulations one
more time.  Mohamed."

Finally, Exhibit 8, "Muslims always win.  You
cancelled the rec for telling your genius.  Count how
many hours I will spend today with my lawyers and
phone calls from overseas, and don't forget to keep
silent.  Mohamed."

Now, there has been some mention made and there
are some allegations made in the defendant's
sentencing memorandum, supported in part by an
article in the newspaper, that Mr. Mohamed has been
mistreated at the Hillsborough County Jail.  If it
becomes necessary, we will produce a witness who has
available for the Court's review, if the Court
determines it's pertinent, the history of Mr.
Mohamed's disciplinary treatment at the jail as well
as Mr. Mohamed's conduct while he was incarcerated at

1    the Hillsborough County Jail.  Mr. Mohamed's conduct

2    includes numerous instances of violation of the

3    rules, misbehavior, including breaking a fire

4    extinguisher plug in his cell, causing water to go

5    all over the place and refusing to follow --

6        THE COURT:  The sprinkler?

7        MR. MONK:  The sprinkler, yes, Your Honor.  And

8    refusing to follow various rules.

9     May I have a moment, please?

10       THE COURT:  You may.

11     (Pause.)

12       MR. MONK:  Also along the lines of Mr. Mohamed's

13    expressions of his intentions, beliefs, thoughts, and

14    so on, you'll recall that I -- I probably took this a

15    little bit out of order.  In the statement that I

16    referred to that Mr. Mohamed made to Special Agent

17    McTavish, they were -- during that conversation they

18    were talking about a video and the fact that in the

19    video Mr. Mohamed had referred to Americans as pigs.

20    And then he and McTavish -- Mohamed and McTavish had

21    a discussion about that.

22       Well, the video to which they were referring is

23    as follows, Your Honor:  Back in 2007, Mr. Mohamed in

24    company with one or more others was in Rawlett Park

25    (ph) in Tampa, and he received a citation for

1  shooting I believe a pellet gun or a BB gun, shooting

2  at game, squirrels and ducks, taking game improperly.

3  That same day, Mr. Mohamed and the other

4  person, Mr. Ishtay (ph), took turns interviewing each

5  other on a video recorder about the events of that

6  day.  In fact, during the interaction that Mr.

7  Mohamed had with the police officer, and the game

8  warden I believe, he pretended that he was having

9  some sort of an attack, that he was physically in

10  distress.  That resulted in an ambulance or an EMT

11  truck being brought to that area.

12  In this video, which is Exhibit 4 A, a disk,

13  and the translation of which is proposed Exhibit 4 B,

14  Mr. Mohamed discusses how he had feigned or faked

15  having a diabetic attack.  In the so-called interview

16  of Mr. Mohamed concerning the events in the park that

17  day, he mocks law enforcement and discusses how he

18  has received training in firearms and will continue

19  to train and continue to acquire weapons even if he

20  has to make them.  He also says that Americans are

21  stupid and pigs.  That is the video to which McTavish

22  was referring in his interview with Mr. Mohamed on

23  August 29 of 2007.

24  With the Court's permission, we'll continue our

25  proffer with Mr. Hoffer.

 1          THE COURT:  All right, sir.  Thank you very

 2    much.

 3          MR. MONK:  I'm sorry, Your Honor.  I move for

 4    admission of proposed Exhibits 4 A and 4 B.

 5          MS. GOUDIE:  Same objection, Your Honor.

 6          THE COURT:  I persist in my ruling, and Exhibits

 7    4 A and 4 B are received on behalf of the United

 8    States.

 9          (Government's Exhibit Nos. 4A and 4B are

10    received into evidence.)

11          THE COURT:  Counsel, it's 13 minutes to 12:00.

12    I do think we'll recess for the lunch hour.  So I

13    would ask you, Mr. Hoffer, to be on the alert for a

14    convenient place to do that between now and noon.

15          MR. HOFFER:  Certainly.  I might be able to

16    conclude because a lot of my thunder, if you will,

17    has been stolen.  That may be a poor choice of words,

18    but I will let the Court know if we're approaching

19    that hour and it's a good place to stop.

20           Your Honor, the aspect of the proffer which I

21    would be prepared to present to the Court essentially

22    would be characterized as the expert or technical

23    aspects of some of the evidence that has been

24    proffered to the Court already.  To that end, the

25    United States was prepared to present the testimony

1    of supervisory Special Agent Richard Stryker,

2    S-T-R-Y-K-E-R, who is an agent who is assigned to the

3    FBI laboratory up in Quantico, and he is an

4    explosives and hazardous materials examiner at that

5    laboratory and has been there a number of years.

