```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION

 3    UNITED STATES OF AMERICA

 4

 5          vs.              CASE NO. 8:07-cr-342-T-23MAP
                             March 31, 2009
 6                           Tampa, Florida

 7

      YOUSSEF SAMIR MEGAHED,
 8
            Defendant.
 9    _____/

10            TRANSCRIPT OF EXCERPT OF PROCEEDINGS
                    (Summation by Mr. Monk)
11        BEFORE THE HONORABLE STEVEN D. MERRYDAY
                 UNITED STATES DISTRICT JUDGE
12
      APPEARANCES:
13
      For the Government:   JAY HOFFER
14                          ROBERT MONK
                            Assistant U.S. Attorneys
15                          400 N. Tampa Street, Suite 3200
                            Tampa, Florida 33602
16                          813/274-6000

17    For the Defendant:    ADAM ALLEN
                            DIONJA DYER
18                          Assistant Federal Defenders
                            400 N. Tampa Street, Suite 2700
19                          Tampa, Florida 33602
                            813/228-2715
20

21
      Court Reporter:       Kerry Mercade
22                          801 N. Florida Avenue
                            Suite 15A
23                          Tampa, Florida 33602
                            813/301-5024
24

25    Proceedings recorded and transcribed by
      computer-aided stenography.
```

1    (Excerpt of proceedings.)

2        MR. MONK:  Good morning, ladies and gentlemen.

3    Mr. Hoffer delivered the opening statement for the

4    Government in this case, so this is the first

5    opportunity that I will have had to address you

6    directly.

7        Initially, I want to thank you for paying close

8    attention over the last almost two and a half weeks

9    to the evidence in the case.  We've heard I believe

10   over three dozen witnesses, 32 witnesses in this

11   Government's case-in-chief, several defense

12   witnesses, a couple of rebuttal witnesses.  And there

13   are, I estimate, well in excess of 100 physical

14   exhibits that have been admitted in evidence in this

15   case.  The evidence has included the testimony of

16   several expert witnesses as well.

17       I hope that this closing argument that I'm

18   about to present to you is a useful and helpful

19   organizational device for you and perhaps a point of

20   departure from which you may wish to begin your own

21   deliberations.  I'll advise you at the outset that

22   this argument of mine is not going to be dramatic and

23   I'm not going to use any theatrical props in this

24   argument.  I'll make an attempt to make a structured

25   presentation so that it aids your rational analysis

1    of the evidence.

2        As an initial matter, we know that the

3    Government has the burden of proof and the standard

4    of proof is beyond a reasonable doubt.  So the

5    question that initially arises is, you know, what is

6    it that has to be proved beyond a reasonable doubt?

7    Those three dozen or so witnesses testified to

8    hundreds or thousands of facts.  Do all of those

9    things that have been testified to have to be proven

10   beyond a reasonable doubt?  And the answer to that,

11   referring to the judge's instructions, is no.

12       What has to be proven beyond a reasonable doubt

13   are the elements of the offenses.  The judge

14   described the elements of the offenses and I'll

15   discuss them with you in my analysis of the evidence.

16   With respect to the first count, the transport of

17   explosives count, there are two elements.  With

18   respect to the second count, the possession of a

19   destructive device count, there are four elements.

20   All of the facts that have been testified to by all

21   of the witnesses, and it doesn't matter which side

22   presented the evidence, may bear upon proof of those

23   elements.

24       The defendant Mr. Megahed is charged with two

25   crimes.  In the first charge he is charged with

1    knowingly transporting explosive materials interstate

2    between the state of Florida and where they were

3    arrested in South Carolina without a required federal

4    license or permit.  Congress has determined that

5    there are certain items that are just too dangerous

6    to transport without a license or a permit.  Those

7    are explosive materials.  This is the first charge

8    and what I will refer to throughout this argument as

9    the transporting charge.

10        In the second charge in the indictment, Mr.

11    Megahed is charged with the crime of possessing an

12    unregistered firearm.  In this instance, again,

13    Congress has determined that there are some things

14    that are just too dangerous to possess without

15    registration.

16        In this charge the term "firearm" has a

17    specific meaning.  The term "firearm" includes a

18    destructive device, and a destructive device in turn

19    includes any incendiary bomb or incendiary similar

20    device.  A destructive device does not have to be

21    fully assembled as long as the components can be

22    readily assembled into a destructive device and as

23    long as it is intended for such use.  This second

24    charge is what I'll refer to as the possession

25    charge.  The first charge relates to transport of

explosives; the second charge relates to possession
of a destructive device.

In connection with the first charge, the
illegal transportation, there are two elements that
have to be proved beyond a reasonable doubt.  First,
that the defendant knowingly transported explosive
materials from the Middle District of Florida
interstate; and, second, that he was not licensed to
transport those explosive materials within the United
States.

Starting with the second element first.  What
evidence is there that Mohamed and Megahed were not
licensed to transport explosives?  The evidence in
that regard with respect to the second element
includes a certified record from the Bureau of
Alcohol, Tobacco, & Firearms, which has been admitted
in evidence as Exhibit 61, that Youssef Megahed and
Ahmed Mohamed did not have licenses or permits that
would have authorized them to transport the
explosives in this case interstate.  That evidence is
in the record.  That evidence is uncontradicted.

We do not have to prove that Mr. Megahed or Mr.
Mohamed knew that they were required to have a
license.  That is not an element of the offense that
has to be proved.  In that regard, we only have to

1  prove that they did not have a license or permit to
2  transport the explosives interstate.

