```
 1              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                   TAMPA DIVISION

 3   UNITED STATES OF AMERICA

 4

 5        vs.                CASE NO. 8:07-cr-342-T-23MAP
                             March 31, 2009
 6                           Tampa, Florida

 7

     YOUSSEF SAMIR MEGAHED,
 8
          Defendant.
 9   _____/

10           TRANSCRIPT OF EXCERPT OF PROCEEDINGS
                 (Summation by Mr. Hoffer)
11        BEFORE THE HONORABLE STEVEN D. MERRYDAY
                UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     For the Government:   JAY HOFFER
14                         ROBERT MONK
                           Assistant U.S. Attorneys
15                         400 N. Tampa Street, Suite 3200
                           Tampa, Florida 33602
16                         813/274-6000

17   For the Defendant:    ADAM ALLEN
                           DIONJA DYER
18                         Assistant Federal Defenders
                           400 N. Tampa Street, Suite 2700
19                         Tampa, Florida 33602
                           813/228-2715
20

21
     Court Reporter:       Kerry Mercade
22                         801 N. Florida Avenue
                           Suite 15A
23                         Tampa, Florida 33602
                           813/301-5024
24

25   Proceedings recorded and transcribed by
     computer-aided stenography.
```

1     MR. HOFFER:  May it please the Court, Counsel,

2     ladies and gentlemen of the Jury, good morning or

3     good afternoon.

4          Well, let's see if I understand it right.  The

5     defense boils down -- defense theory, defense

6     arguments boil down to this:  Mr. Mohamed brought

7     along the PVC pipes containing a potassium nitrate

8     explosive mixture.  He hid them in one of his best

9     friend's car's trunk.  He brought more pipe with more

10    potassium nitrate in order to surprise himself or

11    maybe Mr. Megahed, the defendant, by whipping them

12    out at some point during this trip to make a rocket

13    that would not fly or to make a firework that would

14    not create light, color, sparkle; an item that would

15    simply at best burn and maybe jump horizontally about

16    20 feet or 20 inches, according to what Mr. Yawn's

17    experiments showed.  That's what it boils down to.

18    That's what the defense boils down to and it's a

19    reason why that's their only interpretation of the

20    evidence because any other reasonable view of all of

21    the evidence in the case and all of the testimony

22    would lead you to render a verdict of guilty as to

23    both counts.

24         Now, Mr. Monk has spent a good deal of time

25    analyzing, going through, the testimony and the

1    evidence to establish how the Government has proven

2    the defendants's guilt in this case.  What I'd like

3    to do in the time remaining to me is to talk a little

4    bit about the illogic of some of the defense claims

5    and some of the defense arguments.

6         Well, the first and primary one is the

7    defendant knew nothing about what was in that trunk,

8    the trunk of the car that he borrowed or he used that

9    was registered to his brother but was his car,

10   because Mohamed had hid them back there, conceivably,

11   at some point prior to one o'clock in the morning on

12   August the 4th, 2007, as if by the by Mohamed could

13   be the only one that could know about those things

14   and no one else could ever know about them.

15        Well, let's take a look at that.  I submit to

16   you when you look at that and apply your logic and

17   common sense, that argument won't fly just like the

18   rockets in here, that they're argued to be, wouldn't

19   fly.

20        Why, ask yourself, first of all, would Mohamed

21   do that?  He's with one of his best friends, someone

22   who visits him all the time.  They're on a trip.  Why

23   does he need to hide anything?  Especially if in the

24   defense's view it's so harmless.  It's a propellant,

25   it's nothing, it's a toy, it's fireworks.  Why hide

1    it?  If he had intended to hide it, why did he do
2    such a lousy job at it?  Why didn't he hide it deep
3    in that wheel well of the trunk where the spare tire
4    was?  You saw that on the defense photograph
5    introduced yesterday.  In fact, a photograph I think
6    the Government introduced, not the defendant.

7         If he intended to do that -- if Mohamed had hid
8    this thing and intended to do so, why didn't he bury
9    it?  If he didn't put it in the wheel well, under the
10   stuff in the trunk.  Remember the testimony of Deputy
11   Fields, everything in the trunk was sort of on an
12   equal level.  Nothing was buried underneath something
13   else.  They could easily find all the bags and look
14   through them because they were all sort of lying
15   right next to each other.  Nothing was really crammed
16   down, secreted in the trunk, buried under tons of
17   bags and tons of debris.

