UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                          Case No. 8:07-CR-342-T-23MAP
-vs-                        23 March 2009
                          Tampa, Florida
                          3:5 p.m.

YOUSSEF SAMIR MEGAHED,

       Defendant.
-------------------------------/

       EXCERPT OF TRANSCRIPT OF TRIAL PROCEEDINGS
      BEFORE THE HONORABLE STEVEN D. MERRYDAY,
        UNITED STATES DISTRICT COURT JUDGE
       (Trial Testimony of Shelly Rensink)

APPEARANCES:

For the Government:      JAY HOFFER, ESQUIRE
                        ROBERT MONK, ESQUIRE
                        Assistant United States Attorneys
                        United States Attorney's Office
                        400 North Tampa Street, Suite 3200
                        Tampa, Florida 33602
                        (813) 274-6000

For the Defendant:       ADAM ALLEN, ESQUIRE
                        DIONJA DYER, ESQUIRE
                        Assistant Federal Public Defender
                        Federal Public Defender's Office
                        400 North Tampa Street
                        Suite 2700
                        Tampa, Florida 33602
                        (813) 228-2715

Reported By:             PAUL K. SPANGLER, RPR,
                        Official Court Reporter
                        Certificates of Merit and
                         Proficiency, Notary Public
                        (813) 301-5898

STENOGRAPHICALLY RECORDED
COMPUTER-AIDED TRANSCRIPTION
BY ECLIPSE

1                        <u>INDEX TO WITNESS</u>

2

<u>Witness</u>                                        <u>Page</u>

3

4       SHELLY RENSINK

5            Direct Examination By Mr. Hoffer              4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX TO EXHIBITS

Marked                    In Evid.

Page

Government's Exhibit 20E                          31
Government's Exhibit 69                           33
Government's Exhibit 12D                          45

1  (3:54 p.m.)   P R O C E E D I N G S

2        THE BAILIFF:  Remain as you are, please.

3        This Honorable Court is again in session.

4                      * * * * *

5        THE COURT:  You are recognized to call your next

6  witness.

7        MR. HOFFER:  Thank you, Your Honor.

8        The united States calls Shelly Rensink.

9        (Pause.)(4:05 p.m.)

10        THE COURT:  Good afternoon.

11        THE WITNESS:  Good afternoon.

12        THE COURT:  Let me ask you to pause one moment, if

13  you will, and raise your right hand.

14  Thereupon,

15                    SHELLY RENSINK,

16  a witness, having been duly sworn, testified as follows:

17        THE WITNESS:  I do.

18        THE COURT:  State your name, please.

19        THE WITNESS:  Shelly Rensink.  S-H-E-L-L-Y

20  R-E-N-S-I-N-K.

21        THE COURT:  All right, please have a seat in the

22  witness stand.  Make yourself comfortable.

23        And I'll recognize Mr. Hoffer for your direct

24  examination.

25                  DIRECT EXAMINATION

BY MR. HOFFER:

Q    Thank you, Your Honor.

     (Pause.)

     Ms. Rensink, good afternoon.

A    Good afternoon.

Q    If you would, uh, keep your voice up and try to speak
into the microphone, at least not too close, so we can all
hear you, okay?

     Ms. Rensink, first of all, let me ask you where you
work and what type of work you do?

A    I work for the Federal Bureau of Investigations, Latent
Print Operations Unit, and I'm a fingerprint specialist.

Q    How long have you been employed by the Federal Bureau
of Investigation, ma'am?

A    About five years.

Q    And where is it that you work specifically?

A    I work in Quantico, Virginia.

Q    The unit at which you work, or in which you work at
this point in time, you just said is what again?

A    It's the Latent Print Operations Unit.

Q    And what does that unit do, generally speaking?

A    Generally speaking we receive items of evidence in
criminal cases, we examine those items for latent prints, we
may have to apply chemicals or light sources to see those
prints, and then we compare those prints to that of known

1   individuals or search those prints in our data base.

2   Then we generate a report of our findings and return

3   that to the contributor, and, if needed, will testify to

4   those findings in a court of law.

5   Q    And your, uh, title at present time at the laboratory

6   is what?

7   A    I'm a physical scientist/forensic examiner.

8   Q    And, uh --

9   THE COURT:  That's physical scientist slash --

10  THE WITNESS:  Yeah, slash, forensic examiner.

11  THE COURT:  Okay.

12  BY MR. HOFFER:

13  Q    I think you said you've been there how many years

14  again, I'm sorry?

15  A    About five years.

16  Q    Okay.

17  And can you tell the -- well, let me ask you first and

18  then we'll -- before being employed by the FBI, did you have

19  a -- other employment, and what -- if so, what?

20  A    I was a community college teacher for chemistry for a

21  year.

22  Q    Now, uh, how long have you been involved in the area

23  of, uh, fingerprints and fingerprint identification, would

24  you say?

25  A    Five years.

1    Q    Okay.

2         So your total time with the FBI?

3    A    Yes.

4    Q    Uh, could you briefly describe for the jury your

5    education and your training specifically as it relates to

6    what you do now and your duties within the latent print

7    unit, the laboratory.

8    A    The FBI Latent Print Operations Unit, uh, put me

9    through a two-year training program in which it gave me

10   lectures and practical exercises relating to physiology,

11   embryology, the chemistry of processing, history of

12   fingerprints, comparison techniques for fingerprints,

13   classification of fingerprints, as well as having me do oral

14   presentation, oral, uh, boards, as well as mock courts, and

15   additionally had me do work under a mentor or supervised

16   case work under a mentor, I also had comparison exercises,

17   and at the end I had a comprehensive certification

18   examination.

19   Q    Okay.

20        At the end of that -- you said it's a two-year

21   process -- what happened at that point with respect to you

22   and your training?

23   A    Once I successfully completed my certification

24   examination, I then started doing case work independently

25   and was put on a probationary period where everything I did

1   in my case work was reviewed by a supervisor for 90 days.

2   Q    So, two years for the program, then about 90 days

3   thereafter for more direct supervision, is that basically

4   how it worked?

5   A    Yes.

6   Q    And following that two years plus 90-day period, uh,

7   are you under any direct supervision or -- or -- at this

8   point, or you work on your own cases and matters?

9   A    I work on my own cases in a -- a team or a group of

10  people which has a supervisor, but it's not direct

11  supervision on each case I work.

12  Q    Now, does the, uh, Federal Bureau of Investigation and

13  the laboratory in which you work, uh, require of you any

14  continuing education or keeping up with trends, anything of

15  that sort?  And if so, what do you -- are you required to

16  do?

17  A    We are required approximately 15 hours a year of

18  continuing education, and this is anywhere from keeping up

19  with reading journals on fingerprints and forensic science

20  to going to multiple conferences that the community offers.

21  Q    Now, Ms. Rensink, prior to today, to appearing here,

22  have you had occasion to testify in any Court, either

23  Federal or State Courts in this country, regarding

24  fingerprint and fingerprint identification?

25  A    Yes.

1   Q    How many times have you done so?

2   A    Four.

3   Q    And do you recall of those four times, Federal Courts,

4   State Court, how it was distributed?

5   A    I believe one was a State and the rest were Federal.

6   Q    And on those four occasions were you -- do you recall,

7   were you qualified on any of those occasions as an expert in

8   giving your testimony?

9   A    Yes.

10   Q    Any of those occasions where you were not qualified as

11   an expert?

12   A    No.

13   Q    Uh, in addition, ma'am, are you a member of any

14   professional associations, organizations that relate to what

15   you do for a living?

