1          UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION

3    UNITED STATES OF AMERICA

4

5          vs.              CASE NO. 8:07-cr-342-T-23TBM
                            March 19, 2009
6                            Tampa, Florida

7

    YOUSSEF SAMIR MEGAHED,
8
          Defendant.
9
    _____/
10
          TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                   (TESTIMONY OF JOHN NICE)
          BEFORE THE HONORABLE STEVEN D. MERRYDAY
12               UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:  JAY HOFFER
                         ROBERT MONK
15                       Assistant U.S. Attorneys
                         400 N. Tampa Street, Suite 3200
16                       Tampa, Florida 33602
                         813/274-6000
17
    For the Defendant:   ADAM ALLEN
18                       DIONJA DYER
                         Assistant Federal Defenders
19                       400 N. Tampa Street, Suite 2700
                         Tampa, Florida 33602
20                       813/228-2715

21   Court Reporter:     Kerry Mercade
                         801 N. Florida Avenue
22                       Suite 15A
                         Tampa, Florida 33602
23                       813/301-5024

24

25   Proceedings recorded and transcribed by
    computer-aided stenography.

1                              **INDEX**

2

**GOVERNMENT WITNESS JOHN NICE**
3    Direct Examination by Mr. Monk............3
     Cross-Examination by Ms. Dyer............35
4    Redirect Examination by Mr. Monk.........56
     Recross-Examination by Ms. Dyer..........67

5

6                      **GOVERNMENT'S EXHIBITS**

7

     **Number**      **Description**                 **Page**
8
     3 A        HP laptop computer..............28
9    24 A       Photograph (contents of Camry)..17
     24 B       Photograph (contents of Camry)..17
10   24 D-E     Photograph (contents of Camry)..17
     24 J-R     Photograph (contents of Camry)..17
11   24 S       Photograph (contents of Camry)..49
     24 W       Photograph (contents of Camry)..49
12   24 BB      Photograph (contents of Camry)..49
     24 GG      Photograph (contents of Camry)..17
13   24 HH      Photograph (contents of Camry)..17
     24 LL      Photograph (contents of Camry)..49
14   24 MM      Photograph (contents of Camry)..17
     24 NN      Photograph (contents of Camry)..17
15   24 PP      Photograph (contents of Camry)..17
     24 YY      Photograph (contents of Camry)..17
16

17

18

19

20

21

22

23

24

25

1    (Excerpt of proceedings.)

2          GOVERNMENT WITNESS, JOHN NICE, SWORN

3       THE COURT:  State your name, please.

4       THE WITNESS:  John Nice, Jr.

5       THE COURT:  Spell your last name.

6       THE WITNESS:  N-I-C-E, sir.

7       THE COURT:  Please have a seat in the witness

8    stand and I'll recognize Mr. Monk for your Direct

9    Examination.

10                    DIRECT EXAMINATION

11   BY MR. MONK:

12   Q    Good morning, sir.

13   A    Good morning, sir.

14   Q    Please tell the members of the jury how you are

15   employed.

16   A    I am currently a full-time bomb technician with

17   the Charleston County Sheriff's Office, sir.

18   Q    In Charleston, South Carolina?

19   A    Yes, sir.

20   Q    I'd like you to tell us, first of all, how long

21   you have been employed with the Charleston County

22   Sheriff's Office as a bomb technician.

23   A    As a bomb technician at Charleston County

24   Sheriff's Office since January of 1998, sir.

25   Q    So about nine years?  I'm sorry, 11 years?

1    A    Almost 11 years, yes, sir.

2    Q    And before you were employed with Charleston

3    County, what did you do for a living?

4    A    I was a police officer at the Charleston City

5    Police Department where I'd been a bomb technician

6    since 1994.

7    Q    And prior to that?

8    A    I was in the United States Army as a combat

9    engineer where I had explosives experience.

10    Q    When you were in the U.S. Army, was your job or

11    assignment related to explosives in ordinance?

12    A    Yes, it was.  I was an E-5, a sergeant of a

13    combat engineer squad, and we were responsible for

14    mining, de-mining, neutralizing booby traps, things

15    of that nature.

16    Q    Do you have any certification in your specific

17    field of being a bomb technician?

18    A    In the related field, I graduated from

19    Huntsville, Alabama, which is an HDS school, a

20    nationally recognized bomb school.

21    Q    When you say "HDS"?

22    A    Hazardous devices school, HDS, yes, sir.  It's

23    run by the FBI and the United States Army in

24    Huntsville, Alabama.  Also, ATF's post-blast

25    investigation school.

1  Q    Stay that again a little bit more slowly.

2  A    Also the ATF's post-blast investigation school,

3  advanced post-blast.

4  Q    ATF being Alcohol, Tobacco & Firearms?

5  A    Yes, sir.

6  Q    Their post-blast school?

7  A    Yes, sir.

8  Q    Go ahead.

9  A    Also, every bomb technician has to be a

10  certified hazardous materials technician also, hazmat

11  items.  So we have a wider range of hazardous devices

12  and substances.

13  Q    The hazardous device school that you attended,

14  could you tell us a little bit about -- first of all,

15  how long is that and the curriculum?

16  A    It's a five-week school in Huntsville, Alabama.

17  We go over basic electronic circuitry, demo

18  procedures, robot operations.

19  Q    By demo procedures you mean demonstration

20  procedures?

21  A    Demolitions.

22  Q    Demolition?

23  A    Demolition procedures, basically firing trains,

24  render-safe procedures, and logic tree application.

25  Q    Logic tree?

```
 1    A    Yes.  When you first go on a scene, what steps
 2    should be taken first.  And if there is a life in
 3    danger, you do these steps and you go on this side of
 4    the logic tree.  If no life is immediately in danger
 5    then you can take this other route which'll lead to
 6    more safety for all the people involved.
 7    Q    Now, I'd like to direct your attention to August
 8    4th, Saturday, August 4th, 2007, and ask you whether
 9    some time during the evening hours on that date you
10    had occasion to go to the area of State Road 176 and
11    Myers Road in Goose Creek, South Carolina.
12    A    Yes, sir.  I received a page from Sergeant
13    Morris, which was -- at the time he was doing my job
14    that I currently hold.  He was a full-time bomb
15    technician for Charleston County Sheriff's Office.
16    He received information and paged out.
17    Q    Okay.  Don't tell us what information he
18    received --
19    A    Okay.
20    Q    -- that he related to you.  But he paged out?
21    A    Yes.  He paged us out and we responded to that
22    location for a possible bomb call.
23    Q    Now, you say -- you use the collective pronoun
24    "we."  Who is we?
25    A    Myself -- on my team it's going to be myself,
```

1    Sergeant Morris, and then we had two other people

2    respond from our team that are not bomb technicians,

3    they are just helpers.  That's the Sergeant Steve

4    Balcerzak and Sergeant John Jacobick.

5         THE COURT:  I'm sorry, sir.  You're going to

6    have to forgive us, but a lot of us are unfamiliar

7    with these names and unfamiliar with these terms.

8    The sergeant's name was what?

9         THE WITNESS:  The other two that weren't bomb

10   technicians that responded to help was Sergeant Steve

11   Balcerzak.

12        THE COURT:  B-A-L-Z-E-R --

13        THE WITNESS:  B-A-L-C-E-R-Z-A-K.

14        THE COURT:  You see how I might have caught that

15   the first time?

16        THE WITNESS:  Yes, sir.  And John Jacobick.

17        THE COURT:  Jacob with an I-C?

18        THE WITNESS:  I-C-K, yes, sir.

19        THE COURT:  All right.  Excuse me, Mr. Monk.

20   BY MR. MONK:

21   Q    Detective Nice, when you arrived at the scene --

22   are you familiar with an individual by the name of

23   Lou Howard?

24   A    Yes, sir.

25   Q    When you arrived at the scene, was Lou Howard

1    there?

2    A    Yes, sir.

3    Q    And approximately what time did you arrive at

4    that location that I've described?

5    A    I get there at approximately 7:30 p.m., give or

6    take five minutes.

7    Q    And once you arrived, were you briefed, provided

8    a summary of known facts?

9    A    Yes, sir.  Lou Howard and Sergeant Morris both

10   briefed me on the scene.

11   Q    And what was your first step as a bomb tech at

12   that scene?

13   A    My first step upon the scene was to make sure

14   that the perimeter was set securely and that no

15   people were coming in and out of our working area and

16   just to make sure that there's no life that was

17   immediately at risk.

18   Q    The perimeter set securely, that entails keeping

19   human beings and traffic away from the subject area,

20   is that correct?

21   A    Yes, sir.

22   Q    And that was done?

23   A    Yes, sir.

24   Q    And did you also initially confer with other

25   specialists and formulate a plan?

