```
 1                 UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3       UNITED STATES OF AMERICA

 4

 5            vs.                CASE NO. 8:07-cr-342-T-23TBM
                                 March 19, 2009
 6                               Tampa, Florida

 7

         YOUSSEF SAMIR MEGAHED,
 8
              Defendant.
 9
         _____/
10
                 TRANSCRIPT OF EXCERPT OF TRIAL SPROCEEDINGS
11                      (TESTIMONY OF MARK FIELDS)
                 BEFORE THE HONORABLE STEVEN D. MERRYDAY
12                    UNITED STATES DISTRICT JUDGE

13       APPEARANCES:

14       For the Government:   JAY HOFFER
                               ROBERT MONK
15                             Assistant U.S. Attorneys
                               400 N. Tampa Street, Suite 3200
16                             Tampa, Florida 33602
                               813/274-6000
17
         For the Defendant:    ADAM ALLEN
18                             DIONJA DYER
                               Assistant Federal Defenders
19                             400 N. Tampa Street, Suite 2700
                               Tampa, Florida 33602
20                             813/228-2715

21       Court Reporter:       Kerry Mercade
                               801 N. Florida Avenue
22                             Suite 15A
                               Tampa, Florida 33602
23                             813/301-5024

24

25       Proceedings recorded and transcribed by
         computer-aided stenography.
```

1                           INDEX

2

**GOVERNMENT WITNESS MARK FIELDS**
3   Direct Examination by Mr. Monk............3
    Cross-Examination by Mr. Allen...........22
4   Redirect Examination by Mr. Monk.........35

5                   **GOVERNMENT'S EXHIBITS**

6

7   **Number       Description                    Page**

8   12 A        Gasoline canister.............21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | GOVERNMENT WITNESS, MARK FIELDS, SWORN |
| 2 | THE COURT:  State your name, please. |
| 3 | THE WITNESS:  Mark Fields. |
| 4 | THE COURT:  Fields, F-I-E-L-D-S? |
| 5 | THE WITNESS:  Yes, sir. |
| 6 | THE COURT:  Please have a seat in the witness |
| 7 | stand and I will recognize Mr. Monk for your Direct |
| 8 | Examination. |
| 9 | DIRECT EXAMINATION |
| 10 | BY MR. MONK: |
| 11 | Q    How are you employed, sir? |
| 12 | A    By the Berkeley County Sheriff's Office. |
| 13 | Q    And what is your full name again, please? |
| 14 | A    Mark Fields. |
| 15 | Q    Please give the members of the jury a little bit |
| 16 | of biographical information about yourself.  How long |
| 17 | have you worked for the Berkeley County Sheriff's |
| 18 | Office? |
| 19 | A    I have been with the Berkeley County Sheriff's |
| 20 | Office approximately three years.  Early 2008, I took |
| 21 | about three-month break to attempt to make more money |
| 22 | at another job, decided to come back to law |
| 23 | enforcement. |
| 24 | Q    Were you working for the Berkeley County |
| 25 | Sheriff's Office in August of 2007? |

1    A    Yes, I was.

2    Q    What was your assignment at that time?

3    A    I was a part of the Selective Enforcement Team,

4    focused on high crime areas.

5    Q    And on August 4th, 2007, were you working?

6    A    Yes, I was.

7    Q    And were you working in the afternoon on that

8    day?

9    A    Yes.

10    Q    Did you have occasion around, say, between 5:15

11    and 5:25 in the afternoon to be in the area of State

12    Road 176 --

13    A    Yes.

14    Q    -- and Myers Road?

15    A    Yes, I did.

16    Q    How did you come to be in that area?

17    A    We was working the Goose Creek area of Berkeley

18    County, basically just doing routine patrol.

19    Q    And did you some time around that same time come

20    to have some contact with Corporal Lamar Blakely?

21    A    Yes.  I heard him over our 800 radio conduct a

22    traffic stop and went over to assist him.

23    Q    Your first idea or notion that he was engaged in

24    a traffic stop was what, something you heard on the

25    radio?

1    A    Yes, sir.

2    Q    And was that -- did he announce his location?

3    A    He announced his location and where they came to

4    a stop.

5    Q    Were you in that area?

6    A    Yes, I was.

7    Q    And when you arrived at that area, was Deputy

8    Blakely present there along with Deputy Andy Taylor,

9    if you recall?

10   A    Yes.

11   Q    And what did you do -- or actually, first of

12   all, what was going on at that scene of that traffic

13   stop when you first arrived there?

