1              UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2                   TAMPA DIVISION

3   UNITED STATES OF AMERICA

4

5         vs.                CASE NO. 8:07-cr-342-T-23TBM
                             March 19, 2009
6                            Tampa, Florida

7

   YOUSSEF SAMIR MEGAHED,
8
        Defendant.
9
   _____/
10
            TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                (TESTIMONY OF JAMEY GEIGER)
           BEFORE THE HONORABLE STEVEN D. MERRYDAY
12               UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:   JAY HOFFER
                         ROBERT MONK
15                       Assistant U.S. Attorneys
                         400 N. Tampa Street, Suite 3200
16                       Tampa, Florida 33602
                         813/274-6000
17
   For the Defendant:   ADAM ALLEN
18                       DIONJA DYER
                         Assistant Federal Defenders
19                       400 N. Tampa Street, Suite 2700
                         Tampa, Florida 33602
20                       813/228-2715

21  Court Reporter:      Kerry Mercade
                         801 N. Florida Avenue
22                       Suite 15A
                         Tampa, Florida 33602
23                       813/301-5024

24

25  Proceedings recorded and transcribed by
   computer-aided stenography.

1                          INDEX

2

**GOVERNMENT WITNESS JAMEY GEIGER**
3    Direct Examination by Mr. Monk............3
     Cross-Examination by Mr. Allen...........14
4    Redirect Examination by Mr. Monk.........20

5                   **GOVERNMENT'S EXHIBITS**

6

7    **Number      Description                    Page**

8                        (None.)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              GOVERNMENT WITNESS, JAMEY GEIGER, SWORN
2              THE COURT:  State your name, please.
3              THE WITNESS:  Jamey Geiger.
4              THE COURT:  And that Jamey is J-A-M-I-E?
5              THE WITNESS:  E-Y.
6              THE COURT:  E-Y.  And G-E-I-G-E-R?
7              THE WITNESS:  Yes, sir.
8              THE COURT:  Mr. Monk, you're recognized for your
9     Direct Examination.
10             MR. MONK:  Thank you.
11                       DIRECT EXAMINATION
12    BY MR. MONK:
13    Q    Sir, during the course of your testimony, would
14    you try to lean in a little bit so that you speak
15    loudly and distinctly?
16    A    Yes, sir.
17    Q    Is it Sergeant Geiger?
18    A    Yes, sir.
19    Q    Sergeant Geiger, how are you employed?
20    A    I'm a deputy with the Berkeley County Sheriff's
21    Office.
22    Q    How long have you been with the Berkeley County
23    Sheriff's Office?
24    A    Approximately 12 years now.
25    Q    Prior thereto, how were you employed?
```

1    A    I was a police officer in two different

2    municipalities:  Mussel Warner (ph) Police Department

3    and St. Stevens Police Department.

4    Q    Back in August 2007, were you in any particular

5    assignment?

6    A    I was assigned to the Selective Enforcement Team

7    and we were doing traffic control in the Goose Creek

8    area of Berkeley County.

9    Q    Did you have a supervisory position with the

10   Selective Enforcement Team?

11   A    Yes, sir.  I was a sergeant with the Selective

12   Enforcement Team.

13   Q    Do you know Lamar Blakely?

14   A    Yes, I do.

15   Q    Was he one of your subordinate officers?

16   A    Yes, sir.

17   Q    How about Mark Fields?

18   A    Yes, sir.

