```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3      UNITED STATES OF AMERICA

 4

 5           vs.                   CASE NO. 8:07-cr-342-T-23TBM
                                   March 19, 2009
 6                                 Tampa, Florida

 7

        YOUSSEF SAMIR MEGAHED,
 8
             Defendant.
 9
        _____/
10
                 TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                 (TESTIMONY OF WADE ALAN CATCHINGS)
                 BEFORE THE HONORABLE STEVEN D. MERRYDAY
12                     UNITED STATES DISTRICT JUDGE

13      APPEARANCES:

14      For the Government:   JAY HOFFER
                              ROBERT MONK
15                            Assistant U.S. Attorneys
                              400 N. Tampa Street, Suite 3200
16                            Tampa, Florida 33602
                              813/274-6000
17
        For the Defendant:    ADAM ALLEN
18                            DIONJA DYER
                              Assistant Federal Defenders
19                            400 N. Tampa Street, Suite 2700
                              Tampa, Florida 33602
20                            813/228-2715

21      Court Reporter:       Kerry Mercade
                              801 N. Florida Avenue
22                            Suite 15A
                              Tampa, Florida 33602
23                            813/301-5024

24

25      Proceedings recorded and transcribed by
        computer-aided stenography.
```

1               INDEX

2

**GOVERNMENT WITNESS WADE ALAN CATCHINGS**

3  Direct Examination by Mr. Hoffer..........3
   Cross-Examination by Mr. Dyer..............
4  Redirect Examination by Mr. Hoffer.........

5

                **GOVERNMENT'S EXHIBITS**

6

7     **Number**      **Description**                      **Page**

8     3 B         Fujitsu hard drive..............52
      4 A         PVC section.....................32
9     5 A         PVC section.....................32
      6 A         PVC section.....................32
10    7 A         PVC section.....................32
      8 A         PVC section rendered safe.......33
11    10 A        Package of safety fuse..........36
      11 B        Power inverter box..............38
12    13          Four cigarette lighters.........38
      14 A        Black & Decker drill............45
13    15 A        Nokia cell phone................45
      15 C        Samsung cell phone..............45
14    20 A        GPS unit........................47
      20 B        GPS box.........................47
15    21 A-D      Wooden dowels...................52
      22 A        ERT video.......................55
16    24 F-I      Photographs (contents/Camry)....65
      24 S-Z      Photographs (contents/Camry)....65
17    24 AA-FF    Photographs (contents/Camry)....65
      24 II-LL    Photographs (contents/Camry)....65
18    40 B        USF Credit Union credit card....54
      75          Photograph (robot).............70

19

20

21

22

23

24

25

1    (Excerpt of proceedings.)

2        GOVERNMENT WITNESS, WADE ALAN CATCHINGS, SWORN

3        THE COURT:  State your name, please.

4        THE WITNESS:  Wade Alan Catchings.

5        THE COURT:  That's Alan with an E-N?

6        THE WITNESS:  A-N.  A-L-A-N.

7        THE COURT:  And Catchings with a C?

8        THE WITNESS:  Yes, sir.

9        THE COURT:  Have a seat in the witness stand,

10    please, and I'll recognize Mr. Hoffer for his Direct

11    Examination.

12        MR. HOFFER:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14    BY MR. HOFFER:

15    Q    Mr. Catchings, sir, good afternoon.

16    A    Good afternoon.

17    Q    If you would, try to keep your voice up and

18    speak into the mic so that we all can hear you, okay?

19    A    Certainly.

20    Q    First of all, let me ask you, sir, are you

21    employed at the present time, and, if so, by whom?

22    A    Employed with the Federal Bureau of

23    Investigation.

24    Q    How long have you been employed by the FBI?

25    A    Approximately eight years.

1    Q    And what is your current duty title or position

2    with the Bureau of Investigation?

3    A    Special Agent.

4    Q    Mr. Catchings, sir, Special Agent Catchings,

5    where is your current duty assignment?

6    A    Columbia, South Carolina.

7    Q    And how long have you worked there for the

8    Federal Bureau of Investigation?

9    A    Approximately seven and a half years.

10   Q    At the present time, just very generally, sir,

11   what are your duties and responsibilities?  What kind

12   of matters do you work on, I guess, that would be the

13   best way?

14   A    Various investigations to include a vast array

15   of predominantly criminal investigations.

16   Historically, I have worked on several different

17   squads from white collar investigations.  My duties

18   also include serving on an evidence response team.

19   Q    Sir, let me direct your attention back if I

20   could to the late evening of August the 4th of 2007,

21   a Saturday, do you recall -- were you assigned to the

22   Columbia Division of the FBI at that point on that

23   date?

24   A    Yes, sir, I was.

25   Q    Did there come a point in time say around the

1    late evening, ten o'clock or so that night, that

2    something happened that required your attention and

3    your efforts on behalf of the FBI?

4    A    Yes, sir.  I received a phone call from

5    supervisory Special Agent Roger Stanton.

6    Q    Without telling us what he may have said to you,

7    did you have a conversation with him at that time?

8    A    Yes.

9    Q    As a result of that conversation, what if

10    anything, sir, did you do at that point?

11    A    Prepared to depart for the Goose Creek area of

12    South Carolina.

13    Q    And did you in fact do so?

14    A    Yes.

15    Q    When you say "prepared to depart," what -- did

16    you have any special preparation you had to make

17    before you actually left on that trip to the Goose

18    Creek area?

19    A    Well, yes.  It was relatively late in the

20    evening, so just clothing and then I also had to

21    prepare cameras, video equipment, or at least pack

22    them in my vehicle, and other items that might be

23    needed during a search, as we were a little bit

24    shorthanded on the search team that evening.

25    Q    Now, did you ultimately then travel to the Goose

1    Creek, South Carolina area on that night or evening?

2    A    That is correct. We arrived the early morning

3    of the following day.

4    Q    When you see "we," who else aside from yourself

5    made that trip at that time?

6    A    The ERT team of that date included myself; the

7    evidence control technician, which is Tonya Black; an

8    individual who performed videography and searched for

9    us that evening, John Graff (ph), Agent Graff;

10    supervisory Special Agent Roger Stanton, who is also

11    a bomb technician for the FBI, was present on the

12    search team and an agent from the Charleston office

13    assigned to the Columbia Division, Mark Williamson.

14    Q    Let me ask you, all the folks you've just

15    mentioned, are they all assigned and worked normally

16    at that time in the Columbia, South Carolina office

17    of the FBI?

18    A    All with the exception of Mark. Agent mark

19    Williamson worked out of the Columbia RA, or resident

20    agency, of the Columbia Division. So he's assigned

21    to the Colombian Division but works out of the city

22    of Charleston.

23    Q    Which of those two offices, Columbia or

24    Charleston, is sort of the controlling office in that

25    area?

```
 1    A    Charleston office would normally be so.

 2    Q    Now, how long did it take you-all to travel from

 3    the area you left, in the Columbia, South Carolina

 4    area, to get to Goose Creek that particular evening?

 5    A    I would say approximately an hour and a half.

 6    Q    Had you ever been to that location or that area

 7    prior to that night, sir?

 8    A    No, sir.

 9    Q    And without telling us specifics of what may

10    have been told to you in the conversation with Agent

11    Stanton or otherwise, did you have an understanding

12    though when you left the Columbia area as to what

13    your duty or responsibility would be once you got to

14    the Goose Creek area that night?

15    A    I believe either through phone conversation at

16    the time of departure or phone conversation via cell

17    phone in route, because we were all in two or three

18    cars heading that direction, that I may serve as the

19    evidence team leader that evening, or the ERT team

20    leader for that evening, as our other individuals who

21    would normally serve in that capacity were in either

22    other locations that evening or in areas farther off

23    that would require additional time travel to get to

24    the search site.

25    Q    You have mentioned this a couple of times, so
```

1    let me ask you a few questions.  You have mentioned

2    the term ERT.  Could you explain what that stands for

3    and what that unit or group of people does?

4    A    Yes, sir.  It's basically a group of

5    individuals, some of whom are support staff with the

6    FBI and some of whom are agents, at least in the

7    Columbia Division, who serve in the capacity of

8    assisting in certain search situations in the

9    collection and documentation and packaging of

10    evidence from various search sites.  We receive

11    additional training to accomplish those tasks.  And

12    there is various roles that one may serve on when on

13    a search site, but basically it is just individuals

14    who are specifically assigned the duties of

15    searching, acquiring, documenting, placing the

16    evidence in appropriate containers for storage, and

17    then ensuring that the evidence is properly received

18    at whatever storage location is going to be the

19    initial destination of that evidence.

20    Q    Have you, Special Agent Catchings, been involved

21    in work on this ERT type team, were you rather, prior

22    to August 4th of 2007?

23    A    Yes, sir.  I have served on the team for

24    approximately six and a half or seven years.

25    Q    So that would put that back close to 2002 or

1    2003?

2    A    Yes, sir, it would.

3    Q    Just very briefly, before one serves on such a

4    unit or team for the FBI, you mentioned something

5    about some training.  Is there some and what type is

6    it?

7    A    There is a two-week basic course that one would

8    go through for basic evidence response, evidence

9    collection, training.  And then beyond that there is

10   various other training courses in photography,

11   evidence collection, blood spatter, so on and so

12   forth, that one may go to.

13   Q    Let me turn your attention back to the late

14   Saturday night, early Sunday morning hours of August

15   4th into August 5th of 2007.  You indicated that you

16   got to the area of Goose Creek to the location you

17   were directed to at about what time as best you

18   remember?

19   A    We arrived at the location at approximately

20   12:20 a.m. on the morning of the 5th.

21   Q    When you got to that location -- "we," I guess,

22   being again you and the ERT team members?

23   A    That is correct, yes, sir.

24   Q    What did you or the members of your team or the

25   team at that point do once they arrived initially at

1    that location?

2    A    Once we arrived we specifically started getting

3    our equipment identified that we may be using during

4    the search.  I set the times on the various recorder

5    and digital camera that I would be using.  It was set

6    per my cell phone at the time.  So those various

7    functions and then basically standing back and

8    waiting for the bomb technicians to release the

9    scene.  It was still an ongoing scene controlled by

10   the bomb technicians when we arrived.

11   Q    That was my next question.  Sir, what was going

12   on that you could observe when you initially got

13   there?

14   A    There were a lot of agencies present.  The

15   specific thing that was going on when we arrived is

16   the bomb technicians were using an automated robot to

17   go toward the vehicle, remove items from the vehicle,

18   and place them out onto the ground or the asphalt

19   roadway adjacent to and behind the vehicle for

20   further examination.  And there was a command RV or

21   vehicle further back that the video could be seen

22   through or observed by.

23   Q    While all of that activity is going on with

24   respect to the bomb squad and the robot, as you

25   mentioned, you said you were performing certain

1      functions with the clocks, et cetera.  Where were you

2      at and where were you doing that?

