```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3     UNITED STATES OF AMERICA

 4

 5          vs.                 CASE NO. 8:07-cr-342-T-23TBM
                                March 20, 2009
 6                              Tampa, Florida

 7

       YOUSSEF SAMIR MEGAHED,
 8
            Defendant.
 9
       _____/
10
                 TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                  (TESTIMONY OF DWIGHT ELLISOR)
                 BEFORE THE HONORABLE STEVEN D. MERRYDAY
12                  UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     For the Government:   JAY HOFFER
                             ROBERT MONK
15                           Assistant U.S. Attorneys
                             400 N. Tampa Street, Suite 3200
16                           Tampa, Florida 33602
                             813/274-6000
17
       For the Defendant:   ADAM ALLEN
18                          DIONJA DYER
                            Assistant Federal Defenders
19                          400 N. Tampa Street, Suite 2700
                            Tampa, Florida 33602
20                          813/228-2715

21     Court Reporter:      Kerry Mercade
                            801 N. Florida Avenue
22                          Suite 15A
                            Tampa, Florida 33602
23                          813/301-5024

24

25     Proceedings recorded and transcribed by
       computer-aided stenography.
```

1

INDEX

2

**GOVERNMENT WITNESS DWIGHT ELLISOR**
3  Direct Examination by Mr. Monk...........3
Cross-Examination by Mr. Allen...........13
4  Redirect Examination by Mr. Monk.........24

5

**GOVERNMENT'S EXHIBITS**

6

| 7 Number | Description | Page |
|---|---|---|
| 8  16 A | Coleslaw container.............9 | |
| 16 B | Photographs (contents/16 A)....7 | |
| 9  34 | Major case prints (Megahed)....10 | |
| 35 | Major case prints (Mohamed)....10 | |

10

**DEFENDANT'S EXHIBITS**

11
1 K-R     Photographs (Contents/Camry)...19
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    GOVERNMENT WITNESS, DWIGHT ELLISOR, SWORN

2    THE COURT:  State your name, please.

3    THE WITNESS:  Dwight M. Ellisor.

4    THE COURT:  Will you spell you last name for us?

5    THE WITNESS:  Certainly, sir.  E-L-L-I-S-O-R.

6    THE COURT:  Please have a seat in the witness

7    stand.  Make yourself comfortable in the chair and I

8    will recognize Mr. Monk for your Direct Examination.

9                    DIRECT EXAMINATION

10   BY MR. MONK:

11   Q    Good morning, sir.

12   A    Good morning, sir.

13   Q    How are you employed?

14   A    I'm employed with the Federal Bureau of

15   Investigation as a Special Agent.

16   Q    And what is your present assignment?

17   A    Presently, I'm assigned to the cyber squad in

18   Columbia, South Carolina.

19   Q    What was your assignment in August 2007?

20   A    I was assigned to the cyber squad, but I also am

21   the senior team leader for the FBI's evidence

22   response team referred to as ERT.

23   Q    Back in August of 07, and specifically on August

24   4th of 2007, did you have occasion to go to the Goose

25   Creek area of South Carolina in the late afternoon,

1    evening hours?

2    A     No, sir.  I was attending cyber-related training

3    in Las Vegas.

4    Q     Did you on a subsequent date, specifically on or

5    about August 28th of 2007, have occasion to examine a

6    silver-ish Toyota Camry?

7    A     Yes, sir, I did.

8    Q     And where geographically was that examination

9    performed in?

10   A     The sheriff's office had an impound lot not far

11   from the detention center.  The exact address I'm not

12   sure.  I followed one of the officers to the impound

13   lot.

14   Q     Did you acquire any evidence or any items from

15   that Toyota Camry which you took into evidence?

16   A     Yes, sir, I did.

17   Q     Specifically, with the Court's permission, I'd

18   like to show the witness what has been admitted in

19   evidence as Government's Exhibit 24 K.

20   A     Yes, sir.  This is the trunk of the vehicle, a

21   photograph that we took.

22   Q     On that date, referring to 24 K, did you

23   retrieve anything from that vehicle that is -- that

24   apparently is depicted in this photograph, 24 K?

