1                    UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA

2                         TAMPA DIVISION

3    UNITED STATES OF AMERICA

4

5           vs.             CASE NO. 8:07-cr-342-T-23TBM
                        March 20, 2009

6                        Tampa, Florida

7

    YOUSSEF SAMIR MEGAHED,

8

        Defendant.

9

    _____/

10
          TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS

11          (TESTIMONY OF PAULETTE POLIQUIN)
      BEFORE THE HONORABLE STEVEN D. MERRYDAY

12            UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    For the Government:  JAY HOFFER
                          ROBERT MONK

15                     Assistant U.S. Attorneys
                     400 N. Tampa Street, Suite 3200

16                     Tampa, Florida 33602
                     813/274-6000

17

    For the Defendant:   ADAM ALLEN

18                     DIONJA DYER
                     Assistant Federal Defenders

19                     400 N. Tampa Street, Suite 2700
                     Tampa, Florida 33602

20                     813/228-2715

21    Court Reporter:      Kerry Mercade
                     801 N. Florida Avenue

22                     Suite 15A
                     Tampa, Florida 33602

23                     813/301-5024

24

25    Proceedings recorded and transcribed by
    computer-aided stenography.

1                            **INDEX**

2
**GOVERNMENT WITNESS PAULETTE POLIQUIN**

3    Direct Examination by Mr. Monk............3
     Cross-Examination by Ms. Dyer............42
4    Redirect Examination by Mr. Monk.........61

5                    **GOVERNMENT'S EXHIBITS**

6

7    **Number        Description                 Page**

8    48 A           Photographs (identified).......23
     50 A           Consent to search (E. Nedro)...37
9    50 B           Consent to search (E. Nedro)...38
     51 A - D       Photographs (East Nedro).......39
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GOVERNMENT WITNESS, PAULETTE POLIQUIN, SWORN

THE COURT:  State your name, please.

THE WITNESS:  Paulette Poliquin.

THE COURT:  Will you spell your last name?

THE WITNESS:  P-O-L-I-Q-U-I-N.

THE COURT:  Please have a seat in the witness stand, make yourself comfortable.  I will recognize Mr. Monk for your Direct Examination.

DIRECT EXAMINATION

BY MR. MONK:

Q    Good morning, ma'am.

A    Good morning.

Q    During the course of your testimony, could you please speak directly into the microphone so that your voice carries; okay?

A    Okay.

Q    Thank you.  Ma'am, what part of town do you reside in?

A    Spring Hill.  I'm sorry.  Sulfur Springs, Tampa.

Q    And your specific address is what?

THE COURT:  No.  We don't need her residence address on the record.

BY MR. MONK:

Q    Do you reside close to the USF campus?

A    Yes, I do.

1    Q    I want to direct your attention back to the

2    summer of 2007 and ask you whether you came to know

3    an individual during the summer of 2007 identified to

4    you to be Ahmed Mohamed?

5    A    Yes.

6    Q    And how did you come to know Ahmed Mohamed?

7    A    I was renting a room and he -- I had an ad in

8    *The Oracle* and -- that's the university paper.  He

9    responded to my ad.  I interviewed him and rented a

10   room to him.

11   Q    And in what month did you rent Mr. Mohamed a

12   room?

13   A    He moved in around the beginning of June.

14   Q    Of 2007?

15   A    2007.

16   Q    When did he move out, if he did move out?

17   A    He didn't move out -- I told him he had to

18   leave.  August -- I told him he had to leave I guess

19   it must have been July the -- early July because he

20   left on August 4th.

21   Q    He left on August the 4th?

22   A    2007.

23   Q    And why is it that you told him he had to leave?

24   A    Because he wasn't a good tenant.  We had

25   discussed that I didn't want people coming over to my

```
 1    home because it was a private home.  I'm a very quiet
 2    person.  And that that was not going to be
 3    acceptable.  He had lot of people coming over.  He
 4    was -- well, he wasn't a good tenant.  He was doing
 5    things that I felt were even, you know, were not okay
 6    with me at all.  He propositioned me sexually.  He
 7    was just not -- I gave him a notice.  I told him,
 8    "You're out of here."
 9    Q    Did you in fact report him to the Tampa Police
10    Department?
11         MS. DYER:  Objection, leading, Your Honor.
12         THE COURT:  Overruled.
13    BY MR. MONK:
14    Q    Did you in fact report him to the Tampa Police
15    Department?
16    A    I felt very uncomfortable with what happened.
17         THE COURT:  Mr. Poliquin, in fairness, the
18    question which was mildly suggestive had to do with
19    whether or not a report was made.  Was there one?
20         THE WITNESS:  Yes.
21         THE COURT:  Mr. Monk?
22    BY MR. MONK:
23    Q    And you told us I believe that although he was
24    -- was one of the rules that he was not supposed to
25    have visitors over to your house?
```

1    A    I told him when I first interviewed him that on

2    the weekend if he wanted to have somebody over for a

3    meal and a movie or something that would be fine.

4    Definitely nobody was to come to my house and be in

5    my house after 11:00 in the evening because I get up

6    at five o'clock in the morning.  So basically the

7    rule was no one after 11:00 during the week and on

8    the weekend a little bit later, but I didn't want to

9    have people during the daytime coming over to my

10    house.  I didn't want a lot of body traffic is what I

11    told him.

12    Q    Did you live by yourself?

13    A    Yes.

14    Q    Unmarried?

15    A    Yes.

16    Q    And did the visitors that Mr. Mohamed would have

17    over to your house, did they fall within the scope of

18    what was permissible or not?

19    A    I don't understand your question.

20    Q    Okay.  Did any of the visitors stay the night?

21    A    A couple of times I woke in the morning and

22    there was two people sleeping on my couches in the

23    living room.  But they were just sleeping, and

24    although I didn't like it, I didn't think it was

25    like, "Oh my God, this is a terrible thing."

1    Q    Do you think you would recognize any of the
2    frequent visitors to your -- to Mr. Mohamed, if you
3    saw them again?
4    A    Yeah.  Well, yes.  I mean, if I saw them enough,
5    yes.
6    Q    I'm sorry?
7    A    If I saw them enough, frequently enough, I would
8    recognize them.  There were some that I didn't see
9    often, so --
10   Q    Please look around the courtroom and tell me
11   whether you recognize any individual or individuals
12   who were frequent visitors to Mr. Mohamed while he
13   was renting a room from you?
14   A    Okay.  I recognize him for sure.
15   Q    Just for the record, ma'am, where are you
16   pointing?  At the counsel table here?
17   A    Um-hum.
18   Q    The gentleman on the end with the white shirt
19   and tie?
20   A    Um-hum.
21       MR. MONK:  For the record indicating, with the
22   Court's permission, the defendant Youssef Megahed.
23   BY MR. MONK:
24   Q    Look around the courtroom.  Anybody else that
25   you recognize?

1    A    No.

2    Q    Now, the visitors, did you ever come to learn

3    their names?  For example, the gentleman that you've

4    just identified, did you ever come to learn his name?

5    A    No.  I stayed away from them as much as

6    possible.  I was upset, so I stayed away.  I just

7    stayed in my room when they would come.  I knew they

8    were there because I heard voices, but I never -- any

9    time that I would -- I saw a couple of them because I

10    came to talk to Mohamed and tell them to leave

11    because it was past the time that they shouldn't have

12    been there.  I did see them a couple of times because

13    of that.  If like he was waiting for Mohamed to go

14    somewhere or whatever I would see him, but I never

15    spoke to him and I was never introduced to him.

16    Q    Did you learn -- you say you never spoke to him.

17    Did you learn what any of the visitors did for a

18    living?

19    A    There was one person that --

20    THE COURT:  Ms. Poliquin, I don't mean to be a

21    pest.

22    THE WITNESS:  Okay.

23    THE COURT:  The question simply was did you come

24    to know what some of Mr. Mohamed's visitors did for a

25    living.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Mr. Monk?

3     BY MR. MONK:

4     Q     And did you learn what this gentleman whom

5     you've just identified did for a living?

