1                    UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                        TAMPA DIVISION

3    UNITED STATES OF AMERICA

4

5           vs.                 CASE NO. 8:07-cr-342-T-23TBM
                            March 20, 2009
6                            Tampa, Florida

7

    YOUSSEF SAMIR MEGAHED,

8
        Defendant.

9
    _____/

10
          TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11             (TESTIMONY OF TROY NOBLE)
        BEFORE THE HONORABLE STEVEN D. MERRYDAY
12            UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    For the Government:  JAY HOFFER
                        ROBERT MONK
15                    Assistant U.S. Attorneys
                      400 N. Tampa Street, Suite 3200
16                    Tampa, Florida 33602
                      813/274-6000
17

    For the Defendant:  ADAM ALLEN
18                    DIONJA DYER
                      Assistant Federal Defenders
19                    400 N. Tampa Street, Suite 2700
                      Tampa, Florida 33602
20                    813/228-2715

21    Court Reporter:     Kerry Mercade
                      801 N. Florida Avenue
22                    Suite 15A
                      Tampa, Florida 33602
23                    813/301-5024

24

25    Proceedings recorded and transcribed by
    computer-aided stenography.

1                          INDEX

2

**GOVERNMENT WITNESS TROY NOBLE**

3    Direct Examination by Mr. Hoffer..........3
     Cross-Examination by Ms. Dyer.............38
4    Redirect Examination by Mr. Hoffer........39

5                    **GOVERNMENT'S EXHIBITS**

6

7    **Number**      **Description**                  **Page**

8    33 A        08/05/07 recording (back seat
                 conversation)..................31
9    33 B        08/05/07 enhanced recording
                 (Back seat conversation).......32

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          GOVERNMENT WITNESS, TROY NOBLE, SWORN

2        THE COURT:  State your name, please.

3        THE WITNESS:  Troy Anthony Noble.

4        THE COURT:  That's T-R-O-Y and N-O-B-E-L?

5        THE WITNESS:  N-O-B-L-E.

6        THE COURT:  Excuse me.  Please have a seat in

7  the witness stand, make yourself comfortable, and

8  I'll recognize Mr. Hoffer for your Direct

9  Examination.

10          DIRECT EXAMINATION

11  BY MR. HOFFER:

12  Q    Mr. Noble, sir, good afternoon.

13  A    Good afternoon.

14  Q    Try to keep your voice up and speak into the mic

15  so we can hear you, okay?

16  A    Thank you.

17  Q    If you would, sir, please tell the members of

18  the jury where you work and what you do for a living,

19  sir.

20  A    I work for the Naval Criminal Investigative

21  Service, NCIS.  I've been so employed for over the

22  last 20 years.  I'm currently assigned to our

23  Charleston office in South Carolina.  For the last

24  three years I've been on loan to the FBI Charleston

25  Foreign Counter Intelligence Squad.  So I actually

1    work in the FBI office in Charleston, South Carolina.

2    Q    For those who are not familiar, what does the

3    Naval Criminal Intelligence Service do, generally

4    speaking?

5    A    Generally, the NCIS works felony investigations

6    on Naval Marine Corps installations, and also

7    involving Naval personnel out of town, or things that

8    could create a threat to the Department of the Navy

9    such as counter intelligence or counter terrorism.

10   Q    You said for the past three years you've been

11   sort of on loan to the FBI and you indicated your

12   assignment there.  What kinds of matters or

13   investigations have you been working on in the last

14   couple of years on loan to the FBI in Charleston?

15   A    Counter intelligence matters at an unclassified

16   level are certainly counter proliferation.  Other

17   countries who wants our technology that could create

18   problems for the Department of the Navy.  So we work

19   those types of matters out of Charleston, South

20   Carolina.

21   Q    Prior to your -- at the beginning of your law

22   enforcement career, sir, did you have any other

23   related work experience or was that pretty much your

24   work experience?

25   A    That's pretty much my work experience.

```
 1    Q    Do you have any special training or skills that
 2    to your knowledge at least picked you out or
 3    designated you so that you would be part of this
 4    foreign counter intelligence work?
 5    A    Yes, I do.  Prior to coming to the FBI office in
 6    Charleston, South Carolina -- the guys I work with
 7    obviously know my background.  They knew that I lived
 8    in the Middle East, that NCIS had put me in the
 9    Middle East for two years.  I travelled to Egypt
10    frequently while I was living in Bahrain, a small
11    island in the Arabian Gulf.  They knew that I had
12    studied Arabic language at the State Department
13    Foreign Service Institute in Alexandria, Virginia.
14    So they knew I had a little bit of background and had
15    worked counter terrorism matters in the past.
16    Q    Let me ask you a bit about your experience in
17    the Middle East.  You lived there for how long?
18    A    I actually lived in Bahrain for two years.
19    Q    And that's from when to when, sir?
20    A    That would be from summer of 2000 to summer of
21    2002.
22    Q    You indicated that you'd had some State
23    Department training course with respect to language.
24    Could you explain what type of course you had and
25    when?
```

1    A    Yeah.  Approximately the year of 1999, and it

2    was approximately a full-year course.  It's Arabic

3    language the entire day mixed with Arabic culture.

