1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2                 TAMPA DIVISION

3    UNITED STATES OF AMERICA

4

5          vs.              CASE NO. 8:07-cr-342-T-23TBM
                            March 23, 2009
6                           Tampa, Florida

7

     YOUSSEF SAMIR MEGAHED,
8
          Defendant.
9
     _____/
10
            TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11              (TESTIMONY OF SUSAN BUCENELL)
            BEFORE THE HONORABLE STEVEN D. MERRYDAY
12              UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:  JAY HOFFER
                          ROBERT MONK
15                        Assistant U.S. Attorneys
                          400 N. Tampa Street, Suite 3200
16                        Tampa, Florida 33602
                          813/274-6000
17
     For the Defendant:   ADAM ALLEN
18                        DIONJA DYER
                          Assistant Federal Defenders
19                        400 N. Tampa Street, Suite 2700
                          Tampa, Florida 33602
20                        813/228-2715

21   Court Reporter:      Kerry Mercade
                          801 N. Florida Avenue
22                        Suite 15A
                          Tampa, Florida 33602
23                        813/301-5024

24

25   Proceedings recorded and transcribed by
     computer-aided stenography.

1                           **INDEX**

2
**GOVERNMENT WITNESS SUSAN BUCENELL**
3   Direct Examination by Mr. Monk...........3
Cross-Examination by Mr. Allen...........19
4

5                  **GOVERNMENT'S EXHIBITS**

6
    **Number      Description              Page**
7
    49 A        Photograph (U-Store-It).......18
8   49 B        Photograph (U-Store-It).......18
    49 E        Photograph (U-Store-It).......18
9   49 F        Photograph (U-Store-It).......18
    49 G        Photograph (U-Store-It).......18
10  52 A        Cap tips.....................12
    53 A        Potassium nitrate granules....14
11  54 A        Sulfur.......................14

12
                   **DEFENDANT'S EXHIBITS**
13
    7 K         Photograph (contents/crates)..28
14  7 R         Photograph (four tires).......28
    7 S         Photograph (crate/notebook)...28
15  7 Q         Photograph (bottles/auto).....28
    7 O         Photograph (two plastic
16              Containers)..................28
    7 U         Photograph (STP fuel injector
17              Cleaner).....................28

18

19

20

21

22

23

24

25

1          GOVERNMENT WITNESS, SUSAN BUCENELL, SWORN

2          THE COURT:  State your name, please.

3          THE WITNESS:  Susan, middle initial B, last name

4     Bucenell, B-U-C-E-N-E-L-L.

5          THE COURT:  Please have a seat in the witness

6     stand and I will recognize Mr. Monk for your Direct

7     Examination.

8                      DIRECT EXAMINATION

9     BY MR. MONK:

10    Q     Ma'am, would you please tell us your occupation?

11    A     I'm an FBI agent.

12    Q     How long have you been employed?

13    A     For 17 years.

14    Q     And is one of your collateral assignments as an

15    FBI agent an assignment to be a member of the

16    evidence response team?

17    A     Yes, it is.

18    Q     And as such, correct me if I'm wrong, you-all

19    have some specialized training in the identification,

20    collection, and preservation of evidence, is that

21    correct?

22    A     Yes, it is correct.

23    Q     During the course of the investigation that is

24    now pending, the case that's pending before this

25    court, did you serve as the team leader on any

1    searches?

2    A    Yes, sir, I did.

3    Q    I'd like to, first of all, begin with date of

4    August 10th, 2007.

5    A    Okay.

6    Q    And I don't want you to tell us the address,

7    okay?

8    A    Okay.

9    Q    On or about that date, August 10th of 2007, did

10   you and other agents conduct a search of Paulette

11   Poliquin's residence?

12   A    Yes, we did.

13   Q    And was that search pursuant to a search

14   warrant, consent, or some other authority?

15   A    That search was pursuant to a consent to search

16   signed by Ms. Poliquin.

17        MR. MONK:  Judge, may we approach the bench for

18   just a moment, please?

19        THE COURT:  You may.

20        (At side bar, on the record.)

