```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3     UNITED STATES OF AMERICA

 4

 5          vs.                      CASE NO. 8:07-cr-342-T-23TBM
                                     March 23, 2009
 6                                   Tampa, Florida

 7

       YOUSSEF SAMIR MEGAHED,
 8
            Defendant.
 9
       _____/
10
              TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                   (TESTIMONY OF DAVID NELSON)
              BEFORE THE HONORABLE STEVEN D. MERRYDAY
12                  UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     For the Government:   JAY HOFFER
                             ROBERT MONK
15                           Assistant U.S. Attorneys
                             400 N. Tampa Street, Suite 3200
16                           Tampa, Florida 33602
                             813/274-6000
17
       For the Defendant:    ADAM ALLEN
18                           DIONJA DYER
                             Assistant Federal Defenders
19                           400 N. Tampa Street, Suite 2700
                             Tampa, Florida 33602
20                           813/228-2715

21     Court Reporter:       Kerry Mercade
                             801 N. Florida Avenue
22                           Suite 15A
                             Tampa, Florida 33602
23                           813/301-5024

24

25     Proceedings recorded and transcribed by
       computer-aided stenography.
```

1                              **INDEX**

2

     **GOVERNMENT WITNESS DAVID NELSON**
3    Direct Examination by Mr. Hoffer..........3
     Cross-Examination by Mr. Dyer.............19
4

5                       **GOVERNMENT'S EXHIBITS**

6

     **Number        Description                    Page**
7
     45 A - E    Photographs (Anniston Circle)..14
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            GOVERNMENT WITNESS, DAVID NELSON, SWORN

2            THE COURT:  State your name, please.

3            THE WITNESS:  David E. Nelson.

4            THE COURT:  Please have a seat in the witness

5     stand and I'll recognize Mr. Hoffer for your Direct

6     Examination.

7                      DIRECT EXAMINATION

8     BY MR. HOFFER:

9     Q     Mr. Nelson, sir, good morning.

10    A     Good morning, sir.

11    Q     First of all, if you would, please tell the

12    members of the jury by whom you are employed and what

13    you do for a living, sir.

14    A     I'm employed by the FBI.  I'm a Special Agent.

15    Q     How long have you been so employed, sir?

16    A     Just over 11 years.

17    Q     And where do you currently work?

18    A     Tampa, Florida.

19    Q     How long have you worked in the Tampa, Florida

20    Division of the FBI?

21    A     Been here approximately two and a half years.

22    Q     Let me direct your attention to August 6 of

23    2007, specifically in the late afternoon, say, four

24    o'clock and thereafter on that date.  Do you recall,

25    were you called upon to do some investigative work

1    connected with the matter presently on trial before

2    this court?

3    A    Yes, sir, I was.

4    Q    What were you called upon to do?  Generally

5    speaking, what was your assignment on that particular

6    afternoon?

7    A    I was asked to be the team leader for a search

8    team to search a residence for bomb-making materials.

9    Q    Without giving us a specific address of the

10   residence -- first of all, let me ask you if you

11   recall the general area or neighborhood where this

12   residence was located?

13   A    I believe it was on Anniston Circle and I

14   believe it was 4959 was the address.

15   Q    Is that located in the city of Tampa or County

16   or where is that at?

17   A    I believe it's within the city of Tampa.

18   Q    Part of the Middle District of Florida?

19   A    Yes.

20   Q    And did you go to that location on that

21   afternoon, and, if so, about what time as best you

22   remember?

23   A    Yes, I did.  We arrived there at approximately

24   4:00 p.m.

25   Q    When you said we, who else went there with you?

1    A    Others members of Tampa's evidence response

2    team.

3    Q    Is that the ERT --

4    A    Correct.

5    Q    -- team of the FBI?

6    A    Yes, sir.

7    Q    Again, their function or purpose is to do what,

8    this ERT unit?

9    A    To conduct crime scene searches and searches for

10    evidence pursuant to search warrant or consent to

11    search.

