1          UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                    TAMPA DIVISION

3    UNITED STATES OF AMERICA

4

5         vs.              CASE NO. 8:07-cr-342-T-23TBM
                           March 23, 2009
6                          Tampa, Florida

7

     YOUSSEF SAMIR MEGAHED,
8
          Defendant.
9
     _____/
10
          TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11   (DIRECT EXAMINATION TESTIMONY OF ANTHONY ONORATO)
           BEFORE THE HONORABLE STEVEN D. MERRYDAY
12                UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:   JAY HOFFER
                           ROBERT MONK
15                         Assistant U.S. Attorneys
                           400 N. Tampa Street, Suite 3200
16                         Tampa, Florida 33602
                           813/274-6000
17
     For the Defendant:    ADAM ALLEN
18                         DIONJA DYER
                           Assistant Federal Defenders
19                         400 N. Tampa Street, Suite 2700
                           Tampa, Florida 33602
20                         813/228-2715

21   Court Reporter:       Kerry Mercade
                           801 N. Florida Avenue
22                         Suite 15A
                           Tampa, Florida 33602
23                         813/301-5024

24

25   Proceedings recorded and transcribed by
     computer-aided stenography.

1                              INDEX

2

GOVERNMENT WITNESS ANTHONY ONORATO

3   Direct Examination by Mr. Monk............3

4

5                    GOVERNMENT'S EXHIBITS

6

    Number       Description                    Page

7

8                        (None.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    GOVERNMENT WITNESS, ANTHONY ONORATO, SWORN

2    THE COURT:  State your name, please.

3    THE WITNESS:  My name is Anthony J. Onorato.

4    The last name is spelled O-N-O-R-A-T-O.

5    THE COURT:  Please have a seat in the witness

6    stand, make yourself comfortable, and I'll recognize

7    Mr. Monk for your Direct Examination.

8    MR. MONK:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. MONK:

11   Q    Please, sir, your full name.

12   A    My full name is Anthony J. Onorato.  Again, that

13   last name is O-N-O-R-A-T-O.

14   Q    And how are you employed?

15   A    I am a forensic DNA examiner in the FBI

16   laboratory, which is in Quantico, Virginia.

17   Q    And how long have you been so employed?

18   A    Since May of 1996, so for almost 13 years now.

19   Q    Would you tell us, sir, about your educational

20   background?

21   A    I have a Bachelor's degree in science from

22   Washington -- from science.  In biology from

23   Washington and Lee University which is in Lexington,

24   Virginia.  I have a Master's in clinical immunology

25   and microbiology degree from Honoman University which

1    is in Philadelphia, Pennsylvania.  I have a master of

2    science and forensic science degree from the

3    University of Alabama at Birmingham.

4    Q    You've been employed at the FBI lab for how

5    long?

6    A    For 13 years now, almost 13 years.

7    Q    And during that period of time have you

8    undergone continuous training?

9    A    I have, yes.

10   Q    What sort of training have you had, on-the-job

11   training?

12   A    When I first began at the FBI back in May of

13   1996, I underwent a two-year training process to

14   become a forensic DNA examiner.  You can really think

15   of that process as a two-year internship.  You bring

16   a lot of the scientific knowledge to the job, but

17   they need to teach you the kinds of techniques that

18   are used in the forensic nuclear DNA testing, teach

19   you how to handle evidence, and things like that.  So

20   it's very much a mentoring process.

21   Q    Have you had occasion to testify in court before

22   with respect or in the field of nuclear DNA analysis?

23   A    I have.  I've testified in federal courts and

24   state courts I think it's 48 times.  I've also

25   testified in Superior Court in Washington, D.C.; in

1    Territorial Court on the island of St. Thomas; and in

2    Crown Court on the island of St. Kitts and Grand

3    Turk.

4    Q    Have you been qualified, sir, to render an

5    expert opinion with respect to nuclear DNA analysis?

6    A    I don't recall specifically, but in most of

7    those testimonies I was testifying in nuclear DNA

8    analysis topics.

9    Q    Have you ever been refused upon tender the

10   opportunity to testify as an expert in this area?

11   A    No.  In all of those occasions I provided

12   testimony.

13        MR. MONK:  Your Honor, with the Court's

14   permission, I'll tender the witness for voir dire.