6        He would have testified based upon his

7    knowledge and experience he has Bachelor of Sciences

8    in engineering, he has been a special agent of the

9    FBI since 1997, but had a career in the Navy prior to

10   that time.  He's been a bomb technician since 1998,

11   and he's been assigned to the laboratory since 2003

12   to the present time.  And he has extensive training

13   and experience in explosives, the chemistry of

14   explosives, things relating to blast investigation,

15   IEDs, improvised explosive devices, things of that

16   nature.  He has training and experience in that

17   regard.

18       And the proffer with respect to Mr. Stryker's

19   testimony would be -- first of all, he would have

20   testified, or I proffer to the Court that, as I say,

21   he's been an explosives and hazardous material or

22   device examiner at the lab for a number of years.

23       He specifically was assigned to this particular

24   case and his role was such that he was the

25   coordinator for all the analysis of all the different

1    sciences done by the laboratory on most if not all of

2    the physical evidence gathered by the FBI in

3    connection with this particular case, so he has

4    personal knowledge of his analysis of the various

5    pieces of evidence collected by The Bureau in the

6    course of this investigation.  He coordinated the

7    entire laboratory process that was done over a period

8    of months, wrote the final report, if you will.  As

9    such, he reviewed pretty much everything as far as

10   the physical evidence and some of the documentary

11   evidence as well which Mr. Monk talked about

12   previously, and the evidence obtained through search

13   warrants, the data kept on the defendant's laptop.

14   He's looked and reviewed all of that stuff as it

15   makes reference to his field of expertise, explosive,

16   rockets, et cetera.  He's also referred Government's

17   5 A, the video which the Court has received into

18   evidence, the toy-to-ignitor video, which the

19   defendant created, produced, uploaded to YouTube back

20   in the end of July in 2007.

21       The proffer to the Court is, first of all, he

22   would be prepared to testify and say that the basic

23   instruction and the basic lessons set forth in that

24   video, in Government's Exhibit 5 A, with respect to

25   how to modify a remote controlled car or remote

1     controlled toy device into a remote controlled

2     ignition system for things like explosives is

3     accurate.  He would testify based upon his expertise

4     and knowledge that having reviewed that video that

5     the lessons portrayed or the information and

6     assistance, if you will, if you use the term of the

7     statute, rendered there by giving and imparting that

8     knowledge would function as portrayed in the video

9     itself; i.e., in other words, the video accurately

10    shows how you can modify one of these toys in the

11    manner that the defendant portrayed it could be done.

12    In fact, Stryker went further than just merely

13    examining the video to determine that it was

14    accurate.  The United States would proffer that

15    Special Agent Stryker with the assistance of others

16    at the lab and other agents actually tested the

17    accuracy of the technology, if you will, the science

18    set forth in Government's Exhibit 5 A, back on July

19    15th of 2008, up at the laboratory in Quantico or at

20    the facilities near there.  He made a video to

21    reflect or demonstrate the testing that he did.  To

22    that extent, Your Honor, in that regard, I would

23    specifically offer what has been previously marked

24    for identification as Government's Exhibit 9, which

25    is a video disk of a recording of the testing done by

1    Agent Stryker and others on that date.  And I would

2    offer those at that point and seek to publish and

3    also to offer some proffered information as to the

4    video itself.

5        MS. GOUDIE:  Your Honor, I'm going to object a

6    little bit differently on this one, although it's on

7    relevancy grounds.  Frankly, we are not disputing

8    that the toy-to-ignitor video, if somebody were to

9    follow that and they had some explosive or whatever

10   on the other end, they would in fact be able to

11   detonate it.  In fact, that does show you how to make

12   a remote controlled detonator.  Therefore, the fact

13   that now the Government wants to introduce and

14   publish to the Court and to the audience a video that

15   was made establishing what is undisputed, but instead

16   showing the actual explosion with some sort of

17   explosives that aren't discussed in the

18   toy-to-ignitor video, and aren't evidence in this

19   case, of a I believe it's an FBI van, we believe it

20   is highly irrelevant.  I know it's to the Court, but

21   it's extremely prejudicial and really doesn't have

22   any purpose whatsoever in this sentencing.  For those

23   reasons, we would object to the introduction and the

24   publishing of Exhibit 9.

25       MR. HOFFER:  Your Honor, I would save the Court

1     the time in this regard.  I would offer the exhibit

2     and withdraw my request to publish it.  I would

3     reserve the opportunity to comment or to proffer as

4     to what's depicted there.  I don't necessarily have

5     to have it published at this point for the Court.

6     It's relatively brief, but still I don't think there

7     is necessarily a need to publish it, if that's the

8     case.

9         THE COURT:  Well, I think Ms. Goudie's objection

10    proceeds from the premise that the purpose of the

11    video is to display an explosion, and in turn the

12    purpose of that display is to verify the validity of

13    the technique that is displayed in the video made by

14    the defendant.  Is there some other purpose to it?