3       We also have to prove in connection with the
4  first element that the -- that these were explosive
5  materials that were transported.  The Court has
6  instructed you that the term "explosive materials"
7  includes safety fuse.  That means that the 20 feet of
8  coiled safety fuse that were in the trunk of the
9  Toyota Camry that was driven from Florida to Goose
10 Creek are explosive materials.  The Court has
11 instructed you that the term "explosive materials"
12 also includes those items designated by the Attorney
13 General of the United States as he or she publishes
14 those items yearly in a document known as the *Federal*
15 *Register*.  During the year 2007, including August of
16 2007 when the transport in this case occurred, a
17 potassium nitrate explosive mixture was included in
18 the Attorney General's list of explosives.  So
19 potassium nitrate explosive mixtures are explosives.

20      During the testimony of Richard Stryker, the
21 explosives expert, a stipulation was entered into and
22 read into the record by the Court, specifically that
23 a potassium nitrate explosive mixture is included in
24 the Attorney General's list of explosive materials
25 and is an explosive mixture.  Also, part of the

1    stipulation was safety fuse is included on that list.

2        Ladies and gentlemen, according to the

3    explosives experts, Richard Stryker and also Ron

4    Kelly, the chemist who testified during this trial as

5    an expert witness, the substances contained in 4 A,

6    Exhibits 4 A, 5 A, 6 A, and 16 A, 16 A being the

7    coleslaw container, and 4, 5, and 6 A being the

8    substances that were in the PVC pipes, were low

9    explosives comprised of potassium nitrate explosive

10   mixtures.  An oxidizer, that is the potassium

11   nitrate, and a fuel, specifically sugar.  In some

12   instances granular sugar, in some instance Karo

13   syrup, another form of sugar.

14       Mr. Stryker also testified that the substances

15   in those exhibits was the same thing that was

16   included in the Attorney General's list of explosive

17   materials.  He uses that list as a reference tool in

18   his work and he testified that what he found was what

19   was referred to in the list.

20       Now, we do not have to prove that the defendant

21   Mr. Megahed knew that the safety fuse and the

22   potassium nitrate explosive mixture in the tubes were

23   listed in the statute or were listed in the *Federal*

24   *Register* as explosive materials.  Those aren't

25   elements that have to be proven.  We do not have to

1    prove that Mr. Megahed knew the chemical composition
2    of those items.
3        The proof required in connection with Mr.
4    Megahed's knowledge is that he knew that these items
5    were in the car and he was aware of the
6    characteristics of the safety fuse and the
7    characteristics of the substances in the PVC pipes
8    and in the coleslaw container that in fact brought
9    them within the purview of the statute.  That is that
10   if they were ignited, they would burn rapidly,
11   deflagrate, another term for what low explosives do.
12       Ladies and gentlemen, these were clearly
13   explosive materials.  Mr. Mohamed did not have a
14   license to transport them and Mr. Megahed did not
15   have a license to transport them either.
16       I would submit to you that the evidence that --
17   I'm sorry -- the explosive materials that were found
18   in this Toyota Camry in Goose Creek, South Carolina
19   were in fact transported from the Middle District of
20   Florida interstate.  How do we know that?  Well,
21   initially we know that they were in -- they were
22   arrested in South Carolina.  And I'm going to ask you
23   during the course of your deliberations to take a
24   very close look at Exhibit 43, which I'll display
25   just a moment on the overhead projector.  If we take

1    a look, the second page of Exhibit 43 --

2        THE COURT:  We have to move the easel there.

3    Excuse me.

4        MR. MONK:  Take a look at the second page of

5    Exhibit 43.  On August 2nd, two days -- two days

6    before this trip began, specifically Items 46 through

7    56, Mr. Mohamed purchased stump remover, which is a

8    primary source that contains a very high percentage

9    of potassium nitrate from Wal-mart Store Number 2627.

10   And please keep in mind that the last page of Exhibit

11   43 is a legend that tells us which -- where which

12   numbered stores are located.  Store Number 2627 is

13   located on Fletcher Avenue.  And that purchase was

14   made on August 2nd at 3:35 p.m.

15       That same day at 7:15 p.m., Mr. Mohamed

16   purchased kitty litter at Wal-mart Store Number 5221,

17   which is on North Florida Avenue in Tampa.

18       Then he went to Home Depot that same day at 7:53

19   p.m. and he purchased PVC pipes of different sizes.

20   And please recall that the PVC pipes that are the

21   subject of the evidence in this case were of

22   different sizes.  And then seven minutes later, he

23   purchased a tube cutter from the same Home Depot.

24        Now, we don't know from the evidence whether

25   Mr. Megahed or Mr. Mohamed, which one of them,

1    purchased the coiled safety fuse that was found in

2    the car, but we do know that there were eight

3    additional rolls of the same type of coiled safety

4    fuse found in Mr. Mohamed's car back in Tampa when it

5    was searched in August.

6        We also know that Mr. Megahed, from the

7    evidence, had in July, some time in July of 2007,

8    assisted Mr. Mohamed in carrying out some sort of a

9    two and a half foot long homemade device from

10   Paulette Poliquin's house.  Both of them put that

11   device into that same car, that is Mr. Mohamed's car,

12   where the eight additional packages of coiled fuse

13   were found during the execution of the search

14   warrant.

15       Remember also, please, that Richard Stryker

16   also testified that the small caps that are in

17   evidence, as I believe Exhibit 53 or 54 -- these were

18   caps that were taken out of the cut up carpet that

19   was removed from Paulette Poliquin's -- the bedroom

20   she had leased to Ahmed Mohamed.  Richard Stryker

21   examined those and he testified that the plastic caps

22   were physically consistent with the plastic cap on

23   the top of a bottle of Spectracide stump remover.