18        Why did Mohamed bring more?  Why was there more
19   potassium nitrate in that container?  Why was there
20   another pipe that was empty?

21        Ask yourself what reason to -- ultimately, what
22   reason does Mohamed, the defendant's close good
23   friend, have to hide it?  They're both engineers,
24   they both know about things.  They both have the same
25   knowledge set.

1          Ms. Poliquin suggested in fact, remember the

2     testimony, they were carrying out a rocket sort of

3     device back in July out of her home together.  Why

4     has Mohamed got to hide his interest in rocketry if

5     that's what this was?

6          Now, the evidence suggests Mohamed didn't put

7     that in there and hide it from his friend.  How do

8     you know that?  Well, take a look at some of the

9     evidence, the location again of the items, the PVC

10    pipes, belies the fact that they were hidden.  They

11    were right in the center of the trunk.  I think

12    Deputy Fields told you that's where he found the bag.

13    They weren't buried.  He said they were next to each

14    other, the items in the trunk.  In fact, the bag

15    wasn't sealed up.  Remember, use your own logic and

16    common sense.  You go into a trunk, you stand over a

17    trunk, you've got these plastic bags.  Sure, they

18    were opaque on the sides and you can't see through

19    them perhaps, but if you look down -- and they're not

20    secured.  They're not tied up.  There's no twist ties

21    around them.  There's no knots in the handles.  You

22    can see right into them.  That trunk is open and

23    you're standing in front of it, you're going to see

24    what's in bags that are open like that.  Logic and

25    common sense.  In fact, that's corroborated by the

1    fact that it didn't take more than two minutes.  In

2    fact, it took a lot less than two minutes for

3    Sergeant Geiger to find the thing.

4         Remember, watch the videotape.  It's about a

5    minute and 30 seconds.  And they're not searching

6    through every bag.  They're looking at one bag,

7    stopping for a little bit, looking, and less than a

8    minute or so later they find this bag and they see

9    the contents without any great effort, without

10   digging or rooting through that trunk.

11        The defendant's fingerprints were on multiple

12   items in that trunk, and these were fingerprints of

13   fresh vintage because these are items mostly that had

14   just been bought that morning at Wal-marts:  The gas

15   canister, one on of each of the two seat box covers

16   that the defendant himself had bought; one or two

17   rather on the inverter box; and two on the GPS box.

18        And, again, it's sort of a red herring to say,

19   well, you know, there weren't any fingerprints of

20   value of anybody on the pipes.  Well, first of all,

21   you heard testimony from Ms. Rensink.  You can touch

22   a thing, you can handle it, do whatever you want with

23   it, and circumstances might prevent you from leaving

24   fingerprints on that item that will be found in the

25   future later on.  And of course somebody brought

1      those pipes, somebody handled them, but there were no

2      fingerprint on them.  So what does that establish?

3      It means exactly what Ms. Rensink said.  You can't

4      take the absence of fingerprints as an indication

5      that the defendant never handled them, never touched

6      them.

7           Just like Mohamed's car.  Remember the

8      fingerprints from Mohamed's car?  Couldn't figure out

9      anybody's prints, even Mr. Mohamed.  It was his car.

10           Again, the science of fingerprints is only as

11     good as whether a print is left by the way someone

12     holds something, for how long, intervening

13     circumstances, all of those factors play a role.

14          Again, the defendant had seen Mohamed, had

15     helped him with that rocket.  There's no reason to

16     hide these rockets, if that's what they were.

17          The purchases on the way north would have

18     alerted the defendant there's something going on and

19     would have caused him to ask about it.  Why does

20     Mohamed buy a drill, an electric drill, on a beach

21     trip, if that's what it really was, at three o'clock

22     in the morning?  Don't you think that's going to

23     cause somebody who's along with him, one of his best

24     friends, to ask, "What's with the drill?  Where's

25     that gonna go?"  I submit to you again that would

1    lead a circumstantial indication there's got to be

2    knowledge on behalf of the defendant.