16   A    I'm a member of the Chesapeake Bay Division of the

17   International Association for Identification.

18   Q    And what does that association do?

19   A    The association itself puts on conferences twice a year

20   that involves all aspects of forensic that does

21   identification type work, meaning DNA, fingerprints, tire

22   marks, tool marks.  We get together and have conferences

23   that have different workshops and lectures to help better

24   inform us as a community.

25   Q    Your area, however, is limited pretty much to the

1  fingerprint side of that equation?

2  A    Yes, I'm strictly fingerprints.

3  Q    All right.

4       Uh, and I guess I neglected to ask you this, but in

5  those four prior court appearances you've had, prior to

6  today, when you've been qualified as an expert, uh, do you

7  recall, was it in the field of fingerprints, the

8  identification of fingerprints, things of that sort?

9       Was that the area you testified in?

10 A    I believe they were considered friction ridge analysis.

11 Q    Okay.

12      That's -- that's a pretty fancy term.  If you could

13 explain what that means.

14 A    Friction ridges are what are found at the end joints of

15 your fingers, and it's basically when the arrangement of

16 these friction ridges come together, that's what we define

17 as a fingerprint.  So it's the fancy term for fingerprint

18 analysis.

19      MR. HOFFER:  Your Honor, at this time I would

20 offer this witness as an expert, uh, in that particular area

21 of science and study.

22      MS. DYER:  No objection, Your Honor.

23      THE COURT:  All right, you may proceed,

24 Mr. Hoffer.

25      And members of the jury, just be mindful that my

1   earlier instructions apply to this witness as well, that is,

2   a -- a person possessing scientific, technical on other

3   specialized skill and experience intended to be useful to

4   the jurors in deciding the facts of the case.

5            Mr. Hoffer.

6   BY MR. HOFFER:

7   Q     Thank you, Your Honor.

8         Ms. Rensink, are you familiar with the term in your

9   field, uh, a "known fingerprint"?

10  A     Yes.

11  Q     What does that term mean, ma'am?

12  A     A known fingerprint is the intentional reproduction of

13  those friction ridges or raised portions of the skin on the

14  end joints of the fingers.  And one of the easiest ways that

15  we typically record that is using black printer's ink.  That

16  ink is spread out on a smooth surface, and then the finger's

17  rolled from nail to nail on that surface.

18        And what that does is, is the ink is actually picked up

19  by those friction ridges.  And then a known fingerprint or

20  known print is made when that finger with the ink is then

21  rolled on to a contrasting background.

22        It can also be done with a computer nowadays, a system

23  called Live Scan, where the finger's basically scanned in,

24  and those ridges appear digitally.

25  Q     So it is a known print, as it sort of suggests, made by

1   someone who is known, and you know whose fingerprints they

2   are?

3   A      Yes.

4   Q      Now, are you also familiar with the term "latent

5   fingerprint"?

6   A      Yes.

7   Q      What does that term mean in layman's terms?

8   A      A latent fingerprint is the unintentional reproduction

9   of the end joints of the fingers so those friction ridges

10  found there --

11         THE COURT:  Ms. Rensink, could you speak a little

12  more slowly --

13         THE WITNESS:  I'm sorry.

14         THE COURT:  -- as you answer.

15         All right, Mr. Hoffer, go ahead.

16  BY MR. HOFFER:

17  Q      Okay, you were talking about a latent fingerprint and

18  describing that.  Have you finished, or did you have more?

19  A      A little more.

20  Q      Okay, please continue.

21  A      So the friction ridges themselves have small openings

22  on them a long the ridges, and these are pores, which

23  depending on if you're nervous, or what you're doing,

24  exercising, sweat will be exuded.

25         That sweat will then coat those friction ridges just

1  like oils from the skin or greases from the hair, blood,

2  dirt, all of that will coat those ridges, and then when you

3  touch something, they may leave behind a reproduction of

4  that or those friction ridges.

5    And you may need light sources to see it, or chemicals,

6  and this is what we call a latent print, because it's

7  unintentional that just touching something by chance it's

8  left.

9  Q  Now, does the visibility of it to the naked eye

10 affect -- affect that as far as it's -- something being a

11 latent fingerprint or not?

12 A  In the FBI we strictly just use any print that's left

13 behind that is not recorded in a known setting or from a

14 known individual, we just call it a latent print, whether

15 it's visual or not.

16 Q  But are -- are some latent prints then in your

17 experience those that can be seen by the naked eye, and some

18 are not visible by the naked eye?

19 A  Yes.

20 Q  And is there any general rule as to how a fingerprint

21 is left?  That is, that can be seen as opposed to not, or do

22 you have familiarity with the distinction, how those are

23 made?

24 A  I'm not quite sure what you're asking me.

25 Q  Okay, let me withdraw the question.  I'm sorry.  Let me

1    move on.

2         What are the factors that allow someone such as you to,

3    uh, examine a fingerprint to be -- and use it as a means of

4    identification?

5    A    There's actually two different factors that we use when

6    using fingerprints as a means of identification.  The first

7    one is persistency.  Fingerprints are persistent in that

8    they are formed during fetal development, and are actually

9    set in their arrangement by week 24 of that fetal

10   development.

11        And barring any scarring to the second layer of skin

12   they will remain the same throughout one's life until the

13   decompensation of the skin after death.

14        Fingerprints are also unique, and they are so unique

15   because the genetic as well as environmental factors that go

16   into forming them well in fetal development is never

17   duplicated, not even identical twins.

18   Q    Okay.

19        Uh, can you -- well, let ask you.  As far as what you

20   have just said in response to my question, are these

21   principles established as sort of basics in your profession,

22   or is there any -- any professional question about some of

23   those answers you just gave about fingerprints and their

24   uniqueness, et cetera?

25   A    No.

1    Q    Now, describe, if you would, please, generally

2    speaking, for the members of the jury, how fingerprints are

3    compared, and how identifications involving latent

4    fingerprints perhaps are made.  Generally speaking.

5    A    Okay.

6        We use a methodology called ACE-V, and it's an acronym

7    that's A-C-E dash V, and this is basically the steps we use

8    to compare and come to a conclusion with a fingerprint and a

9    known fingerprint.

10       What happens is, is we first take the latent print, and

11   we analyze it, or that A phase, and we look for all the

12   information that's present.  What was the surface it was

13   left on?  What might have -- substance might have been left

14   behind?  Are there different pressures?  How hard might

15   have -- it have been pushed down, or had it been moved side

16   to side?  As well as what information is actually in the

17   latent.

18       When I look at those ridges, there's three levels of

19   detail.  The first level is how the ridges flow.  Do they

20   form a pattern?  We look at arches, loops and whirls.

21       Then we go to the second level of detail, which is a

22   little more -- it's more of a closeup shot, and we're

23   actually looking at, well, what do the ridges do?  Ridges

24   can end where they flow and then stop.  They can divide

25   where they flow and then literally split into two ridges.

Or they can form a dot, just like a period at the end of the sentence.

And we look at not only the type, but what direction are they flowing in that print? And then where are they in the print, not only relative to the print itself, but to each other.

And then we also look at the most minute level of detail, which is level three. Those pores I mentioned earlier, where are they, and where are they relative to each other?

And also, do the edges of those friction ridges, are they thick? Are they wide? How are they shaped? We take all that information into the latent print and decide, do we have enough information to compare it. And if we do, we'll then analyze the known print.