1    A    Yes, sir.  At that time, myself, Sergeant

2    Morris, and Lou Howard sat down and devised a plan at

3    that time to send down the robot and get a first good

4    reconnaissance of the scene.

5    Q    To send down the robot?

6    A    Yes, sir.

7    Q    Tell us about that.  Is that a tool that you

8    ultimately used that evening?

9    A    Yes, sir.  It's the remote tech F6A hazardous

10   devices robot.  It's approximately four-foot tall,

11   weighs approximately 400 pounds.  It is equipped with

12   several video cameras, manipulating arms.  And Lou

13   Howard was operating that from one of our vehicles by

14   remote control to get us the pictures inside the

15   vehicle that we needed to further assess the

16   situation.

17   Q    The robot had camera capability, is that

18   correct?

19   A    Yes, sir.

20   Q    Now, the camera capability that it had at that

21   time, did it have the capability of actually

22   recording a video?

23   A    No, sir.  That was one of the shortfalls we saw

24   that day.  We have sense had it fixed.  At the time

25   we did not have the capability to record off the

1    robot.

2    Q    So when you say that it had camera capability,

3    does that mean that you could physically remain at a

4    distant vantage and using the camera capability as

5    the robot moved up closer to where it was going, the

6    robot would transmit to you-all at the distant

7    vantage what the robot was seeing up close?

8    A    Yes, sir.  It's basically a closed circuit

9    television system but microwave fed to us.  We was

10   watching the video.  As the robot was approaching, we

11   were watching it from the robot's point of view

12   approaching the vehicle.

13   Q    Now, when you-all formulated this plan of

14   action -- well, generally speaking, based upon your

15   training and experience, is there a hierarchy of

16   priorities that you follow in carrying out your job?

17   A    Yes, sir.

18   Q    And what is that?

19   A    We have -- our first priority is the priority of

20   life.

21   Q    Priority of what?

22   A    Of life.

23   Q    What does that mean?

24   A    We have to make sure everybody at the scene,

25   including the bomb technicians, do not incur

1    unnecessary risk and that they're safe at what

2    they're doing.

3    Q    Okay.

4    A    After that is the preservation of property, both

5    innocent people's property, and we just don't want to

6    destroy something for the sake of destroying it.

7         After that is returning the public to normalcy,

8    opening up that roadway as quickly as we can so we

9    don't keep traffic stopped for the next three days.

10        And then after that is preservation of evidence.

11   Q    When you arrived and this plan was formulated,

12   in the course of events, what was the first thing

13   that occurred?  Did the robot go out or did something

14   else happen first?

15   A    When I get there, we prepared to robot to send

16   it down.  That was the first thing we did as a team

17   after I got there.

18   Q    When you say you sent it down, would that be you

19   sent it toward the automobile?

20   A    Yes.  Whenever I say I sent it down, down range.

21   And at that point this particular instance, down

22   range is where the vehicle is.  That's our down range

23   area.

24   Q    When you were monitoring -- when you-all were

25   monitoring what the robot was seeing, where were

1    you-all located?

2    A    We were approximately three to four hundred feet

3    away inside of our bomb response vehicle.

4    Q    And after the bomb -- the robot went down and

5    took a look, is that correct?

6    A    Yes, sir.

7    Q    What's the next thing that occurred?

8    A    On the video screen we noticed a plastic bag

9    that was laying on top and it had four to five PVC

10   pipes in it, another plastic bag that looked like it

11   contained possibly safety fuse.  From the information

12   that I had at that time, that was our known threat.

13   So we decided -- at that point I instructed Lou

14   Howard just to grab that with the robot and take that

15   away from the vehicle as quickly as possible so our

16   biggest threat that we knew about that day would be

17   away from our work area.

18   Q    The car being the work area?

19   A    Yes, sir.

20   Q    You say this plastic bag was on top.  Was it on

21   the top of the car?  Was it on the top of something

22   else or --

23   A    It was on top of some other items that were in

24   the trunk area of the vehicle, sir.

25   Q    So the trunk was opened when you --

1    A    Sure.

2    Q    Is that correct?

3    A    Yes, sir.

4    Q    And you say you instructed Lou Howard to remove

5    that.  Does that -- what was the -- what was the

6    chain of command, so to speak, with respect to the

7    work that the bomb techs were doing?

8    A    Traditionally on a bomb scene, the senior

9    ranking person is not necessarily a person in charge,

10    the person that makes tactical decisions or the

11    person with the most experience in this field.  Just

12    because someone is higher rank and he has one year

13    experience does not mean he can make quicker

14    decisions than someone who's been doing it for 15

15    years.

16    Q    Now, you're with the Charleston County Sheriff's

17    Office, correct?

18    A    Yes, sir.

19    Q    And what agency was Lou Howard with?

20    A    He works for SLED, the State Law Enforcement

21    Division.

22    Q    Once you directed him to remove that plastic

23    bag, what occurred?  Was it removed?

24    A    It was removed and placed on the right-hand side

25    of the roadway.  That was the decision we made

1     collectively as a group.  So we could, as we were

2     pulling items out of the vehicle with the robot,

3     we'll place them on the side of the road in a set,

4     organized manner so we'll know what came out first,

5     second, third, fourth, and so on until we get the

6     vehicle area cleared as much as we can.

7     Q    Once that item was taken out of the trunk and

8     placed on the roadway, what was the next thing that

9     occurred?

10    A    My helpers helped me dress out into a bomb suit,

11    which is the EOD 8, Med-Eng EOD 8 bomb suit.

12    Q    Is that the model, EOD 8?

13    A    Yes, sir.  MED-ENG is the make of it and the

14    model is the EOD 8.  Lou Howard, his department uses

15    the EOD 9, which is just a different -- a new model

16    of the same suit.

17    Q    This bomb suit, is this designed to protect you

18    from a bomb blast?

19    A    Yes, sir.  It's designed to protect me from

20    blast fragmentation and overpressure in case there

21    was a detonation in close proximity to me.

22    Q    Can you describe for us the suit in terms of its

23    size, weight, and so forth?

24    A    It's basically a fully encapsulated suit made

25    out of Kevlar.  The particular model we use is green

1    and black, has a full head gear like a pilot's

2    helmet, and it weighs about 70 pounds.

3    Q    Is it bulky and does it inhibit your movements

4    to some extent?

5    A    Yes, sir, it does.  With the heat around August

6    7th, it was well up in the 90s that day.  With no

7    airflow, the extra weight, the heat, the stress, it

8    limits your time and your ability to function

9    correctly in that suit.

10    Q    Once you got into that suit, what did you do?

11    A    I took a digital camera, approached down range

12    toward the vehicle, and I started snapping pictures

13    as I approached it to try and document the scene as

14    untainted as possible so we would have a digital

15    document of where every item was located within the

16    vehicle.

17    Q    Before the items started being taken out?

18    A    Yes, sir.

19         MR. MONK:  Your Honor, may I approach the

20    witness?

21         THE COURT:  Yes, sir.

22    BY MR. MONK:

23    Q    I'm going to show you what's been marked as the

24    following:  Proposed Exhibit 24 A, 24 B, bravo, 24

25    David, 24 E, 24 J, 24 K, 24 L, 24 M, 24 N, as in

1    Nancy, 24 O, 24 P, 24 Q, 24 R, 24 double M, 24 double

2    N, 24 double P, 24 double Y, 24 double G, and 24

3    double H.

4         Please take a look at those and tell us whether

5    you recognize these to be photos that you took with

6    your digital camera that evening at the scene.

7    A    Yes, sir.  These two pictures here, I do not

8    believe I took.

9    Q    Which two are you referring to by --

10   A    24 GG and 24 HH.

11   Q    Do you nevertheless recognize what is depicted

12   in 24 GG and 24 HH?

13   A    Yes, sir, I do.

14   Q    And do you recognize whether what is depicted

15   accurately reflects the scene on the evening of

16   August 4th, 2007?

17   A    Yes, I do.

18   Q    What about other proposed exhibits?

19   A    Those all appear to be the pictures I took that

20   night.

21        MR. MONK:  At this time, Your Honor, I'd move

22   for admission of each of the proposed exhibits that

23   I've recited.

24        MS. DYER:  No objection, Your Honor.

25        THE COURT:  Each stated exhibit is received on

1    behalf of the United States, including GG and HH in

2    the 24 series.

3         (Government's Exhibit Nos. 24 A, B, D, E, J - R,

4    MM, NN, PP, YY, GG, and HH are received into

5    evidence.)

6         MR. MONK:  Your Honor, may I please publish some

7    of these photos?

8         THE COURT:  Yes, sir.

9    BY MR. MONK:

10   Q    First of all, just to get us oriented.

11        THE COURT:  Is this identifiable by exhibit

12   number?