14   A    When I arrived they were both obtaining

15   information from central dispatch as far as their

16   driver's license.  And I just basically was there as

17   a cover officer, keep an eye on the vehicle while

18   they was obtaining information.

19   Q    Does that mean then that when you got there

20   Lamar Blakely was back in his patrol car?

21   A    Yes.

22   Q    And did Corporal Blakely perform a consent

23   search of that vehicle?

24   A    Yes, he got consent.

25   Q    And did you participate in that?

1    A    Yes, I did.

2    Q    And you actually helped in searching the

3    vehicle?

4    A    Yes.

5    Q    And what side of the car did you participate in

6    searching?

7    A    I began on the passenger side, front passenger

8    compartment.

9    Q    Did you perform a rigorous and thorough and

10   exhaustive search or otherwise?

11   A    At the time I just basically -- it was just a

12   visual of the front driver compartment.

13   Q    Now, do you know a Sergeant Jamie Geiger?

14   A    Yes, I do.

15   Q    While you were on the scene that day, did he

16   also arrive?

17   A    Yes, he did.

18   Q    Did he participate in the search of that vehicle

19   as well?

20   A    Yes, he did.

21   Q    Now, did there come a point in time -- your

22   present assignment -- if we can take a little detour,

23   I should have asked this before.  Your present

24   assignment is what?

25   A    Could you rephrase that?

```
 1    Q     Yes.  Your present assignment with the Berkeley

 2    County Sheriff's Office today is what?

 3    A     Uniform patrol division.

 4    Q     And your rank - private?

 5    A     PFC, yes, sir.

 6    Q     Once Sergeant Geiger arrived, did he, if you

 7    recall, participate in searching the car as well?

 8    A     Yes, he did.

 9    Q     And did there come a point in time when you and

10    Sergeant Geiger wound up in the trunk area of the

11    car?

12    A     That's where we ended up, in the trunk, yes.

13    Q     You both participated in searching the trunk?

14    A     Yes.

15    Q     You can direct your attention to the monitor in

16    front of you.  Do you see it there as well?

17    A     Yeah.

18    Q     Sir, do you see that?

19    A     Yes.

20    Q     Do you recognize this scene here?

21    A     Yes.

22    Q     Is Sergeant Geiger the gentleman on the left,

23    the comparatively shorter individual?

24    A     Yes.

25    Q     In, looks like, street clothes?
```

1   A   Yes.

2   Q   And who is the taller person whose back we're

3   seeing?  Is that you or is that Taylor, or who is

4   that?

5   A   I believe that's Andy Taylor.

6   Q   And let's go ahead and play this video, please.

7       THE COURT:  This is exhibit?

8       MR. MONK:  I'm sorry, Judge.  This is Exhibit 1

9   C 2.

10      THE COURT:  We're at 18:02:37.

11      MR. MONK:  Yes.

12      (Portion of Government's Exhibit 1 C 2 played in

13  open court.)

14  BY MR. MONK:

15  Q   And where are you?

16  A   Right there in the middle.

17  Q   You've got the hat on?

18  A   Yes, sir.

19      MR. MONK:  Excuse me.  Would you stop it,

20  please?

21      Now, Your Honor, we're at 17:59:17.

22      (Portion of Government's Exhibit 1 C 2 played in

23  open court.)

24  BY MR. MONK:

25  Q   That's Sergeant Geiger, correct, on the left?

```
1    A    Yes.

2    Q    And where are you?

3    A    Front passenger side.

4    Q    Are you obscured presently?

5    A    Yes, I am.

6    Q    That's Taylor on the rear?

7    A    Yes.

8    Q    Right rear, correct?

9    A    Yes.

10   Q    Where are the occupants at this time?

11   A    Out of camera sight, over to the right of --

12   Q    To the right of the screen?

13   A    Yes.

14   Q    What's happening now?

15   A    Going to the trunk area.

16   Q    Who?

17   A    Sergeant Geiger and myself.

18   Q    Where is Sergeant Geiger starting to search?

19   A    In the trunk area.

20   Q    Which side?

21   A    The left side.

22   Q    What are you doing?  Are you searching or just

23   standing there?

24   A    Standing there.

25   Q    Are you beginning to search now as well?
```

1    A    Yes.

2    Q    Where are you searching?

3    A    The right side trunk area closest to me.

4    Q    What do you have in your hands, if you know?

5    A    Some -- a bag.

6    Q    What's that, if you know?

7    A    Some type of box.

8    Q    Now, what's that, if you remember?

9    A    I don't remember.

10   Q    Does that appear to be a bag?

11   A    Yeah, that's a bag.

12   Q    Do you remember whether you showed something to

13   Sergeant Geiger?

14   A    I'm showing it to him right now.

15   Q    What is that, if you recall?

16   A    There was a clear Ziploc baggy inside of that

17   bag and it contained some PVC pipe.