19   Q    Back on Saturday, August 4th, 2007, at right

20   around 5:30 in the afternoon, did you have some

21   contact with Corporal Blakely?

22   A    Yes, sir.  He called me on the phone and advised

23   me he had a --

24   Q    Don't tell me what he said.  As a result of your

25   contact with him, did you have occasion to go to the

1   area of State Road 176 and Myers Road in the city of

2   Goose Creek?

3   A   Yes, sir.

4   Q   I would like to direct your attention to a still

5   of a video that is on the screen now.  This is 1 C 2,

6   and the operator's time is 31:02, and the time on the

7   video, if I'm making it out correctly, is 17:59:24.

8   Do you see that, sir?

9   A   Yes, sir.

10   Q   With the Court's permission, I will ask the

11   operator to play the video and I'll ask you to be

12   attentive to the video.  Do you recognize this scene,

13   first of all?

14   A   Yes, sir.

15   Q   And do you recognize yourself in this scene?

16   A   Yes, sir.

17   Q   Where are you?

18   A   Driver's side right now.

19   Q   You're getting into the car?

20   A   Yes, sir.

21   Q   Did you get -- when you arrived at that scene as

22   a result of Corporal Blakely's call, did you

23   participate in a search of that automobile?

24   A   Yes, sir.

25   Q   Is that -- is your participation in that search

1   being depicted right now?

2   A    Yes, sir.

3   Q    Did you start on the driver's side in the

4   passenger compartment?

5   A    Yes, sir.

6   Q    Who, if anyone, was searching the passenger

7   side?

8   A    Looks like Corporal Blakely and Private Fields.

9   Q    Now, did there come a point in time when you

10  acquired the keys to the ignition or the keys to the

11  trunk and opened the trunk with keys?

12  A    Yes, sir.

13  Q    Is that about to occur?

14  A    Yes, sir.

15  Q    Who is standing to your right?

16  A    Deputy Fields.

17  Q    All right.  Now, as you start to search this

18  vehicle, tell us -- did you start -- what part of the

19  trunk did you start in?

20  A    The driver's side, rear driver's side.

21  Q    Okay.  You apparently, and correct me if I'm

22  wrong, have moved something from the left-hand part

23  of the trunk in toward the center of the trunk?

24  A    Yes, sir.

25  Q    And is that Taylor who was in the view there,

         1    obstructing the view?

         2    A    Yes, that would be Officer Taylor.

         3    Q    Now, is this -- the person next to you, is that

         4    Fields?

         5    A    Yes, sir.

         6    Q    Did he join you and participate in the search?

         7    A    Yes, sir.

         8    Q    Did you see him pick a bag up?

         9    A    Yes, sir.

        10    Q    Is that from the center or just right of center

        11    aspect of the trunk?

        12    A    Yes, sir.

        13    Q    What's occurring now?

        14    A    He's showing me some items that he's located.

        15    Q    Do you recall what you just pulled out of that

        16    bag?

        17    A    No, sir.

        18    Q    Now, you apparently, and correct me if I'm

        19    wrong, have removed something from the bag, correct?

        20    A    Yes, sir.

        21    Q    That you're examining?  Is that right?

        22    A    Yes, sir.

        23    Q    Now, at that point -- and we can stop the tape

        24    now.  At that point you've moved away from the trunk

        25    of the car sort of abruptly, is that correct?