3      A     Various locations.  Some of our members, by the

4      time we got down there, as they had all gone into a

5      rush, some needed to take care of bathroom situations

6      and they were off at other locations.  We were

7      collecting batteries for flashlights, as it was

8      obviously going to a low light area.  Prepping

9      equipment.  Then at one time during the search, I did

10     take photographs of another item of evidence that was

11     presented to a CART examiner there that was on the

12     scene.  And beyond that, simply observing and

13     waiting.

14     Q     And the reason you were waiting, as understood

15     it or came to understand that morning before you

16     could do your search activity, was what?

17     A     Well, one of the primary concerns is the safety

18     of the team members and they wanted to ensure that

19     the scene was going to be as safe as possible before

20     the ERT members took control of the scene to start

21     collecting the evidence that evening or morning.

22     Q     Did you get a sense when you arrived visually or

23     otherwise -- or withdrawn.  Let me ask you, sir,

24     before you got to the location or upon arrival, did

25     you learn what specific type of area or item you

1    would be searching that morning?

2    A    We knew it would be a vehicle and -- I mean,

3    obviously we were informed that there might be

4    explosive devices in the vehicle, in or about the

5    vehicle.

6    Q    Let me further narrow your attention down to

7    about one o'clock, 1:15 or so in the morning on that

8    day.  Were you already at that location at Goose

9    Creek at that time, sir?

10    A    Yes, sir, I was.

11    Q    And were you doing some of your preparatory work

12    you described a few minutes ago at that point?

13    A    Yes, sir.  We were getting clothing, other items

14    that I mentioned, all prepared.  Whatever equipment,

15    all the documentation, paperwork, all that kind of

16    thing organized in preparation to go down to the

17    scene when it's released.

18    Q    Did something happen with respect to some

19    initial work of evidence collection at around 1:15 or

20    so that morning that you were involved in?

21    A    Yes, sir.  At approximately 1:15 a.m. that

22    morning, there was a laptop computer that was brought

23    into the CART examiner, the computer examiner.  And

24    since I had the digital camera and photographic

25    equipment there with me, I was asked to go ahead and

1   photographically document the laptop and the hard

2   drive as it was removed from the laptop prior to

3   examination and I did so.

4   Q    Let me ask you, I think you may have it up

5   there, but -- I think you probably do.  There's an

6   item there in front of you, Government's Exhibit -- I

7   think it's in evidence -- 3 A?

8   A    Yes, sir.

9   Q    Let me ask you, first of all, if you recognize

10  that or if you're familiar with that from the events

11  of that morning?

12  A    Yes, sir.  It does appear to be the laptop that

13  was brought to us or that I was asked to photograph

14  early that morning.

15  Q    Let me ask you, first of all, when you say "was

16  brought to you," do you recall by whom and under what

17  circumstances it was brought to where you were?

18  A    No, sir, I don't directly recall the exact

19  circumstances.  Although, they said --

20  Q    Without telling us what anybody else said to

21  you, do you recall, if not the name of the person or

22  persons who brought it to you, what persons they were

23  or who they were?

24  A    No, I do not recall directly who brought it in.

25  Q    And in what condition was it at the time, as

1    best you recollect?

2    A    It certainly did not have what appears

3    fingerprint dust on it at that time.

4    Q    You said you did certain things with it before

5    anyone dealt with, is that correct?  Did I understand

6    that correctly?

7    A    The only interaction I've had with the laptop is

8    to photograph it, so all I did is to position the

9    laptop for photographs.  And then when the computer

10   expert or CART examiner actually removed the hard

11   drive from the laptop, I then photographed the serial

12   number of not only the laptop itself but the serial

13   number of the hard drive removed from the laptop.

14   Q    Let me ask you, sir, you said you recorded or

15   photographed the serial number of the laptop itself,

16   did you from that photograph and from paperwork you

17   may have done record that serial number so you had

18   that information?

19   A    Yes, sir, I did.

20   Q    Do you recall that serial number off the top of

21   your head?

22   A    No, sir, I do not.

23   Q    Do you have any documents or items with you that

24   you could use to refresh your recollection --

25   A    I do.

1    Q    -- as to that serial number?  And if you do, I

2    would ask you to perhaps take a look at the item.

3    Don't read it aloud if you have it there with you.

4    And while you're doing that, if you could actually

5    compare it with this Exhibit 3 A to see how the

6    numbers that may appear on the 3 A match or

7    correspond.  Do you have any documents there that can

8    refresh your recollection?

9    A    I may have.  I can review my 302 and other

10   documents to see if I have those serial numbers on

11   these documents.

12        MR. HOFFER:  With the Court's permission?

13        THE COURT:  Yes, sir.

14   BY MR. HOFFER:

15   Q    You may do so, sir.

16   A    The laptop itself, the serial number does match

17   exactly with the serial number listed in my 302 of

18   the -- or my memorandum of the search events.

19   However, the hard drive either appears to be removed

20   or replaced back into the laptop, so I would have to

21   either -- I don't know if it's easily removable.  It

22   appears to either be separated or screwed in.

23   Q    Let me ask you this at this point, is the body

24   or the shell of the item that you have there in front

25   of you, does the serial number attached to it

1 correspond to your notes or your records from that

2 morning?

3 A    It does, yes, sir.

4 Q    Now, you mentioned and I just asked you

5 briefly -- you said that was brought in, photographed

6 by you, and then someone did some work on it at the

7 time.  Do you recall who was there when you observed

8 them do some forensic work or whatever with that

9 item?

10 A    Yes, sir.

11 Q    Who was that?

12 A    That would be the CART examiner, Stacy Holthus.

13 Q    Now, you've mentioned the word "CART examiner."

14 Let me ask you in the FBI lingo, what does that word

15 mean and what do they do?

16 A    Well, it's a computer analyst and technician,

17 but basically they're the computer experts that would

18 examine digital media, whether it be computers, CDs,

19 other digital media storage devices for evidentiary

20 purposes.

21     MR. HOFFER:  If I can approach the witness, Your

22 Honor?

23     THE COURT:  You may.

24 BY MR. HOFFER:

25 Q    Special Agent Catchings, let me hand this to

1    you, an item which has been marked for identification

2    as Government's Exhibit 3 B.  Let me ask you, sir, if

3    you recognize that item from the events of the

4    morning of August 5th of 2007?

5    A    The serial number on this hard drive matches

6    exactly with the serial number recorded on my

7    memorandum of that evening.

8    Q    Based upon that match, sir, is that the item you

9    saw that morning as you recall?

10   A    Yes, it is, sir.

11        MR. HOFFER:  Your Honor, at this point I'd offer

12   Government's Exhibit 3 B.

13        MS. DYER:  Your Honor, may we approach?

14        THE COURT:  You may.

15        (At side bar, on the record.)

16        THE COURT:  Ms. Dyer, you have on objection?

17        MS. DYER:  My first objection, Your Honor, would

18   be I do not want to by not objecting to the

19   admissibility of the hard drive be conceding that all

20   of the information on the hard drive is now admitted

21   and in full view of the jury.

22        THE COURT:  I understand this proffer and the

23   receipt into evidence presumably to be of this object

24   as an object and not the undifferentiated mass of

25   information presumably contained on the hard drive.

1        MR. HOFFER:  That's correct.

2        THE COURT:  The hard drive as an object.

3        MS. DYER:  My second objection, Your Honor,

4  would be since this Court still has not ruled on the

5  admissibility of the contents of this hard drive, and

6  the Government to this point has placed a lot of

7  importance and testimony on the laptop, if the Court

8  were to rule in our favor and not admit anything from

9  laptop, it would leave an impermissible inference in

10  the jury's mind that there was some import, at least

11  from the Government's perspective, of this laptop and

12  now they're not hearing what it is and they would

13  speculate.  If the Court were inclined and ready to

14  rule on the admissibility of the contents of the

15  laptop at this time in my favor, I would object to

16  any of this being admissible and any further

17  discussion of the laptop being admissible as

18  irrelevant.

19        THE COURT:  I will certainly hear the United

20  States, but it strikes me that, first of all, I think

21  that you based on your thorough knowledge of the

22  facts in and around the matter have focused on that

23  issue, that is the issue of the laptop, in a way that

24  no juror possibly could.  And I have not ruled on the

25  question, nor is it possible to rule on it, viewed

1    one or two different ways.  For example, it would not

2    be possible to rule favorably to the United States on

3    the issue until at the very least the evidence in the

4    case established the similar nature of the rocket

5    propellant that has been discussed as appearing in

6    the films and the substance in the trunk.  I don't

7    know that to be the facts, so that seems to me to be

8    a foundational fact before which I could not possibly

9    resolve that issue in favor of the United States

10    since that's at least one and perhaps the principal

11    reason for its stated probative value and relevance.

12    I think there may be some other issues, but I can't

13    do it before that, and I don't have any reason to

14    exclude before it's offered.  Until I know -- so I'm

15    not going to rule now.

16        I see your point about it moots certain other

17    matters and creates some conveniences if the ruling

18    were to be made, but it needs to be made in an

19    informed fashion that I can't do that now.  I'm

20    listening hard, but that's denied also.

21        Did you want to respond in any way?

22        MR. HOFFER:  I just want to advise the Court

23    that the Court was correct, at least initially.  This

24    offer is an offer of the shell, if you will, or the

25    body of this hard drive.  I understand it wasn't my

1    intention, nor the United States, to publish any

2    contents of it at this juncture through this witness.

3    That's first.

4        I also understand the Court's hesitancy and I

5    understand the timing that you've articulated and I

6    think that is an appropriate --

7        THE COURT:  Sequence.

8        MR. HOFFER:  -- ruling on the motion.

9        As far as if the Court is overruling the

10   objection, I was just going to say that I do not

11   believe that introducing this without publishing any

12   contents, and then if there is some issue about the

13   video anyway and this is not published or its

14   contents are not published how it could prejudice

15   anybody, quite frankly, if the Court rules against

16   us.

17       THE COURT:  On the present hard drive?

18       MR. HOFFER:  Just the shell.

19       THE COURT:  I don't think it does.  I think

20   that's the point.  It's not being admitted for its

21   contents.  It's being admitted as an object.  I

22   agree.  I was trying to say that, although --

23       MR. HOFFER:  We understand the Court's position

24   and we carved out as separate exhibits which aren't

25   being offered right now any of those item which we

1    might seek to have the Court rule on and admit

2    separately from this.  So we're not attempting to

3    publish this or anything beyond the shell of the item

4    itself.

5        THE COURT:  I think we're all on the same page

6    on that.  Let me just say parenthetically, oddly

7    enough, that issue doesn't present itself with

8    respect to the Ocala Wal-mart transaction testimony.

9    In other words, there is no analogous testimonial

10   foundation that's relevant to that question.  Of

11   course, that evidence also is not being proffered as

12   probative based upon connection with any event in the

13   scenario here other than the intrinsic story.

14       MS. DYER:  Thank you.

15       THE COURT:  I guess it was easier to say -- what

16   I should have said was:  If I'm going to rule on it,

17   it would be easier to rule on the Ocala issue right

18   this minute than it would be -- it would easier to

19   rule in an informed manner on the Ocala one than on

20   the video.  Let's go.

21       (End of side bar discussion.)