25   A     Yes, sir.  There is a small, clear, plastic

1    container a little bit to the left of the photograph

2    you're looking at.

3        THE COURT:  Mr. Ellisor, you have the ability

4    with your finger to touch that screen in front of

5    you.  I believe you can make a line.

6        THE WITNESS:  Thank you, sir.  This container

7    right here, it had a Wal-mart sticker on it that

8    identified it as a coleslaw kit.

9    BY MR. MONK:

10   Q    If that was within that vehicle on August 28th,

11   apparently it was not collected as evidence on August

12   4th or August 5th of 2007, is that correct?

13   A    That's correct.

14   Q    And can you tell us when you -- if you did

15   examine it -- did you examine the coleslaw container

16   and it's contents, first of all?

17   A    What I did was I opened up the container and I

18   took a small swabbing of the material.  Inside it was

19   wrapped with what appeared to be a white coffee

20   filter and within that coffee filter was a brown

21   substance.  It was oily, sticky.  It had a sweet

22   smell aroma to it.  I'm not sure what the material

23   was.

24   Q    This was a couple of weeks after the 4th and the

25   5th, correct?

1    A    Yes, sir.

2    Q    Aside from its smell, the sweet smell, describe

3    the physical appearance.

4    A    There were three -- I guess you could say it

5    almost looked like fecal matter. There were two

6    longer pieces and one shorter piece. I think in my

7    report once we weighed it, it was .73 grams. I

8    believe we have a photograph of the material.

9    Q    Now, did -- why did you swab it?

10    A    On the night of the incident, when the -- on

11    August 4th or 5th, when the team went down to Goose

12    Creek to collect evidence from the vehicle, to my

13    understanding from the debrief of the other team

14    members, there was a canine unit that walked around

15    the vehicle and it had defecated near the car. It

16    was very late at night. It was dark. When the team

17    was searching the car, they found this container.

18    When they opened it up, it resembled feces. Well,

19    with the remains that the dog had left there, someone

20    had stepped in it and smeared it on the pavement all

21    around the car. When the team was there and they saw

22    that and then smelling what they smelled from the

23    animal, they assumed that it was fecal matter and

24    they closed it back up. They left it and that's why

25    it wasn't collected that evening.

```
 1          MR. MONK:  All right.  If I may have a moment?
 2           (Pause.)
 3          MR. MONK:  With the Court's permission, I'd like
 4     to show you what has been marked as 16 A and 16 B
 5     proposed exhibits.
 6          THE COURT:  Yes, sir.
 7     BY MR. MONK:
 8     Q    Take a look, first of all, at 16 bravo and tell
 9     me whether that accurately depicts what you observed
10     in that coleslaw container?
11     A    That is.  That's the picture we took on or about
12     the 28th.
13          MR. MONK:  I'd move for admission of proposed
14     Exhibit 16 bravo, Your Honor.
15          THE COURT:  Hearing to objection, Exhibit 16 B
16     is received at the request of the United States.
17          (Government's Exhibit No. 16 B is received into
18     evidence.)
19          MR. MONK:  May I publish it?
20          THE COURT:  You may.
21     BY MR. MONK:
22     Q    That's the first page, correct?
23     A    Yes, sir.  Yes, sir.  That's what it looked like
24     when I pulled back what I believed to be a coffee
25     filter.
```

1    Q    Now, why did you --

2         THE COURT:  Mr. Ellisor, is the color that we

3    see or that you see on the screen there true to the

4    original?

5         THE WITNESS:  Yes, sir.  It was a brownish

6    color.  It was very close to that.

7         THE COURT:  Is the color that we see the color

8    that you saw then?

9         THE WITNESS:  I'm sorry.  It's a little bit

10   darker here.  It's not as red.  The material was

11   actually more of a brown color.

12        MR. MONK:  Your Honor, if I may, the photograph

13   itself is browner and less yellow around the edges of

14   the coffee filter than is depicted on the screen.

15   BY MR. MONK:

16   Q    Now, you said that you swabbed the substance

17   within the coleslaw container?