6     A     No.

7     Q     Did you observe any of the automobiles that any

8     of the visitors to Mr. Mohamed drove?

9     A     Yes.  There was one -- yes.

10    Q     What automobile do you recall?

11    A     It was a very light metallic greenish gray.  I

12    can't tell you more about it except it was a compact

13    car.  I was not paying attention to his vehicle that

14    much, although it was parked in my driveway a lot.

15    That's what it looked like to me, just a Honda or

16    whatever, some type of car like that.

17    Q     And did you frequently speak with Mr. Mohamed?

18    A     Not frequently, no.  When I found out about him,

19    the things that he was telling me, my flags went up

20    in my head.  Flags went up and I didn't speak to him

21    very often.

22    Q     Did Mr. Mohamed ever express to you his

23    sentiments concerning Americans?

24          MS. DYER:  Objection, Your Honor, calls for

25    hearsay.

1    THE COURT:  Why don't we come to the bench just

2    a minute?

3    (At side bar, on the record.)

4    MS. DYER:  If I may, Your Honor, I would also

5    add it's irrelevant to this case and this defendant.

6    THE COURT:  All right.  In either event I would

7    need to know the purpose for which this is being

8    elicited.

9    MR. MONK:  Yes, Your Honor.  I'll go back to,

10   with the Court's permission, what we have to prove in

11   this case, the elements of the offenses.  In this

12   case Mr. Megahed is charged in Counts 3 and 4 with

13   possession of explosives and Count 4 with -- I'm

14   sorry, transporting explosives and possession of a

15   firearm.  He's charged jointly with Mr. Mohamed and

16   as an aider and abetter.

17   While Mr. Mohamed is not on trial in this

18   courtroom, there -- Mr. Mohamed's intention, his

19   knowledge with respect to those charged offenses is

20   nevertheless relevant.  And the defense is aware of

21   that because the defense has advanced the theme in

22   opening statement and through cross-examination that

23   Mr. Mohamed's purpose in creating these items that

24   were in the trunk was that he had a harmless interest

25   in sugar rockets.  In fact, Mr. Mohamed has

1    demonstrated by a cornucopia of very anti-American

2    information extracted from his computer.  He was not

3    interested merely in the creation of sugar rockets

4    but in the creation of weapons.  As a matter of fact,

5    one of the defense proposed exhibits is an excerpt I

6    believe from Mr. Mohamed's HP laptop computer

7    addressing out of context sugar rockets.

8         Now, I expect that the witness will testify that

9    Mr. Mohamed frequently referred to Americans as

10   stupid, gullible, and we certainly are not offering

11   that for the truth of the matter asserted but only to

12   demonstrate Mr. Mohamed's state of mind.  And I also

13   anticipate the witness to testify that Mr. Youssef

14   Megahed, one of the frequent visitors she heard

15   engage in anti-American discussions with Mr. Mohamed.

16        With respect to Count 4, Your Honor --

17        THE COURT:  There is not going to be any

18   evidence in the case that any -- first of all, the

19   charge is possession and transportation.

20        MR. MONK:  Correct.

21        THE COURT:  Doesn't require the proof of any

22   object, objective.  There is no objective known or

23   suggested that I know of, that I've heard any tale

24   of, so this testimony -- if we assume that that both

25   is what the testimony is going to be, let's assume

1    the testimony is accurate and accurately portrays the

2    state of mind of Mr. Mohamed and even Mr. Megahed,

3    that it was -- that he's anti-American.  There's no

4    evidence that he had any such objective in mind or

5    even that such an objective was achievable by the

6    material that's in dispute here.  On the other hand,

7    it's highly inflammatory.

8         MR. MONK:  If Mr. Mohamed and Mr. Megahed had

9    only been charged in Count 3, that's correct, Your

10   Honor.  However, in Count 4, the firearms charge, the

11   Government is going to be -- because we have an

12   unassembled device, there is an intent -- there is an

13   intent aspect to that and that is that --

14        THE COURT:  To assemble it to do what?

15        MR. MONK:  The intent was to assemble it into a

16   weapon.

17        THE COURT:  There is nothing in the record to --

18   there's no foundation for that sort of conclusion at

19   this point.  I don't know that.  I don't know that --

20   I don't know what it was or what its potential was.

21   I mean, I don't want to suggest that I'm not aware

22   that under certain circumstances derivative materials

23   can be utilized by informed persons with resources

24   and time to make a propellant that includes KNO 3.  I

25   don't have any foundation to assume that -- to make

1    the leap from this defendant, whatever his attitudes,

2    to knowledge that the substance is even in the trunk.

3    Then I have to infer from -- first of all, I have to

4    infer that from something.  I don't know that there

5    is anything in the record except circumstance, albeit

6    suggestive circumstance.  Then I have to infer from

7    the presence of it a nefarious purpose for it, which

8    I would have to infer from uncontextualized

9    statements he might have made about Americans.  Did

10   he make the statement that he had the intent to

11   attack America?

12        MR. MONK:  No.

13        THE COURT:  Or make any destruction?

14        MR. MONK:  Mr. Megahed?  No.

15        THE COURT:  But you can find all sorts of people

16   generally in and around an election, for example, who

17   can give you an approximate number of Americans that

18   think they are stupid.  I say that with a smile on my

19   face, and I suspect that's not the tenor or tone of

20   what this witness will testify to.  You know, it's

21   one thing if you're a judge in a case to say, "Okay,

22   we're going to let the landlord say a few things

23   about in effect why she threw out of the house the

24   driver of the car."  We have got to find some place

25   to draw some lines here.  We've got to decide when,

1    if we're going to, we're going to draw it.

2        For me to permit evidence about a supposedly

3    militaristic use of a propellant, you are asking me

4    to infer that intent from mere statements.  You're

5    asking me to contribute the context to the

6    statements, and I think it's too far, Mr. Monk,

7    particularly, weighed over against the inflammatory

8    value of it.

9        MR. MONK:  May I make a representation to the

10   Court?

11       THE COURT:  Particularly in terms of not

12   overlooking the actual state of the nation and the

13   world at the moment.  It's particularly inflammatory.

14   Go ahead.

15       MR. MONK:  Your Honor, if the Court ultimately

16   admits, either because the defense opens the door or

17   in rebuttal, the Internet history, we will be able to

18   demonstrate that this defendant Mr. Megahed in the

19   account that he controlled on that E-Machine accessed

20   the following websites.

21       THE COURT:  Okay.  But you can make that proof

22   without testimony from Mr. Mohamed's landlord.

23       MR. MONK:  I understand, Your Honor.  However,

24   that evidence provides additional context.  That

25   evidence will show that it was not a matter of

1    merely, you know, clicking waywardly on and

2    accidently stumbling across this website or that

3    website.  As a result of volitional navigation, this

4    defendant accessing a destructive device website

5    entitled destructive device; a Qassam rocket website;

6    a website entitled how rocks work.

7        THE COURT:  I understand that, Mr. Monk.  Let me

8    ask the question this way.  If we permit this witness

9    to testify as to an anti-American statement made by

10    Mr. Megahed, what permissible inference or inferences

11    would you and the jurors to draw from that statement?

12    Just show me the chain.

13        MR. MONK:  Yes, Your Honor.  That Mr. Megahed

14    shared with Mr. Mohamed a sentiment concerning

15    America and America's involvement in activities in

16    the Middle East.  Mr. Mohamed clearly had an interest

17    in rocketry for the purpose of turning rockets into

18    homemade weapons.  And that when Mr. Mohamed

19    transported those devices in the car, the fact that

20    he -- that Mr. Megahed shared those interests and

21    those sentiments is evidence that -- it is evidence

22    probative of Mr. Megahed's knowledge of those items

23    in the trunk.  Not necessarily more likely than not,

24    but that's not the test under 401.