4    We do this with two or three of our agents every year

5    prior to sending them to, in this case, the Middle

6    East.

7    Q    As a consequence of that training and your

8    experience in the Middle East, how would you

9    characterize your facility, if you will, as far as

10   the Arabic language.  How good a speaker and

11   understander of the language are you?

12   A    I'm not a fluent Arabic linguist.  I'm not a

13   translator.  I learned enough to communicate to get

14   around.  By State Department standards, five being

15   the top score usually attributable to a native

16   speaker who has really studied the nuances of the

17   language, I was a level two.  So a very mediocre

18   proficiency.

19   Q    Would that be your characterization of your

20   skills back in 2007, say, for example, or would it be

21   different?

22   A    Possibly slightly lower.  Obviously, I've been

23   out of the region for a few years and wouldn't have

24   been using it as regularly, but I would imagine

25   fairly close to a level two.

1    Q    Now, sir, let me direct your attention, Mr.

2    Noble, if I could to the late evening, early morning

3    hours of August 4th going into August 5th of 2007.

4    You were working with the FBI assigned there from

5    NCIS at that time, correct?

6    A    That is correct.

7    Q    In the late evening or early morning hours of

8    that time period, did you called upon to do some work

9    as an investigator in this particular matter?

10   A    Yes, I did.

11   Q    Were you -- do you recall about what time your

12   involvement started on that day or night or morning,

13   whenever it was?

14   A    I received a phone call at approximately 2:30

15   that morning, which would have been on August 5th.

16   That was from my NCIS supervisor who was already at

17   the scene of the traffic stop.

18   Q    Without telling us what was said to you in the

19   course of that conversation, as a consequence of

20   receiving that call, did you take some action?  If

21   so, what did you do?

22   A    As a consequence of that call, I drove to the

23   site of the traffic stop and arrived about three

24   o'clock in the morning.

25   Q    By the way, the location you went to, do you

```
 1   recall where it was and if you had ever been there

 2   before?

 3   A    I had not been in that general area before, but

 4   I understand it to be Highway 176 in Goose Creek,

 5   South Carolina.

 6   Q    When you got there, sir, do you recall, what,

 7   generally speaking, was going on and if there were

 8   other people?

 9   A    Yeah, there were a lot of other people there.

10   Obviously, it appeared to be a major crime scene.

11   You know, there were flashing red lights.  There were

12   portable flood type lights.  There was an RV for a

13   command post.  They seem to have a crime scene set

14   up.  You couldn't enter without passing a deputy.

15   They had it set up as if it were a major crime scene.

16   Q    And did you meet up with anybody at that point

17   and receive a particular duty assignment for your

18   work that morning on August 5th?

19   A    Yes, I did.

20   Q    Who did you meet up with and what did you have

21   discussion -- who did you meet up with, first of all?

22   A    I met with the assistant special agent in charge

23   for the FBI Columbia Division, Ms. Julie Johnson.

24   Q    Did you have a conversation with her?

25   A    I did.
```

1    Q    As a consequence of that, did you receive a

2    particular assignment that you were asked to perform

3    that morning?

4    A    Yes.

5    Q    What type of assignment was it, sir?

6    A    I was requested to participate in the

7    transportation from the crime scene to the Berkeley

8    County Jail.  They wanted to sit in the vehicle, the

9    police vehicle, and help transport the two

10    individuals from the crime scene to the jail and be

11    (A) a consenting party to a recording device that

12    would be in the vehicle, and (B) to be listening to

13    hear any information or any discussion that would be

14    had that might be of indications and warnings of an

15    eminent threat, if I heard something that needed to

16    be acted upon right then.  The recording device is

17    not one that they could hear right away.  So they

18    were hoping to get some real-time feedback as to what

19    the discussion might have been.

20    Q    Now, you've mentioned the term, I guess, I think

21    you said law enforcement or consenting party or

22    something like that.  Are you familiar with that

23    term?

24    A    In general, yes, sir.

25    Q    Generally speaking, what does it mean in lay

1    terms?

2    A    In a law enforcement investigation, when we

3    record a conversation of individuals, usually we

4    either want to have a Government consenting party,

5    somebody that's agreed to consent to that

6    conversation being monitored, or a warrant from a

7    court.  In this case I was in a position to consent

8    to the conversations that would be had in that

9    vehicle.

10    Q    As a consequence of being asked to perform that

11    duty, what's the first thing you did and where did

12    you go?

13    A    One of the first things I did was met up with

14    Special Agent Ed Klimas, who was the individual who

15    had the recorder, so he could show me how to operate

16    it, where it would be placed, and how to return it to

17    him.

18    Q    Now, did you do that on that morning?

19    A    Yes, sir, I did.

20    Q    When you met with Agent Klimas, did he have

21    something with him that he showed you?

22    A    He did.  He had a very small recording device

23    that he explained to me that I would need to but a

24    preamble on it, a little introduction.  Showed me

25    where he would put it in the vehicle and asked me to

1    return it to him after we transported the two

2    individuals.

3    Q    Had you, sir, performed this kind of role prior

4    to the morning of August 5th in any of your other

5    investigations, something like this?

6    A    Not that I can think of.  I've never been an

7    individual actually being wired or monitored, if you

8    will.  I have actually used cooperating witnesses to

9    do that type of work for me, but I've never been the

10   actual consenting party.