21        MR. MONK:  Your Honor, I would like to at least

22   elicit from her the street that this was on because

23   we've got to connect what was taken from the

24   residence with what was examined by the lab.  I can

25   do that by reference to the street without getting

1    into any more specific address.  Would that be okay?

2    Just Nedro street.

3        THE COURT:  I guess there are other things on

4    that street, so it's not tantamount to the street

5    address.

6        MR. MONK:  Okay.

7        THE COURT:  If it's necessary, it's necessary.

8    We still have -- you still have an obligation to

9    edit, redact the transcript to omit under Rule 49.

10   That's the only reason the announcement comes with --

11   the statement in open court comes within the purview

12   of the rule is because the transcript will get placed

13   on the docket.  And if the transcript gets placed on

14   the docket, then it's a public document.  What the

15   rules have done is create a redaction responsibility

16   to counsel at the time they acquire the transcript

17   and the reporter.  They need to tell the reporter

18   what to redact.

19       MR. ALLEN:  That's why we get that notice.

20       THE COURT:  Well, it's in the rules.  It's not

21   Merryday.  It's in all rules:  Civil, criminal,

22   bankruptcy, and appellate, all that new privacy

23   policy rule.  That's why I'm doing it.  When the

24   committee adopted the rules, they recognized that

25   there was going to be some transition required to get

1    people to adjust to it, but my reason for suggesting

2    to you that we not use the numbers in open court is

3    not because the rule effects open court, because it

4    doesn't, but it relieves your redaction

5    responsibility if we don't ever get it into the

6    transcript.

7         MR. MONK:  Right.

8         THE COURT:  So what I suggest to people is they

9    not use it to start with unless it's necessary.  If

10   it is, they have to remember to redact it.  Does that

11   make sense?

12        MR. MONK:  It did.

13        MR. ALLEN:  Correct me if I'm wrong, but doesn't

14   that include account numbers, bank account numbers?

15        THE COURT:  Yes.

16        MR. ALLEN:  That's going to be an issue as well.

17        THE COURT:  There are three or four categories:

18   Identifiers for minors, financial account numbers,

19   street addresses, last four digits -- you may include

20   only the last four digits of the Social Security

21   number or tax payer ID; the year of an individual's

22   birth, if it's a date of birth; minor's initials

23   rather than name; last four digit of the financial

24   account number; the city and state of the home

25   address.

```
 1          So, in other words, if we get -- I sort of think
 2     it's not good because of newspaper potential and the
 3     like.  If you did ask for the address here by name of
 4     street and number, then you'd have to redact both and
 5     leave it only with the city and state according to
 6     the rule.
 7          MR. ALLEN:  I think Mr. Monk and I had a
 8     prosecution for people taking this information.
 9          MR. MONK:  That's right.
10          THE COURT:  And these days with some of the --
11     I'm not sure what it's -- with some of the
12     individuals who on web pages are dispersing some of
13     this information with mal intent.  It was among
14     others, not exclusively, but among others the
15     Department of Justice that wanted these rules and I
16     think wisely so.  The answer to your question is yes,
17     you may.
18          (End of side bar discussion.)
19          THE COURT:  Yes.
20     BY MR. MONK:
21     Q    This search that we're getting into that
22     occurred on August 10th, 2007 at Paulette Poliquin's
23     residence, the street name only, is that Nedro Street
24     in Tampa?
25     A    Yes, sir, it was.
```

1    Q    Were you the team leader on that search?

2    A    Yes, I was.

3    Q    As such, does that mean that you were

4    essentially the evidence custodian?

5    A    Well, it means a little more than -- yes, I was

6    the evidence custodian, but I was administratively in

7    charge of the team that day.

8    Q    Will you please describe for the jury the area

9    of the residence that was encompassed by that search?

10    A    That day we were searching a bedroom and a

11    bathroom --

12    Q    Okay.

13    A    -- that was within the home.

14    Q    The bedroom that you searched, was that

15    identified to you to be Mr. Ahmed Mohamed's bedroom?