12    Q    In addition to members of the FBI, other agents

13    et cetera, were there members of any other agencies

14    involved in the unit or team you were with at that

15    time?

16    A    Yes.  The other individuals who initially

17    responded to the search site were part of the bomb

18    squad for I believe Tampa Police Department and I

19    believe one person from the Hillsborough County

20    Sheriff's Office, as well as the FBI's special agent

21    bomb technician.

22    Q    Now, the type of home or the residence that you

23    went to, can you -- do you recall what type of a home

24    or location was it?

25    A    It was a single family residence located within

1    a suburban neighborhood of Tampa, Florida.

2    Q    How many stories were in the home, do you

3    recall?

4    A    Two stories.

5    Q    When you and the agents and other individuals

6    present with you arrived there around four o'clock

7    that afternoon, do you recall was anyone present in

8    the residence in the home at that time that you

9    remember?

10    A    There was not.

11    Q    How did you gain entry then?

12    A    An agent from our Pinellas residence agency

13    brought a key to the residence.

14    Q    Now, did you have any paperwork with you with

15    respect to that search at that time regarding

16    actually your ability to conduct the search?  Do you

17    remember?

18    A    I believe the agent who brought the key had the

19    consent to search form, which I saw, but we did not

20    keep a copy at the time.

21    MR. HOFFER:  May I approach the witness, Your

22    Honor?

23    THE COURT:  You may.

24    BY MR. HOFFER:

25    Q    Let me get back to you on that.  I could

1    approach anyway while I'm here and show you what's

2    been marked for identification as Government's

3    Exhibits 25 A through 25 E, as in Edward.  Let me ask

4    you, first of all -- without talking about the

5    exhibits just yet, let me ask you, when you arrived

6    at the location, did you and the other members of the

7    ERT team gain entry or access into the residence?

8    A    We did.  But first the special agent bomb

9    technician and the local bomb techs cleared the

10   residence for any dangerous devices.

11   Q    Now, was that done successfully without any

12   problem?

13   A    Yes.

14   Q    Once that was done, you and the other folks

15   entered the residence, correct?

16   A    Yes, sir.

17   Q    Now, did you have -- based upon your

18   understanding of your assignment at that time, did

19   you have a specific understanding or a specific plan

20   as to what, if any, kinds of items or things you were

21   looking for or searching for on that afternoon?

22   A    Our general instructions were we had consent to

23   search for the residence and we were to look for

24   bomb-making materials.

25   Q    Now, did you and any other members of your unit

```
 1    ultimately during the course of your search there

 2    find and locate any items that you took from the

 3    residence?

 4    A     Yes, sir.

 5    Q     And what type of items generally did you find?

 6    A     We found a radio-controlled boat.  We found a

 7    disassembled watch.  We found a list of supplies,

 8    found a material safety data sheet, and several

 9    computers.

10    Q     Specifically, let me address the computer, the

11    last issue of it.  Do you recall -- you said

12    computers, I guess that's plural?

13    A     Correct.  There were three.

14    Q     Let me specifically direct you.  Do you recall

15    that date, did you have occasion to find and take

16    from the residence a desktop-type computer

17    manufactured I think by a company called E-Machine?

18    A     Yes, sir.

19    Q     Do you recall where it was when you found or saw

20    that item in the house on that date?

21    A     It was in the upstairs loft area at a small

22    desk.

23    Q     Was it connected to any other computer-related

24    type equipment or devices when you saw it initially?

25    A     I believe it was connected to a printer/fax
```

1    machine combination unit.

2    Q    What is the protocol or procedure when you seize

3    an item such as that as far as what do you do and

4    what record keeping is made at that time?

5    A    We shut down the computer.  We record the serial

6    number and the make and model of the computer.  We

7    take photographs of the computer in place and then

8    it's packaged and taken back to our office.

9    Q    How much time did you and the other members of

10    your team spend inside the home on that day as best

11    you remember?