15        THE COURT:  All right.  Mr. Allen, have you any

16   questions for this witness?

17        MR. ALLEN:  No, sir.

18        THE COURT:  Then the Court receives this witness

19   for the purpose of receiving opinion testimony on the

20   subject of nuclear DNA analysis.

21        Members of the jury, this witness also much like

22   an earlier one when I instructed you about so-called

23   expert witnesses has been received and enabled to

24   testify in the form of an opinion.  But as I said

25   before, as with all other witnesses, it is the

1    province of the jury to determine what weight and

2    credibility to give to the person's testimony.

3        Mr. Monk?

4    BY MR. MONK:

5    Q    Mr. Onorato, tell the members of the jury, first

6    of all, please, what is DNA?

7    A    Well, DNA is actually a chemical acronym.  It's

8    the a chemical acronym for the substance that's

9    contained in most of the building blocks of your

10   body.  These building blocks are called cells.  It's

11   the chemical substance that essentially the

12   encyclopedia for all of the genetic information that

13   makes you a human being and that makes you unique as

14   a human being.

15   Q    DNA is found within the human body in cells at

16   the cellular level?

17   A    That's correct.

18   Q    And as the name of your specialty implies,

19   nuclear DNA, is DNA found within the nucleus of

20   cells?

21   A    That's correct.  If you think of each of these

22   building blocks, each of these cells, as an egg.  The

23   yolk of the egg we term the nucleus.  The nucleus

24   contains DNA that you receive both from your mother

25   and father.  Hence, we call it nuclear DNA.

1 Q Does DNA vary from person to person?  And are

2 you capable of identifying such differences if there

3 are differences?

4 A Your nuclear DNA does differ from person to

5 person.  The one special exception to this would be

6 identical twins, which by definition have the same

7 nuclear DNA.  All other individuals do differ in

8 terms of their nuclear DNA.  There are really

9 thousands of differences in your DNA versus another

10 individual's DNA.  In the laboratory, we don't test

11 for all of these thousands of differences.  We focus

12 in on essentially 14 differences.  One of the set of

13 differences is a sex typing difference, and then

14 there are 13 other differences that we term STR

15 differences.  STR is just another acronym that stands

16 for short tandem repeat differences.

17 Q Mr. Onorato, is it possible to perform DNA

18 profiling an inanimate objects based upon a human

19 being having had contact with those objects?

20 A It is.  There is two basic ways that we identify

21 material to test in a nuclear forensic DNA typing

22 lab.  The first is we'll attempt to identify body

23 fluids.  So we can identify blood.  We can identify

24 semen, which is the male reproductive fluid.  Or the

25 other way we can go about identifying samples for

1    potential testing is to simply take an item and

2    understand the way it's normally used.  For instance,

3    an envelope flap.  We know where envelope flaps can

4    be licked, and so we'll take samples from those kinds

5    of areas in an effort to recover any DNA material

6    that might be there based on that envelope being

7    licked.

8    Q    Now, do you work in the same general laboratory

9    that Ron Kelly works in?

10    A    I do.  We moved to the new lab facility about

11    four years ago.  I think Mr. Kelly is up on the

12    fourth floor, and the DNA typing or the nuclear DNA

13    typing unit is on the third floor of the building.

14    Q    When a specimen comes into the lab, is it

15    accorded a Q number, a questioned item number?

16    A    It is.  If it's an evidence item or essentially

17    an item that's from the scene of a potential crime or

18    something like that, it's given a Q number.  The

19    reference samples that we use to compare any results

20    to the evidence are given K numbers for known

21    samples.

22    Q    Did you do some work in connection with the case

23    that is now before the Court?

24    A    Yes, I did.

25    Q    And did you do some work with respect to the

1    following items:  Item Q 17, a plastic two liter

2    bottle containing an unknown liquid?

3    A    I did.

4    Q    With respect to the nature of the liquid and

5    determining what the composition of the liquid is,

6    would that be something you would do or someone else?

7    A    Someone else.

8    Q    And what did you do with respect to this plastic

9    two liter bottle containing unknown liquid?

10   A    What we did in our unit was take essentially a

11   Q-tip, moisten it with a little water and we swabbed

12   the mouth of the bottle and the inside of the cap

13   that was on the bottle.