15        MR. HOFFER:  There is one other purpose which I

16    would proffer to the Court.  That is in the three

17    separate tests that are reflected on that video

18    recording, not only did Special Agent Stryker choose

19    to utilize the ignition or initiation process which

20    the defendant published, if you will, in his video --

21    in other words, he used that delivery system to

22    initiate the explosion that he did, but he also chose

23    as the various forms of explosives that he would use

24    to show the usefulness of this device and the

25    delivery system, if you will, he chose different

1    explosives that were reflected in the research done

2    on the defendant's laptop.  He used three different

3    forms of explosives and utilized each of them because

4    those were forms of explosives that there was

5    research and material about on the defendant's laptop

6    at the time it was ceased by agents back in August.

7    That's the relevance of it as well, to show that it

8    could be utilized with some of those same forms of

9    explosive materials.  Again, so it has a secondary

10   purpose as well as just showing that the initiation

11   or ignition system would work.  It shows it would

12   work with those explosives.

13        THE COURT:  Ms. Goudie, did you want to be heard

14   further on that?

15        MS. GOUDIE:  Well, the only other thing that I

16   would say, Your Honor, is that's exactly why I don't

17   think that's it relevant.  If Your Honor recalls, and

18   I know you've heard a lot of the -- from both the

19   public defender's office and us as far as what was

20   found in the trunk of the car.  If you recall, they

21   couldn't get -- the FBI couldn't get that to do

22   anything, but the worst was smoke.

23        THE COURT:  I don't understand this to be that.

24        MS. GOUDIE:  I don't know what it is.  The fact

25   is that the purpose of this, the fact that it can be

1    a detonator, we don't disagree that that shows how to

2    make a remote controlled detonator.

3        THE COURT:  That's pretty straightforward

4    circuitry.

5        MS. GOUDIE:  Yeah.  But as far as this variety

6    of different explosions that this special agent has

7    come up with because of research that's taking place

8    over 30 seconds on the web, on the website, I just

9    really honestly believe that it's inflammatory.  I

10   know it's to the Court, but it's inflammatory, it's

11   prejudicial, it's completely irrelevant.  It doesn't

12   have anything to do with why we're here.

13       THE COURT:  Is there among the array of

14   substances that are utilized in this video the

15   compound in some proportions that was in the trunk?

16       MR. HOFFER:  No, Your Honor.  Well, yes and no.

17   There were three different compounds utilized.

18   Potassium nitrate directly is not one of the

19   compounds that is tested with this delivery system.

20   However, the acetone peroxide which as Mr. Monk

21   explained in his proffer was something that was not

22   researched rather heavily but saved information about

23   it and formulas about it were saved on his laptop.

24   That was utilized as one of the forms of high

25   explosives.

1          THE COURT:  My question here was whether the

2     KNO3 compound that was in the trunk was one of the

3     compounds in the video?

4          MR. HOFFER:  Not directly, no.

5          THE COURT:  The video is proffered exclusively

6     to demonstrate a connection between research, what

7     we've called research, or some might call surfing or

8     whatever it is, purchases and consequences among

9     which the United States would suggest a link?

10          MR. HOFFER:  Correct.

11          THE COURT:  I actually feel better about any 403

12     consequence if it's not the trunk substance, which I

13     think was your point, Ms. Goudie.  I'm going to

14     overrule the objection.  I'll admit the video and we

15     will see it when we resume this session.

16          It's precisely 12 o'clock now.  Is 90 minutes an

17     adequate lunch hour for everyone?  Do people have

18     things that require more time than that for lunch?

19     All right.  We will be in recess until 1:30.  When we

20     return, we'll recognize Mr. Hoffer, and we will see

21     this video, and you may resume your proffer.

22           Anything else, Mr. Hoffer?

23          MR. HOFFER:  Your Honor, just for the guidance

24     of the Court.

25          THE COURT:  Can I ask everyone just to hold

1  still just a minute?  Excuse me.  Go ahead, Mr.

2  Hoffer.

3      MR. HOFFER:  I was simply going to advise the

4  Court that for its own consideration of time and

5  scheduling, the remainder of my proffer is obviously

6  going to be considerably shorter than the first

7  component, Mr. Monk's presentation.  I can't estimate

8  it, but it's going to be considerably shorter in time

9  than what has preceded it.

10     THE COURT:  Well, I'll be here for the duration

11  and we'll resume it at 1:30.

12     Anything else, Mr. Monk?

13     MR. MONK:  One thing with the Court's

14  permission.

15     THE COURT:  Yes, sir.

16     MR. MONK:  I mention this because the comment

17  was Ms. Goudie made and also Your Honor referred to

18  surfing.  The fact of the matter is even though in 1

19  A it appears that there is only for a minute that

20  these websites were clicked on --

21     THE COURT:  I was not making a finding, Mr.

22  Monk; I was avoiding making one.

23     MR. MONK:  I want to point out that many of

24  those were saved by Mr. Mohamed on his laptop.  They

25  weren't simply casually clicked on once.  He actually

1    saved the files on his laptop.