24   The evidence that I've just recited points to and

25   supports the proposition that these explosive

1    materials were transported interstate from the Middle

2    District of Florida to where they were found in Goose

3    Creek, South Carolina.

4         I'd submit to you, ladies and gentlemen, that

5    the main point of contention in connection with this

6    first count of the indictment is Mr. Megahed's

7    knowing possession of these devices that were in the

8    trunk of the car.  That is whether Mr. Megahed

9    knowingly possessed those items:  The safety fuse,

10   the PVC pipes containing the potassium nitrate

11   explosive mixture in the car.

12        Now, I'm going to take just a moment to discuss

13   this notion of possession, elaborate just a little

14   bit on what the judge told us about the notion of

15   possession.  Specifically, the two or rather the four

16   kinds of possession:  Actual, physical possession,

17   constructive possession, sole possession, and joint

18   possession.  If my car keys obviously are in my

19   pocket then I have actual, physical possession of my

20   car keys.  I have physical control over them and I

21   actually possess them.  If they are on a key rack

22   back at my house, then I may not have actual physical

23   possession of them, but I have constructive

24   possession of them because I have both the power and

25   the intention to take control of them at a later

1    time.

2         My possession of my automobile can be sole or

3    joint.  If I possess it myself, that possession is

4    sole possession.  However, under that meaning, if my

5    wife and I have joint constructive -- under that

6    meaning, my wife and I do in fact have joint

7    constructive possession of our family automobile that

8    sits in our driveway outside of our house.

9         I submit to you that the evidence that we've

10   introduced in this case proves beyond a reasonable

11   doubt that Mr. Megahed in fact had knowledge of the

12   presence of the explosives in that automobile and he

13   also jointly possessed those items with Ahmed

14   Mohamed.  What is the evidence of that?  First of

15   all, it's clear I believe from the evidence that Mr.

16   Mohamed and Mr. Megahed are friends.  Both of them

17   lived in Tampa.  Mr. Megahed was identified

18   absolutely, according to a word used by Paulette

19   Poliquin, as a frequent visitor at her house.  They

20   spoke frequently on their cell phones between a time

21   in June and the August 4th trip, over 70 times

22   between June and August 4th, over half a dozen times

23   between August 2nd and August 4th, according to

24   Special Agent Brown's testimony regarding his

25   analysis of the cell phone records.

1          The testimony in this case focused on the

2    events in Goose Creek, both on Saturday, August 4th,

3    and also on the dates preceding August 4th.  You

4    recall from the defense opening statement, we were

5    told by defendant's lawyer that this was a weekend

6    jaunt to the beach by two typical college buddies who

7    were on tight budgets.

8          Ladies and gentlemen, in the early morning

9    hours of August 4th, Mr. Megahed and Mr. Mohamed left

10   Tampa in Youssef Megahed's brother's car, that is

11   Yahia Megahed's car, the 2000 Camry.  I'll discuss

12   the evidence regarding this weekend trip as it bears

13   upon Mr. Megahed's knowing possession of the items in

14   this car.  I'd at least like to attempt to proceed

15   somewhat chronological in that regard.

16         Let's take another look at Exhibit 43, this

17   time the first page.  If we start with Item 30, on

18   August 4th at 1:08 a.m., we see that Mr. Mohamed

19   purchased cashews from Wal-mart Store 2627, which is

20   in Tampa on Fletcher Avenue.  That tells us that they

21   were still in Tampa at 1:08, or around about one

22   o'clock in the morning.

23         Then a little while later, we see that they are

24   in Ocala, Florida.  And we see that at 3:17 a.m., Mr.

25   Megahed, on a tight budget, paid $288 for a Garmin

1    Global Positioning System at Store Number 697.  And

2    697, according to the legend on Exhibit 43, is on

3    West 19th Avenue in Ocala, Florida.

4        A minute later, Mr. Megahed purchased the power

5    inverter that he used to power Mr. Mohamed's HP

6    laptop at the same store for $17.88.

7        We see that they then moved to Jacksonville,

8    and beginning at 6:41 a.m. and continuing on until

9    7:22 a.m., they are at yet another Wal-mart store,

10   Store Number 1173, in Jacksonville, where they

11   purchased $28.50 worth of gasoline.  The defendant

12   Mr. Megahed then purchased at the same store numerous

13   items relating to firearms:  Glue remover, bore

14   cleaner, gun oil, a gun cleaning kit, gun patch, gun

15   scrubber, rifle cleaning rod, a rifle kit, and

16   solvent.  At that same store while they were both

17   from the store shopping, Mr. Mohamed purchased a

18   drill.

19       Then at 9:06 a.m., Mr. Megahed purchased floor

20   mats and seat covers at Wal-mart Store Number 1172,

21   which is at Jacksonville Beach, according to the

22   legend.

23       So far while driving through Florida, while

24   still in Florida, between one o'clock in the morning

25   and 9:00 a.m., they have stopped and made purchases

1    at four different Wal-mart stores.  There aren't any

2    other Wal-mart purchases on this exhibit until we get

3    to Goose Creek later that afternoon.

4         Ladies and gentlemen, I'd submit to you that

5    while it appears that during this trip Mr. Mohamed

6    and Mr. Megahed might well have visited one or more

7    beaches, as evidenced by their presence in

8    Jacksonville Beach and what they included or

9    programmed in as waypoints on the global positioning

10   system, the purpose of this trip was not solely to go

11   to the beach.  They purchased a drill, a power

12   inverter, and different materials relating to

13   firearms which they picked up at four different

14   Wal-mart stores along the way.  They made a point of

15   not purchasing all of those items from the same

16   Wal-mart store.  We don't know whether they were

17   going to buy additional items at other Wal-mart

18   stores after leaving Goose Creek since they were

19   arrested that afternoon.