3        And the defendant's own purchases.  Again, he

4    buys the inverter to run the laptop, a laptop which

5    has information about explosives and has this video

6    about military style rockets being launched that he

7    watches just before they're stopped by Corporal

8    Blakely.

9        The seat covers and the floor mats.  Well, the

10   seat covers and the floor mats are odd.  Two college

11   kids on a trip buying seat mats and floor covers.

12   Well, Agent Brown told you the seats were in fine

13   condition in that car.  They didn't need new seat

14   covers.  They didn't need floor mats.  Unless, of

15   course, you're going to do something in that car and

16   you don't want to leave residue behind, you don't

17   want to leave traces behind.  You put new things

18   down.  You buy them, leave the tags on, shake them

19   out, wash them out, whatever, return them back to

20   Wal-mart when you're done.  No trace of what you've

21   been involved with.  And who bought those things?

22   The defendant did at three o'clock in the morning or

23   I think about seven o'clock in the morning in

24   Jacksonville.

25       The furtive conduct.  You heard reference to

1     that again.  Why are they rooting around in the

2     center console?  Why is Mohamed constantly looking

3     through the rearview mirror?  Why is the defendant

4     pulling the laptop wires out, tossing it in the back

5     seat, that you can see later on when you look at the

6     video of the car?  And why is he slamming the laptop

7     shut?  Not closing it gingerly, slamming it shut and

8     clutching it when the officers come up to the car and

9     Deputy Taylor is on his side and Corporal Blakely is

10    on the other.  Why is that all happening?

11         Why did they not stop right away?  There's two

12    spots they could have pulled in, the Alcoa plant has

13    that three-lane driveway, drive-in.  There's another

14    spot where there's some sort of a power plant, you

15    heard.  They passed all of those spots and pulled in

16    right where it's bumpity, bumpity, bumpity, to borrow

17    someone's expression, on the side of the road.

18         Why did they stop talking and stare at the

19    trunk, both the defendant and Mr. Mohamed, when the

20    trunk is opened and the searching of the trunk

21    begins?

22         And again, of course, why if the defendant is

23    unaware of this stuff in the car does he have this

24    rather interesting history on the Internet of looking

25    at IEDs, potassium nitrate, which exactly is the

1    component of Exhibits 3A, 4A, and 5A, nitroglycerin,

2    fuses?  I won't go through the list.  Incendiary

3    devices, destructive devices.  Some of the things he

4    has an interest in obviously.

5        And perhaps the best evidence of it all as far

6    as the defendant's knowledge, something Mr. Allen

7    didn't talk an awful lot about, is that backseat

8    conversation at about 4:00 in the morning on August

9    the 5th.  The defendant and Mohamed are speaking in

10   Arabic.  As they know, no one can hear them.  And

11   they say and do or not say several things that compel

12   you, I submit to you, to conclude the defendant was

13   aware of the contents of the car.

14       Remember, the first reference in that

15   conversation after they switch over to Arabic is from

16   Mr. Mohamed.  And what does he say?  "I mean, my

17   Lord, oh my Lord, this time I heard that you were

18   sleeping the whole time.  They took one of them and

19   they made it -- they made it explode."

20       And what does defendant say?  "What are you

21   talking about?  What exploded?  What do you mean?"

22   No.  He says, "Did it work?"  There's no surprise in

23   him.  I mean, if you were sitting in a car with

24   somebody and they talked to you and they say, "Well,

25   they made it explode," do you say, "There was

1    something in the car explodes?"  That's not the

2    defendant's reaction at all.

3        Go on in the conversation, Page 4.  And invite

4    you to read the entire transcript, Government's

5    Exhibit 33 D in evidence.  Page 4, there is some

6    concern about the drill, as if they are trying to

7    distance themselves from the drill.  Mohamed says, "I

8    bought the drill to make holes in the invention for

9    the fuse."

10        And of course, does the defendant say, "What?

11   A drill to make holes?  Fuse?"  Again, does he react?

12   No.  No surprise in him whatsoever.  The drill.  He

13   says, "What?"  The drill.  He's very concerned, the

14   defendant is, about that drill and what Mohamed has

15   said about it.  I submit to you that he's not shocked

16   that it's there, he knows why it's there in

17   relationship to what's in the trunk of that car

18   because of all the other reasons just talked about.