We'll move to the comparison phase after we've analyzed both, and we'll hold them side to side and look for similarities and differences.

Once we've exhausted all the similarities and differences, we move into what is known as the evaluation phase, and we come to one of three conclusions. The first conclusion is that of identification. That means, all the information in the latent print and in the known print are in agreement with no unexplainable differences. Meaning, they came from the same source.

1    Then another conclusion I can make is that of

2    non-identification or exclusion.  That means the latent

3    print and the known print are not in agreement, so they did

4    not come from the same source.

5    And then there's one last conclusion I can make, and

6    that's inconclusive.  That just means that I don't have the

7    same areas to compare.  So if my latent is the middle of

8    a -- is -- I guess "middle of the finger" is not right --

9    the tip of a finger, and then my known prints don't include

10   tips, I can't come to decision, so I have to render it

11   inconclusive.

12   Once I've made one of those three conclusions,

13   identification, exclusion, or inconclusive, I then move to

14   the verification phase, and this is simply a quality

15   assurance step where we give another certified trained

16   examiner the information that we had, and they do the ACE

17   portion, or that analysis comparison and evaluation, and

18   come to their own conclusion as that quality control step to

19   make sure that our work is being checked and double checked.

20   Q    Does -- let me start with the last part of your answer.

21   Does that verification process, uh, does it take place at

22   the laboratory at which you work, uh, in every instance when

23   there's either identification or not, or only when you

24   positively identify?

25   How often is that done?

1   A   We actually have two different forms of verification in

2   our lab.  The first one is the standard verification, and

3   that happens whenever an identification is made, and that is

4   done within the laboratory itself.

5       Another form of verification we have is something

6   called blind verification, and this is when another examiner

7   just gets a photo of the latent and analyzes it, and then

8   will later be given something to compare it, so they have no

9   background knowledge or bias in the case.

10       And this is done when we have something of a single

11   conclusion making, meaning that one decision has been made,

12   whether it be an identification, a non-identification, or an

13   inconclusive.  And that is also done within the lab.

14   Q   Let me ask you, Ms. Rensink, does the quality, if you

15   will, for want of a better term, of the latent fingerprint

16   that you have to look at, does that affect your ability to

17   make identification or not as far as a known set of

18   fingerprints that you're given?

19   A   When it comes to known fingerprints, there has to be a

20   certain quality, or we actually have to be able to see the

21   ridges to actually be able to compare the ridges.  So

22   depending on the quality of the prints that were taken, it

23   can affect our -- our comparison steps.

24   Q   Okay.

25       But as far as the latent print which you're seeking to

1    identify, uh, are you familiar with the term -- and I may be

2    using it incorrectly, but a "fingerprint of no value"?

3    A    Yes, that is a term we use.

4    Q    And what does that term mean?

5    A    A print of no value or not of value means that there is

6    not sufficient quality and quantity of information in that

7    print to ever be able to actually compare it and make an

8    identification or non-identification.

9    Q    So when a fingerprint is deemed to be of no value, does

10   that mean it can't be compared simply to a specific known

11   fingerprint, or to any known fingerprints of anyone?

12   A    It means it cannot be compared to any known prints of

13   anyone.

14             MR. HOFFER:  All right.

15             May I approach the witness, Your Honor?

16             THE COURT:  You may.

17             (Pause.)

18   BY MR. HOFFER:

19   Q    Ms. Rensink, I have placed in front of you an exhibit

20   which has been I believe received in evidence as

21   Government's Exhibit 20B.  Uh, I ask you, it's a -- a series

22   of items inside of a plastic container, which you may need

23   to open to examine more closely, but let me ask you first if

24   you recognize that package and the things contained in it,

25   and if you've seen them before today?

1       And if you need to open it, you can do so, and we'll

2  help you with that.

3       (Pause.)

4  A    Yes, I recognize it, and I did receive it in the lab.

5  Q    All right.

6       So this is an item you did some work -- called upon to

7  do some work upon in the laboratory?

8  A    Yes.

9  Q    Do you recall approximately when you got it?

10 A    I would have to look at my notes.  I would say at least

11 a year ago.

12 Q    All right.

13      Well, without going to the specific date, you do

14 recognize it as something you had worked on.  How do you

15 know it's something you had worked on at the lab?

16 A    I can actually on one part -- piece of the evidence I

17 can see my initials on it, which we do in the laboratory so

18 that when we get to trial we can put two and two together.

19 Q    Well, let me ask you about that.  As far as when you

20 get an item, such as what you perhaps recognize there as

21 part of Government's 20B, uh, I was going to ask you, how it

22 is handled and how it is marked for later reference or use?

23      What -- what do you do in your normal course?

24 A    Uh, evidence is typically received in our evidence

25 control unit, it is given a laboratory number, which is a

1  specific marker so we can track it within the lab itself,

2  and as well as the lab number it's given a specific item

3  number.  In this case, this was item number Q3, or I know it

4  as item Q3.

5       And then that evidence control unit or original group

6  that accepts it, in this case I believe it was the

7  Explosives Unit, they prepare documents and decide what

8  units get it.  And somewhere along the way the contributors

9  requested a latent print examination, and once Explosives

10 gave it to different units for their exams, I received it in

11 my unit to do a latent print examination.

12 Q    All right.

13      Now, you said you recognize one specific part or more

14 of that item, what -- what part or parts do you recognize

15 from what you see today?

16 A    I was strictly pointing to the cardboard piece that's

17 sitting out.  I can see my initials in.  But if I open it,

18 I'm pretty sure I can find initials on additional pieces,

19 but every piece to me looks familiar from --

20 Q    Okay.

21 A    -- when I reviewed my notes on this case.

22 Q    Ma'am, if you could open it then.  I don't know if you

23 require a pair of scissors to get through that.

24      (Pause.)

25 A    Yeah, that probably would be helpful.

1          MR. HOFFER:  Okay, if we could ask the Court's

2   indulgence for --

3          THE BAILIFF:  Second drawer.

4          THE COURT:  What are we going to do?  We're going

5   to cut it open?

6          MR. HOFFER:  Yes.

7          THE COURT:  Why is that?

8          I mean, she can see it, can't she?  Or does she

9   need to --

10  BY MR. HOFFER:

11  Q    Well, Ms. Rensink, let me ask you.  As far as how it is

12  packaged now, the items that you recognize, are you able to

13  sort of see them through the plastic?

14  A    Yes.

15         MR. HOFFER:  All right, Your Honor, we'll leave it

16  be at the moment, if the Court please.

17         Uh, within those items -- within that big

18  container, did you do some work on any or all of those

19  pieces, and, if so, what did you do?

20         THE WITNESS:  I actually processed all the pieces

21  in this case.  Uh, it came originally as just a GPS box, and

22  I opened it and found multiple items within that box,

23  including a cardboard insert, there's an instruction manual,

24  a CD with a CD holder around it, uh, some plastic bags,

25  looks like the -- a bubble wrap here, and an instruction

1  manual, as well as it looks like a couple of other pieces of

2  evidence or, I guess, items that went with the GPS box

3  itself.  And I processed every item for latent prints using

4  different chemicals and light sources.

5  BY MR. HOFFER:

6  Q    Okay.

7       When you say you process items such as this, what do

8  you mean by that term, ma'am?

9  A    Basically when we're deciding on how to process, uh, an

10  item of evidence, I will sort them into different categories

11  of evidence.  I look for -- if something is porous, meaning

12  it absorbs something, like paper; if it's nonporous, meaning

13  it's something like a plastic bag where things don't

14  typically absorb into that surface; or if it's somewhere in

15  between, something called semi-porous.