13        MR. MONK:  Yes, I'm sorry.  This would be 24 A.

14   Your Honor, I'm wondering whether if we dim the

15   lights a little bit the contrast would be better?

16        THE COURT:  Yes, sir.  Ms. Dear, would you dim

17   the lights?

18        MR. MONK:  Thanks.

19        THE COURT:  You'll notice that John Barnes, our

20   Systems supervisor, has been in over the evening and

21   made some adjustments.  I'll thank him for you.

22   BY MR. MONK:

23   Q    24 A.  Can you see that on the screen in front

24   of you?

25   A    Yes, sir.

1    Q    What is this -- obviously, what does this

2    depict?

3    A    That is depicting the vehicle from our bomb

4    response vehicle to our suspect vehicle.  I wanted to

5    show the relationship to the roadway, where it was

6    at, and the original starting condition of the

7    vehicle before we started work.

8    Q    Does this photo also accurately depict the grade

9    of the shoulder that this car pulled off on?

10   A    It doesn't show it the greatest.  On the

11   passenger side of that vehicle, it drops down at a

12   fairly substantial rate, making it hard to traverse

13   around that side of the car.

14   Q    With what, with the robot?

15   A    With the robot, yes, sir.

16   Q    24 Bravo.  Take a look at this, please.  This is

17   a more close-up photo?

18   A    It's just a closer photo as I was approaching

19   the vehicle.

20   Q    24 J?

21   A    After I approached the vehicle, that was what

22   was in the right-hand corner section of the trunk

23   area, the passenger side area.

24   Q    Now, do you recognize -- what are these items,

25   if you recall, that you actually saw as you were

     1    taking the photos?  The red item in the center?

     2    A     That is a plastic fuel can.

     3    Q     And I'm going to use a pointer.  Take a look at

     4    the screen up here.  Do you recall what this item

     5    was?

     6    A     No, I do not, sir.

     7    Q     Okay.  Anything else depicted here that you

     8    recall just looking at this photo?

     9    A     The box on top of the orange box is I do believe

    10    the Garmin or the GPS box that was from the GPS that

    11    was inside the vehicle.

    12    Q     That would be?

    13    A     The white box on top, sir.

    14    Q     Look at the screen up here.  That would be

    15    there?

    16    A     Yes, sir.  Yes, sir.

    17    Q     By the way, as you're taking these photos, the

    18    item with the suspect materials in it has already

    19    been removed?

    20    A     Already been removed and it's on the roadway

    21    behind me on the right-hand side of the road.

    22    Q     And where was that within this trunk area?

    23    A     It was -- I do believe whenever we first took

    24    the robot down, I do believe it was sitting in the

    25    area of the orange box.

1    Q    Where the --

2    A    Where the arrow is now, yes, sir.

3         THE COURT:  You said, "Where the arrow is now."

4    That was in the lower left-hand corner of that

5    photograph.  If you were standing behind the car, in

6    the middle of the car looking at the trunk with the

7    lid open, what part of the trunk would that same

8    area, that is the lower left-hand corner of the

9    photograph, have been?

10        THE WITNESS:  To the best of my recollection,

11   sir, right off hand, it should have been near the

12   center of the vehicle.

13        THE COURT:  And nearer the bumper than the

14   passenger seat?  In other words, nearer the rear of

15   the car than the front?

16        THE WITNESS:  Yes, to the best of my

17   recollection.

18        THE COURT:  Well --

19        THE WITNESS:  I'm just trying to --

20        THE COURT:  My question to you is:  Do you have

21   a recollection of where the removed bag was in the

22   trunk?  First, do you have a recollection of where it

23   was?

24        THE WITNESS:  Yes, sir.  From what I remember,

25   it was laying right on top of that orange box near

1    the middle, rear area of the trunk.

2    BY MR. MONK:

3    Q    Could you please touch the screen again to see

4    if we can get rid of those arrows?

5    A    Sorry about that.

6    Q    Now, let's take a look at 24 K.  Do you

7    recognize that?

8    A    Yes, sir.

9    Q    And what is that?

10    A    That is more of a center shot into the rear of

11    the trunk area, closer to the rear portion of the

12    bumper area of the trunk.

13    Q    Take a look at the big screen.  Do you see this?

14    A    Yes, I do, sir.

15    Q    This plastic -- is that a plastic coleslaw-type

16    container?

17    A    Yes, it is.

18    Q    Do you remember whether that was removed from

19    the trunk that evening?

20    A    Not until the very end of the evening, sir.

21    Q    Did you during the course of that evening at

22    some point in time take a look at the contents of

23    that plastic-type container?

24    A    Yes, I did.  Whenever we were clearing the

25    vehicle to make sure there wasn't anything left in it

1    that was hazardous, Sergeant Morris picked up that

2    particular piece of item.

3    Q    Was he in a bomb suit?

4    A    No.  That was after we -- after we believed we

5    had everything of hazardous materials out of the

6    vessel.  We were doing our final clearance on it

7    before we turned over the vehicle to evidence, FBI

8    evidence personnel.  At that time we do our final

9    sweep in civilian clothes.

10   Q    Then that was removed while you were in civilian

11   clothes?

12   A    Yes, sir.

13   Q    Does that -- is that an indication that you did

14   not believe that the contents were hazardous?

15   A    Yes, sir.

16   Q    You did not -- yes, you did not believe it was

17   hazardous?

18   A    We did not believe that was hazardous at the

19   time, sir.

20   Q    And what did you believe that it was?

21   A    It had the appearance of human feces.

22   Q    Okay.  Just a few more, please.  24 L.  Are we

23   still in the trunk area?

24   A    Yes, sir.

25   Q    And this blue item here, do you know what that

1    was?

2    A    Yes, sir, that was a sleeping bag.

3    Q    What about the item that says "Black & Decker"?

4    A    I did not know -- I do not recall exactly which

5    type of tool it was, but it was a Black & Decker

6    tool.

7    Q    24 double M.  What is this that we're looking at

8    now?

9    A    That was the plastic bag that was inside of the

10   other plastic bag that held the PVC pipes containing

11   a brownish, off-white substance.

12   Q    24 double N.  What's that?

13   A    Another view of that same PVC pipe, sir.

14   Q    Take a look at the larger screen.  This

15   contrasting color that is contrasting to the white

16   PVC, what did that appear to be?  Was there a

17   substance within those pipes?

18   A    Yes, sir.

19   Q    Describe what you saw that is with respect to

20   the interior of the pipes.

21   A    On one end of the pipe I do believe they had a

22   wooden dowel section shoved into it and the other

23   side was packed with an unknown chemical item.

24   Q    24 PP.  This one is difficult to see.  What is

25   this item here, the circular item?

1    A    That is a common safety fuse.

2    Q    And I'll have to remove this to give you a

3    better view of the interior of the bag here, but I'm

4    going to show it to you and ask you what is in this

5    area right here.  Can you make that out?

6    A    It's hard for me to tell from that photo

7    exactly.  It appears to be the PVC pipes.

8         MR. MONK:  Your Honor, may I please just

9    distribute this one to the members of the jury?

10        THE COURT:  Yes.  Hand it to Mr. Watts.  Given

11   its difficulty, we'll circulate it among the jurors

12   for a moment.

13   BY MR. MONK:

14   Q    Now, you mentioned or alluded to wooden dowels?

15   A    Yes, sir.

16   Q    Take a look at 24 GG, 24 double G.  I'll ask you

17   first of all, this 24 double G, is this one of the

18   photos, you did not take?

19   A    I did not take that photo, sir.

20   Q    You took photos to try to preserve the

21   appearance of -- that is what the state of affairs

22   was when you arrived there, correct?

23   A    Yes.

24   Q    Now, later on in the evening after the work of

25   the bomb technicians was over and done with, was the

1    scene at some point in time turned over to the FBI?

2    A    Yes, it was for processing, sir.

3    Q    You mentioned your hierarchy of priorities on

4    the low end of which is evidence preservation, is

5    that correct?

6    A    Yes, sir.

7    Q    When you turned the scene over to the FBI, did

8    they then take over and execute their job with

9    respect to evidence preservation?

10   A    Correct.

11   Q    And so this -- can you tell us -- this evidence

12   envelope that these items are in, can you tell from

13   this photo whether this was taken after the scene was

14   turned over to the FBI?

15   A    Yes, it was, sir.

16   Q    And what are these items?

17   A    Those items on the left are the wooden dowels

18   that appeared to be inside of the PVC pipes.