18   Q    What's he doing?

19   A    I don't know what he's doing.

20   Q    Do you recall whether there was safety fuse in

21   that bag, too?

22   A    I remember seeing fuses somewhere.  I don't

23   recall if they was in the bag or not.

24   Q    Now, did you just see Geiger move back from the

25   trunk?

```
 1    A     Yes.

 2    Q     Do you recall at the time he moved back from the

 3    trunk whether he said anything?

 4    A     Yes.  He --

 5    Q     What did he say?

 6    A     "Put that shit down."

 7          MR. ALLEN:  Objection, hearsay.

 8          THE COURT:  Overruled.

 9    BY MR. MONK:

10    Q     What did he say?

11    A     He said, "Put that shit down."

12    Q     Okay.  Did you do that?

13    A     Yes, I did.

14    Q     Now, to the -- we can go ahead and stop that

15    now.  It's being stopped at 18:03:06.

16          To the extent that you can recall -- if you can

17    recall, from what part of the trunk -- first of all,

18    first of all, the PVC pipes that you referred to,

19    were they actually inside the bag that you were

20    holding?

21    A     Yes.

22    Q     When you picked the bag up, did you have to

23    untie it or was it open at the time?

24    A     It was already opened.

25    Q     Do you recall whether it was a plastic Wal-mart
```

```
 1    type bag?

 2    A     It was a Wal-mart type bag, yes.

 3    Q     Do you remember whether there was anything else

 4    in that bag other than the -- or in addition to the

 5    PVC pipes?

 6    A     Besides the Ziploc baggy that they were in

 7    inside of the Wal-mart bag, I don't recall anything

 8    else.

 9    Q     Does that mean that there wasn't anything else

10    in the bag or you just don't remember?

11    A     I don't remember.

12    Q     So there could have been?

13    A     Could have been.

14    Q     To the extent that you can recall -- well,

15    Sergeant Geiger, if I'm not mistaken, and correct me

16    if I'm wrong, was searching the left aspect of the

17    trunk, that is, as you're at the rear of the car

18    facing the trunk and facing forward, correct?

19    A     Correct.

20    Q     And what aspect of the trunk were you looking

21    into or searching?

22    A     Kind of in the middle of the trunk, closest to

23    the rear of the car.

24    Q     And do you recall whether when you picked that

25    bag up you had to move anything else out of the way,
```

1    was it underneath something else or don't you

2    remember?

3    A    It was pretty much level with everything else.

4    I just was able to pick it right up.

5    Q    So when you say it was level with everything

6    else -- let me ask it another way.  If you recall,

7    was there anything on top of the bag?

8    A    No.

9    Q    Were you -- did you look into the bag and see

10    the PVC pipes before you picked it up or did you see

11    them only after you picked up the bag?

12    A    It was after.

13    Q    Do you remember whether you could have seen into

14    the bag --

15        MR. ALLEN:  Objection, calls for speculation.

16    I'm sorry, Your Honor.  I'll let him finish the

17    question.

18    BY MR. MONK:

19    Q    Do you remember whether you were able to look

20    down into the bag?  Had you done so, looked down into

21    the bag and seen the PVC pipes before you picked up

22    the bag?

23        MR. ALLEN:  Same objection.

24        THE COURT:  It's difficult because it's at least

25    two questions.  Do you remember whether you were able

1    to look down into the bag before you picked it up?

2    In other words, was the bag open at the top?

3          THE WITNESS:  It was not open at the top.

4          THE COURT:  Did you try to look down into the

5    bottom of it and see that it was closed at the top?

6          THE WITNESS:  No.

7          THE COURT:  Did you in fact move the bag,

8    enabling yourself to see into the bottom?

9          THE WITNESS:  No.

10   BY MR. MONK:

11   Q    After you put the bag down, is that correct?

12   A    Yes.

13   Q    Did you-all move away from the vehicle?

14   A    Yes, we did.

15   Q    Perimeter set up?

16   A    Yes, we did.

17   Q    What can you tell us, if anything, about the

18   characteristics of the PVC pipes that you saw in the

19   baggy, is that correct?

20   A    Yes.

21   Q    What other characteristics other than the

22   characteristics of being PVC pipes, if anything?

23   A    On the ends, the open end of the PVC pipe, there

24   was a green and blue speckily-type material.  Didn't

25   know what it was, though.