```
 1    A    Yes, sir.

 2    Q    Do you remember actually doing that?

 3    A    Yes, sir.

 4    Q    Now, let's go back.  And we don't have to rewind

 5    the tape for this.  But just before you moved away

 6    from the trunk, Deputy Taylor came back and

 7    obstructed our view, correct?

 8    A    Yes, sir.

 9    Q    Do you know -- do you remember whether -- first

10    of all, what was it that caused you to sort of jump

11    or move back?

12    A    There was some items in there that I thought to

13    be explosives.

14    Q    When you say there were some items in there,

15    were they in a bag?

16    A    Yes, sir.

17    Q    Do you recall whether they were in the same bag

18    that Fields was seen to be holding up and you are

19    seen to be removing one or two items from?

20    A    It was the same bag.

21    Q    The same bag.  What is that caused you to move

22    back?  What did you observe?

23    A    There were several pieces of PVC pipe that were

24    sealed on one end and had a substance packed into it.

25    Q    When you say they were sealed on one end, what
```

1   is that you observed that you refer to as being

2   sealed on one end?

3   A    It had a substance on the end of it sealing off

4   the top end of it.

5   Q    And do you recall whether you -- whether you saw

6   any holes or anything else unusual in one or more of

7   those pipes?

8   A    Yes, sir.  On the bottom side of them, there

9   were some holes.  Looked like they had been drilled

10  in to where you would attach a fuse.

11  Q    And what did you think -- what was your

12  impression as to what those items were?

13  A    It was a pipe bomb.

14  Q    Now, correct me if I'm wrong, but just before we

15  turned the video off, you were looking in the bag and

16  removing one or more items from the bag and you were

17  remaining stationary, correct?

18  A    Yes, sir.

19  Q    You didn't jump back immediately upon looking in

20  the bag, correct?

21  A    No, sir.

22  Q    What does that tell us?  Or stated differently,

23  what can you tell us about what was in that bag and

24  when you first noticed what you referred to as the

25  pipe bombs or the articles, the PVC articles?

1    A    Why did I react the way I did?

2    Q    Well, no.  I didn't ask the question very well.

3    THE COURT:  I think his question was what was

4    the first thing that you saw that triggered your

5    visual response in moving backwards from the bag and

6    the car?

7    THE WITNESS:  Okay.  The first thing that I

8    noticed that I can remember what set me off was

9    looking at it and then seeing the substance in the

10    pipe and it having holes drilled in it for a fuse.

11    It triggered me.

12    BY MR. MONK:

13    Q    If we move back maybe a few seconds in time

14    before that, when the bag was first opened up, you

15    did or did not see the PVC pipes right away?

16    A    I didn't see it right away.

17    Q    Does that mean that there was something on top

18    of it?

19    A    I think there were several items in the bag

20    itself.

21    Q    Silver or several?

22    A    Several.

23    Q    Do you recall what else was in the bag?

24    A    No, sir, not off the top of my head.

25    Q    So there were several items in the bag.  You

1    removed one or two of those, and then -- was that

2    when you -- after they were removed, did you then see

3    the PVC pipes?

4    A    Deputy Fields brought it to my attention.  He

5    actually was the one that drew my attention to the

6    items itself.

7    Q    How did he do that?

8    A    Picked it up and showed it to me.

9    Q    He picked it up out of the bag?

10   A    Yes, sir.

11   Q    Do you remember whether it was in a clear,

12   Ziploc type bag?

13   A    Yes, sir, it was in a Ziploc bag.

14   Q    Did you give Deputy Fields any direction?

15   A    Yeah.  I told him to put it down.

16   Q    Is that when you moved back?

17   A    Yes, sir.

18   Q    Now, were you the senior person at the scene at

19   that point?

20   A    Yes, sir.

21   Q    And what if any further searching of the vehicle

22   was conducted at the time?

23   A    Once we found that we discontinued any searches

24   of the vehicle.  For our safety we didn't search any

25   more of the vehicle.

1     Q    And did you call for assistance?

2     A    Yes, sir, we called for Charleston County's Bomb

3    Squad.

4     Q    Charleston County's Bomb Squad?

5     A    Yes, sir.

6     Q    Does Berkeley County have a bomb squad?

7     A    No, sir.

8     Q    What other precautions did you take, if any, for

9    the safety of yourself and others?

10    A    We shut down Highway 176 to make sure that

11   civilians passing by weren't harmed if something were

12   to happen.  We shut down the interstate, I mean, 176,

13   and called in the necessary people to handle the

14   situation.

15    Q    Did you also direct that the two occupants of

16   the Toyota be moved elsewhere?

17    A    Yes, sir.  For their safety they were placed

18   separate patrol cars.

19    Q    For their safety?

20    A    Yes, sir.  And it was hot outside, very hot.

21    Q    And also to get them away from the Toyota?

22    A    Yes, sir.

23    Q    The patrol cars they were put in, were those

24   cars air-conditioned?

25    A    Yes, sir.

1    Q    Now, could we please switch over to the ELMO?

2         Show you what has been admitted in evidence as

3    24 A.  Does this appear to be the Toyota Camry?

4    A    Yes, sir.

5         THE COURT:  Mr. Monk, let us make an adjustment

6    there.  This yellow creeping into our image is not

7    proper.

8          Mr. Watts, let's go ahead and call John Barnes

9    and ask him if he'll come back and take a look at

10   this for us.