22       MS. DYER:  No objection, Your Honor.

23   BY MR. HOFFER:

24   Q    Special Agent Catchings, following that which

25   occurred some time around 1:15 I think or so area in

1      the morning, the activity regarding 3 A and 3 B that

2      we just talked about, did there come a point in time

3      later on that particular morning that you and your

4      time actually had a chance to actually do something

5      that you were there to do?  And, if so, about when

6      was that as best you remember?

7      A     Yes, sir.  At approximately 3:15 a.m. that

8      morning, the scene was released to the evidence

9      response team, and at that time we started to prepare

10     for video documentation of the scene.

11     Q     When you say the scene was released, again, what

12     do you mean by that?  In sort lay terms, what

13     happened?

14     A     I guess the short answer would be that the

15     controlling entity of the scene at that time when we

16     arrived as actually controlling access to the vehicle

17     and the surrounding area was the bomb technicians

18     there on the scene at the time.  They announced at

19     approximately 3:10 they felt the area was safe to

20     start examining additionally for evidence by the

21     evidence response team.

22           Just prior to that, I think for about five

23     minutes, they sent down a drug and/or bomb sniffing

24     dog to circle the vehicle to ensure there were no

25     other items there that could potentially surprise

1    them.  And then it was fully released to -- released

2    being they're no longer technically in control of the

3    scene.  We would be the ones down there controlling

4    the scene of the vehicle and its contents.

5    Q    Before we discuss the specifics of the search

6    conducted that morning, let me ask you, Special Agent

7    Catchings, is there some set protocol for a search of

8    an item such as a vehicle, such as this was, that you

9    follow and your team follows as far as the routine

10   protocol and procedure that you follow?

11   A    There is no set -- each search site is going to

12   have its own particulars.  Of course, this one did as

13   well.  It was nighttime with low light and eventually

14   even less light as some of the emergency vehicles

15   departed.  We had evidentiary items out further from

16   the vehicle than one would normally have in a search

17   scene, as a lot of the items were several yards

18   removed from the vehicle.

19        However one approaches a scene, generally

20   through the same practice -- it's not mandatory, but

21   you approach from the fartherest outpoint of evidence

22   and work your way in.  That's what we did in our

23   video documentation of the scene to document this is

24   how the scene was at the time the evidence response

25   team arrived.  We videoed down the line of evidence

1    or line of items that had been removed from the

2    vehicle, videoing them on the way down to the

3    vehicle, and then more or less separate the vehicle

4    into quadrants and try to videotape the vehicle as

5    best you can from it being on the side of the road.

6    And then a full circle and then the interior of the

7    vehicle, making sure to get the contents of the

8    vehicle as close as possible what one could view if

9    one was looking at it from standing outside the

10   vehicle.  Then we go back and photographically

11   document the items.

12        After that, the search team starts searching

13   through for items that may be underneath some of the

14   obvious items.

15   Q    So a videotape of the car first, as I understood

16   you?

17   A    That is correct, yes, sir.

18   Q    Or the area approaching the car and then the car

19   itself?

20   A    That's correct.

21   Q    And you mentioned a minute ago that you had to

22   start far out from the car with your videotaping

23   first because of what reason?

24   A    Several of the items had been removed by the

25   bomb technicians and were placed adjacent to and back

1    behind the vehicle for several yards back behind the

2    vehicle, so our search actually started from the

3    initial item that had been removed from the vehicle

4    and then worked our way up.  And we videoed first,

5    then we photographed.  But at the same time I'm

6    photographing obvious items that are laid out, some

7    members of the team would be starting to begin their

8    search on the contents of the vehicle and the

9    contents of some of the bags that were laid out along

10   the highway.

11   Q    You've mentioned as far as keeping a record of

12   what's happening and what's being searched and where

13   it's being found, you mentioned a video.  Any other

14   methods being used during the search that you're

15   going to undertake at that point?

16   A    Photographing, photographic documentation of the

17   evidence, and also keeping a photographic log, and

18   then an evidence recovery log of the items that were

19   eventually seized.

20   Q    Let me jump ahead for one second just so it may

21   be helpful.  As an ERT team member and based upon

22   your training and experience with the Federal Bureau

23   of Investigation, once items of evidence, physical

24   items of evidence, are collected from a scene, be it

25   Goose Creek or whatever, is there some -- can you

1    explain generally the procedure as far as the

2    securing and the maintaining of those items and their

3    integrity?  Once they are taken from a scene, what's

4    done with them and how is that maintained?

5    A     Part of the responsibility of an evidence

6    response team member, and specifically the team

7    leader, is to ensure that the items are collected

8    properly, they are packaged properly, and then they

9    are shipped properly to their destination.  Within

10   that packaging process, there is going to be an

11   evidence recovery log maintained, a property seized

12   form filled out.  And at the time that that item is

13   seized, it's going to be provided with an evidence

14   number.  Then the change of custody starts.  It's

15   going to be initialed off by one of the team members,

16   by one of the search team members.  Generally

17   speaking, two members will sign off on each item.

18   That item will be properly packaged, sealed, dated,

19   and initialed by the team members.  Then it's

20   provided to the evidence control technician.  The

21   chain of custody then initiates and it will be

22   assigned a 1-B number by the evidence control

23   technician and a formal chain started on -- wherever

24   that evidence goes, there'll be a record of that

25   evidence, whether it goes to the lab or to another

1    division or what have you, that chain will follow

2    that item of evidence.

3    Q    So when you say that a 1-B number, and that's

4    probably an FBI term as well, is generated for an

5    item or a group of items, what does that mean

6    exactly?

7    A    An evidence control number, a control number for

8    that item which can be split if that item -- it there

9    are multiple items included in that package, it can

10   always be split down - sub items, sub control numbers

11   from that original item.

12   Q    Again, based upon your training and experience

13   both as an ERT team member or leader and generally as

14   a special agent for the years you've have been a

15   special agent, once those items of evidence are

16   collected and assigned these 1-B numbers, as you say,

17   and I guess brought back to your offices from a scene

18   like this Goose Creek scene of the search, is there a

19   procedure maintained by the Federal Bureau of

20   Investigation that once that item comes back into the

21   office somehow it's controlled so people can know

22   where it is, where it's going, what happens to it?

23   A    Yes, sir, there is.

24   Q    Generally, again, without going into too much

25   detail, what's that process or procedure as you're

1    aware of it?

2    A    Generally in our situation from an evidence

3    response team, we're generally going to bring the

4    evidence at one time to the evidence control

5    technician to be secured in our evidence control room

6    or area.  The proper documentation will be done at

7    that time.  It will be assigned by the evidence

8    control technician.  It will be logged in and it will

9    be stored in an evidence control area.  Then anyone

10   that needs to see it or if it needs to be sent to any

11   other location for whatever reason, then that will be

12   documented as to who and when and where it was going.

13   And then that chain follows that item wherever it

14   goes.  If it needs to come back, there is also a

15   record of it coming back to whatever originating

16   location, in our case the Columbia Division, when it

17   would be logged back into our evidence control area.

18   Q    When you say logging back in before it's moved

19   and when it comes back, how is that logging done?

20   A    Basically, the individual checking out the item

21   would sign for it.  The individual taking custody of

22   the item signs for it.  It comes back.  The

23   individual dates, signs, time of that item as it goes

24   and comes or wherever it travels.

25        MR. HOFFER:  May I approach the witness, Your

1    Honor?

2         THE COURT:  You may.

3    BY MR. HOFFER:

4    Q    Special Agent Catchings, I'm going to show you,

5    and let me just make a record as I sit here,

6    Government's exhibits marked for identification as 4

7    A, 5 A, 6 A, 7 A, and 8 A.  Let me just deal with the

8    4, 5, 6, and 7 A numbers right now and put 8 off to

9    the side for a second if we could, okay?

10   A    Yes, sir.

11   Q    Let me ask you, taking a look at those, if you

12   recognize those items from the events of the morning

13   of August 5th.  And, if so, what you recognize them

14   to be or recognize similar to?

15   A    They appear to be portions of the PVP pipe that

16   were seized that evening from the roadside or

17   directly behind the vehicle as we approached.

18   Q    Now, from your activity in that morning, do you

19   recall where items such as those were seen by you

20   initially and collected from as best you can

21   recollect?

22   A    Yes, sir.  They were collected from the roadside

23   behind the vehicle.  It appeared to us as we could

24   tell on several items that were relocated by the

25   robot used by the bomb technicians.

1    Q    And you said they appear to be but not exactly,

2    or I forget what the words you used, could you

3    amplify that in your response?

4    A    Well, in the condition we found the items, they

5    of course were not this dirty.  They were more

6    plainly white.  They were sealed.  These appeared,

7    some of them, to have been cut open and probably the

8    contents removed from the pipe itself.  We did not

9    there at the scene ourselves remove any of the

10    contents from the pipe or do any thorough examination

11    of the pipe, attempt to remove any cap from the pipe

12    or anything such as that.  We left them as we found

13    them and simply collected them and packaged them for

14    shipment to the evidence control technician.

15    Q    Obviously, these items are all in plastic bags

16    or containers.  Were they in separate type bags like

17    that or separate from each other when you first

18    observed them that morning?

19    A    No, sir.  They were together in one package when

20    we observed them.

21    Q    And do you recall when you first observed them

22    where with respect to the vehicle, the road, or where

23    were they initially when you saw them that morning?

24    A    Approximately probably 20 to 25 yards behind the

25    vehicle.  They were within -- there were two basic

1    lines of items that had been removed from the vehicle

2    that extended behind the trunk, behind the vehicle,

3    toward the command post area, and they were within

4    those lines leading up to the vehicle.

5    Q    If I could ask you, sir, if you recollect items

6    such as those or the PVP pipe sections that you saw

7    in that condition, you said there were contents

8    inside them, do you recall or can you characterize

9    what you saw that morning and describe the contents

10   you saw in those various pieces of pipe?

11   A    I would be unable to do so, sir, because Roger

12   Stanton who assisted with the evidence team is a

13   trained bomb technician and we relied heavily on him

14   to observe those items and assist in proper packaging

15   of those items.  Other than photograph them, present

16   when they were videoed, I did not do a lot of direct

17   handling of those items.

18   Q    What I meant more was if do you recall anything

19   about the description of the color or the type of

20   contents you saw, if you have any recollection?

21   A    Not of the contents, no, sir.

22        MR. HOFFER:  Your Honor, at this time I would

23   offer Government's Exhibit 4 A, 5 A, 6 A, and 7 A.

24        MS. DYER:  No objection.

25        THE COURT:  4 A through 7 A are received on

1    behalf of the United States.

2         (Government's Exhibit Nos. 4 A, 5 A, 6 A, and 7

3    A are received into evidence.)

4    BY MR. HOFFER:

5    Q    I would also now ask you, Special Agent

6    Catchings, if you would, to look at 8 A, which I also

7    I think have handed up to you there?

8    A    Yes, sir.

9    Q    And I ask you the same question, if you

10   recognize that or it is familiar to you from the

11   events of that morning of August 5th of 2007?