18   A    Yes, sir.  Once it was reported back to the

19   Tampa Division that they thought it was possible

20   fecal matter in the container, the Tampa Division

21   asked the Columbia Division of the FBI to go back and

22   to swab it for any DNA.  That's why I was called and

23   asked to go down there to retrieve that material.

24   Q    And 16 alpha that's before you, do you recognize

25   that, sir?

1  A    Yes, sir.  This is the container that we

2  collected and this is my handwriting on the evidence

3  sticker label that's been placed on it.

4  Q    When you took this into evidence, did you secure

5  it in some manner to ensure its integrity and also

6  create a record so that its identification as what

7  you retrieved from the car could ultimately be traced

8  back to you?

9  A    Yes, sir.  It was turned into evidence control

10  and assigned a chain of custody log.

11      MR. MONK:  I'd move for admission of proposed

12  Exhibit 16 A, Your Honor.

13      MR. ALLEN:  No, objection.

14      THE COURT:  Exhibit 16 A is received at the

15  request of the United States.

16      (Government's Exhibit No. 16 A is received into

17  evidence.)

18  BY MR. MONK:

19  Q    Now, on that same date, did you have occasion to

20  have contact with individuals identified to you to be

21  Mr. Youssef Megahed and Mr. Ahmed Mohamed?

22  A    Yes, sir, I did.

23      MR. MONK:  Let me show you, with the Court's

24  permission, what has been marked as proposed exhibits

25  34 and 35.

1       THE COURT:  Yes, sir.

2    BY MR. MONK:

3    Q    Do you recognize those, sir?

4    A    Yes, sir.  Exhibit 34 is the fingerprint cards

5    that we collected from Mr. Megahed.

6    Q    Okay.  And proposed Exhibit 35?

7    A    These were the major case fingerprints that we

8    collected from Mr. Mohamed.

9        MR. MONK:  I move for admission into evidence of

10    those proposed exhibits, Your Honor.

11       MR. ALLEN:  No objection, Your Honor.

12       THE COURT:  Exhibits 34 and 35 are received.

13       (Government's Exhibit Nos. 34 and 35 are

14    received into evidence.)

15       MR. MONK:  And Your Honor, may I, just so that

16    the jury has an idea of what one of these cards looks

17    like, briefly publish one?

18       THE COURT:  Yes, sir.

19    BY MR. MONK:

20    Q    This is from Exhibit 34.  Tell us how you-all go

21    about taking these fingerprints and for what purpose.

22    First of all, the method that you use.

23    A    The method that we use.  When agents go through

24    the academy, we're trained to collect major case

25    prints.  Being the evidence response team leader, we

1     also receive additional training.

2        With this particular card, you want to collect

3     all ten fingers.  What the examiner is looking at for

4     these cards is really the detail right here in this

5     area on these top lines, and then on the bottom lines

6     you're looking for as much detail as you can get

7     through here, and then on these two lower areas here,

8     it's the thumb and the tip.  That's how they trained

9     us to collect that information to turn into our

10    examiners.

11    Q    Let me ask you this, Agent Ellisor, when you

12    acquired these fingerprints and put them on the

13    cards, do you simply have the individual whose prints

14    you're taking on his or her own plop their fingers

15    and thumbs down on the card?

16    A    It's -- we actually direct their hands.  When

17    you work together, it's very easy to accomplish.  But

18    their hands are directed by us.

19    Q    When you say you direct their hands, does that

20    mean that you actually take their fingers, the digits

21    and the thumb, and roll them from one side to the

22    other?

23    A    Yes, sir, that's correct.

24    Q    And what is the purpose of carefully rolling the

25    digits with the -- the fingers have ink on them,

1    correct?

2    A    Correct.  If it's not done properly, the

3    fingerprints can be smeared, the inked prints on the

4    paper, and then the card will need to be recompleted.

5    Q    Is it important for comparison purposes that

6    these ridges that are apparent on this exhibit that

7    is up on the screen that the ridges are defined and

8    distinct?

9    A    Yes, sir.

10   Q    And is it correct that if the digits are not

11   carefully rolled it's very easy to smudge a

12   fingerprint?

13   A    That's correct.

14   Q    Once they're smudged and the ridges are not

15   distinct, does that result in an unreadable or

16   unusable print?