25        THE COURT:  I agree with that.  In other words,

1    you're are asking to admit evidence of a statement by

2    the defendant from which you would infer --

3        Here's my ruling:  This is a compounding of

4    inferences that is so highly attenuates the testimony

5    as to make it of low probative value.  It is

6    conspicuously inflammatory.  It doesn't have the

7    proper predicate in evidence at the moment.  And it

8    is rendered even lower in probative value by the

9    availability of other evidence of a greater probative

10   value on the same subject.

11       The hearsay objection is meritless and overruled

12   for the reason that the evidence is not offered to

13   prove the truth of it but merely to prove the fact of

14   it.  Not the truth of what was said, but the fact of

15   the statements having been made.  I think that we can

16   rely on the United States not to proffer anti-United

17   States statements for their truth.

18       Second, to the extent that the objection was a

19   403 objection or a relevance objection, it strikes me

20   as meritorious and rather distinctly so on this

21   record given the circumstances of this case.  I've

22   given a lot of thought to this and that connection

23   while not nonexistent depends upon this chain of

24   compound inferences and is for that reason of low

25   probative value and high inflammatory value.

1       MR. MONK:  I understand.

2       THE COURT:  I'm confident that's right.

3  Sustained.

4       MS. DYER:  Can I clarify something for the

5  record?

6       THE COURT:  You won.

7       MS. DYER:  I understand that, Your Honor.  The

8  question was calling for Mr. Mohamed's statement.

9  That's why I made the hearsay objection.

10       THE COURT:  Actually, you know, we were up here

11  one question too soon but we've just overlooked that

12  since we've gotten so far into it.  The question was,

13  did you learn of something or other statements.  That

14  was actually the question.  The question was:  Did

15  you -- you say never spoke to -- did Mr. Mohamed

16  express to you his sentiments concerning Americans?

17  That's just a yes or no.

18       MS. DYER:  I understand.  But then the Court in

19  its analysis talked about Mr. Megahed's statements.

20  I want to make sure that the ruling is to both

21  individuals.

22       MR. MONK:  I understand.

23       MS. DYER:  And based on that, Your Honor, I

24  would move for a mistrial because I believe based on

25  the exact same analysis the Court just went through,

1    back in May it ruled the same way and the Government

2    was aware of that.  So stating the question which

3    throws out there that obviously there were some

4    made --

5         THE COURT:  I ruled what now?

6         MS. DYER:  On May 2nd of this year, in my first

7    motion in limine, which this Court granted in part,

8    the only part that it did not grant was the 45-minute

9    video that is still pending.  You ruled that those

10   statements had no probative value and were as you

11   said several times today extremely inflammatory;

12   therefore, were not allowed to come in.  The

13   Government knew that; the Government asked the

14   question anyway.  Like I said, that through out the

15   fact that they obviously had been made or why ask the

16   question.  So I would move for a mistrial based on

17   the Government's intentionally violating the Court's

18   order in an extremely inflammatory way.

19        THE COURT:  That's overruled.  I don't think the

20   Government has violated any order by asking the

21   question.  Overruled, denied.

22        MR. MONK:  Can I make one comment?

23        THE COURT:  Yes.

24        MR. MONK:  First of all, the construction of

25   your order last May is wrong by counsel.  She's just

1   wrong.  That was not excluded.

2       Secondly, that motion in limine was filed before

3   the second superseding indictment was issued.  It was

4   directed basically to the 842 violation.  So there

5   was no ruling on that.

6       THE COURT:  Everyone else's memory of this is

7   better than mine, I'm sure.  I didn't have in my mind

8   any ruling that I had made that was so expansive as

9   to preclude that question.

10      MS. DYER:  That's fine.  And the record is the

11  record.

12      THE COURT:  And you may be right.  Whatever it

13  is, even if I did rule that on that that day, the

14  asking of that question, even if erroneous and even

15  if contrary to any ruling that I made is harmless.

16  On its face, it's harmless.

17      (End of side bar discussion.)

18      MR. MONK:  Your Honor, I'm going to go down a

19  different path now.

20      THE COURT:  Yes, sir.

21  BY MR. MONK:

22  Q    Ms. Poliquin, do you recall whether your tenant

23  Mr. Mohamed, whether you ever observed him in the

24  possession of any sort of model rockets?

25  A    Yes.

1  Q    Tell us the circumstances of that.

2  A    I was coming home.  I came home and I came in

3  through the side door and I saw Mohamed and I'm not

4  one hundred percent sure if it's, you know --

5  Q    Say again.  You're not --

6  A    I'm not one hundred percent sure if it was him,

7  but there was another person that they were carrying

8  a rocket, model of some type of rocket.  I thought,

9  "What the heck?  What's this?"  I asked him, I said,

10  "What is that?  What are you doing with that?  What

11  is that?"

12      And he said that it was a project that he was

13  work on for the university.  So I didn't know what to

14  think about it, you know, but it was very unusual.

15  That's what I can say.

16  Q    And approximately when was that?  What month?

17  A    July.

18  Q    Was it right around the 4th of July?

19  A    It was around that time, yes.  I can't

20  specifically say exactly when, but it was around that

21  time.

22  Q    And how -- describe this rocket.

23  A    Well, it took two people apparently to transport

24  it.  It was about -- I guess about this wide.

25  Q    Indicating about?

```
 1    A    About two and a half feet.

 2    Q    Okay.

 3    A    Platform type thing and in the middle there was

 4    a rocket type thing.  And that's all I can tell you

 5    to describe it.  I don't know how else to describe

 6    it.

 7    Q    Mr. Mohamed said this was a school project?

 8    A    Yeah.  He was doing something for the

 9    university.

10    Q    Now, you say that you're not one hundred percent

11    sure that it was Mr. Megahed, is that correct?

12    A    I mean, if I was asked that question when it

13    first -- you know, like, a year and a half ago, I

14    probably would -- whatever answer I gave then would

15    be the truthful one.  Now I don't know one hundred

16    percent who it was.  I know that there was another

17    person definitely.

18    Q    Well, were you in fact asked that question a

19    year and a half ago?  Were you in fact --

20    A    I think I was asked that, yes, sir.

21    Q    And were you shown some photos about a year and

22    a half ago?

23    A    Oh, yes.

24    Q    Were you asked at that time whether you could

25    identify the individual who was carrying that rocket
```

1    in company with Mr. Mohamed?

2    A    Yes, sir.  I mean, they were being very specific

3    at that time, yes, when I was being asked the

4    questions.

5    Q    Were you able to identify at that time the

6    person who --

7    A    I'm not -- now it's too far behind.  I don't

8    remember.

9         MS. DYER:  Your Honor --

10        THE COURT:  Wait just a moment.  What's the

11   legal basis for your objection?

12        MS. DYER:  Your Honor, I believe the testimony

13   was --

14        THE COURT:  Do you have a legal basis for your

15   objection?

16        MS. DYER:  Foundation, knowledge, personal

17   knowledge.  I can explain better if we can approach.

18        THE COURT:  Well, if you want to come back, you

19   can.  I don't see room here for an objection based on

20   that, so overruled.

21        MR. MONK:  May I approach the witness, Your

22   Honor?

23        THE COURT:  You may.

24        Ms. Dyer, the question began "were you able to

25   identify" and without respect to the answer, that

1   would only be a cross-examination issue, I think.

2       MS. DYER:  Yes, Your Honor.

3   BY MR. MONK:

4   Q    Ma'am, I've placed before you proposed Exhibit

5   48 A.  Will you open that up, please?  It consists of

6   a number of pages.  Would you please leaf through

7   those pages and look on the back of each page, okay?

8   A    Um-hum.

9   Q    Do you recognize your signature on the back of

10  each one of those pages?

11  A    Yeah, um-hum.

12  Q    And do you recognize the photographs?

13  A    Yes.

14  Q    Were you shown those photographs by a law

15  enforcement agent?

16  A    Yes.

17      MR. MONK:  I'd move for admission of proposed

18  Exhibit 48 A.

19      MS. DYER:  No objection.

20      THE COURT:  48 A is received.

21      (Government's Exhibit No. 48 A is received into

22  evidence.)