11   Q    So you've been involved in these kind of matters

12   but not with you yourself as a participant, it sounds

13   like?

14   A    Exactly.

15   Q    As you understood it and based upon what you

16   observed and what you did that morning, was this

17   recording device that was with Agent Klimas, was it

18   put somewhere and do you recall or do you know where

19   it was put?

20   A    Yes, I do.  Mr. Klimas showed me that he was

21   going to put it behind the back seat in an area that

22   would kind of sit between the two individuals.  My

23   layman's understanding of what that was for was so

24   that it would best pick up both individuals speaking

25   to each other.  So it's right in the middle behind

1    the back seat.

2    Q    Who inserted it or placed it there in the car?

3    A    Ed Klimas actually placed it in the car but

4    showed me where he placed it so I could remove it.

5    Q    And once it was placed by Agent Klimas, was it

6    visible to people who didn't know it was there?

7    A    No, sir.  It would not have been visible.

8    Q    With respect to all this, once the recorder was

9    placed in that location, what is the next thing that

10   happened with respect to this investigation that

11   morning?

12   A    Once the recorder was in place, we were able to

13   move the police vehicle up to the location where the

14   two subjects were and then put them in the vehicle.

15   Q    And did that in fact happen?

16   A    It did.

17   Q    Do you recall or do you know, the vehicle that

18   we're talking about here, was it a law enforcement

19   vehicle or whose car was it?

20   A    My understanding, it was Deputy Lamar Blakely's

21   vehicle.

22   Q    Did you have occasion to meet with him on that

23   morning?

24   A    I did.

25   Q    And was anyone else involved in that ride from

1    that location?  Who else was involved in that car?

2    A    The only individuals in the car were Lamar

3    Blakely, myself, Mr. Megahed, and Ahmed Mohamed.

4    Q    I'm going to ask you the question, if you look

5    about the courtroom today and recognize anyone who

6    was in that car or to be in that car that morning on

7    that drive on August 5th of 2007.  If so, could you

8    point them out and indicate an article of clothing

9    they have on today?

10    A    Sure.  Youssef Megahed with the white shirt and

11    the tie.

12        MR. HOFFER:  Indicating the defendant, Your

13    Honor.

14        THE COURT:  Yes.

15    BY MR. HOFFER:

16    Q    Now, you said when you first saw -- let's stick

17    here for a second with the defendant.  When you first

18    saw him on that morning, do you recall where he was

19    in relation to everything that was going on?

20    A    I believe they were bringing him out of a second

21    vehicle.  I think he was still sitting in somebody

22    else's vehicle.  I can't swear to that, but that's my

23    estimation.  They took him out of one vehicle to put

24    him into Blakely's vehicle for the transportation.

25    Q    You indicated there was yet another person as

1  well in addition to the defendant?

2  A    There was.  Mr. Ahmed Mohamed.

3  Q    Do you recall where you first saw him on that

4  morning and where -- what he was doing?

5  A    They were bringing him also from the same

6  general area where the vehicle was to put him in the

7  back of Lamar Blakely's vehicle.

8  Q    When you saw those two individuals, the

9  defendant and this Mr. Mohamed, I would ask you, sir,

10  do you recall having an idea whether you had ever met

11  or had contact with either one of them prior to that

12  morning on that day?

13  A    I did not recognize either one of them.  No, I

14  didn't think I had had contact prior with either one

15  of them.

16  Q    Now, let me ask you or go back to this issue of

17  the recording device for a quick second.  You

18  mentioned that you had never been a participant in

19  this kind of situation prior to that morning, but you

20  had some involvement with those kinds of

21  investigative tools, is that correct?

22  A    Yes, that is correct.

23  Q    Have you had experience with them since August

24  of 2007?

25  A    No, I have not.

1    Q    You've mentioned something about a preamble, I

2    think was the word you used.  Can you explain what

3    you meant by this preamble and what it was?

4    A    Under normal conditions during a law enforcement

5    investigation when we're going to record an interview

6    or a phone call, or in this nature a conversation, we

7    like to have the law enforcement officer to state his

8    name, the date, maybe a time, maybe a location, just

9    something to kind of authenticate that piece of

10   evidence for a later date.

11   Q    And did you make such a preamble on that

12   morning?

13   A    Yes, sir, I did.

14   Q    Now, when it came to the point in time that the

15   defendant -- and you saw Mr. Mohamed.  Were they

16   restrained or cuffed in any way or anything like

17   that?

18   A    Yes, sir.  They would have been handcuffed at

19   that time.

20   Q    Did they enter the car -- were they placed into

21   the car on that morning?

22   A    They would have been helped into the vehicle,

23   sure.

24   Q    Do you recall where they were seated in the

25   vehicle?

1    A    Yes.  If I were sitting in the vehicle this way,

2    I'm in the passenger seat in the front.  Mr. Mohamed

3    would have been behind Deputy Blakely.  Mr. Megahed

4    would have been behind me.

5    Q    Was there anything dividing, physically

6    dividing, the area between where you and Corporal

7    Blakely or Deputy Blakely sat and the location where

8    the defendant and Mr. Mohamed sat?

9    A    No, sir.  There was no barrier between us.

10   Q    Did there come a point in time that the police

11   vehicle you were in departed from that location that

12   morning?