16    A    Yes, it was.

17    Q    And the bathroom, similarly, a bathroom that Mr.

18    Mohamed used?

19    A    Yes, sir.

20    Q    What did you take away with you during the

21    course of that search?

22    A    Would you like me to just go over my evidence

23    recovery log and go down the log to let you know?

24    Q    If you would, please, but I don't want you to

25    read.  Try to testify from your present memory.  If

1    you need to refer to something to refresh your

2    memory, you may do so.

3    A    Okay.  Well, the biggest thing that we took that

4    day from the residence from the bedroom was -- I had

5    made the decision early on in search that we were

6    going to take the entire carpet.  We were going to

7    cut the entire carpeting out of the bedroom because

8    we were initially searching on our hands and knees.

9    It was like a real thick pile carpeting.  It was an

10   older carpeting.  And we kept finding all sorts of

11   little things in the carpeting, so I had the decision

12   that we were going to take the entire carpeting.  So

13   in order to do that, we had to cut the carpeting in

14   two pieces in order to be able to roll it up and take

15   it away.

16   Q    Excuse me.  Sorry to interrupt.  In that regard

17   you said you had make the decision to take the

18   carpeting.  Did you ask Ms. Poliquin if that was

19   okay?

20   A    Oh, absolutely.

21   Q    Go ahead.

22   A    Prior to cutting out the entire carpeting, there

23   were a couple of areas within the carpeting that had

24   large, very dark stains on it.  Prior to cutting up

25   the whole carpeting, I cut out those particular areas

1    to send to the lab separately.  We searched a dresser

2    that had several drawers in it.  It was either six or

3    eight drawers.  Within each of those drawers there

4    were tiny little metal pieces, lots of hair, some

5    powdery residue.  When I saw that -- sometimes it's

6    hard to make sure that you get all those tiny, tiny,

7    little pieces and every little piece of hair, so what

8    we did was we used to tape to take the hair out of

9    the drawer.  Then each drawer had a drawer liner on

10   it, you know, that the sticky stuff at the bottom of

11   the drawer.  We carefully pulled up the drawer liners

12   and folded them up and sent those to the lab to make

13   sure that we didn't lose anything from the drawers.

14   We took the comforter off the bed.  In the bathroom I

15   recall that there was some of those same very dark

16   stains on the bathroom rug, so we took the entire

17   bathroom rug with us.  Also on the baseboard in the

18   bedroom and on the bottom by the rug, as well as the

19   baseboard that boarded the door, there were some real

20   dark stains.  What we did was we did some swabbing of

21   the doors so to lab could possibly determine what

22   those stains were.  Those swabs were placed in vials.

23   We took those with us.  The booties that we wore on

24   our feet throughout the search, we bagged those up

25   and took those with us.

1    Q    Why did you wear those?

2    A    Just to make sure that we didn't bring anything

3    in from the outside.  We didn't bring that into the

4    bedroom and contaminate it, cross-contaminate it with

5    anything.

6    Q    Was the carpet sent to the lab for analysis?

7    A    Yes, sir, it was.

8    MR. MONK:  May I approach the witness, Your

9    Honor?

10    THE COURT:  You may.

11    BY MR. MONK:

12    Q    Show you proposed Exhibits 53 A, 54 A, and 52 A.

13    A    Okay.

14    Q    Let's start with 52 A.

15    A    Okay.

16    Q    Take a close look at that.  Do you recognize any

17    aspect of 52 A?

18    A    I do.  These were -- I don't exactly know what

19    these specifically are, but they are little plastic

20    things that came from the rug.

21    Q    In the bedroom identified as Mr. Mohamed's

22    bedroom?

23    A    Correct.

24    Q    And did you take those in evidence and send them

25    to the lab as well?

1    A    Well, we -- they were in the carpeting, so we

2    took the carpeting and sent the carpeting in.  And

3    the people at the lab extracted these from the

4    carpeting.

5         MR. MONK:  I move for admission of proposed

6    Exhibit 52 A.

7         MR. ALLEN:  No objection.

8         THE COURT:  Exhibit 52 A is received on behalf

9    of the United States.