12    A    Just under three hours.

13    Q    I guess I should have asked you this before, but

14    let me ask you this now.  When you and the team

15    members initially enter a residence, let's say, as

16    you did in this case, to do a search, whether it is

17    -- under any circumstance, search warrant, consent to

18    search or whatever, is there a particular procedure

19    you follow or protocol as far as things you do first,

20    things you do in sequence to conduct a search such as

21    that?

22    A    Yes, sir, there is.

23    Q    Generally speaking, what is the procedure or

24    protocol that is followed?

25    A    The initial entry is done by the team leader and

1    maybe one other ERT member, and it's an initial

2    survey.  We call it a hand-and-pocket search where we

3    just walk through the residence trying to determine

4    what we have and be able to brief the other team

5    members as to what is going to be necessary in terms

6    of equipment and personnel.  For example, personal

7    protective equipment if it's a crime scene that has

8    chemicals or other dangerous objects.

9    Q    All right.

10   A    After the initial survey, the team leader briefs

11   the rest of the team, makes specific assignments.  By

12   our protocol, the next thing are entry photos,

13   photographs of every room of the residence, including

14   the outside of the residence.  Once those are

15   complete then the search actually begins and

16   different ERT members are assigned different areas to

17   look for the specific items that we are seeking.

18   Q    And after that occurs, what next occurs in the

19   course of the procedure or protocol?

20   A    The items are identified as possible candidates

21   for seizure pursuant either to the search or the

22   consent.  The team leader in consultation with others

23   makes a determination what is taken and what is not.

24   Those items are packaged up, recorded on an evidence

25   recovery log.  They are packaged and labelled with

1    the date, the place where they were located, the case

2    number, and the person who seized the evidence.  And

3    then they are prepared for transport.

4         At the end of that process, similar to the

5    initial walk-through, a final walk-through is done

6    where we make sure we don't leave any equipment or

7    evidence or personal items, and then exit photos are

8    taken prior to departure.

9    Q    Let me just ask you, to your understanding based

10   upon your experience and your training as an agent

11   and as a member of this ERT unit, is this general

12   order or protocol or procedure, call it what you

13   will, you've just described, is that consistent for

14   every search that the team does anywhere by the FBI?

15   Is that pretty much standard?

16   A    Typically, yes, sir.

17   Q    Is it also something that is standard just here

18   within this Tampa Bay area or to your knowledge and

19   understanding, if you know, this is the protocol

20   that's followed around the country?

21   A    It's the protocol followed by evidence response

22   teams all over the country.

23   Q    Let me ask you, you've mentioned a couple of

24   things that were taken from the residence.  I want to

25   ask you, you mentioned a sheet of paper or safety

1    data, or something?

2    A    Correct.

3    Q    Do you recall, generally speaking, what type of

4    item that was?

5    A    I don't recall what -- it was MST, material

6    safety data sheet.  I don't recall exactly what it

7    was for.  I believe it was for a bottle of spray

8    lubricant, like a cooking-type oil.  We weren't sure

9    if it was relevant.  We weren't certain that it could

10    be used in the making of bomb, but it was of

11    investigative interest so we seized it.

12    Q    You mentioned -- we talked about the E-Machine a

13    minute ago.  You said that one of the things that is

14    done is you record the serial number of an item such

15    as that.  Is one of the reasons you do that because

16    -- are serial numbers like that unique?

17    A    Yes, sir, they are.

18    Q    So that you can identify it later as far as what

19    it was you took out of the place.  Is that the reason

20    you do something like that?

21    A    Yes, sir, that's correct.

22    Q    Do you recall -- do you have the serial number

23    of that E-Machine computer in your head in your

24    memory at this point in time?

25    A    Not in my memory, sir.

1    Q    Is there any document or do you have any items

2    with you that could refresh your recollection as to

3    is that serial number?