14   Q    What sort of test or tests did you perform?

15   A    We characterized the 14 different locations I

16   spoke about earlier.  We do a sex typing test and we

17   do the 13, what we call, STR tests.  When you think

18   of these tests, you need to realize that in terms of

19   your nuclear DNA, each of you has 46 chromosomes.

20   Those 46 chromosomes come in 23 pairs of chromosomes.

21   You get one of those pairs from your mother, the

22   other from your father.  When we do a DNA test at one

23   of these locations, we actually get two answers.  We

24   get the answer for that person that they got from

25   their mother and from their father.  If you do one

1      DNA test, you get two answers that represent an

2      individual.  If you do 13 tests, you get 26 answers.

3      What we did is we performed those 14 tests on the

4      material that we recovered from the mouth and the cap

5      of that bottle.

6      Q    And we discussed Q items or questioned items.  I

7      think you might have referred to a K item.  What is a

8      K item?

9      A    Those are the items that are submitted to the

10     unit that are going to serve as the reference

11     material from specific individuals.  Most often we

12     either get a blood sample from an individual or an

13     oral swab from an individual.  An oral swab is really

14     just a Q-tip where someone will rub the inside of

15     someone's cheek.  That's going to be the DNA source

16     from that specific individual so that we can run

17     those same 14 tests on that reference material so we

18     can compare the DNA typing results from those tests,

19     from the reference material to the evidence material.

20     Q    The K items, are those also known as knowns?

21     A    That's correct.  That is where the K would come

22     from, yes.

23     Q    Did you have two knowns in this case?

24     A    That's correct.

25     Q    And who were those knowns?

1    A    We had a known that was identified to us as K 4,

2    and this known was from a Mohamed.  Ahmed Mohamed was

3    the K 4 individual.

4        The K 6 individual -- again, each of these K

5    numbers has its own unique identifier.  So there's K

6    4 and then K 6 was identified to us as having been

7    taken from Youssef Megahed.

8    Q    Did you -- with respect to the Q17, the plastic

9    two liter bottle containing unknown liquid, did you

10   perform tests to determine whether either Mr. Megahed

11   or Mr. Mohamed's DNA blueprint was on that bottle?

12   A    We did.  Again, what we do in the laboratory is

13   we do the same 14 tests on any DNA that we recovered

14   from the mouth of the bottle and the cap of the

15   bottle.  We compare those results to the results from

16   both of the reference samples that are again

17   subjected to the same 14 tests.  We did obtain DNA

18   from the cap of the bottle and from the mouth of the

19   bottle.  The DNA typing results that we obtained from

20   the mouth and cap of the bottle were consistent with

21   coming from a single individual.  Those results were

22   consistent with the DNA typing results that we

23   obtained from Mr. Megahed.

24   Q    Do you have an opinion with respect to who

25   contributed the DNA that was found in the mouth and

1    cap area of that bottle?

2    A    Yes.  Based on that matching DNA type and the

3    rarity of that profile, it's my opinion that Mr.

4    Megahed is the source of that DNA to a reasonable

5    degree of scientific certainty.

6    Q    Now, I believe you said, and correct me if I'm

7    wrong, that you only found one person's DNA on that

8    bottle, is that correct?

9    A    That's correct.  There was DNA that was

10    consistent with coming from one single individual on

11    the mouth and cap of the bottle.

12    Q    The tests that you performed, do they sometimes

13    disclose the presence of multiple individuals' DNA on

14    a single item?

15    A    They do.  Oftentimes the material that we

16    recover from an item of evidence will give us what we

17    call a mixture of DNA where you have more than one

18    person's DNA present on that object.

19    Q    I think you also used the word or referred to

20    your finding as a rare or rarity in this instance?

21    A    That's correct.  Whenever we have a matching DNA

22    type, we are able to assess how common or rare that

23    type is in the general population.

24    Q    In connection with your opinion that Mr. Megahed

25    contributed the DNA on the soft drink bottle, could

1    you translate that into some numeric or other

2    indication to give us a specific and concrete idea of

3    how rare that would be?

4    A    So for a matching DNA profile, what we will do

5    again is estimate how common or rare that profile is

6    in the general population.  We do that by calculating

7    four essentially fractions.  These fractions are the

8    same kind of values that one in two or one in four

9    is.  We do them in four populations at the FBI lab.