2         THE COURT:  Understood.

3         Mr. Moreno, anything further?

4         MS. MORENO:  Not at this moment.

5         THE COURT:  Ms. Goudie?

6         MS. GOUDIE:  No, sir.

7         THE COURT:  I'll see you at 1:30.  We're in

8    recess.

9         (Recess from 12:00 p.m. until 1:34 p.m.)

10        THE COURT:  Mr. Hoffer, you're recognized to

11   resume your proffer.

12        MR. HOFFER:  Your Honor, before I commence that

13   if I could ask the Court as sort of a housekeeping

14   matter:  There are two witnesses who have been

15   sequestered and kept outside the courtroom.  They've

16   been here all morning.  They're FBI employees and

17   they were brought here on subpoena but not our

18   subpoena.  I am not certain whether there is going to

19   be any further need to keep them, but that's not my

20   decision since it wasn't our subpoena.  I was just

21   wondering if the Court would perhaps want to make

22   that inquiry.  If in fact they are not going to be

23   needed, we perhaps can send them back to their

24   duties.

25        THE COURT:  I think that's fair.

1        Ms. Moreno or Ms. Goudie?

2        MS. MORENO:  Yes, Your Honor.  In fact, if I

3   would have been approached on this earlier, I

4   certainly would have agreed to that.  We did not come

5   to the decision about the proffer and the

6   understanding of the way the hearing would go until

7   late last night, so absolutely.

8        THE COURT:  Is it necessary to name these

9   witnesses in order to excuse them or can we just

10  excuse the two witnesses subpoenaed by the defense?

11       MS. MORENO:  That's fine, Your Honor.  No

12  problem.

13       THE COURT:  If someone will affect that.  Please

14  extend the Court's thanks to the witnesses for

15  responding to the subpoena.

16       MR. HOFFER:  Having said that, Your Honor, where

17  we were was we were on the verge of actually

18  publishing for the Court's review Government's

19  Exhibit Number 9.  Just to refresh for a second, even

20  though it's been a short while, the Government --

21       THE COURT:  This is the exemplar of the

22  materials?

23       MR. HOFFER:  It's a video of testing done of

24  both the mechanism employed in the video made by the

25  defendant and used with some of the components or

1   explosive materials he had been researching on-line,

2   or someone had been researching on-line on his

3   computer.

4        THE COURT:  Indeed.  Mr. Watts, if you will pull

5   down the lights for us?

6        THE COURT SECURITY OFFICER:  Yes, sir.

7        MR. HOFFER:  I think we're set.  With the

8   Court's permission, my intention is to view a portion

9   of it.  It's basically segmented into three primary

10  components, different tests.  Pause after viewing the

11  first component, proffer a bit about what's involved;

12  view the second, follow the same procedure through

13  the third.  For the record, this is Government's

14  Exhibit Number 9.

15       (Portion of Government's Exhibit 9 played in

16  open court.)

17       MR. HOFFER:  If we could pause that for a

18  moment.

19       THE COURT:  Mr. Hoffer, as you pause, if you

20  will just note that you have paused at 36.5 seconds

21  of the tape of Exhibit 9.

22       MR. HOFFER:  Thank you, Your Honor.  Your Honor,

23  the proceeding 36 odd seconds of this, what is

24  depicted therein is a test done by Special Agent

25  Stryker, I believe that is he with the remote control

1    in his hand, up in Quantico on July the 15th of this

2    year with the assistance of other special agents.

3    What he did and what he would testify to and the

4    proffer to the Court is that he utilized the

5    instructions and the teaching, if you will, contained

6    in Government's Exhibit 5 A, the toy-to-ignitor video

7    that the defendant produced and made and uploaded to

8    YouTube.  You will see that -- in fact, you will have

9    seen that he had a remote controlled device, very

10   similar with toy remote controlled, radio remote

11   controlled transmitter.  He had basically connected

12   and modified the circuit on the toy car body to

13   connect it to what I think was referenced in the

14   intro caption:  Two grams of TATP.  What Special

15   Agent Stryker would testify would be that TATP -- and

16   I'm not even going to try to pronounce the full

17   chemical name.  TATP is a synonym for acetone

18   peroxide.  Acetone peroxide, he will tell you, is a

19   high explosive.  That's how it's characterized.  It

20   is a high explosive that according to the proffer so

21   far and some of the evidence you received, the

22   defendant had done some significant amount of

23   research about.