20        We do know from the evidence that with minor

21   variations, Wal-mart stores, according to Kathy Sawn,

22   usually carry pretty much the same items.  Ms. Sawn

23   was the corporate fraud researcher for Wal-mart who

24   told us just that.

25        There was no need to purchase these items on

1  this trip.  They could have purchased them, that is

2  the drill and the other items, back home in Tampa.

3  They purchased them on this trip because going to the

4  beach was not the only focus of their weekend plans.

5  They were also intent on using the materials that

6  were in the trunk of that car.  That's why Mohamed

7  bought the drill.

8      Now, please recall that the first witness who

9  testified in this case was Berkeley County Sheriff's

10 Deputy Lamar Blakely.  He told us that Goose Creek,

11 South Carolina is a small city, the population of

12 about 35,000.  It's not a tourist town.  There are no

13 beaches or other tourist attractions there.  It

14 contains a number of locally owned businesses, a

15 number of residential subdivisions, and also the U.S.

16 Naval weapons station, which was about five to seven

17 miles away from where Mr. Mohamed and Mr. Megahed

18 were stopped for speeding.

19     Deputy Andy Taylor -- I'll show you the second

20 page of Exhibit 73 to give us an idea of where Goose

21 Creek is in relationship to I-95.  Deputy Andy

22 Taylor, who grew up in Goose Creek, also told us the

23 same thing concerning the characteristics of that

24 city.  It was originally a military town.

25     It was suggested by the defense on

1    Cross-Examination of a number of witnesses that the

2    reason that Mr. Megahed and Mr. Mohamed came down to

3    Goose Creek was to purchase gasoline at a Murphy's

4    Oil gas station.  And that Murphy's Oil gas stations

5    sold gasoline comparatively more cheaply.  In fact,

6    Exhibit 43 shows that Mr. Megahed purchased gasoline

7    at that Murphy's Oil gas station on August 4th before

8    they were stopped.  But they did not -- they clearly,

9    ladies and gentlemen, did not drive to Goose Creek

10   for the purpose of purchasing gasoline.

11        We know that Mr. Megahed and Mr. Mohamed had

12   been to Walterboro, which is reflected very close to

13   I-95.  They had been to Walterboro before they went

14   to Goose Creek, and we know that because Mr.

15   Megahed's bank records, Exhibit 39 A, the Bank of

16   America records, and more specifically a page from

17   those records, show that they were in Walterboro and

18   Mr. Megahed used his Bank of America check card to

19   purchase food at Burger King that day.  You'll see

20   that it shows the date posted as August 7th, but the

21   date the transaction occurred is August 4th.

22        We know that, according to Lamar Blakely,

23   Walterboro is about a 40-minute drive to Goose Creek

24   and that there are other gas stations along the way,

25   but apparently they were intent on purchasing cheaper

1    gas at the Murphy's Oil gas station.

2    According to Kathy Sawn, the Wal-mart

3    representative, there was a Wal-mart store in

4    Walterboro, and the Wal-mart store in Walterboro had

5    a Murphy's gas station at the time.  They did not

6    have to drive 40 minutes from Walterboro to Goose

7    Creek to purchase gas.  Moreover, at the time of

8    their arrests, if you recall the testimony from

9    Special Agent Brown, when that automobile was

10   acquired pursuant to a warrant, the gas tank was half

11   full.

12   Ladies and gentlemen, in connection with the

13   two charges that have been brought against Mr.

14   Megahed, we do not have to prove why Mr. Mohamed and

15   Mr. Megahed deliberately drove to Goose Creek, South

16   Carolina that day.  That's not one of the elements of

17   the offenses.  The evidence though does show that

18   they did not have to drive to Goose Creek to buy

19   gasoline and that they choose to go there anyway.

20   Around 5:20 p.m. that day, Deputy Blakely, a

21   member of the Berkeley County Sheriff's Office and a

22   member of the Special Enforcement Team, turned off

23   Geneva Road onto State Road 176, as reflected in this

24   exhibit, Exhibit 68.  If you take a look at Exhibit

25   68, you'll see where Geneva Road is located.  He made

1    a right-hand turn onto -- off of Geneva Road onto

2    State Road 176.  When he made that right-hand turn,

3    he fell in behind the Toyota Camry.  Now, there was

4    initially another car between the Camry and Officer

5    Blakely's vehicle, but that other car got into the

6    next lane.  As soon as he made that right-hand turn,

7    he was behind the Camry.

8         Ladies and gentlemen, here is the Wal-mart

9    store right here.  Blakely got behind the Camry when

10   it was going in this direction approaching the

11   Wal-mart store.  That means that Mr. Mohamed and Mr.

12   Megahed after purchasing gasoline made a right-hand

13   turn on 176 and then turned around and went the other

14   direction.  And when they turned around and went in

15   the other direction, that's when Officer Blakely fell

16   in behind them.

17        Now, Deputy Blakely made certain observations

18   as he drove behind that car.  He observed that the

19   Camry had a Florida license plate.  He observed that

20   the driver, who turned out to be Mr. Mohamed, stared

21   at him intently and continuously in the rearview

22   mirror.  He also noticed that the car started to

23   speed up.  He didn't have radar installed in that car

24   as yet, so he paced the vehicle and ultimately

25   determined that it was travelling at 60 miles an hour

1    in a posted 45 mile an hour zone.  Deputy Blakely

2    activated the lights on his marked vehicle and it

3    virtually lit up like a Christmas tree.  There are at

4    least eight blue and clear lights on the front aspect

5    of the car, and he initiated those.  Three seconds or

6    so after he turns on the lights, the video system

7    starts to work, and the video system captured in --

8    Government's Exhibit 1 C 2 shows what occurred in the

9    traffic stop three seconds after the lights were

10    turned on and from that point forward.