19        Again, continuing on in the conversation,

20   Mohamed said, "Well, you know, I told him," talking

21   about his conversation with one of the officers, "I

22   only did it twice before.  The two times I did it

23   before, it was something simple and it has never

24   worked.  That's it."

25        What does the defendant say?  "Did you tell him

1    that it has never worked before?"

2         Not, "What are you talking about?"  He knows

3    full well what Mohamed is talking about.  These are

4    things they've dealt with before.  They've

5    experimented with these things before.  He ain't

6    surprised by anything that Mohamed's telling him.

7    Not one comment in here indicates a surprise or shock

8    or reaction you'd expect from someone who had no

9    knowledge whatsoever of what's in that car.

10        They talk further in the conversation about a

11   live weapon.  There's some reference.  Megahed said,

12   "Did you tell them where you went?"

13        Mohamed, "Yes, that's what I told them.  That

14   was the first time in my life -- for real, that was

15   the first time in my life that I've used live weapon.

16   The only time in my live where I used a live weapon."

17   There is no shock or response from the defendant

18   indicating what are you talking about.  He initiated

19   that part of the conversation.

20        Finally and most significantly in the

21   conversation at Page 7, Megahed says, the defendant,

22   "We weren't expecting something like this, talking

23   about the car stop."

24        And Mohamed said, "Praise be to God, we were

25   discussing," simultaneous conversation, "I mean,

1    whether to take this thing with us or no.  You even

2    told me," unintelligible, "listen," unintelligible.

3         What were they discussing?  I submit to you in

4    the totality of all the evidence they were discussing

5    whether to bring the potassium nitrate explosive

6    mixture with them on this trip.

7         Now, a point or two about this backseat

8    conversation.  You might wonder why when you read it

9    is Mohamed being so concerned or so solicitous about

10   what Megahed has said, especially if they've already

11   been interviewed by the FBI.  But, again, think about

12   it this way.  Mohamed is a little older.  He's a

13   little more protective, perhaps.  He doesn't want

14   anymore damage.  He doesn't want anymore

15   discrepancies in their stories, so they're going to

16   talk in the back seat about, "What did you say now?

17   What are you going to say in the future?  Tell them

18   it's fireworks.  I'll tell them it's only me, you

19   knew nothing about it."  Do you have to say that to

20   somebody if that's the truth?  Or do you have to say

21   that to somebody because that's your story and you're

22   sticking with it and you're afraid the other guy with

23   you might not stick with it.  He might crack.  He

24   might break.  You have to reassure the defendant.

25   That's what Mohamed does.  Because both know exactly

1    what's going on and they know what's likely to come

2    now that they've been detained by law enforcement.

3        I submit all of that indicates

4    circumstantially, because we have no direct

5    admissions by anybody on that score, indicates the

6    defendant is well aware of what's in that trunk of

7    his brother's car that he took Mohamed along with on

8    this drive north from Tampa on the morning of August

9    4th.

10        Well, failing this or failing the argument that

11    they have no knowledge, the defendant had no

12    knowledge, the defense then attacks the nature of the

13    items themselves.  You have to wonder sometimes when

14    I stand up here in rebuttal what trial everybody's

15    been watching because you have to wonder the way the

16    evidence has been portrayed.  Well, they say it's not

17    explosive material; it's just fireworks or toy

18    rockets.  There's no basis in the evidence or

19    testimony for that.

20        Mr. Kelly, Mr. Stryker were clear.  These were

21    low explosives.  The word "pyrotechnic" came in there

22    at low explosive pyrotechnic mixture.  Not a

23    firework, not a rocket.  Stuff wouldn't fly.  Even

24    Mr. Yawn tried to make it fly.  He had to add a stick

25    to it.  He had to set it up right, and even then only

1    once did something like this ever fly.  I think

2    Stryker told you you need fins, you need a nose cone.

3    These are not rockets.  They're not going to fly, and

4    they usually didn't, even for Mr. Yawn with all of

5    his experience and his expertise.

6        They're low explosives, both Kelly and Stryker

7    confirmed.  He did tests.  Mr. Kelly is a chemist.

8    He did all those tests.  He detailed his opinion.

9    That's exactly what was in those PVC pipes and in

10   that Wal-mart container.