16       And then I have a guideline of different processes that

17  I go through for each item depending on which category they

18  fit into.  So in this category or in this set of

19  circumstances there was, I believe, a little bit of

20  everything, because the box itself is shinier and has almost

21  a coating to it, which would probably make it semi-porous,

22  there was some paper which made it porous, and then the

23  bubble wrap as well as the plastic bag, it looks like, and I

24  believe there was a CD in there, will all be considered

25  nonporous.

1    Q    Okay.

2         And does the porous or nonporous nature of items affect

3    your ability do the work?

4    A    No, but just changes the type of processes or chemicals

5    I might apply.

6    Q    Okay.

7         Now, with respect to the processing, which is

8    essentially, I guess, as you described it, your effort to

9    determine if there are any latent fingerprints on the item,

10   uh, did you have with you at the time simu -- simultaneously

11   the certain sets of known fingerprints?

12   A    Yes.

13   Q    And how many did you have, do you recall?

14   A    I don't recall how many.

15            MR. HOFFER:  Okay.

16            If I may approach the witness, Your Honor?

17            THE COURT:  You may.

18            (Pause.)

19   BY MR. HOFFER:

20   Q    Ms. Rensink, I have handed you two exhibits which are

21   received in evidence as Government's Exhibits 34 and 35, do

22   you recognize those two items?

23   A    Yes, both of them have my initials in the bottom

24   right-hand corner.

25   Q    And what does that indicate to you as far as what role,

1    if any, those items played in your work with respect to the

2    contents of that Government's 20 there?

3    A    Government's Exhibit 34 and 35 are known recorded

4    prints that I used to compare any developed prints in this

5    case.

6    Q    All right.

7    Now, were you -- staying with 34 and 35 for a minute,

8    you were not involved in the collection of those items, were

9    you, the known fingerprints?

10    A    No.

11    Q    Now, generally speaking, or specifically as far as you

12    need to, can you describe for the jury what various

13    processes, or what various methods you used on the items in

14    that exhibit there to attempt to find out if there were any

15    latent fingerprints for -- of value for you?

16    A    Generically speaking, without using my notes for each

17    specific item, what -- with the paper items what I typically

18    do is start off with a visual examination, just to see if

19    there's any prints that might have been left behind in dirt,

20    or sometimes makeup, if somebody's handling -- or touching

21    their face and then touching an item will leave a print

22    behind with makeup.  So I wanted to look and see if I could

23    see anything visually.

24    Uh, on porous items after that we'll use a laser or a

25    light source to see if there's any fluorescent prints.

1   Vitamin B in some people is very high, and when it's left

2   behind will actually light up if a laser or UV light is

3   used.  So I wanted to also examine it with that UV or laser

4   just to see if there is anything fluorescent.

5       After that I used a chemical known as, uh, DFO, or

6   D-F-O, literally, it's -- it's an acronym for a very long

7   chemical name that we don't like to use, uh, and what that

8   does is, it actually reacts with chemicals or amino acids

9   that are left behind by the sweat that's often coating those

10  fiction ridges.  So I would spray that porous item with DFO,

11  then I use a laser because it's actually a chemical that

12  fluoresces, I look for latent prints in that case.

13      Then I move on to my next chemical, which is called

14  ninhydrin, and ninhydrin also reacts with amino acids left

15  behind in perspiration, but it develops as just a purple

16  color.  So I'll examine -- or spray the item with ninhydrin,

17  and then examine it.

18      After I use that, I then go on to something called

19  physical developer.  Physical developer is a liquid process

20  that actually interacts with oils or greases left behind and

21  forms latent prints that I can see visually.  And that's

22  typically how I would process any of the paper items or

23  porous items in a case.  And that would include a case like

24  this where there were multiple paper items.

25      If it is a nonporous item such as a plastic bag, or the

1  bubble wrap that was in here, I would start again with the

2  visual examination and then do the laser or UV examination.

3      After that I would go into a process called super

4  gluing, and that's where I heat the super glue up really

5  high, to a very high temp, it makes it form kind of a cloud,

6  and that cloud will actually cover the evidence and stick to

7  prints that are left behind and allow me to visualize them.

8      So, I'll use the super glue, I will look for the latent

9  prints.  And then depending on what I see, I will move on to

10  the next processing step, which is called RAM, it's R-A-M,

11  it's a acronym for three chemicals that form a special dye,

12  and that dye sticks to the super glue.

13      So I will spray the item I've super-glued, and then I

14  will look under a laser or UV light source, because the dye

15  fluoresces, and the dye is used because super glue is

16  generally white, and on items that are white it's really

17  hard to distinguish as a human with our eyes white on white.

18  So if I add the dye, it actually gives me a way to visualize

19  the super glue a little bit different.

20      Once I do the dye stain, or the RAM, I then move on

21  to the last process or step, which is powder.  And typically

22  we use a black powder on light surfaces, or we use a white

23  powder on dark surfaces so that we can try to visualize any

24  latent prints that are there.

25  Q    Okay.

1      Having -- with respect to Government's 20B that you

2   have there, uh, you utilized some or all of those tests, and

3   you were able to identify -- or were you able to identify

4   any latent fingerprints of value to you as a result of all

5   of those examinations?

6   A    Yes, I developed multiple latent prints that were of

7   value for comparison purposes.

8   Q    Do you recall how many you found and where specifically

9   they were located at?

10  A    Yes, I just need to grab my notes to refresh my memory.

11          MR. HOFFER:  With the Court's permission?

12          THE COURT:  Yes, sir.

13          (Pause.)

14          THE WITNESS:  On Government's Exhibit 20B I

15  developed one latent print on the cardboard piece that holds

16  the GPS in the box.  I developed one latent print on the

17  instruction manual found within the box.  And then three

18  latent prints were developed on an envelope that was found

19  within that box.

20  BY MR. HOFFER:

21  Q    Did -- so you have a total of five altogether --

22  A    Yes.

23  Q    -- correct?

24      Did you then compare, uh, those five latent prints,

25  which were of value, usable to you, to the known

1    fingerprints you had, Government's 34 and 35, uh, to see if

2    you could find any matches?

3    A    Yes, I did.

4    Q    And what were the results of that comparison?

5         (Pause.)

6    A    The latent print that was developed on the cardboard

7    piece that held the GPS and the instruction manual were

8    identified, and the three latent prints that were developed

9    on the envelope were not identified.

10   Q    When you say -- let's start with the three first, the

11   last three.  You say they were not identified.  Did you

12   compare them with respect to just those two known

13   fingerprints, or any other sets of known fingerprints?

14   A    I compared them to multiple individuals that the case

15   agent had asked me to.

16   Q    With respect to the individual whose prints are

17   appearing, Government's 34 or Government's 35, on those

18   three, uh, were there -- was there any match on the

19   envelope?

20   A    No.

21   Q    What about now the two others you mentioned, the print

22   that you found on the cardboard piece and the print you

23   found on the instruction manual?

24   A    Those were both identified with the latent prints that

25   were recorded in Government's Exhibit 34 that are a

1  ten-print card and major case prints or palm prints,

2  fingerprints of Youssef Megahed.

3  Q    Now, uh, once you make those comparison and you lift

4  those prints, do you do anything to record that examination,

5  it's results in any way?

6  A    I have both case notes, which are my examiner notes, as

7  well as a report that's documenting these identifications

8  that is sent to the contributing agency.