19   Q    You said the items on the left?

20   A    Yes, sir, those two items.

21   Q    These items?

22   A    Yes, sir.

23   Q    And what about these items?

24   A    PVC pipes.

25   Q    Now, same photograph.  Is this the safety fuse?

1    A    Yes, it is.

2    Q    Now, when you, Detective Nice, went to take your

3    photographs of the scene -- thus far, we've been

4    looking at, and correct me if I'm wrong, items that

5    were either in the trunk or on the roadway, is that

6    correct?

7    A    Correct, sir.

8    Q    And the items that were on the roadway, that is

9    the PVC pipes and so forth, correct me if I'm wrong,

10   had been removed from the trunk?

11   A    Correct, with the robot, yes, sir.

12   Q    Did you also take photos of the interior

13   passenger compartment of the car?

14   A    Yes, I did.  As I was down there, I tried to

15   document as much as I could.

16   Q    Let's take a look, please, at 24 O.  Did you

17   take this photograph?

18   A    Yes, sir.

19   Q    And what part of the interior passenger

20   compartment of the Toyota does this depict?

21   A    The rear seat directly behind the driver's seat.

22   Q    And do you know whether this orange item, Black

23   & Decker item, is what's known as a power inverter?

24   A    Yes, sir, it is.

25   Q    This black item is a cord, correct?

1    A    Yes, sir.

2    Q    And is this where this item was when you saw it?

3    You didn't move it to this position?

4    A    No, sir.  Everything is documented the way I

5    found it.

6    Q    Showing you what has been admitted into evidence

7    as 24 E.  Now, what are we looking at here?

8    A    The front passenger floorboard of the Toyota.

9    Q    Okay.  And what is this item right here that I'm

10   pointing to?

11   A    That was a laptop that was laying on the

12   floorboard, sir.

13   Q    Did you at some point in time receive a request

14   or direction with respect to that laptop?

15   A    Yes, I did.  I was requested by the FBI that at

16   the first possible chance try and remove that from

17   the vehicle and get it back to them.

18   Q    And did you do that?

19   A    Yes, sir, I did.

20   Q    Let me show you what's been marked as proposed

21   Exhibit 3 A.  Go ahead and take it out.  Is that

22   similar in appearance to the laptop that you removed

23   from the vehicle that evening?

24   A    That appears to be the one, sir.

25        MR. MONK:  I'd move for admission of proposed

1    Exhibit 3 A.

2        MS. DYER:  No objection, Your Honor.

3        THE COURT:  Exhibit 3 A is received on behalf of

4    the United States.

5        (Government's Exhibit No. 3 A is received into

6    evidence.)

7    BY MR. MONK:

8    Q    Now, Detective Nice, correct me if I'm wrong,

9    when you picked that up off the floor and turned it

10   over to the FBI, you didn't record the serial number

11   yourself to make sure that that is the laptop.  If

12   that was done, somebody else did it, correct?

13   A    Yes, sir.  At that point I was still in a bomb

14   suit and I still had a lot of my mission to go.  I

15   was trying to move in as expedient manner as

16   possible.

17   Q    By the way, with respect to the photos that you

18   took while you were in your bomb suit, did the bomb

19   suit you were wearing inhibit or effect your ability

20   to as good a pictures as you would like to have

21   taken?

22   A    Yeah.  I'm not the greatest picture taker in the

23   world, but also I try to reiterate, I'm wearing a

24   70-pound suit.  It's a hundred and some odd degrees.

25   It's very late at night.  My mobility and vision is

1    restricted.  I'm just putting up a digital camera,

2    snapping as I'm approaching.  I'm trying to document

3    the best I can, but I'm -- I'm not really concerned

4    if I miss one particular item.  There are certain

5    items I'm trying to get the best I can, but it's

6    still iffy.

7    Q    Now, that photo that's up on the screen there,

8    it's a little bit difficult to tell.  Where in the

9    car was that laptop?  Is that showing on the floor?

10    A    Yes, sir, on the floorboard.

11    Q    In what part of the car?

12    A    The passenger seat area.

13    Q    The front seat?

14    A    Yes, sir.

15    Q    The front passenger seat?

16    A    Yes, sir.

17    Q    Exhibit 24 Q.  Did you take this photo as well?

18    A    Yes, sir.

19    Q    Now, you earlier mentioned I think a Garmin or

20    global positioning system box in the trunk?

21    A    Yes, sir.

22    Q    Is this a GPS on the windshield in the front

23    seat?

24    A    Yes, sir.  Whenever I was taking pictures in the

25    trunk and I saw that for a GPS, I walked around and

1    was looking into the vehicle and saw that GPS, I

2    decided to take a snapshot of that also.

3    Q     24 P.  Is this another photo of the front

4    passenger seat area from a little bit different

5    vantage?

6    A     Yes, sir.  That's more of a straight down shot

7    and that's what I got originally with my digital

8    camera.  I looked at it to see how it showed up and

9    didn't show up, so I had to get at a lower angle to

10   show the laptop underneath the dash area.

11   Q     Finally, what is this?

12   A     That's a picture taken from the driver's side

13   door toward the passenger area showing the center

14   console area.

15   Q     Now, what's the next, generally speaking, next

16   event or series of events in the sequence of the work

17   of the bomb techs that evening?  Thus far, you've

18   told us about having been briefed, the one

19   significant item, or a significant item being taken

20   out and put on the roadway, and then you took your

21   photos, correct?

22   A     Yes, sir.

23   Q     What is the next significant event or series of

24   events in what you-all did that evening?

25   A     After we documented where all the items were

1     inside the vehicle, I then went back to my staging

2     area and after a brief discussion between myself, Lou

3     Howard, and Sergeant Morris, the robot continued its

4     work and took the items out of the compartment area

5     of the vehicle as much as it could.  We wanted to

6     just keep on utilizing the robot as much as we could

7     at that point.

8     Q    Now, did -- when you normally do your work as a

9     bomb tech, do you normally try to, as they put it,

10    make these things go away?

11    A    A lot of times when you are dealing with

12    explosives, and especially not commercially

13    manufactured explosives, you really don't know how

14    sensitive they are, how volatile they are.  We

15    usually try and -- it's called distruct-in-place as

16    one form of a render safe.  If I totally destroy it,

17    then I don't have to worry about any hazards to it.

18    That is a common practice, but that's usually not

19    when you're worrying about a prosecution afterwards.

20    If I did that then a lot of the evidence would be

21    destroyed.  We had to determine if we could safely

22    transport it, and, if we could, maintain as much

23    evidence as possible.

24    Q    Okay.  You used the term "render safe."

25    A    Yes, sir.

1    Q    And was there a render safe procedure that was

2    conducted in this instance?

3    A    Yes, there was.

4    Q    And who did that?

5    A    Lou Howard did.

6    Q    What did that entail in this instance?

7    A    Taking a percussion-actuated, non-electric

8    disrupter, which is our PAN for short, and striking

9    one of the PVC pipes with a particular designed round

10   that would travel extremely fast to test that PVC

11   pipe to determine whether it and the contents were

12   susceptible to exploding if they were hit with a high

13   shock item.

14   Q    So that was done?

15   A    Yes, sir.

16   Q    I take it that was done in a little container

17   that was set up so that when the device was shattered

18   it contained the materials?

19   A    Yes, sir.  We did that farther in front of the

20   vehicle so just in case we did have a sympathetic

21   detonation it wouldn't contaminate the items that we

22   already had separated from the vehicle.

23   Q    What do you mean by "sympathetic detonation"?

24   A    If we struck it with that round and it was a

25   high shock sensitive item, it would have exploded.

1    Some materials like TATP and stuff will.  If you hit

2    them with a hammer or if you hit them with high

3    shock, they'll explode without having heat or

4    friction applied to hem.

5    Q    So when the PAN procedure was used, was there --

6    did the item, that is the PVC pipe with the substance

7    within it, is that correct?

8    A    Yes, sir.

9    Q    Did that generate an audible secondary

10   explosion?

11   A    The PAN is the same as a shotgun firing, so you

12   will hear that, but --

13   Q    Excuse me.  There was a loud noise --

14   A    Yes, sir.

15   Q    -- when the PAN was fired?

16   A    Yes, sir.

17   Q    Was there a secondary loud noise explosion when

18   the item was shattered?

19   A    No, sir.

20   Q    Based upon the fact that when the PVC pipe with

21   the substance in it -- based upon the fact that when

22   that was struck at high velocity it did not detonate

23   or issue an audible explosion, did that -- what did

24   that indicate to you with respect to your ability to

25   transport the remaining devices?

1    A    That it would be safe for road transportation.

2    I wouldn't have to worry about another detonation if

3    there was a wreck or if it was just getting jostled

4    around inside the vehicle.  I'd know it would be safe

5    for transportation.