    1    Q    Anything else that you recall?

    2    A    No.

    3    Q    Did you have one of the -- there were two

    4    occupants of the vehicle, correct?

    5    A    Yes.

    6    Q    By the way, would you look around the courtroom

    7    and tell us whether either occupant is in court

    8    today?

    9    A    Yes, he is.

   10    Q    Where is he sitting and what's he wearing?

   11    A    That green shirt right there.

   12    Q    At counsel table?

   13    A    Yes.

   14    Q    And when this bag was discovered, did the search

   15    effectively end?

   16    A    Yes, it did.

   17    Q    And the two occupants, Mr. Megahed and Mr.

   18    Mohamed, correct?

   19    A    Yes.

   20    Q    Were they put in separate vehicles?

   21    A    Yes, they were.

   22    Q    Did one of them go in your vehicle?

   23    A    Yes, he did.

   24    Q    Who?

   25    A    The defendant Megahed.

1   Q    Mr. Megahed?

2   A    Yes.

3   Q    And where was your car moved to?

4   A    It was backed up.  First it was backed up away

5   from their vehicle, and then it was moved up to block

6   traffic.

7   Q    And did Mr. Megahed remain in your vehicle that

8   evening until he was transported to the detention

9   center?

10  A    Yes, he did.

11  Q    Did you have the air-conditioning on?

12  A    Yes.

13  Q    Now, you remained at the scene, correct, for --

14  A    Yes, sir.

15  Q    For the balance of the evening, you were

16  directing traffic?

17  A    Yes.

18  Q    Did there come a point in time when you heard

19  some sort of a loud report that may have sounded like

20  an explosion or something like that?

21  A    Yes.

22  Q    Do you remember about when that was?

23  A    Not exactly.  It was some time early morning,

24  anywhere between 3:00 a.m. 7:00 a.m.

25  Q    What did the sound sound like?

```
 1   A    It sounded -- it was -- I've never really heard
 2   an explosion like that before, but it was pretty
 3   loud.
 4   Q    Mr. Megahed and Mr. Mohamed remained separated?
 5   A    Yes.
 6        MR. MONK:  Just a moment, please, Your Honor.
 7        THE COURT:  Yes, sir.
 8        (Pause.)
 9        THE COURT:  Officer, when you approached that
10   vehicle for the first time, was the trunk open?
11        THE WITNESS:  No, sir.
12        THE COURT:  Was Officer Geiger present?
13        THE WITNESS:  No.
14        THE COURT:  He arrived after you arrived?
15        THE WITNESS:  Yes.
16        THE COURT:  Was the trunk opened at any time
17   before he got there?
18        THE WITNESS:  No.
19        THE COURT:  Were you present when the trunk was
20   first opened?
21        THE WITNESS:  Yes, I was.
22        THE COURT:  It was Officer Geiger that did that?
23        THE WITNESS:  Yes.
24        THE COURT:  How near were you to the trunk when
25   it was first opened?
```

1          THE WITNESS:  A few feet.

2          THE COURT:  Were you looking into the trunk when

3     it was opened?

4          THE WITNESS:  I believe so.

5          THE COURT:  Referring to the surface of the

6     inside of the trunk, in other words, where the carpet

7     normally is in a nice trunk, was the entire surface

8     area covered with objects and paraphernalia or was

9     part of it empty?

10         THE WITNESS:  The entire surface was covered.

11         THE COURT:  Was it tightly or loosely packed?

12         THE WITNESS:  I'd say a mixture of both.  Maybe

13    just --

14         MR. MONK:  Judge, I'm sorry.  I didn't hear that

15    response.

16         THE COURT:  I'm not sure there was one, Mr.

17    Monk.  The response was -- the reporter has reported

18    "a mixture of both."

19         Did you perceive when the trunk was first opened

20    and you looked into the trunk area that items were

21    stacked one on top of the other, or did it appear to

22    be one layer of items?

23         THE WITNESS:  It appeared to be one layer of

24    items.

25         THE COURT:  Mr. Monk?

1    BY MR. MONK:

2    Q    With respect to when the trunk was first opened

3    and so forth in that regard, does 1 C 2, which is

4    that video that was up on the screen that you just

5    watched, does that accurately depict when the trunk

6    was first opened and the series of events that

7    occurred thereafter?

8    A    Yeah.

9    Q    Now, in connection with the judge's recent

10   questions, I'm going to show you what has been

11   admitted in evidence as Exhibit 24 Bravo.  Does this

12   look like the car?

13   A    Yes, it does.

14   Q    With the trunk open, correct?

15   A    Yes.

16   Q    And 24 -- let me show you 24 J.  Anything

17   depicted in this photo look familiar to you from when

18   you were searching in the trunk?