11        (Pause.)

12        MR. MONK:  May I proceed, Your Honor?

13        THE COURT:  Yes, sir, you may.

14   BY MR. MONK:

15   Q    24 A appears to be the Toyota Camry?

16   A    Yes, sir.

17   Q    And show you what's been admitted as 24 K.  Do

18   you recall whether that looks similar to the

19   condition of the trunk when you and Deputy Fields

20   were searching the trunk?

21   A    Yes, sir.

22        MR. MONK:  With the Court's permission, just a

23   moment, please.

24        (Pause.)

25        MR. MONK:  Thank you very much, Your Honor.

1          THE COURT:  Does that complete your Direct

2     Examination, Mr. Monk?

3          MR. MONK:  It does.

4          THE COURT:  Mr. Allen, you are recognized for

5     your cross-examination.

6          MR. ALLEN:  Thank you, Your Honor.  One moment,

7     please.

8                         CROSS-EXAMINATION

9     BY MR. ALLEN:

10    Q    Afternoon, Sergeant.

11    A    How are you doing?

12    Q    Good.  Now, when the Government was showing you

13    its Exhibit 1 C 2, which was the videotape of the

14    search of that vehicle, initially you were searching

15    the interior of the vehicle --

16    A    Yes, sir.

17    Q    -- correct?  Also in the interior of the vehicle

18    was Corporal Blakely --

19    A    Yes.

20    Q    -- correct?  And Corporal Blakely was the one

21    who made the stop, correct?

22    A    Yes, sir.

23    Q    And he was the one that was -- he was the first

24    officer on the scene?

25    A    Yes, sir.

1      Q     And probably was there longer than anybody else,

2      I guess?

3      A     Yes, sir.

4      Q     And even though I think the video was played

5      rather quickly, you and Officer Blakely spent a fair

6      amount of time searching the interior of the car,

7      correct?

8      THE COURT: Mr. Allen, you can omit the

9      editorializing in your examination. Is it not the

10     case that that video was played at its normal and

11     correct speed except when it was played as announced

12     as fast forwarded?

13     MR. ALLEN: I apologize, Your Honor.

14     THE COURT: Go ahead.

15     BY MR. ALLEN:

16     Q     Did you spend some time with Officer Blakely

17     searching the interior of the car?

18     A     Yes, sir.

19     Q     While searching the interior of the car, do you

20     recall one of the two of you finding some Wal-mart

21     gift cards?

22     A     I don't recall.

23     Q     Okay. Do you remember either Officer Blakely or

24     yourself finding a bunch of receipts and going

25     through the receipts and talking about where based on

1    your investigation these individuals may have been

2    earlier in the day?

3    A    Yes, sir.

4    Q    Do you recall Officer Blakely telling you to be

5    on the look out for fireworks or fuses?

6    A    Yes, sir.

7    Q    And one of the -- and you followed that advice

8    and you were on the look out for fireworks or fuses?

9    A    I was on the look out for -- yes, sir.

10   Q    And other stuff?

11   A    Yes, sir.

12   Q    Now going to the search of the trunk of the

13   vehicle.  When you opened the trunk and looked down,

14   you didn't see these PVC pipe items?

15   A    No, sir.

16   Q    Even when you opened the bag and looked in, you

17   initially didn't see these PVC pipe items?

18   A    No, sir.

19   Q    And given the opaqueness of the bag, you

20   couldn't see through the bag to see the PVC pipe

21   items either?

22   A    No, sir.

23   Q    You indicated that when you opened the bag,

24   removed whatever items were on top of it and saw the

25   PVC pipes, your initial reaction was that it was a

1    pipe bomb?

2    A    Yes, sir.

3    Q    Have you ever seen a pipe bomb before?

4    A    Yes, sir.

5    Q    Was that as part of law enforcement?

6    A    I've had some specialized training with it.

7    Q    I noticed that you were the only one that

8    reacted once those were revealed, even though

9    everybody else had seen it at that point?

10   A    Yes, sir.

11   Q    Had you ever at any point in your life dealt

12   with model rockets?

13   A    No, sir.  Bottle rockets but not model rockets.

14   Q    Not model rockets.  You ever seen a model rocket

15   motor?

16   A    No, sir.

17   Q    You indicated that there was -- when you were

18   looking at these PVC pipe items, you saw a saw a hole

19   in one end of it?

20   A    Yes, sir.

21   Q    Was the hole in the plastic of the PVC pipe or

22   was it in the mixture of substance?

23   A    It was in the mixture of substance.

24   Q    Do you recall the color of the mixture of

25   substance that the hole was in?

     1    A    It was a pale color.  I can't describe it very

     2    well, but it was a pale color.

     3    Q    Was it similar to the color of cat litter?

     4    A    I'd say probably the same general color.

     5    Q    Do you know what a rocket nozzle is?

     6    A    No, sir.

     7    Q    Was there a fuse in that hole which you thought

     8    was designed to have a fuse in it?

     9    A    No, sir.

    10    Q    Showing you Government's Exhibit 24 A, which is

    11    the Toyota that you searched, correct?

    12    A    Yes, sir.

    13    Q    Would you agree with me that this is not a newer

    14    model Toyota?

    15    A    I would agree with you.

    16    Q    And that it is not in the best of physical

    17    condition?

    18         MR. MONK:  Objection, Your Honor, foundation of

    19    personal knowledge.

    20    BY MR. ALLEN:

    21    Q    Have you seen old vehicles in your experience as

    22    a law enforcement officer?

    23    A    Yes, sir.

    24    Q    Would you agree with me that this is an older

    25    model Toyota Camry?