12   A    It appears to be one of the PVC pipes that has

13   been exploded or the contents initiated.

14   Q    Do you recall collecting such an item from the

15   scene that particular morning into evidence?

16   A    If it were collected, it would be one that --

17   the bomb techs initiated a controlled explosion on

18   that evening.  One was collected.  I was not the

19   individual that collected that specific item, but one

20   was collected that was initiated right on scene that

21   evening.

22        THE COURT:  Mr. Catchings, would you hold that

23   up so I can see it just a moment?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Thank you.  And that's 8 A?

1     MR. HOFFER:  Yes, it is, Your Honor.

2     BY MR. HOFFER:

3     Q    Let me ask you, Special Agent Catchings, do you

4     recall ultimately as the ERT team or group leader,

5     did you-all collect that particular item that you

6     described that was rendered safe somehow that night

7     or that morning as well?

8     A    Yes, sir, we did.

9     Q    Does that look similar to the item or do you

10    know if that's the item that you did collect?

11    A    Yes, sir, it would be the item, as it would have

12    maintained that control number.

13        MR. HOFFER:  Your Honor, at this point I'd offer

14    Government's Exhibit 8 A.

15        MS. DYER:  No objection.

16        THE COURT:  8 A is received on behalf of the

17    United States.

18        (Government's Exhibit No. 8 A is received into

19    evidence.)

20    BY MR. HOFFER:

21    Q    Now, Special Agent Catchings, were you in the

22    area that morning when this render safe test was done

23    by some of the bomb folks?

24    A    Yes, sir, I was in the general area.

25    Q    How far away from where the bomb tech folks were

1    you as best you can recollect?

2    A    Probably more than 40 yards but less around 100

3    yards, somewhere around 50 or 60 yards.

4    Q    Are you familiar with that or have some basic

5    understanding of what kind of tests or procedures

6    they were doing at that time?

7    A    My understanding is that they -- in a controlled

8    situation, they fired a round similar to one that

9    would be fired from a shotgun to initiate the device

10   in a controlled situation, whether that's behind

11   sandbags or with water containment, I'm not exactly a

12   hundred percent sure.  That's not something I'm

13   really educated or trained on.

14   Q    And do you recall -- you were some distance away

15   but did you hear anything that particular morning

16   while you were at the scene that was part of that

17   procedural process?

18   A    Yes, sir.

19   Q    What did you hear?

20   A    For lack of a better term, just a loud bang.

21        MR. HOFFER:  If I could have -- if I may

22   approach the witness again, Your Honor, in a moment?

23        THE COURT:  Yes, sir.

24   BY MR. HOFFER:

25   Q    I've handed you, sir, what has been marked and I

1    believe received in evidence as Government's Exhibit

2    9 A.  Do you see that, sir?

3    A    Yes, sir.

4    Q    Do you recognize that or are you familiar with

5    that from the events of that morning?

6    A    I clearly recognize this item, yes, sir.

7    Q    What do you recognize it to be and where did you

8    see it first that day as best you remember?

9    A    It was on the roadside behind the trunk of the

10   vehicle in one of the lines of items removed from the

11   trunk.

12        MR. HOFFER:  May I approach the witness again,

13   Your Honor?

14        THE COURT:  You may.

15   BY MR. HOFFER:

16   Q    Sir, I've handed you three more exhibits.  And

17   if my memory serves, I believe they are Government's

18   10 A for identification, Government's 11 B, and I

19   think Government's again for identification -- I'm

20   sorry, I've forgotten the third item that I gave you.

21   A    You handed me 10 A, 13, and 11 B.

22   Q    All right.  I'm going to ask you the same

23   question as to each if you could.  Look at each of

24   those items and ask you if you recognize them, and,

25   if so, from where and when?

1    A    Yes, sir.  I recognize all of the items clearly.

2    I don't -- I will start with 10 A.  I clearly recall

3    10 A, which is described as safety fuse.

4    Q    Where did you see that?

5    A    It was located along the highway behind the

6    vehicle.  It had been removed from the vehicle.

7    Q    What did you and the other people in your team

8    do with that on that particular morning?

9    A    Photographed it.  Videotaped, photographed, and

10    then packaged for collection.

11    Q    And that's 10 A?

12    A    Yes, sir, that's 10 A.

13         MR. HOFFER:  Your Honor, at this point I'd offer

14    Government's Exhibit 10 A.

15         MS. DYER:  No objection.

16         THE COURT:  Exhibit 10 A is received at the

17    request of the United States.

18         (Government's Exhibit No. 10 A is received into

19    evidence.)

20    BY MR. HOFFER:

21    Q    Let me ask you to turn your attention, Special

22    Agent Catchings, to Government's Exhibit 11 B and ask

23    you if you recognize that, and, if so, from where and

24    when?

25    A    Yes, sir, it is a package for a vehicle charger,

1    one of the extra chargers that you can plug into a

2    cigarette lighter to provide AC power from your DC

3    outlet on your vehicle.

4    Q    And if you recognize it from the events of that

5    morning, tell us from where and when as best you

6    remember you recognize it?

7    A    It would have also been located behind the

8    vehicle in a line of items leading up to the vehicle

9    itself.

10   Q    And what did you and the members of your team do

11   with respect to that item that morning?

12   A    It would have been videoed, photographically

13   documented, and then collected as evidence as well.

14   Q    Let me ask you this question about, I guess, 10

15   A that you just looked at and this one as well.

16   Obviously, they are both in clear, plastic

17   containers.  Were they encased in such a way or

18   contained that way that morning or not?

19   A    No, sir, they were not in exactly this form, nor

20   were they this dirty either.  They were more of a

21   pristine new look to them as newer items, newly

22   purchased items.

23        MR. HOFFER:  Your Honor, at this point I'd offer

24   Government's Exhibit 11 B.

25        MS. DYER:  No objection.

1          THE COURT:  11 B is received at the request of

2     the United States.

3          (Government's Exhibit No. 11 B is received into

4     evidence.)

5     BY MR. HOFFER:

6     Q    The next item you have there in front of you,

7     sir, is Government's 13, I believe, is that correct?

8     A    Yes, sir, it is correct.

9     Q    I would ask you the same question, Special Agent

10    Catchings.  Do you recognize it from that morning,

11    and, if so, from where and what activity?

12    A    I do clearly recognize these items.  There were

13    -- they are cigarette lighters and they were present

14    inside the vehicle to the center console area as to

15    where most of these items were at the time we

16    photographed and documented them and seized them and

17    properly packaged them.

18    Q    Were those items seized or taken from the car

19    that morning?

20    A    Yes, sir.

21         MR. HOFFER:  At this point, Your Honor, I'd

22    offer Government's Exhibit 13.

23         MS. DYER:  No objection, Your Honor.

24         THE COURT:  Exhibit 13 is received at the

25    request of the United States.

1        (Government's Exhibit No. 13 is received into

2    evidence.)

3    BY MR. HOFFER:

4    Q    Let me hand you that exhibit which is marked

5    Government's 11 A, I think received in evidence at

6    this point, and ask you if you recognize that item?

7    A    Yes, sir, I do.

8    Q    What do you recognize it to be and from where do

9    you recognize it?

10   A    It appears to be the same charger that one could

11   place in a DC cigarette lighter that would have

12   potentially come from the packaging that would be

13   used for AC power.

14   Q    And from the events of the morning of August

15   5th, do you recognize that from what you saw or

16   observed in the Goose Creek area?

17   A    Yes, sir.

18   Q    When you first noticed or observed that item, do

19   you recall where it was and what kind of a condition

20   it was in?

21   A    Well, certainly it would not have what appears

22   to be maybe fingerprint dust on it or other dusting

23   on it.  To the best of my recollection, I would have

24   to check records, I believe it was present with the

25   packaging or close to the packaging at the time.  It

1    could have been an item that was found within the

2    vehicle itself.

3    Q    Okay.  You say you have some records that might

4    refresh your recollection on that particular point?

5    A    I may.  I'm not certain that I have the actual

6    list of evidentiary items as they were collected on

7    my person, but I could refer to those to be

8    absolutely certain as to whether or not it was seized

9    from in the vehicle or behind the vehicle.

10   Q    Let me just ask you at this point in time, up to

11   point the various items that you have described that

12   you observed that morning, was it your responsibility

13   or duty as the head of the ERT team to make note of

14   the various things there and where they were before

15   they were removed from the scene?

16   A    We -- it is our practice to as much as possible

17   document each item in the relative position it was

18   prior to removal for packaging and seizing.  Some

19   items just from the sheer nature of where they're

20   found, maybe in pockets or underneath other items,

21   that cannot be done.  But we do try to document it in

22   as close to the condition we find it in at the time.

23   Q    But would you -- I guess my question relates to

24   you personally.  Would it have been your duty and did

25   you in fact look at everything in its location before

1    anybody moved anything around in that vehicle?

2    A   It would have not necessarily been my duty to

3    observe each item prior to removal just as a team

4    leader, but as a team leader also serving as a

5    photographer, generally I would have seen each item

6    before it was moved unless it had to be moved from

7    underneath or within some other item.

8    Q   I'm going to ask you to look down there on the

9    well of the courtroom there on the floor next to the

10    exhibit table.  Can you see that's Government's 12 A,

11    that red item that's there?  Can you see that, sir?

12    A   Yes, sir, I can see the "12 A" written on the

13    gasoline container.

14    Q   Perhaps I should give it to you so you can

15    examine it more closely.  The question I'd ask of you

16    is, Special Agent Catchings, do you recall seeing an

17    item, that item or something similar, that morning on

18    August 5th?

19    A   I vividly recall this item, yes, sir.

20    Q   When you recall seeing it at the location, do

21    you remember where it was or under what circumstances

22    you saw it?

23    A   It was clearly one of the items that was removed

24    from the vehicle and it was placed along that line

25    behind the trunk of the vehicle.

1      MR. HOFFER: If I could approach the witness

2    again, Your Honor?

3      THE COURT: You may.

4    BY MR. HOFFER:

5    Q   I'm going to load you down again, sir. Going to

6    hand you what's been marked for identification

7    purposes as Government's Exhibit 14 A, Government's

8    Exhibit 15 A, 15 C, and 20 A. They were all marked

9    for identification purposes. I guess we'll start

10    with the lowest number, which I think is 15 A. Is

11    that what I handed you first?

12      THE COURT: 14 A.

13      MR. HOFFER: I'm sorry. Thank you, Your Honor.

14    BY MR. HOFFER:

15    Q   14 A. Do you have that there in front of me?

16    A   Yes, sir, I do have 14 A in front of me.

17    Q   And I would ask you, sir, if you recognize that

18    item, and, if so, from where and under what

19    circumstances?

20    A   Yes, sir, I clearly recall this item as being

21    collected from behind the vehicle on that early

22    morning. It is basically a Black & Decker drill

23    slash screwdriver, electronic Black & Decker

24    screwdriver slash drill set.

25    Q   When you saw it, it was where initially?

 1    A    It was behind the vehicle in the line leading up

 2    to the vehicle to the best of my recollection.