17   A    Yes, sir.  We'd have to create a new card.

18       MR. MONK:  May I have a moment, sir?

19       THE COURT:  You may.

20        (Pause.)

21       MR. MONK:  I'd like to show the witness what has

22   been admitted into evidence as Exhibit 71.

23       THE COURT:  Yes, sir.

24   BY MR. MONK:

25   Q    Do you recognize this as Mr. Ahmed Mohamed?

1    A    Yes, sir.

2         MR. MONK:  Nothing further, Your Honor.

3         THE COURT:  Thank you, Mr. Monk.

4         Has the defense any cross-examination for this

5    witness?

6         MR. ALLEN:  Yes, please, Your Honor.

7         THE COURT:  You're recognized for that purpose.

8                      CROSS-EXAMINATION

9    BY MR. ALLEN:

10   Q    Agent Ellisor, I believe you testified you're a

11   member of the cyber squad?

12   A    Yes, sir, that's correct.

13   Q    In my mind that -- I think of cyber space.  What

14   exactly does the cyber squad do?

15   A    We investigate crimes dealing with child

16   pornography, criminal intrusions into networks.  We

17   also deal with foreign entities trying to weaken the

18   American infrastructure through their computer

19   systems.

20   Q    I'm showing you what's been previously

21   introduced as Government's Exhibit 16 B.  That's the

22   material and substance that was in the coleslaw

23   container, correct?

24   A    Yes, sir.

25   Q    And it was very wet?

1    A    It was a sticky wet.  It was very moist.

2    Q    Was the stickiness similar to like a syrup?

3    A    It could be characterized that way, yes, sir.

4    Q    And you also smelled it and it had a sweet sort

5    of smell to it?

6    A    Yes, sir.

7    Q    Would that also be consistent with a syrup

8    sweetness?

9    A    Like a Karo syrup, yes, sir.

10    Q    When you observed this, this was on August 28?

11    A    Yes, sir, I believe, on or about.

12    Q    And the vehicle was stopped on August 4th,

13    correct?

14    A    Yes, sir.

15    Q    So it was 24 days after the vehicle stop and

16    this substance is sticky, wet, and moist?

17    A    Yes, sir.  This is how I found it.

18    Q    Now, showing you the second page of 16 B, which

19    is a farther back picture, I guess, or a picture of

20    the coleslaw container with the substance inside?

21    A    Yes, sir.

22    Q    You testified that you swabbed that for DNA?

23    A    Yes, sir.

24    Q    And then the DNA was sent to a lab?

25    A    The FBI lab.

1    Q    And was that -- the purpose of that was show

2    they could see if they could determine who may have

3    actually possessed this coleslaw container at a

4    previous time?

5    A    No, sir.  When I went there, I was expecting to

6    find fecal matter.  And I had the DNA collection

7    swab.  Once I opened it up and realized that it

8    wasn't that material, I had no idea what this is.  So

9    what I did was I took the DNA swab, I swabbed the

10   material.  You can see in this particular picture,

11   this is the area that I ran the -- it's basically a

12   Q-tip.  I swabbed the material.  I packaged it

13   separately.  Then I also packaged this material and

14   sent it up to the lab for examination.

15   Q    So you didn't swab the outside of the container,

16   you were swabbing the actual what appeared to be

17   fecal matter for DNA?

18   A    Yes, sir.  Originally that's what I was planning

19   on doing.  Once I saw this material, I had no idea

20   what it was, so I took a sample and sent that to the

21   lab along with this material.

22   Q    I guess because if it was -- if an animal had

23   produced that, you could maybe get DNA from it,

24   correct?

25   A    Animal or human.  If it were indeed fecal

1   matter, yes, sir.

2   Q     Showing you what's Government's Exhibit 34.  And

3   this would be the fingerprints from Youssef Megahed,

4   correct?

5   A     Yes, sir.

6   Q     And those fingerprints were sent off to the lab,

7   correct?

8   A     Yes, sir.  They were sent off to Clarksburg,

9   West Virginia.

10  Q     And that was so the known prints of Youssef

11  Megahed could be compared to any prints that may have

12  been found on any items that were recovered in

13  evidence, correct?