23      MR. MONK:  May I publish part of this, Your

24  Honor?

25      THE COURT:  You may.  Publish 48 A, right?

1      MR. MONK:  That's correct.

2   BY MR. MONK:

3   Q     Now, the top of the page -- each page we have a

4   photo and then on the bottom a number, correct,

5   ma'am?

6   A     Um-hum.

7   Q     Is that a yes?

8   A     Yes.

9   Q     And is this Mr. Mohamed, your tenant?

10  A     Yes.

11  Q     And this would be Photo Number 3, correct?

12  A     Yep, yes.

13  Q     And on the back of each photo the date and is

14  that your signature?

15  A     That's my signature.

16  Q     Looks like an R?

17  A     Yes.

18  Q     Is that right?

19  A     Just my first -- whatever, that's my signature.

20  Q     Task Force Agent Alan Brown.  Was he one of the

21  individuals who showed you these photos on October

22  15th?

23  A     That's the signature there, yeah.

24  Q     Do you know this gentleman over here at the end

25  of the table?

1    A    Um-hum.

2    Q    Has he been out to your house before?

3    A    Um-hum.

4    Q    Is that a yes?

5    A    Yes.

6    Q    Now, this device about two and a half feet long,

7    you mentioned a platform?

8    A    It was on something that they could carry it

9    with.  You know, I call it a platform.

10   Q    Where did they -- where did they take -- if you

11   saw, where did they take this rocket?

12   A    They took it out of my house.  I didn't really

13   follow them, so -- I know they -- it was two cars out

14   there.  That's all I know.  I didn't really pay

15   attention.  I would say that they took it to

16   Mohamed's car because I seem to -- but I'm not one

17   hundred percent sure.  It seems that they were taking

18   it to his car.

19   Q    Would your identification of where they were

20   taking it have been fresher in your mind a year and a

21   half ago when you spoke with the agent?

22   A    Yeah, yes, of course.  But, you know, it's been

23   awhile so --

24   Q    Now, aside from the length of the rocket and the

25   platform, further describe for us to the extent that

1    you can recall what other characteristics this rocket

2    had.

3    A    Well, it looked like a model for something.  It

4    was some type of a model.  That's all I can say.

5        THE COURT:  Well, did it have length?  If so,

6    how long was it?  Show us with your hands.

7        THE WITNESS:  It was about this high.

8        THE COURT:  I can't see your other hand.

9        THE WITNESS:  Sorry.  It was about this high.

10        THE COURT:  Hold your hands up like this.  How

11    long was it?

12        THE WITNESS:  Like that?

13        THE COURT:  Yes, ma'am.

14        THE WITNESS:  This way.

15        THE COURT:  Did it have circumference?

16        THE WITNESS:  Yes.  It was like a model rocket.

17        THE COURT:  Did it have color?

18        THE WITNESS:  Red and white, I think, were the

19    colors on there.

20        THE COURT:  Was it striped or polka dot or the

21    body one color and the wings another?

22        THE WITNESS:  I'm not sure one hundred percent.

23        THE COURT:  It generally looked red and white?

24        THE WITNESS:  Yes, general.

25        THE COURT:  Could you tell if it was made of one

1    particular kind of substance, say plastic?

2          THE WITNESS:  PVC, I would say.  Some type of

3    PVC, plastic.

4          THE COURT:  Was it shiny or dull?

5          THE WITNESS:  It was more like a shiny type

6    material.

7          THE COURT:  You say when you saw this rocket

8    there were two people?

9          THE WITNESS:  Two people.

10         THE COURT:  Were they both carrying it together?

11         THE WITNESS:  Yeah, they were carrying it

12   together.

13         THE COURT:  On their shoulders?

14         THE WITNESS:  No.  Like this.  They were both --

15   they had it like this.  One was backing up and you

16   know.

17         THE COURT:  One had one end of it and one the

18   other?

19         THE WITNESS:  Yes.

20         THE COURT:  Were the two men facing one another?

21         THE WITNESS:  Yes.

22         THE COURT:  And were they walking sideways or

23   was one walking backwards and one walking frontward?

24         THE WITNESS:  One backward, one forward.

25         THE COURT:  And headed where?

1        THE WITNESS:  Towards the exit of my house.  I

2    think Mohamed was the one that was facing my way.

3    The other guy was facing towards the door so he

4    wouldn't see --

5        THE COURT:  So the, as you call him, other guy

6    was the one walking backwards?

7        THE WITNESS:  Yes.

8        THE COURT:  And as you saw them, were you in the

9    same room with them or in a another room looking

10   through a door?

11       THE WITNESS:  No.  I was in the same room.

12       THE COURT:  Did they walk into one door of a

13   room you were in, walk through the room, and walk out

14   the other door?

15       THE WITNESS:  When I saw them, they were in the

16   same room as I was coming into.

17       THE COURT:  I see.  What were you doing at the

18   time?  Were you washing dishes or --

19       THE WITNESS:  I was just walking into the house

20   from -- just walking into the house.

21       THE COURT:  Okay.  Do you recall whether you

22   spoke to them?

23       THE WITNESS:  Yes, I told Mohamed -- I said,

24   "Mohamed, what is that?"  I asked him what it was.  I

25   said, "What's this?"

1      THE COURT:  Excuse me, Mr. Monk.

2    BY MR. MONK:

3    Q    Now, did you know what -- well, Mr. Mohamed, if

4    you know, was he employed by the University of South

5    Florida?

6    A    Yes, he was.  He told me he was working for a

7    professor on a project out in the field.  It was

8    something to do with hydro --

9    Q    Hydrology?

10    A    -- draulics.  Something with septic systems.  I

11    was having a hard time with my septic and he offered

12    to help me.  He said, "I'm working on a project for

13    the university out in the field.  We're doing some

14    research on a hydro--" whatever.  Something to do

15    with septic, something to do with water.

16    Q    If he had theretofore told you that he was

17    involved in hydrology, when he told you that this

18    rocket was a --

19    A    Didn't make sense.

20    Q    -- was a project for school, did that make sense

21    to you?

22    A    No.  No, it didn't.

23    Q    Did you ask him to explain?

24    A    No.  Because I think I already -- I was trying

25    to not -- I didn't talk to the guy very much.  I was

1    just shocked that I saw that, and I was like what.

2    Q    Now, I think you previously estimated about two

3    and a half feet in length.

4    A    (Witness indicated.)

5    Q    Is that correct?

6    A    Yes.

7    Q    If you're able to tell us this, what was it

8    about this item that required two people to carry it?

9    Let me give you an example.  If, for example, I want

10   to pick up this item, I might be able to do that by

11   myself.  But another item, for example, if it's very

12   heavy or heavy and fragile that's the same length, I

13   may need some assistance with.  What did it appear to

14   you it was about the characteristics of this rocket

15   that necessitated or required two individuals who

16   were walking facing each other, one backwards, to

17   carry it?  That was a long not, very good question,

18   but do you understand what I'm asking?

19   A    Yes.  What is the question?

20   Q    Okay.  Well, what was it about -- what was it

21   about this approximately two and a half foot long

22   item that would have required two individuals, one of

23   whom was walking backwards, to carry it as opposed to

24   one individual?

25   A    I think it was just balancing it so that the

    1    rocket wouldn't tip over or something like that.  It

    2    didn't seem to be heavy.  I don't think it was the

    3    heaviness.  I would say it was maybe the awkward

    4    height of the rocket, something like that.  I don't

    5    know.

    6    Q    Okay.  Now, did Mr. Mohamed actually describe it

    7    to you as a rocket?

    8    A    No.

    9    Q    Well, you use the word "rocket" --

   10    A    I did.

   11    Q    -- to describe what you saw.  Okay?

   12    A    Yeah.

   13    Q    Can you tell us -- to the extent that you

   14    remember, what was on one end and what was on the

   15    other end?

   16    A    It had the shape of a rocket.  That's the best I

   17    can describe it.  It had something on the top that

   18    was pointed.

   19    Q    Like a nose cone?

   20    A    Yeah, something like that.  And it would be

   21    something that you would consider to be a rocket.