13   A    Yes, there was.

14   Q    Do you recall about what time that was?

15   A    I arrived at the scene around 3:00, and we

16   departed for the jail at approximately four o'clock

17   in the morning.

18   Q    How long did that trip take?

19   A    It was approximately 15 or 20 minutes.

20   Q    During the course of that 15- or 20-minute time

21   period, was there any conversation in the car that

22   you recall?

23   A    Yes, there was.

24   Q    And who was involved in the conversation, first

25   of all, just get the parties?

1    A    Initially, Mr. Mohamed asked me a couple of

2    direct questions.  And then Mohamed and Mr. Megahed

3    had a discussion.  Those would have been the only

4    parties.  I don't believe Officer Blakely spoke to

5    them or to me directly during that ride.

6    Q    Now, other than the brief -- or the conversation

7    you may have had with Mohamed on that morning, you

8    said initially there was some of that, the other

9    conversation you said was between whom?

10   A    Mr. Megahed and Mr. Mohamed.

11   Q    So they weren't -- was anyone addressing or

12   speaking to you or Corporal Blakely as far as you

13   could tell from what you heard or were they talking

14   amongst themselves?

15   A    Talking amongst themselves after the initial

16   questioning, if I understood your question correctly.

17   Q    What language did all this conversation take

18   place in?  First of all, the initial discussion

19   between yourself -- between you and Mohamed, what

20   language was that in?

21   A    English.

22   Q    Did you find that you had an ability to

23   understand what he was saying to you in English and

24   he was understanding you at that time?

25   A    Yes.

1    Q    And the later or a bit later conversation, as

2    you described it, between the defendant and Mohamed,

3    do you recall what language that conversation took

4    place in?

5    A    They spoke to each other in Arabic.

6    Q    Now, during the course of the conversation

7    between the defendant and Mohamed, were you able to

8    hear part or parts or any of that conversation?

9    A    I was able to hear parts of it, not all of it.

10   I was able to comprehend very small pieces,

11   fragments, words, not necessarily context or meaning.

12   Q    When you say pieces or fragments, what kinds of

13   types of pieces or fragments were you understanding

14   during the course of their conversation back and

15   forth?

16   A    There were words that stood out to me that, one,

17   told me I was probably listening to people speaking

18   in an Egyptian dialect.  Words like *kibda* (ph), words

19   like *hagga* (ph); *aey* for what.  *Kibda* meaning this.

20   *Hagga* being a unique pronunciation of an Arabic word.

21   *Mish* (ph) to negate a noun, being somewhat unique but

22   not exclusive to Egyptian dialect.  So I was hearing

23   things that kind of help confirm to me that they were

24   speaking in an Egyptian dialect.

25   Q    What's the extent or what's the nature of your

1    experience with Egyptian dialects as opposed to say

2    other dialects in the Middle East?

3    A     During the two years I lived in the Middle East,

4    I spent six months in Egypt, approximately six months

5    of that time.  So I had several conversations or

6    numerous conversations with Egyptians where you could

7    actually start to understand a little bit of the

8    nuances and the differences between standard Arabic.

9    Q     Now, in the course of the period of time of the

10    conversation that you were sort of listening to or

11    overhearing, with you able to inform some impression

12    from that as to what kind of a conversation and what

13    was the nature of the conversation?

14    A     Again, without understanding the full context or

15    all of the vocabulary, my initial impression and what

16    I brought back to the linguist to review was that the

17    discussion was about --

18         THE COURT:  His question was not what the

19    subject was but were you able to understand the

20    nature of the conversation.  That's really yes or no.

21         THE WITNESS:  I'm sorry, Your Honor.  Yes.

22         THE COURT:  All right, go ahead.

23    BY MR. HOFFER:

24    Q     My next question would be:  Did you form an

25    impression and what was that impression of what was

1    the substance of that discussion or conversation?

2        MS. DYER:  Objection, Your Honor.  May we

3    approach?

4        THE COURT:  You may.

5        (At side bar, on the record.)

6        MS. DYER:  Your Honor, I would object.  I

7    believe the question was calling for --

8        THE COURT:  What is the legal basis for your

9    objection?

10       MS. DYER:  Hearsay.  I believe it's calling for

11   responses -- a response based on what Mr. Mohamed

12   said.

13       THE COURT:  But not to prove that Mohamed is a

14   truthful man, only to prove the contents of his

15   words.  You don't get that?  If they said something

16   conspiratorial, let's assume that hypothetical for a

17   moment.  Assume that there was conspiratorial theme.

18   It's only being introduced to prove that that's what

19   they said, not the truth of any fact they assert.

20   That's a pretty solid hearsay analysis, Ms. Dyer.

21       MS. DYER:  Let me see if I understood that

22   analysis.

23       THE COURT:  To prove that the statement was made

24   and not to prove the truth of it.

25       MS. DYER:  Right.  And I think the Court said

1    even if we assume it was conspiratorial in nature, is

2    that what you said?  I'm not sure I heard you.

3         THE COURT:  I was just -- it doesn't make a

4    difference what they said, although it could bear on

5    relevance, I suppose.  He's not offering the

6    statements of Megahed and Mohamed to prove their

7    truthfulness.