10        (Government's Exhibit No. 52 A is received into

11   evidence.)

12        THE COURT:  And these are the "little plastic

13   things?"

14        MR. MONK:  Yes, Your Honor.

15   BY MR. MONK:

16   Q    Would you please take a look at 53 A and 54 A

17   and tell me whether you recognize those?

18   A    53 A is contents from one of the dresser

19   drawers.  It would have been Dresser Drawer Number 2.

20   And I recognize the black powder, the hair, and this

21   white little piece of paper in here.  Although I

22   haven't unrolled it, I would imagine that that's the

23   piece of paper that we dumped the drawer out in and

24   folded it up like a pill fold to send it to the lab

25   before we took the drawer liner out.

1    Q    What about 54 A?

2    A    54 A is yellowish powder and little tiny little

3    pellet things that were taken from one of the drawers

4    as well.

5    MR. MONK:  I move for admission of proposed

6    Exhibits 53 A and 54 A.

7    MR. ALLEN:  Your Honor, prior to admission,

8    could she just confirm what those pieces of paper are

9    or could I look at them because I have not seen them?

10    THE COURT:  Would you like to ask a question to

11    voir dire the exhibit, Mr. Allen?  I'm not sure I

12    understand.

13    MR. ALLEN:  I think she --

14    THE COURT:  Is there an objection?

15    MR. ALLEN:  Can I just speak with Mr. Monk

16    briefly?

17    THE COURT:  Certainly.

18    (Pause.)

19    MR. ALLEN:  If I could just examine the exhibit

20    quickly, Your Honor.  I don't have any objection,

21    Your Honor.

22    THE COURT:  That's 54 A, which is received on

23    behalf of the United States.

24    MR. MONK:  53 A and 54 A, Your Honor.

25    THE COURT:  Both.

1    MR. ALLEN:  Correct, Your Honor.

2    (Government's Exhibit Nos. 53 A and 54 A are

3 received into evidence.)

4 BY MR. MONK:

5 Q Now, did you also -- I'm going to switch gears

6 here, okay?

7 A Okay.

8 Q Did you also participate in the search of

9 another location on the very next day, August 11th of

10 2007?

11 A Yes, I did.

12 Q And was that a consent search or was that

13 pursuant to a search warrant that you-all acquired

14 from a federal judge in this building, a magistrate

15 judge?

16 A If you are referring to the search at Pampas

17 Place, that was a search pursuant to a search

18 warrant.

19 Q Were you the team leader on that search as well?

20 A Yes, sir, I was.

21 Q And was it your understanding that the Pampas

22 Place location was the location to which Mr. Ahmed

23 Mohamed had moved when he left Paulette Poliquin's

24 residence?

25 A Yes, sir.

1    Q    Were you also the team leader on a search that

2    was carried out the following day on August 12th of

3    2007?

4    A    Yes, sir.  I was the team leader at a search

5    conducted at a Metro Storage.

6    Q    The Metro Storage facility?

7    A    Yes, sir.

8    Q    Would that have been the storage unit rented by

9    one Kareem Mussoui (ph)?

10    A    I am not sure who it was rented by.

11    Q    Did you at some point in time also participate

12    in the search of a storage unit that was a unit held

13    by Youssef Megahed?

14    A    If that was the U-Store-It place off of Skipper

15    Road, yes, sir, I did.

16    Q    Did you participate in the search of a

17    U-Store-It facility on Skipper Road in Tampa?

18    A    Yes, sir, I did.

19    Q    Were you the team leader on that search?

20    A    I was not the team leader; I was assisting the

21    assigned team leader on that search.

22    Q    Did you take photographs or were photographs

23    taken?

24    A    Yes, photographs were taken at that search.

25         MR. MONK:  If I may show the witness what's been

1   marked as proposed Exhibit 49 A through 49 G, Your

2   Honor?

3       THE COURT:  You may.

4       THE WITNESS:  Okay.

5   BY MR. MONK:

6   Q    Do you recognize those photos?

7   A    I do.

8   Q    Do you recognize what they depict?

9   A    Yes, sir.  These are photos of the items that

10  were contained in that U-Store-It place in Tampa off

11  of Skipper Road.