4    A    Yeah, I have my log in my pocket.

5    Q    If you would, with the Court's permission, I'd

6    ask if you'd be allowed to consult that.  Just read

7    it to yourself, and if that refreshes your

8    recollection as far as what the serial number was,

9    I'd like to ask you what that number was.

10        THE COURT:  You may.

11   BY MR. HOFFER:

12   Q    Your memory having been refreshed, do you want

13   to make a stab at that?

14   A    Sure thing.  CK85BC0006555.

15   Q    Now, again, you said that item was in the upper

16   -- upstairs area.  Specifically, that upper second

17   story area, can you generally tell the members of the

18   jury -- describe that upper area, what you saw,

19   layout, rooms, things of that nature?

20   A    As you go up the stairs at this residence, there

21   are three bedrooms upstairs, and they feed to a

22   common hallway that leads to essentially two common

23   areas, two lofts, that overlook the living room from

24   the downstairs area.  The first common area is

25   immediately outside two of the bedrooms.  And then

```
 1    down that hallway, which is an open hallway or a loft

 2    is another common area where there was another desk

 3    and a television and a couch.

 4    Q    Let me ask you, sir, I have placed in front of

 5    you a few seconds ago, or minutes ago, what is marked

 6    for identification rather as Government's Exhibit 45

 7    A through E, as in Edward, five photographs.  Do you

 8    have those items there in front of you?

 9    A    Yes, sir, I do.

10    Q    Do you recognize those items?

11    A    Yes, I do.

12    Q    What are they, sir?

13    A    They're the photographs that I took of the

14    common area, the loft area, that I just described.

15    Q    And how is it that you recognize those

16    photographs?  Did you take them, first of all?

17    A    I took them, yes.

18         MR. HOFFER:  Your Honor, at this point let me

19    offer Government's Exhibit 45 A through E.

20         MS. DYER:  No objection.

21         THE COURT:  45 A through E are received on

22    behalf of the United States.

23         (Government's Exhibit Nos. 45 A through E are

24    received into evidence.)

25         MR. HOFFER:  May I publish one or two of the
```

 1    exhibits, Your Honor?

 2         THE COURT:  You may.

 3    BY MR. HOFFER:

 4    Q    Publishing 45 A.  It's the front of the

 5    residence, is it not?

 6    A    Yes, sir, it is.

 7    Q    45 B, which I'd like to put up on the screen,

 8    and it will be on your monitor as well.  You will

 9    have it in front of you.  Tell us, first of all, what

10    area is depicted in this photograph.

11    A    This is the first common area I described that's

12    immediately outside one of the bedrooms, and that is

13    where the E-Machine's desktop computer was found in

14    this brown desk that it is sitting on.

15    Q    There is sort of -- is that -- would that be the

16    item that I have circled there, the bottom sort of

17    shelf or drawer space of that wooden unit there?

18    A    That's correct, sir.

19    Q    You said there was some other computer equipment

20    there which you can see.  What kinds of equipment do

21    you recall being connected to it when you took this

22    photo?

23    A    There's the printer or fax unit, which appears

24    to be on the right.  There's also a laptop computer,

25    but to my knowledge it was not connected to the

1    desktop.  Then the monitor and keyboard, speakers,

2    and mice -- and mouse.

3    Q    And the printer/fax unit that you said -- that

4    you've described, is that the item that I've circled

5    there on the monitor?

6    A    Yes.  Yes, sir.

7    Q    The white sort of unit to the right and a little

8    bit above on a separate sort of table in the picture?

9    A    Yes, sir.

10   Q    Just 45 C, that is, I guess is it not -- or what

11   is that?

12   A    That's a close-up photograph of the E-Machine's

13   desktop computer that we are discussing.

14        MR. HOFFER:  If I could have a moment, Your

15   Honor?

16        THE COURT:  Yes, sir.

17   BY MR. HOFFER:

18   Q    Obviously, I know this.  You said you left --

19   you and the other agents departed the premises of

20   this residence about what time?

21   A    About 7:00 p.m., sir.

22   Q    What was the condition of the premises, the

23   residence, when you left it?