10   Those populations are the Caucasian population, the

11   black population, the southeast Hispanic population,

12   and the southwest Hispanic population.  There's

13   really nothing magical about those four populations.

14   They're just four groups that make up the general

15   population.  And we give four values to give four

16   basic representations of how common or rare a DNA

17   profile is in those groups.

18        In this case or for this item in this case, the

19   bottle and the cap, the fractions that I calculated

20   in terms of the matching profile between the bottle

21   and Mr. Megahed were in the Caucasian population, one

22   in 620 quadrillion.  Now, 620 quadrillion would be a

23   6, a 2, and a 0 with another 15 zeros after it.

24        In the black population the profile's rarity is

25   one in 460 quadrillion.

1          In the southeast Hispanic population, the

2     profile's rarity is one in 90 quadrillion.

3          And in the southwestern Hispanic population,

4     the profile's rarity is one in 150 quadrillion.

5          Based on the rarities in these populations,

6     that's what I'm basing my opinion on that the DNA

7     present on the bottle is from Mr. Megahed.

8     Q    Let's move on to the next item.  Did you examine

9     a Q18?

10    A    Q18 was a right glove and I did test the right

11    glove, yes.

12    Q    More specifically, was it a magenta and black

13    colored glove?

14    A    An oceanic magenta and black colored glove,

15    that's correct.  That's how it was identified.

16    Q    By the way, going back just for a second to the

17    soda bottle, the liter bottle, did you also exclude

18    Mr. Mohamed as a contributor of DNA on that bottle?

19    A    That's correct.  The DNA typing results for Mr.

20    Mohamed did not match the DNA typing results that we

21    obtained from the bottle and inside the cap.

22    Q    With respect to Q18, the right-handed oceanic

23    glove, what did your test or tests disclose?

24    A    We did recover DNA from this right glove.  It

25    was a mixture of DNA.  There were at least two

1    individuals' DNA present on the glove.  There was a

2    major contributor of DNA on this glove.  What that

3    means is oftentimes what you'll find when you have

4    DNA for more than one person on an object, there will

5    be an individual who donated the majority of the DNA

6    or more of the DNA than someone else.  Then you can

7    think of this -- if you were to take a pound of my

8    DNA, hypothetically, and combine it with an ounce of

9    Mr. Monk's DNA, the testing results for my pound of

10   DNA would be much stronger than Mr. Monk's.  That

11   would be a sample in which I was the major

12   contributor to that mixture and Mr. Monk was the

13   minor contributor to that mixture.

14       We obtained a mixture from this glove, the

15   right-handed glove.  It did have a major contributor

16   and that major contributor matched Mr. Megahed.

17   Q    The other contributor or contributors, you refer

18   to them as minor contributors?

19   A    Again, they're minor contributors only because

20   the amount of DNA that they would have been

21   responsible for leaving on the glove was less than

22   Mr. Megahed left.

23   Q    And did you also test to determine whether Mr.

24   Mohamed was a minor contributor?

25   A    We did.  There was so little information from

1    that right glove that there really was not a lot to

2    compare Mr. Mohamed to.  When we did do that

3    comparison, Mr. Mohamed was excluded as being a

4    potential contributor to the DNA on the right glove.

5    Q    Now, you started to say I believe that there was

6    so little information on the right glove.  Is it --

7    do you have to have a minimum amount of cellular

8    material on an object in order to perform a DNA

9    analysis?

10   A    Well, you can perform a DNA analysis really on

11   no cells if you would like.  But to have the

12   expectation of getting any kind of result that is

13   going to give you any kind of comparative

14   information, you're generally going to need somewhere

15   around 100 or 150 cells before you're going to have

16   enough DNA in total to actually detect the type and

17   have information that is useful for comparison

18   purposes.

19   Q    All right.  Your ability to be able to detect a

20   useful amount of information, is that affected by

21   other things, including the duration of the touching

22   on the surface?

23   A    That's correct.  Really all the considerations

24   that I try to take into account in figuring out

25   whether something is suitable for trying to do a DNA

1    test on are things like if the object was touched how

2    long was it touched for?  Because the longer

3    something is touched, the more likely you're going to

4    transfer a sufficient number of cells for me to

5    detect.