24        Preliminary, I would pick up on the same point

25   that Mr. Monk made at the close of the morning

1      session.  The materials that the Government has

2      offered into evidence here for the Court's review,

3      more specifically 1 A, which is a summary, but 1 B

4      which is the source documents and references to the

5      "bomb shock" folder all are documents saved in

6      various component parts of the defendant's laptop

7      computer and found back in August when the FBI made a

8      mirror image hard copy and did forensic examination

9      of that computer, such that even if, as the Court

10     pointed out and observed in the summary, which is

11     Government's Exhibit 1 A perhaps, that websites were

12     visited and maybe there is a minute later and another

13     website was visited.  The bottom line is we retrieved

14     it because these websites and the information

15     contained in them were saved in parts of that

16     computer and accessible later on.  The defendant or

17     whoever was using it need not necessarily have only

18     viewed it once for a minute and then never been able

19     to see it or view it again.  We know that it was

20     looked at initially at the times mentioned in the

21     summary and was available for recall later because we

22     were able to pull it up at a much later date and find

23     it forensically on the defendant's laptop computer.

24          Specifically, TATP, or acetone peroxide, was

25     chosen for the first test because as Special Agent

1    Stryker would testify, it's a high explosive, number

2    one, and you could see it was a very small amount.

3    Two grams, I think, were utilized of it to connect to

4    the modified circuit of the toy car.  It produced

5    what's depicted there.

6        The Court will recall that as Mr. Monk

7    mentioned, acetone peroxide is prominent in a number

8    of places on the defendant's computer.  Government's

9    Exhibit 2 B, which is in evidence at this point,

10    which the Court will recall was sort of a walk

11    through, if you will, of the pathway in through this

12    folder called "bomb shock" on the defendant's laptop

13    computer.  There were significant files.  In fact, on

14    the -- I guess we can't do it, flip back and forth

15    from the video to the DOAR system.  Acetone peroxide

16    files are contained in that "bomb shock" folder,

17    which is where he housed a lot of his materials.

18    About the tenth page of Government's Exhibit 2 B

19    actually shows one of the websites that was saved

20    there, which is acetone peroxide.htm.  If the Court

21    will note and it's hard because of the smallness of

22    the -- I will try to focus it if I can.  You'll see

23    that one of the things saved was a tutorial, if you

24    will, on acetone peroxide.  One of the first things

25    it mentions is that it is a primary high explosive,

1    its sensitivity to various factors.  But that it can

2    be handled properly and can be made properly and

3    safely.  In fact, it is, "A great to place to start

4    in HEs."  I would proffer to the Court and submit

5    that HEs are high explosives.  If you follow along,

6    the ingredients are set forth there:  Acetone, we've

7    seen the defendant had pictures of acetone, had

8    formulas about this; H2O2, hydrogen peroxide; and

9    acid, three components which have to be mixed

10   together in a proper manner to form this high

11   explosive.  Things that are readily available, easily

12   accessible, Special Agent Stryker would testify.

13   Acetone, we have seen is commercially available.

14   It's a nail polish remover, he would say.  Hydrogen

15   peroxide, sold in CVS and other pharmacies stores,

16   easily available to the general consumer.  And any

17   form of hydrochloric acid, which Special Agent

18   Stryker would say would include muriatic acid, which

19   can be bought commercially at pool stores, at home

20   improvement stores for pools and other uses.  Those

21   are the three primary components and ingredients.  We

22   know the defendant bought around the time he started

23   looking at this folder two of those and made

24   purchases of two of those three items around that

25   very same time.

1       The second page of this particular folder in

2   his "bomb shock" also talks about how acetone

3   peroxide is a -- can be mixed with something else,

4   ammonium nitrate, which is found in fertilizers, to

5   make even a more powerful explosive.  That's going to

6   significant because that's going to come up in a

7   moment as we continue on through Government's Exhibit

8   Number 9, but the significance so far of this portion

9   of Government's 9 is that the system worked as the

10  defendant laid it out on his video, and it worked

11  with one of the types of high explosives he had been

12  doing research on on his computer.

13       Now I think if we can switch back to the video

14  and go to the second component or part of

15  Government's Exhibit Number 9, picking up 36.5

16  seconds.

17       (Portion of Government's Exhibit 9 is played in

18  open court.)

19       MR. HOFFER:  If we could pause that again, and

20  we're pausing it at about 47.8 seconds.

21       The proceeding again is very similar to the

22  first component, Your Honor, of this video.  That is,

23  the second component reflects Special Agent Stryker

24  conducting the same tests using the same mechanism of

25  delivery, i.e., the converted remote controlled car

1    and car body and remote controlled device to transmit

2    or initiate a detonation or ignition in this case of

3    smokeless powder.  Now, it's a little hard to see

4    because of the way the camera angle was set up, but

5    there was a flash and then there was some flame

6    created by that process.  Again, Special Agent

7    Stryker, it is our proffer, would testify that this

8    too confirmed again that using the same mechanism and

9    system that the defendant described and illustrated

10   in Government's Exhibit 5 A, he was able to light or

11   ignite that smokeless powder.  Smokeless powder, he

12   would tell you, is a low explosive.  It's not a high

13   explosive, but it's somewhat akin to black powder

14   that is more familiar to most people.