11        The Camry didn't stop right away.  It kept on

12    going about a half a mile or so.  The Camry passed by

13    a number of areas that were suitable for pulling off

14    the highway:  An entrance to the Alcoa factory, a

15    field next to that entrance, also a turnaround spot

16    near a subdivision.  But it didn't pull over right

17    away.  Deputy Blakely observed that the driver and

18    the passenger were moving around toward the console

19    area of the car while that car continued to go.

20        Now, Deputy Blakely told us about his training

21    and experience in drug interdiction.  Frankly, his

22    testimony indicates that based upon what he did and

23    what his specialty was, the focus of his thoughts was

24    the possibility that there may have been narcotics

25    trafficking or narcotics transport activity afoot.

1    He told us what he does when he approaches a

2    stopped vehicle whose occupants and contents are

3    unknown to him.  He watches the hands.  He watches

4    for the movements of the individuals who are in the

5    car.  And he approached the driver's side and he put

6    -- he left a thumbprint or a fingerprint on the top

7    of that car so that if something happened to him and

8    the car drove away, law enforcement officers would

9    later be able to identify the car.  As he was

10   approaching that vehicle, he observed who turned out

11   to be the passenger, Mr. Megahed, pulling wires out

12   of a laptop computer and throwing them in the back

13   seat.

14   His testimony in that regard is corroborated by

15   Special Agent Wade Catchings, the evidence recovery

16   team supervisor with the FBI who came to the scene

17   later that day, later that evening, and recovered the

18   laptop cord as well as the power inverter from the

19   back passenger compartment area of the car.

20   THE COURT:  Mr. Monk, would you like the lights

21   back on?

22   MR. MONK:  Yes, Your Honor.

23   It's also corroborated by the fact that it was

24   Mr. Megahed who purchased the power inverter from

25   Wal-mart.

1     The suspicions that Special Agent -- I'm sorry,

2     that Deputy Blakely had makes sense within common

3     sense from the vantage of a law enforcement officer

4     who is engaged in the law enforcement work that

5     Deputy Blakely was engaged in from the vantage of

6     common sense.

7     I'm also -- I'm going to allude to another

8     instruction that Judge Merryday gave you and that's

9     this:  In your deliberations, in your analysis of the

10    evidence, you are perfectly within your rights and

11    encouraged to use your common sense.  The discharge

12    of your responsibilities is not some artificial task

13    that's performed divorced from the common sense you

14    exercise in everyday life, but it is expected, and I

15    ask you to exercise your common sense in analyzing

16    the evidence.

17    Ladies and gentlemen, the evidence indicates

18    that this was not the proverbial small town speed

19    trap that the -- that that's what the stop was all

20    about.  In fact, Deputy Blakely did not write a

21    speeding ticket.  He wrote out a warning citation.

22    Once he determined that the automobile had not been

23    stolen, he verified its registration, he decided that

24    these guys weren't from this area, may not have been

25    familiar with the traffic laws, so he gave them a

1   little bit of a break.  Exhibit 2 is the warning

2   citation that he wrote out.

3       At the same time, Deputy Blakely also decided

4   that something didn't smell just right, so he asked

5   for and received consent to search the car.  Based

6   upon what he had observed up to that point in time,

7   his suspicions again focused on the possible

8   transport of narcotics.

9       There was no doubt that this was a police

10  vehicle behind this car.  There was no doubt that

11  they were satisfactory places to stop before they

12  stopped.  And they kept going.

13      We also know from a subsequent search that

14  evening -- well, first of all, the search conducted

15  by Blakely, Geiger, and Fields, and the search

16  conducted later that evening that included a drug

17  sniffing dog, we know that there were no drugs in the

18  car.

19      Well, if the furtive movements and gestures

20  that aroused Blakely's suspicion with respect to

21  narcotics trafficking were not born out with respect

22  to narcotics trafficking then what were the matters

23  of concern to Megahed and Mohamed that were in that

24  car if not drugs?  The only things that would have

25  been of concern to them were the laptop computer and

1    the contents of the laptop computer, the bullets

2    under Mr. Megahed's seat, the fuses, the PVC pipes

3    containing the potassium nitrate explosive mixture,

4    the can of gasoline, and the other items found in the

5    trunk of that car.

6         Ladies and gentlemen, I would suggest and

7    submit to you that Mr. Megahed was in fact concerned

8    about that laptop.  You recall from the testimony of

9    Deputy Taylor that when Mr. Megahed got out of the

10   car, he still had the laptop in his possession, and

11   he had to be told to put it down.  He had good reason

12   to be concerned about that laptop.  He had just

13   finished watching a video on that laptop, a video

14   that was in total 44 minutes in length, was the last

15   item accessed on that laptop computer.  It was opened

16   around 5:06 p.m., Eastern Standard Time, not long

17   before that traffic stop occurred.

18        Please recall the testimony of Stacy Holthus,

19   the FBI computer forensic analyst, who told us that

20   she was able to determine what the last item accessed

21   on Mohamed's laptop was that day.  It was a video

22   that was accessed and opened with the Real Player

23   software.  It was opened at 5:06 p.m. on August 4th.

24   The computer was shut down at 5:19 p.m.  She

25   testified that it was played for eight minutes at

1    least, but may have been played longer than that.