11       Do they function by explosion?  You bet ya they

12   do.  Mr. Kelly and Mr. Stryker both explained to you,

13   an explosion isn't always a boom.  An explosion is a

14   violent chemical reaction.  And in this case a low

15   explosive -- high explosives go boom.  Low explosives

16   deflagrate.  They burn rapidly.  That's why they're

17   dangerous.  That's why they're regulated.  They burn

18   rapidly.  That's the reaction.  That is the

19   explosion.  I think it was Kelly who said that's the

20   definition of explosion.  Isn't always just the boom

21   and the loud noise.  It can be the violent burn and

22   the hiss that accompanies something like that.

23       They won't fly.  They don't emit light, color,

24   sound.  They're not sparklers.  They're not

25   fireworks.  They're not pyrotechnic compositions.  No

1   one ever said that, at least not the Government

2   experts did.  Neither Kelly or Stryker confirmed

3   that.  Their tests confirmed and their opinions were

4   low explosive potassium nitrate explosive mixtures.

5       By the way, if you want to read I think it's

6   Defendant's 27, go right ahead.  That's some of the

7   stuff on Mohamed's laptop.  Read what Mr. Yawn says

8   in there about how dangerous this stuff can be if you

9   don't handle it right.  And what can happen to you,

10  and the precautions you've got to take.  This is not

11  kid's stuff.  That's why it's regulated.  That's why

12  you gotta get a permit to transport it.

13      As far as the destructive device, Count 4,

14  well, the argument is no evidence of an intent.

15  Again, the testimony and the evidence, I submit to

16  you, refutes that.  Stryker said you could easily

17  assemble these things into a destructive device.  He

18  explained how he did several configurations.  Some of

19  them didn't work, but what might have worked had he

20  tried it again.  He didn't keep going at them.  He

21  tried other configurations.  He gave you at least two

22  or three ways it could work, in his opinion, as an

23  incendiary bomb or something similar.  You have

24  photos of that, of his test work, Government's 63 C.

25  It ignited and the gas vapors and the canister

1    burned.  That caused a fireball, as he explained.  If

2    a fireball isn't a weapon, members of the jury, I

3    don't know what is.  It's not a campfire.  That

4    configuration with the gasoline canister, the

5    gasoline canister, by the way, that belonged to the

6    defendant; the lighters that he brought with him in

7    the car in the center console; the safety fuse, we

8    don't know who bought, was in the trunk of the

9    defendant's car.  You take all those things together

10   and the PVC pipe with the potassium nitrate explosive

11   mixture in it, configure them, you've got yourself an

12   incendiary device.  Mr. Stryker confirmed that with

13   his testing.

14        And interestingly enough, you've got the

15   defendant's visits to sites on fuse, destructive

16   device, and incendiary device, are some of the things

17   he displayed an interest in prior to August 4th.

18        And if there is no intent to create this

19   destructive device, why bring the lighters?  There

20   are four lighters in the center console.  You see

21   them in the pictures.  They are in evidence.  No

22   evidence anybody smoked in that car, but you've got

23   four cigarette lighters in the car.

24        The fuse in the car we don't know who bought,

25   but it certainly was brought along for the party.

1    Twist ties, Government's 67 A, that the

2    defendant buys about two days before they leave,

3    about two days after he reads about destructive

4    devices and incendiary devices.  Twist ties that

5    could hold up to 15 pounds, look at the tag and look

6    at the label, which could function in the place of

7    monofilament tape or duct tape to secure the PVC

8    pipe, I submit to you, to the gasoline canister half

9    full with gasoline.

10    We heard a lot about this running out of

11    gasoline argument.  Well, I submit to you that again

12    doesn't hold water, no pun intended, when you think

13    about.  There's no evidence, number one, that the

14    defendant was on that trip where Mohamed supposedly

15    ran out of gas.  We don't know.  Mr. Kuettel just

16    said some guy named Mohamed was in the car.  The gas

17    can was the defendants.  His fingerprints on the

18    nozzle instead the canister.  Not on the outside,

19    inside.  It's his can.  It was only half full,

20    remember that.  They had a GPS; they bought them that

21    morning.  They can check for gas stations anywhere

22    they're driving.  You don't have to worry about gas

23    stations and having a can of gas in the car in the

24    trunk if you're going to buy a GPS which has gas

25    stations programmed in.