9  Q    How about photographs?

10 A    Yes.  We also -- every step of the way whenever we

11 develop a print in a process, we send it to our photography

12 unit who captures the latent prints that are detected in

13 photographs, as well as in a CD format.

14       MR. HOFFER:  May I approach the witness,

15 Your Honor?

16       THE COURT:  You may.

17       (Pause.)

18 BY MR. HOFFER:

19 Q    I've just handed you what's been marked for

20 identification as I think Government's Exhibit 20E, as in

21 Edward, uh, take a look at those, and ask you if you

22 recognize those items?

23 A    Yes, both of those are pictures of the latent prints I

24 developed regarding the -- or Government's Exhibit 20B, and

25 both of them have my initials on them.

Q    And what -- do they depict the prints you've just been
describing, the one from -- which prints specifically are
identified or photographed in those two pictures?

A    The first one marked Government's Exhibit 20E is a
photograph of a latent print that I developed in DFO on the
cardboard insert of the GPS box, that was identified with
the right index finger, and the right index finger on
Government's Exhibit 34, the ten-print card bearing the name
Youssef Megahed.

And the second photograph marked Government's Exhibit
20E was a latent print I developed with physical developer
on the instruction manual, and that one was identified as
the right thumb -- as the right thumb on Government's
Exhibit 34, the ten-print card bearing the name
Youssef Megahed.

MR. HOFFER:  Your Honor, at this point I offer
Government's Exhibit 20E.

MS. DYER:  No objection.

THE COURT:  20E is received.

(Thereupon, Government's Exhibit 20E was received
and filed in evidence.)

BY MR. HOFFER:

Q    Now, Ms. Rensink, did you ultimately -- were you
requested to prepare some sort of an exhibit that would help
explain the process of identification as to one or more of

1  those specific prints?

2  A    Yes.

3  Q    And did you create that, and did you bring that with

4  you today?

5  A    Yes, I did.

6        MR. HOFFER:  May I approach the witness again,

7  Your Honor?

8        THE COURT:  You may.

9        (Pause.)

10  BY MR. HOFFER:

11  Q    Ms. Rensink, I've handed you an exhibit which is marked

12  for identification purposes as Government's 69, uh, do you

13  recognize that item, and, if so, what is is it?

14  A    Yes, Government's Exhibit 69 is a set of charted

15  enlargements that shows the print from Government's Exhibit

16  20B and the specific latent print that was developed on the

17  insert of the GPS box, as well as the fingerprint in

18  Government's Exhibit Four -- I'm sorry -- in Government's

19  Exhibit 34, to demonstrate how I go through my comparison

20  steps and how I actually made the identification in this

21  case.

22        THE COURT:  You said "charted enlargements"?

23        THE WITNESS:  Yes.

24        MR. HOFFER:  Your Honor, at this point I would

25  offer Government's 69.

1          MS. DYER:  No objection.

2          THE COURT:  Exhibit 69 is received on behalf of

3     the United States.

4          (Thereupon, Government's Exhibit 69 was received

5     and filed in evidence.)

6          MR. HOFFER:  Your Honor, this one might be better

7     and easier -- I don't know, ma'am, do you think you can work

8     with it from where you are seated, or the easel might be a

9     better mechanism to describe it and putting it up on that

10    easel over there?

11         THE WITNESS:  Uh, the easel would be nice.

12         MR. HOFFER:  Your Honor, with the Court's

13    permission, could we perhaps ask Mr. Watts to assist in

14    getting the easel in position so --

15         THE COURT:  Yes, sir.

16         MR. HOFFER:  And perhaps ask permission for the

17    witness to come off the box and --

18         THE COURT:  The witness may step down, and --

19         (Pause.)

20         MR. ALLEN:  Your Honor, may we relocate?

21         THE COURT:  You may.

22         MR. ALLEN:  Thank you.

23         (Pause.)

24         THE COURT:  Mr. Watts, you have the mike?

25         THE BAILIFF:  Yes.

1          (Pause.)

2          Do you have enough hands?

3  BY MR. HOFFER:

4  Q    Ms. Rensink, if you would, you're standing by the

5  easel, in that Government's Exhibit 69 would you open that,

6  would you publish that to the jury, and perhaps as an

7  initial matter explain the two halves -- what are depicted,

8  uh, on the two halves of that exhibit.

9  A    Okay.

10         So with Government's Exhibit 69, this is what we call a

11  charted enlargement, and this is to show what I was actually

12  looking at and how I came to my conclusion of identification

13  in one of the many latent prints in this case.

14         What you're seeing is letters, lines and numbers, and

15  I've placed these here for illustrative purposes.  The dark

16  lines that you're seeing on both of these are the friction

17  ridges or those raised portions on the hand, and the white

18  areas are what we call furrows, or those valleys in between.

19         The latent print is that of the latent -- latent print

20  that I developed on Government's Exhibit 20B in DFO.

21  Q    Which one of the two that came off that exhibit is

22  depicted on the right hand as on the --

23  A    On the left-hand side, the latent print.  This is the

24  one that was developed on the insert or the cardboard insert

25  that held the GPS.

1    Q    All right, if you would continue, please.

2    A    The known print on the -- your right side is that of

3    the print that appears in Government's Exhibit 34, which is

4    a set of a ten-print card as well as palm prints and

5    fingerprints for Youssef Megahed.

6         So the first thing I do with the latent print is just

7    analyze it and look at what's happening.  I'm looking at the

8    way ridges are flowing, what are they doing?  Is there a

9    pattern type to it?

10        So if I just trace the ridges, they kind of -- they

11   come in, and there's actually a curve right here, and then

12   it exits the same side upon which it enters, and that's

13   actually a looping or a loop formation or pattern type.

14        Then what I'm going to do is, I'm going to look at the

15   known print and also look for that information, the way the

16   ridges flow.  This is considered level one.  So, I follow

17   the ridge in, and then it curves, and then it goes out the

18   same side on which it enters.  So it's also a loop type

19   pattern.

20        Now, as I'm going through each level of detail, the

21   level one, level two and three, I have to have complete

22   agreement, otherwise these cannot be made by the same

23   individual.

24        So at this point as I'm analyzing the ridge flow and

25   saying they're both looping type patterns, they are in

1  agreement, so I can move to the next phase of my analysis

2  and comparison, which is level two, and that's where I spend

3  most of the time when I'm examining.

4      Again, level two is looking at what the ridges are

5  doing.  Are they ending?  Are they dividing?  Or is there a

6  dot?  In this case there's no dots in either of them, so you

7  won't hear me refer to that.

8      However, if I start with what is marked as

9  characteristic one, there's a dividing ridge that is

10 pointing down and to the right.  If I follow the lower

11 portion of that dividing ridge down -- and it's probably

12 easier to see if I just use my finger -- follow it down and

13 then enter the furrow.  There's another ending ridge.  And

14 this ending ridge is pointing up and to the left.

15      From that ending ridge which I mark characteristic two

16 and going straight down, there's another ending ridge, and

17 this ending ridge is pointing down into the right.

18      Characteristic number two and number three are two

19 ending ridges that very close together, and this is what we

20 actually call is a short ridge.

21      Now, remember, as I go from the latent to the known,

22 everything has to be in agreement for me to count these as

23 an identification.  So when I moved to this side, I should

24 not only see those characteristics, but they should open in

25 the same direction as well as being in the same relative

1  position to each other and to the latent print.