6    Q    By the way, the fact that the substance within

7    the PVC pipes did not result in an auditory report

8    when it was -- when that item and the substance were

9    struck at the high velocity, is that an indication

10   that the substance within those pipes was not an

11   explosive?

12   A    No, sir.  Several commercial explosives, C-4,

13   you can hit several of those with a very sharp report

14   and it will not detonate them.  Certain explosives

15   are shock sensitive; certain ones aren't.  That was

16   just a determination to make sure this particular one

17   wasn't so we could transport it.

18        MR. MONK:  Your Honor, may I have a moment,

19   please?

20        THE COURT:  You may.

21        (Pause.)

22        MR. MONK:  Thank you, Your Honor.  That's all.

23        THE COURT:  Thank you, Mr. Monk.

24        Has the defense cross-examination for this

25   witness?

1          MS. DYER:  Yes, Your Honor.

2          THE COURT:  Ms. Dyer, you are recognized for

3     that purpose.

4          MS. DYER:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6     BY MS. DYER:

7     Q    Good morning, sir.

8     A    Good morning, ma'am.

9     Q    I didn't catch it.  What's your rank?

10    A    Detective.

11    Q    Detective, okay.  Detective Nice, you said when

12    you first arrived on scene it was about 7:30 p.m.?

13    A    Yes, ma'am.

14    Q    Were you aware that the stop occurred about 5:30

15    p.m.?

16    A    No, ma'am.

17    Q    So you had no idea how long other officers had

18    been on the scene before your arrival?

19    A    No, ma'am.

20    Q    And you said one of the first things you did was

21    get briefed on what had happened up to that point?

22    A    Yes, ma'am.

23    Q    So you would know how to assess the situation?

24    A    Correct.

25    Q    You testified that according to the pictures, or

1    while you were testifying about the pictures, that

2    when you arrived, plastic bag containing the PVC

3    pipes was situated on top of a box in the trunk,

4    correct?

5    A    To the best of my recollection, yes, ma'am.

6    Q    But you have no idea if that's where it was when

7    the car was actually stopped initially, do you?

8    A    No.  You are absolutely right.

9    Q    So if other officers had searched the trunk,

10   they may have been the one to place it on that box?

11   A    Correct.

12   Q    In fact, were you briefed that other officers

13   did rummage through the trunk and that's how they

14   found those items?

15       MR. MONK:  Objection, Your Honor, hearsay.

16       THE COURT:  Overruled.

17   BY MS. DYER:

18   Q    Do you need me to repeat the question?

19   A    Yes, ma'am.

20   Q    To your knowledge did other officers rummage

21   through the trunk prior to your arrival and that's

22   how they knew that they had the substance and needed

23   to call you?

24       THE COURT:  Wait just a moment.  That wasn't the

25   question.  The question was whether it was reported

1    to you that the trunk had already been touched by

2    other officers, in effect, before you got there?  The

3    question is was it reported to you before you began

4    your examination or was it reported to you that other

5    officers had touched the material in the trunk, the

6    bags and the other items that were there?

7         THE WITNESS:  It was reported to me that the

8    trunk was looked into, yes, sir.

9         THE COURT:  You may go ahead.

10         MS. DYER:  Thanks for correcting me, Your Honor.

11         THE COURT:  You're welcome, Ms. Dyer.

12    BY MS. DYER:

13    Q    You then made a decision to have the robot go in

14    first, obviously for safety reasons, correct?

15    A    Yes, ma'am.

16    Q    Because obviously you were called there because

17    there might be something that's explosive or

18    dangerous?

19    A    Yes, ma'am.

20    Q    Were you informed what that substance consisted

21    of?

22         MR. MONK:  Objection, Your Honor.

23         MS. DYER:  I'm not asking what was said, Your

24    Honor.

25         THE COURT:  Perhaps everyone should step to side

1    bar just a moment and let's discuss the issue.

2        (At side bar, on the record.)

3        THE COURT:  The question so everyone will

4    remember is:  "Were you informed what the substance

5    consisted of?"

6        What's your objection?

7        MR. MONK:  Hearsay.

8        THE COURT:  All right.  Now, first of all, the

9    question asks if in effect he received information.

10   It doesn't ask the substance of the information.

11   While a non-responsive answer is possible, the

12   question does not call for hearsay on its face.  For

13   that reason the objection is due to be overruled.

14       But the hearsay issue is pervading this

15   particular line of questioning, so let's discuss it

16   just a minute.  Not every report in court is

17   introduced to prove the truth of the matter asserted.

18   It may be offered to prove, if relevant, that the

19   statement was made to the witness.  In this

20   particular case, for instance, because the fact that

21   the witness was told that the material in the trunk

22   was disturbed before he saw it or was not disturbed

23   before he saw it, whether accurate or inaccurate,

24   (therefore, the truth is not the reason for its being

25   offered) explains this person's conduct.  It is not

1    hearsay.

2        The question with respect to what the substance

3    was may or may not have effected his conduct.  It may

4    or may not be hearsay.  But the fact that, for

5    instance, he was told that it was Substance A and

6    therefore he proceeded in one way, told it was

7    Substance B and therefore proceeded in another way,

8    explains his conduct, and it would be under those

9    circumstances introduced for that purpose and not to

10   prove the truth.

11       I know that's a fundamental hearsay distinction

12   known far and wide.  It's easy to get blurred here in

13   the course of the courtroom.  Of course, I have to

14   look to that precise distinction in ruling.

15       So with respect to the pending question, given

16   its limited aspirations, I'm forced to overrule the

17   hearsay objection.  The hearsay objection may be

18   overruleable even to the implied question of was he

19   informed of what the substance was.  So that's my

20   thinking on this little group of questions.

21       Would anybody like to --

22       MR. MONK:  No.

23       THE COURT:  So that everybody understands what

24   I'm thinking and why I'm ruling the way I am.  And

25   sometimes I hear the question -- of course, I have

1    the benefit of glancing over here and doubling up on

2    my hearing of the question.

3        Let me tell you, I don't want anyone at my

4    having said that to start asking that question

5    knowing that there will be an unresponsive answer and

6    trying to take advantage of the fact that the hearsay

7    objection is not meritorious and slightly premature

8    to get into evidence but at least get exposed to a

9    juror an answer that everyone in the room with a law

10   degree knows is objectionable.  Okay.

11       (End of side bar discussion.)

12   BY MS. DYER:

13   Q    Detective, were you informed what type of

14   substance or what the contents of the supposed

15   dangerous substance was?

16       THE COURT:  Now, Detective, the question was

17   were you informed?

18       THE WITNESS:  Yes.

19       THE COURT:  Well done.

20   BY MS. DYER:

21   Q    And did that information play into what you did

22   next in how you assessed the situation and the scene?

23   A    Yes, it did.

24   Q    Were you informed that the substance was

25   potentially potassium nitrate and Karo syrup?

```
1    A    Yes.

2    Q    You testified that you took photographs at the

3    scene.

4    A    Yes, ma'am.

5    Q    I was a little bit confused as to the timing of

6    that.  The robot goes in before you, correct?

7    A    Yes.

8    Q    And is the only thing that the robot removes,

9    before you approached the car, the bag with the PVC

10   pipes?

11   A    Yes.

12   Q    I'm showing you what's already been admitted as

13   Government 24 A.  This is the car that you approach

14   and take pictures of, correct?

15   A    Yes, ma'am.

16   Q    Would you agree with me that it does not have

17   any hubcaps?

18   A    Yes, ma'am.

19        THE COURT:  You said "hubcaps"?

20        MS. DYER:  Yes, sir.

21   BY MS. DYER:

22   Q    I'm going to show you what's previously been

23   admitted as Government's 24 PP.  And you recognize

24   the items in that photograph?

25   A    Yes, ma'am.
```

1    Q    I believe you testified that it was common

2    safety fuse?

3    A    Yes, ma'am.

4    Q    Is that the green -- I don't know if you can

5    tell it's green, but the circle wire looking item

6    above the yellow cardboard?

7    A    Yes, ma'am.

8    Q    And that's still in the package?

9    A    Yes, ma'am.

10    Q    Now, it appears from this photo that that safety

11    fuse and the other items depicted, which I believe

12    you testified were wooden dowels, is that correct --

13    A    Yes, ma'am.

14    Q    -- are inside another bag, is that what was

15    happening?

16    A    Yes, ma'am.

17    Q    And it looks to me like it's not a clear bag.

18    Was it a clear bag?

19    A    I'm not sure which one -- the exterior bag?

20    Q    The exterior bag?

21    A    No, I don't believe it was, ma'am.

22    Q    Well, in looking at the picture --

23    A    It doesn't look like it was a clear bag, no,

24    ma'am.

25    Q    All of these items were inside that bag prior to

1    removal?