19   A    The gas can and the tarp.

20   Q    Okay.  Did you see the tarp when you were

21   searching?

22   A    Yes, I did.

23   Q    And that -- I think when we looked at the video,

24   correct me if I'm wrong, did you at some point pick

25   up a box and then toss the box back into the trunk?

1    A    Yes.

2    Q    Is that box, if you know, depicted in this

3    photograph?

4    A    I don't recall.

5    Q    And 24 K.  Do you remember whether -- you see

6    the plastic apparently several plastic bags, correct?

7    A    Correct.

8    Q    The plastic bags that are apparent from this

9    photo, do you recall whether any of them are in the

10    same approximate position that the plastic bag with

11    the PVC pipes was in before you picked it up?

12    A    I do not recall.

13    Q    Okay.  To the extent that you recall, when you

14    put it back down when Geiger told you to put it down,

15    do you remember whether you put it back in the same

16    approximate position that you had picked it up from?

17    A    Same vicinity, yes.

18    Q    Showing you again 24 J.  Do you recall seeing

19    the gas can in the car?

20    A    Yes.

21    MR. MONK:  If I can approach the witness, Judge?

22    THE COURT:  You may.

23  BY MR. MONK:

24    Q    Let's take a look at proposed Exhibit 12 A.  Now

25    --

1     MR. ALLEN:  Your Honor, it may be more

2     appropriate for the exhibit not to be published until

3     it's introduced.

4     BY MR. MONK:

5     Q     Do you -- setting aside the dark material on the

6     external surface of that item, if you set that aside,

7     does that appear to be substantially similar to the

8     gas can that you saw in the trunk of the car?

9     A     Yes.

10    Q     Am I correct that what appears to be soot or

11    dirt or fingerprint powder or something like that was

12    not on the gas can when you saw it in the trunk of

13    the car?

14    A     No, it wasn't.

15          MR. MONK:  I would move for admission of

16    proposed Exhibit 12 A.

17          MR. ALLEN:  No objection, Your Honor.

18          THE COURT:  Exhibit 12 A of the United States is

19    received.

20          (Government's Exhibit No. 12 A is received into

21    evidence.)

22    BY MR. MONK:

23    Q     I believe you told us before, and please correct

24    me if I'm wrong.  I'm showing 24 K.  That when you

25    picked up the plastic bag -- take a look at 24 K,

1    please.  I'll take that gas can from you.  When you

2    first picked up the plastic bag that contained the

3    PVC pipes, I think you told us that the top of the

4    bag was not tied, is that correct?

5    A    Correct.

6    Q    Can you tell us whether this photo approximates

7    or is substantially identical to the condition of the

8    bag that you picked up in terms of not being tied at

9    the top?  Was it open like this is?

10   A    Yes.

11        MR. MONK:  Thank you, Your Honor.  Nothing

12   further.

13        THE COURT:  Thank you, Mr. Monk.

14        The defense is recognized for any

15   cross-examination.

16        MR. ALLEN:  Thank you, Your Honor.

17        THE COURT:  Mr. Allen?

18                    CROSS-EXAMINATION

19   BY MR. ALLEN:

20   Q    Good morning, sir.

21   A    Good morning.

22   Q    On Direct Examination you indicated that you had

23   left law enforcement for another job for a period of

24   time to make more money.

25   A    Yes.

1    Q    Or try to at least.  What was that other job?

2    A    It's a plant in South Carolina, an electricity

3    plant.

4    Q    At any point in your life did you ever make your

5    own fireworks?

6    A    Never.

7    Q    Did you ever make a model rocket?

8    A    Never.

9    Q    Would you recognize a homemade model rocket, if

10   you'd seen one?

11   A    I don't believe so.

12   Q    I believe you testified that you were actually

13   present at the back of the Toyota when the driver Mr.

14   Mohamed gave consent to search the vehicle?

15   A    Yes.

16   Q    Mr. Mohamed was cooperative, correct?

17   A    Yes, he was.

18   Q    Now, the first part of that Toyota that was

19   searched was the interior of the Toyota, correct?

20   A    Correct.

21   Q    And you were actually standing at the passenger

22   side of that vehicle when Corporal Blakely and

23   Sergeant Geiger were searching the inside?

24   A    Yes.

25   Q    Were you able to -- when you were standing

1    there, were you able to hear what Officer Blakely was

2    saying as he was going through the items he was

3    finding in the car?

4    A    I was able to hear, but I don't recall anything

5    he said.

6    Q    Do you recall him saying to be on the look out

7    for fuses and fireworks?