```
 1    A     It's an older model, yes, sir.

 2    Q     Would you agree with me that it's not in the

 3    best of physical condition?

 4          MR. MONK:  Objection, Your Honor, personal

 5    knowledge with respect to its mechanical condition.

 6          MR. ALLEN:  The outside body of the car.  Would

 7    you agree with me that the body of the car --

 8          THE COURT:  Mr. Allen?

 9          MR. ALLEN:  I'm sorry, Your Honor.  I should

10    wait for the Court to rule and I apologize.

11          THE COURT:  There were a couple of opportunities

12    for that, Mr. Allen, in there.

13          MR. ALLEN:  I know.

14          THE COURT:  Officer, did you -- Mr. Allen, I

15    believe the objection is that there is no predicate

16    for his observation of the vehicle.  That's not

17    asking for a different way to draw the conclusion but

18    asking for the necessary predicate of observation, I

19    believe.

20          MR. ALLEN:  Yes, sir.

21          THE COURT:  Which objection is sustained.

22    BY MR. ALLEN:

23    Q     When you were at the scene, did you have an

24    opportunity to observe the interior of the vehicle?

25    A     Yes, sir.
```

1    Q    Did you have an opportunity to observe the

2    exterior of the vehicle?

3    A    Yes, sir.

4    Q    Based on those observations, would you not agree

5    with me that the vehicle was not in the best of

6    physical condition from appearance from the outside?

7    A    It was older.

8         MR. ALLEN:  If I could have a moment, Your

9    Honor?

10        THE COURT:  Yes, sir.

11         (Pause.)

12        MR. ALLEN:  I don't have any further questions,

13   Your Honor.

14        THE COURT:  Any redirect examination?

15        MR. MONK:  Yes, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MR. MONK:

18   Q    You have seen fireworks from time to time in

19   your life, correct?

20   A    Yes, sir.

21   Q    And, in fact, fireworks are readily available

22   for sale at a number of commercial establishments

23   throughout the state of South Carolina, is that

24   correct?

25   A    Yes, sir.

1    Q    And I think you told us -- well, have you ever

2    seen any fireworks like these with substances packed

3    in PVC pipes?

4    A    No, sir, I'd never seen anything like that until

5    that day.

6    Q    But you have seen pipe bombs, I think you told

7    us on Cross-Examination?

8    A    Several times, yes, sir.

9    Q    And you had some specialized training, I think,

10   in connection with pipe bombs?

11   A    Yes, sir, at the University of Phoenix.

12   Q    Did that training have anything to do with why

13   you moved back from the trunk of the car when you saw

14   what you believed might be pipe bombs?

15   A    Yes, sir.

16   Q    And what do you know about the destructive

17   capability of pipe bombs?

18   A    They are very unstable and very volatile, and

19   they're not -- you don't want to be around them.

20   Q    The instability of pipe bombs in your training,

21   does that result in part from the fact that they are

22   homemade devices rather than devices that are made to

23   precise military or commercial specifications?

24   A    Yes, sir.  That's --

25        MR. ALLEN:  Objection, leading.

1          THE COURT:  Sustained.

2     BY MR. HOFFER:

3     Q    In your training, the training you've had, pipe

4     bombs, do you know, are they normally homemade

5     devices?

6          MR. ALLEN:  Objection, leading.

7          THE COURT:  Overruled.

8          THE WITNESS:  Yes, sir.

9     BY MR. MONK:

10    Q    Are they typically, in your training, made to

11    precise commercial or military specifications or

12    otherwise?

13    A    No, sir.

14    Q    Does that have something to do with their

15    instability?

16    A    Yes, sir.

17    Q    Did you see any fuse in the trunk or any other

18    aspect of that car?

19    A    Yes, sir.

20    Q    Now, you've seen fireworks, Lady Fingers, Black

21    Cats, commercial fireworks, correct?

22    A    Yes, sir.

23    Q    You have seen the fuse in those type of

24    fireworks?

25    A    Yes, sir.

1    Q     Is that the type of fuse you saw in the trunk of

2    that car?

3    A     No, sir.

4    Q     Describe the fuse that you saw in the trunk of

5    that car for the jury, please.

6    A     It was a thicker fuse like a hobby fuse.  It's

7    not like you would see in a firecracker or anything

8    like that.

9    Q     And what about the length?  Was it the length of

10    a typical firecracker fuse, maybe a half an inch to

11    an inch long?