 3    Q    By the way, you've mentioned that -- when you

 4    say that two lines of things behind the vehicle,

 5    where were those items placed as far as the road, the

 6    shoulder?  Do you recall?

 7    A    Clearly they were on the asphalt.  One line more

 8    or less followed the white line that is on the

 9    right-hand side as the road travels.  One more

10    closely followed the yellow line that divides modes

11    of traffic.  They weren't exactly placed on the

12    lines, but more or less that's the direction they

13    followed.

14    Q    Let me ask you now to then look next at

15    Government's 15 A and 15 C.  You may have to open the

16    containers to examine them more closely if you need

17    to and I would invite you to do so.  Ask you if you

18    recognize them once you have examined them more

19    carefully?

20    A    I believe I might have to see the contents.  I

21    can't really observe the contents without opening

22    them, if that's proper to do so.

23    Q    I would ask you to do so if you can.

24    A    It is a Nokia cell phone.

25    Q    I would ask you, sir -- for the record I'll just

1    say that the plastic outer container in which it was

2    in the bag, the seal was broken on that when you

3    opened it, correct?

4    A    That is correct, yes, sir.

5    Q    You broke the seal yourself?

6    A    I did break the seal.

7    Q    And having seen the contents of 15 A, do you

8    recognize it from the events of the morning of August

9    5th, and, if so, from where and when as best you

10   remember?

11   A    Yes, sir.  It was a cell phone that was within

12   the vehicle at the time we searched the contents of

13   the vehicle.

14   Q    Let me ask you to do the same thing, sir, with

15   respect to Government's 15 C, which I think is before

16   you.  Again, if you need to open the bag, you may do

17   so and let us know.

18   A    I would need to open the bag to fully observe

19   the contents of this one.

20   Q    Please do so, sir.

21   A    It appears to be the Samsung cell phone with its

22   SIM card.

23   Q    Do you recall seeing that on that morning, and,

24   if so, where and under what circumstances?

25   A    Yes, sir.  It was also contained within the

1    vehicle itself at the time we found it, documented

2    it, and collected it.

3    Q    And you mentioned there was a phone and

4    something else?

5    A    Generally what's referred to as the SIM card,

6    the card that contains the memory of your phone

7    numbers and other items that you may store within

8    your phone.  Usually according to what type of

9    technology the phone uses, SIM cards are used for

10   certain CDMA phones.

11   Q    And you recognize that from that morning?

12   A    Yes, sir.

13        MR. HOFFER:  Your Honor, at this point I would

14   offer the three items collectively, 14 A, 15 A, and

15   15 C into evidence.

16        MS. DYER:  No objection.

17        THE COURT:  Each of the three is received at the

18   request of the United States.

19        (Government's Exhibit Nos. 14 A, 15 A, and 15 C

20   are received into evidence.)

21        THE WITNESS:  If I may, sir, I failed to mention

22   the battery of the phone is also contained in the

23   bag.

24   BY MR. HOFFER:

25   Q    Thank you, sir.  If you could, could you put

1  those back in the container so they can maintain

2  their marking.

3      THE COURT:  The battery for the 15 C cell phone?

4      THE WITNESS:  Yes, sir.

5  BY MR. HOFFER:

6  Q    Now, I've handed you I think one more item.

7  A    You did, sir.

8  Q    And what is that and --

9  A    It is Exhibit 20 A, which is the GPS system that

10  was present inside the vehicle on the passenger side

11  of the vehicle at the time we collected it.

12  Q    And you've answered my question.  Was it

13  received in evidence by your team and you on that

14  morning?

15  A    Yes, sir, it was.

16  Q    Do you recall from where you located it or

17  seized it at that time?

18  A    Yes, sir.  It was located on the passenger side

19  of the vehicle, on the front passenger side of the

20  vehicle.  It is a Garmin GPS system.

21      MR. HOFFER:  May I approach the witness again,

22  Your Honor?

23      THE COURT:  You may.

24  BY MR. HOFFER:

25  Q    Special Agent Catchings, I've have handed you

1    another item marked for identification as

2    Government's Exhibit 20 B, as in boy, correct?

3    A    Yes, sir, 20 B.

4    Q    Have you -- again, I invite you to examine it

5    and ask you after you've looked at it more carefully

6    if you recognize it from the events of the morning of

7    August 5th?

8    A    I clearly recognize the item as the box that the

9    Garmin GPS was most likely purchased and removed from

10    this box.  The box itself though was recovered from

11    the line of items that were placed by the robot

12    behind the vehicle, and it still contains the rope

13    and sticky pad that the robot used to attach to and

14    remove items.

15    MR. HOFFER:  Before we proceed further with

16    that, let me offer at this point, Your Honor,

17    Government's Exhibit 20 A and 20 B both together as

18    exhibits.

19    MS. DYER:  No objection.

20    THE COURT:  Exhibits 20 A and 20 B are received

21    at the request of the United States.

22    (Government's Exhibit Nos. 20 A and 20 B are

23    received into evidence.)

24    THE COURT:  20 B is the box?

25    MR. HOFFER:  Yes, it is.

1    BY MR. HOFFER:

2    Q    Correct, sir?

3    A    Yes, it is the box for the GPS system, the

4    Garmin GPS Street Pilot C-330.

5        THE COURT:  And the item attached to it was

6    attached to it in the process of removing it from the

7    trunk by the robot?

8        THE WITNESS:  Yes, Your Honor.  I'm not

9    qualified to say exactly how they do it, but I did

10    observe the robot attaching some of these items to

11    them.

12        THE COURT:  But it was not an item that was in

13    the car, it was an item that was brought to the scene

14    with the robot by the officers?

15        THE WITNESS:  Yes.  This little thing attached

16    to it, yes, sir.

17        THE COURT:  So that's law enforcement's object

18    that's attached?

19        THE WITNESS:  Yes, sir.  Yes, Your Honor.

20        THE COURT:  20 A and 20 B are received with

21    attachment.

22        MR. HOFFER:  If I may approach the witness

23    again, Your Honor?

24        THE COURT:  You may.  Mr. Hoffer, will your

25    Direct Examination be much longer?  I'm just looking

1    for a convenient afternoon recess.

2        MR. HOFFER:  This would be about as good as any,

3    Your Honor.

4        THE COURT:  Mr. Watts, I think this would be a

5    good time.  It's very nearly four o'clock and we're a

6    little bit extended here in our immediate post-lunch

7    session.  We'll be in recess for a few minutes and

8    we'll come back and resume Mr. Hoffer's Direct

9    Examination of the witness.

10        THE COURT SECURITY OFFICER:  Rise for the jury,

11    please.

12        (Jury out at 3:51 p.m.)

13        THE COURT:  Mr. Catchings, you can step down and

14    make yourself comfortable.

15        THE WITNESS:  Thank you, Your Honor.

16        (Recess from 3:51 p.m. until 4:11 p.m.)

17        THE COURT:  Purely for the purposes of imagining

18    managing the schedule, Mr. Hoffer, how much more do

19    you think you have on Direct in terms of time?

20        MR. HOFFER:  Time wise, Your Honor, probably

21    about another 15 minutes of examination and then

22    there is a video which I would like a snippet to be

23    shown and published to the jury should it be

24    admitted.  When I say a snippet, I mean a couple of

25    minutes worth of that.

1          THE COURT:  Of what?

2          MR. HOFFER:  A videotape exhibit, Government's

3     22, which has not yet been received in evidence.

4          THE COURT:  I don't know what it is.  You'll

5     some good deal of cross-examination from the defense?

6          MS. DYER:  I don't think a great deal.

7          THE COURT:  And the witness has travelled here

8     from where, Charleston?

9          THE WITNESS:  Columbia, South Carolina, Your

10    Honor.

11         THE COURT:  That's right, Columbia.  You know, I

12    used to work in Barnwell.

13         THE WITNESS:  That's not far.

14         THE COURT:  I know that.

15         Well, I think we should finish this witness

16    tonight and let him go to Columbia.

17         Ladies and gentlemen, let me offer an

18    observation.  This is nearing the end of the fourth

19    day of this proceeding.  You have an attentive and

20    what appears to me to be willing jury.  Let's not

21    bore them to death.  They have a good grasp of what

22    this scene is.  They have a good grasp of who did

23    what, when, and the part that has been reviewed.  I

24    would look for opportunities to streamline, not out

25    of impatience, but some of this is very cumulative.

1    Some of it the incremental relevance of is not clear

2    to the casual observer.  Keep that in mind.

3         You need to keep the thing moving and not repair

4    constantly.  You don't always have to begin at the

5    very beginning and go through all the matters

6    precedent with every witness.

7         Mr. Watts, if you'll return the jurors to the

8    courtroom?

9         THE COURT SECURITY OFFICER:  Yes, sir.

10        (Jury in at 4:15 p.m.)

11        THE COURT:  Please be seated, one and all.  Mr.

12   Hoffer, you are recognized to resume your Direct

13   Examination of Mr. Catchings.

14        MR. HOFFER:  Thank you, Your Honor.

15   BY MR. HOFFER:

16   Q    Special Agent Catchings, I have put up in the

17   jury's absence in front of you there a series of

18   exhibits for identification.  I'd like you to look at

19   what's marked as Government's 21 A, 21 B, and 21 C,

20   and 21 D.  And the same question I'd ask you if you

21   recognize those items from that morning, and, if so,

22   from where?

23   A    Yes, sir.  These appear to be portions of dowel

24   rods that were collected from the asphalt behind the

25   vehicle that were placed there by the bomb

1    technicians.

2    Q    Were they collected by you or the other members

3    of your team to your knowledge on that morning?

4    A    Yes, sir, they were.

5         MR. HOFFER:  Your Honor, at this point I would

6    Government's Exhibits 21 A through D, David.

7         MS. DYER:  No objection.

8         THE COURT:  21 A through D are received at the

9    request of the United States.

10        (Government's Exhibit Nos. 21 A through D are

11   received into evidence.)

12        MR. HOFFER:  Your Honor, just slightly out of

13   sequence, but could I ask -- I've been advised that

14   with respect to Government's 3 B, an item the witness

15   looked at earlier, it was offered, there was a side

16   bar, but I don't know if the Court ever actually

17   ruled in admitting that exhibit.

18        THE COURT:  If I did not and if I now hear no

19   objection, Exhibit 3 B is received at the suggestion

20   of the United States.

21        (Government's Exhibit No. 3 B is received into

22   evidence.)

23   BY MR. HOFFER:

24   Q    Now, there are a few other items there you have

25   before you, sir, and you probably have them and

1    you've got the numbers there that you can tell me.

2    Could you give us just the numbers of the items that

3    you have in front of you?

4    A    Yes, sir.  Exhibit 22 A, 40 B, and 23.

5    Q    40 B, as in boy?

6    A    Yes, sir.

7    Q    Let's start with that one for no other reason

8    and 23, I guess, those two.  Do you recognize either

9    one of those items from that morning, and, if so,

10    from where and under what circumstance, if you do?

11    A    I have no specific recollection of the

12    individual card itself, but the card does appear to

13    be one of a --

14    Q    Don't show it to anybody.  Just talk about it.

15    A    One of the credit cards that were seized from

16    the front of the vehicle during the search that

17    morning.