14  A     Correct.  They could be used that way, yes, sir.

15  Q     And the same thing with Mr. Mohamed's

16  fingerprint card?

17  A     Yes, sir.

18  Q     Now, I notice on here you have Youssef Megahed's

19  Social Security number, correct?

20  A     Yes, sir.

21  Q     I notice that there was no Social Security

22  number on Mr. Mohamed's fingerprint card.  Do you

23  know why that is?

24  A     I do not recall if it was -- this was the card I

25  completed.  There was another agent with me, Mark

1    Williamson.  He completed one set and I completed the

2    other set.  This particular set of Mr. Megahed was

3    completed by me.  I don't know if it's -- if we did

4    not know --

5         THE COURT:  The question was do you know why --

6         THE WITNESS:  No.

7         THE COURT:  -- it is on one and not on the

8    other?

9         THE WITNESS:  No, sir, I do not.

10   BY MR. ALLEN:

11   Q    In addition to taking Youssef Megahed's

12   fingerprints, you also took a DNA swab, did you not,

13   from Mr. Megahed?

14   A    Yes, sir.  We took photos, we took a DNA swab,

15   fingerprints, that's correct.

16   Q    And similar to the fingerprints, the DNA from

17   Youssef Megahed was sent to the lab so that if DNA

18   was found on any of the evidence collected, there

19   could be a comparison between Youssef Megahed's known

20   DNA and any DNA that may have been found on any of

21   the evidence that was collected in this case?

22   A    Yes, sir.

23   Q    And that would be the same with Mr. Mohamed's

24   DNA, correct?

25   A    Correct.

1  Q    Now, you took more pictures than just the two

2  that you've reviewed here today, correct?

3  A    Yes, sir.

4       MR. ALLEN:  May I approach the witness, Your

5  Honor?

6       THE COURT:  You may.

7  BY MR. ALLEN:

8  Q    Sir, I'm about to hand you Defense Exhibits 1 K,

9  1 L, 1 M, 1 N, 1 O, 1 P, 1 Q, and 1 R.

10      MR. ALLEN:  May I approach the witness, Your

11 Honor?

12      THE COURT:  You may.

13 BY MR. ALLEN:

14 Q    Sir, if you could look at these exhibits and let

15 me know if those are some of the photographs that you

16 took on that day.

17 A    Yes, sir, these are.

18 Q    Do those photographs fairly and accurately

19 depict the items you took pictures of on August 28th,

20 2007?

21 A    Yes, sir.

22      MR. ALLEN:  Your Honor, at this time I'd move

23 into evidence Defense Exhibits 1 K through 1 R.

24      THE COURT:  Hearing no objection, Exhibits 1 K

25 through R are received at the request of the defense.

```
 1          (Defendant's Exhibit Nos. 1 K-R are received

 2     into evidence.)

 3          MR. ALLEN:  Permission to publish, Your Honor?

 4          THE COURT:  Sure.  Yes, sir.

 5     BY MR. ALLEN:

 6     Q    Agent Ellisor, I'm now showing you Defense

 7     Exhibit 1 K.  Do you recognize what 1 K is?

 8     A    Yes, sir.

 9     Q    What is it?

10     A    This is the vehicle that was in the impound lot

11     that we went to collect evidence from on or about the

12     28th.

13     Q    And that would be the Toyota Camry?

14     A    Yes, sir.

15     Q    Now showing you what has been introduced as 1 L,

16     Defense Exhibit?

17          THE COURT:  Are we going to go through a series

18     of these exhibits, Mr. Allen?

19          MR. ALLEN:  Yes, sir.

20          THE COURT:  They are not in dispute, I take it.

21     His authorship of them is not in dispute?

22          MR. ALLEN:  Correct.

23          THE COURT:  There any new material in any of

24     these?

25          MR. ALLEN:  There are some items that I would
```

1    want to point out in there that have not --

2         THE COURT:  Let's get to it.

3         MR. ALLEN:  Yes, sir.

4    BY MR. ALLEN:

5    Q    And in Exhibit 1 L, that would be the front seat

6    area, correct?