   22    That's the only way I can describe it.

   23    Q    And did it appear to you to be homemade?

   24    A    Yeah, something -- like a model like he was

   25    explaining.

1    Q    And looked like PVC?

2    A    Yep.

3    Q    And when was this occasion in proximity to when

4    he moved out?

5    A    Weeks before.  I mean, it wasn't just before he

6    moved out.  I mean, maybe -- he moved out on the 4th

7    of August, so around the 4th of July, around the

8    proximity of there, so --

9    Q    Now, I think you told us a little while ago that

10   he moved out on August 4th?

11   A    Um-hum, yes.

12   Q    Is that yes?  Okay.  Now, August 4th was -- do

13   you remember what day of the week it was?

14   A    I'm not sure if it was a Thursday or a Friday.

15   Q    Do you remember what day of the week he moved

16   out?

17   A    I don't know if it was a Thursday or Friday.

18   I'm not sure of the day.

19   Q    Do you know where he was going when he left your

20   premises?

21   A    No.  He said he was going on a trip.  He said,

22   "I'm going" -- he was supposed to leave the next day.

23   He was supposed to leave on the 5th.  He said, "Can

24   you give me my one day back, my money for one day?

25   I'm not sleeping here, I'm going on a trip."

1          I said, "Yes, I'm going to give you your money,

2     get out."  I gave him his money and he left.

3     Q     Now, show you what has been admitted in evidence

4     as Exhibit 71.

5          MR. MONK:  May I approach the witness, Your

6     Honor?

7          THE COURT:  You may.

8     BY MR. MONK:

9     Q     Take a look at the first page of that.  There

10    are three pages, correct?

11    A     Yep, yes.

12    Q     Whose photograph is depicted on the first page?

13    A     That's Mohamed.

14    Q     Is one of his frequent visitors depicted on the

15    second or third page or both?  Take a look at the

16    second page.

17    A     The second page, yeah, I saw him, yes.

18    Q     Okay.  And the third page?

19    A     Yes.

20    Q     The third page, is that Mr. Megahed seated in

21    court here?

22    A     Yes.

23    Q     But the second page is one of Mr. Mohamed's

24    frequent visitors as well?

25    A     Um-hum, yes.

 1          MR. MONK:  If I may publish part of this, Your

 2     Honor?

 3          THE COURT:  You may.

 4     BY MR. MONK:

 5     Q     This is Page 2 of Exhibit 71.  Did Mr. Mohamed

 6     ever introduce to you these two visitors, this

 7     gentleman who I'm now displaying on the screen, and

 8     the gentleman in court?  Did he ever introduce those

 9     gentlemen to you as brothers?

10     A     No.  Pardon?

11     Q     As brothers?

12     A     No, he never introduced them to me.

13     Q     Now, when they took this rocket out of your

14     house -- okay, I'm not sure but I think you said you

15     believed they put it in one of the cars?

16     A     Yes.

17     Q     Do you know where they took it?

18     A     No, I don't.

19     Q     Did you ever see that rocket again?

20     A     No.

21     Q     Did you know that Mr. -- did you know whether

22     Mr. Mohamed was working on constructing that rocket

23     in your house?

24     A     No.

25     Q     Were you aware of that at all?

```
 1    A    No.

 2    Q    Now, what sort of -- what sort of hours did Mr.

 3    Mohamed keep?  First of all, let me back up.  Let me

 4    back up.  Put a time frame around when he lived with

 5    you.  Would it be from June until the beginning of

 6    August?

 7    A    Yes.

 8    Q    Mid-June or beginning of June or what?

 9    A    Beginning of June.

10    Q    And did he fall into a pattern of keeping any

11    sort of hours and any sort of a routine?

12    A    He would go to bed around 4:30 in the morning

13    and sleep, I don't know, depending on the day because

14    sometimes he did go to work.  But he would get up

15    like -- if he did go to work, he got up fairly early

16    and then came back home, went back to bed.

17    Q    About what time?

18    A    Well, he'd come home around, I don't know, maybe

19    11:00, 12:00, 1:00.  It depended on the day.  He'd

20    sleep to around 6:00, I guess, 6:00 or 7:00.  And

21    sometimes later.  Sometimes he would be sleeping

22    until 8:00.  It depend on what his -- he tended to go

23    to sleep around 4:30 in the morning.

24    Q    When the visitors would come over, when

25    typically would that be?
```

1   A    Well, it depended.  I mean, sometimes it would

2   be 10:00, but mostly it was sometimes as early as

3   9:00, but 10:00, 11:00.  It was pretty late when they

4   would come.  They would stay sometimes to I guess

5   1:00.  Sometimes they were in his room so I had no

6   idea if they were watching a movie or what they were

7   doing.  I really didn't -- sometimes they'd be

8   outside on my front lawn cooking some stuff.  I

9   really --

10   Q    Now, did -- shortly after Mr. Mohamed moved out,

11   did you have some contact with one or more FBI

12   agents?

13   A    Yes.

14   Q    Okay.  And did you give the FBI consent to

15   search the room that Mr. Mohamed lived in?

16   A    Yes.

17        MR. MONK:  With the Court's permission, I would

18   like to approach the witness.

19        THE COURT:  Yes, sir.

20        MR. MONK:  All right.  May I inquire a couple of

21   questions from here?

22        THE COURT:  You may.

23   BY MR. MONK:

24   Q    Let's take a look at, please, 50 A.  Do you

25   recognize your signature on this?

1    A    Yes.

2         MR. MONK:  I'd move for admission into evidence

3    of proposed Exhibit 50 A.

4         MS. DYER:  If I could have one moment, Your

5    Honor.

6         THE COURT:  That was 50 A?

7         MR. MONK:  Yes, Your Honor.

8         MS. DYER:  No objection, Your Honor.

9         THE COURT:  Exhibit 50 A is received.

10        (Government's Exhibit No. 50 A is received into

11   evidence.)

12   BY MR. MONK:

13   Q    Is this one of the consent forms that you signed

14   permitting the law enforcement officers to search

15   your house?

16   A    Yes.

17   Q    By the way, did Mr. Mohamed have a cat?

18   A    No.  I have a cat.

19   Q    Okay.  Did you keep the cat's litter in Mr.

20   Mohamed's room?

21   A    Before that maybe the litter was in there at

22   some point.

23   Q    Before he moved in?

24   A    Yes, before that.

25   Q    And 50 B or 50 bravo, do you also recognize this

1    document?

2    A    Yes.

3         MR. MONK:  Move for admission of proposed

4    Exhibit 50 B.

5         MS. DYER:  No objection.

6    BY MR. MONK:

7    Q    This is another consent form where you allowed

8    the FBI to search your residence, correct?

9    A    Um-hum.

10        THE COURT:  50 B is received.

11        (Government's Exhibit No. 50 B is received into

12   evidence.)

13   BY MR. MONK:

14   Q    And 51 A through D, does this -- well, look at

15   these, please.  Do you recognize them?

16   A    Um-hum, yes.

17   Q    All right.  Do these -- what are they?

18   A    They're pictures of basically the front of my

19   house and then inside the room where Mohamed was

20   renting.  The room where Mohamed rented.

21        MR. MONK:  Your Honor, I'd move for admission

22   into evidence of this proposed exhibit.

23        MS. DYER:  No objection.

24        THE COURT:  Exhibit 51, parts A through D, is

25   received.

1          (Government's Exhibit Nos. 51 A - D are received

2     into evidence.)

3     BY MR. MONK:

4     Q     Now, during the weeks following when Mr. Mohamed

5     moved out in August of 2007, did the FBI make a

6     pretty thorough search of the bedroom that you had

7     rented to Mr. Mohamed?

8     A     Yes, they did.

9     Q     As a matter of fact, did you give them

10    permission to cut the carpet out and remove the

11    carpet from the bedroom?

12    A     Yes.

13    Q     Did they do that?

14    A     Yes.

15    Q     And did they also -- did you also give them

16    permission to remove the drawer liners and some of

17    the furniture from the room?