8         MS. DYER:  I understand that.

9         THE COURT:  He is presenting them only to show

10   what was said in the back of that car.  I don't know

11   what it was, so I can't -- I don't know.  I'm the

12   only one here that doesn't know what was said.  I

13   don't know what exact analysis to give it.  I think

14   we can exclude that the United States is proving up

15   the veracity, character for truthfulness for Mohamed

16   and Megahed.

17        MS. DYER:  Yes, Your Honor.  And if I could just

18   put one thing on the record?

19        THE COURT:  Yes.

20        MS. DYER:  I believe that in the Eleventh

21   Circuit when talking about whether or not a statement

22   of a co-conspirator could show come of a non

23   testifying co-conspirator --

24        THE COURT:  This is different a objection, but

25   go ahead.

1          MS. DYER:  Well, no.  It still has to do with

2     hearsay, Your Honor.  I'm trying to establish that it

3     is hearsay in the Eleventh Circuit or it could be

4     hearsay in the Eleventh Circuit.  They have held that

5     even when what the co-conspirator is saying is in an

6     effort to conceal the conspiracy, not for the truth

7     of the matter asserted, but the consent is an attempt

8     to conceal the conspiracy --

9          THE COURT:  It's still within the conspiracy.

10         MS. DYER:  -- that it only comes in if it's in

11    furtherance of the conspiracy because obviously

12    co-conspirator statements in furtherance of the

13    conspiracy are an exception to the hearsay rule.

14    Therefore, if you work backwards, I'm submitting that

15    that means it is hearsay originally because it is non

16    testifying co-conspirator even in those instances

17    because it's trying to conceal the conspiracy.

18    Obviously, it's not for the truth of the matter

19    asserted just like here.  I believe the Government is

20    going to say they were making replies, as they have

21    said in opening and in some prior court hearings.  So

22    it's not for the truth of the matter, of course.  I

23    believe under the Eleventh Circuit analysis for the

24    admission of similar co-conspirator statements when

25    they are not testifying, they have held that it is

1    necessary to find that it was made in furtherance of

2    a conspiracy between the two individuals in order to

3    get around the hearsay rules.

4        MR. HOFFER:  Your Honor, as we indicated in our

5    trial brief, I think it's true the Eleventh Circuit

6    is sort of stingy on 801(d)(2)(E), co-conspirator

7    statements, in the context of the ultimate stage of

8    the conspiracy, if you will.  It's just about over.

9        Interestingly, there is no case in the Eleventh

10   on this kind of situation.  But there is one we cited

11   in our brief I think from the Tenth Circuit.

12       THE COURT:  You mean --

13       MR. HOFFER:  Two defendants.

14       THE COURT:  -- when the conspiracy itself has

15   been interrupted as far as its active phase.

16       MR. HOFFER:  Correct.  That case certainly

17   clearly is almost on all fours with this.  The court

18   there had no trouble determining that conversation

19   was an exception to the hearsay rule.  Of course,

20   we're not offering it for the truthful of what they

21   said but for what they said to each other.

22       THE COURT:  Ms. Dyer, your circumstance comes up

23   when the non testifying declarant says to the other

24   conspirator, "It was you that got us into this mess

25   when you shot Jones."  Or the two of them saying, "It

1    was old Bill that got us both into this."

2        Now, don't shake your head on me, Ms. Dyer.  I

3    understand you disagree.  But it seems to me this is

4    no more than a statement.  So I think it comes in

5    either way or both ways.

6        MS. DYER:  With all due respect, Your Honor, I

7    think Mr. Hoffer just made my point.  The only case

8    he could find even close to the circumstances in

9    this, they had to find an exception to the hearsay

10   rule.  That exception was --

11       THE COURT:  It depends on what that conspirator

12   is saying to that other conspirator.  It depends on

13   upon the content.  They might be offering it for the

14   truth if what they're saying is, for instance, to the

15   co-conspirator, "It was you who pulled the trigger

16   and that's what got us both into this trouble."  Now,

17   that's not being introduced to prove it was said.

18   That's being introduced to prove who the trigger man

19   was.  Hearsay.  It dies unless it's saved elsewhere

20   as a co-conspirator statement qualifying it.

21       We don't get there because what's the fact that

22   the United States is trying to establish by

23   introducing this testimony?

24       MS. DYER:  That they're co-conspirators.  That

25   was clear in their trial brief and opening statement.

1        MR. HOFFER:  And, respectfully, that they are

2    furthering their conspiracy.

3        THE COURT:  I'm sorry, Ms. Dyer.  I listened

4    hard but I don't think that's right.  The closest I

5    could get to ruling in your favor was if the

6    statement had been, "Well, I'm glad we're

7    co-conspirators."  I'm not sure that would qualify

8    and that's kind of silly anyway.  I think you're

9    wrong on both prongs.  First, it's not hearsay.  If

10   it were, it's saved by the co-conspirator.

11   Overruled.

12       (End of side bar discussion.)

13   BY MR. HOFFER:

14   Q    I guess if you recall my last question -- I'll

15   put it to you again, or do you recall it?

16   A    I do not recall it.

17   Q    My question to you I believe was something along

18   these lines.

19       THE COURT:  If your not sure, wait just a

20   moment.