12      MR. MONK:  I move for admission of 49 A through

13  49 G.

14      MR. ALLEN:  Your Honor, 401 and 403 objection to

15  49 C and 49 D.

16      THE COURT:  Mr. Allen, I can't hear you when you

17  bend over at the waist and speak into the tabletop.

18  If you have an objection and want to be heard on it,

19  why don't we step forward to the bench just a moment?

20      (At side bar, on the record.)

21      MR. ALLEN:  We have objections to 49 C and D.

22      THE COURT:  Can I see them a moment?

23      MR. ALLEN:  Certainly.

24      THE COURT:  All right.  What's your objection to

25  49 C and D?

1      MR. ALLEN:  Your Honor --

2      THE COURT:  Not genuineness and authenticity?

3      MR. ALLEN:  No, sir.  It's relevance.  I'm not

4  aware -- I've read all of the lab reports.  Nobody's

5  expressed any opinion that those have any function

6  related to the items that were ultimately found in

7  the car or the destructive device that the Government

8  is going to testify about.  I think not knowing what

9  they are could give some sort of negative impression

10  to the jury, so I move to exclude them.  I don't

11  think they're relevant.  Whatever relevance they have

12  should be outweighed by due appearance of the

13  unknown.

14      THE COURT:  All right.  Mr. Monk?

15      MR. MONK:  They were found in Mr. Megahed's

16  storage unit.  For right now, Your Honor, I will

17  withdraw my motion to seek the admission of these

18  two --

19      THE COURT:  All right.

20      MR. MONK:  -- and re-visit them with the court

21  and counsel later.

22      THE COURT:  Okay.  All right.

23      MR. ALLEN:  I have no objection to the other

24  exhibits.

25      (End of side bar discussion.)

1          MR. MONK:  Your Honor, at this time we're

2     withdrawing our motion for the admission of 49 C and

3     D.

4          THE COURT:  Then Exhibits 49 A, B, E, F, and G

5     are received on behalf of the United States.

6          (Government's Exhibit Nos. 49 A, B, E, F, and G

7     are received into evidence.)

8          MR. MONK:  May I approach, Your Honor?

9          THE COURT:  You may.

10          MR. MONK:  If I may briefly publish these photos

11     that have been admitted?

12          THE COURT:  You may.

13     BY MR. MONK:

14     Q     49 A.  Ma'am, does this show the interior of the

15     storage unit?

16     A     Yes, sir, it does.

17          THE COURT:  Did that show the entire interior?

18          THE WITNESS:  Yes.  You can see the three walls

19     there and that's the open door.

20          THE COURT:  Thank you.

21     BY MR. MONK:

22     Q     49 B.  That's a little bit more of a close-up of

23     some of the items?

24     A     Yes, sir, it is.

25     Q     And 49 E is kind of dark.  Can you make out what

1    that is or not?

2    A    I believe it's the vest portion and regulators

3    from a -- and face part of a scuba suit.

4    Q    49 F.  Some tanks?

5    A    Correct.

6    Q    49 G.  Does that also look like --

7    A    It appears to be some part of a scuba gear.

8         MR. MONK:  Thank you very much, Your Honor.

9         THE COURT:  Thank you, Mr. Monk.

10        Has the defense cross-examination for this

11   witness?

12        MR. ALLEN:  Yes, Your Honor.

13        THE COURT:  Mr. Allen, you are recognized for

14   that purpose.

15                   CROSS-EXAMINATION

16   BY MR. ALLEN:

17   Q    Just so I'm clear, you participated in four

18   searches between August 10th and August 11th?

19   A    That's correct.

20   Q    The first two searches were --

21   A    No.  I'm sorry, sir.  It was between August 10th

22   and August 12th.

23   Q    Thank you.  And there was two different

24   residences that were searched on August 10th?

25   A    No, sir.

1    Q    Okay.  What was the first search that you did?

2    A    The first search was the room within a home on

3    Nedro and that was on August 10th.

4    Q    Let's start with that.

5    A    Okay.

6    Q    And that was a residence where Mr. Mohamed had

7    resided at one point?