24   A    It was secured.  We locked the door and loaded

25   all of our gear and departed the residence.

```
 1    Q    What, if anything, did you and the other agents

 2    with you do with the items that you had seized or

 3    taken from the home during the search that day?

 4    A    I personally transported them back to our

 5    office.

 6    Q    And when you went back there, what did you do

 7    with those various items at that time?

 8    A    I stored them at my desk because our evidence

 9    room was closed.  It was after hours at this point.

10    Q    How secure is that area?  What is the security

11    in that area where you stored the items overnight?

12    A    It's a separate room within my squad area that

13    has limited access, and I stored them underneath me

14    desk.  It's a key pad controlled room, not accessible

15    by anyone other than those assigned to work in that

16    room.

17    Q    So only agents or other personnel of the FBI

18    have access to that area?

19    A    Yes, sir, that's correct.  And specifically

20    those working on my squad.

21    Q    I guess I maybe forgot to mention, what squad or

22    unit did you work with at the time?

23    A    Cyber crimes, Squad 8.

24    Q    What is that?

25    A    We investigate violations of federal law that
```

1    pertain to computer crime, intellectual property

2    violations, child pornography, on-line predators,

3    computer hackers.

4         MR. HOFFER:  May I have a moment, Your Honor?

5         THE COURT:  You may.

6         (Pause.)

7    BY MR. HOFFER:

8    Q    I have a copy here so I'll put it up because I

9    momentarily cannot seem to locate the original.  Do

10   you recall -- you mentioned the consent form that you

11   had an opportunity to see.  Maybe I should just hand

12   you this copy, it might be easier.

13        MR. HOFFER:  If may approach the witness?

14        THE COURT:  You may.

15   BY MR. HOFFER:

16   Q    I'll hand you Government's 44 and ask if you

17   recognize either one of those composite documents in

18   the exhibit as being the documents you saw at some

19   point prior to the beginning of that search on that

20   day?

21   A    Yes, sir, these are the same documents.

22        MR. HOFFER:  Thank you, Your Honor.  I have no

23   further questions of this witness.

24        THE COURT:  Thank you, Mr. Hoffer.

25        Ms. Dyer, you are recognized for any

1    cross-examination of Mr. Nelson.

2         MS. DYER:  Thank you, Your Honor.  May I

3    approach the evidence table?

4         THE COURT:  You may.

5                   CROSS-EXAMINATION

6    BY MS. DYER:

7    Q    Good afternoon, sir.

8    A    Good afternoon, ma'am.

9    Q    I'm going to show you what's already been

10   admitted as Government's 21 B.  You didn't find any

11   of those at this residence, did you?

12   A    No, ma'am.

13   Q    I'm going to show you what's already been

14   introduced as Government's 79.  You didn't find any

15   of these at this residence, did you?

16   A    No, ma'am.

17   Q    I'm going to show you what's been admitted as

18   Government's 82.  If you can take a look at that.

19   You didn't find anything like that at that residence,

20   did you?

21   A    No, ma'am.

22   Q    In addition to the residence, you searched the

23   garage, correct?

24   A    Yes.

25   Q    You didn't find any stump remover in the garage,

1    did you?

2    A    Ma'am, I'm not even sure what that is.

3         MS. DYER:  Nothing else, Your Honor.  Thank you.

4         THE COURT:  Thank you, Ms. Dyer.

5         Anything further from the United States?

6         MR. HOFFER:  No, Your Honor.  Thank you.

7         THE COURT:  In that case, Mr. Nelson, you may

8    step down and you're excused with our thanks.

9         THE WITNESS:  Thank you, Your Honor.

10        (End of excerpt of proceedings.)

11

12              C E R T I F I C A T E

13        I, Kerry Mercade, certify that the foregoing is

14   a correct transcript from the record of proceedings

15   in the above-entitled matter.

16                              S/Kerry Mercade

17                              Kerry Mercade
                                Court Reporter
18

19

20

21

22

23

24

25