6    Q    Are there other considerations?  For example,

7    the type of surface, does that make a difference in

8    your ability to successfully test for the presence of

9    DNA?

10   A    It absolutely does.  So the ideal touch would be

11   a long touch on something rough because the rougher

12   an object is the more cells will be dislodged.

13   Hopefully, the contact will be extended so that there

14   is plenty of time for the cells to be dislodged by

15   the rough surface.

16   Q    Would another factor or circumstance entering

17   into your success in testing be whether or not a

18   surface tested had any sort of intervening

19   disturbance between the touching and the testing?

20   A    If by intervening -- what was the term you used,

21   Mr. Monk?

22   Q    An intervening disturbance of any type?

23   A    Intervening disturbances -- I guess the first

24   aspect of that would be if you have a rough surface

25   and you can have extended contact, it would be ideal

1    if you had friction between the body part and the

2    rough surface.  Again, you'd be dislodging a maximum

3    amount of genetic material in the cells.  The genetic

4    material in the cells.

5        In terms of intervening disturbances that occur

6    after someone touches an object, if you had

7    intervening disturbances where the surface that was

8    touched for a long time, being a rough surface in a

9    very -- with rubbing that occurred, you could begin

10   to remove that material if you were to wipe it

11   purposely or if that object was put in a pocket and

12   the object would rub the inside of the pocket.  You

13   could dislodge material that was deposited if you

14   handled it in a manner where you had that kind of

15   interaction.

16   Q    Do some people, for lack of a better term, shed

17   more than others do?

18   A    We all shed.  We're all shedding skin cells from

19   ourselves virtually at all times during the day.  It

20   is true in the laboratory amongst the folks in our

21   unit or any kind of other unit that does this kind of

22   testing, there do seem to be people that shed their

23   cells into material more often than others.  So it

24   does appear that some folks are greater shedders than

25   others.  But is isn't something that you're going to

1    read in a scientific journal about having Type A

2    shedders or Type B shedders. But we're all shedding

3    material and it does seem like some people will shed

4    more material than others.

5    Q    Let's go to the other glove, Q19. Was that the

6    left-handed oceanic glove?

7    A    That's correct.

8    Q    What, if anything, did your test or tests

9    determine in connection with that glove?

10    A    We did recover DNA from the left-handed glove.

11    It was a mixture of DNA. There were three or more

12    individuals' DNA on this glove. There was a major

13    contributor to this mixture of DNA on the left glove

14    and that major contributor's type was the same as the

15    DNA typing results that we obtained from Mr.

16    Megahed's oral swab.

17    Q    And what about Mr. Mohamed in connection with

18    being a potential contributor to Q19, the left-handed

19    glove?

20    A    Based on a comparison between the mixture

21    results on the left-handed glove and Mr. Mohamed's

22    DNA typing results, Mr. Mohamed was excluded as being

23    both a major contributor as well as a minor

24    contributor to that glove.

25    Q    And did you also test a laptop computer?

1    A    We did.  The laboratory had identified the

2    laptop computer as Q21.

3    Q    And where did you -- how did you go about taking

4    the swabs from this laptop computer?

5    A    This is one of those items where you're sort of

6    putting the object out in front of you and asking

7    yourselves how does someone use this.  It was a

8    laptop computer.  What we ended up doing is taking

9    the Q-tip and moistening it with water and swabbing

10   the latch area where you would have essentially

11   allowed the screen to be lifted up from the body of

12   the laptop.  We took the same swab and we swabbed the

13   keys on the laptop and the mouse pad area on the

14   laptop.  Because we weren't necessarily expecting to

15   obtain a lot of DNA from any area on the laptop, we

16   didn't take separate samples.  We took one big sample

17   in an effort to maximize the amount of material that

18   we were recovering.  So we took all three areas onto

19   the same sample.

20   Q    Would you recognize the laptop if you saw it

21   again?

22   A    I actually never saw the laptop.

23   Q    Okay.

24   A    But there would be markings from the laboratory

25   that I could identify.

1    Q    On the laptop itself or the bag it was in?

2    A    The bag that it was in, yes.

3    Q    Take look at this.

4    MR. MONK:  I'm showing the witness 3 A, Your

5    Honor.

6    THE WITNESS:  Yes, I can identify the packaging.

7    It has -- the packaging has the laboratory number,

8    which is the identifying information for the

9    submission.  It also has the identifying information

10   for the laptop, which was item Q21.