15       Indeed, if the Court looks through some of the

16   research contained on the defendant's computer, more

17   specifically I think we had Government's Exhibit 1 B,

18   one of the first things of interest there is a

19   website and information saved from a website relating

20   to black powder and formulas on how to make it.

21   Interestingly enough, and Special Agent Stryker would

22   so testify, the three components of making something

23   like black powder are potassium nitrate, charcoal

24   powder, and sulfur.  The Court will see if it goes

25   back to the summary, which is Government's Exhibit 1

A, the defendant bought sulfur.  He bought charcoal
briquettes.  Those are purchase he made around the
time period of all of what was going on in late July
and late June of 2007.  And potassium nitrate, as Mr.
Monk explained and Special Agent Stryker would
testify, and is easily available and accessible by
buying what the defendant himself also bought,
commercially available stump remover, which is sold
at places like Wal-mart, Home Depot, et cetera.
Government's 1 A reflects those purchases of that
item as well.

Special Agent Stryker would further testify
that in fact the FBI lab examiners found what
appeared to be the tips or caps of bottles consistent
with how potassium nitrate is packaged in these
spectricide (ph) stump removal bottles.  They found
the cut caps from those kind of things in the carpet
and in the apartment or room where the defendant had
been residing in June and into July of 2007.

The third component of Government's Exhibit 9,
we can just look at that now.  We're starting at 47.8
seconds.

(Portion of Government's Exhibit 9 played in
open court.)

MR. HOFFER:  Now, for the record, Your Honor,

1     we've come to the end of Government's Exhibit 9, and

2     just a few proffered comments with respect to the

3     very last portion the Court's just viewed.

4         This was a slightly different test and Special

5     Agent Stryker would testify, we proffer to the Court,

6     that what was done in this last component of this

7     test was that -- utilized as the explosive material

8     was a combination of what's called AMFO, ammonium

9     nitrate with a fuel oxidizer, a combination of AMFO

10    and C-4 explosive.  You saw a van that was set off

11    way in the distance with that as the explosive

12    material.

13        In that particular component or portion of the

14    video, concededly, Special Agent Stryker will testify

15    he did not utilize exactly the defendant's process or

16    initiation system, i.e., the remote controlled

17    modified toy car.  He decided, he would testify to

18    you that if need be, that for safety reasons and

19    because of the distance, it was too unsafe and not

20    practical to use the defendant's system as he

21    explained it.  He used the commercially available and

22    safe remote controlled system that the experts

23    utilize to set off explosions remotely.  What this

24    shows is, first of all, that ammonium nitrate mixed

25    with a fuel oxidizer in that case, that's what they

1     used as the high explosive, in fact can do

2     substantial damage to the van, as it did.  You saw

3     the very last portion which showed the impact of an

4     explosion set off in that way in microseconds.  It

5     showed it in very, very, very slow motion.

6     THE COURT:  You said AMFO and C-4?

7     MR. HOFFER:  C-4, correct.  And what's

8     significant mostly about the last portion of

9     Government's Exhibit Number 9 is yet again ammonium

10    nitrate, which is a high explosive Special Agent

11    Stryker would testify, is a high explosive that the

12    defendant in his research or someone using his laptop

13    in his research prior to August 4th of last year was

14    researching on the web, saved websites and

15    information relating to it.  Government's Exhibit 1 B

16    contains some of those sites that were visited and

17    stored on the computer where there is discussions of

18    ammonium nitrate and how it can be utilized and in

19    fact the formula and the process to put it together,

20    the component parts to create it.  That's why it was

21    selected for this demonstrative test to show its

22    impact or its capability as a high explosive if it

23    was utilized in the amount set forth there in the

24    caption and with a safe delivery system.

25    On that point, Special Agent Stryker would

1      further testify, I would proffer to the Court, that

2      indeed although the defendant in his video in

3      indicated, the court may recall, that the remote

4      controlled toy car system he used didn't have the

5      greatest of ranges of transmission. He first of all

6      said there would be further lessons where he'd talk

7      about longer distances. But of significance, Special

8      Agent Stryker would testify that one of the things

9      that could be utilized in much the same way if

10     modified would be a common device that a lot of

11     people have - walkie-talkie transmitters. They send

12     and transmit by radio signal a circuit much farther

13     distances than a radio or remote controlled car

14     controller would.

15         Interestingly enough, as the Court will note

16     again in Government's Exhibit 1 A, the summary of

17     purchases and activity, there were in fact two

18     separate purchases of walkie-talkie transmitters,

19     sets of them, by the defendant. One I think on July

20     the 12th of 2007, and one on July 19th, I believe, a

21     week later, of 2007, which was only a week or so, ten

22     days maybe, prior to the creation of the video on the

23     30th. The defendant had already bought two of those

24     for purposes somewhat unknown. Again, there is an

25     application that Special Agent Stryker would testify

1    about for such devices in making remote controlled

2    detonation of explosives such as AMFO, TATP, or other

3    forms of explosives.