2        During this trial the judge read a stipulation

3    concerning the agreement of parties relating to that

4    video as follows:  "You've heard testimony concerning

5    the files last accessed on Mohamed's HP laptop

6    computer seized from the Toyota Camry on August 4,

7    2007.  The parties stipulate, and you may treat as

8    proven, that Mohamed's HP laptop contains a

9    downloaded video of approximately 44 minutes in

10   length that portrays military style rockets in

11   different settings being launched by propellants of

12   unknown composition."

13       Ladies and gentlemen, just before that traffic

14   stop occurred, Mr. Megahed was watching that

15   44-minute video that depicted the launching of

16   military style rockets being launched by propellants

17   of unknown composition.  That's what he was watching

18   just before being stopped and that's why he pulled

19   the cord out of that laptop and threw it in the back

20   seat and closed the lid on that laptop just as

21   Blakely was approaching the Camry on the driver's

22   side as though he had not been looking at anything at

23   all on the laptop.  The video he was watching was

24   directly related to the items that Mr. Megahed knew

25   were in the trunk of that car.

1    Blakely began his search. He found receipts

2 reflecting the purchases from Wal-mart stores that

3 occurred earlier that day: The drill, the power

4 inverter, the floor mats, the seat covers. When he

5 discovered the .22 caliber bullets, he had Mr.

6 Mohamed and Mr. Megahed placed in handcuffs.

7    Let me mention something else to you at this

8 point pertaining to the purchases that these two men

9 made from those different Wal-mart stores while they

10 were on their journey out of Florida through South

11 Carolina. There is something else very curious about

12 these purchases. You'll notice in Government's

13 Exhibits 18 A and 18 B admitted in evidence, and

14 these are reflected in the photographs taken of the

15 automobile, the cardboard binding and the hangers are

16 still on these floor mats. They were put on the

17 floors in the car with these items still on. You'll

18 also notice that how it's not unusual to save

19 receipts on items just purchased, and maybe not on

20 some of the containers that the items come in, that

21 Mr. Mohamed and Mr. Megahed saved all the boxes,

22 saved the receipts. The seat covers you'll note that

23 were placed on the seats were of different colors.

24 He purchased seat covers of different colors.

25    Ladies and gentlemen, I would submit to you

that Mr. Megahed and Mr. Mohamed had every intention
of using these items that they purchased and then
unwinding the purchases, taking them back to Wal-mart
when they were through using them for the purpose
they had to use them on this trip.  There's no other
reason why they would put these floor mats in the car
on the floor as depicted in photographs with the
bindings still on them other than because they were
going to take them back.

Back to the traffic stop.  We know that
Sergeant Geiger was called to the scene.  Exhibit 1 C
2 shows what occurred when Sergeant Geiger found the
or looked in the bag the Deputy Fields had picked up
and removed one or two items and then found the PVC
pipes within that bag.  He visibly moved back from
the trunk area of the car and told Fields to put that
stuff down.

According to Deputy Taylor, as Fields and
Geiger approached the trunk of that car, Mohamed and
Megahed were off to the back of that car, off to the
back of the vehicle chatting in a foreign language.
Then as they went and opened the trunk of the car,
Taylor testified -- I believe it was Taylor.  It may
have been Fields who testified that they stopped
talking and they both looked at the trunk of the car.

1    We were told by law enforcement officers from

2    Berkeley County, I believe it was Deputy Taylor, that

3    that sometimes happens with individuals who are

4    carrying contraband.  They will unconsciously look at

5    the area of the car that they're concerned about.

6    That's just what Megahed and Mohamed did in this

7    case.

8         Geiger, Sergeant Geiger saw four pieces of PVC

9    with a brownish substance in inside, plugged on one

10   end with a hole in the end.  He said they looked to

11   him like pipe bombs.  He was asked on

12   Cross-Examination whether he had ever seen homemade

13   fireworks and he said that he had never seen

14   fireworks that looked like that but he had seen pipe

15   bombs that looked like that.  He said the fuse was

16   thicker than typical fireworks and it was coiled.

17   The reason that he was taken aback and moved away

18   from these devices is because based upon his training

19   and experience, he knew that homemade devices like

20   this, like pipe bombs, were inherently more dangerous

21   than explosives that are made according to commercial

22   or military specifications cause you just never know

23   what you're going to get.  That 's why he was so

24   afraid of what he saw in the back of that car.

25         The bomb squad arrived at the scene.  Geiger

1    called the bomb squad.  They collected evidence.

2    They used a robot to collect many items of evidence

3    from the trunk of that car.

4         And far beyond midnight after the bomb squad

5    cleared the scene, the FBI evidence response team

6    started collecting the evidence that was placed on

7    the roadway.  A number of items were taken into

8    evidence that had been taken out of the trunk of the

9    car by the robot and placed on the roadway:  The PVC

10   pipes with the substances inside, the safety fuse,

11   the gas can, the Black & Decker drill, the Garmin GPS

12   box, and dowel rods

13        THE COURT:  Mr. Monk, you asked to be notified

14   upon the expiration of 50 minutes.

15        MR. MONK:  Five-zero, Your Honor?

16        THE COURT:  Five-zero.

17        MR. MONK:  We know that Special Agent Dwight

18   Ellisor went back and picked up 16 A, I believe,

19   three weeks or so later.  It had not been taken into

20   evidence that night because they -- the personnel

21   there thought it was fecal material.  It resembled

22   fecal material.  A dog had gone to the bathroom

23   around the automobile, and so that was not collected

24   until several weeks later.