1    THE COURT:  Mr. Hoffer, you have five minutes.

2    MR. HOFFER:  Thank you, Your Honor.

3    They pass by the Walterboro gas stations where

4    there was Murphy Oil.  They had the gift cards.  They

5    had a balance on those gift cards.  You can look at

6    the picture of the receipt.  And they only bought

7    half a tank of gasoline at the Murphy Oil station in

8    Goose Creek because when the car was stopped, there

9    was only half a tank in it.  If you're that concerned

10   about running out of gasoline, you fill up the tank

11   when you have a chance, especially if it's a bargain

12   at Murphy Oil, unless you want the gas canister to be

13   half full of gas so you can utilize it as a

14   destructive device.

15   Was it a beach trip?  The evidence goes both

16   ways.  It's funny.  They have a funny way of stocking

17   themselves up for beach trips.  They don't get a

18   cooler, suntan oil, sunblock, towels, bathing suits.

19   They stop at Wal-mart and get inverters, drills,

20   floor mats, seat covers, gun cleaning material.

21   Funny way to stock up for a beach trip, but it could

22   have been a beach trip as part of their purpose.  How

23   many times, members of the jury, have you gone off on

24   a pleasure trip and built a little business in or

25   vice-versa.  You can have more than one purpose when

1    you're travelling.

2         Finally, again, that Internet history.  The

3    argument for the defense is it's irrelevant.  Well, I

4    submit to you to remember a couple of things.  Number

5    one, Mr. Pivnichny told you the times that he had in

6    his summary are minimum times those pages would have

7    been opened.  He said the pages could have been moved

8    into the background, another page opened, go back to

9    the page you had.  They have a computer.  A lot of

10   people do that all the time.  You minimize, go to

11   another one, come back.  Mr. Pivnichny said that's

12   minimum times they were opened.  He can't tell you

13   because he can't prove if they were printed or not,

14   but certainly there was enough time to print each and

15   every one of those pages and store it for a later

16   day.  Can't tell you more than that because the

17   printer information is not stored.

18        It's interesting, I guess the defense would

19   have you believe the defendant was some sort of

20   insomniac.  So when most people are awake at night

21   counting sheep, he's counting the ways to make

22   destructive devices and incendiary devices.

23        And it meant nothing, but again he had to get

24   there by clicking volitionally from one link to

25   another.  He couldn't have gotten to these sites by

1    accident.  And how ironic the sites are about

2    incendiary devices, destructive device, all the

3    things that relate to the kinds of items that were in

4    the car and the kinds of uses to which they could be

5    put.  And it was after all the Usef account, how

6    ironic.  U-S-E-F was the name on the account that

7    looked at those websites.  Not the home account, not

8    the Mariam account.  And at two, three, four o'clock

9    in the morning almost routinely, it makes you wonder

10   why he's up that late looking at that stuff when

11   other people are in the house.  I submit that's

12   exactly why.

13        Members of the jury, the evidence, I submit to

14   you, is in this case rather powerful and it points in

15   one direction.  The defense would have you have a

16   depiction on what happened on August the 4th and the

17   days just before that, I submit, defies logic, it

18   defies common sense, and it defies your life

19   experience and logic.

20        The defense version ignores the defendant's own

21   statements in the back of the car.  It ignores the

22   conversations between the defendant and Mohamed, and

23   ignores all the evidence that points in one

24   direction.

25        The evidence is now all before you, as is the

1    testimony.  I ask that you apply to that evidence and

2    to that testimony your life experience and your

3    common sense.  They are your thirteenth juror.  And

4    never, ever, ever, be afraid to apply your logic,

5    your common sense, and your life experience to the

6    testimony and the evidence in a case such as this.

7    When you do that, I submit to you -- when you apply

8    your logic and your common sense and your life

9    experience to the testimony and evidence, there will

10    be only one verdict you can reach.  That is the

11    verdict that justice requires in this case and that

12    is only one verdict, a verdict of guilty as to this

13    defendant as to both counts in this indictment.

14      Thank you again for your time and for your

15    attention.

16    (End of excerpt of proceedings.)

17

18            C E R T I F I C A T E

19    I, Kerry Mercade, certify that the foregoing is

20    a correct transcript from the record of proceedings

21    in the above-entitled matter.

22                    S/Kerry Mercade

23                    Kerry Mercade
                         Court Reporter

24

25