2       So starting at what I marked as characteristic one, it

3  is a dividing ridge pointing down and to the right.  If I

4  follow the bottom part of that ridge down, and then enter

5  the furrow, there's an ending ridge, which I marked as

6  characteristic two, and it's pointing up and to the left.

7       If I follow that ridge down, I find another ending

8  ridge which is pointing down and to the right.  In

9  characteristics two and three are two ending ridges that are

10 very close together which again makes that short ridge.

11      If I go back to my latent print and start with

12 characteristic three, I follow that.  I move down one ridge

13 and follow that ridge down.  I find an ending ridge that is

14 pointing to the right and slightly down.

15      If I go from that characteristic which I marked here as

16 characteristic four, and go down one ridge, and then two

17 ridges, there's another ending ridge, and this ending ridge

18 is pointing slightly down and to the right.

19      If I move to the furrow just below characteristic five

20 and up a little bit, there's another ending ridge pointing

21 down and to the right.  If I move back to the latent

22 starting -- or, sorry, move back to the known and I start a

23 characteristic three, and I move down one ridge, and follow

24 it to the right, there is an ending ridge, which is pointing

25 slightly down and to the right.  This I have marked

1  characteristic number four.

2      I go down one ridge, and then to another ridge.

3  There's an ending ridge which I have marked characteristic

4  five, which is pointing slightly down and to the right.

5      Following that over, and moving over one ridge, is an

6  ending ridge, which I have marked characteristic six, which

7  is pointing slightly downward and to the right.

8      Now, it's with these six characteristics that I've

9  charted and explained to you, as well as this --

10  characteristics seven through 11 that I've charted and not

11  explained, as well as other characteristics within these two

12  prints, that I have come to the conclusion that the latent

13  print developed on Government's Exhibit 20B on the cardboard

14  insert of the -- that was holding the GPS with the DFO is

15  the same print that was recorded on Government's Exhibit 34,

16  a fingerprint card including palm prints of Youssef Megahed.

17  Q    Now, let me ask you --

18          THE COURT REPORTER:  I'm sorry, Mr. Hoffer.

19  BY MR. HOFFER:

20  Q    I'm sorry.

21      Let me just ask you, Ms. Rensink, the DFO you've just

22  mentioned again, that's one of your chemical processes --

23  A    Yes.

24  Q    -- right?

25      Now, you have charted or shown here --

1          THE COURT:  Mr. Hoffer, would you stand where the

2    reporter can see you.

3          MR. HOFFER:  I will.  I'll stand by the

4    microphone.

5          THE COURT:  Thank you.

6    BY MR. HOFFER:

7    Q    The chart you have shown here has 11 different points

8    that are numbered one through 11, and replicated on both

9    sides.  My question do you is:  You've indicated that those

10   are, I take it from what I understand, 11 points of

11   agreement you saw in the known fingerprint as compared to

12   the left side latent fingerprint, correct?

13   A    Yes.

14   Q    Now, you said there were other types -- other things

15   that also lent themselves to allowing you to make a match or

16   make an identification; generally for this particular print,

17   do you recall what other kinds of things you saw in addition

18   to those 11?

19   A    There's additional characteristics that I haven't

20   marked, meaning additional ending ridges or dividing ridges

21   that are in the latent and the known, but for demonstrative

22   purposes I just left it to 11.

23   Q    Is there a minimum number or threshold that you must

24   reach for these comparisons between your known fingerprint

25   and the questioned or latent one before you can say to a

1 reasonable degree of scientific certainty that you have a

2 match or a comparison?

3 A    We basically use the standard of suf -- sufficient

4 quality and quantity, meaning we've never seen any two

5 prints to have this much in common that were not from the

6 same source.  So I've never seen any latent and known print

7 that were not made by the same individual that have this

8 many characteristics in common.

9 Q    So I should have asked you, perhaps now is as good a

10 time as any, but I should have asked you this before, is it

11 your opinion then to a reasonable degree of scientific

12 certainty, based upon your training, your knowledge and your

13 examination, that those two prints that are depicted there,

14 uh, the latent and the known, uh, came from the same person?

15 A    Yes.

16        MR. HOFFER:  I think, Your Honor, we can continue

17 without the exhibit, uh, and the witness can resume the

18 witness box, with the Court's permission.

19            THE COURT:  All right, sir.

20            THE BAILIFF:  Thank you.

21            THE COURT:  Thank you.

22            (Pause.)

23 BY MR. HOFFER:

24 Q    Now, Ms. Rensink, let me ask you as a general principle

25 again, uh, and this will relate to the various other items

1    I'm going to show you in a few minutes, uh, do -- do the

2    number or type of these comparisons you find, or matches,

3    uh, again, are they a factor in your identification?

4        In other words, are some going to vary as far as you

5    had a 11 depicted there plus others you said, uh, does that

6    vary as far as your identification ability?

7    A    Yes, it can vary from print to print, depending on how

8    much print is actually present.

9             MR. HOFFER:  If I could approach the witness,

10   Your Honor?

11            THE COURT:  You may.

12            (Pause.)

13   BY MR. HOFFER:

14   Q    Ms. Rensink, I have placed before you Government's

15   Exhibit 12A, uh, ask you if you, from looking at it,

16   recognize it, or if you've seen it before today?

17   A    Yes, I have, my initials appear on the top part of the

18   handle.

19   Q    And what does that indicate to you as far as your prior

20   contact with this item?

21   A    It indicates that I had it -- received it in the lab as

22   evidence, and the black powder on it is my doing.

23   Q    Okay.

24        And what is that black powder that appears on it?

25   A    As I mentioned before, if it's a nonporous item we go

1    through a set of processes, and one of the last processing

2    steps is to powder an item.  In this case, since it was red,

3    I used black powder.

4    Q    And as a consequence, you did some examination work

5    with respect to that item, as you recall?

6    A    Yes.

7    Q    And, uh, what types of process or what types of

8    procedures did you apply to that particular item,

9    do you remember -- do you recall?

10   A    This item was a nonporous item, meaning I don't expect

11   prints to readily be absorbed into it, such as paper would,

12   so I processed it.  But first looking at it visually, and

13   then with different light sources, the laser, the UV, just

14   to see if there is any prints that might fluoresce on it.

15       After I did that, I super-glued it.  And then after

16   super glue I applied a super glue dye to help better

17   visualize the super glue on it.  And then lastly, I powdered

18   it.

19   Q    And as a consequence of doing all of that with respect

20   to that exhibit there, Government's 12A, were you able to

21   find, uh, on that item any fingerprints of value for

22   examination purposes or identification purposes?

23   A    Yes, I developed one latent fingerprint of value.

24   Q    And do you recall where on that item you found that

25   fingerprint of value?

A    The fingerprint was found on the nozzle that's on the
inside of the gas can.

Q    Okay.

There's a yellow and black, it looks, nozzle; is that
what you're referring to?

A    Yes.

If you untwist it and actually pull it out, there's
actually like the siphon nozzle of the gas can.  You can
flip it around so that it will pour differently, and I found
it on that.

Q    Did you have occasion, Ms. Rensink, to compare that
latent fingerprint that you found there on Government's
34 -- I mean, Government's 12A rather, I'm sorry, with the
known set of fingerprints in Government's 34 or Government's
35?

A    Yes, I did.

Q    And as a consequence of making that comparison, what,
if anything -- what, if any, match did you find to a
reasonable degree of scientific certainty?

A    I found that the latent print that I developed on
Government's Exhibit 12A, the nozzle of the gas can, and
that of the fingerprint in the right ring finger block on
Government's Exhibit 34 bearing the name Youssef Megahed
were from the same individual, or were identified as a
match.