2    A    Yes, ma'am.

3    Q    Now, in testifying about the wooden dowels, you

4    said that they did something with them.  What was

5    that testimony, do you remember?  Do you remember

6    testifying about the use of the wooden dowels or what

7    somebody may have done with them?

8    A    I want to say in -- that the wooden dowels were

9    the same diameter and they could be inside the PVC

10   pipes.

11   Q    Could be?

12   A    Could be.

13   Q    But they weren't?

14   A    I cannot remember if they were or not.  I didn't

15   take apart one of the PVC pipes.

16   Q    At the point that this photograph is taken, the

17   PVC pipes have already been removed by the robot,

18   correct?

19   A    Yes, ma'am.

20   Q    From the trunk of the car?

21   A    Yes, ma'am.

22   Q    And they're in a separate area.  They're not in

23   in this photograph, correct?

24   A    Correct.

25   Q    But the wooden dowels are in this bag in this

1    photograph?

2    A    Yes, ma'am.

3    Q    So they weren't inside the PVC pipes?

4    A    I cannot remember.  I'm looking at these PVC

5    pipes in the dark at night.  It was probably after

6    midnight at that point.  With PVC pipes in there and

7    dowels in there, I thought they could be inside of

8    the PVC pipes.  I don't know if they were or not.

9    Q    Showing you what's already been admitted as

10    Government 24 NN.  Do you recognize that?

11    A    Yes, ma'am.

12    Q    Did you testify on Direct that that is the

13    plastic bag that was removed by the robot containing

14    the PVC pipes?

15    A    Yes, ma'am.

16    Q    Are there any wooden dowels in those PVC pipes?

17    A    That I cannot tell you.  It's hard to see in

18    there, ma'am.

19    Q    Looking at the photograph -- and I believe Mr.

20    Monk when he was questioning you had you look at this

21    substance right here?

22    A    Correct.

23    Q    And what did you testify that was?

24    A    That it was an unknown substance.

25    Q    An unknown substance?

```
 1    A    Yes, ma'am.

 2    Q    Is that because you didn't test it or you

 3    couldn't tell by looking at it?

 4    A    I never tested any of the items, ma'am.

 5    Q    So your testimony that it was an unknown

 6    substance or your opinion --

 7    A    Unknown to me.

 8    Q    What is that based on?

 9    A    That I just can't look at the substance and tell

10    you what it is.

11    Q    So it might be a wooden dowel, it might not?

12    A    Correct.

13    Q    Okay.  That's all I was trying to get to.  You

14    testified you also took pictures of the inside of the

15    vehicle.

16    A    Yes, ma'am.

17    Q    And I believe you testified, and correct me if

18    I'm wrong, that you tried to -- I don't want to try

19    to remember what you said, but you didn't move any of

20    the items before you took the photographs, correct?

21    A    Correct.

22    Q    I want to show you what's already been admitted

23    into evidence as Government's 24 O.  I believe you

24    testified that was the back seat of the car?

25    A    Yes, ma'am.
```

1    Q    And that that orange and black thing was a power

2    inverter?

3    A    It appears to be one, yes, ma'am.

4    Q    And it appears to be right next to a pink glove?

5    A    Yes, ma'am.

6    Q    Do you remember how many pink gloves were in the

7    back seat?

8    A    No, ma'am.

9    Q    I want to show you what's already been admitted

10   into evidence as Government's 24 N.  Is that the same

11   back seat?

12   A    Yes, ma'am.

13   Q    Is that the same pink glove?

14   A    I don't know if it's the same one or not, ma'am.

15   Q    Is that the same area of the back seat that is

16   depicted in 24 O?

17   A    Yes, ma'am, it is.

18   Q    Is the power inverter next to the pink glove in

19   this picture?

20   A    No, ma'am, it isn't.

21   Q    I'm going to show you what's already been

22   admitted into evidence as Government's 24 P.  Is that

23   the back seat of this vehicle?

24   A    I'd have to say yes, ma'am.

25   Q    Would it help to do it that way?  Does that

1    help?

2    A    Yes, ma'am.

3    Q    That's the back seat of the vehicle?

4    A    Yes, ma'am.

5    Q    Did this car have more than one back seat?

6    A    No, ma'am.

7    Q    Is that the same back seat that was depicted in

8    pictures 24 O and 24 N?

9    A    Yes, ma'am, I would say it is.

10    Q    I'm going to show you what's already been

11    admitted into evidence as Government 24 Q.  I believe

12    you -- I believe you testified that that was a GPS

13    device?

14    A    I do believe it was, yes, ma'am.

15    Q    And part of that belief was based on the fact

16    that you found a box for one in the trunk.  I thought

17    you testified to that, is that --

18    A    There was a box for a GPS inside the trunk, yes,

19    ma'am.

20    Q    I thought you testified so you went around and

21    looked --

22    A    While I was going through the car, I saw that

23    and clipped the picture.  You have to remember

24    pictures were taken at three different times during

25    the night.

1    Q    Okay.  Do you remember whether or not the GPS

2    was plugged in?

3    A    I have no idea, ma'am.

4    Q    So you didn't remove it at any point that night?

5    A    No, ma'am, I didn't.

6    Q    I want to show you what's previously been marked

7    as Government's Exhibit 24 S, 24 W, 24 BB and 24 LL.

8         MS. DYER:  May I approach the witness, Your

9    Honor?

10        THE COURT:  You may.

11   BY MS. DYER:

12   Q    Ask you to look through those and tell me if you

13   recognize them.

14   A    Okay.

15   Q    Do you recognize them?

16   A    I believe I know what they depict.

17        THE COURT:  The -- go ahead.

18   BY MS. DYER:

19   Q    Did you take these pictures?

20   A    I do not remembering these pictures.

21   Q    Okay.  Do you recognize the items in the

22   pictures?

23   A    I know what they look similar to, yes, ma'am.

24   Q    Do they look similar to items found in the

25   vehicle that night when you and others searched it?

1    A    Yes, ma'am.

2         MS. DYER:  With the Government's permission, I

3    would like to move these into evidence.

4         MR. MONK:  May I take a look at them, please?

5         THE COURT:  No objection?

6         MR. MONK:  I'm sorry, Judge, no objection.

7         THE COURT:  Exhibits 24 S, W, BB, and LL, of the

8    United States are received.

9         (Government's Exhibit Nos. 24 S, W, BB, and LL,

10   are received into evidence.)

11   BY MS. DYER:

12   Q    Detective, I'm going to show you what's now been

13   admitted into evidence, Government 24 S.  What does

14   that depict?

15   A    Receipts.

16   Q    Do you recognize the background of the receipts,

17   what they're laying on?

18   A    Appears to be a car seat, ma'am.

19   Q    Does that car seat look similar to the one of

20   the vehicle you were searching that evening?

21   A    Yes, ma'am.

22   Q    Can you read the receipts?

23   A    I can read "Wal-mart", "items sold".

24   Q    How about this one?  Might be easier to look at

25   your screen, I'm not sure.

```
 1    A    No, it's not easier to look at my screen.  Looks
 2    like a gas receipt, ma'am.  Looks like "gallons" and
 3    "pump", and "unleaded."
 4    Q    From a Murphy Oil gas station?
 5    A    Murphy U.S.A., yes, ma'am.
 6    Q    In Goose Creek, South Carolina?
 7    A    Yes, ma'am.
 8    Q    And can you see that the date was August 4th,
 9    2007?
10    A    Yes, ma'am.
11    Q    At 17:12?
12    A    Yes, ma'am.
13    Q    Do you know military time?
14    A    Yes, sir.
15    Q    What time is that?
16    A    5:12.
17    Q    5:12 p.m.?
18    A    Yes, ma'am.
19    Q    On August 4th, 2007?
20    A    That's what it says.
21    Q    Yes.
22    A    Yes, ma'am.
23    Q    Show you what's now been admitted Government's
24    24 LL.  Do you recognize that?
25    A    A Florida driver's license.
```

1   Q   Do you recognize it as something that was from

2   the search that evening?

3   A   I do recall a couple of IDs being found at the

4   location.  I'm not sure which one it is.  It really

5   didn't concern me too much.

6   Q   You had more important things on your mind?

7   A   I had other things on my mind, yes, ma'am.

8   Q   You had testified at some point in the evening

9   it was recorded where the items were located?

10  A   Yes, ma'am.

11  Q   Was that at the end of the evening after

12  everything was located?

13  A   I'm glad you brought this up.  When I originally

14  went down on the first trip right after the road

15  block removed items, I documented as quickly as I

16  could certain items.

17      After we thought the vehicle was secure and the

18  robot and the vehicle could be gone through, more

19  pictures were taken.  After we were done securing the

20  car and the vehicle was turned over to FBI evidence,

21  more pictures were taken.  So it's kind of hard to

22  determine what inside the vehicle you're showing a

23  picture of at what stage of the evening.  That's why

24  certain items are being moved.