8    A    I don't recall anything he said.

9    Q    Would it refresh your memory to review the

10    transcript of the audio of that tape?

11    A    It would.

12    MR. ALLEN:  May I approach, Your Honor?

13    MR. MONK:  Excuse me, Your Honor.  I'm going to

14    interpose an objection.

15    THE COURT:  Why don't we come to side bar just

16    one second and let me understand what we're doing?

17    (At side bar, on the record.)

18    THE COURT:  You are doing what?

19    MR. ALLEN:  I'm refreshing his memory.  He said

20    he did not recall.

21    THE COURT:  He said he didn't hear.  He repeated

22    and said he didn't hear anything that was said.  Did

23    he somewhere else -- did this witness testify

24    somewhere else that he didn't remember what he said

25    or make a report of what was said?

1       MR. ALLEN: I was -- the Court has the

2  transcript, so --

3       THE COURT: I do.

4       MR. ALLEN: I think I said he did not recall.

5       THE COURT: I see the last thing that he said,

6  but I don't believe that's what he meant because

7  previously two or three times he had said he didn't

8  hear a thing. I can read it to you exactly.

9       MR. ALLEN: My recollection --

10       THE COURT: I don't understand his recollection

11  to have failed unless it was that he is failing to

12  remember that he overheard. He is failing to

13  remember that he overheard and has otherwise said he

14  overheard. I'm not trying to nit-pick, but I don't

15  know what the substantive testimony is you're about

16  to try to use to refresh his memory. He's not a

17  right vehicle for it unless you establish that he

18  heard and has forgotten.

19       MR. ALLEN: I thought he said --

20       THE COURT: I heard what he said and he used the

21  word "recall" the last time, but the previous two or

22  three times he said very emphatically he had not

23  overheard. I don't think his then saying, apparently

24  changing it since you repeated the question, to say,

25  I don't recall anything he said," subjects him to

1    what you're about to do.

2        MR. ALLEN:  I understand.

3        THE COURT:  What you're about to do is use an

4    undemonstrated failure of recollection to introduce

5    substantive testimony.  There's been no failure of

6    recollection.  There's a failure to perceive.

7        MR. ALLEN:  Just so the Court understands or

8    doesn't have the perception that I was trying to do

9    something --

10        THE COURT:  I don't.  I don't think you were

11    trying to do anything wrong.  I think there is no

12    predicate for what you are about to do.

13        MR. ALLEN:  I thought he said he was close

14    enough to hear but he didn't recall everything that

15    was said.  I may have heard it wrong.  Sometimes you

16    hear what you want to hear, Your Honor.

17        THE COURT:  What was your objection, Mr. Monk?

18        MR. MONK:  Your Honor, in addition to what the

19    Court has just expressed, while there can -- it's

20    true, one can hear sometimes what one wants to hear.

21    There is no mistake about the fact that that which

22    Mr. Allen identified is a transcript of the audio of

23    the car stop.  Not only is it not marked, it hasn't

24    been authenticated, no witness has testified to its

25    accuracy.  We haven't heard anything about it before.

1   Yet, he has presented it to the witness in the

2   context of the question, representing before the jury

3   that this is what the item is.  It's objectionable

4   for that reason as well.

5       MR. ALLEN:  In that regard, Your Honor, it's a

6   certified copy by a court reporter.

7       THE COURT:  It doesn't make much difference what

8   it is.  The only question is whether it refreshes.

9       MR. ALLEN:  Yes, sir.  I agree.

10      THE COURT:  You can hand him something and ask

11  if it refreshes his recollection, but we're not going

12  to publish it.  I don't think it has to be admitted

13  or even admissible.

14      MR. MONK:  The difficulty, Your Honor, is that

15  he has identified it.  He has represented that it is

16  something that has not been proven or demonstrated.

17      THE COURT:  I think that was unnecessary to the

18  function of refreshing failed recollection.

19      Having just now reread the whole transcript or

20  the rough transcript that the reporter has to refresh

21  my memory, I think it's just too ambiguous.  Let's

22  start over and just ask him, just make the necessary

23  distinctions.  What is that you have here?

24      MR. ALLEN:  Your Honor --

25      THE COURT:  That's a typed transcript of the

1    audio portion that you have otherwise agreed to

2    exclude, the two of you stipulated extrajudicially to

3    exclude.  Is the question that you're now presenting

4    me whether using it to refresh is consistent with

5    your extrajudicial stipulation?

6        MR. ALLEN:  I'm not asking that question because

7    I think you can refresh a witness --

8        THE COURT:  The exercise that you are about to

9    engage in implies that question, does it not?