12    A     No, sir.  It was a coiled length of fuse.

13    Q     Coiled?

14    A     Yes, sir.

15    Q     Some number of feet long?

16    A     Yes, sir.

17    Q     Now, if I recall correctly from the video that

18    we watched, you were -- well, I'll just ask you

19    directly.  Did you search the front and the back on

20    the driver's side, just the front, just the back,

21    what, before you got out to go to the trunk?

22    A     Just the front.

23          MR. MONK:  Nothing further.

24          MR. ALLEN:  Just on limited areas?

25          THE COURT:  Briefly, Mr. Allen, go ahead.  And

1    focused.

2                    RECROSS-EXAMINATION

3    BY MR. ALLEN:

4    Q    I want to address the pipe bomb, your training

5    with pipe bombs, or what you know about pipe bombs.

6    Isn't it true that when you learned about pipe bombs

7    it was explained to you that, one, you need a pipe,

8    right?  That's what makes it a pipe bomb.  Or a

9    cylinder thing shaped like a pipe, right?

10   A    That's part of it, yes, sir.

11   Q    And that it's necessary for both ends of the

12   pipe to be capped so that the materials inside will

13   increase enough force to break the pipe that's

14   containing the mixture of substance inside?

15   A    If you want it work good.

16   Q    It would not work, would it not, if the end was

17   open and the substance and material came out the end

18   instead of creating enough force to cause the pipe to

19   break and to cause shrapnel to fly?

20   A    I can't say what would have happened if we lit

21   it off.  I can't tell you if it had enough pressure

22   or packed in there enough to contain the explosion

23   and cause a big boom or not, I don't know.

24   Q    That's why it would need to be sent to a lab for

25   testing?

1    A    Yes, sir.

2    Q    You mentioned the fuse was hobby fuse?

3    A    Yes, sir.

4    Q    Isn't it true that hobby fuse is used to launch

5    model rockets?

6    A    It can be used for that, yes, sir.

7         MR. ALLEN:  Thank you.

8         THE COURT:  All right.  Mr. Geiger, when you

9    approached that automobile on the side of State Road

10   176 for the first time, did you have in mind a

11   protocol for the inspection of the exterior and the

12   interior of the car?

13        THE WITNESS:  We follow our guidelines as far as

14   searches, as far as our having a reasonable suspicion

15   and what we need to do to search a vehicle.

16        THE COURT:  Assuming you have permission to

17   search the vehicle, what is your protocol?

18        THE WITNESS:  To search the interior

19   compartments first, the most easily seen and readily

20   accessible, and then work your way to the more fine

21   search details.

22        THE COURT:  Is that what you did in August of 07

23   at the scene that you have been discussing with

24   counsel?

25        THE WITNESS:  Yes, sir.

1    THE COURT:  Did you inspect the exterior of the

2    automobile?

3    THE WITNESS:  Briefly.

4    THE COURT:  You walked in a circle around the

5    automobile?

6    THE WITNESS:  I don't think I did that.

7    THE COURT:  To the extent that you did inspect

8    the exterior of the automobile, what were you looking

9    for?

10   THE WITNESS:  Anything that would be out of the

11   ordinary to the vehicle.

12   THE COURT:  Some electronic gadget or something?

13   THE WITNESS:  Yes, sir.

14   THE COURT:  Were you looking for the condition

15   of the paint?

16   THE WITNESS:  No, sir.

17   THE COURT:  Were you looking for dents?

18   THE WITNESS:  No, sir.

19   THE COURT:  Were you looking to determine

20   whether the headlights, taillights, and turn signals

21   worked?

22   THE WITNESS:  No, sir.

23   THE COURT:  Were you looking for the condition

24   of the tires and their tread?

25   THE WITNESS:  No, sir.

1        THE COURT:  Were you looking for hubcaps?

2        THE WITNESS:  No sir.

3        THE COURT:  Were you looking for breaks in the

4    windshield?

5        THE WITNESS:  No, sir.

6        THE COURT:  Did you inspect the interior of the

7    car?

8        THE WITNESS:  I searched the interior on the

9    driver's side.

10       THE COURT:  Did you sit in one seat or the other

11   or more than one of them during your search?

12       THE WITNESS:  I may have sat in the driver's

13   seat.

14       THE COURT:  Does knowledge of your protocol

15   suggest to you that it was the driver's seat you sat

16   in?

17       THE WITNESS:  Yes, sir, because that was the

18   side that I searched.

19       THE COURT:  Did you have a protocol for