18    Q    What exhibit number would that be?

19    A    40 B.

20    Q    40 B.  Was it taken into evidence to your

21    knowledge on that day or at some point?

22    A    Yes, sir, it was.

23    Q    Let me ask you the same question as far as the

24    other item, which I guess is 23.  Do you recognize

25    that exhibit, if you do, without showing it to

1    anybody or --

2    A    Well, this is a series of cards, credit cards

3    and other various cards that one would carry in a

4    wallet or a card case.  I have no specific

5    recollection of this particular item being seized.

6    However, it could have been in the various items such

7    as this that were taken from the front of the

8    vehicle.

9         MR. HOFFER:  Having said that, let me offer at

10   this point, Your Honor, solely the previous exhibit,

11   Government's 40 B.

12        MS. DYER:  No objection.

13        THE COURT:  40 B is received at the request of

14   the United States.

15        (Government's Exhibit No. 40 B is received into

16   evidence.)

17   BY MR. HOFFER:

18   Q    And the other item you have there is 22 A.  Do

19   you recognize that item, sir, and, if so, what is

20   that?

21   A    Yes, sir.  This is a DVD disc containing the

22   video of the original video that we took the night --

23   the morning of the search.

24   Q    Have you had an opportunity to view that on one

25   or more occasions since the morning of that search?

1    A    Yes, sir, I have.

2    Q    When was the last time or when did you last view

3    the contents of that recording prior to coming into

4    the court this afternoon?

5    A    This morning and again this afternoon I viewed a

6    portion of this video.

7    Q    And when you did, did you verify whether it was

8    a fair and accurate recording of what was viewed by

9    you and the events of that evening as far as the

10    evidence collection?

11    A    Yes, sir, it is.

12    MR. HOFFER:  Your Honor, at this point I'd offer

13    Government's Exhibit 22 A.

14    MS. DYER:  No objection.

15    THE COURT:  Exhibit 22 A is received at the

16    request of the United States.

17    (Government's Exhibit No. 22 A is received into

18    evidence.)

19    MR. HOFFER:  In fact, if the Court would permit,

20    I would like to publish a portion of that.  I have to

21    take that exhibit back to do so.  If we could switch

22    to the computer.

23    THE COURT:  We'll do so and we'll pull the

24    lights down a bit.

25    MR. HOFFER:  I'm advised we already have it in

1    the machine.  For the record, we've paused the frame

2    on the screen that has got a date of August 5th,

3    2007, at 3:14:24 a.m.

4    BY MR. HOFFER:

5    Q    Special Agent Catchings, before we start looking

6    at this, did you have a hand in setting the time as

7    far as the screen and the recording this made?

8    A    Yes, sir, I personally programmed the time on

9    the video camera just prior to us starting the video

10   process.  And it was set per my cell phone time at

11   the time of the search.

12   Q    Let's just start publishing a portion of this

13   from the beginning.  And as you view it, could you

14   tell us what's transpiring in the initial phase of

15   it?

16   A    That is the video and it does clear up.  That's

17   just the momentary start of the video.  Exactly as

18   myself and Agent Graff -- Agent Graff would have the

19   video camera in hand and I'm walking down the pathway

20   or the asphalt highway leading up to vehicle and

21   we're attempting to focus in the dark on each item as

22   we go down.

23   Q    Could I ask if we could -- we're at 3:14:56 a.m.

24   Could we just fast forward at a slow fast forward

25   pace for a bit?  Agent Catchings, as this is moving

1    forward, what's happening, generally speaking?

2    A    We're walking down.  That was the GPS box that

3    you just saw with -- as you see, it's much cleaner

4    then.  It has the attachment there that was used by

5    the robot to remove it from vehicle.

6         As you can see, there is the PVC piping, much

7    whiter and clear that night.

8         As you can see, it's generally following two

9    paths.  As the video camera will come up, you can see

10   the other line of evidence going down the yellow line

11   of the highway and this line of evidence is going

12   down the right barrier line on the right-hand side of

13   the highway.

14   Q    As we're looking at that PVC, it was in a

15   plastic sort of bag, was that what you saw that

16   morning as well?

17   A    This is what the ERT team saw when we initially

18   talked down.  You are seeing it as we first saw it.

19   You are seeing what we saw as we first walked down.

20   Q    Pick up the pace on the fast forwarding a little

21   bit.  Actually, can we jump to about 12 minutes so

22   that we can save some time?

23   A    You can kind of see the car on up in front to

24   kind of get a sense of how far we started back as it

25   comes up.

1    Q    Can we back up to about 12 minutes on the nose

2    on the counter?  Maybe we perhaps should back up just

3    a little bit more, I apologize, 11:30 maybe, so we

4    can set the background.  Starting from there, we're

5    at 3:25:31 a.m.  Special Agent Catchings, from your

6    recollection, what's being recorded here in this

7    portion of Government's 22?

8    A    Those are some of the cards that were present in

9    the driver's seat as we arrived at the vehicle.

10   Those include some identifying cards and some

11   Wal-mart purchase cards.

12   Q    Without going into -- just if you could narrate

13   the areas of the car that are being shown as we go

14   through them?

15   A    We're going back to the trunk area now.  We are

16   originally in the driver's side.  That is the command

17   post area in the rear or where it focused on with all

18   the lights shining down.  The light doesn't quite

19   reach the car.  It's still a rather dark video.

20        Now you're seeing some of the items directly

21   adjacent.  Those are the trunk items.  That's the

22   back of the trunk.  And we're going to pull the trunk

23   lid down, I believe, at some point in the video and

24   have the tag clearly shown.  But that's the interior

25   of the trunk at this time.

1   Q    Where are we going from there?

2   A    We're walking around on the passenger side,

3   which is on the side of the highway.  Some of the

4   items on the side of the highway are just refuse

5   thrown out on the highway.

6   Q    If we could fast forward a bit through this

7   portion?

8   A    That was a bag used to cover dog refuse so we

9   didn't step in it.

10  Q    Now, we are back in the car again.  Tell us

11  what's going on and where we are at?

12  A    That is the condition of the back seat as we

13  found it.

14  Q    Can you slow it down to normal speed?

15  A    So you're seeing the items that were in the back

16  of the vehicle as we found them that evening.  You'll

17  see some cups, cords.

18  Q    Could we back it up for about ten seconds?  I

19  know it's hard, but -- all right.  Now move it

20  forward frame by frame for about four or five

21  seconds, perhaps a bit more.  Okay.  I'm sorry.  I

22  guess normal pace.  We're not getting there.  Stop.

23       What area of the car -- I know it's hard because

24  of the image being frozen, but do you recall what

25  area of the car that's depicting?

1    A    Yes, sir, that is the -- you're looking kind

2    from the rear passenger side of the vehicle, so the

3    passenger seat is directly in front.  Then you're

4    looking at the console, the rear of that console

5    where a fast food cup is placed in one of the cup

6    holders that would be accessed from the rear

7    passenger area.  And there is power cords and other

8    items that are right there in that center console

9    area that would be in between the rear passenger seat

10   behind the passenger area and the rear passenger that

11   would be behind the driver.

12   Q    If I could ask you -- I don't know.  I guess I

13   can.  This portion and forward of the car is what, so

14   we can orient where that is?

15   A    That is kind of the center console.

16   Q    This portion where you said there were the cords

17   and this cup, what's that area of the car?

18   A    That's just a drop down cup holder that's for

19   the rear passenger or I guess one could use it from

20   the front seat in you kind of leaned and put your cup

21   back there.  That's just the area in between the two

22   floorboards of the right passenger seat in the rear

23   and the left passenger seat behind the driver in the

24   rear.  That's whan in between, some power cords and

25   other items down there.

1    Q    Can we move it forward at normal speed for just

2    a bit more?  We're now focused still on that rear cup

3    holder, correct?

4    A    That's right.  You can see that console.  As in

5    many cars, it has that flip up where there is a

6    storage area, so it's flipped up with the storage

7    area visible in inside.  That's just clothing and a

8    lot of items that are down in the rear passenger

9    area.

10   Q    Thank you.  If we could stop there.  Special

11   Agent Catchings, let me ask you, you mentioned in

12   your testimony earlier before the break that there

13   was -- in addition to the video photography, there

14   were still photographs that were taken at the scene,

15   correct?

16   A    That is correct, yes, sir.

17   Q    And is there a procedure or process by which you

18   and the ERT folks follow some rules about how you

19   take still photographs and what you take, et cetera?

20   A    Well, there is general guidelines.  And with a

21   car you want to break a car down into quadrants.

22   Generally, in most vehicles other than an SUV, you're

23   going to have your basic quadrants.  You're going to

24   have a trunk area, but then you're going to have the

25   right rear passenger, front passenger area on the

1    right side of the car, the driver's side on the left

2    side of the car, and then the left quadrant behind

3    the driver's side.  You generally break it down into

4    quadrants.  It doesn't really matter what quadrant

5    you start in, but you generally follow a circle and

6    go in that quadrant to keep things a little bit more

7    organized.

8         You would generally -- if you locate an item in

9    one quadrant that is covered by other items, you may

10   remove those items to get a good photographic

11   documentation of that item, but you could do so,

12   generally speaking, within that quadrant where you

13   find it.  In other words, if you find something in

14   the passenger floorboard on the front, you might have

15   to move some items off the top of it, move it to the

16   seat.  But the original photographs are going to be

17   as it is as you see it to begin with, and then as you

18   have to go down layers is to get down to the other

19   items that are covered up or in pants pockets that

20   you have to remove.  You try to photograph those

21   items in each quadrant that you find it.

22   Q    Special Agent Catchings, I have now placed in

23   front of you a series of exhibits that are the 24

24   series.  I believe they are not received in evidence

25   at this point.  24 C -- and just check with me as we

| | | |
|---|---|---|
| 1 | | go through them.  24 E? |
| 2 | A | I have 24 F, fox trot. |
| 3 | Q | I'm sorry.  Fox trot.  24 G, as in George? |
| 4 | A | Correct. |
| 5 | Q | 24 H? |
| 6 | A | Yes, sir. |
| 7 | Q | 24 I, as in Ida? |
| 8 | A | 24 I. |
| 9 | Q | Okay.  Then we skip I think to 24 T, as in |
| 10 | | Thomas? |
| 11 | A | I skip to 24 S, as in Sierra. |
| 12 | Q | T, as in Thomas? |
| 13 | A | Then I have 24 T, as in Thomas. |
| 14 | Q | U, V? |
| 15 | A | It appears to be a U or possibly a V, 24. |
| 16 | Q | Check the next one to see. |
| 17 | A | That's clearly a U because the next one is 24 V. |
| 18 | Q | X, Y? |
| 19 | A | My next one in line is 24 W, as in whiskey. |
| 20 | Q | Whiskey, all right.  24 X and Y? |
| 21 | A | I have 24 X and 24 Y. |
| 22 | Q | Z? |
| 23 | A | 24 Z. |
| 24 | Q | Now, the next series starts with double A? |
| 25 | A | 24 double A. |

1    Q    Through at least double F, correct, with the

2    exception of double B may not be there?