7    A    Yes, sir.  The driver's area.

8    Q    Do you recall noticing when you were searching

9    the vehicle sand and dirt on this front floor mat?

10   A    No, sir.

11   Q    I'm sorry?

12   A    No, sir, I do not recall.

13   Q    I'm showing you 1 M, which is antifreeze coolant

14   with NAPA on it, correct?

15   A    Correct.

16   Q    Do you recall there being actual fluid inside

17   that actual antifreeze coolant container?

18   A    Yes, sir.

19   Q    And that was found in the trunk of the vehicle,

20   was it not?

21   A    I would have to see the document that I prepared

22   to give you the exact location, sir.

23   Q    Would that be your photo log?

24   A    That may annotate it or the FD 302 that I

25   prepared.

1    Q    Do you have that with you?

2    A    I do, sir.

3    Q    Okay.  If you could look at that.

4    A    According to my report, a white plastic

5    one-gallon container labeled NAPA antifreeze coolant

6    was located in the trunk compartment of the vehicle.

7    Q    Thank you.  Let me show you 1 N.  That's a

8    photograph of the trunk of the vehicle, is it not?

9    A    It is, sir.

10   Q    Do you see this box right here to the left of

11   the trunk area that my finger is pointing to?

12   A    Yes, sir.

13        MR. ALLEN:  Your Honor, may I approach the

14   witness?

15        THE COURT:  You may.

16   BY MR. ALLEN:

17   Q    Sir, can you read what's written on that box?

18        THE COURT:  Is what's written on that box

19   legible?

20        MR. ALLEN:  It is when you look at it closely.

21        THE COURT:  All right.  Read it to him.  Do you

22   have question about it?

23        MR. ALLEN:  Yes, sir.

24        THE COURT:  He doesn't know what's on there.

25   You're not asking to testify.  You are asking him to

1    read.  You can read as well as he can.  If you want

2    to ask him a question, just read it to him and ask

3    him your question.

4    BY MR. ALLEN:

5    Q     Sir, that was a box for a high output air pump,

6    was it not?

7    A     I can read the high output air pump, yes, sir.

8          THE COURT:  You have no independent recollection

9    of what the box was?

10         THE WITNESS:  No, sir.  My main concern was --

11         THE COURT:  I understand.  As you sit there, you

12   have no recollection one way or the other what the

13   box was?

14         THE WITNESS:  No, sir.

15         THE COURT:  Did hearing the reading of the text

16   of the box refresh your memory in any way?

17         THE WITNESS:  To tell you the truth, sir, I

18   really didn't pay much attention to that box.

19         THE COURT:  That's fine.  Thank you.

20         Mr. Allen?

21   BY MR. ALLEN:

22   Q     Did you ever open that box and look inside?

23   A     I do not recall.

24   Q     Let me show you 1 O.  Do you see this hard

25   plastic box here in the front of the trunk area?

1    A    Yes, sir.

2    Q    Did you ever open that up?

3    A    It was opened but I'm afraid I can't recall what

4    was inside unless there was a photo taken of the

5    interior of that container.

6         THE COURT:  Do you remember whether you opened

7    it or someone else opened it?

8         THE WITNESS:  I would have been taking the

9    photographs, so I do not recall opening it, sir.

10   BY MR. ALLEN:

11   Q    Do you at any time recall finding a ratchet set

12   in the vehicle, a tool set?

13   A    I'm afraid I don't recall, sir.

14   Q    Okay.

15        THE COURT:  Do you mean by that a set of socket

16   wrenches?  Is that what you're talking about?