18    A     Yes.

19    Q     And were you ultimately compensated for that?

20    A     Yes.

21          THE COURT:  Mr. Monk, I think this would be a

22    good time for us to take the morning recess unless

23    this is particularly inopportune for you.

24          MR. MONK:  It is not.

25          THE COURT:  Then it's just a quarter to 11:00.

1    We'll take our morning recess and resume at or very

2    near 11 o'clock.

3         Mr. Watts?

4         THE COURT SECURITY OFFICER:  Rise for the jury,

5    please.

6         (Jury out at 10:41 a.m.)

7         THE COURT:  You may step down and make yourself

8    comfortable, ma'am.

9         (Recess from 10:43 a.m. until 11:09 a.m.)

10        THE COURT:  Mr. Watts, if you'll return the

11   jurors to the courtroom, please?

12        THE COURT SECURITY OFFICER:  Yes, sir.

13        (Jury in at 11:10 a.m.)

14        THE COURT:  Please be seated, one and all.  Mr.

15   Monk, you are recognized to resume your Direct

16   Examination.

17        MR. MONK:  Thank you, Your Honor.

18   BY MR. MONK:

19   Q    Ms. Poliquin, only a couple more questions.  Do

20   you remember whether Mr. Mohamed possessed a laptop

21   computer at the time he lived in your house?

22   A    Yes, he did.

23   Q    And had you seen that computer?

24   A    Yes.

25        MR. MONK:  If I can approach the witness?

1          THE COURT:  Yes, sir.

2     BY MR. MONK:

3     Q     I don't know whether you -- if you -- this is

4     dirty.  Take a look at what's been admitted in

5     evidence as 3 A.  Do you recognize this at all?

6     A     The only time I saw it, it was open.  I never

7     saw it like that.  It was already open.  Basically, I

8     would say that that's the color and the size.

9     Q     The color and the size?

10    A     Yeah.

11    Q     And when Mr. Mohamed moved out of your

12    residence, did he leave anything?

13    A     There was a little refrigerator that wasn't

14    working that he left, but that's it.

15    Q     Nothing else?

16    A     No.

17    Q     What type of an automobile did he have?

18    A     He had a maroon-colored Taurus, Ford Taurus.

19    Q     What color was it?

20    A     Like a maroon color.

21         MR. MONK:  That's all, Your Honor.  Thank you.

22         THE COURT:  Thank you, Mr. Monk.

23         Has the defense any cross-examination for this

24    witness?

25         MS. DYER:  Yes.  Thank you, Your Honor.

1          THE COURT:  You are recognized for that purpose.

2                     CROSS-EXAMINATION

3     BY MS. DYER:

4     Q     Good morning, Ms. Poliquin.

5     A     Good morning.

6     Q     Ma'am, you testified on Direct that your memory

7     was better when you were interviewed previously by

8     agents from the FBI, is that correct?

9     A     Yes.

10    Q     And those interviews took place closer in time

11    to when Mr. Mohamed was actually a tenant at your

12    residence, correct?

13    A     Yes.

14    Q     So that's why the memory was better at that

15    time?

16    A     Yes.

17    Q     So if you were asked questions similar to the

18    ones you were asked by Mr. Monk and the answers were

19    different today than they were back then, the answers

20    you gave the officers prior to today would be more

21    accurate, correct?

22    A     Correct.

23    Q     Now, how many times have you spoken with agents

24    from the FBI?

25    A     I would say between three and four times.

1    Q    When was the most recent?

2    A    Last week.

3    Q    Last week.  You testified that Mr. Mohamed was

4    not a -- I'm not sure if you said was not a good

5    tenant or was a bad tenant.  Do you remember what you

6    said?

7         THE COURT:  You mean here today?

8         THE WITNESS:  He wasn't a good tenant.

9    BY MS. DYER:

10   Q    Did you have tenants prior to Mr. Mohamed?

11   A    Yes.

12   Q    Did you ever have any problems with any of those

13   tenants?

14   A    Not with respect to having a lot of people come

15   over, no.

16   Q    But you did have some problems with some prior

17   tenants?

18   A    Nothing where I would tell them you have to

19   leave.

20   Q    Now, Mr. Mohamed was in the United States on a

21   student visa, correct?

22   A    That's what he told me.

23   Q    And he was a graduate student at USF?

24   A    He was doing something with regards to

25   engineering, a Master's or something.  I'm not

1    familiar with that whole thing, but he was doing some

2    type of engineering degree.

3    Q    And he was from Egypt?

4    A    I'm not -- he told me that his father was --

5    Egypt and Turkey.  I don't know exactly what he was.

6    One of his parents was Turkish and the other one was

7    Egyptian.

8    Q    It appeared to you as if he did not have much

9    money, correct?

10    A    Correct.

11    Q    You just testified that -- the last question I

12    believe Mr. Monk asked you that Mr. Mohamed drove a

13    red Taurus?

14    A    Correct.

15    Q    Earlier on before we took the break a few

16    minutes ago, Mr. Monk asked you about Mr. Mohamed's

17    car, too.  Correct me if I'm wrong, you said it was a

18    compact car but you didn't really pay any attention?

19    A    No, that's wrong.  I wasn't talking about Mr.

20    Mohamed's car.  I was talking about another vehicle.

21    I was not talking about Mr. Mohamed's car.  I

22    definitely know Mr. Mohamed's car.

23    Q    That's why I was confused.  Thank you for

24    clarifying that.

25        I believe you testified that you were upset by

```
 1    the fact that Mr. Mohamed had visitors over and you
 2    had told him that that was one of the rules - he
 3    couldn't, correct?
 4    A    I told him that there was a limit on when and
 5    until what time.  I didn't say he could not have
 6    anybody over.  I wanted to be specific that I didn't
 7    want a lot of body traffic and that there were a
 8    limit of time, because -- that's it.  But I did not
 9    say he could not have any people over.
10    Q    And he had too many for you?
11    A    Well, it was how late they were there and
12    basically was -- I couldn't sleep because there was
13    all these people talking and it was late, and I was
14    having to get up at five o'clock in the morning.
15    Q    And I guess that's what I'm trying to get to.
16    All these people talking.  There were too many -- he
17    had too many visitors?
18    A    For me, yes.
19    Q    You testified that when the agents came out to
20    your house, they showed you some photographs to
21    identify, correct?
22    A    Correct.
23    Q    And I believe Mr. Monk showed you some
24    photographs and asked you if those were the
25    photographs you identified at that time, correct?
```

1  A  Yes.

2  Q  Now, prior to showing you those photographs, the

3  agents had told you why they were coming to talk to

4  you, correct?

5  A  I don't understand what you mean.

6  Q  Okay.  Did they show you the photographs as soon

7  as they walked in the door to your residence that

8  day?

9  A  You're talking about the very first time ever

10  that I saw FBI agents?

11  Q  When you were shown the photographs that you

12  identified?

13  A  The first -- yes.  Okay.  Can you give me the

14  question again?

15  Q  Of course.  Let me try to do it a step at a

16  time.  You said that you have talked to the agents

17  about three or four times?

18  A  Yes.

19      THE COURT:  Ms. Dyer -- Ms. Poliquin, on the day

20  that the FBI agents first showed you photographs for

21  identification, did they tell you a purpose they had

22  in coming to your home or in showing you those

23  photographs?

24      THE WITNESS:  No.

25      THE COURT:  Go ahead.

BY MS. DYER:

Q    Did they show you those photographs the very
first time they came to your house?

A    Yes.

Q    And did they show you those photographs -- was
that the very first thing they did that day was show
you those photographs?

A    Yes.

Q    Now, I believe you testified that you did not
know the individuals in the photographs by name, is
that correct?

A    That's correct.

Q    So when they asked you questions, how did you
answer them?  Did you point to the photograph and say
this is the person I'm talking about when I answer
this question that way?