21       MR. HOFFER:  Thank you, Your Honor.  If the

22   court reporter has it.

23       THE COURT:  Your question was:  Did you form an

24   impression and what was that impression?  What was

25   the substance of that discussion or conversation?

```
 1        That's three questions.  You can sort of add them
 2        together, divide by three, and answer that one.
 3             THE WITNESS:  Thank you, Your Honor.  Yes, I did
 4        form an impression.  My impression of the discussion
 5        was it was about their mini detentions, if you will,
 6        and what they talked about to the officers that
 7        talked to them and what was in the vehicle at the
 8        time.
 9             THE COURT:  Did you say many detentions?
10             THE WITNESS:  Mini detentions.
11             THE COURT:  M-I-N-I?
12             THE WITNESS:  Mini, yes, Your Honor.
13        BY MR. HOFFER:
14        Q    Did there come a point in time, Agent, Noble,
15        that you all in the car arrived somewhere?
16        A    Yes.
17        Q    Where did you arrive, first of all?
18        A    We arrived at the Berkeley County Jail.
19        Q    And what happened there?
20        A    At that point Mr. Mohamed and Mr. Megahed were
21        removed from the vehicle, taken inside the jail to be
22        processed.
23        Q    And what did you do that the time?
24        A    I initially helped to take them into the jail
25        and watched the processing begin with the other
```

1    sheriff's deputies.

2    Q    What, if anything, did you do then?

3    A    Once they had finished securing the two

4    individuals to a place that they were able to move

5    them away from the booking center area, I went back

6    to the vehicle.

7    Q    And what did you do at that point, sir?

8    A    I removed the recording device and took the

9    battery out of it.

10   Q    Can you explain the reason why you took the

11   battery out?

12   A    It's not the type of device that has a very

13   readily available on/off switch.  To take the power

14   off and to not record the conversation of Deputy

15   Blakely and myself on the way back, we just shut it

16   off.  We shut it off by taking the battery out.

17   Q    Based upon your familiarity with these kinds of

18   recording devices and the use of them, is that a

19   normal routine to shut down the device after the

20   parties you're seeking to record have left the

21   location?

22   A    Yes, absolutely.  You don't want to have hours

23   of non related conversation on the tape because that

24   tape is going to become evidence.  You don't want to

25   have all that transcribed as a part of the evidence.

1    Q    Let me ask you, where did you go from that

2    location that morning next?

3    A    We went back to the crime scene location where I

4    took the recording device and provided it back to Ed

5    Klimas.

6    Q    Now, let me ask you about what -- what you

7    overheard, the conversation between the defendant and

8    Mohamed.  Did you detect any difference, if you will,

9    in their tone or the ability you had to hear them

10   clearly and what they were saying between this

11   defendant and Mohamed?  If so, what was the

12   difference there?

13   A    I did notice a difference.  Mr. Mohamed was

14   quite a bit louder and much easier to understand from

15   my position.  He also seemed to speak quite a bit

16   more.  Mr. Megahed was a little quieter, little more

17   muffled, and was a little more difficult to hear.

18   Q    Let me direct your attention to a bit later on

19   on that day.  After you met up with Agent Klimas and

20   gave him back this device, did you have some occasion

21   later that day to do some further follow-up work in

22   this case?

23   A    I did.

24   Q    What did you do and -- first of all?

25   A    Later that afternoon I went back down to the FBI

1    office where an actual Egyptian linguist sits and has

2    a copy made of the recording in order to begin the

3    translation process.

4    Q    Did you have an opportunity at that point in

5    time to hear a recording of what purported to be that

6    conversation in the back seat of the car?

7    A    Yes, I did.

8    Q    And did it appear familiar to you or did you

9    recognize it at that time?

10   A    Sure, I recognized it as the conversation from

11   just hours earlier on the same day.

12        MR. HOFFER:  May I approach the witness, Your

13   Honor?

14        THE COURT:  You may.

15   BY MR. HOFFER:

16   Q    Before I come up, Agent Noble, let me ask you,

17   have you had occasion recently prior to today coming

18   into court to review or hear that recording of that

19   conversation again?

20   A    Yes, I have.

21   Q    When was the last time that you recall that you

22   listened to it?

23   A    It would have been yesterday morning.

24   Q    If I could approach and I'll show you what is

25   marked as Government's Exhibits 33 A, 33 B, and 33

1    A2, I guess.  There are three all together.  Let me

2    direct your attention first to Government's Exhibit

3    33 A.  Do you recognize that item as something you

4    have seen or had contact with prior to today?

5    A    Yes, I do.

6    Q    And what do you recognize it to be?

7    A    I placed my initials, T-A-N, in red on the CD or

8    the disc.

9    Q    When did you last see it or do that, as you

10   remember?

11   A    That would have been yesterday morning.

12   Q    And did you do anything with the disc itself at

13   that time that you did that?

14   A    I would have played the content to refresh my

15   recollection and confirm that it was the same

16   conversation.

17   Q    And once you listened to the contents of that,

18   what was your impression as far as whether it was a

19   recording of that conversation?

20   A    That it is the same recording from that

21   conversation.

22   Q    Let me ask you now --

23        MR. HOFFER:  Your Honor, at this point I would

24   offer Government's Exhibit 33 A.