8    A    Correct.

9    Q    And the bulk of the evidence that you pulled

10   from that residence was from Mr. Mohamed's bedroom

11   inside that residence?

12   A    Correct, from the bedroom that we searched.

13   Q    And you wore booties on your feet so you didn't

14   contaminate the area?

15   A    Correct.

16   Q    And you did a very thorough search of that?

17   A    Yes, sir.

18   Q    Is that the standard operating procedure for the

19   FBI?  Is that normally how the FBI will conduct a

20   search of a residence?

21   A    I don't understand your question.  Is how --

22   Q    Is the procedure you followed on August 10th the

23   standard procedure when the FBI is conducting a

24   search for trace evidence?

25        THE COURT:  You mentioned booties.  Do you mean,

 1    for instance, the wearing of booties?

 2         MR. ALLEN:  Yes, Your Honor.

 3         THE COURT:  I think the question is maybe too

 4    general.

 5    BY MR. ALLEN:

 6    Q    On August 10th, among other things, you were

 7    searching for trace evidence, correct?

 8    A    That is correct.

 9    Q    And can you tell the jury what trace evidence

10    is?

11    A    Trace evidence is things like hair, fibers,

12    very, very, small, tiny parts or particles.

13    Q    And when you -- that's why you removed the

14    carpet, correct?

15    A    Well, we removed the carpet because during a

16    search on our hands and knees we were starting to

17    find tiny little pieces of things.

18    Q    And in order to make sure you get everything,

19    you take the whole carpet so that it could be later

20    searched --

21    A    At the lab.

22    Q    -- at the lab?

23    A    Correct.

24    Q    And that was the same thing with the liners of

25    the drawers.  You take the liner because that may

1    have material stuck to it?

2    A     Initially what we did was we dumped the drawer

3    out into a folded piece of paper, and then we also

4    taped what we couldn't get from the dump.  Then after

5    that we carefully took out the liner.

6    Q   Is that method of searching for trace evidence

7    standard operating procedure in your training with

8    the FBI?

9    A     That all depends on the situation, sir.  I mean,

10   it's different for every situation.

11   Q   Is there any level of search more intensive than

12   the search that you did on that first residence that

13   you were trained to do?

14   A     I mean, again, I'm not really sure what you're

15   asking for.  If I had a -- if I were searching a

16   deceased person's body, searching for trace evidence

17   on that is way different than searching a bedroom.  I

18   mean, there's not a one, two, three protocol for each

19   -- you know, just kind of use your common sense when

20   you're in there and decide what you need to do.

21   Q   Let me ask it this way.  Was there anything else

22   that you thought you should have done that you didn't

23   do in the search of that residence?

24   A     Yes.  While we were there apparently we did not

25   take a table that was in the corner.  There was a

1    table that had -- it was a tiny little table that had

2    a table cloth and a piece of glass on top of it.  And

3    at the time we were searching this did not -- I as

4    the team leader did not know that it was important

5    nor did the agents that I was with.  We did not take

6    it, and apparently it was important.  So one of the

7    agents had to go back two days later and ask to take

8    it.

9    Q    Okay.  Anything else?

10   A    No, not that I'm aware of.

11   Q    And the second search that you participated in

12   occurred when?

13   A    The second search was on August 11th of 2007.

14   Q    And that was at -- on Pampas Street?

15   A    Yes, sir.  That was on Pampas Place in Tampa.

16   Q    And that was another potential residence of Mr.

17   Mohamed, correct?

18   A    Yes, sir.

19   Q    And when you were at that residence, there was

20   also a Honda at the residence that was searched,

21   correct?

22   A    I don't remember what kind of car it was, but,

23   yes, I do recall there was a vehicle there that

24   needed to be searched.

25   Q    And that vehicle belonged to Ahmed Ishtay (ph),

1    isn't that correct?

2    A    I don't know, sir.  I didn't have anything to do

3    with the vehicle search at the Pampas residence.