11   BY MR. MONK:

12   Q    So this is the laptop that we're talking about,

13   is that correct?

14   A    It is.

15   Q    And did you test for the presence of DNA with

16   respect to Mr. Ahmed Mohamed's DNA and also Mr.

17   Youssef Megahed?

18   A    Again, we recovered DNA from this laptop.  It

19   was a mixture of DNA.  There were three or more

20   people or three or more persons that contributed DNA

21   to this mixture.  There was a major contributor to

22   this mixture of DNA from the laptop.  The major

23   contributor typing results from the laptop matched

24   Mr. Mohamed, and Mr. Megahed could not be excluded as

25   a potential minor contributor to the DNA that we

1    obtained from the laptop.

2    Q    When you say Mr. Megahed could not be excluded

3    as a minor contributor, what do you mean by that?

4    A    Again, we're talking about the results that

5    would be weaker in terms of their relative strengths

6    with respect to the major contributor.  Mr. Megahed,

7    his DNA typing results were consistent with some of

8    the DNA typing results that we obtained from the

9    minor contributor to the mixture of DNA on the

10   laptop.

11       The fractions that we calculated for this

12   particular match, for the Mr. Megahed match to the

13   minor contributor results on the laptop, again, there

14   were four.  They are the four different populations

15   we spoke about.  In the Caucasian population, the

16   fraction is one in eight.  From the Caucasian

17   population the fraction is one in nine.  From the

18   southeast Hispanic population, the fraction is one in

19   12.  From the southwest Hispanic population, the

20   fraction is one in 20.

21   Q    Do you then achieve some sort of a average or

22   how do you make the quantity determination?

23   A    Well, again, what those values are is how common

24   or rare that minor contributor typing result is in

25   the four populations.  Really the way to look at

1    those fractions is as a range.  Those fractions will

2    range anywhere from one in eight to one in 20.  So

3    you could expect for any one person who would walk in

4    front of the courthouse today on average between one

5    and eight and one in 20 would have a DNA type that

6    could be a potential minor contributor to the DNA

7    mixture that was found on the laptop.  That would be

8    the most appropriate way to view the fractions.

9    Q    Between one and eight and one in 20 people

10   walking past the courthouse could be a contributor of

11   DNA to the laptop, correct?

12   A    That's right.  The DNA profile that they would

13   be found to have would be consistent with the minor

14   contributor typing results on the laptop.

15   Q    And how does Mr. Megahed fit into that?

16   A    Well, when I compared Mr. Megahed's DNA typing

17   results, they were included as a possible minor

18   contributor on the laptop.  So Mr. Megahed would be

19   one of the one in ten or one in eight to one in 20

20   individuals.

21   Q    Who could be a minor contributor?

22   A    Whose DNA types -- that's correct.  Whose DNA

23   type was consistent with the minor contributor on the

24   computer.

25        MR. MONK:  May I have a moment, please, Your

1    Honor?

2         THE COURT:  You may.

3          (Pause.)

4    BY MR. MONK:

5    Q    Finally, Mr. Onorato, does the absence of DNA on

6    a surface mean that no one ever touched it?

7    A    No.  You could conceivably touch a surface and

8    not leave any DNA or you could also touch a surface

9    and not leave a sufficient amount of DNA my tests to

10   detect.

11        MR. MONK:  Thank you.

12        THE WITNESS:  Thank you.

13        THE COURT:  Does that complete your Direct

14   Examination, Mr. Monk?

15        MR. MONK:  I'm sorry, Judge.  Yes, it does.

16        THE COURT:  Mr. Allen, you're recognized for

17   your cross-examination.  Mr. Allen, perhaps this

18   would be a good time for us to take the afternoon

19   recess before you undertake this.

20        MR. ALLEN:  I think that's a great idea.

21        THE COURT:  We'll be in recess then for about 15

22   minutes.

23        Mr. Watts?

24        THE COURT SECURITY OFFICER:  Rise for the jury,

25   please.

1          (Jury out at 3:29 p.m.)

2          (End of excerpt of proceedings.)

3

4                    C E R T I F I C A T E

5          I, Kerry Mercade, certify that the foregoing is

6     a correct transcript from the record of proceedings

7     in the above-entitled matter.

8                              S/Kerry Mercade

9                              Kerry Mercade
                               Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25