4        Significantly, he would testify that AMFO was

5    utilized, had been utilized, and in fact I think one

6    of the websites saved in Government's 1 B makes

7    reference to the fact that AMFO, ammonium nitrate,

8    was utilized in Oklahoma City by Mr. McVeigh.

9        Significantly, too, Special Agent Stryker would

10    testify AMFO is relatively easy to obtain.  The

11    ingredients are easy to get.  If one has the

12    knowledge or the formula as was contained on the

13    defendant's computer, it could be created without too

14    much danger if it's done properly, just as acetone

15    peroxide would be as well.  That would be significant

16    in Special Agent Stryker's view, and that's why he

17    chose those as part of his demonstrative exhibits.

18        Special Agent Stryker, I would proffer to the

19    Court, would also have testifies that he reviewed the

20    contents of Government's 1 B, the websites saved and

21    looked at on the defendant's laptop computer.  He

22    looked at the contents of the "bomb shock," those are

23    the words, the folder that was on the defendant's

24    laptop as well.  He would testify -- essentially, I

25    think I'm characterizing his words, that it was

1    basically almost a cornucopia of materials on

2    explosives, explosive materials, the chemistry

3    relating to explosives, et cetera.  He verified or

4    would verify that the information contained within

5    the various components of Government's 1 B and on the

6    defendant's laptop that was retrieved from it about

7    black powder, about potassium nitrate, about TNT,

8    ammonium nitrate, about TAPT, that acetone peroxide,

9    all of that information was relatively accurate.  The

10   formulas that were contained in some of those

11   websites were accurate as far as instruction on how

12   to make these things.  This was not information that

13   was misleading or somehow inaccurate.  He would have

14   gone through that.

15        And significantly for the Court I think to

16   consider as well is the fact that what we're dealing

17   with in this particular case is a defendant who

18   concededly is a college graduate.  In fact, he was a

19   graduate student in engineering at USF who on his

20   visa application indicated he had a college degree I

21   think from the university in Cairo in Egypt.  He had

22   the sophistication and the knowledge of the sciences.

23   Not a simple person without a great deal of

24   background or education, but a highly intelligent

25   individual.  That is significant as far as being able

1    to understand these items and the chemistry involved

2    and make use and follow these instructions safely and

3    correctly.

4         Also, the Government would proffer to the

5    Court, Your Honor, that indeed the FBI did verify and

6    check with USF, where the defendant was employed as a

7    teaching assistant and a graduate student, that among

8    the purchases we've talked about so far, the

9    potassium nitrate, the sulfur, the charcoal, the

10   acetone, the hydrogen peroxide, people in his

11   department have all indicated these are not items

12   that he would have been required to purchase or he

13   would have needed for any of his school projects.

14   His area was in hydrology, hydrological engineering,

15   the movements of water, et cetera.  These things,

16   according to USF folks that the FBI has talked to, we

17   would proffer to the Court, did not have any

18   relevance to school projects or studies.  They

19   clearly had some other outside source or outside

20   reason aside from that.  Again, that ties back into

21   the fact that he does have this knowledge and this

22   advanced degree and this understanding of engineering

23   and advanced sciences.

24        Finally, Your Honor, as far as Agent Stryker is

25   concerned, he would further have testified and the

     1     United States would proffer to the Court, that he is
     2     familiar with the concept Mr. Monk raised on his
     3     proffer of what's referred to or known in the Middle
     4     East as a Qassam rocket.  Mr. Monk has covered this
     5     to some extent.  I'd merely point out that Special
     6     Agent Stryker has indicated he's familiar with those
     7     and would have described somewhat what they are.
     8     They are basically as Mr. Monk called them, the poor
     9     man's rocket, that is utilized largely in the Middle
    10     East.  They are composed usually of a simple tube of
    11     steal, generally, which is packed with a propellant
    12     of some sort.  One of the primary propellants that's
    13     used to power the rocket is the potassium nitrate
    14     explosive mixture, if it's done properly.  They are
    15     then -- to make them further deadly to perhaps life
    16     or limb, these are rockets that are made simply,
    17     packed with this propellant, and then crafted with
    18     some sort of warhead usually.  He would testify that
    19     in his experience these rockets have some sort of a
    20     warhead or a nose cone that can be packed with any
    21     form of explosive, which when the rocket is fired,
    22     when it lands ultimately at its destination can be
    23     made to explode and cause further damage.  So the
    24     rocket itself doesn't just cause the damage by
    25     landing on something, explosion can ensue causing

1    further damage.