25        Ladies and gentlemen, it is helpful in

1    evaluating whether Mr. Megahed was in knowing
2    possession of a safety fuse and the potassium nitrate
3    explosive materials that were in the trunk of the car
4    by looking at some other evidence as well.  The
5    explosive mixtures that were in those PVC pipes, the
6    gas can, the fuse, were in the trunk of the car.
7    What else was in the trunk of the car?  Many things,
8    the boxes for many things that Megahed had purchased.
9        The defendant's fingerprints, Mr. Megahed's
10   fingerprints were all over items in the trunk of that
11   car under circumstances that we know that he went in
12   that trunk while the PVC pipes were also in the
13   trunk.  His fingerprint was on the gas can.  His
14   fingerprints were on the seat cover boxes in the
15   trunk that were purchased earlier that day.  They
16   were on the power inverter box that he had purchased
17   that day.  They were on the GPS box in two different
18   locations.  That means that Mr. Megahed was in the
19   trunk of that car after it left Tampa and put those
20   items in the car while the potassium nitrate
21   explosive mixtures were in the trunk of that car.
22       Let me speak for just a second about
23   circumstantial evidence, which was also included in
24   the judge's instructions.  He told you that the law
25   makes no distinction between direct and

1    circumstantial evidence.  Indeed, in some instances

2    circumstantial evidence can be more powerful and

3    stronger than direct evidence.  Simply put, if a

4    witness takes the stand and reports that he saw a

5    human being standing in the snow.  If believed, that

6    testimony tends to directly establish that fact.

7    That's direct evidence.  If a witness gets on the

8    stand and testifies that he saw human footprints in

9    freshly fallen snow, that testimony, if believed,

10   tends to circumstantially establish that fact.

11       Mr. Megahed's fingerprints were all over

12   various items in the trunk of that car.  In addition,

13   there is other direct and circumstantial evidence

14   that establishes his knowing, joint possession with

15   Ahmed Mohamed on those items.

16       Please recall that Mr. Mohamed's landlady

17   Paulette Poliquin testified, again, that Mr. Megahed

18   was a frequent visitor.  In July, an individual who

19   she could not be sure about now, testifying in court

20   almost two years later, helped Mohamed take a

21   homemade device two and a half feet long out of the

22   house and put it in Mohamed's car.

23       In mid-October of 2007, while the events were

24   fresh in her mind, Special Agent Alan Brown showed

25   her a photo array, according to his testimony, and

1    she identified Youssef Megahed as the individual --

2    in October of 2007, she identified Youssef Megahed

3    from that photo spread as the individual who helped

4    Mohamed carry that device out of that house.

5        Mohamed lied to her when he told her that the

6    device was for a school project.  We know according

7    to Professor Nachabe's testimony that it was not.

8        Mr. Megahed and Mr. Mohamed jointly possessed

9    these devices that were carried in the car on August

10   4th of 2007, just as they jointly possessed that

11   homemade device in July of 2007.

12       Ladies and gentlemen, I'd ask you to consider

13   the other side of the coin.  If Mr. Megahed did not

14   know and was not in knowing, joint possession of the

15   items in the trunk of this car on August 4th, 2007,

16   it must be because Mr. Mohamed had some reason to

17   keep that hidden from him.  But that makes no sense

18   that he would have hidden those devices from Megahed.

19   It clearly appears from the evidence that they were

20   friends.

21       Moreover, if you recall the testimony of Deputy

22   Fields -- Deputy Fields who was the deputy who

23   actually found and picked up the bag that these

24   devices were in.  He was shown Exhibit 24 K, the

25   photo, one of the photos.  It shows toward the back

1    of the car roughly in the center to right center area

2    this white bag.  It's not tied at the top.  He told

3    us that this is roughly -- this appears to be roughly

4    the area from which he picked it and put it back

5    down.

6         Now, yesterday, one of the photos taken by the

7    defense that we moved into evidence showed the spare

8    tire area of that car, which is a sunken spare tire

9    area.  If Mr. Mohamed for some reason wanted to hide

10   these devices from Mr. Megahed, he didn't do a very

11   good job.  He didn't hide them at all.

12        Again, its's clear that the focus of this trip

13   was to engage in some activity with these explosives.

14   This was not just a beach trip.  They didn't even

15   have any swimming suits in this car.  The defense in

16   their -- one of the last witnesses they called

17   yesterday, Special Agent Brown, had him identify a

18   photograph of Mr. Megahed that was recovered from Mr.

19   Megahed's U-Store-It facility, a photograph of Mr.

20   Megahed taken around April of 2007 wearing a swimming

21   suit.  Well, that demonstrates that Mr. Megahed in

22   2007 owned a swimming suit but didn't take it on this

23   trip on the beach and neither did Mr. Mohamed.

24        We heard about the listening device that was

25   put legally in the back of Deputy Blakely's

1    automobile when at the end of the evening Mr. Mohamed

2    and Mr. Megahed were put back together for ultimate

3    transport to the detention.  On that translation --

4    and it's a multi-page translation.  On Page 6, Mr.

5    Megahed states, "We weren't expecting something like

6    this."

7         Mr. Mohamed then responds, "Praise be to God,

8    we were discussing," and then it's interrupted by

9    simultaneous conversation, "we were discussing, I

10    mean, whether to take this thing with us or no.  You

11    even told me," and then an unintelligible sentence,

12    and then the discussion goes on.

13         Ladies and gentlemen, that discussion relates

14    to -- they were discussing the fact that they had

15    discussed whether or not to take these devices with

16    them on the trip.  That further indicates Mr.

17    Megahed's knowing possession of these explosive

18    materials.

19         All right.  I'm going to turn now to a

20    discussion of the transport charge, that is the

21    second charge in the indictment where Mr. Megahed is

22    charged with unlawfully transporting an unregistered

23    firearm, specifically a destructive device.  In this

24    case, the firearms -- I'm sorry, the explosives

25    expert Richard Stryker testified very clearly that he

1  has had training in destructive devices.  In Mr.