Q    And again, do you have a specific recollection, or can you even quantify how many factors led you to make that match, or do you know?

A    I don't recall off the top of my head.

Q    If I may -- did you have occasion to -- after doing all that work, and making examination, to photograph the results of your examination as far as the 12A, the gas canister?

A    The photograph of the latent was -- or a photograph of the latent that was detected was taken after the process, it was developed to it.

MR. HOFFER:  May I approach the witness, Your Honor?

THE COURT:  You may.

(Pause.)

BY MR. HOFFER:

Q    Let me hand you, ma'am, what's been marked for identification as Government's Exhibit 12D, as in David; do you recognize that item?

A    Yes, it's a photograph of the latent print that I developed on Government's Exhibit 12A, and it has my initials on it.

MR. HOFFER:  Your Honor, at this point I'd offer Government's Exhibit 12A -- 12D.

MS. DYER:  No objection.

THE COURT:  You say 12D?

1          MR. HOFFER:  D, as in David.

2          THE COURT:  It is received.

3          (Thereupon, Government's Exhibit 12D was received

4    and filed in evidence.)

5    BY MR. HOFFER:

6    Q    Let me ask you, Ms. Rensink, looking at 12D, does that

7    refresh your recollection as to when it was that you worked

8    with 12A and did the matching and took the photograph?

9    A    The photograph itself is marked 9/13/07.

10   Q    And --

11   A    I believe that would be around that time that I either

12   used it for comparison purposes or sent it to the

13   photography unit.

14   Q    So, is it safe to say that sometime in September of

15   2007 you were doing this work?

16   A    Approximately.

17   Q    All right.

18        Now, in addition to the one fingerprint you've

19   identified or talked about here on this canister, this item

20   12A, Government's Exhibit 12A, were you able to identify any

21   other fingerprints on that item?

22   A    There were no other latent prints developed on this

23   item.

24   Q    Now, Ms. Rensink, generally speaking again, let's just

25   step back from the specific to the general, uh, are you

1   familiar, from your experience and your training, uh, and

2   your work, with the various factors that affect the ability

3   of, uh, a person to leave a fingerprint on a surface?

4   A    There's actually quite a few factors that play into if

5   a latent print is left behind, and these can range from a

6   person wearing gloves so there's actually to contact between

7   the finger and an item, to the type of item.

8        If an item is textured, if there's a lot of texturing,

9   what happens is that a latent print may be left behind, but

10  it's so frag -- fragmented that not everything is captured

11  so that we can compare it.

12       If you wash your hands, or have extremely dry skin,

13  there may be nothing on the fingers to coat those ridges.

14  So when you touch an item you can't leave anything behind.

15       Weather conditions can play a factor.  If you leave a

16  print behind in sweat or perspiration, and it rains, the

17  water will actually wash away the chemicals that are left

18  behind by your sweat.

19       So there's a lot of different factors, whether it be

20  weather or just the condition of the skin that play a role

21  in if there's actually a latent print left behind.

22  Q    Okay, so you've mentioned the person's own physiology,

23  how much they sweat or not sweat, uh, climate conditions, or

24  atmospheric conditions; are there other things that might

25  affect the ability to even find a print on something, or

1  identify it?

2  A    Sometimes the age can play a role in it in the fact

3  that some chemicals that are left behind can actually

4  degrade over time, if it's too hot, that can change the

5  composition, and then we can't process it for any additional

6  latent prints because the chemical that was left behind is

7  no longer there.

8  Q    Okay.

9      By the way, you've mentioned age of prints, can you,

10 uh, in examining item and lifting or finding an identifiable

11 fingerprint tell anything about the age of that print, or

12 how long it's been there?

13 A    No.

14 Q    Now, are there other external factors that may be

15 intentional or not that could also affect the ability to

16 even leave a fingerprint of value on a surface?  By that I

17 mean, intentional acts of someone that might affect what's

18 left there, things of that nature?

19 A    If a person was to grab a cleaner and a rag and wipe an

20 item down, that's enough to destroy a latent print.  Latent

21 prints are actually pretty fragile.  Uh, if you think about

22 how this surface is probably cleaned.  If you put a latent

23 print down, and then somebody comes either with just a rag,

24 or even just my sleeve can brush off a latent print

25 literally that easily.

1    So somebody either wiping against it or wiping it down

2  intentionally could eliminate any latent prints that were

3  left behind.

4  Q    Does the type of -- you've mentioned a little bit about

5  the type of surface or composition of an item, does that

6  play a role, or smoothness, roughness, anything like that?

7  A    Like I said, very textured surfaces sometimes are so

8  broken up that they actually will not capture a latent print

9  in a way that connects all the information left behind.

10  Some surfaces, if they're too slick, won't necessarily hold

11  onto the material that's left behind.

12    There's a lot of different surface types, some types of

13  surfaces such as clothing will actually absorb anything

14  that's left behind, and it -- it actually spreads out into

15  the cloth so that you can't get any discernible latent

16  print.

17  Q    Now, you mentioned some various things about the

18  weather, or the physiology of a person, et cetera, will that

19  vary even with the same person, from your training and

20  experience, by which I mean -- I hope I can get this out --

21  by which I mean, the same person touching one item, perhaps

22  at another time, either the same day or another point in

23  time touching another item; is the ability of that person to

24  leave an identifiable fingerprint going to be the same

25  because it's the same person, or does it change?

1    A    No, it actually changes, as you said, or I've said,

2    depending on the condition of the weather itself.  From

3    personal experience, I know I leave better prints in the

4    summer when I'm hotter and sweatier than I do in the winter

5    when my hands are very dry and I can't seem to keep any

6    moisture on them.

7        It's -- it really comes down to that.  Even washing

8    your hands can take away the materials that can be left

9    behind.  So if you wash your hands after a certain point you

10   may not be able to leave latents for a while, or until you

11   start sweating or working with something that coats those

12   friction ridges again.

13   Q    Now, are there also factors, uh, that affect the

14   ability of someone such as yourself, an examiner, to be able

15   to identify a fingerprint, different things like you've

16   mentioned before as far as leaving a print, just being able

17   to read one or find one?

18       Or is it the same thing?

19   A    Again, if the print -- if there's not enough

20   information, sometimes depending on the surface type or what

21   was left behind, or how much pressure was used, we'll get

22   nothing more than just an outline of a finger.  There's no

23   actual ridge detail.

24       So depending on the conditions of that print being left

25   behind, there might not be any actual friction ridge detail

1  that we can use for comparisons.  It might just be the

2  outline, and in that case we cannot use it for

3  identification purposes.

4  Q    Are you familiar, ma'am, with the term "partial

5  prints"?

6  A    That is a term I've heard.

7  Q    Okay.

8       Uh, from what you've heard and what you understand of

9  the term, does it have some meaning in what you do on a

10 day-to-day basis?

11 A    Technically a partial print just means not a whole

12 print.  So unless the print is recorded in a set

13 circumstances such as a ten-print card, anything that's left

14 behind is in theory a partial print, so every latent print

15 is also a partial print.

16 Q    Now, based upon all of that that you've just described,

17 let me ask you, Ms. Rensink:  In your opinion, based again

18 upon your training, your experience, and your knowledge,

19 does the fact that perhaps the fingerprint or prints of a

20 person cannot be found, or are not located on an item, mean

21 necessarily that that particular person in question, the

22 hypothetical person, has never touched, possessed or had any

23 contact with the particular item?