25  Q   I'm sorry.  That wasn't my question.  I thought

1    you testified on Direct that at some point in the

2    evening it was documented where all the items were in

3    the vehicle.

4    A    Through photography, yes, ma'am.

5    Q    I'm sorry.  I thought you meant like somebody

6    was writing it down.

7    A    No, I'm sorry.

8    Q    Do you know if that was ever done, if anybody

9    ever wrote down where everything was found?

10    A    Personal knowledge of that, ma'am, no.

11    Q    So you or no one from your team had the

12    responsibility of recording any evidence --

13    A    Correct.

14    Q    -- at all?

15    A    Correct.

16    Q    You testified about a coleslaw container?

17    A    Yes, ma'am, one was in the trunk.

18    Q    Showing you what has already been admitted as

19    Government 24 K.  Is this what we're referring to as

20    a coleslaw container?

21    A    That's what I'm -- yes, ma'am.

22    Q    You testified that that was not originally

23    removed from the trunk of the car?

24    A    Correct.

25    Q    So the robot didn't remove it?

1    A    Correct.

2    Q    And it was the -- correct me if I'm wrong, the

3    robot's job initially to remove any items that were

4    suspected as hazardous or dangerous so that you could

5    then approach hopefully safely?

6    A    As much as we could, yes, ma'am.

7    Q    And I believe you said that this was not removed

8    until almost the end of the evening when you were

9    like doing your last check?

10   A    Correct.

11   Q    You didn't even have any safety gear on?

12   A    Correct.

13   Q    And that's because there was no indication that

14   it was dangerous to that point?

15        THE COURT:  What is the "this", Ms. Dyer?

16   BY MS. DYER:

17   Q    There was no indication that whatever was in the

18   coleslaw container --

19        THE COURT:  Coleslaw container, okay.

20   BY MS. DYER:

21   Q    -- was dangerous?

22   A    It wasn't so much that, ma'am.  Just we couldn't

23   get ahold of all items with the robot.  There were

24   several items in that robot.  The robot can only pick

25   up certain things.  Whenever we retrieved big items

1     from that trunk, certain things we were no longer

2     able to see with the robot so we didn't even know

3     were in there.  The night just progresses as it goes.

4     I'm sorry about that.

5     Q    And that's understandable.  So are you saying

6     now that that was not removed because the robot did

7     not have the ability to or -- well, let's start with

8     that one?

9     A    I'm just saying we just did not remove it.  No

10    particular reason.  We just couldn't either, one,

11    didn't see it, or we thought most of the hazardous

12    items were removed from the car and we just didn't

13    get around to it until we got up to the car.  We got

14    most of the big items away from the car and that's

15    what we were concerned about.

16    Q    When you say "big," you don't mean in size, or

17    do you?

18    A    Most of the large items, yes.

19    Q    Well, the PVC pipe items weren't large?

20    A    No.  But they were already told to us as

21    hazardous, possibly hazardous.

22    Q    And I'm sorry.  I thought you said on Direct

23    that this wasn't removed until the end because you

24    had no information that it was hazardous?

25    A    Yes, ma'am.

1    Q    You did testify to that?

2    A    I do believe I did.  I'd have to go back on the

3    --

4    Q    That's why I asked you if that's why it was

5    removed last.  And then you said, no, it was because

6    we didn't know it was there.  So which is it?

7    A    It could be a combination of the two, ma'am.  It

8    wasn't one of the high priority items for us.

9    Q    So you didn't really remember why.  It just

10   wasn't.

11   A    Yeah.  Might just not have saw it.  I'm sorry.

12   Q    That's fine.  And you didn't have any

13   information about it that would make it a high

14   priority item?

15   A    No, ma'am.

16   Q    I believe you testified that it looked like

17   human feces?

18   A    When it was opened, yeah.

19   Q    And that's what it looked like to you --

20   A    Yes.

21   Q    -- as an explosives expert?

22   A    Yes, ma'am.

23        MS. DYER:  If I could have a moment, Your Honor?

24        THE COURT:  You may.

25        (Pause.)

1       MS. DYER:  Nothing else, Your Honor.

2       THE COURT:  Thank you, Ms. Dyer.

3       Mr. Monk, you are recognized for any redirect

4   examination.

5                    REDIRECT EXAMINATION

6   BY MR. MONK:

7   Q    Detective Nice, I think you told us on

8   Cross-Examination that you were briefed when you

9   arrived at the scene.  As a result of that briefing

10  you understood that the substance could have been a

11  combination of potassium nitrate and Karo syrup.  Did

12  you testify to that effect on Cross-Examination?

13  A    Yes, sir.

14  Q    Now, did you with that information while you

15  were at the scene conduct any -- you or any of the

16  other bomb techs conduct any on-scene tests or

17  chemical analyses?

18  A    No, sir.  We don't have that equipment handy on

19  scene.

20  Q    Did you in fact confer over the phone with an

21  FBI chemist in Washington?

22  A    Yes, I did.

23  Q    And do you know whether potassium nitrate/sugar

24  or potassium nitrate/Karo syrup mixture is in fact a

25  low explosive?

1          MS. DYER:  Objection, Your Honor, beyond the

2     scope.  Calls for a legal conclusion.

3          THE COURT:  Do you want to be heard on that, Mr.

4     Monk?

5          MR. MONK:  Yes, I do.

6          THE COURT:  All right.  Then come to side bar.

7          (At side bar, on the record.)

8          THE COURT:  Your question is does he know

9     whether it is a low explosive.

10          MR. MONK:  Whether that combination is a low

11     explosive, yes, based upon his training and

12     experience.

13          THE COURT:  So are you asking him for an opinion

14     as he sits there or are you asking him for his then

15     existing understanding, right or wrong?

16          MR. MONK:  I'm asking him for --

17          THE COURT:  Or are you asking what he was told

18     by the guy he was talking to on the phone?

19          MR. MONK:  The latter is not the thrust of the

20     question.  He has extensive experience, and based

21     upon his experience and training whether he knows

22     whether that is in fact a low explosive.

23          THE COURT:  Within the meaning of a statute?

24          MR. MONK:  No.  Within the meaning of his

25     training.

1          THE COURT:  Well, I'm not sure that that's not

2     susceptible of being objected to as a legal

3     conclusion.  I'm not sure that would be dispositive

4     if it were otherwise okay.  I'm not sure that I

5     understand how he defines a low explosive, nor has it

6     been defined for either the juror or the witness.

7     Nor have his qualifications to render an opinion on

8     whether it was a low explosive -- he certainly has

9     better than a layperson's understanding.

10         Did you want to elaborate your objection any

11     further?  I thought I understood it, maybe I don't.

12         MS. DYER:  No.  But just in response to Mr.

13     Monk, he didn't lay a foundation that it was based on

14     his training and experience.  The question

15     immediately followed his call from Washington.  If it

16     is admissible, I would ask that that be --

17         THE COURT:  I was sort of expecting what you

18     meant was:  Did the guy up there tell him that it was

19     an explosive?  Which is a different issue entirely.

20     I think if we're going to elicit opinion testimony,

21     we need do at least two things.  We need to establish

22     his credentials and make sure they're in the right

23     field and provide the defense an opportunity to voir

24     dire those credentials and let me make a conclusion

25     with respect to his qualifications to give opinion

1     testimony and instruct the jury with respect to how

2     to receive opinion testimony.  And any part of that

3     will include definition of what a low explosive is.

4     And I'll remind the jury that to the extent that's a

5     legal conclusion, they'll be instructed by the law

6     from the Court.

7          The reason I'm bringing this up is we're a

8     little bit ahead of ourselves, I think, just to ask

9     for that ultimate conclusion.

10          MR. MONK:  I understand.

11          THE COURT:  Sustained.

12          (End of side bar discussion.)

13    BY MR. MONK:

14    Q    Detective Nice, let me ask a different question.

15    A    Yes, sir.

16    Q    In your training and experience, have you dealt

17    with or encountered high explosives as well as low

18    explosives?

19    A    Yes, sir.

20    Q    Do you know the difference between deflagration

21    and detonation?

22    A    Yes, I do.

23    Q    What is that?

24    A    Deflagration is when you have a particle --

25    Q    Excuse me.  Could you please lean forward and

1    speak a little bit more loudly?

2    A    Deflagration is usually a low explosive where

3    you have the burn going from particle to particle.  A

4    detonation is when you have an instantaneous release

5    of energetic material.

6    Q    And materials that detonate --

7    A    Yes, sir.

8    Q    -- when they detonate, are they generally, if

9    you know, and based on your experience, accompanied

10   by an audible report or a bang?