10       MR. ALLEN:  I think the agreement was, to the

11   extent there was, and we quibble on that but I

12   concede it, is we would not introduce any of the

13   audio.  I'm not.  I'm just refreshing his memory.

14       THE COURT:  All right.  You understand why Mr.

15   Monk doesn't want it called a typed transcript of the

16   audio in the presence of the jury, right?

17       MR. ALLEN:  I would --

18       THE COURT:  Do you understand why Mr. Monk

19   doesn't want it called that?

20       MR. ALLEN:  I do, completely.

21       THE COURT:  Don't call it that.

22       MR. ALLEN:  I'll just refer to it as an item.

23       THE COURT:  That's fine.  Hand you this item and

24   ask if this refreshes your recollection.

25       MR. ALLEN:  Yes, sir.

1    THE COURT:  Now, I understand that you are going

2    to clarify the question of whether he did hear or did

3    not hear, not whether he was close enough to hear.

4    The question is not that but whether he heard or

5    didn't hear.  If he heard something, has he forgotten

6    that and presently cannot recall.  And then I think

7    you can present that item.  I'm not here teaching you

8    trial practice, but --

9    MR. ALLEN:  I'll take it, Judge.

10    THE COURT:  We're trying to expedite.  Does that

11    sound like the proper procedure, Mr. Monk?

12    MR. MONK:  Yes.  The only thing that I would ask

13    is that if he is going to use something to refresh

14    that it be identified and marked for identification

15    purposes.

16    MR. ALLEN:  I can do that.

17    THE COURT:  You can just say, "I hand you an

18    item marked for identification as X."

19    MR. ALLEN:  Okay.

20    THE COURT:  In general, what I've just said will

21    never get anyone in trouble but will avoid much

22    trouble and will simplify the process on all

23    occasions.  It may not be the only way to do it, but

24    it's always a way to do it.

25    MR. ALLEN:  Yes, sir.

1          (End of side bar discussion.)

2     BY MR. ALLEN:

3     Q     Deputy Fields, let's take a few steps back and

4     kind of start over that line of questioning.  When

5     Officer Blakely and Sergeant Geiger were inside the

6     interior of the vehicle, which would be the front

7     seat or the back seat of the vehicle, you were

8     standing near the passenger window?

9     A     Yes.

10    Q     When you were standing at the passenger window,

11    could you -- did you --

12         THE COURT:  Did you --

13    BY MR. ALLEN:

14    Q     -- did you hear any of the conversation between

15    anything that Officer Blakely was saying?

16    A     I did hear.

17    Q     Okay.  Did you hear -- do you recall hearing

18    Officer Blakely in essence saying, "We need to be

19    looking for fireworks and fuses."

20    A     I do not.

21    Q     Let me hand you what is marked as Defense

22    Exhibit 100 for identification.

23         MR. ALLEN:  May I approach the witness?

24         THE COURT:  You may.

25    BY MR. ALLEN:

1     Q    If you can look at Page 20 and see -- I don't

2    want you to read it.  I just want to see if it

3    refreshes your memory.  You can go to the next page

4    if you like.

5     THE COURT:  Officer, the question is only does

6    what you are now reading refresh your memory.  So

7    answer that question and then we'll see if there is

8    another.

9     THE WITNESS:  No.

10   BY MR. ALLEN:

11   Q    I'm sorry.  It does not?

12   A    It does not.

13   Q    Okay, thank you.  Now, let's go back to the --

14   or ahead, I guess, to when you were standing at the

15   trunk area and you were searching and Sergeant Geiger

16   were searching the trunk area of the vehicle, okay?

17   A    (Witness indicated.)

18   Q    Let me show you what's been marked as

19   Government's Exhibit 24 K.  I believe you testified

20   on Direct Examination -- well, actually, examination

21   by the Court that your recollection was that the

22   items in the trunk were not stacked on top of each

23   other.  Looking at Government's Exhibit 24 K, which

24   is a photograph of the trunk, would you not agree

25   that at least some of those items are stacked on top

1    of each other?

2    A    They could be somewhat laying on each other

3    possibly, but not really stacked on top of each other

4    like I've seen some trunks.

5    Q    I understand.  Now, there's a whole bunch of

6    Wal-mart bags in that trunk, depicted in Government's

7    Exhibit 24 K, correct?

8    A    Correct.

9    Q    And the color of those bags is white, right?

10   A    Correct.

11   Q    And there is lettering on those bags, correct?

12   A    Correct.

13   Q    And one cannot see through those bags and see

14   what's inside, the content, unless you open the bag

15   and look down inside, correct?