20   searching the interior of the automobile?

21       THE WITNESS:  Just more habit than actual

22   protocol.

23       THE COURT:  Well, then, will you explain, just

24   make a brief statement of your habit with respect to

25   the search of the interior.

1           THE WITNESS:  When I search a vehicle, I

2      automatically go -- just in law enforcement in

3      general, when I search vehicles always for -- I look

4      for something that'll hurt me first.  I look for a

5      knife or I look for a gun.  That's usually up under

6      the seat or stuffed in beside the seat.  I usually

7      hit those areas first just to look for stuff that may

8      hurt me or one of my fellow officers.

9           From there I'll do a more fine search.  I've

10     been trained for interdiction work, so I'll do a

11     pretty thorough inspection of places where contraband

12     is known to have hidden before.

13          Once I get finished with that, if I haven't

14     found anything or there is nothing that sparks my

15     interest any further, I usually stop the search

16     there.  If it requires it, we can do a more -- I

17     guess take the car down as far as it needs to go.  In

18     this case, it wasn't -- we didn't have to.

19          THE COURT:  Did you search in the back seat of

20     this car?

21          THE WITNESS:  I don't think I did.  I think I

22     stayed right to the front, front driver's side.

23          THE COURT:  On the front side, did you look on

24     both the passenger's and the driver's side?

25          THE WITNESS:  Yes, sir.

1       THE COURT:  Did you look under the seat on both

2   sides?

3       THE WITNESS:  I looked under the driver's seat.

4       THE COURT:  Did you look in the glove box or

5   whatever other enclosed parts you could see?

6       THE WITNESS:  No, sir, I don't think I

7   personally looked in the glove box.

8       THE COURT:  Were there enclosures on the doors,

9   slots two into which things went, or bags attached to

10   the doors?

11       THE WITNESS:  Yes, sir, I think there was some

12   on the door panel.

13       THE COURT:  Did you look in those?

14       THE WITNESS:  Yes, sir.

15       THE COURT:  Again, in inspecting the interior of

16   the car, you were looking for what?

17       THE WITNESS:  Contraband, weapons.

18       THE COURT:  When you say your training is in

19   interdiction, what do you mean by interdiction?

20       THE WITNESS:  Criminal interdiction for illegal

21   substances travelling on our highways.

22       THE COURT:  You mean locating and taking

23   possession of --

24       THE WITNESS:  Yes, sir.

25       THE COURT:  -- by interdiction?

1           THE WITNESS:  Yes, sir.

2           THE COURT:  When you arrived at the scene, did

3     you become the commanding officer at the scene by the

4     fact of your arrival?

5           THE WITNESS:  Yes, sir.  I guess by privilege of

6     rank, yes, sir.

7           THE COURT:  Did you in fact take command?

8           THE WITNESS:  No, sir.

9           THE COURT:  You focused on a particular

10    assignment and allowed the others at your discretion

11    to continue their tasks that were underway, whatever

12    they were?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Did you ask anyone's permission to

15    open the trunk, whether that person was at the scene

16    or elsewhere?

17          THE WITNESS:  No, sir.

18          THE COURT:  Did you need anyone's permission to

19    open the trunk other than the consent to search from

20    the owner or occupant?

21          THE WITNESS:  No, sir.

22          THE COURT:  Did you conduct any search of the

23    exterior of the trunk, the lock or the like, or the

24    seals along the outside of the trunk lid before you

25    undertook to open the trunk?

1          THE WITNESS:  No, sir.

2          THE COURT:  Anything further from the United

3     States?

4          MR. MONK:  No, Your Honor.

5          THE COURT:  Anything further from the defense?

6          MR. ALLEN:  No, Your Honor.  Thank you.

7          THE COURT:  Mr. Geiger, you may step down and

8     you are excused with our thanks.

9          THE WITNESS:  Thank you.

10          (End of excerpt of proceedings.)

11

12                    C E R T I F I C A T E

13          I, Kerry Mercade, certify that the foregoing is

14     a correct transcript from the record of proceedings

15     in the above-entitled matter.

16                              S/Kerry Mercade

17                              Kerry Mercade
                                Court Reporter
18

19

20

21

22

23

24

25