3    A    24 double B is present.

4    Q    Okay.

5    A    24 double C, 24 double D, 24 double E, 24 double

6    F, 24 double I, 24 double J, 24 double K, 24 double

7    L, 24 double O, 24 double Q, 24 double R, 24 double

8    S, 24 double T, 24 double U, 24 double V, then I have

9    two others that are 24 double W and 24 double X.

10   Q    Having gone through those and looked through

11   those, are you familiar with them and do you

12   recognize them from the events of the morning of

13   August 5th?

14   A    They are clearly my photographs or reprints of

15   my photographs, yes, sir.

16   Q    And they fairly and accurate depict the various

17   items that they show from what you saw on the morning

18   of August the 5th?

19   A    Yes, sir, they do.  They're not necessarily in

20   any particular order, but they are my photographs

21   from that day, yes, sir.

22        MR. HOFFER:  Your Honor, I apologize for the

23   sequence, but I would offer those.  Some may have

24   already been received, I believe, but all those that

25   have not in that litany, I would offer at this point

1    on behalf of the United States.

2         MS. DYER:  No objection.

3         THE COURT:  Each of those exhibits stated by the

4    witness is received on behalf of the United States.

5         (Government's Exhibit Nos. 24 F - I, 24 S - Z,

6    24 AA - FF, 24 II - LL, 24 OO, 24 QQ - XX are

7    received into evidence.)

8         MR. HOFFER:  If I could just approach the

9    witness to retrieve one or two of the exhibits we're

10   talking about.  If the ELMO is on, if I could just

11   have that for a moment, please.

12   BY MR. HOFFER:

13   Q    You said a second ago, Agent Catchings, that

14   there are circumstances under which the location of

15   an item might be subject to some movement for the

16   photography or whatever before it's recovered or

17   taken into evidence, do you recall that?

18   A    Yes, sir, I do.

19   Q    Did you have that situation on the morning of

20   August the 5th at any point during your search and

21   recovery of evidence at that time?

22   A    Yes, sir, on multiple occasions just from the

23   sheer volume of items that were compacted into the

24   vehicle itself.  Several items had to be photographed

25   in layers or placed where we could get a better flash

1    as the lighting was very poor.  Some items after we

2    photographed them even in a quadrant that they were

3    found in, we removed them outside the vehicle to

4    photograph them on the asphalt to get a clear

5    photograph.  Then I photographed them prior to going

6    into the container that they would be placed in for

7    proper storage and transport.

8    Q    So for example, this is Government's Exhibit's

9    24 T, and I think you can see it on your monitor as

10    well as on the screen.  Do you recall this

11    photograph?  Was that how the items in it appeared

12    initially before any movement or not?

13    A    No, sir.  That would be subsequent to us going

14    through several different items in that area, finding

15    those items, and then placing them out for proper

16    photographic documentation.

17    Q    Do you recall, did you and your team have to do

18    that on more than one occasion that morning?

19    A    Yes, sir, we did.

20    Q    Let me ask you specifically -- I'll show you

21    this exhibit, which has been received I believe, 24

22    O.  I believe that is now in evidence.  Do you recall

23    the circumstances -- and let me zoom out a little bit

24    -- the circumstances of this photograph being taken

25    that morning?

1  A    Yes, sir.

2  Q    And, again, with respect to the items in it, you

3  see this item here which I'm circling around which

4  appears to be some sort of a power cord.  Do you

5  recall seeing that in the vehicle that morning?

6  A    Yes, sir, I do.

7  Q    When you first saw it, was it in that condition

8  and that location?

9  A    My recollection is it was in rear floorboard

10  area of the vehicle, directly behind the console,

11  perhaps a little leaning toward the driver's side of

12  the console, but it was down in the rear floorboard

13  area.

14  Q    And so if that were was the case then the

15  circumstances of this photograph it appears on the

16  seat or some seat of the car, what happened when this

17  photograph was taken or prior to it, as best you

18  remember?

19  A    As we are going through different items and

20  photographing them, that item would have been removed

21  from the floorboard area, placed there onto the seat

22  to properly, photographically document the item being

23  there along with some of the other items that are

24  there in the seat.

25  Q    Sure.  What about this object which is I think a

1    Black & Decker, is what -- it bears the name of Black

2    & Decker?

3    A    Yes, sir.  That's the charger that we've looked

4    at previously, the DC to AC charger.

5    Q    As far as when you first observed it before

6    anybody else dealt with it or moved it all, do you

7    remember where you first saw that item?

8    A    I don't remember directly where we first saw it,

9    but just by the placement of it, it was my practice

10   that night and I informed the rest of the team

11   members when they find something -- although some

12   items are going to be dead center and you've got to

13   pick a side, we photographed them at least initially

14   in the quadrant that they were found.  So those items

15   would have been found in the rear of the vehicle,

16   probably to the rear driver's side of the vehicle.

17   Q    You also mentioned -- and I'm going to show you

18   something in a second.  You mentioned that you

19   observed or noted before you started your evidence

20   collection a robot being utilized by the bomb squad

21   folks.  Did you make that observation, do you recall?

22   A    Yes, sir, I did.

23   Q    Have you had any experience with those kinds of

24   items or that particular type of robot device prior

25   to that morning?

1    A    I have never used such a robot, no, sir.

2    Q    Not using, but have you seen or witnessed that

3    kind of activity with something like that before?

4    A    Yes, sir.

5         MR. HOFFER:  If I could approach the witness,

6    Your Honor?

7    BY MR. HOFFER:

8    Q    Take a look at the photograph and I ask you if

9    you recognize anybody in that photograph or any item

10   in that photograph?

11        THE COURT:  Did you state the exhibit number?

12        MR. HOFFER:  75, Your Honor.

13        THE COURT:  Thank you.

14        THE WITNESS:  I do recognize the item and the

15   individual there portrayed in the picture.

16   BY MR. HOFFER:

17   Q    Do you recognize them from the events of the

18   morning of August 5?

19   A    Yes, sir.  Well, a similar item was obviously

20   there that evening.  If it was not the exact same

21   robot, it was one very similar to this.  I believe it

22   to be the same one.  That was one of the bomb techs.

23   I don't know them personally, but one of the bomb

24   techs that was on the seen at the time.

25        MR. HOFFER:  Your Honor, at this point I'd offer

1    Government's 75.

2         MS. DYER:  No objection.

3         THE COURT:  Exhibit 75 is received at the

4    request of the United States.

5         (Government's Exhibit No. 75 is received into

6    evidence.)

7         MR. HOFFER:  If I could just have a moment, Your

8    Honor?

9         THE COURT:  You may.

10         (Pause.)

11         MR. HOFFER:  If I could just request the

12    opportunity, Your Honor, to retrieve an exhibit and

13    perhaps we could just publish it for a second this

14    one last exhibit, Your Honor, Government's 75.

15         THE COURT:  Yes, sir.

16    BY MR. HOFFER:

17    Q    Let me zoom out for a second.  Special Agent

18    Catchings, as opposed to the individual, the item on

19    the left-hand side of this photograph, you recognize

20    to be what?

21    A    That was the robot that the bomb technicians

22    were using that evening to retrieve items from the

23    vehicle.

24         MR. HOFFER:  Thank you, Your Honor.  I have no

25    further questions of this witness at this point.

1          THE COURT:  Thank you, Mr. Hoffer.

2          Ms. Dyer, have you cross-examination for this

3     witness?

4          MS. DYER:  I do, Your Honor.

5          THE COURT:  You are recognized for that purpose.

6                         CROSS-EXAMINATION

7     BY MS. DYER:

8     Q     Good afternoon.

9     A     Good afternoon, ma'am.

10    Q     In the beginning of your direct testimony, I

11    don't remember what question, but Mr. Hoffer asked

12    you a question and asked if there was anything that

13    you could review to refresh your memory and you said

14    my 302.  Do you remember that?

15    A     Yes, ma'am.

16    Q     Is a 302 an FBI form number for what's basically

17    your report of what happened that night?

18    A     Yes, ma'am, that is correct.

19    Q     I believe you testified about 3:10 a.m. is when

20    you began the video documentation of the scene?

21    A     It was approximately 3:16 is my recollection,

22    yes, ma'am.

23    Q     And that video documentation is what we saw a

24    little bit of just a few minutes ago in Government 22

25    A?

1    A    Yes, ma'am.

2    Q    And you testified frequently that you videotaped

3    or took picture of items that had been placed in two

4    lines along the roadway coming backward from the

5    vehicle that was stopped, correct?

6    A    That is correct.

7    Q    Is it my understanding that you saw the robot

8    take each of those items out and place it there?

9    A    I did not see each item taken out, no, ma'am.  I

10    did see the robot in action taking items out, but I

11    was busy with other things and didn't observe each

12    item.

13    Q    The items on the roadway that you videotaped

14    were taken out by the robot?

15    A    That is my understanding, yes, ma'am.

16    Q    You also testified that before you could do your

17    job, a dog was taken up around the vehicle?

18    A    Yes, that is correct.

19    Q    That's a -- what type of dog?

20    A    If I can refer to my 302, I can tell you

21    exactly.

22    Q    Absolutely.

23    A    It was a drug sniffing dog, but it was escorted

24    by its handler and a bomb technician.

25    Q    Do you know if it was a bomb sniffing dog as

1    well or just drugs?

2    A    I do not know.  Probably at the time I was

3    informed that it was a drug sniffing dog or I would

4    have mentioned the bomb sniffing.  So it was a drug

5    sniffing dog with a bomb technician along with the

6    dog's handler.

7    Q    And it was after that occurred that the scene

8    was declared secure and you were allowed to move in?

9    A    Yes, that is correct.

10   Q    So it was then safe?

11   A    They believed it to be safe enough for us to

12   approach, yes, ma'am.

13   Q    Do you remember, and if you need to refer to

14   your report, if the dog sniffed the items that were

15   strewn down the road?

16   A    I do not recall whether or not the dog did, no,

17   ma'am.

18   Q    Would referring to your 302 help refresh your

19   memory?

20   A    Probably not.  The dog may or may not have gone

21   up or down.  I would have been probably busy

22   preparing for the video and going down.  I did not

23   directly observe the dog going up and down the items.

24   It would just be an assumption on my part if I said

25   he did.

1   Q    Would it have also been an assumption if it is

2   in your 302?

3   A    No.

4   Q    I would ask you to look at the remainder of the

5   sentence that you just referred to remember what type

6   of dog it was?

7   A    "Around the vehicle and the items removed from

8   the vehicle."  Obviously he did.

9        THE COURT:  I'm sorry.  I didn't -- you just

10  read something and you read it so quickly that I

11  couldn't distinction the words.

12       THE WITNESS:  I apologize, Your Honor.  It is

13  clearly in my 302 that -- the complete sentence, "At

14  approximately 3:10 a.m., a drug sniffing dog was

15  escorted by his handler and a bomb technician to the

16  vehicle in question.  The drug sniffing dog was

17  escorted around the vehicle and to the items that had

18  been removed from the vehicle.  At approximately 3:15

19  a.m., the scene was declared secured by the bomb

20  technicians and ERT assumed control of the vehicle,

21  the scene."