17        MR. ALLEN:  Yes, sir.

18        THE COURT:  Okay.

19   BY MR. ALLEN:

20   Q    Sir, I'm about to hand you what's been marked

21   for defense identification as 1 B, 1 E, 1 F, 1 G, 1

22   H, and 1 I.

23        MR. ALLEN:  May I approach the witness, Your

24   Honor?

25        THE COURT:  You may.

```
1     BY MR. ALLEN:

2     Q     Sir, if you could look at these items.

3     A     (Witness complied.)

4     Q     Do you recognize these items?

5     A     No, sir.

6     Q     No?

7     A     No, sir.

8     Q     None of them?

9     A     No, I do not.

10    Q     Was there another officer present with you

11    actually searching and retrieving items from the

12    vehicle on August 28th?

13    A     On the search that we did, we focused mainly on

14    any kind of hazardous or biohazard or what we thought

15    might be fecal matter in the container.  The vehicle

16    had been previously searched.  Those items might have

17    been retrieved from one of the earlier searches, sir.

18          MR. ALLEN:  I don't have any further questions,

19    Your Honor.

20          THE COURT:  Thank you, Mr. Allen.

21          Has the United States redirect examination for

22    this witness?

23          MR. MONK:  Yes, sir.

24          THE COURT:  You're recognized for that purpose.

25                      REDIRECT EXAMINATION
```

1   BY MR. MONK:

2   Q    Special Agent Ellisor, you told us on

3   Cross-Examination I believe that you were swabbing

4   the contents of that coleslaw container because it

5   was suspected fecal matter, is that correct?

6   A    When I initially travelled down there, that was

7   the intention that I had to collect DNA from what

8   they thought was fecal matter.  Once I opened the

9   container, I realized it wasn't fecal matter.  I did

10  not know what the material was.

11  Q    Well, the swabbing of the material in the

12  container for DNA presumably would have done for the

13  purpose of trying to identify a human being

14  associated with that substance had it in fact been

15  fecal matter?

16  A    Yes, sir.

17  Q    If I understood correctly or understand

18  correctly, at that time the two occupants of the

19  vehicle, Mr. Megahed and Mr. Mohamed, were in

20  custody, correct?

21  A    Correct.

22  Q    Then was it for the purpose of identifying one

23  of those individuals or what?

24  A    When I conducted the swabbing on the 28th, sir?

25  Q    Yes.

1   A    That was just to have a small sample.  The lab

2   doesn't always need the whole container.  If they

3   have a swabbing of the material, they can run their

4   tests on that, sir.  What I did by collecting that

5   swab is giving them the option of either using the

6   swabbing for their testing or the original contents.

7        THE COURT:  What was the investigative objective

8   of capturing a sample of that material?

9        THE WITNESS:  Just to send it to the lab so it

10  could be analyzed, sir.

11       THE COURT:  For the sake of running an analysis

12  or was there some investigative objective of

13  capturing that information?

14       THE WITNESS:  Well, it would have been an

15  investigative method to determine what the material

16  was.

17       THE COURT:  Go ahead, Mr. Monk.

18  BY MR. MONK:

19  Q    But was there an investigative objective?

20       THE COURT:  What were you trying to find out?

21  By saving and evaluating that material, what were you

22  trying to find out?

23       THE WITNESS:  To determine what the material

24  was, sir.

25  BY MR. MONK:

1    Q    Now, you told us that the -- your intention in

2    reviewing the contents of the car, which had already

3    been searched was to evaluate any potentially

4    hazardous materials, is that correct?

5    A    Yes, sir.

6    Q    Did you do any perform any examination with

7    respect to the antifreeze container that is depicted

8    in one of the photos?

9    A    The antifreeze container, I opened up.  It

10    appeared to be a clear liquid inside.  I used my hand

11    to whiff it toward me to see if there was any smell.

12    It was odorless.  There were no samples collected of

13    that, sir.

14    Q    Do you know whether in fact the entire contents

15    of that automobile and the automobile itself were

16    subsequently seized pursuant to a search and seizure

17    warrant and driven by agents down to Tampa and housed

18    in evidence storage in Tampa?

19    A    No, sir.  My involvement was very limited.  It

20    ended at that point once the samples were collected.

21    MR. MONK:  That's all I have.

22    THE COURT:  Anything further, Mr. Allen?

23    MR. ALLEN:  No, Your Honor.

24    THE COURT:  The agent may step down.  You are

25    excused with our thanks.

1          THE WITNESS:  Thank you, sir.

2          (End of excerpt of proceedings.)

3

4                    C E R T I F I C A T E

5          I, Kerry Mercade, certify that the foregoing is

6     a correct transcript from the record of proceedings

7     in the above-entitled matter.

8                                   S/Kerry Mercade

9                                   Kerry Mercade
                                    Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25