A    The first time I never spoke about anybody else
except Mohamed.  I didn't -- the only thing I did was
I identified the pictures, and then I went into my
story about him being at my house.  I had no idea
that they had been arrested to begin with.  I was
just telling them my story and that's what I
concentrated on - Mohamed, the man that lived at my
house.

Q    Okay.  What I'm trying to gather is when you

1    told the agents information about other people, like

2    when you told them about seeing two individuals

3    taking this model rocket out of your home, I believe

4    you originally testified you weren't sure if they

5    asked you?

6    A    Correct, yes, okay.

7    Q    But if they asked you do you recognize who that

8    other individual was, would you have said, yeah,

9    that's -- by name?

10   A    No, no.

11   Q    Did you point at a picture and say that's who

12   was helping him carry out the model rocket?

13   A    I'm not one hundred percent sure how that went.

14   Q    Okay.  But you couldn't do it by name?

15   A    No.  I didn't know their names.

16        MS. DYER:  May I approach, Your Honor?

17        THE COURT:  You may.

18   BY MS. DYER:

19   Q    I'm showing you what's been admitted as

20   Government's Exhibit 48 A.  Can you look at that?

21   A    Um-hum.

22   Q    Do you recognize that individual?

23   A    Today?  You know, I sort of recognize him, yeah.

24   I know I've seen him before.  It's a vague

25   recollection is what I'm trying to say.

1    Q    Ask you to look at the back of that photo. Is

2    that your signature?

3    A    Um-hum.

4    Q    So at the time -- and its says October 15th,

5    2007?

6    A    Um-hum.

7    Q    That's the day you signed this?

8    A    Yes.

9    Q    And you signed it after you identified that

10    person as somebody you knew?

11    A    Well, that I had seen before. These were just

12    people that I had seen. I don't know them.

13    Q    I'm sorry. Somebody that you had recognized?

14    A    Yes.

15    Q    Somebody you had recognized from being at Mr.

16    Mohamed -- well, your residence but with Mr. Mohamed?

17    A    Yes.

18    Q    Can you say for sure that that's not the

19    individual that you saw carrying the rocket that day?

20    A    No, I can't.

21    Q    So, Ms. Poliquin, I now have the photo I just

22    showed you up on the screen for the jury to see. So

23    I'll ask again, can you say that that's not the

24    individual you saw carrying the rocket that day?

25    A    I can't.

1    Q    And that's Page 4 of that exhibit?

2    A    Yes.

3    Q    And that's not the individual that you

4    identified earlier today as my client Youssef Megahed

5    who is in the courtroom?

6    A    No.  That's not him, no.

7    Q    Thank you.  Now, when you were talking to these

8    agents about the visitors that Mr. Mohamed had at the

9    residence that you recognized, you told them, did you

10   not, that you saw some of those individuals more

11   often than others?

12   A    Correct.

13   Q    And you told them that you saw some of those

14   individuals more than you saw my client Youssef

15   Megahed?

16   A    No, I never said that.

17   Q    You never said that ?

18   A    He was one of the ones that was there the most.

19   Q    And there was nobody there more than him?

20   A    No.  There was one other person that was there,

21   a younger guy.  I don't know him either.  I mean, I

22   didn't -- I was never introduced.  There was two

23   people who I would say were there more often that I

24   actually saw on a more regular basis.

25   Q    Okay.  Let me show you Government's 48 A again.

1    Actually, that's not a good picture.

2        Let me show you Government's Number 71 in

3    evidence that Mr. Monk had you look through on

4    Direct.  Do you remember Mr. Monk asking if you

5    recognized that individual?

6    A    Yes.

7    Q    And that individual is not my client, Youssef

8    Megahed, correct?

9    A    Right.

10   Q    That's a Yahia Megahed, correct?

11   A    Correct.  Well, I don't know his name but that's

12   another person, yeah.

13   Q    It says Yahia Megahed on it?

14   A    Okay, that's him.

15       THE COURT:  Ms. Dyer, you're not asking her if

16   she can read.  You're asking her if she can identify

17   this person by name and she said no.

18       MS. DYER:  Yes, Your Honor.

19       THE COURT:  So don't argument.  Let's go.

20   BY MS. DYER:

21   Q    Ma'am, you agree with me that this exhibit says

22   that this is Yahia Megahed, correct?

23   A    Correct.

24       THE COURT:  Ms. Dyer, go ahead.

25   BY MS. DYER:

1    Q    Now, is this the individual that you just said

2    was at your house with Mr. Mohamed more often than my

3    client?

4    A    I'm not -- my recollection today is not as

5    fresh, but I would say that he was one that I would

6    see more often.

7    Q    And, again, your memory would have been clearer

8    back when you were interviewed, correct?

9    A    Correct.

10    Q    Now, isn't it true that around the 4th of July

11    holiday of 2007, Mr. Mohamed began to show an

12    interest in how fireworks work?

13    A    Around that time, yes.

14    Q    And he actually shot some fireworks off from

15    your yard?

16    A    I never saw any of that.

17    Q    You never saw any of that?

18    A    I never saw him or anyone shooting, but I did

19    see a couple of, you know, after they're shot on the

20    ground, whatever that stuff.  I did see a couple of

21    things there, but I don't know if it was him.  I

22    never saw that.

23        THE COURT:  Your testimony is you had scourge

24    marks in your yard?

25        THE WITNESS:  On the street in front.

1          THE COURT:  On the street, all right.

2          THE WITNESS:  Not in my yard.

3          THE COURT:  You don't know how they got there?

4          THE WITNESS:  No.  I never saw anything.

5     BY MS. DYER:

6     Q     And to follow up on the Court's question, was it

7     scourge marks or was there some debris left over?

8     A     Debris-type of -- from a little I don't know

9     what they call it.

10         THE COURT:  Ms. Poliquin, did you see this place

11    where these things were?

12         THE WITNESS:  No, Your Honor.  I didn't see

13    anything.

14         THE COURT:  Did you see this debris or scourge

15    marks or whatever it was?

16         THE WITNESS:  Yes, I did see that.

17         THE COURT:  Can you tell us what you saw?

18    Without worrying about how it got there, what was it

19    that you saw?

20         THE WITNESS:  It looked like the ones that you

21    stick in the -- the very small ones that you stick in

22    the ground and then you light them up.  The residue

23    is about this long.

24         THE COURT:  A little piece of stick?

25         THE WITNESS:  That's it.  I saw a couple of that

1    on the street in front of my house.  That's all I

2    know.

3        THE COURT:  So it was just some debris.  All

4    right, go ahead.

5    BY MS. DYER:

6    Q    Do you know what a bottle rocket is?

7    A    No.

8    Q    Ms. Poliquin, you are aware that Mr. Mohamed and

9    Mr. Youssef Megahed went to The Keys in July to go

10   scuba diving, correct?

11   A    He told me that he was going on a trip there.

12   Q    You testified on Direct that there was a time,

13   and I'm not asking you why, but that you had called

14   the police about Mr. Mohamed, correct?

15   A    Correct.

16   Q    And no one ever came out to talk to you about

17   that, did they?

18   A    No.

19   Q    Ma'am, when you -- when Mr. Mohamed would have

20   visitors over late at night, you would stay in your

21   room?

22   A    Correct.

23   Q    You testified when you were trying to describe

24   this model rocket that you saw Mr. Mohamed and some

25   other individual carrying out of your apartment as

1    homemade.  Do you remember that?

2    A    Yes.

3    Q    By that do you mean the kind that you buy in the

4    store and you assemble at home?

5    A    No, I don't think it was one -- I don't know

6    much about rockets to begin with, but I think it was

7    like -- you buy separate things and put it together.

8    Q    You also tried to describe -- when describing

9    what you saw when these two individuals were taking

10    out this rocket, you said that they were walking out

11    the door, correct?

12    A    Correct.

13    Q    Taking it outside of your house.  And I believe

14    you testified that they were facing each other,

15    correct?

16    A    That's my recollection, yes.

17    Q    And I believe you testified that it was Mr.

18    Mohamed that was actually facing you, correct?

19    A    Yes.

20    Q    Ma'am, were you present when Mr. Mohamed moved

21    out of your residence?