25        MS. DYER:  Same objection.

1        THE COURT:  What's the legal basis for your

2   objection?

3        MS. DYER:  Hearsay, Your Honor.

4        THE COURT:  The side bar objection?

5        MS. DYER:  Yes, Your Honor.

6        THE COURT:  I persist in my ruling.  33 A is

7   received on behalf of the United States.

8        (Government's Exhibit No. 33 A is received into

9   evidence.)

10  BY MR. HOFFER:

11  Q    Now, did you have occasion prior to today as

12  well to review in a similar fashion either 33 A2 or

13  33 B prior to coming to court this afternoon?

14  A    Yes, I did.  Actually the same time yesterday

15  morning.

16  Q    So the other two, you listened to both of those

17  yesterday?

18  A    Yes, sir.

19  Q    And how do you know that those are the items

20  that you listened to?

21  A    They also have my initials on them.

22  Q    And when did you place the initials on there?

23  A    Yesterday morning.

24  Q    I would ask you same question as to 33 A2 and 33

25  B.  When you listened to them, did you detect, first

1    of all, any difference between those two and 33 A,

2    the one you said you just looked at a minute ago?

3    A    Yes, I did.

4    Q    What was the difference?

5    A    One of them actually is enhanced where you can

6    actually hear the audio of the two individuals

7    speaking a little better.  It's a little clearer

8    sounding.

9    Q    Let's focus on that one.  Do you recall or do

10   you remember which one that was?

11   A    I believe that one is 33 B.

12   Q    As a consequence of that, listening to it, did

13   you get an impression or understanding in listening

14   as to whether it was a fair and still accurate

15   recording of what you heard on the morning of August

16   5th of 2007?

17   A    Yes, I did.

18        MR. HOFFER:  Your Honor, at this point I would

19   offer 33 B, you said?

20        THE WITNESS:  Yes, sir.

21        MR. HOFFER:  I would offer 33 B.

22        MS. DYER:  Same objection.

23        THE COURT:  I persist in my ruling.  33 B is

24   received on behalf of the United States.

25        (Government's Exhibit No. 33 B is received into

1    evidence.)

2    BY MR. HOFFER:

3    Q    I guess, sir, I'd just ask you the same

4    question.  33 A2, which you have there, you listened

5    to that as well yesterday?

6    A    Yes, I did.

7    Q    Same question, sir.  Did that fairly and

8    accurately when you heard it at least the spoken part

9    of the conversations that occurred in that car on the

10   morning of August 5th, 2007?

11   A    Yes, it is a fair and accurate representation of

12   the spoken portions of the conversation that evening.

13        MR. HOFFER:  Your Honor, I would offer 33 A2 at

14   this point.

15        MS. DYER:  May we approach?

16        THE COURT:  You may.

17        (At side bar, on the record.)

18        MS. DYER:  Your Honor, this exhibit also has a

19   translation by a Government witness that has not been

20   certified as an expert or qualified to actually

21   translate Arabic to English.  So until that occurs, I

22   would ask that this exhibit not be admitted.

23        THE COURT:  This witness did the translation?

24        MR. HOFFER:  No.

25        MS. DYER:  No, Your Honor.

1       MR. HOFFER:  Your Honor, if I may.  We're not

2  going to seek to publish it now.  Counsel is right.

3  It does have that additional translation, which will

4  -- subject to connection, we do have a witness who

5  will authenticate the translation and at that point

6  we'll seek to publish it.

7       THE COURT:  You're not going to publish the

8  audio portion now?

9       MR. HOFFER:  I'm going to publish it because

10  it's in Arabic.  It serves no purpose without the

11  translation.  We're not going to seek to publish it

12  now anyway.

13       THE COURT:  Absent the proper foundation, the --

14  is this the one with the superimposed translation?

15       MR. HOFFER:  Yes.

16       THE COURT:  That superimposed translation can't

17  come in until we have it established.

18       MR. HOFFER:  I understand.  We won't publish it

19  anyway until that point.

20       THE COURT:  As it turns out, I think the

21  objection may be premature but meritorious on the

22  present record.

23       MS. DYER:  If this gets admitted, it will then

24  be stricken if the translator --

25       THE COURT:  Or I'll conditionally admit it.  I

1     think the federal rules contemplate conditional

2     admission subject to establishing --

3          MR. HOFFER:  Or I can withdraw the offer of it

4     and offer it at that point, either way.

5          THE COURT:  Either one.  If it's offered, I'm

6     going to conditionally admit it subject to the

7     establishment of the proper foundation.

8          MR. HOFFER:  That's fine, Your Honor.

9          MS. DYER:  Thank you.

10          THE COURT:  Of course, for the audio portion, it

11     would be admissible separately.  Whether it would be

12     meaningful if played, of course, is another question.

13     With the legend and translation, I think it's got to

14     be conditionally admitted at most.  So are you going

15     to put it in conditionally?

16          MR. HOFFER:  I would offer it conditionally,

17     yes, sir.

18          THE COURT:  We will receive it conditioned upon

19     the subsequent establishment of a proper predicate.

20          (End of side bar discussion.)

21          THE COURT:  That would apply as to all three of

22     the exhibits or just one of the three?