4    Q    The only property you searched that related to

5    Youssef Megahed was the storage unit on Skipper Road?

6    A    I really can't answer that question accurately

7    because I wasn't one of the investigators in this

8    investigation.  At this point in time, I'm just -- I

9    don't have anything to do with the investigation.  I

10   am on the evidence response team.  Although, I'm an

11   agent and I do investigate cases, this was not my

12   case.  So I'm simply there to find evidence that is

13   listed in the list of items to be seized.  I don't

14   have any intimate knowledge of who lives where, who

15   is associated with what address.

16   Q    You searched a storage unit at Skipper Road,

17   correct?

18   A    Yes, sir.

19   Q    I believe you testified on Direct that that was

20   a storage rented by Youssef Megahed, correct?

21   A    Yes, sir, I did.

22   Q    I'm showing you what's been introduced as

23   Government's Exhibit 49.

24   A    Okay.

25   Q    Over here is a red gas can.  Do you recall

```
 1    seeing a red gas can in this storage unit?

 2    A    Yes.

 3    Q    And the search of the storage unit was on what

 4    day?

 5    A    I wasn't the team leader for this particular

 6    search.  I assisted the team leader.  I don't have

 7    the paperwork for this particular search, so I'm

 8    not --

 9    Q    It was after August 4th, 2007, after the arrest

10    of my client Mr. Megahed?

11    A    Okay.

12    Q    I'm asking.  Do you know was this search after

13    or before his arrest?

14    A    I don't know what the exact date of this

15    particular search was because I was not the team

16    leader on this search.

17         THE COURT:  Was it after or before what?

18         MR. ALLEN:  August 4th, 2007, the arrest of my

19    client Youssef Megahed.

20         THE COURT:  I just couldn't hear what it was.

21    BY MR. ALLEN:

22    Q    Do you recall seeing this mechanics cart?

23    A    Yes, sir, I do.

24    Q    Do you recall these oil canisters?

25    A    Yes, sir.
```

```
1    Q    Do you recall this oil pan?

2    A    I mean, I don't have a specific recollection of

3    the oil pan, but --

4    Q    Do you recall this being a gun case?

5    A    Yes, sir, I remember there being rifle in there.

6    Q    A .22 caliber rifle?

7    A    I don't know what caliber it was.

8    Q    These are bullets, correct, a box of bullets?

9    Do you recall seeing a box of bullets?

10   A    No, I don't.

11   Q    Do you recall seeing these targets?

12   A    Yes, sir, I do.

13   Q    Do you recall what was in this blue container?

14   A    We wouldn't have opened that up to know what's

15   in that blue container.

16   Q    Showing you Government's Exhibit 49 F.  These

17   are scuba diving tanks, correct?

18   A    I think that's what they are.

19        MR. ALLEN:  If I can have just a moment, Your

20   Honor?

21        THE COURT:  You may.

22         (Pause.)

23        MR. ALLEN:  May I approach the witness, Your

24   Honor?

25        THE COURT:  You may.
```

1    MR. ALLEN:  I apologize, Your Honor, I'm just

2    trying to get them in order.

3    BY MR. ALLEN:

4    Q    Agent, I'm showing you what's been previously

5    marked as Defendant's Exhibits 7 K, 7 R, 7 S, 7 Q, 7

6    O, and 7 U.

7    A    Okay.

8    Q    If you could look at those.

9    A    Sure.

10    THE COURT:  Mr. Allen?

11    MR. ALLEN:  Yes, sir.

12    THE COURT:  What is your question so that she

13    may look at these exhibits with your question in

14    mind?

15    BY MR. ALLEN:

16    Q    Do you recognize these photographs as

17    photographs you took during the search of that

18    U-Store-It facility?

19    A    I didn't take photographs during the search of

20    this unit.

21    Q    Do you recognize those photographs as depicting

22    items that were found in that storage unit during

23    your search?

24    A    Yes, sir, I do.

25    MR. ALLEN:  Your Honor, at this time I'd move in

1    the defense exhibits previously noted.

2         MR. MONK:  No objection.

3         THE COURT:  Defense Exhibits 7 K, R, S, Q, O,

4    and U are received.