2        Special Agent Stryker would testify what is

3    highly significant is many of the same high

4    explosives that the defendant's laptop stored

5    information on like the TATP, acetone peroxide, like

6    the ammonium nitrate, like the AMFO, could be

7    components of a warhead for such rockets.  Those are

8    utilized by people who fire these things in the

9    Middle East in the Middle East conflict as the

10    warhead.  They pack the warhead with that and pack

11    usually a detonating cap or even something as simple

12    as a bullet which can be setup with something to

13    strike it.  When the warhead hits the target, it

14    initiates an explosion within the warhead and that

15    initiates the explosion of the larger material

16    contained in it.  These are things that are utilized

17    and he has seen and familiar with in the Middle East

18    in the Middle East conflict.

19        Further, Special Agent Stryker would testify

20    that he found on the defendant's laptop computer and

21    highly significant to him was a 400 plus page

22    treatise - we didn't print it out here, but it is

23    available - called *The Chemistry of Powder and*

24    *Explosives*, which Special Agent Stryker would tell

25    you is in fact an authoritative guide and research

1    treatise on explosives which he himself and his

2    colleagues use at the laboratory in their analysis of

3    these things in the course of their duties.  He saw

4    it on saved the defendant's laptop as well and

5    thought that significant that that kind of

6    information was stored as well.

7         He would further testify to one or two other

8    things that the Court was interested a bit ago about

9    the contents of the car back in August 4th.  One of

10   the contents of the car the defendant was driving was

11   fuse, safety fuse.  There was about 20 feet, I think,

12   a package of safety fuse, which is defined by the

13   Attorney General in his yearly classification of

14   explosive materials as an explosive material under 18

15   U.S. Code § 841.  Significant is the fact that fuse

16   is obviously an essential component not only of these

17   Qassam rockets -- you've got to initiate or set off

18   that propellant somehow and these fuses are used for

19   that purpose.  But there is testimony and there

20   information from the FBI's investigation in this case

21   that in fact the defendant some time around July the

22   4th of 2007 went to a fireworks stand located here in

23   Hillsborough County and spoke with a clerk there, and

24   in fact inquired about whether the clerk and the

25   store sold fuse.  When told that it did, he was asked

1    by the clerk how much fuse he wished to buy.  His

2    response was he wanted to buy a lot.  That's a

3    quote-unquote from the witness.  Then he asked if he

4    could buy it by the case.  When he was told the cases

5    of fuse would include between 200 and 500 pieces of

6    fuse in a case, he asked if he could buy cases of

7    that fuse.  He was denied that by the store because

8    they refused to sell that kind of quantity of fusing

9    to anybody who didn't have a legitimate purpose or

10   reason for it.  I would proffer to the Court the

11   information is that he submitted no reason or purpose

12   other than just asking if he could buy that kind of

13   quantity of fuse and it was denied.  So the fuse has

14   relevance because he had it both on August the 4th

15   when the car he was driving in South Carolina was

16   stopped, and it also obviously has relevance to the

17   use of rockets.

18       And I would point out further to the Court that

19   again Special Agent Stryker would say that also

20   contained in Government's 1 B, there are some

21   websites about the construction of rockets, how to

22   make them aerodynamically, the use of fins to help

23   propel them through the air, how the make the nose

24   cones or warheads, if you will, if you want to use it

25   for a nefarious purpose.  That, too, is contained

1    within Government's Exhibit 1 B and some of the

2    websites and information saved on the defendant's

3    laptop computer when it was found back in August of

4    last year.

5        If I could have just a second, Your Honor, I

6    think I am just about done.  If I could consult with

7    counsel for a moment?

8        THE COURT:  Yes, sir.

9        (Pause.)

10   MR. HOFFER:  Your Honor, I think that concludes

11   our proffer.  Oh, there is one other.  I'm sorry, I

12   apologize.  There is one other point that I think

13   bears talking about.  That is, the Court made some

14   inquiry earlier on about Google and a number of hits

15   on YouTube.  I would simply point out from the

16   information available and from discussion with

17   experts who understand and know computers far better

18   than I certainly do, Google or YouTube wasn't able to

19   provide any sort of record because it's beyond their

20   ability to show what happened once someone viewed all

21   or part of the video that was on YouTube.  But again,

22   the experts tell me that once someone views something

23   like that, if they choose to save it or to send it on

24   or send it somewhere else, there is no way to track

25   that and essentially no way to know the life-span of

 1    something on the Internet.  It could remain in the

 2    ether or in the cyber world for quite a long time.

 3         I think the Court is aware and I think the

 4    presentence report indicates, YouTube shortly after

 5    it was put up on YouTube discovered this video was

 6    there and did take it down.  In that time period that

 7    it was in existence, there is no way to know how far

 8    it went, to whom, and what date went with it.  I

 9    think that's significant for the Court to understand.

10         I think that's it.  Thank you, Your Honor.

11         (End of requested excerpt of proceedings.)

12

13                    C E R T I F I C A T E

14         I, Kerry Mercade, certify that the foregoing is

15    a correct transcript from the record of proceedings

16    in the above-entitled matter.

17                                   S/Kerry Mercade

18                                   Kerry Mercade
                                     Court Reporter
19

20

21

22

23

24

25