2  Stryker's experience, destructive devices almost

3  always include homemade improvised explosive devices.

4  Mr. Stryker stated his opinion that the potassium

5  nitrate explosive mixture in the PVC pipes that were

6  in the trunk of that Camry together with the safety

7  fuse and the gasoline could be readily assembled into

8  an incendiary bomb or an incendiary similar device.

9      The evidence is conclusive that neither Mr.

10  Megahed nor Mr. Mohamed had registered any

11  destructive devices with the National Firearms and

12  Registration and transfer record.  That's reflected

13  in Exhibits 62 A and 62 B that are in evidence.

14      Ladies and gentlemen, each one of the terms

15  that I just alluded to from Richard Stryker's

16  testimony about the items that were found in that car

17  that could have been assembled into a destructive

18  device, destructive device, improvised explosive

19  device, potassium nitrate explosive mixture, and

20  incendiary bomb, those were all -- those were terms

21  that were all on websites accessed and researched by

22  Youssef Megahed on the E-Machine's computer, usually

23  in the middle of the night,  just weeks before this

24  trip in August.

25      It was suggested during Cross-Examination that

1      the potassium nitrate mixtures were nothing more than

2      Mr. Mohamed's innocent hobby relating to fireworks or

3      hobby rocketry.  There are several difficulties with

4      that thesis.  The first is that Richard Stryker told

5      us that the colors associated with fireworks are

6      created by infusing into the mixture different

7      metals, powdered metals, Strontium.  There were no

8      such chemicals that were infused into these mixtures.

9          Secondly, while low explosives, such as were

10     found here, can have an innocent use, the intention

11     of the possessor is important in determining whether

12     or not the intended use is innocent or not.  In that

13     regard, I ask you to please take a look at what's

14     been admitted in evidence as Exhibit 87.  Exhibit 87

15     contains information relevant to the intentions that

16     were involved here.  That exhibit includes websites

17     taken from Mr. Mohamed's HP laptop computer that he

18     had downloaded onto his computer, which were not

19     password protected, which means that Mr. Megahed had

20     full access to them.  Mr. Mohamed had downloaded the

21     recipe for acetone peroxide, a primary high

22     explosive, and then he printed out photos of two of

23     the commercially available primary ingredients of

24     that.

25         We know that on July 31st, four days before

1    that trip that resulted in their arrests, Mr. Mohamed

2    purchased those ingredients that are part of what's

3    necessary to make that high explosive.  Just four

4    days before that trip.

5         Youssef Megahed, using the Usef account on the

6    E-Machine's computer accessed numerous Wikipedia

7    websites very similar to the websites on Mr.

8    Mohamed's computer.  Please look at the hard copies

9    in Exhibit 47 Bravo:  A website entitled *Incendiary*

10   *Device*, accessed by Mr. Megahed; a website entitled

11   *Destructive Device* that actually contains definitions

12   and a specific detailed reference to one of the

13   statutes specifically involved in this case in Title

14   26; a website entitled *Palestinian Domestic Weapons*

15   *Production*; a website entitled *Qassam Rocket*; another

16   entitled *Fuse*, *Explosives*; and a website entitled

17   *Potassium Nitrate*, which describes potassium nitrate

18   and other explosive mixtures.  While in many

19   instances Mr. Megahed's accessing of these websites

20   was of short duration, we do not know and cannot know

21   whether or not he printed any of the information out.

22   We do know that every time he accessed one of those,

23   it was a volitional navigation to that website.  He

24   had to search for it or he had to click on a link

25   that took him to each one of these websites.

1    Ladies and gentlemen, this and other evidence

2    in this case indicates that Mr. Megahed and Mr.

3    Mohamed had the mutual intention to assemble the item

4    in the trunk of this vehicle into an incendiary bomb

5    or an incendiary destructive device of a similar

6    nature.  The quantity of safety fuse in that vehicle,

7    20 feet, they had in that car burns, according to the

8    testimony, at the rate of approximately one foot for

9    every 15 to 20 seconds and provided them with a delay

10    of up to five minutes.  They spoke about the gasoline

11    in the trunk of that car in Arabic while they were in

12    the back seat of Blakely's vehicle being transported

13    to jail.

14    On Page 2 of that translation, Megahed says to

15    Mohamed, "Did you tell them about the gasoline?"

16    Mohamed responds, "Yeah, there is nothing.  I

17    told them that it's not yours and that you have

18    nothing to do with it and I was the one who made

19    these fireworks," et cetera, and the discussion goes

20    on.

21    Mr. Megahed did have something to do with the

22    gasoline.  His fingerprint was on the pour spout.

23    Ladies and gentlemen, again, we are not

24    required to prove as an element of the offenses the

25    ultimate purpose of this trip.  We are required to

1    prove the elements of the offenses that are charged,

2    one relating to the transportation of explosive

3    materials and the other relating to possession of an

4    incendiary destructive device.  We have proven those

5    crimes far beyond a reasonable doubt, both through

6    direct and circumstantial evidence.

7         We very much appreciate your close attention

8    that you have given the last two and a half weeks to

9    the testimony in this case.  I ask that following

10   your deliberations you return a verdict of guilty

11   with respect to both counts in this indictment.

12   Thank you.

13        (End of excerpt of proceedings.)

14

15                    C E R T I F I C A T E

16        I, Kerry Mercade, certify that the foregoing is

17   a correct transcript from the record of proceedings

18   in the above-entitled matter.

19                                   S/Kerry Mercade

20                                   Kerry Mercade
                                     Court Reporter

21

22

23

24

25