24 A    No, fingerprints cannot rule somebody out from touching

25 an item.

1  Q    And why not?

2  A    If I develop a latent print, and then I ID that latent

3  print with an individual, I know that that latent print was

4  left behind by that individual.  But that does not mean

5  under a set of different circumstances that they did not

6  handle that paper, or another person didn't, they just may

7  not have left a fingerprint behind.

8      So I cannot actually rule or exclude people from

9  touching an item, I can only make a decision based on that

10 latent print that was developed on if it was somebody's or

11 not.

12         MR. HOFFER:  May I approach the witness,

13 Your Honor?

14         THE COURT:  You may. (5:02 p.m.)

15         MR. HOFFER:  Actually, Your Honor, may we approach

16 briefly?

17         THE COURT:  Yes.

18         (Thereupon, the following conversation was had at

19 the bench:)

20         THE COURT:  Okay.

21         MR. HOFFER:  I was just mindful of the time,

22 Your Honor, I know I still have much -- not much more, but

23 some other areas to inquire of this witness, I don't know

24 when the Court wants to break, but I just want guidance on

25 that, I guess.

1          THE COURT:  This witness has to go back to

2    Virginia?

3          MR. HOFFER:  But not today.

4          THE COURT:  Tonight?

5          MR. HOFFER:  She's scheduled to go tomorrow.

6          THE COURT:  Okay.

7          And what is your pleasure?

8          MR. HOFFER:  I can go as long as the Court

9    pleases, I just wanted to get some guidance as far as what

10   the Court wanted to do.

11         MS. DYER:  It doesn't matter to me.

12         THE COURT:  You're indifferent?

13         MS. DYER:  Might matter to the jury.

14         THE COURT:  Hum?

15         MS. DYER:  It might matter to the jury.

16         THE COURT:  Yes.  We're probably not going to

17   finish tonight anyway, that's what you're telling me?

18         Thirty minutes is not going to get it, is it?

19         MR. HOFFER:  I might finish by that point, I'm not

20   sure how much cross-examination might ensue.

21         THE COURT:  What's to cross-examine?

22         MR. HOFFER:  I don't know.

23         THE COURT:  Is any of this testimony disputed in

24   any way?

25         MR. HOFFER:  I don't know.  Is it?

1          MS. DYER:  Not so far.

2          THE COURT:  Just fingerprint ID, isn't it?

3          I mean -- oh, well -- okay, we'll call it quits.

4     We'll let Mr. Spangler get back to his typical venue and

5     adjourn for the evening then, okay?

6          All right.

7          MR. HOFFER:  Thank you.

8          (Thereupon, the bench discussion was concluded and

9     the proceedings resumed as follows:)

10         THE COURT:  Members of the jury, as you might

11    surmise we just had a brief discussion at sidebar and this

12    is a convenient place for us to break for the evening.  So,

13    if the witness will be understanding, we'll ask her to

14    return in the morning, and at the same time I will ask all

15    of you to assemble in the jury room in time to resume these

16    proceedings at 9:00 o'clock in the morning.

17         Be mindful of my precautionary instructions, which

18    I will spare you repeating, but I know you know the ones I'm

19    talking about.  Drive safely, and I'll see you at

20    9:00 o'clock the morning.

21         Mr. Watts.

22         THE BAILIFF:  Rise for the jury, please.

23         (Jury out)

24         THE COURT:  The witness may step down, and you are

25    excused until tomorrow morning at 9:00 o'clock.

1          THE WITNESS:  Thank you.

2          (Witness excused)

3          THE COURT:  Thank you.

4          Mr. Hoffer and Mr. Monk, how are we doing?

5          MR. MONK:  I believe we're going to finish this

6   week, Your Honor.

7          THE COURT:  Okay.  You anticipate finishing about

8   when then, or I -- just this week?

9          MR. MONK:  Well, possibly Wednesday.

10          THE COURT:  Okay.

11          All right.

12          MR. HOFFER:  I concur.

13          THE COURT:  And --

14          MR. ALLEN:  Do they have a possible -- morning, or

15   end of the day?

16          MR. MONK:  And your Honor we predicted and advised

17   counsel last week that they may want to have one or more

18   witnesses here this week.  And beyond that I'm just not sure

19   at this point.

20          THE COURT:  All right.

21          I take it that the thrust of this witness's

22   testimony is -- is fingerprint identification on certain

23   objects; what other objects will be the subject of her

24   testimony, Mr. Hoffer?

25          MR. HOFFER:  Just so the Court is aware, uh -- and

obviously given the predicate so far established, the rest

of it's going to flow very quickly, uh, much more quickly.

She was going to be asked to examine the -- the pipes,

dowels, even things that were not identified -- or she could

not find any prints.

So she is going to be asked to -- about ten or --

ten or -- ten or 11 more items I think that -- that she did

examine with varying degrees of either success or

nonsuccess.

THE COURT:  All right.

Good.  All right.  Thank you.

MR. ALLEN:  Your Honor, I -- before you leave --

THE COURT:  What?  Yes, sir.

MR. ALLEN:  Let me come to the podium.

THE COURT:  I'm coming back, though, don't worry

about it.

MR. ALLEN:  Uh, the beeping sound by my client's,

uh --

THE COURT:  You explained it.

MR. ALLEN:  -- GPS, uh, we could ask -- we would

ask if maybe he could be relieved of that obligation, or

would the Court ask for us to contact Pretrial and have them

take it off and put it back on at the end of each day, or

are we okay?

THE COURT:  What have you been doing?

1           MR. ALLEN:  He's just been coming in with it.

2   He's been wearing it in court, uh, that's the beeping.

3           THE COURT:  It doesn't come to mind, what's making

4   it beep?

5           MR. ALLEN:  He may be able to explain that more

6   than me, Your Honor.

7           THE COURT:  No doubt, Mr. Allen.

8           THE DEFENDANT:  The signal is interrupted --

9           THE COURT:  Oh, I see, it's not -- it's not

10  getting its base signal because of the building -- structure

11  of the building.  Yes, you can't -- it's hard to make your

12  cell phone work in here too.

13          MR. ALLEN:  Yes, sir.

14          THE COURT:  I don't have an answer to that.  Why

15  don't you ask that question to the Pretrial Service officer

16  and see -- see what the answer is.

17          I -- I don't know, I'm malleable on the subject --

18          MR. ALLEN:  Yes, sir.

19          THE COURT:  -- for sure.

20          Anything else?

21          MR. ALLEN:  No, sir.

22          THE COURT:  All right.

23          Well, we'll see you one and all in the morning

24  about 9:00 a.m., and we are in recess until then.

25              (Thereupon, the Court stood in recess at 5:08 p.m.

1    to reconvene at 9:00 a.m. March 24th, 2009.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH    )

          I, PAUL K. SPANGLER, Official Court Reporter for the United States District Court, Middle District, Tampa Division,

          DO HEREBY CERTIFY, that I was authorized to and did, through use of Computer Aided Transcription, report in shorthand the proceedings and evidence in the above-styled cause, as stated in the caption hereto, and that the foregoing pages numbered 1 to 58, inclusive, constitute a true and correct transcription of my shorthand report of said proceedings and evidence.

          IN WITNESS WHEREOF I have hereunto set my hand in the City of Tampa, County of Hillsborough, State of Florida, this 14th day of April, 2009.


          S/PAUL K. SPANGLER
          _____
          PAUL K. SPANGLER, Official Court Reporter