11   A    Yes, they are, sir.

12   Q    What about materials that deflagrate or burn?

13   A    Usually not, sir.

14   Q    Usually what?

15   A    Usually not, sir.

16   Q    Materials that deflagrate, if properly confined,

17   can they result in an audible report or bang?

18   A    Yes, sir.  When they overpressure a confined

19   vessel, the overpressure overcomes the strength of

20   the vessel and you will get what's an audible

21   explosion.

22   Q    Now, you were asked on Cross-Examination about

23   the safety fuse.

24   A    Yes, sir.

25   Q    Showing 24 double P.

1          MR. MONK:  If I could just have a moment,

2    please?

3          THE COURT:  Yes, sir.

4          (Pause.)

5    BY MR. MONK:

6    Q    Well, let's go with 24 GG.  Does this appear to

7    be a container of safety fuse?

8    A    Yes, sir.

9    Q    And in your experience, is the component or the

10   material, the active material within safety fuse what

11   is known as black powder?

12   A    Yes, sir.

13   Q    What is black powder?

14   A    I'm not sure of the exact chemical makeup of it,

15   sir.  It's a low explosive.

16   Q    And are you familiar with what timing fuse is?

17   A    Yes, I am.

18   Q    What's the difference between timing fuse and

19   safety fuse?

20         MS. DYER:  Objection, Your Honor.

21         MR. MONK:  I'll withdraw that question, Your

22   Honor.

23         THE COURT:  All right, sir.  Thank you.

24   BY MR. MONK:

25   Q    Now, I believe you testified that photographs

1    were taken at different times that night?

2    A    Yes, sir.

3    Q    At different times and also by different people?

4    A    Yes, sir.

5    Q    Who else besides you, either by name, or if you

6    don't know the person's name, job or employment

7    description, took photos?

8    A    FBI evidence technicians.

9         MR. MONK:  Your Honor, may I just have a moment,

10   please?

11        THE COURT:  Yes, sir.

12         (Pause.)

13        MR. MONK:  Thank you, Your Honor.

14   BY MR. MONK:

15   Q    I'm going to show you a couple of exhibits the

16   defense showed you.

17   A    Yes, sir.

18   Q    24 S.  Correct me if I'm wrong, but -- and you

19   may not know by looking at this.  Does that appear

20   that the background upon which those receipts are

21   displayed may look like an automobile seat?

22   A    It appears to be such, yes, sir.

23   Q    And this photograph, it looks like the receipts

24   are laid out, is that correct?

25   A    Appears to be so, yes, sir.

1    Q    Do you know whether when the FBI photographer

2    took his or her photos some of the items in the car

3    were laid out so that they could be adequately

4    photographed?

5    A    I'm sure a lot of his pictures he laid them out

6    to get the best possible picture, where I didn't have

7    that convenience.

8    Q    And so you did not take this photo, correct?

9    A    I do not recall taking that photo, no, sir.

10   Q    What about 24 double L?

11   A    No, sir.

12   Q    You did not take that photo either?

13   A    No, sir.

14   Q    What about 24 W?

15   A    No, sir.

16   Q    And how can you tell which of these photos that

17   you took and which that you didn't take?

18   A    The ones that are obviously staged photographs,

19   I did not have the time to take.  The other

20   photographs, if it's of a scene, it possibly could

21   have been me taking them or it could have been the

22   first pass after we have cleared the vehicle and the

23   evidence technicians came to take a picture.  But it

24   respects effectively everything that was in the

25   vehicle, maybe not in the exact location it was in.

1      MR. MONK:  If I could just have a moment,

2   please?

3      (Pause.)

4   BY MR. MONK:

5   Q    That which the Government has admitted as 24 O,

6   let's take a look at this again.  Do you see the back

7   seat, the book, the pink glove?

8   A    Yes.

9   Q    And what looks like a cord and a power inverter?

10  A    Yes.

11  Q    That's 24 O.

12     Also, what Government's Exhibit 24 N.  Let's

13  take a look at this.  Do you see what appears to be

14  the same book in a slightly different location?

15  A    Yes, sir.

16  Q    Pink glove and some -- looks like some sort of a

17  case for discs there?

18  A    Yes, sir.

19  Q    That's not in 24 O, correct?

20  A    Correct.

21  Q    And, also, 24 O has the power inverter, whereas

22  24 N does not contain the power inverter and the

23  cord, is that correct?

24  A    Not that I can see right offhand, correct, sir.

25  Q    Do you know which of these photos you took?

1    A    No, sir, I don't.

2    Q    So you don't know whether -- after reviewing the

3    photos, whether 24 O was one that you took when you

4    took your photographs documenting the scene or

5    whether this was taken later by the FBI, correct?

6    A    Correct.  It could have been the photos I took

7    on the first pass, the photos I took after we

8    believed we cleared the vehicle and before the FBI

9    evidence technicians came down, or it could be

10    photographs from the FBI technician.  All three of

11    them would represent different stages.

12    Q    Well, I want to make sure we understand the

13    photos you took on the second pass.  The photos you

14    took on the first pass, correct me if I'm wrong, you

15    hadn't moved anything and that's what you took of

16    items in place, correct?

17    A    Correct.

18    Q    As to whether police officers who searched the

19    vehicle had moved things, you don't know?

20    A    I have no idea.

21    Q    Now, the second pass that you took, tell us

22    about that, the second pass where you took photos.

23    A    Basically, after we got most of the items out of

24    the vehicle that we believed are dangerous and we're

25    going back through, the camera was brought back with

1   us again and more photos were taken.

2   Q    By whom?

3   A    Me or Pat Morris.

4   Q    Why did you take the more photos?

5   A    Just to continue documenting the scene.

6   Q    This coleslaw container that you talked about

7   both on direct and cross-examination, if I understood

8   you correctly, and please tell if I'm wrong, did

9   you-all think that that contained feces?

10  A    Yes, sir.

11  Q    Does that mean if that is what your belief was

12  that that wouldn't have been a suspected hazardous

13  substance?

14  A    It wasn't as hazardous to me as if I thought it

15  was something else.  It was -- when Sergeant Morris

16  picked it up, both me and him believed just looking

17  at it, it was a piece of feces in there.  That was

18  pretty much where our investigation of that stopped.

19  It appeared to be feces.

20       MR. MONK:  Judge, may I have a moment, please?

21       THE COURT:  You may.

22       (Pause.)

23       MR. MONK:  Thank you, Your Honor.  That's all.

24       THE COURT:  If there is nothing further --

25       MS. DYER:  Your Honor, just on the area that

1  wasn't covered originally.

2      THE COURT:  Ms. Dyer, if you have some recross,

3  you are welcome.

4      MS. DYER:  Thank you, Your Honor.

5                  RECROSS-EXAMINATION

6  BY MS. DYER:

7  Q   Detective, you just testified on Recross (sic)

8  that you're not sure when all of these pictures were

9  taken and you're not sure if you took all of the

10 pictures that have been introduced in Government 24

11 composite, all the ones we've been shown during your

12 testimony?

13 A   Correct, ma'am.

14 Q   I thought you originally stated that the only

15 photos in that group you did not take were 24 GG and

16 24 HH?

17 A   That I was sure I didn't take, yes, ma'am.

18 Q   On this second trip down where some of these

19 pictures may have been taken by you or -- Sergeant

20 Morris?

21 A   Sergeant Morris, yes, ma'am.

22 Q   What was the time span between the first photos

23 and the second photos, do you know?

24 A   Several hours.

25 Q   Several hours?

```
 1    A    Yes, ma'am.

 2    Q    Had people been in the car moving things around?

 3    A    Different people did different things at the

 4    time, yes, ma'am.

 5    Q    Mr. Monk asked you about your knowledge through

 6    your training and experience about the difference

 7    between deflagration --

 8    A    Deflagration.

 9    Q    No L?

10    A    Correct.  Well, I do believe there is an L in

11    there.  Deflagration.

12    Q    And detonation?

13    A    Yes, ma'am.

14    Q    And you said that deflagration was a low

15    explosive?

16    A    Yes, ma'am.

17    Q    Do you know whether or not a pyrotechnic is a

18    low explosive?

19    A    It's usually listed as low explosives, yes,

20    ma'am.

21    Q    Have you ever heard of sugar rockets?

22    A    No, ma'am.

23         MS. DYER:  Nothing else.  Thank you, Your Honor.

24         (End of excerpt of proceedings.)

25
```

C E R T I F I C A T E

I, Kerry Mercade, certify that the foregoing is

a correct transcript from the record of proceedings

in the above-entitled matter.

<u>S/Kerry Mercade</u>

Kerry Mercade
Court Reporter