16   A    Correct.

17   Q    You have no idea who originally put those

18   Wal-mart bags in that trunk, do you?

19   A    No, I don't.

20   Q    Prior to you and Sergeant Geiger pulling the

21   Wal-mart bags out and looking inside the different

22   bags, did anybody take any photographs of the trunk

23   prior to you guys pulling anything out?

24   A    No, they didn't.

25   Q    You indicated that you recall when you were

1    looking at one of the PVC pipe items seeing I believe

2    some green and blue speckly material?

3    A    Yes.

4    Q    Do you have a cat?  Ever had a cat?

5    A    No, I haven't.

6    Q    Have you ever seen cat litter?

7    A    Yes, I have.

8    Q    Did that blue and green speckly substance in

9    any way resemble cat litter?

10   A    I guess you could say maybe a little.

11   Q    Do you recall seeing a small little hole inside

12   blue and green cat-like litter substance?

13   A    I didn't look at it long enough to see a hole.

14        MR. MONK:  Excuse me, Your Honor.  I'm going to

15   object to the characterization of the question,

16   cat-like litter substance.

17        THE COURT:  Sustained.  It's argumentative.

18   BY MR. ALLEN:

19   Q    You indicated that Mr. Youssef Megahed was

20   placed in your vehicle after these items in the trunk

21   were found and you drove your vehicle farther up the

22   road?

23   A    Yes.

24   Q    And I think you said you actually ultimately

25   used your vehicle to block traffic?

1    A    Yes.

2    Q    So Mr. Megahed was in the vehicle while the

3    vehicle was being used to block traffic?

4    A    Yes.

5    Q    Were you with him the whole time until he got

6    transported off to the detention center?

7    A    Within a few feet.

8    Q    Did other officers come to your vehicle to

9    interview Youssef Megahed during that five- or six-

10    hour period of time?

11    A    No, they didn't.

12    Q    Was he ever taken from your vehicle during that

13    period of time to be interviewed?

14    A    No.

15    Q    Where were you actually at when you heard this

16    loud sound?

17    A    Two hundred yards down the road.

18         MR. ALLEN:  Can I approach the exhibits, Your

19    Honor?

20         THE COURT:  You may.

21    BY MR. ALLEN:

22    Q    Deputy Fields, I'm showing you Government's

23    Exhibit 12 A, which is the gas can.

24    A    Yes.

25    Q    I believe you testified on Direct that all of

1    this black stuff on the can and this writing and

2    stuff was not on the can when it was in the trunk of

3    the vehicle?

4    A    That's correct.

5    Q    Have you ever seen a gas can similar to this

6    before?

7    A    Yes, I have.

8    Q    Have you ever owned one?

9    A    A few of them.

10   Q    You ever put one in the trunk of your car?

11   A    Most likely at some time.

12   Q    And why did you do that?

13   A    To transport gas.

14        MR. ALLEN:  I don't have any further questions,

15   Your Honor.

16        THE COURT:  Thank you, Mr. Allen.

17        Is there any redirect examination from the

18   United States?

19        MR. MONK:  Yes, sir.

20                    REDIRECT EXAMINATION

21   BY MR. MONK:

22   Q    You've used those type of gas cans before to

23   transport gas, is that correct?

24   A    Yes.

25   Q    In connection with purchasing gas to fill your

1   law mower?

2   A   Correct.

3   Q   And you were asked on Cross-Examination about

4   fireworks, okay?

5   A   Yes.

6   Q   Is it accurate that fireworks are openly sold

7   commercially in South Carolina?

8   A   Yes, they are.

9   Q   Readily available, is that correct?

10  A   That's correct.

11  Q   And you were also asked about Exhibit 24 K,

12  which I'll put back up on the screen.  Now, I think

13  you testified that you in fact picked up -- picked

14  the bag up and looked down inside, is that correct?

15  A   Yes.

16  Q   The bag that the PVC pipes were in that you

17  picked up, was that bag hidden in some deep recess of

18  the trunk or was it in this approximate position?

19  A   It was in that approximate position.

20      MR. MONK:  Okay.  That's all I have.

21      THE COURT:  Thank you, Mr. Monk.

22      Anything further from the defense?

23      If not, Officer, you may step down.  You are

24  excused with our thanks.

25      (End of excerpt of proceedings.)

```
 1              C E R T I F I C A T E

 2         I, Kerry Mercade, certify that the foregoing is

 3     a correct transcript from the record of proceedings

 4     in the above-entitled matter.

 5                                    S/Kerry Mercade

 6                                    Kerry Mercade
                                      Court Reporter
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```