22  BY MS. DYER:

23  Q    Also when being questioned by Mr. Hoffer, he had

24  asked you about where a specific item was located and

25  you couldn't remember and you said it was because you

1   didn't have a report or something.  Do you remember

2   that testimony?

3   A    I would need to know the item.

4   Q    Okay.  You testified that part of the process

5   that you and your team was doing was searching,

6   photographing, or videotaping?

7   A    Yes.

8   Q    And then recovering evidence?

9   A    Yes, ma'am.

10  Q    And packaging evidence?

11  A    That's correct.

12  Q    And I thought you testified that as part of that

13  somebody was recording what item was being recovered,

14  correct?

15  A    That's correct.

16  Q    And where it was recovered from to the best that

17  they could?

18  A    That's correct.

19  Q    And was that eventually either that night or

20  later made into some kind of log or report?

21  A    Yes.

22  Q    And what would that be called?

23  A    Well, there would be an evidence recovery log,

24  which was transcribed to an items seized log, a

25  report form.

1      MS. DYER:  May I approach, Your Honor?

2      THE COURT:  You may.

3   BY MS. DYER:

4   Q   I'd ask you to take a look at that and see if

5   you recognize it.

6   A   This is the evidence recovery log that would

7   have been of the 28 items seized that evening along

8   with the administrative worksheet and the

9   administrative log.

10  Q   Would being able to refer to that help you

11  remember items that were seized by you or your team?

12  A   It would, yes, ma'am.

13  Q   Do you remember a University of Florida ID card

14  being recovered?

15  A   I remember ID cards.  Being specific on a

16  University of Florida ID card, I would have to either

17  refer to my photographs or determine if it was an

18  item that was specifically mentioned in the recovery

19  log.

20  Q   I'd ask you to review Item 9 and see if that

21  refreshes your memory.

22  A   Yes, it's there with the Wal-mart receipts and

23  University of Florida ID card.

24  Q   And if necessary, review this log to see if a

25  Florida map was also recovered?

1    A    I do recall a Florida map being recovered,

2    probably more than one Florida map.

3    Q    And also *Tampa Bay and Gulf Beaches Guide*?

4    A    I do recall a Tampa activities guide being

5    seized, yes, ma'am.

6    Q    Would referring to Item 19 on the log refresh

7    your memory as to whether or not it was an *And Gulf*

8    *Beaches Guide*?

9    A    It clearly says, *Tampa Bay and Gulf Beaches*

10   *Guide*.

11        THE COURT:  Are you saying golf or gulf?

12        MS. DYER:  Gulf.

13        THE COURT:  With an O?

14        MS. DYER:  With a U.

15        THE WITNESS:  Gulf, I'm sorry, Your Honor.  It's

16   G-U-L-F.

17        THE COURT:  It could have been either one given

18   the places we're talking about or both.

19   BY MS. DYER:

20   Q    How about a thumb drive, Item 27?

21   A    Yes, along with the other items, one Sony one

22   gigabyte thumb drive.

23   Q    You talked about a GPS device --

24   A    Yes, the Garmin GPS.

25   Q    -- that was recovered from the vehicle.  I

1  believe when you testified on Direct you testified

2  that it was located on the passenger side of the

3  vehicle?

4  A    Yes, ma'am.

5  Q    Was it on the passenger seat, on the floorboard?

6  Where in the passenger side of the vehicle?

7  A    Dashboard area.

8  Q    In the dashboard area?

9  A    Yes, ma'am.

10  Q    I want to show you what's been already admitted

11  as Government's 24 Q.  Do you recognize the area that

12  this photograph depicts?

13  A    Yes, ma'am.  That would be the area that we

14  recovered it from.

15  Q    So it was actually secured onto the windshield,

16  it looks like?

17  A    Yes, ma'am.

18  Q    And is this the wire, like the power cord that's

19  coming down?

20  A    Yes.

21  Q    And this is how it was when you got to the

22  vehicle, correct?

23  A    It was still on when we arrived at the vehicle

24  at somewhere after 3:15 that morning.

25  Q    It was still on, the power was on?

1    A    Yes, ma'am, that's correct.

2    Q    So it was plugged in?

3    A    Yes.

4    Q    It was plugged into the cigarette lighter right

5    in the front dash of the car?

6    A    The video that I took would clearly show, but I

7    do believe it was plugged in and in a working state

8    when we arrived.

9         MS. DYER:  May I approach the table, Your Honor?

10        THE COURT:  You may.

11   BY MS. DYER:

12   Q    I'm handing you what's been admitted as

13   Government's 20 A and 11 A.  Government 20 A is the

14   GPS device with the power cord that we were just

15   talking about?

16   A    Yes, ma'am.

17   Q    And 11 A is the power inverter that you

18   testified about on Direct?

19   A    Yes, ma'am.

20   Q    You agree with me that both of those have ends

21   that would be plugged into a cigarette lighter in

22   order to get power?

23   A    Yes, ma'am.  There is clearly a cigarette

24   lighter or DC connection for the Garmin and there is

25   also one for the device here.

1    Q    And they're exactly the same?

2    A    Well, yes.  They would go into the same

3    receptacle, yes, ma'am.  The same type of receptacle.

4         MS. DYER:  May I approach again, Your Honor?

5         THE COURT:  You may.

6    BY MS. DYER:

7    Q    I'd ask you to look at Government's 14 A.  I

8    believe you testified that was a drill slash or also

9    screwdriver?

10   A    Yes, ma'am.  It describes it as one that will

11   drill holes and drive screws.

12   Q    I may have misunderstood, but on Direct did you

13   say it was an electronic one?

14   A    Well, it's electric in that it may work off of

15   battery power.  It's not a manual drill.  Now, I

16   don't believe that it requires it to be plugged in

17   with a cord.

18   Q    You testified that you took obviously photos of

19   the items that were out on the roadway?

20   A    Yes, ma'am.

21   Q    I believe you testified concerning some dowels?

22   A    Dowel rods, yes, ma'am, wooden rods.

23   Q    I don't remember if you were asked this, but let

24   me want to show you Government's 24 GG.  Is that the

25   photo that you were talking about that you took a

1    picture of those dowels?

2    A    Yes, ma'am.  It's one of the photos that we

3    would have taken.

4    Q    Now, would you or somebody from your team have

5    placed it in that evidence bag?

6    A    Yes.  That would be a photograph that we took as

7    we placed them in the bag.  This is -- as we are

8    collecting and going down collecting items, we

9    photographed it with the container that it would be

10   placed in.

11   Q    I want to show you Government's 24 PP.  Did you

12   also take that one, that photo?

13   A    That would be one of the photos probably as we

14   were originally going down in the state that they

15   were as we were originally -- after the videotape

16   then I went back and photographed the items in place.

17   So that would have been one of the original

18   photographs or the early photographs.

19   Q    Are you saying that Government's 24 PP, this

20   photo, was taken prior to 24 GG?

21   A    It would appear to be.  Well, it would have to

22   be, yes.

23   Q    And that's because in 24 PP, the dowels are

24   still in an opaque bag with some other items and not

25   just in the evidence bag?

1    A    That is correct.

2    Q    And I'm sorry, did you actually take them out of

3    the bag depicted in 24 PP and place them in the

4    evidence bag?

5         THE COURT:  You mean this witness as opposed to

6    someone else?

7         MS. DYER:  Yes, Your Honor.  I'm sorry.

8         THE WITNESS:  I would have to actually -- on

9    each individual item, I don't recall if I was the one

10   that actually would have seized or collected the

11   dowel rods.  As I would be photographing most all of

12   them, I probably didn't bag each and every item, but

13   I may have been present when they were done.

14   BY MS. DYER:

15   Q    Do you recollect either yourself or seeing

16   someone else remove these wooden dowels from the

17   opaque bag and place them in the evidence bag?

18   A    I have no direct recollection of those items

19   being removed from the bag and placed into those

20   bags.

21        MS. DYER:  May I approach the witness, Your

22   Honor?

23        THE COURT:  You may.

24   BY MS. DYER:

25   Q    Can you tell me if you recognize that

1    photograph?

2    A    I clearly do not.

3    Q    Thank you.

4    THE COURT:  That was document --

5    MS. DYER:  It was --

6    THE COURT:  -- marked for ID as?

7    MS. DYER:  -- Government's Exhibit 23 for

8    identification purposes.

9    BY MS. DYER:

10   Q    Sir, just for clarification, I believe one of

11   the last things you testified to on Direct was that

12   when you approached the vehicle, the wires -- I'm not

13   sure if you said it was the power cord to the laptop

14   or not, and I'd ask you to answer that if you can,

15   and the power inverter that in one of the pictures

16   you were shown was sitting up on the seat.

17   Originally when you approached the vehicle, they were

18   in the floorboard?

19   A    I do recall, not vividly, but I have

20   recollection that the power cord in question was

21   there.  Whether the power inverter was there, I have

22   no direct specific recollection.  It would have been

23   my practice that it would have been photographed in

24   the quadrant that it was found.

25   Q    And you were the last person in any of these law

1    enforcement agencies at the scene to take pictures

2    before the items were actually recovered and tagged

3    and packaged?

4    A    Yes, that is correct.

5         MS. DYER:  Nothing else, Your Honor.  Thank you.

6         THE COURT:  Thank you, Ms. Dyer.

7         Has the United States any redirect examination?

8         MR. HOFFER:  I have one or two, Your Honor.

9         THE COURT:  You are recognized for that purpose.

10        MR. HOFFER:  Thank you.

11                      REDIRECT EXAMINATION

12   BY MR. HOFFER:

13   Q    Special Agent Catchings, you have up there the

14   inverter, which I think is 11 A, correct?  No.  It's

15   here.  You have seen that?

16   A    Yes, sir.

17   Q    And you also saw the laptop, 3 A, earlier?

18   A    Yes, sir.

19   Q    From your experience, are you familiar with

20   laptops and how they work?

21   A    Yes, sir, I am.

22   Q    Are you familiar to some extent with these

23   inverters and how they work?

24   A    I am.

25   Q    Would 3 A, for example, a laptop of that sort,

1    be come partible in use with 11 A to power it when

2    one's not near a power outlet?

3    A    I use them myself, yes, sir.

4         MR. HOFFER:  If I could have one moment, Your

5    Honor?

6         THE COURT:  Yes, sir.

7         (Pause.)

8         MR. HOFFER:  Thank you, Your Honor.  I have no

9    further questions of this witness.

10        THE COURT:  If there is nothing further then,

11   Mr. Catchings, you may step down.  You're excused

12   with our thanks.

13        (End of excerpt of proceedings.)

14

15                 C E R T I F I C A T E

16        I, Kerry Mercade, certify that the foregoing is

17   a correct transcript from the record of proceedings

18   in the above-entitled matter.

19                                 S/Kerry Mercade

20                                 Kerry Mercade
                                   Court Reporter
21

22

23

24

25