22    A    Yes.  I wasn't present when he was packing up

23    his stuff, just when he -- last minute.

24    Q    When he packed up his car and drove away?

25    A    I wasn't there when he was packing, no.

1  Q   When he drove away?

2  A   Yes.  Bye.

3  Q   Ma'am, on January 27th of this year, 2009, a Mr.

4  Kelleher, Andy Kelleher from my office, came to your

5  home.  Do you remember that?

6  A   I don't know about the name.  I know that

7  somebody came to -- he wanted me to talk to him and

8  he said he was for -- from the FBI, I guess

9  presenting -- go ahead.  Yes, I would say yes, I

10  guess.  A man came to my door representing --

11  Q   He said he represented Youssef Megahed?

12  A   He didn't say -- I guess.  I'm not familiar with

13  these terms, the legal terms.  He was representing I

14  guess Youssef.

15      THE COURT:  Well, Ms. Poliquin, someone came to

16  see you that you associated with this case?

17      THE WITNESS:  Yes.

18      THE COURT:  It was a man?

19      THE WITNESS:  Yes.

20      THE COURT:  Was it the daytime or the nighttime?

21      THE WITNESS:  Daytime.

22      THE COURT:  I see.  I take it you met them at

23  the door?

24      THE WITNESS:  Yes.

25      THE COURT:  Did they identify themselves?

```
1          THE WITNESS:  Yes, but I can't remember the
2     exact name that he said.
3          THE COURT:  But whatever it was, it caused you
4     to associate what you heard with this case?
5          THE WITNESS:  Yeah.  He told me that it was
6     having to do with the case.
7          THE COURT:  All right, go ahead.
8     BY MS. DYER:
9     Q    And you told that man that day that you had
10    nothing to say?
11    A    Yes, because I said I had told the FBI already
12    everything I had say.
13    Q    You told him you had already told the FBI
14    everything?
15    A    Yeah, that I had to say.
16    Q    And you told him that you didn't know anything,
17    you had no information?
18    A    Yeah.  I don't have any information regarding
19    why Mohamed was arrested or anything like that.  I
20    didn't have any information about that.
21    Q    Then on March 5th, 2009, just a little over a
22    week ago --
23    A    Yes.
24    Q    -- a female came to your door to ask you some
25    other questions, correct?
```

1   A    Correct.

2   Q    And she also told you that she was there on

3   behalf of Mr. Megahed?

4   A    Yes.

5   Q    And you again told her you didn't know anything,

6   correct?

7   A    I said I had told everything I knew to the FBI

8   already.

9   Q    And you told her you don't remember anything on

10  March 5th, 2009, correct?

11  A    I said that I didn't recall -- she just showed

12  me some pictures.  I told her, "Listen, at this point

13  I don't remember."  They are very vague.

14  Q    I'm going to get to that.  But the first

15  question was you told her you couldn't remember

16  anything on March 5, 2009, about this incident?

17  A    Well, that's taking it way out of context

18  because I do remember things.

19  Q    I'm just asking --

20       THE COURT:  This is the third time, Ms. Dyer,

21  and the last.

22       MS. DYER:  Yes, sir.

23  BY MS. DYER:

24  Q    Did you tell her, "I don't remember anything?"

25  A    Not in the context that you're trying to say.  I

1    remember many things.

2    Q    You started talking about some photographs that

3    she gave you.  She gave you six photographs that day,

4    correct?

5    A    She gave me some photographs, yes.

6    Q    And she asked you to look through them?

7    A    Yes.

8    Q    And you did?

9    A    I did.

10   Q    And she didn't tell you anything specifically

11   about these photographs beforehand, correct?

12   A    No.

13   Q    And, in fact, while you were looking through

14   these photographs, she had her back turned to you, is

15   that correct?

16   A    I don't remember that, but whatever.

17   Q    And you told her you did not recognize any of

18   those people?

19   A    I did not say that word "recognize."  I said at

20   this stage it's so far away -- I said it's very hard

21   for me to describe these people now.  The truth is if

22   you went -- if you saw -- I already identified the

23   people that I know to the FBI, or whatever it was, a

24   long time ago.  I said right now it's not fresh on my

25   memory.  I would rather not say anything because I

1    don't want to imply people that I don't even know if

2    it's them.  So I don't know now.  I don't want to do

3    that.  I said take it, I'm not going to -- she wanted

4    me to sign whatever.  I said, "No, I can't do that

5    right now."

6    Q    And you said they all look the same?

7    A    Because, yeah, it's not fresh in your mind.

8    They all have the same type of coloring, you know,

9    like dark hair or whatever.  It's a black and white

10   photo.  It's not like it's -- something is striking

11   you.  They're all like black and white photos.  Some

12   of them are the same age, whatever.

13        THE COURT:  Wait just a minute.  What is the

14   question, Ms. Dyer, or is there a question?

15        MS. DYER:  The question I had asked, Your Honor,

16   was:  And you told her they all looked the same?  And

17   I believe she answered yes.

18        THE COURT:  I'm not going to accept that

19   characterization of her answer.  I just want to know

20   what the question was and you're now recognized to go

21   to your next question.

22        MS. DYER:  Thank you, Your Honor.

23   BY MS. DYER:

24   Q    And earlier when Mr. Monk asked you to look

25   around the room and see if there was anybody you

1   recognized, you pointed out my client Youssef

2   Megahed, correct?

3   A    Yes.

4   Q    And you said you absolutely recognized him,

5   correct?

6   A    Yes.

7        MS. DYER:  Nothing else, Your Honor.  Thank you.

8        THE COURT:  Thank you, Ms. Dyer.

9        Anything more from the United States?

10       THE WITNESS:  I'm not done yet?

11       THE COURT:  No, ma'am, but close.  It's close.

12                   REDIRECT EXAMINATION

13  BY MR. MONK:

14  Q    Ms. Poliquin, is it fair to say that since the

15  these events occurred in the summer of 2007 until

16  today, you have received some unwelcome attention?

17  A    Yes.

18  Q    Have you had reporters around your house?

19  A    Yes.

20  Q    Is it fair to say that you would rather not be

21  involved in this?

22  A    Yes.

23  Q    And not be in court today?

24  A    Yes.

25  Q    And when the person for the defense came out in

1    March and showed you pictures, was your decision not

2    to get involved in that conversation the result of

3    not wanting to get somebody in trouble when you were

4    not sure --

5    A    Yes.

6    Q    -- at this point?

7    A    I didn't want to get anybody in trouble that I

8    wasn't one hundred percent sure.  She was showing me

9    pictures I wasn't sure.

10       MS. DYER:  Your Honor, I didn't get a chance

11   because I was waiting for everybody to stop speaking,

12   but I was going to object to leading.  I would just

13   ask that in the future no leading by this -- to this

14   witness.

15       THE COURT:  The point is well-taken.  Go ahead,

16   Mr. Monk.

17   BY MR. MONK:

18   Q    Ms. Poliquin, you've described -- let me just

19   ask:  The city where you resided in August of 07, is

20   that Tampa?

21   A    Yes.

22   Q    And do you recall when Mr. Mohamed lived with

23   you, do you remember him ever bringing long sections

24   of PVC piping into the house and working on them in

25   his room?

1    A    No.

2    Q    Do you recall him ever working with stump

3    remover in his room?

4    A    I don't even know what that is.  No, I don't

5    have any idea what he did in his room.

6         MR. MONK:  That's all, Your Honor.  Thank you.

7         THE COURT:  Thank you, Mr. Monk.

8         If there is nothing further then, Ms. Poliquin,

9    you may step down and you're excused with our thanks.

10        THE WITNESS:  Thank you, sir.

11        (End of excerpt of proceedings.)

12

13              C E R T I F I C A T E

14        I, Kerry Mercade, certify that the foregoing is

15   a correct transcript from the record of proceedings

16   in the above-entitled matter.

17                            S/Kerry Mercade

18                            Kerry Mercade
                             Court Reporter
19

20

21

22

23

24

25