23          MR. HOFFER:  I think the objection relates only

24     to 33 A2, Your Honor.

25          THE COURT:  But it would apply -- I don't know

```
 1    that, so it's a question.  Is there a legend on the
 2    other two?
 3         MR. HOFFER:  There is not.
 4         THE COURT:  Okay.  So A2 then is conditionally
 5    admitted on behalf of the United States.
 6         (Government's Exhibit No. 33 A2 is conditionally
 7    received into evidence.)
 8         MR. HOFFER:  If I could have a moment?
 9          (Pause.)
10         THE COURT:  Subject to the establishment of a
11    proper predicate.
12         MR. HOFFER:  If I could approach the witness for
13    just one more second.
14         THE COURT:  That may have sounded peculiar,
15    members of the jury, the part about conditional
16    admission, but sometimes an item of evidence in order
17    to be admitted into evidence, shown to the jury, and
18    used during your deliberations may require the
19    establishment of one or two or three things.
20    Sometimes it's only possible to establish one or two
21    of them through one witness and it may take a third
22    witness to establish something else.  What in plain
23    language I said just a second ago was that we have
24    two or three things that need to be done here.  This
25    witness has only done and can only do one or two of
```

1    them.  So later on another witness will presumably do

2    the third, and then we'll unconditionally admit it if

3    that predicate is satisfied.  Sounds a little hocus

4    pocus, but it's a sound way to indicate on the record

5    what stage of progress we've made as of this moment.

6    So excuse me for that.

7         Mr. Hoffer?

8         MR. HOFFER:  Thank you, Your Honor.

9    BY MR. HOFFER:

10   Q    Just one other question, Agent Noble.  I have

11   placed before you what's been received in evidence as

12   Government's Exhibit I think it's 71.  And looking at

13   that, especially the individual depicted in the first

14   -- on the first page of that exhibit, do you

15   recognize that person?

16   A    Yes, I do.

17   Q    And who is that and where do you recognize him

18   from?  Compound.

19   A    That is Ahmed Mohamed and I recognize him from

20   the traffic stop location that evening.

21        MR. HOFFER:  Thank you, Your Honor.  I have no

22   further questions of this witness at this time.

23        THE COURT:  Thank you, Mr. Hoffer.

24        MS. DYER:  May I, Your Honor?

25        THE COURT:  Ms. Dyer, you are recognized for any

1    cross-examination of Mr. Noble.

2                      CROSS-EXAMINATION

3    BY MS. DYER:

4    Q    Mr. Noble, I believe you testified that before

5    Mr. Mohamed and Mr. Megahed began speaking to each

6    other in Arabic, Mr. Mohamed asked you a few

7    particular questions?

8    A    Yes, ma'am, that's correct.

9    Q    And that was in English?

10   A    Yes.

11   Q    I believe when you said that you came to an

12   impression about what this conversation was about you

13   said mini detention.  I had trouble understanding.

14   At first I thought you said many, M-A-N-Y.  What did

15   you say?

16   A    Mini, M-I-N-I.  Maybe a bad choice of words.

17   Prior to being arrested, they were detained, so I

18   labelled it a mini detention.  Maybe a bad choice.

19   Maybe just simply a detention.

20   Q    Then did you say they were talking about the

21   interviews they gave to police during that mini

22   detention?

23   A    That was the impression I formed, yes, ma'am.

24        MS. DYER:  Thank you.  Nothing else, Your Honor.

25        THE COURT:  Thank you, Ms. Dyer.

1          Anything further, Mr. Hoffer?

2          MR. HOFFER:  I do have one or two, I think.

3                    REDIRECT EXAMINATION

4     BY MR. HOFFER:

5     Q     Agent Noble, if you recall, was there some

6     sequence in your conversation with Mohamed, Mr.

7     Mohamed in English, that prompted then a change in

8     the conversation turning to another language and then

9     just between the defendant and he.  Do you recall how

10    that all happened?

11    A     Yes, I do.

12    Q     What happened?

13    A     Mr. Mohamed first asked me -- I was wearing a

14    ball cap that night that said NCIS on it.  He asked

15    me what NCIS stood for.  I explained to him it was

16    the Naval Criminal Investigative Service.  He

17    mentioned he was doing some teaching down here at the

18    University of Southern Florida and he knew a Navy

19    guy.  Then it progressed into him asking me if it was

20    okay if he and Mr. Megahed spoke to each other.

21    Q     And what did you respond?

22    A     I told him it was okay.

23    Q     Was there anything else in that line of

24    conversation?

25    A     He then asked me if it was okay if they spoke in

1    Arabic.  I told him that that was okay as well.

2         MR. HOFFER:  Thank you, Your Honor.  I have no

3    further question of this witness.

4         THE COURT:  Thank you, Mr. Hoffer.

5         In that case, Mr. Noble, you may step down.

6    You're excused with our thanks.

7         THE WITNESS:  Thank you, Your Honor.

8         (End of excerpt of proceedings.)

9

10                   C E R T I F I C A T E

11        I, Kerry Mercade, certify that the foregoing is

12   a correct transcript from the record of proceedings

13   in the above-entitled matter.

14                                   S/Kerry Mercade

15                                   Kerry Mercade
                                     Court Reporter
16

17

18

19

20

21

22

23

24

25