5         (Defendant's Exhibit Nos. 7 K, R, S, Q, O, and U

6    are received into evidence.)

7         THE COURT:  You say you had those in order, Mr.

8    Allen?

9         MR. ALLEN:  No.  I was trying to get them in

10   order, Your Honor.

11        THE COURT:  I see.  The pattern was not readily

12   detectable.

13        MR. ALLEN:  Your Honor, with the Court's

14   permission, I would like to publish Defense Exhibit 7

15   K.

16        THE COURT:  You may.

17   BY MR. ALLEN:

18   Q    Do you recall seeing this milk carton full of

19   gas treatment?

20   A    Yes, sir, I do.

21   Q    Do you recall discovering this milk carton full

22   of school books or books?

23   A    Yes, I do.

24   Q    Showing you, with the Court's permission, 7 R.

25   Do you recall seeing these four tires in the storage

1    unit?

2    A    Yes, sir, I do.

3    Q    And then is that where the scuba tanks were

4    located?

5    A    I believe so, yes, sir.

6    Q    Defense 7 S is that the same carton of books, is

7    it not, and a notebook?  Do you recall seeing that?

8    A    Yes, sir.

9    Q    Showing you what's been introduced as Defense 7

10   Q.  Were the items in the storage unit ultimately

11   being brought out into the driveway area of the

12   storage unit for photography purposes?

13   A    Yes, sir.

14   Q    Does this refresh your memory whether or not you

15   saw a box of bullets?

16   A    I mean, I see it there in the picture, but I

17   don't have a specific recollection of, "Oh, I

18   remember there were bullets there."

19   Q    Showing you 7 O.  Does this refresh your memory

20   whether or not there was an oil drip pan?

21   A    I recall seeing that there.

22   Q    Do you recall finding a photograph of Youssef

23   Megahed at the beach?

24   A    No, sir, I don't.

25        MR. ALLEN:  May I approach the witness, Your

1    Honor?

2         THE COURT:  You may.

3    BY MR. ALLEN:

4    Q    I'm showing you what's marked as Defense Exhibit

5    101 for identification purposes only.  If you could

6    just look at that and let me know if that refreshes

7    your memory.  That's all I want to know is does it

8    refresh your memory?

9    A    No.

10        MR. ALLEN:  If I could just have a moment, Your

11   Honor?

12        THE COURT:  You may.

13        (Pause.)

14   BY MR. ALLEN:

15   Q    Was the search of the U Storage pursuant to

16   Youssef Megahed's consent?

17   A    I'm aware that the search was pursuant to a

18   consent, yes.

19   Q    At any time during the search of this storage

20   unit did you find any PVC pipe?

21   A    I don't recall there being any PVC pipe at that

22   search.

23   Q    Do you recall at the search of the U-Store-It

24   unit finding any safety fuse?

25   A    I'm not really sure I know -- what do you mean a

1    safety fuse?

2         MR. ALLEN:  May I approach the exhibit table?

3         THE COURT:  You may.

4    BY MR. ALLEN:

5    Q    Showing you what's been introduced into evidence

6    as Government's 82.  Take a look at that.

7    A    And you're asking me if we found any of this?

8    Q    In the storage unit.

9    A    I don't recall that we did, no.

10        MR. ALLEN:  I don't have any further questions,

11   Your Honor.

12        THE COURT:  Thank you, Mr. Allen.

13        Mr. Monk, has the United States any redirect

14   examination?

15        MR. MONK:  May I see Exhibit 101 for

16   identification, please?

17        THE COURT:  You may.

18        MR. MONK:  No further questions, Your Honor.

19        THE COURT:  Ms. Bucenell, you may step down.

20   You're excused with our thanks.

21        THE WITNESS:  Okay.  Thank you.

22        (End of excerpt of proceedings.)

23

24

25

1          C E R T I F I C A T E

2          I, Kerry Mercade, certify that the foregoing is

3   a correct transcript from the record of proceedings

4   in the above-entitled matter.

5                                    S/Kerry Mercade

6                                    Kerry Mercade
                                     Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25