1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2                 TAMPA DIVISION

3    UNITED STATES OF AMERICA

4

5          vs.              CASE NO. 8:07-cr-342-T-23TBM
                            March 24, 2009
6                            Tampa, Florida

7

     YOUSSEF SAMIR MEGAHED,
8
          Defendant.
9
     _____/
10
          TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11              (TESTIMONY OF RICHARD STRYKER)
          BEFORE THE HONORABLE STEVEN D. MERRYDAY
12              UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:  JAY HOFFER
                          ROBERT MONK
15                        Assistant U.S. Attorneys
                          400 N. Tampa Street, Suite 3200
16                        Tampa, Florida 33602
                          813/274-6000
17
     For the Defendant:   ADAM ALLEN
18                        DIONJA DYER
                          Assistant Federal Defenders
19                        400 N. Tampa Street, Suite 2700
                          Tampa, Florida 33602
20                        813/228-2715

21   Court Reporter:      Kerry Mercade
                          801 N. Florida Avenue
22                        Suite 15A
                          Tampa, Florida 33602
23                        813/301-5024

24

25   Proceedings recorded and transcribed by
     computer-aided stenography.

1

## INDEX

2

**GOVERNMENT WITNESS RICHARD STRYKER**
3    Direct Examination by Mr. Hoffer..........3
     Voir Dire Examination by Mr. Allen........17
4    Cross-Examination by Mr. Allen...........119
     Redirect Examination by Mr. Hoffer........179

5

6

## GOVERNMENT'S EXHIBITS

7

8    **Number      Description                   Page**

9    63 C         Photographs (tests results)....112
     64 A – F     Photographs (lab results)......65

10

## 11    DEFENDANT'S EXHIBITS

12   15 A – C     Photographs (agents testing)...167
     20           Sensodyne toothpaste..........133

13

14

15

16

17

18

19

20

21

22

23

24

25

1        GOVERNMENT WITNESS, RICHARD STRYKER, SWORN

2       THE COURT:  State your name, please.

3       THE WITNESS:  Richard N. Stryker.

4       THE COURT:  Would you spell your last name for

5 us?

6       THE WITNESS:  S-T-R-Y-K-E-R.

7       THE COURT:  Mr. Stryker, have a seat in the

8 witness stand and I will recognize Mr. Hoffer for

9 your Direct Examination.

10             DIRECT EXAMINATION

11 BY MR. HOFFER:

12 Q    Mr. Stryker, sir, good morning.

13 A    Good morning.

14 Q    Let me ask you first, preliminarily, how are you

15 employed and what you do for a living, sir?

16 A    I'm a supervisory special agent with the Federal

17 Bureau of Investigation.  I work in the FBI

18 laboratory in the explosives unit at the laboratory.

19 Q    How long have you worked for the Federal Bureau

20 of Investigation, sir?

21 A    I have worked for approximately 11 and a half

22 years for the FBI.

23 Q    How long -- well, you said your current title or

24 position at this point is what?

25 A    A supervisory special agent.

1    Q    What are your duties and responsibilities in

2    that capacity, sir?

3    A    Primarily, we conduct forensic examinations on

4    bombing-related evidence that's submitted to the

5    laboratory.  We also conduct a myriad of training for

6    state, local, other federal partners, international

7    training on explosive devices and post-blast crime

8    scenes.  And those are the two primary categories we

9    get involved with.

10   Q    As a supervisory special agent that sounds like

11   you supervise people.  How many people do you

12   supervise and what type of work do they do?

13   A    Actually, at that time I'm only supervising one

14   person who is this technician who works for me

15   assisting with the processing of the evidence.

16   Q    How many folks are there in the explosives unit

17   of the laboratory in general?  Do you know how many

18   total there are?

19   A    Not the exact number but approximately 30

20   people.

21   Q    Prior to joining the FBI -- when did you join

22   the FBI, what year?

23   A    1997.

24   Q    Prior to that -- can you tell members of the

25   jury a bit about your prior employment experiences,

1    sir?

2    A    Prior to the FBI, upon graduating from the U.S.

3    Naval Academy in Annapolis, I was a Naval officer for

4    six years.  I served both as a surface warfare

5    officer in the engineering department on a ship, and

6    then midstream in that commitment, I switched over to

7    the special operations community in the Naval,

8    specifically explosive ordinance disposal, which is

9    responsible for locating, rendering safe, and

10   disposing of any type of explosive munitions or

11   explosive devices.

12        When I got off active duty in 92, I went to the

13   Reserves and worked in the Reserves for approximately

14   five years in a EOD billet at Movida 10 (ph) in

15   Virginia.  But the Reserves didn't pay the primary

16   paycheck, so I was also an environmental engineer

17   working for the Department of the Navy, civil

18   service.

19        Then in 1997 I entered on duty with the FBI.

20   Q    In the course of -- you said you were active

21   service Navy for how many years, sir?

22   A    Active for six and Reserves for five.

23   Q    In the course of those six years when you were

24   active, and I guess even during your Reserves tenure,

25   you mentioned that you were an explosives -- what was

 1    the term again?

 2    A     EOD, explosive ordinance disposal.

 3    Q     In the course of your -- did you get special

 4    training to serve in that capacity?  I assume that

 5    you must have.

 6    A     Yes, sir.

 7    Q     Generally speaking, what kind of training did

 8    you get to prepare you to do that function in the

 9    Navy?

10    A     It's a very long training cycle, specifically

11    with the Navy because prior to that if weren't

12    already at least the equivalent of a second class

13    diver, you had to participate in basic dive training,

14    basic officer dive training.  The whole training was

15    approximately 15 months long.  The bulk of it dealt

16    with EOD, or explosive ordinance disposal tools and

17    techniques, how to properly recognize the myriad of

18    ordinance, not just everything that's in the U.S.

19    inventory but everything foreign.

20    Q     Stop you for a second if I could, I'm sorry.

21    You've have used the word "ordinance".  What do you

22    mean by that?

23    A     Ordinance is a term that's used to describe a

24    military-type munition, whether it be a missile, a

25    rocket, a projectile, a grenade, things of that

1     nature.

2     Q     Please continue, sir.

3     A     So the bulk of the training involves learning to

4     recognize all that, and not only to recognize it but

5     to know all this material works.  We have to

6     understand all the fusing mechanisms so that we can

7     safely approach, decide what sort of render safe

8     procedure might be applied.  And if one is not

9     necessary, simply how to effectively destroy all

10    these types of munitions.  It also involved

11    improvised explosive devices, chemical devices,

12    nuclear devices.  It covered the full gamut of things

13    that detonate or explode.  We were tested in those

14    processes as well.

15         Again, the Navy was a little bit longer because

16    unlike the other services who also had EOD

17    technicians, we specialized in underwater ordinance

18    as well.  So we did all the conventional stuff as

19    well as underwater.

20    Q     After you left the Navy or some time thereafter

21    you said you joined the FBI in 1997, did you say?

22    A     Correct.

23    Q     Did you attend the academy, FBI academy?

24    A     Yes, sir.

25    Q     Following that, your graduation from the

1    academy, what type of matters did you work on at that

2    point?

3    A    Upon graduation I was assigned to the

4    Philadelphia Division.  I primarily worked mostly

5    international terrorism.  I did work some domestic

6    terrorism and civil rights.  When I first got it was

7    primarily civil rights and domestic terrorism, and

8    then it evolved into international terrorism.  This

9    was prior to 911 when all three matters were handled

10   on one squad.  As you can imagine, it has evolved

11   quite a bit since then, but that's what I worked when

12   I was there prior to coming to the lab.

13   Q    So you were functioning as a ordinary special

14   agent in that capacity, not at the laboratory,

15   correct?

16   A    Correct.

17   Q    So you were investigating matters or cases at

18   that point?

19   A    That's correct.

20   Q    Did there -- when did you join or move to the

21   laboratory to begin work there?

22   A    I moved to the laboratory in June of 2003.  But

23   if I may, approximately two years after I was at the

24   field office, I had the opportunity to go to the

25   hazardous devices school in Huntsville, Alabama.

1     That's a school that the FBI runs that trains all

2     state, local, and federal bomb techs in the country.

3     When I graduated from that school -- even though I

4     had all the military EOD background, you still have

5     to go to that school.  You are designated as a

6     special agent bomb technician.  Depending on the

7     field office that you work at, it's either more of a

8     primary or collateral duty to liaison with the state

9     and local bomb techs to make them aware of new render

10    safe procedures, equipment, and also perform render

11    safe procedures if the state and locals decide that

12    they may need some assistance.

13    Q    How long a course is that, this hazardous device

14    school that you mentioned?

15    A    Hazardous devices school is approximately five

16    weeks long.  I think it's six weeks nowadays.

17    Q    What kind of things are taught there that you

18    learned?

19    A    Again, the focus of that school is improvised

20    explosive devices.  Or homemade bombs is another

21    synonym for hazardous devices.  That's the focus.

22    They only have a tiny block on all the ordinance

23    which I was trained in the military.  Again, it's

24    primarily how to recognize an improvised explosive

25    device and how to safely render it safe.

1    Q    And when you got out of that -- you passed that

2    course, I take it, correct?

3    A    Yes.

4    Q    And did you get a special certification of any

5    sort or special designation?

6    A    Yes.  We're designated as a special agent bomb

7    technician.  We have to get recertified every three

8    years.

9    Q    And your duties and responsibilities as a

10    special agent bomb technician are, as you described,

11    dealing with these matters as far as rendering them

12    safe and safely dealing with those kind of devices?

13    A    Essentially, yes, sir.

14    Q    And did you function in that capacity solely or

15    was that your sole assignment after getting out of

16    this course or what did you do?

17    A    No.  For me at that point it was a collateral

18    duty.  But, again, during that time I taught several

19    post-blast investigator courses that were sponsored

20    by the Philadelphia Division and still continued

21    working the cases that I had been assigned to as

22    well.

23    Q    So that was an additional sort of part of your

24    work in Philadelphia?

25    A    Yes.

1    Q    Now, you said at some point you left the

2    Philadelphia office of the FBI and at that point you

3    went to the laboratory?

4    A    Yes.  There was a job opening at the lab.  It

5    was a promotion.  I applied for it, was accepted, and

6    reported for duty in June of 2003.

7    Q    And let me just jump back one second before we

8    talk about the lab.  In the period of time, sounds

9    like, two years or maybe somewhat less or more that

10   you were a special agent bomb technician, did you

11   have occasion as part of your duties to actually in

12   real life deal with some of these kind of situations

13   involving explosives or bombs of things of that --

14   destructive devices, things of that nature?

15   A    During that period of time I never had to --

16   well, actually there was one occasion where I suited

17   up with some of the locals when they had a suspect

18   package and were shorthanded.  Yes, we dealt with

19   those matters when called upon to do so.

20   Q    Now, you joined the laboratory in 2003, as you

21   said, I think, a minute ago?

22   A    Correct.

23   Q    When you joined, what part of the laboratory did

24   you join and what were your duties and

25   responsibilities initially?

1  A    I joined specifically the explosives unit in the

2  laboratory.  Again, my duties and responsibilities

3  were to conduct forensic exams, write forensic

4  reports, testify when called to do so, conduct

5  training.  But prior to be qualified to do so there

6  is a training process.

7  Q    Could you describe that briefly?

8  A    It's a pretty lengthy process of essentially

9  working with the other qualified examiners and

10  extensive OJT or on-the-job training; working with

11  the evidence when it initially comes in; checking it

12  for safety; writing detailed notes on -- let me back

13  up.  Deciding where the evidence goes to, because

14  we're usually the first ones that get it and the last

15  ones.  We first get it and we check it for safety,

16  photograph, inventory, decide usually in conjunction

17  with the contributor of the evidence where it's going

18  to go to first:  Latents, DNA, et cetera.  Then once

19  it's gone through that process, we get it back and

20  decide -- you know, that's when we perform the bulk

21  of our exams.  During that we take detailed notes.

22  But again it's during this process of getting

23  qualified we perform all tasks.  We write reports

24  which are reviewed by senior examiners.  We attend

25  other training courses, and we have a booklet that we

1    have to get signed off, checking different boxes that

2    we've accomplished different tasks.  We go through an

3    extensive moot court process where they really try to

4    give you the difficult questions so you know how to

5    handle yourself in court.  And then essentially once

6    you accomplish that and complete your last series of

7    moot courts, the panel people there decide whether

8    you've passed or not and then you are deemed to be

9    qualified.

10   Q    And did you pass that course of examination or

11   training?

12   A    Yes.

13   Q    What year was that, do you remember?

14   A    I think it was July of 2005.  It was

15   approximately two years later.

16   Q    Following that, once you get to that point, does

17   that mean that you perform your function on your own

18   at that point or is there any additional continuing

19   supervision or mentoring or anything like that?

20   A    Well, we -- you're essentially on your own, so

21   to speak.  In other words, you're putting your name

22   on that report so you're responsible for it.  But we

23   do take proficiency tests at least annually to ensure

24   that we are doing what we are supposed to be doing

25   and that we're proficient at doing it.

1    Q     In the course of the time that you have been at

2    the lab from 2003 on, have you had occasion to take

3    any additional training or special -- any additional

4    special certifications that relate to what you do and

5    your knowledge base?

6    A     I've taken several training courses.

7    Q     Is there some method set out or requirement for

8    this continuing education or continue to take these

9    courses?

10   A     Not specifically.  There are some required ones.

11   I don't specifically recall what they are during

12   their training process before you get qualified.  But

13   I mean usually after you've been qualified, if you

14   see an opportunity to attend training that you think

15   is relevant or pertinent, usually you're provided

16   that opportunity to go to that sort of training.

17   Q     Are you familiar, sir, with the term

18   "explosives" or "hazardous device examiner"?

19   A     Yes, sir.

20   Q     What does that mean?

21   A     Again, it's a person who's received a

22   specialized training that's able to recognize,

23   identify, make a functionality determination of how

24   things work, try to put the pieces back to together,

25   so to speak, to the extent possible depending on the

1    condition of the evidence that you get because

2    unfortunately, I'm sure you may realize, sometimes

3    the evidence is in better condition than other times,

4    depending on the extent or the nature of the

5    explosion.  Again, to render a expert or professional

6    opinion about what the evidence is, write that in a

7    report, and submit it.

8    Q    Did you ever attend any course or obtain that

9    certification for yourself?

10    A    Could you rephrase that, please?

11    Q    My question is did you ever get that designation

12    or title?

13    A    Yes.  I was designated as a hazardous device

14    examiner at the completion of all my training.

15    Q    Are you a member of any professional

16    associations that relate to what you do for a living?

17    A    No, sir.

18    Q    Have you had occasion in the years you've been

19    involved in the field of explosives and devices and

20    such to teach or instruct others in some of these

21    areas?

22    A    Yes.

23    Q    What kinds of opportunities or what things have

24    you done in that regard, sir?

25    A    I've been the principal instructor in numerous

1    post-blast classes, which are classes which teach

2    state, local, federal, international partners the

3    basics of explosives, how they work, what they are.

4    We conduct on-hands demonstrations of this using a

5    variety of explosives, explosive effects, so they can

6    witness this.  Again, we have a lot of classroom

7    material where we cover subjects like improvised

8    destructive devices:  What they are, how they work,

9    the myriad of things that can be considered to be

10   IEDs.  Of course, the essence of it is how to

11   approach a post-blast crime scene because they're

12   quite different than a standard crime scene, if you

13   will.  There's going to be different things that you

14   have to consider.  The evidence isn't necessarily

15   going to be very evident or apparent when you

16   approach this scene.  So we teach all of those times

17   of items and I've done that numerous times.  I don't

18   have a specific number, but --

19   Q    Have you in the course of your years in the

20   dealing with explosives and explosives materials and

21   such had occasion also to deal with items that have

22   been characterized or could be characterized as

23   destructive devices?

24   A    Yes, sir.

25   Q    How do you differentiate or how you would you

1　　explain the difference between the two, explosive

2　　device or destructive device?  Is there some easy

3　　definition that you're familiar with?

4　　A　　Essentially, they are synonymous.  Destructive

5　　device is kind of a legal term.  It's synonymous with

6　　an IED, a homemade bomb.  Essentially, there's two

7　　major components that you have to have to have one.

8　　One is a fusing system.  It's a broad category.

9　　　　MR. ALLEN:  Your Honor, if he's going to get

10　　into opinions, I would like to voir dire him on

11　　qualifications.

12　　　　MR. HOFFER:  I would at this point offer and

13　　tender the witness in the field of explosives,

14　　explosive devices, and destructive devices, Your

15　　Honor.

16　　　　THE COURT:  Mr. Allen, you have an opportunity

17　　to voir dire this witness with respect to his

18　　credentials to opine in the stated arena of opinion.

19　　　　MR. ALLEN:  Thank you, Your Honor.

20　　　　　　　　　VOIR DIRE EXAMINATION

21　　BY MR. ALLEN:

22　　Q　　Agent Stryker, your educational background is

23　　limited to receiving a general engineering degree in

24　　May of 1986?

25　　A　　That's when I received my Bachelor of Science

1    in, yes, sir.

2    Q    And you have not received any masters or PhD

3    degrees in science, correct?

4    A    No, sir.

5    Q    You are not -- did not even receive a degree in

6    chemistry, correct?

7    A    No, sir.

8    Q    Have you ever testified in court as an expert

9    witness recording destructive devices?

10   A    Yes, sir.

11   Q    Have you testified in court as an expert witness

12   regarding explosive materials?

13   A    Not specifically explosive materials, but they

14   are all related.

15   Q    I understand.  Have you ever given an expert

16   opinion on what is an explosive material?

17   A    Not specifically.

18   Q    Have you ever given expert opinions on what is a

19   pyrotechnic?

20   A    No, sir.

21   Q    I believe you testified you don't -- you are not

22   a member of any affiliations, professional

23   affiliations regarding destructive devices?

24   A    That's correct.

25   Q    And you're not involved in any professional

1     affiliations regarding explosive or explosive

2     materials?

3     A    Correct.

4     Q    Is the bulk of your expertise based on

5     on-the-job training and experience as opposed to

6     educational?

7     A    The bulk of my experience is primarily based on

8     what I've been paid to do since 1989.  I've been

9     involved in explosives and explosive devices ever

10    since then.

11    Q    The people that have paid you since 1989 would

12    be the federal government either through the Navy or

13    through the FBI?

14    A    That's correct.

15       MR. ALLEN:  I don't have any further questions,

16    Your Honor.

17       THE COURT:  Mr. Hoffer, do you and Mr. Allen

18    want to come to side bar just a moment?

19       (At side bar, on the record.)

20       THE COURT:  Do you have an objection?

21       MR. ALLEN:  Yes, Your Honor, although it's not a

22    very strong one.  I believe his training and

23    experience can qualify him under 702.

24       THE COURT:  Well, of course.  Of course.  All

25    right then.  I was going to give you a chance to

 1    argue here at side bar, but I think there is nothing

 2    to argue.

 3         MR. ALLEN:  Training and experience is

 4    sufficient.

 5         THE COURT:  All right, excuse me.

 6         (End of side bar discussion.)

 7         THE COURT:  Members of the jury, remain mindful

 8    of my precautionary instructions with respect to the

 9    testimony of an expert witness, which applies to this

10    witness as well as others, and which I'll visit again

11    in my closing instructions at the end of the case.

12         Mr. Hoffer?

13    BY MR. HOFFER:

14    Q    Mr. Stryker, sir, if you would, following up on

15    the last question actually posed to you about your

16    previous experience in rendering an expert opinion in

17    court, could you amplify a bit as to what

18    circumstances those instances were and what areas you

19    were called to testify about?

20    A    It was a case that involved the sale of a

21    variety of military munitions to include surface to

22    air missiles, projectiles, recoilless rifle systems,

23    and I had to provide testimony on how those systems

24    worked.  The nature of their destructive capacity was

25    primarily the gist of my testimony in that case.

Q    Let's go back to your work at the explosives
unit at the laboratory again for just a second.  You
had mentioned a few minutes ago that your unit in
cases involving examinations of things that come to
your attention is the first and the last unit of the
laboratory of the other components to deal with
things that are submitted.  Why is that?

A    It's primarily for safety issues.  I mean, when
the evidence physically comes into the laboratory and
when it's either delivered by a vehicle, some police
officer or agent driving it up to the back of the
lab, or if it comes in usually via FedEx, it's going
to go to our evidence control center simply in our
case to have a laboratory number placed on the
outside of the package.  They're not going to open up
the package because of safety concerns.  And there
could be occasion where something, and there has been
unfortunately probably 20 years ago, where a
hazardous device was shipped into the laboratory
still in a hazardous condition.  For safety reasons
we'll open it first, check it for safety, perform an
inventory to make sure what the contributor said they
sent was in fact what they sent us.  And to the
extent possible we'll take some inventory
photographs.  Sometimes it's not wise to disturb the

1    evidence even for those types of photographs before

2    we get it to another discipline.  And then usually

3    because of the nature of the other exams -- latent

4    fingerprints are delicate.  DNA could be compromised.

5    Hairs and fibers, that sort of thing, are delicate,

6    so we don't really want to handle this evidence too

7    much.  We decide on where it needs to go to.  We

8    monitor the flow of evidence.  And then when all the

9    other exams are complete, we get it back and perform

10   our examinations a little bit more detailed, close-up

11   look at what all the pieces and parts are.

12   Q    Now, in the course of your work at the

13   laboratory and in the course of your training and

14   experience that you've been describing this morning

15   already, have you become familiar, sir, with the

16   various statutes and regulations that govern things

17   that are sometimes called explosive materials?

18   A    Yes, sir.

19   Q    How do you deal with that in your day to day?

20   What's your interaction with those statutes or

21   regulations?  How do they work in your universe?

22   A    Well, when it pertains to a federal offense,

23   they are the laws that govern the legality or

24   illegality of making an explosive device or

25   possessing material.  You know, what is this

1    material.  It has direct application.

2    Q    Are there any specific references out there that

3    you consult or look at when you're dealing with

4    making that sort of identification or classification?

5    A    Could you repeat that, please?

6    Q    I guess my questions is this.  Let me rephrase

7    it, rather.  When you are called upon to give an

8    opinion or give an analysis of whether something

9    meets the federal statute or regulation definition of

10   being an explosive or an explosive material --  and

11   you're familiar with those definitions, right?

12   A    Yes.

13   Q    What do you consult or what do you look at that

14   helps you to arrive at those kinds of conclusions?

15   A    Simply look at the evidence.

16   Q    Is there anywhere that you're familiar with a

17   listing of things that fall into one category or

18   another as far as being explosive materials or the

19   like?

20   A    There is the Federal Register, which lists the

21   materials which the Government deems to be explosive

22   materials.

23   Q    And do you have occasion to consult with that

24   periodically or have you had over the years to

25   consult with that in making your determinations on

1  varies things that come to your attention at the lab?

2  A    Yes, sir.

3     MR. HOFFER:  Your Honor, may I approach the

4  witness at this time?

5     THE COURT:  You may.

6  BY MR. HOFFER:

7  Q    Mr. Stryker, sir, I've have handed you what is

8  marked for identification as Government's Exhibit 60,

9  6-0.  Ask you if you recognize that document.  Don't

10  tell us specifically what it is, but do you recognize

11  it or have you seen it before?

12  A    Yes.

13  Q    Generally speaking, what type of a document or

14  item is that?

15  A    This is a list approved by the Attorney General

16  which includes all the explosive materials which are

17  governed, if you will, under Title 18, I think,

18  Section 841.  That refers to this list which

19  encompasses a myriad of explosives.

20     MR. HOFFER:  Your Honor, at this point I would

21  offer Government's 60.

22     MR. ALLEN:  Objection, Your Honor.

23     THE COURT:  Excuse me?

24     MR. ALLEN:  I have an objection.

25     THE COURT:  All right.  You can come to side

1    bar.

2         (At side bar, on the record.)

3         MR. ALLEN:  Your Honor, the Government is

4    attempting to introduce a sectio of the Code of

5    Federal Regulations, basically a legal document.  I

6    don't believe it serves any evidentiary purpose in

7    this case to introduce a legal document.  It would be

8    like introducing the federal statute in evidence.

9    The Court is going to instruct them on what the law

10   is.  We don't need to have that section.  If he wants

11   to ask questions about what's on the list that's

12   relevant, that seems appropriate.  But to actually

13   move in a section of the CFR seems inappropriate.

14        MR. HOFFER:  If I hear the objection correctly,

15   I'm not sure I understand it.  This document does not

16   answer the ultimate issue or question for the jury.

17   This document is the Attorney General's list of

18   explosive materials.  It's, in essence, a regulation,

19   if you will, or a publication of the Attorney General

20   annually listed.

21        It lists, for the Court's information, and the

22   relevant issue is potassium nitrate explosive mixture

23   and safety fuse as two of the myriad of items that

24   are on there.

25        It is no different than a regulation of other

1    things the Court could take judicial notice of and

2    admit in evidence.  I briefed that in our trial

3    brief.  I don't think there's --

4        THE COURT:  I think the question is not whether

5    I can take judicial notice of it or the fact that it

6    is listed is useful.  It's just whether or not the

7    document itself with all its irrelevant parts

8    warrants admission.  I mean, I don't think there's

9    anything wrong with testifying that, yes, KNO 3 is on

10   there.  It's going to be unrebutted, isn't it?

11       MR. ALLEN:  Well, potassium nitrate explosive

12   mixture is on there.  I don't think that's KNO 3.

13       THE COURT:  Well, whatever it is.  I mean, that

14   part is not going to be disputed.  What is on there

15   is what's on there.  I can take judicial notice of

16   what's on there.  But I have no reason to take

17   judicial notice of the irrelevant parts.

18       MR. HOFFER:  We can either redact it or --

19   obviously, the question is going to be and the

20   testimony is going to have to relate back to the

21   comparison of what is in this case, the evidence in

22   this case, and what is on this list.  So we're not

23   invading the jury's province in any way by

24   introducing this.  If the Court is concerned about

25   irrelevant parts of the list, we can redact or

1     whatever.

2          MR. ALLEN:  We'll stipulate that potassium

3     nitrate explosive material is on the list.

4          THE COURT:  Why don't I just announce that

5     potassium nitrate explosive mixture is on the

6     Attorney General's list?

7          MR. HOFFER:  And so is safety fuse.

8          MR. ALLEN:  Yeah, that's in the statute.  I

9     don't have a problem with that.

10         THE COURT:  And the safety fuse.  That way we

11    avoid the issue.  I don't know what else is in that.

12         MR. ALLEN:  There's a lot.

13         THE COURT:  Is that agreeable?

14         MR. HOFFER:  I believe so.

15         THE COURT:  So I'll announce that potassium

16    nitrate explosive --

17         MR. HOFFER:  Mixture.

18         THE COURT:  -- mixture is a --

19         MR. ALLEN:  Is on the Attorney General's list.

20         THE COURT:  -- of.

21         MR. HOFFER:  Of explosive materials.

22         THE COURT:  Explosive materials, okay.

23         MR. HOFFER:  And so is safety fuse.

24         THE COURT:  And so is safety fuse.

25         MR. HOFFER:  To the extent that it is relevant,

1   Your Honor, this is the list that was applicable I

2   think from June of -- I forget, August or September

3   of 2006 to -- it's a yearly list, so it would be --

4        MR. ALLEN:  September 27, 2006.

5        THE COURT:  09/27/06 through 09/27/07?

6        MR. ALLEN:  Right.

7        THE COURT:  That seems to be an agreeable way to

8   avoid any of that.

9        Just for my sort of play, it's 10:30.  How much

10  longer are you going to be on Direct with this guy?

11       MR. HOFFER:  There's a lot of material to cover.

12       THE COURT:  The more I'm thinking about this

13  issue that we discussed at side bar last time, I'm

14  putting the United States on what appears to be,

15  because of the circularity of this proof problem, a

16  knot.  I want to discuss that knot with you at the

17  morning break, probably at the front of it.  I'm not

18  sure I'm expressing myself well.  I think there may

19  be a couple of fair and acceptable things that we can

20  do here.  So at the morning break if I can just get

21  the two of you to step up here and let's just resume

22  that conversation about the propellant.  Thank you.

23       (End of side bar discussion.)

24       THE COURT:  Members of the jury, to save time

25  the parties have stipulated, that is agreed, and I

1    take judicial notice of the fact that the potassium

2    nitrate, a potassium nitrate explosive mixture is

3    included on the Attorney General's list of explosive

4    materials.  Potassium nitrate explosive mixture,

5    quote-unquote, "potassium nitrate explosive mixture"

6    is an "explosive material" as defined by the Attorney

7    General's list about which you have heard testimony.

8         Also, "safety fuse" is included on that list as

9    an "explosive material."

10        Both of those matters, one the presence on the

11   list of potassium nitrate explosive mixture and the

12   presence on the list of safety fuse was true between

13   at least September 27 of 2006 through September 27,

14   2007.  I do not suggest that it was or was not the

15   case in any other time, but for our purposes the

16   definitions were as I stated during that pertinent

17   time.

18        As I say, the parties have stipulated or agreed

19   to that fact and the Court can take note of the

20   contents of the Federal Register, which is an

21   official publication of the rules and regulations of

22   the United States.  You may treat that fact as

23   established for the purpose of your deliberations.

24        Any objection to that instruction, Mr. Hoffer?

25        MR. HOFFER:  No, Your Honor.

1           THE COURT:  Mr. Allen?

2           MR. ALLEN:  No, Your Honor.

3           THE COURT:  It is just at 10:30 and since we

4    have had a couple of interruptions here, I think we

5    should relent and go ahead and take the morning

6    recess.

7           Mr. Watts?

8           THE COURT SECURITY OFFICER:  Rise for the jury,

9    please.

10          (Jury out at 10:30 a.m.)

11          THE COURT:  All right.  We are in recess.  And

12    if Mr. Hoffer and Mr. Allen would step to side bar to

13    chat just a moment.

14          The witness may step down and make himself

15    comfortable.  We are in recess.

16          (Recess from 10:30 a.m. until 11:09 a.m.)

17          THE COURT:  Mr. Hoffer, would you and Mr. Allen

18    come back just a moment please to side bar?

19          (At side bar, on the record.)

20          THE COURT:  We did not make a record a few

21    minutes ago because the reporter was called away.  We

22    did have a discussion at my suggestion because of the

23    nature of the present witness and my earlier

24    suggestion that the United States defer eliciting

25    testimony on the subject of the propellant in a

1    Qassam rocket or other rocket propellant.  We

2    discussed during our conference how we might manage

3    the evidentiary issue associated with the so-called

4    video presentation that arises from what I understand

5    to be the defendant's viewing a video on the laptop

6    some minutes before the arrest in South Carolina.

7    I have suggested that the parties discuss some

8    stipulation with respect to the fact that the

9    defendant was watching a video and a stipulation with

10   respect to the subject matter of the video, that is,

11   that it portrayed larger scale, ordinance quality

12   missiles launched at least if some instances in

13   combat circumstances and capable of a large-scale of

14   military quality destruction.  Those words are not

15   carefully chosen, but --

16   We discussed the possibility of showing perhaps

17   a still or two that qualitatively conveyed to the

18   viewer the nature of the video on the laptop that was

19   viewed by the defendant, as I understand it.  I don't

20   know what progress, if any, was made on that.  I'm

21   not necessarily calling upon you to do that.  I just

22   wanted to sort of recapitulate the record here for

23   just a minute.

24   I did say that after a great deal of thought

25   that I decided that making a presentation of the

1    audio and video portions of the pre-arrest video was

2    distinctly in my judgment more prejudicial than

3    probative, so I was trying to suggest alternatives

4    that eliminated what I think to be purely prejudicial

5    audio portion of the presentation, which is not in

6    English and I think not pertinent to the charges and

7    highly inflammatory and the unnecessary portions of

8    the video which display military campaigns against

9    American Forces by persons of national origin and

10   religious persuasion similar to the defendant.  It

11   seemed to me that those matters were almost purely

12   inflammatory and prejudicial and that the inference

13   that remains with the jury to decide the strength of

14   the inference to which the United States is entitled

15   here is that this defendant's viewing a film of

16   rocket propulsion, to the extent that the evidence

17   establishes that he did, and to the extent that there

18   is some unusual substance in the trunk of the car

19   capable of rocket propulsion, to the extent that the

20   evidence establishes that there was, creates an

21   inference of the defendant's having the necessary

22   interest in and consequent knowledge of the nature of

23   propulsion and propellants to have also understood

24   the nature and attributes of the propellant in his

25   trunk.  Again, assuming the evidence establishes the

1       constituent parts of that inference.

2           Having established that inference, having

3       established the basis for that inference, it seems to

4       me that that requires only knowledge that a film was

5       viewed, the subject of the film was simple rocket

6       propulsion, and that the balance of it, that which

7       relates to middle eastern conflict between the United

8       States soldiers and their assailants in and around

9       combat zones the Middle East is unduly inflammatory

10      in that it suggests to the jurors a decision on an

11      improper basis, that is, the basis other than the

12      admitted evidence in this case.  In particular, it

13      suggests a decision based on emotion, perhaps

14      putatively bad character of the defendant, other bad

15      acts by the defendant or others which acts are, so

16      far as the jury knows, unpunished or by a perceived

17      threat either to the jurors or their community, the

18      United States or others, none of which are a proper

19      basis for a decision in this case, upon all of which

20      is strongly suggested by the audio and the bulk of

21      the video portions of that presentation.

22           Did I give a fair rendering of our discussion,

23      Mr. Hoffer?

24           MR. HOFFER:  I believe so.

25           THE COURT:  Anything you'd like to add for any

1    reason?  I didn't mean to understate or undersell

2    anyone's position here.

3        MR. HOFFER:  I don't believe so, Your Honor.

4    For the Court's information, Counsel asked me just

5    before the Court came on the bench where we were on

6    the issue.  Of course, I just briefed Mr. Monk about

7    the side bar conference we had a second ago anyway.

8    So we're not at the point where we are prepared to

9    present a stipulation either in Word or, you know, a

10   screen shot or snippet in somehow cleansed form that

11   might be amenable.  The Court certainly has set forth

12   our discussions accurately from what I can tell.

13       I would make one observation.  I don't want to

14   belabor this because I know we've got the jury

15   waiting outside.  Mere words or stipulation, a verbal

16   stipulation, one shortfall of that is rocketry, if

17   you will, from what I'm learning and what I've

18   learned is of course legal.  There are rocket motors

19   you can possess.  There are things you can do with

20   them legally and buy commercially, et cetera.  What

21   this defendant or defendants had in that car was an

22   item which they transported illegally without getting

23   the necessary permit.  So there is an unlawful nature

24   in this rocket propellant, not by the nature of it

25   but what they did with it.  So to merely having a

1    verbal stipulation that says he was watching a video

2    on rockets, or however you describe them, doesn't

3    capture the essence and doesn't relate back I think

4    far enough.  That's why I'm more inclined to accept

5    the Court's suggestion that we perhaps can get a

6    cleansed snippet or screen shot or two to sort of

7    just convey the image.  That we're not talking about

8    backyard hobby rockets.

9         THE COURT:  Right.  I think that's legitimate if

10   you can establish the link that that fuel is

11   derivative of this fuel.  In other words, the

12   military quality rocket fuel that's portrayed is

13   derivative of the fuel that's in the trunk.  I guess

14   your argument was a little broader than that.

15        MR. HOFFER:  It was.

16        THE COURT:  That if he knew about one sort and

17   had an interest in one sort, he would be informed

18   about the other.  I think that's a slightly different

19   inference, but it's an available inference, I think.

20        MR. HOFFER:  I think we can establish factually

21   the factual connection and the wider inference if

22   what I'm looking for, obviously.  That's correct.

23        THE COURT:  As I said I think you're entitled to

24   it, I mean, in the sense that if there were the

25   identical propellant it would be a stronger inference

1    than if it's not.  But it's still -- to the extent

2    that the inference goes to his knowledge and

3    interests, it's still available.

4        MR. HOFFER:  Merely just reporting to the Court

5    that we have -- maybe during the lunch recess, which

6    we'll be busy doing other things -- so we may not

7    have anything by the end of the day on this issue or

8    something we can propose to the other side and see

9    how they react.  But it will obviously come up some

10   time as far as an alternate needing of a resolution

11   at least through several of our witnesses.  So we

12   have some time to try to come up with something on

13   that score.  I'm just giving you the timetable.  It

14   doesn't have to be decided in the next hour or two.

15   We've got lots of other things to deal with as far as

16   our witnesses.

17       THE COURT:  I hope I didn't spring it too soon,

18   but I just want to make sure I didn't -- it's better

19   to spring it a little too soon than a little too

20   late.

21       MR. ALLEN:  Yes, sir.  Can I have just a brief

22   moment to put some things on the record?

23       THE COURT:  You may.  I was going to call on you

24   second, having called on Mr. Hoffer first.

25       MR. ALLEN:  I don't know that the Court meant to

1    say this right, but in discussing the stipulation the

2    Court talked about the fact that the defendant was

3    watching --

4         THE COURT:  I'm extemporizing, Mr. Allen.  Be

5    merciful.

6         MR. ALLEN:  Yes, sir.  I don't know that the

7    evidence will be able to established the defendant

8    was actually watching the video.  I think they'll be

9    able to establish the video was played on the player.

10        We would maintain, Your Honor -- and I

11   understand the Court's ruling and I'm not trying to

12   disrespectful.  We would maintain that unless the

13   government can show that it's the identical mixture

14   of substance, potassium nitrate and sugar, that it

15   should not -- an oral stipulation should not be

16   required.  Because it's the gasoline example that the

17   Court talked about it -- if there was a stolen

18   vehicle was the charge and the defendant at some

19   point watched a video that had gasoline in it -- to

20   show that the video that he watched had gasoline in

21   it doesn't show that he has knowledge of the stolen

22   vehicle.

23        Propellants, some are high explosives; some are

24   low explosives.  There is a dig difference between

25   that.  We think that they should have to tie up that

1    what's in the video, which I don't think they can, is

2    potassium nitrate and sugar propellant as opposed to

3    the numerous different type of propellants which are

4    made with high explosives.

5        THE COURT:  Well, I had not considered that part

6    of it in detail because that wasn't known to me.

7        MR. ALLEN:  Yes, sir.

8        THE COURT:  But I'll consider that.

9        MR. ALLEN:  Yes, sir.

10       THE COURT:  I'd say one inference is weaker than

11   the other, but I don't know that it's unavailable.

12   I'll consider it.  I see your point.

13       MR. ALLEN:  Yes, sir.

14       THE COURT:  But there is no sense to delay.

15   This is not going to come up before the lunch break.

16       MR. HOFFER:  No.  We can move way forward before

17   we get to that.

18       THE COURT:  Thank you, Mr. Hoffer and Mr. Allen.

19       (End of side bar discussion.)

20       THE COURT:  Mr. Watts, if you'll return the

21   jurors to the courtroom?

22       THE COURT SECURITY OFFICER:  Yes, sir.

23       (Jury in at 11:26 a.m.)

24       THE COURT:  Please be seated, one and all.

25   Members of the jury, that recess was extended, as you

1    noticed.  Counsel and I were working for the last few

2    minutes and we did so productively.  Thank you for

3    your patience.  I thought you would be more

4    comfortable where you were sitting and waiting rather

5    than sitting and waiting there.  It's a little bit

6    easier for us to operate.  And I knew if you became

7    bored while you were in there, you could eat the rest

8    of those doughnuts.

9        Mr. Hoffer, you are recognized to resume your

10   Direct Examination.

11       MR. HOFFER:  Thank you, Your Honor.

12   BY MR. HOFFER:

13   Q    Now, Mr. Stryker, when we broke we were talking

14   bit about your familiarity with the Attorney

15   General's list that the Court was mentioning also.

16   You have seen that and you have had occasion to use

17   that in the course of your day-to-day function at the

18   FBI explosives unit of the laboratory?

19   A    Yes, it's something I'm familiar with.

20   Q    As a consequence of understanding the fact that

21   there is this list and you can consult it and your

22   knowledge of the definitions that are out there of

23   what constitutes an explosive material, as you said,

24   you know the law, are you aware generally that there

25   are restrictions with respect to explosive materials

1    as far as certain things that can be done or not done

2    with them by citizens of the United States or people

3    of the United States?

4    A    By "restrictions" do you mean exemptions?

5    Q    No.  By "restrictions" I mean -- well, let me

6    rephrase it perhaps better.  Are you aware from your

7    experience and from your training and your knowledge

8    that the laws impose certain requirements on

9    transportation of these kind of items, commerce in

10   them, things of that nature?

11   A    Yes.

12   Q    Is transportation one of the areas where there

13   are some restrictions?

14   A    Yes.

15   Q    Do your knowledge, if you know, generally is one

16   allowed to transport an explosive material?  If so,

17   are there any special circumstances that you have to

18   go through beforehand?

19   A    In a general sense, no, the common person isn't

20   able to transport these, specifically the items

21   listed in this Attorney General list of explosive

22   materials.  However, there are some exemptions.  But

23   in general, no.  You have to have certain permits or

24   licenses to be able to do so.

25   Q    Let me talk to you for a few minutes or ask you

1    some questions about just the field of explosives in

2    a very broad sense for a second.  Are you familiar,

3    sir, with the term high explosive?

4    A    Yes.

5    Q    What is or what does the term "high explosive"

6    mean?

7    A    A high explosive is an explosive material that's

8    designed to detonate.  And the term "detonation" is a

9    specific term not to be confused with any other.  It

10   describes the rate of reaction.  A detonation occurs

11   in hundredths of a second.  It describes actually a

12   chemical reaction that occurs in the material.  If

13   you can imagine a column, if you will, of a stick or

14   a pipe.  If you can imagine that.  Then we're going

15   to start the reaction at one end through the force

16   that's required to start that reaction.  The speed

17   that that reaction occurred in that column of

18   material, nothing to do with the air, the speed of

19   that reaction, the shockwave moving through that

20   material travels greater than the speed of sound.  If

21   that phenomenon occurs or can occur in that material,

22   it's a high explosive because it functions by

23   detonation.

24   Q    By detonation or initiation, I think you used

25   that term, what do you mean by that?  Maybe you've

1    said already, I'm not sure.

2    A    By initiation?

3    Q    Or detonation?

4    A    Again, it's the speed of that reaction occurring

5    in the material itself.

6    Q    Okay.

7    A    It's over far quicker than you can blink your

8    eye.  These are materials like Composition-4 or C-4,

9    dynamites, ammonium nitrate and fuel oil, TNT, which

10   is trinotrotoluene, things like that are considered

11   high explosives because they detonate.

12   Q    When you use that term -- let me ask you for

13   high explosives now.  We're talking general

14   classification.  Are these high speeds,

15   faster-than-the-speed-of-sound reactions accompanied

16   by any sound or noise or what?

17   A    Yes.  You'll -- again, the reaction again is

18   microseconds as far as the time of the reaction, but

19   you're always going to get with high explosives the

20   production of gas rapidly, heat, and a loud noise

21   sometimes referred to as a report.

22   Q    Now, and are there commercially available

23   sources by which -- not a manufacture of high

24   explosive, but just an ordinary person could

25   potentially create or manufacture some of these on

1    their own?

2    A    Yes, sir.  Unfortunately, I guess there is lots

3    of high explosives that can be made with -- not

4    safely so but made with commonly available materials

5    and a little bit of knowledge.

6    Q    Now, let me ask you, sir, if you are familiar

7    with the term then low explosive, the other end of

8    the spectrum.  Are you familiar with that term?

9    A    Yes, sir.

10   Q    What does the term "low explosive" relate to or

11   mean?

12   A    Well, low explosive -- let me back up, if I may,

13   too.  All explosives whether they are high or low

14   have as their main ingredients two broad classes:  An

15   oxidizer and a fuel.  You have to have those two

16   present.  Specifically, all explosives have those in

17   a way that when they react, either by detonation or

18   explosion, it doesn't need outside air like a

19   campfire burning.  If you take the air away, the fire

20   goes out.  You take the oxygen source.  The oxygen is

21   from the air.  With an explosive material, that

22   oxygen is part of the mixture or the compound.  It's

23   there.  It doesn't need the oxygen from the air that

24   we breath.  In other words, it'll happen -- the

25   reaction will occur in a vacuum.  It can occur

1     underwater where oxygen isn't present.  If you have

2     those two ingredients in the right proportions that

3     will sustain a reaction, you have an explosive

4     material.

5          Now, low explosives unlike high explosives are

6     designed to deflagrate, which is a term that means it

7     burns rapidly.  It doesn't need the ambient oxygen.

8     It's all right there.  Once the reaction starts, the

9     oxygen is present on the molecules in the mixture.

10    That chemical reaction occurs irregardless.

11    Q    Could you give the jury some examples or types

12    of what are common -- what are low explosives as

13    opposed to the high explosives?

14    A    Some common examples are black powder, which are

15    in antique firearms or modern day, muzzle loading

16    type weapons; black powder substitutes like Pyrodex;

17    and a whole variety of smokeless powders.  There's

18    approximately 150 different types for specific

19    applications for small arms ammunition like rifle,

20    pistol, and shotgun shells.  Those types of items are

21    low explosives.  They deflagrate or burn rapidly.

22    Q    Now, is there necessarily or is there at all any

23    sort of a loud noise or you use the term report, I

24    would use the term just a boom type sound, when a low

25    explosive is either lit or ignited or whatever the

1    term happens to be to start the reaction?

2    A    The answer to that question is it depends.  As

3    far as getting a loud noise, it depends on how it's

4    configured.  Generally, if it's unconfined there is

5    going to be some noise.  You'll hear some swooshing

6    of air.  It's not going to be that classical

7    experience that I think we all have of hearing that

8    loud noise or that report.  Certainly, those low

9    explosives if they are confined, usually in a pipe or

10   some physical container -- literally, you can have

11   confinement just by the weight of the material

12   itself.  In other words, if I initiate it on the

13   bottom and I've got a big stack of this material,

14   depending on what it is, and I have direct experience

15   with black powder, it will give that boom, that sound

16   that a lot of people associate with an explosion.

17   Q    So is it possible then for low explosives to

18   create that loud noise or report?

19   A    It is possible, yes.

20   Q    And you mention something about confinement.

21   How does that impact upon that?

22   A    Well, confinement changes the configuration of

23   this material, if you will.  By holding it together,

24   you're allowing that particle to particle heat

25   transfer, that deflagration, to essentially occur

1    faster.

2        Also what you're getting -- for example, black

3    powder.  No matter how hard you may try, you will

4    never get black powder to detonate, to occur in that

5    phenomenon which I previously described.  If you put

6    it in a pipe, you confine it in a pipe, and you

7    initiate it with a flame source, depending on your

8    level of confinement and your configuration, you're

9    going to result in a mechanical explosion because

10   there is -- if I may, there's three types of

11   explosion:  Mechanical, chemical, and nuclear.  I

12   have been describing the chemical nature.  A

13   mechanical explosion is where the container or the

14   confinement, think of a water heater where the safety

15   valve they fail shut and the pressure builds up and

16   builds up and it rapidly releases and it sends

17   material and shrapnel scattered about.  That's a

18   mechanical explosion, a build up of pressure.  Well,

19   that's essentially what's happening with low

20   explosives.  The reaction is the same -- except for

21   speed, the reaction is the same whether it occurs in

22   a line that I may pour out on the ground or in a

23   pipe.  It's the same reaction.  It's happening faster

24   in the pipe.  And the holding ability of that pipe,

25   the capacity of that pipe to hold pressure is

 1    overcome because you build up so much pressure

 2    quickly in that pipe and it violently ruptures.

 3    Q    Have you come to -- there's a term, I guess it's

 4    relevant to what you do.  The word explosion, which

 5    we've all talked about here, but do you have or

 6    understand what the definition of explosion actually

 7    is?

 8    A    Again, there's three types.  But in general I

 9    described the mechanical, the chemical, and the

10    nuclear.  Generally, an explosion is characterized by

11    the rapid going away of where things once have been

12    in simple turn terms.  It generally means that you

13    have rapid build up of pressure, rapid build up of

14    gases, usually accompanied by some heat generation

15    and sometimes noise.

16        Again, in the classical sense I think most

17    people know what it is.  You get that loud report.

18    But it also defines the chemical rate of reaction,

19    the deflagration, if you will, of that material is

20    also -- these materials, low explosives, are designed

21    to deflagrate.  If they function that way then

22    they're doing their job.

23    Q    And "deflagrate" again means burn rapidly?

24    A    Burn rapidly.

25    Q    Now, you mentioned a minute ago that there are

1    basically two component part of these, a fuel and an

2    oxidizer, that's for both high and low explosives, is

3    that correct?

4    A    That's correct.

5    Q    How do each of those components function or what

6    do that they do or add to the mix?

7    A    Well, all sorts of explosions again as a rapid

8    burning, if you will.  Detonations are slightly

9    different but we can essentially consider it to be an

10   even extreme form of rapid burning.  You need that

11   oxygen to be present.

12       Like I was describing before, whether that

13   oxygen is present in the ambient air or molecularly

14   through the mixture or the compound, you need that

15   oxygen to sustain that type of reaction.  You have to

16   have those two present in the right amounts because

17   if you have, for example, a can, if you will, of an

18   oxidizer and I just take a pinch of a fuel and throw

19   it in there, that's not sufficient enough to get that

20   going.  It has to be in the right mixtures and be

21   able to initiate with some flame source and sustain

22   that reaction.

23   Q    And so the oxidizer provides the oxygen that's

24   needed --

25   A    Right.

1    Q    -- to allow this to happen.  And the fuel does

2    what?

3    A    The fuel is consumed as part of that reaction.

4    Q    All right, sir.  Let me direct your attention

5    back to some time period of September of 2007 and

6    thereafter.  Did there come time there were called

7    upon at the explosives unit at the lab to do some

8    work or analysis regarding the case on trial before

9    this court?

10   A    Yes, sir.

11   Q    And do you recall what your first initial

12   contact with the matter was or when you first became

13   involved?

14   A    It was relatively soon after, you know, we

15   became aware of it.  I wasn't in the office when the

16   evidence was initially -- the initial batch of

17   evidence that was brought to the laboratory.  The

18   case was assigned to me, and, you know, I worked it

19   once I was back in the office.  I can't remember what

20   I was away for at the time.

21   Q    Sure.  When you say the case was assigned to

22   you, as far as the way the laboratory works, what do

23   you mean by that?

24   A    Well, each time a case that comes in that the

25   explosives unit is going to be involved with, there

1    is a request coordinator.  There is -- the boss has

2    got to assign the case to somebody, so he assigned it

3    and this one was my turn to get a case.  He literally

4    just assigned it to me.

5    Q   So with regard to the various components of the

6    lab and the work they did, when did you do your work

7    and -- first of all, when did you get to work on

8    these items?

9    A   Again, I don't recall specifically when.  Again,

10    we're generally the first ones to get it and the last

11    ones after it had gone through all the other

12    processes.

13    Q   Let me ask you, are you familiar, Mr. Stryker,

14    with potassium nitrate?

15    A   Yes, I am.

16    Q   To the best you can describe in layman's terms,

17    what kind of a substance or material is it?

18    A   It's an oxidizer.

19    Q   And the purpose it serves is that, I guess, as

20    an oxidizer?

21    A   As far as it being a component of an explosive,

22    yes.

23    Q   Now, are you also familiar with the term

24    "potassium nitrate explosive mixture" such as you

25    mentioned was on that list you looked at a minute

1   ago?

2   A    Yes.

3   Q    And what does that term mean as contrasted to

4   simply potassium nitrate we just talked about?

5   A    Well, it means the potassium nitrate is the

6   primary oxidizer and that the mixture portion would

7   mean you would have some fuel, a suitable fuel, to

8   combine with that to have an explosive mixture.

9   Q    And when it comes to creating a potassium

10  nitrate explosive mixture, which mixes those two sort

11  of components, is there only one specified or

12  specific type of fuel or does it vary?

13  A    I don't know the fuel gamut of what fuels would

14  be appropriate to add to potassium nitrate but

15  certainly sugar is and also sulfur.  I don't know --

16  again, sulfur itself may have to be combined with

17  something.  I would say there certainly is the

18  possibility that other fuels could be used to

19  generate an explosive mixture.

20  Q    Have you had experience with dealing with these

21  kind of mixtures or compounds?

22  A    Mostly with sugar, potassium nitrate/sugar or

23  potassium nitrate/sugar with sulfur.

24  Q    And perhaps I should ask you as far as the way

25  the combination that creates a potassium nitrate

1    explosive mixture, you've got sugar, let's say, and

2    you've got potassium nitrate.  I'm not even sure what

3    form they're in, but can you explain a bit to the

4    jury the form these things take and how they are put

5    together to create that kind of explosive mixture to

6    your knowledge?

7    A    Primarily, potassium nitrate is a white powder.

8    It could be obtained in I assume several different

9    grain sizes, but the finer the powder the better.

10   The same with sugar.  Powdered sugar like icing sugar

11   or confectioner's sugar would work better than

12   granulated sugar.  Simply combining them, just a

13   physical mixture or a blend, the more homogenous or

14   the more uniform that mixture, the better the

15   explosive material.

16        MR. HOFFER:  May I approach the witness, Your

17   Honor?

18        THE COURT:  You may.

19   BY MR. HOFFER:

20   Q    Let me start with these items.  Mr. Stryker, I

21   have placed before you a series of exhibits there:

22   Government's 4 A and B, 5 A and B, and 6 A and B.

23   Let me ask you, first of all, if you recognize -- one

24   is the photo and one is the actual item.  Do you

25   recognize those items?

1    A    Yes.

2    Q    And have you had occasion to deal with them or

3    do some work on them prior to today?

4    A    Yes, I have.

5    Q    How do you know or recognize that these are

6    items that you analyzed or looked at in connection

7    with your work at the lab?

8    A    My initials are on them.

9    Q    And did you do any kind of analysis or

10    examination of these, and, if so, could you explain

11    what you did with respect to them?

12    A    I took physical measurements, weights of the

13    material inside, and detailed the type of

14    configuration, the diameter of the pipe, the

15    thickness of the PVC pipe.  After it had gone through

16    all the other examinations, latents, DNA, explosive

17    chemistry, I removed them from the pipe by cutting

18    the PVC.  And once I was able to break that bound, it

19    was kind of sticky in there.  For the most part with

20    the exception of one of the items, it came out

21    relatively intact.

22    Q    So the photographs that are 4 B, 5 B, and 6 B,

23    for example, did you take those?

24    A    Yes.

25    Q    And did you have some occasion also to consult

1    and look at the other examinations or reports that

2    were done prior to your conclusion of your work in

3    this?

4    A    Just Mr. Kelly's.

5    Q    So you reviewed his.  He did some work on it

6    before you finished your work?

7    A    Right.

8    Q    As a consequence of the physical examination,

9    the consultations you did with other reports, did you

10    reach an opinion as to what this stuff is?

11    A    It's a potassium nitrate explosive mixture.

12    Q    And is that -- the material that's depicted in

13    that photograph, the contents of the tubes

14    themselves, the pipes, is that consistent with or in

15    your experience the same as the item listed on the

16    Attorney General's list?

17    A    Yes, it is.

18    Q    Now, in the realm of explosives high and low

19    then, where does this material fall, if anywhere?

20    A    This would be a low explosive.

21    Q    Does or would -- this may be a little bit

22    repetitive, but I want to make this clear.  Does the

23    function of this if it were properly -- well, how is

24    this kind of a substance, potassium nitrate explosive

25    mixture, how is it set off, if you will, or ignited

1    or initiated?

2    A    It's initiated with a flame source such as fuse

3    or a match, something of that nature.

4    Q    When a heat source or light source like that, a

5    flame or match, is applied to it, what happens?

6    A    If you have that suitable mixture of fuel and

7    oxidizer, it starts reacting and performs the way it

8    should.  It deflagrates; it rapidly burns.

9    Q    Now, are you familiar, Mr. Stryker, with -- we

10   talked a minute ago about commercially available

11   sources for some of these types of explosives.  For

12   example, a potassium nitrate explosive mixture, is

13   there a commercially available source for the

14   potassium nitrate that you might use?

15   A    Yes.

16   Q    What types of things are out there commercially

17   that you could use for the source of the potassium

18   nitrate?

19   A    There are a couple.  There are some various

20   vendors on-line that sell pyrotechnic or firework

21   type materials.  You can purchase potassium nitrate

22   via that route or several stump remover products have

23   as the primary ingredient potassium nitrate,

24   specifically the Spectracide brand stump remover.

25   Q    If I could approach and so show you Government's

1    52 B.  Have you seen that product before, sir?

2    A    Yes, I have.

3    Q    Is that a source of potassium nitrate or does it

4    contain it?

5    A    Yes, it is.

6    Q    To utilize that -- let me just ask you, based

7    upon your knowledge and training, do you have to do

8    anything to separate the contents of that Spectracide

9    stump remover item to get potassium nitrate from it?

10   A    No.  Again, it's the primary ingredient.  I

11   don't know the exact percent, but probably in the

12   upper 90s is potassium nitrate.  Having worked with

13   this material, it stinks pretty bad.  It has an odor

14   to it.  Whereas, if you were to get the pure

15   potassium nitrate, there is not so much of an odor.

16   Q    Does it have any odor or smell, this potassium

17   nitrate, when it is mixed in the proper ratio as you

18   say to make a potassium nitrate explosive mixture?

19   A    I mean, once its mixed up and put in a pipe, you

20   really don't smell it per se.  It's just mostly

21   during the mixing process.

22   Q    Let's say it's not in a pipe.  Say it's separate

23   or in a container that's open or whatever.  How would

24   that affect the smell?

25   A    I would suppose it's possible to get the odor.

1      Q      Is a potassium nitrate explosive mixture in your

2      experience and training a dangerous type of

3      substance?

4      A      Well, all explosives are.

5      Q      How so or why?

6      A      They're all inherently dangerous, some more so

7      than others.  It depends on how they're made, how

8      they're stored, how they're used, how they are

9      initiated.  Bad things can happen with explosives.

10     Inherently, they are all dangerous and we have to

11     take certain precautions with them.

12     Q      You're also familiar with sulfur.  You've

13     mentioned sulfur earlier in your testimony.  Are you

14     familiar with sulfur?

15     A      Yes, sir.

16     Q      In the fuel/oxidizer world, where does that

17     fall?

18     A      That would be considered a fuel.

19     Q      And would that, the addition or involvement of

20     sulfur together with potassium nitrate or alone or

21     with sugar, have any effect on creating this type of

22     explosive mixture you've been talking about?

23     A      If it were added in --

24            MR. ALLEN:  Objection, 401, Your Honor.

25            THE COURT:  Overruled.

1    BY MR. HOFFER:

2    Q    You may answer, sir.

3    A    If it were added, it would aid in the reaction

4    and the deflagration process.  It would tend to speed

5    it up, be more quicker reacting low explosive.

6         MR. HOFFER:  If I could approach again?

7         THE COURT:  You may.

8         THE WITNESS:  May I add to that as well?

9    BY MR. HOFFER:

10   Q    Sure.  When I come up there let me just hand you

11   this and then you can do that if you wish.

12   A    I mentioned black powder before.  It's been

13   around for quite a long time.  The primary

14   ingredients in black powder are potassium nitrate,

15   charcoal, which is a fuel, and sulfur.  So you can

16   see that the primary ingredient in black powder,

17   approximately 75 percent of it in that formulation,

18   is potassium nitrate; charcoal, finely ground down;

19   and sulfur.  About 15 percent charcoal and

20   approximately ten percent sulfur.

21   Q    Now, I have placed before you, sir, an item in

22   evidence as Government's Exhibit 57 A, as in Adam.

23   Have you seen that item before in the course of your

24   examinations done in this case?

25   A    Yes, I have.

1    Q    And what type of -- what type of item is that?

2    What is it?

3    A    It's called garden sulfur.

4    Q    And would that -- the addition of that type of

5    material and into the potassium nitrate and the mix

6    with sugar perhaps have the effect you were just

7    describing?

8    A    Yes, if it were ground down, it would aid in

9    that reaction.  It would speed it up.

10    Q    Now, let me ask you if you had occasion to do

11    some testing of your own with regard to the items

12    that I previously handed you that are depicted in 4

13    B, 5 B and 6 B, and that in fact came out of the

14    contents of 4 A, 5 A, and 6 A.  Did you some of our

15    own testing on those items?

16    A    Yes, I did.

17    Q    What kind of testing did you do, first of all?

18    A    I created mixtures of potassium nitrate and

19    sugar, both with Karo syrup as the sugar fuel source

20    as well as icing or confectioner's sugar as the fuel

21    in different proportions of fuel and oxidizer.  I did

22    a 70/30 -- excuse me, 60/40, 70/30, and an 80/20,

23    with the higher number being the oxidizer.  In other

24    words, the 60, 70, and 80 was the oxidizer and then

25    the fuel.

1    I obtained similar PVC pipe in using that

2  variety of ratios of fuel to oxidizer.  I made

3  various mixtures and inserted them in the pipe with

4  end plugs, if you will, that were made out of kitty

5  litter.  You simply just invert the pipe in a

6  vertical position, pour about a half inch or so of

7  kitty litter down there and use a wood dowel and fits

8  right inside the pipe, and you smack it with a

9  hammer.  The reason I did that, that was similar to

10  some of the ends of some of the specimens here that I

11  looked at.  One of them had two kitty litter end

12  plugs.  I think the other two had one each.

13    I initiated them with safety fuse similar to

14  items that I examined and wanted to observe what

15  would happened.  I have never specifically dealt with

16  this configuration.  I knew from Ron's examination we

17  had a low explosive material in a pipe.  It's

18  generally not a good thing.  I wanted to see how this

19  material would behave in that configuration.  I

20  drilled a hole in the middle.  And it's all in a

21  chart in my report, but I had tape around some of the

22  ends, but generally kept with the configuration of

23  what I found.

24  Q Now, you did not actually do this testing

25  utilizing the items in 4 A, 5 A, and 6 B, correct,

1    the ingredients of that?

2    A    We didn't use the items from the evidence.  I

3    mean, we obtained similar PVC pipe.  We obtained

4    Spectracide stump remover from a local Wal-mart, I

5    believe.  We didn't use sulfur because it wasn't

6    found in the material.

7    Q    Now, either you or Ron Kelly who -- you know Ron

8    Kelly, correct?

9    A    Yes.

10    Q    You reviewed his analyses and reports as well

11    prior to your work, correct?

12    A    Correct.

13    Q    Were either you or he or anybody else at the lab

14    able to determine the quantitative composition of the

15    substances in 4 A, 5 A, and 6 A by which I mean the

16    percentage of potassium nitrate, percentage of sugar

17    in each of those samples?

18    A    No.

19    Q    As a result can you explain why you used the

20    various 70/30, 80/20, 60/40 mixes that you did use?

21    A    The reason I chose those numbers are this:

22    Those are the ratios that you generally find with low

23    explosives.  Most low explosives fall in that

24    parameter where they tend to be heavier on the

25    oxidizer than the fuel.  Because as I mentioned

1    before, if your proportions aren't right, you won't

2    be either to initiate or sustain a reaction.  With my

3    experience and a consultation with other members of

4    my unit, we kind of collectively, if you will,

5    thought that would be a reasonable range to mix up

6    and see what happens.

7    Q    And where did you perform these tests you did?

8    A    At Marine Corps Base Quantico.

9    Q    And do you recall approximately when it was you

10   did that specific type of testing?

11   A    I don't.  I'd have to refer to my report.

12   Q    So you had by my understanding three different

13   percentage combinations that you used?

14   A    Right.

15   Q    I take it, sir, you tested each one

16   individually?

17   A    Yes.

18   Q    Set each test up separately, correct?

19   A    That's correct.

20   Q    Three separate percentages.  And as far as the

21   types of fuel, if you will, that you used, did you --

22   was this the same or did you vary that as well?

23   A     It was two types of fuel.  One was Karo syrup as

24   a sugar or fuel source and the other was icing sugar,

25   the finely powdered sugar, again available at

1    supermarkets.

2    Q    So that would be a total of six tests basically,

3    when you add it all up, would that be correct?

4    A    It was more than that.  I would have to refer to

5    the chart and my report.

6    Q    Again, when you conducted these tests, do you

7    recall what kind of results you got when you lit

8    these things with that fuse you described a minute

9    ago?

10    A    Yes.  We had a full spectrum.  Some of them

11    didn't initiate at all and some of them burned

12    violently, had a forceful explosion of gases,

13    something that we sort of suspected may happen.

14    Again, that was through the hole that was made to

15    what we call prime in or to insert the fuse in there.

16    That's where those gases violently came through.  And

17    in some cases the PVC pipe itself caught on fire.  It

18    melted, burned, charred.

19    Q    Did you take photographs recording the results

20    of these different tests?

21    A    I did.

22    Q    Let me ask if you -- since you had multiple

23    tests, do you recall off the top of your head or do

24    you have a specific memory now as to how each variant

25    of the mixture or substance worked, or do you have

1    notes that refresh your recollection on that?

2    A    Generally, the powdered sugar worked better than

3    the Karo syrup.  I think that some of that had to do

4    with getting a really good mixture.  Because when you

5    mix this Karo syrup with this powdered substance,

6    it's kind of like making a batch of cookies.  It's

7    really hard to get a really good homogenous mixture.

8    We did it as best we could.  Again, you don't have

9    really fuel/oxidizer mixture, so that may be part of

10   it with the Karo syrup.  Whereas, with the powder it

11   was a lot easier to get that good blend.  But in

12   general the powdered sugar worked better, and I think

13   the 70/30 was -- again, I'd have to refer to my

14   report, but 70/30, 60/40, I think generally worked

15   pretty well.

16       MR. HOFFER:  May I approach the witness, Your

17   Honor?

18       THE COURT:  You may.

19   BY MR. HOFFER:

20   Q    If you need to refresh your recollection, do you

21   have a copy of that report available to you?

22   A    I do have a copy.

23   Q    Let me first approach and hand you a series of

24   exhibits which are marked for identification as

25   Government's 64 A through 64 F, as in frank.  Let me

1    ask you questions about those exhibits, sir.  Do you

2    recognize those items?

3    A    Yes, I do.

4    Q    What do you recognize them to be, sir?

5    A    I recognize them to be pictures of the aftermath

6    of the testing that I did.

7    MR. HOFFER:  Your Honor, at this point I would

8    offer 64 A through F, as in frank.

9    MR. ALLEN:  Just a moment, Your Honor.  No

10   objection.

11   THE COURT:  64 A through F are received on

12   behalf of the United States.

13   (Government's Exhibit Nos. 64 A through F are

14   received into evidence.)

15  BY MR. HOFFER:

16   Q    If you have your report available to you as

17   well, perhaps you could just very quickly give the

18   breakdown to the members of the jury as to the

19   various tests and the kinds of reactions you got when

20   you performed each of them.  And while you do that,

21   I'll get extra copies of those photos and we can talk

22   about them.

23   A    With the -- first, we'll take the powdered

24   sugar, the granular icing sugar, as the fuel source.

25   Q    Would that be what's depicted in Exhibit 64 A,

1    the exhibit you have there?

2    A    64 A, B, and C are all with powdered sugar as

3    the fuel source.

4    Q    I'm going to put up 64 A, and maybe we could

5    bring the lights down a bit.  Now, looking at 64 A

6    and also refreshing your recollection from your

7    notes, just tell us what's reflected here and what

8    you recall as to each of these tests on each of these

9    different items.

10    A    Again, the results -- the visual observation of

11    what happened was what I characterize in my report as

12    the forceful explosion of smoke and gases.  And you

13    could also see some flame associated with that.

14    Q    Could I just stop you that before you even get

15    to it?  Is that result or reaction indicative or

16    suggest to you that what you have there is an

17    explosive mixture?

18    A    Yes, sir.

19    Q    Please continue as far as just telling us a bit

20    about what each of these --

21    A    Well, again, the these are all a 60/40 mixture,

22    60 percent potassium nitrate, 40 percent by weight of

23    the powdered sugar.  And as the little tabs below

24    each one indicate, the end prime is through the end

25    or the opening in the pipe with a little hole drilled

1    through the cat litter end plug is where I primed in

2    or inserted the fuse.  The middle prime indicates

3    that I simply drilled a hole in the middle of the

4    pipe because I didn't know how it would behave in

5    that configuration.  Then the bottom two are the same

6    thing as the top but I just added a little bit of

7    duct tape, one piece of duct tape to see if perhaps

8    that little bit of confinement in addition to the cat

9    litter end plugs would make a difference.  That's

10   what we had depicted up there.

11   Q    Now, did you get any loud noise or loud report

12   when you did any of these tests, do you remember?

13   A    You could hear the gases escaping, but there was

14   no loud boom.

15   Q    And is the escaping of gases and all that again

16   evidence or indicative of an explosive type mixture

17   or a low explosive mixture?

18   A    Yes, it is.

19   Q    Please continue.  I've put up 64 B.  What does

20   that depict?

21   A    Again, it's a potassium nitrate/powder sugar

22   mixture.  This time all four of them are 70/30

23   mixtures:  70 percent oxidizer and 30 percent fuel.

24   Similarly, up top and again with all the 70/30

25   mixtures, I characterized the resulting reaction as a

1    forceful expulsion of smoke and gases.  Again, end

2    primed at the top one, that means down the center

3    line of the pipe.  Middle prime means I drilled in

4    the physical middle portion of the pipe.  And then

5    the bottom two are the same as the top with the

6    addition of a piece of duct tape.

7    Q    64 C, which is your next series of results, I

8    guess.

9    A    Right.  Again, this is the powdered sugar as the

10   fuel in an 80/20 proportion, 80 percent being the

11   oxidizer.  I characterized this reaction for all four

12   of them as simply smoke produced.  So we're getting

13   out of that range where there is not a sufficient

14   mixture of fuel and oxidizer to produce the same type

15   of reaction as the previous ones.

16   Q    So you're still in powdered sugar.  Was that

17   result something you expected or did not expect as

18   far as this particular proportion?

19   A    It came as no surprise.

20   Q    And why to your understanding based upon your

21   training and experience did these with the 80/20 mix

22   react as compared to some of the more substantial

23   burning or charring that are shown in some of the

24   earlier exhibits we just looked at?

25   A    Again, it depends on your fuel and oxidizer

1    mixtures.  Chemically, when you have the right

2    balance that chemical reaction just is more

3    efficient.  When you start messing with the ratios

4    where the fuel was too high or low or vice-versa for

5    the oxidizer, it's going to change the reaction as

6    far as the speed of it.

7    Q    Did your test results differ when you got out of

8    the realm of the powdered sugar and went into the

9    realm of using the Karo syrup as your fuel?

10   A    The results did change.

11   Q    How so, generally speaking?

12   A    Generally speaking, we didn't get any that

13   reacted as violently as the characterization that I

14   made as far as the forceful explosion of gases and

15   smoke.  Essentially, the 60/40 and the 70/30 mixtures

16   produced smoke.  The 80/20 mixtures, nothing happened

17   to them, did not initiate with the Karo syrup.

18   Again, when you think about the 80/20, probably some

19   of that had to do with homogeneity of it.  It wasn't

20   perhaps a great mixture because we have so little

21   sugar to aid in that sticky liquid Karo syrup to mix

22   it.

23   Q    For example, I've put up on the screen for the

24   jury Government's Exhibit 64 E.  That is your 70/30

25   mixture.  Again, could you comment as far as what

1    kind of reaction you got in this situation?

2    A   The 70/30 with Karo syrup used as the fuel, they

3    all produced smoke.

4    Q   It appeared that the bottom two had a little bit

5    of charring on end.  Do you recall that?

6    A   Well, it's evident there, but again the -- that

7    could have just been by the tape burning or the PVC

8    pipe itself.  Again, the visual characterization of

9    that was simply smoke produced.

10    Q   Now, would that -- the production of just smoke

11    alone, would that change the characterization of what

12    the composition is when you had, say, something like

13    the 70/30 Karo syrup, or what you would call it?

14    A   I'm sorry.  Could you repeat that?

15    Q   I guess my question is you described earlier the

16    fact that you had smoke and gases escaping on the

17    earlier mixtures that was indicative to you of an

18    item that was, am I correct, you said explosive

19    mixture or low explosive?

20    A   That's correct.

21    MR. ALLEN:  Objection, leading.

22    THE COURT:  Overruled.

23    BY MR. HOFFER:

24    Q   My question is would the fact that in these

25    examples or tests you did with just Karo syrup in

1  different formulations, you only said -- the only

2  thing you got was smoke, correct?

3  A    Right.

4  Q    Would that change what you could describe that

5  mixture as from this test or how you would

6  characterize it?

7  A    Not necessarily.  Again, an explosion -- you

8  have that fuel and oxidizer present.  If it's

9  sustained and it's initiated, low explosives function

10  at a variety of speeds depending on which material

11  you start with.  This perhaps being at the lower end

12  of things.  Something like flash powder, which

13  potassium chlorate and aluminum, things that you

14  mostly see at 4th of July celebrations, et cetera,

15  where the mortar is in the air and you see that

16  bright flash, that really loud noise.  That's a low

17  explosive.  That's on the high end of the low

18  explosives.

19  Q    Now, Mr. Stryker, you have -- do you have any

20  training, specific training or experience in a

21  general field that's characterized as pyrotechnics?

22  A    Could you repeat that again?

23  Q    Do you have any training, specific training or

24  experience dealing with what's called pyrotechnic?

25  A    Yes.

1    Q    Perhaps I should ask you first before we get

2    into it, what's the definition in your mind of

3    pyrotechnics?

4    A    A pyrotechnic is a low explosive, but it's

5    essentially designed or configured in a way to

6    produce a certain effect, whether that effect is you

7    want more smoke, you want more bright lights, you

8    want some colors, it's a use category, if you will.

9    They're all low explosive.

10    Q    What kind of training specifically do you have

11    or experience in dealing with that realm of devices

12    or items?

13    A    I attended a week long course at Washington

14    College in Maryland by a Dr. Konkling (ph) who

15    provides a course of the chemistry of pyrotechnics

16    and explosives.

17    Q    Now, many of us are familiar with the term

18    "fireworks."  How does that fit in or correspond with

19    this term of pyrotechnics you just mentioned?

20    A    They are essentially -- fireworks are

21    pyrotechnic.  Again, they're low explosives.  They

22    are designed to produce certain effects, whether it

23    be, again, loud noise, smoke, colors, things of that

24    nature.

25    Q    With a firework, if you will, commercially

1    available type fireworks, what is it from your

2    knowledge and experience that produces or makes those

3    noises, colors, lights, the effects of those things?

4    A    Well, the noise would be a combination of

5    confinement and type of material used.

6         Color would be the types of additives in that

7    fuel and oxidizer.  Primarily they use metals, finely

8    powdered metals.  For example, strontium, a metal, if

9    it is in fine powdered form is going to produce a red

10   color.  I'm not certain, but I think copper, finally

11   powdered copper is going to produce either a green or

12   a blue color.  And other metals, iron.  You know,

13   aluminum is one that's used as a fuel.  Actually,

14   these powdered metals are fuels in and of themselves.

15   I know it may be hard to conceptualize that, but a

16   finely powdered metal serves as a fuel as well.  But

17   depending on the metal you choose, you're going to

18   get different colors.

19        With smoke, again, changing the combination of

20   fuel and oxidizers and percentages, as well as what

21   they are, you're going to get perhaps more of a smoke

22   effect.

23   Q    Were any of those type of additives, if you

24   will, the metals, et cetera, to your understanding

25   from your examination present in the compounds you

1    took out of Government's 4 A, 5 A, and 6 A?

2    A    No, not to my knowledge.

3    Q    Since you are familiar with fireworks, I guess,

4    was fireworks one of the things covered in that

5    course and from your experience you've dealt with

6    since then?

7    A    Yes, sir.

8    Q    In your opinion are the contents of 4 A, 5 A,

9    and 6 A as they were received in the lab and looked

10   at by you, are those fireworks?

11   A    No, sir.

12   Q    Why not?  What's missing?

13   A    I'm not aware of any firework, per se, any

14   commercially available firework using this

15   combination of potassium nitrate and sugar.  Where

16   you primarily find potassium nitrate as the main

17   source of oxidizer in pyrotechnics or fireworks, if

18   you will, is in black powder.  I'm not aware of it

19   existing in any other formulation.

20   Q    Let me turn to something else for a second.  Let

21   me ask you if you're familiar, sir, with the term or

22   something called a rocket motor?

23   A    Yes, I am.

24   Q    What's a rocket motor?

25   A    A rocket motor is a section of a rocket usually

1    at the rear of the rocket that contains a low

2    explosive, and it is designed to propel the rocket

3    into the air.

4    Q    Are you familiar with and have you studied those

5    and familiar with the functions of those from your

6    experience, your work experience and your education?

7    A    Yes, sir.

8    Q    Generally speaking, without getting too specific

9    or too technical, how do these rocket motors function

10   to lift something off the ground?  I mean, what goes

11   on there?

12   A    Not to get too technical, but with every action

13   there is an equal and opposite reaction.  Physics

14   101.  That's essentially how a rocket works.  You're

15   generating a force.  Through the forceful expulsion

16   of those gases, it generates a force that's

17   concentrated through perhaps some sort of nozzle that

18   creates pressure.  That pressure, as we have all seen

19   rockets from probably small ones up to space shuttle

20   launches, provides a lot of energy on that ground.

21   It pushes it up.  It overcomes the gravity holding it

22   down.  It overcomes air resistance and it moves it in

23   the air.

24   Q    Are you familiar in the context of rockets with

25   the term "propellant"?

1    A    Yes, sir.

2    Q    What is a propellant in a rocket context?

3    A    Primarily, again, it's a low explosive that is

4    used to as it says to propel it.  Propellants are

5    also used -- that term is used in small arms an

6    ammunition.

7    Q    Potassium nitrate and explosive mixture, could

8    that function in the context of a rocket motor as a

9    propellant?

10   A    Could it, sir?

11   Q    Could it?

12   A    Yes, sir.

13        MR. HOFFER:  May I approach the witness again,

14   Your Honor?

15        THE COURT:  You may.

16   BY MR. HOFFER:

17   Q    It might be up there already, 10 A?

18   A    What is it?

19   Q    I'll get it.  I don't believe it's there.

20   Handing you, sir, what's been received in evidence as

21   Government's Exhibit 10 A.  Do you recognize that?

22   A    Yes, I do.

23   Q    Did you have occasion to examine it at the lab

24   in connection with this matter?

25   A    Yes.

1    Q    How do you know that that's what you looked at?

2    A    My initials are on the item.

3    Q    Now, the package label says "safety fuse."  Is

4    that what this is?

5    A    Yes.  It could be considered safety fuse,

6    viscular fuse, cannon fuse.

7    Q    What's its purpose and how does it function,

8    sir?

9    A    Its purpose is twofold, to provide an ignition

10    source, a source of heat or flame.  It's also to

11    provide a measure of safety.  The longer -- it burns

12    out a rate.  This is approximately 15 or 20 seconds

13    per foot.  It provides a measure of safety.  So the

14    longer fuse you have -- you light it at one end and

15    it gives you time to get away so that when the

16    resultant thing happens, you're in a safe area.

17    Q    Did you have occasion in connection with your

18    examinations in this case to actually take a look or

19    exam that item and determine something about what

20    it's made of?

21    A    The general characteristics of it, yes.  I think

22    Mr. Kelly did the chemical analysis of the low

23    explosive filler.

24    Q    Are you familiar with how those things worked or

25    what this is made of?

1  A    I would have to refer to his report, but I think

2  it was a potassium chlorate or perchlorate based low

3  explosive filler.

4  Q    And where is that low explosive component of it?

5  It looks just like a long string type item, if you

6  will?  Can you explain that?

7  A    Essentially, the construction of safety fuse,

8  hobby fuse -- there's a variety of ways to construct

9  it, but they all have generally this in common.  You

10  have a low explosive filler, usually black powder but

11  sometimes chlorate or perchlorate based low

12  explosive, and as it's made essentially these little

13  fiber wraps, I believe it's cotton in most cases, are

14  being twisted around as the low explosive is

15  introduced to it.  So it kind of adheres to the

16  middle of this wrap, if you will.  It's all inside

17  this wrapping of fibers.  If you had occasion to

18  slice a little bit and look at a cross section or

19  even longitudinally you could see this.  Oftentimes,

20  they're coated with some sort of waxy material or

21  lacquer to provide some sort of weather proofing,

22  some shelf life so that it won't pick up too much

23  moisture when it's on the shelf.  That's generally

24  how it's constructed.

25  Q    And as far as what causes it to burn once you

1    light it with the heat source, what part of it is the

2    part that burns?

3    A    The inside.  The low explosive filler is

4    burning.  Again, this is a good example of a low

5    explosive filler that's burning out a slower rate, if

6    you will, because of the way it's configured, because

7    of the density and the particle size of it.  It's

8    going to burn at a predetermined rate depending on

9    how the manufacturer makes it.

10    Q    Do they function at different rates or speeds?

11    A    They do.  They'll actually vary slightly from

12    batch to batch that's produced.  Generally, these

13    safety fuses or hobby fuses are in the 15- to

14    20-second per foot range.

15    Q    Approach again and show you what's been received

16    in evidence as Government's 82, I believe, and ask

17    you if you've seen that before today?

18    A    Yes, I have.

19    Q    And did you see that in connection with your

20    examinations or work in this case?

21    A    Yes.

22    Q    Let me just ask you, would you say that -- what

23    are those items?

24    A    That's a lot of fuse.

25    Q    Do they function or perform in the same way as

1    you've just been describing with respect to

2    Government's 10 A?

3    A    Yes.

4    Q    As far as their composition, do they vary at all

5    from what you've been describing as far as 10 A?

6    A    No.

7    Q    Now, going back again to Government's 4 A, 5 A,

8    and 6 A, the items you have there and the photographs

9    of the contents, but specifically looking at the

10   combination of those two, if you will, the contents

11   and the pipe sections that they were in.  When you

12   examined them, would you characterize those items as

13   rockets?

14   A    No, not as a rocket.

15   Q    What would you characterize them as?

16   A    I would say that it was more in line with

17   perhaps serving as a motor for a rocket.

18   Q    Now, why would you not call them rockets as

19   opposed to simply a rocket motor.  What's missing or

20   what more do you need to constitute a rocket?

21   A    There's a whole variety of rockets, but

22   generally you have to have some way of stabilizing it

23   in flight.  If this were to have been launched as it

24   were, it would spin wildly out of control.  You have

25   to have some way, with either fins or some sort of

```
 1    stick if you will.  Being very crude, you may have
 2    experienced bottle rockets which launch an item.  But
 3    I didn't find any material suitable to even serve in
 4    that primitive purpose.  But generally rockets have
 5    fins, nose cone to make it ballistically efficient as
 6    it travels.
 7    Q    In your opinion based upon your examination, you
 8    analysis, and your training and experience, would
 9    these items, the 4 A, 5 A, and 6 A, as they were
10    received in their original condition, would those if
11    they were lit -- the contents inside lit, would they
12    fly?
13    A    Again, they wouldn't fly.  I mean, it may go up
14    in the air a little bit, but it's just going to spin
15    out of control wildly.  If it gets airborne, it won't
16    be for too long.
17    Q    For the same reason you mentioned, because of
18    the absence of those things, or something else?
19    A    That's primarily it.  Again, this is a -- like I
20    said, it more resembles a rocket motor, but this is a
21    -- especially in this configuration, this is
22    improvised.
23    Q    Can you have a rocket, assuming you have all the
24    other features, that will fly if you don't have the
25    rocket motor as a part of it?
```

1    A    I'm sorry.  Can you repeat that again?

2    Q    Can you have a rocket which has all the other

3    aerodynamics and features you say you need which are

4    lacking here, can you have such an item that will

5    work and fly if you don't have the rocket motor

6    component as part of it?

7    A    No.  You need the rocket motor to get to it to

8    launch.

9    Q    You did some -- you mentioned a moment that you

10    did some actual physical examination and computations

11    about 4 A, 5 A, and 6 A, when you were taking them

12    part, et cetera, correct?

13    A    Yes.

14    Q    Did you make some measurements about each of

15    these items in their original state, what they were

16    made of as far as the dimensions, weights, things of

17    that nature?

18    A    Yes.

19    Q    Do you recall offhand, if you have any notes,

20    you might want to refer to them, as far as the weight

21    of the contents of each of those three, 4 A, 5 A, and

22    6 A, specifically as far as the inner core or inner

23    contents you removed out of the center of the pipe

24    sections?  Do you recall that?

25    A    The explosive filler in Specimen Q1 was 112.3

1   grams.

2   Q    Q1 is which item as far as the numbers we're

3   using in court?  That's your lab number, right?

4   A    That would be your Specimen 4 B.

5        THE COURT:  Your question at the moment is as to

6   the weight of the contents?

7        MR. HOFFER:  Weight of the contents, yes.

8        THE WITNESS:  The weight of the contents is just

9   again the explosive filler minus, to the extent

10  possible, the cat litter because some of the granules

11  adhered to that material, especially the ones that I

12  believe were Karo based.

13       My Specimen Q2, which equates to your Exhibit 5

14  B, the explosive filler with 66.3 grams.

15       And my Specimen Q3, which equates to your 6 B,

16  Government's Exhibit 6 B, had an explosive filler

17  that weighed 73.9 grams.

18  Q    Did you also do some --

19       THE COURT:  Wait a second.  How many grams are

20  there in an ounce?  Would you agree with me that's

21  it's 28.35 grams per ounce?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  Go ahead.

24  BY MR. HOFFER:

25  Q    Did you also do some physical examination or

1    testing of the wood pieces, the dowels that you

2    received at the laboratory?

3    A    Yes.

4    Q    Did you determine anything as far as how they

5    were compatible with the diameters of the pipe

6    sections that you received?

7    A    They were slightly smaller than te diameter of

8    the PVC pipe sections, so they were suitable for use

9    as a tool, if you will, to compress the cat litter

10   end plugs.  I believe at least one of them had some

11   physical evidence of that granular material.  There

12   was a type of cat litter that had some blue/green

13   granules in it.  That was also on the end of one of

14   those wood sections.

15   Q    Now, let me turn to a different area for a

16   second.  In your years of experience and training in

17   dealing, you've mentioned, with explosives and

18   ordinance and that kind of stuff, have you also had

19   training and experience dealing with a class of items

20   called destructive devices?

21   A    Yes, sir.

22   Q    And is that a term you use normally or is that a

23   legal term?

24   A    It's a term that we use synonymously.  It is a

25   legal term, but it's a term we use synonymously with

1    improvised explosive devices or homemade bombs.

2    Q    What kind of specific training and experience

3    have you had dealing with that class of devices or

4    items?

5    A    I've had extensive training both in the military

6    and in the special agent bomb technician community.

7    Q    And have you had in addition to your formal

8    training, on-the-job training basically dealing with

9    these matters over the years?

10   A    Yes, sir.

11   Q    Are you also familiar with the term "incendiary

12   bomb"?

13   A    Yes.

14   Q    What is an incendiary bomb from your training

15   and experience, sir?

16   A    Actually, I think the term is not really that

17   good of a term.

18   Q    Okay.

19   A    But a lot of times folks will use the term

20   "bomb" whereas we don't technically use that.  For an

21   example, I was in the military and the military only

22   considers a bomb to be something that's dropped from

23   an aircraft.  Projectiles are things that are

24   projected out of cannons, but yet they are similar.

25        The term "incendiary bomb" is almost a

1    misnomer.  For example, you may have heard of

2    something called naypom.  It drops from a very light

3    weight container that contains a gelatinous form of

4    gasoline, if you will.  When that hits the ground, it

5    is just spreading out.  That light aluminum case

6    spreads out and you have these white phosphorous

7    igniters which causes it to ignite.  It doesn't

8    explode, if you will, in the traditional sense.  It

9    is creating a fire.  That's the purpose of an

10   incendiary device.  What I like to call an incendiary

11   device is something that is a device, which means it

12   has a fusing system and something that will catch on

13   fire for not so good purposes.  Or they might be

14   intentional, but this term "incendiary" is again to

15   destroy something.  It could be as simple as a fuse

16   like this and some combustible material.  We have

17   fuse and a material that will ignite, start the fire.

18   Or it could be complex.  You know, some electronic

19   system that could be a cell phone or a radio that

20   through some electronic fusing system will eventually

21   cause a fire but yet no explosion in the classic

22   sense.  So it's not really a bomb, per se.  It's an

23   incendiary device.  It's like a bomb, it's going to

24   produce destruction.

25   Q    Were you called upon, sir, to perform any tests

1    or examination in this case to determine if the

2    components submitted to you from the vehicle that was

3    stopped in this case could be readily assembled into

4    a destructive device or incendiary device, whatever

5    the phrase you want to use in that regard?

6    A    They could be readily assembled.

7    Q    Well, did you do some testing to verify that

8    conclusion?

9    A    Yes.

10   Q    What kind of testing did you do specifically,

11   type and when as best you recollect?  Do you recall

12   off the top of your head or do you need to refresh

13   your recollection?

14   A    I'll just quickly go to my report here.  I did

15   some testing again at one of our Charlie demolition

16   ranges in Quantico.

17   Q    First of all, when did you do them and where?

18   A    March 31, 2008; Quantico.  I did six

19   configurations or six tests.

20   Q    And did you utilize different parts or pieces or

21   components in each of these tests?

22   A    I used the fuse, a 70/30 mixture of the

23   Spectracide brand stump remover with the powdered

24   icing sugar, approximately 73 grams of that.  So it

25   was approximately within the realm of the three pipes

1    that I had examined as far as weight of the material.

2    And a can of gasoline with approximately the same

3    amount of gasoline that we received it in.  And we

4    configured different -- we had different

5    configurations of that PVC pipe with the low

6    explosive filler, the fuse, and the gasoline to see

7    if we can get the gasoline to catch fire to combust.

8    Q    Now, you didn't use the actual items in evidence

9    that you were examining, correct?

10   A    No, not the actual evidence items.

11   Q    So how close were the various components you

12   used to what you received as far as the nature,

13   composition, weight, et cetera?

14   A    Well, the fuse was similar.  There was this

15   green fuse, same diameter.  Not from the same

16   manufacturer, per se.  It didn't have the same

17   packaging on it.  It could have been from the same

18   manufacturer.  The pipe was the same diameter,

19   approximately the same weight of material.  Again,

20   the same gas can, same brand and manufacturer of gas

21   can, and approximately the same amount of gasoline in

22   that can.

23   Q    So you have there some of that fuse, the

24   Government's 10 A, I think it is.  I'll hand you

25   what's been received as Government's 12 A.  Hold on

1   to that for a second. You have 4 A, 5 A, and 6 A.

2   Well, did you use things similar to those or exact

3   replications of those in these tests?

4   A    Again, it was the same type of gas can, same

5   manufacturer, this Blitz, B-L-I-T-Z, brand gas can,

6   same type of fuse, same configuration of the pipes.

7   We used a 70/30 powdered sugar mixture.

8   Q    You said you did six -- how many tests?

9   A    Six.

10  Q    I would like you to tell the members of the jury

11  about each of those tests. Let's start with test

12  number one for want of a better term. Describe,

13  first of all, how you configured your components in

14  that. In other words, how you put the things

15  together and then tell us what happened.

16       THE COURT: Mr. Hoffer, it's 20 minutes to 1:00.

17  I wonder if before we start this series of tests,

18  this might be a good opportunity to break for the

19  lunch hour.

20       MR. HOFFER: That's fine, Your Honor.

21       THE COURT: Members of the jury, it's, as I just

22  said 20 minutes to 1:00. Why don't we take the lunch

23  hour. I'll ask you to assemble in the jury room in

24  time to resume these proceedings at two o'clock.

25  We'll dedicate ourselves to being precise and

1        resuming precisely at two o'clock.

2            Be mindful of my precautionary instructions and

3        we'll see you at 2:00.

4             Mr. Watts?

5            THE COURT SECURITY OFFICER:  Rise for the jury,

6        please.

7            (Jury out at 12:39 p.m.)

8            THE COURT:  The witness may step down and be at

9        ease.

10            I'd like to see Mr. Hoffer and Mr. Allen before

11        you go.  Otherwise, we are in recess.

12            (At side bar, on the record.)

13            THE COURT:  I just want to make sure and I could

14        not remember whether I said on the record that I, in

15        fact, rescinded what was an earlier instruction to

16        the United States to wait until a later time to

17        elicit from this witness the information about the

18        nature of the fuel.  I think Mr. Hoffer decided he

19        was going to do that anyway, but I wanted to make the

20        record plain that to the extent there was an earlier

21        instruction I had rescinded it.

22            Do you guys need anything more from me on this

23        issue?

24            MR. HOFFER:  No, Your Honor.  To that end, the

25        witness is going to go back.  He is still on Direct,

1    so I think we can do this.  He's going to look at

2    that video and see if we can come up with a snapshot

3    or maybe a snippet and then bring that -- if we can

4    recreate it in time, bring it back here and let

5    counsel take a look at it to see what his reaction

6    is.

7            THE COURT:  Great.

8            MR. ALLEN:  Could I just make an observation?

9            THE COURT:  Yes, sir.

10           MR. ALLEN:  The witness has testified that those

11   items would not fly.  Does that not make the video

12   even less probative?

13           MR. HOFFER:  I'd make the simple observation he

14   said they are component of rockets that will fly.

15           THE COURT:  I don't know that I can benefit you,

16   the Government, or myself.

17           MR. HOFFER:  I knew I was going to hear that

18   somehow one way or the other.

19           THE COURT:  I'm not commenting on that.

20           MR. ALLEN:  Yes, sir.

21           THE COURT:  That sounds like we're headed in the

22   right direction.  Thank you very much.  And I'll see

23   you guys after lunch at two o'clock.

24           (End of side bar discussion.)

25           (Recess from 12:41 p.m. until 2:00 p.m.)

1      THE COURT:  We are awaiting the arrival of a

2   juror.

3      MR. HOFFER:  Your Honor, would you like the

4   witness back on the stand?

5      THE COURT:  Might as well.

6      (Jury in at 2:03 p.m.)

7      THE COURT:  Please be seated, one and all.  Mr.

8   Hoffer, you are recognized to resume your Direct

9   Examination of Mr. Stryker.

10      MR. HOFFER:  Thank you, Your Honor.

11   BY MR. HOFFER:

12   Q    Mr. Stryker, I think when we broke for the lunch

13   recess, we were talking about incendiary devices or

14   bombs, if you will, whatever the term.  And just to

15   get us back to that, you had said that you did some

16   testing with some of the components of the car.  We

17   were about to talk about those, I think.  I think

18   that's where we stopped.

19   A    I believe so.

20   Q    You have there in front of you some of the

21   components that you attempted to replicate or used

22   similar items in your tests, correct?

23   A    Correct.

24   Q    Okay.  I think we started test number one,

25   obvious place to start.  Tell the members of the

1       jury, if you would, when you did test number one how

2       you assembled this various pieces that you had and

3       what happened as far as the first test that you did?

4       A     Okay.  Essentially, I wanted to take or

5       replicate items that were found in the trunk of the

6       vehicle and make a determination or conduct a series

7       of tests to see if I actually could combine them in

8       such a way to create a functional incendiary device

9       or destructive device.

10          The first thing we had was a gas can, which is a

11      pretty thick piece of plastic.  I thought that with

12      the impingement of the hot gases coming out of the

13      PVC tube that it would breach the container and

14      perhaps catch the gasoline on fire.  So the first

15      test I essentially took one of the PVC tubes with the

16      low explosive filler and essentially had it

17      vertically in the side with -- the gas is impinging

18      down in this region here of the gas can.

19      Q     Let me stop you for a second.  You've used this

20      word "impingement."  Could you explain that term?

21      A     Well, impingement means that the hot gases or

22      the flame coming out of that PVC tube would be

23      directly applied at that area.  In other words, that

24      was pretty darn close, a very small gap, if any, from

25      where those gases would be hitting this piece of

1    plastic.

2         When I initiated that, the PVC tube with the

3    explosive filler functioned similar to the previous

4    test I did with all the different mixtures.  It did

5    in fact burn a hole a little bit smaller than a dime.

6    The gasoline spilled out until it reached an

7    equilibrium.  The gasoline was -- here it is, this

8    little mark here.  Right here this little mark here,

9    this little black mark, that was the approximate

10   level of the gasoline originally in this container.

11   Q    If you could just hold that for a second and I

12   could approach just to see.  The witness has

13   indicated a mark on Government's Exhibit 12 A.  Now,

14   that mark that was put on 12 A, did you put that

15   there or did somebody else put that there?

16   A    I put that there.

17   Q    What did that represent?

18   A    That's the approximate level of the gasoline as

19   we received it in the laboratory.

20   Q    Okay.

21   A    So you can see down in this area here, this mark

22   is, you know, roughly three inches higher.  The

23   gasoline poured out until it reached an equilibrium

24   with that level where the hole was made.  There

25   wasn't sufficient heat energy from the rocket motor

1    or for the device to cause the gasoline to ignite, so

2    --

3    Q    Go ahead.

4    A    The second configuration I attempted, we didn't

5    get any resultant fire, was I removed the cap that

6    comes on the -- this is all starting with fresh

7    equipment here, another gas can that's brand new,

8    another device, PVC tube.  This was removed and I

9    inserted the PVC tube down into the nozzle with the

10   gases going into the gasoline.  Now, I knew that in

11   this area here it's going to be too fuel rich even

12   with those hot gases coming out and that little bit

13   of flame.  That's what we call too fuel rich.  With

14   gasoline you need a proper amount of air, ambient

15   oxygen, to mix with that to cause the combustion.

16   But what I thought may happen is that the -- and I

17   taped this over pretty good, secured it pretty good

18   in there, so that it would expand and rupture.

19        The first time I attempted this, I didn't have

20   it secured in there very well, so the --

21   Q    The "it" that you had secured in there was what?

22   A    Pardon me?

23   Q    The "it" that you had secured to the nozzle was

24   what?

25   A    The PVC pipe with the low explosive filler was

1     inserted.  It had a pretty tight fit, but we taped it

2     up as well.  Again, the gases were going down into

3     the gas can.  So the gas can started to swell.  After

4     it did that, this is about ten seconds, didn't have

5     it secured in there good enough and it ejected out.

6     It just popped out pretty good.  No fire as a result.

7     Q    Let me see if I understand your explanation.

8     The second variation or second test, you had a PVC

9     pipe, I think you said, and you had the mixture in

10    there, the potassium nitrate?

11    A    Potassium nitrate and sugar.

12    Q    Explosive mixture, is that what you would call

13    it?

14    A    Yes.

15    Q    And you put it in the nozzle area.  How did you

16    light these things, by the way?  What did you do in

17    these various tests?

18    A    We used what's called an electric match.  An

19    electric match is two wires with a match composition

20    at the end of that.  It's simply flares up like a

21    match would.  We use that -- when we try to replicate

22    things, we use electric matches for initiating low

23    explosives just because they're very reliable and

24    they're safe to use as opposed to the fuse or safety

25    fuse in this case.  Again, it functions as I've

1    previously described but it can be brittle and tend

2    to not work.  It's relatively cheaply made and it's

3    not a great thing to use when you're trying to be

4    safe about things, and especially as it applies to

5    the way I was working with this.

6    Q    So in this test number two, if you will, which I

7    guess would have been your second configuration of

8    things or putting together of things, so it's clear,

9    the PVC pipe with the mixture in it is not on the

10   side but it's in the nozzle secured in there.  You

11   said after about ten seconds, something happened.

12   What happened then?

13   A    Well, immediately after the match ignited the

14   mixture inside the PVC pipe, we saw a little bit of

15   smoke wisp out from this area around the nozzle.  The

16   gas can started really bulging.  I mean, it was

17   expanding pretty well.

18   Q    What does that suggest or mean?

19   A    There was a build up of pressure.  We were

20   pressuring this gas can now.

21   Q    And then what happened?

22   A    Then I don't recall the exact timing but

23   approximately ten, 20 seconds afterwards, the PVC

24   pipe popped out.  It overcame the bit of tape that I

25   had attempted to secure it in there and it jettisoned

1    out.

2    Q    So what did you do next?

3    A    Next, we got rid of that and went to another

4    configuration where we inserted it similar to test

5    number two, just put the same thing back down there.

6    I wrapped some -- I believe it was on test three.  I

7    wrapped 20 feet of this fuse generally around this

8    top area here.  I had two electric matches, again to

9    simulate the ignition in that configuration.  In

10   other words, one could have simply lighted the fuse

11   with a match and lighted the fuse on that which would

12   have gone into the PVC pipe inside the gas can.  I

13   just added some fuse which existed in the trunk and

14   initiated it.  When I did what happened was this:

15   Only the fuse ignited.  Because it was taped around

16   there, it ignited rather vigorously.  Nothing

17   happened to this and the reason was that electric

18   match, as I inserted it in this nozzle, the little

19   insulation on the wire kind of stripped off and it

20   shorted out.  The match didn't function is what

21   happened.  It is what we call a misfire.  Again, it

22   wasn't a successful demonstration.

23   Q    Let me hold you there for a second so I

24   understand.  On test three you had the PVC pipe again

25   with the material inside in the nozzle, right?

1    A    Same way as before, yes.

2    Q    And you said you had fuse around the top?

3    A    Wrapped around this area up here.

4    Q    So my question is you could not -- you said

5    there was a malfunction and you couldn't make the

6    piece of pipe in the nozzle area or --

7    A    The mixture in the pipe did not initiate because

8    the match didn't initiate.

9    Q    When you say "initiate" is that sort of light

10   up?  Is that what you mean?

11   A    Correct.

12   Q    What about what happened with the fuse that was

13   wrapped around the top part of the canister?  What

14   did that do and what occurred with respect to that?

15   A    It vigorously burned.  Because it was all

16   wrapped around itself, instead of burning at the 15

17   to 20 second per foot, when the flame on the outside

18   of it -- as this fuse is consuming itself, it starts

19   touching other parts of the fuse.  Because it was

20   just kind of a jumbled bit of fuse there, it just

21   virtually all ignited at one time.  So it was just a

22   short duration after the initial match lit as to when

23   it flared up, so to speak.

24   Q    Other than that flare-up, did anything else

25   happen with respect to the gasoline?

1    A    No.

2    Q    Or the vapors that you talked about, things of

3    that nature?

4    A    No.  Because the mixture inside didn't burn,

5    there was no build up of pressure.

6    Q    What did you do then after that result?

7    A    Then we essentially duplicated it again, tried

8    to take a little bit more care and caution when I was

9    inserting the fuse inside the nozzle area, secured

10   it, had the fuse wrapped around again.  And this time

11   the gasoline can after successful admission of both

12   the fuse up top and the PVC tube inside did

13   pressurize the gas can enough to where it burst.  It

14   ruptured up top here.  Again, there wasn't sufficient

15   heat from the remaining fuse, fuel/air mixture to

16   cause it to catch on fire.  It ruptured violently.

17   The gasoline sprayed out, but no fire.  Again, that's

18   not necessarily uncommon because we're improvising

19   here.  That's the nature of the beast when you

20   improvise sometimes.

21   Q    Let me hold you right there and ask you, as far

22   as what you were testing or with these component

23   parts, can you explain what would be -- if the --

24   what would be, and we haven't gotten there yet, a

25   successful result that would allow you to classify

1     this kind of a configuration in the various sorts as

2     an incendiary type device or bomb?  What would have

3     to happen with respect to the gas, the canister?  Can

4     you explain that if it were successful in terms of

5     being an incendiary type of device or bomb?

6     A     Well, again --

7          MR. ALLEN:  Objection to the compound question.

8          MR. HOFFER:  I'll withdraw it and try to make it

9     simpler.  I apologize, Your Honor.

10    BY MR. HOFFER:

11    Q     I guess I'm just asking you as far as

12    theoretically, because you haven't gotten a

13    successful result, I guess, as you say, in these four

14    tests --

15         THE COURT:  Mr. Hoffer, do you have your

16    question in mind?

17         MR. HOFFER:  Thank you, Your Honor.

18    BY MR. HOFFER:

19    Q     How would these kind of items in a hypothetical

20    situation perform as an incendiary bomb or device?

21         MR. ALLEN:  Objection, compound question.

22         THE COURT:  Overruled.

23    BY MR. HOFFER:

24    Q     You may answer.

25    A     For an incendiary device you need a fusing

1    system and something that's going to catch on fire.

2    It can be simple or complex.

3    Q    I guess what I meant to ask you was in this

4    hypothetical situation you are testing for, how would

5    a fire be generated?  What are the steps involved in

6    the process, I guess?

7    A    The process would be the fuse, which is the

8    safety fuse/hobby fuse that is here.  This green fuse

9    is literally your fuse.  It's your way of initiating

10    it.  It is your getaway time, if you would, your

11    safety margin.  Then simply to -- we're essentially

12    adding the gasoline can because it was in the trunk.

13    In other words, you could take that PVC tube which is

14    going to -- we successfully showed that it's going to

15    expel these hot gases -- and simply throw it in the

16    trash can that has combustible material like paper in

17    it and start a fire that way.  That would work pretty

18    well.  We were trying to use the gasoline since it

19    was in the trunk.  And that would be sufficient to

20    have an incendiary device.  So we're applying the PVC

21    tube with the low explosive filler, the fuse, and now

22    the gasoline can.  Because gasoline is obviously a

23    very volatile fuel.

24    Q    You have mentioned more than once I think in

25    your answers so far the question of the vapors of the

1    gasoline and a fuel rich environment or something.

2    My question is about that.  How does the gasoline

3    itself, which is sort of flammable, and the vapors

4    play into how this performs if it becomes an

5    incendiary type of a bomb or device?

6        MR. ALLEN:  Your Honor, may we approach?

7        THE COURT:  Yes.

8    (At side bar, on the record.)

9        MR. ALLEN:  Your Honor, that's about the fifth

10   time Mr. Hoffer has referred to this an incendiary

11   device or a bomb.  This witness testified that the

12   bomb is not what it is.  That was a compound thing.

13   He said that's a misnomer, that's not what I believe

14   is an incendiary device.  The bomb is significant

15   because that's what's needed under the statute.  Mr.

16   Hoffer repeatedly keeps referring to this as

17   incendiary device or bomb.  It's inappropriate for

18   Mr. Hoffer to use that compound question every time

19   he asks that question.  Because the statute prohibits

20   incendiary bombs, not incendiary devices.  So that's

21   why Mr. Hoffer refers to it as a bomb and just keeps

22   referring to it as an incendiary device.

23       THE COURT:  I understand.

24       MR. HOFFER:  Your Honor, that's not what he

25   said.  If you recall the testimony earlier, he said

1    the word "bomb" is sort of misnomer as far as people

2    believe bombs to be things that explode.  He said

3    that's not what a bomb is.  A bomb can be something

4    that flames as an incendiary does.  He doesn't like

5    the incendiary bomb.  That's not the word he uses in

6    his common parlance, but that doesn't mean that's

7    what he's saying this.  In fact, I think he said

8    that.

9        THE COURT:  And the basis for your objection is?

10       MR. ALLEN:  It's a compound question.

11       THE COURT:  I don't think it is compound even if

12    you argument is correct.  But it doesn't strike me as

13    otherwise objectionable in the form.  It strikes me

14    as an appropriate subject for cross-examination, but

15    I will say, Mr. Hoffer, I know you're -- I know this

16    is not easy subject matter about which to formulate a

17    question, but it would help to get the question

18    stated as simply as possible.

19       MR. HOFFER:  I know.

20       THE COURT:  I know you do and I'm not trying to

21    increase your difficulty by pointing it out.  When

22    you've got two or three terms of art planted in the

23    sentence, and terms of art of which the jurors are

24    not readily familiar planted in a sentence, they can

25    lose it.

1         MR. HOFFER:  Sure.

2         THE COURT:  Overruled.

3         (End of side bar discussion.)

4   BY MR. HOFFER:

5   Q   Mr. Stryker, do you recall my question?

6   A   No.

7   Q   Okay.  Let me rephrase it very simply.  The

8   gasoline and the vapors from that gasoline, what role

9   do they play in these tests that you've been

10   describing?

11   A   In this case we were trying to see if we can use

12   the PVC tube to cause the gasoline to catch on fire.

13   When gasoline burns, you're essentially burning the

14   vapors.  I mean, you could have a bucket of gasoline,

15   if you ignite it before the vapors really have a

16   chance to be all over the place, you're essentially

17   just going to be burning those vapors.  It's just

18   going to be contained -- let's say it's a steel

19   bucket -- at the top.  That's what's burning is the

20   vapors that are coming off that gasoline.  So to get

21   that ignition point just right, you have to have the

22   proper mixture of gasoline vapors and ambient oxygen.

23   If it's what we call too fuel rich, there's too much

24   gasoline vapors present and not enough oxygen, it

25   won't ignite.

1        Conversely, if you're in an oxygen deficient

2    atmosphere, there's not enough oxygen, it won't

3    ignite either.  So it's actually sometimes tricky to

4    get that combination just right when you're dealing

5    with things that need ambient oxygen to catch on

6    fire.

7    Q    When you use the term "ambient oxygen", what do

8    you mean, sir?

9    A    I'm saying the oxygen that's present in the

10   atmosphere and the air that we breath.

11   Q    Up to this point you've described four tests

12   that you conducted or four different variations of

13   things.  In any of those instances up to in this

14   point have you had any flame occur or anything like

15   that?

16   A    Not from the gasoline.

17   Q    And for an incendiary type of item or device,

18   call it what you will, that involves flame, correct,

19   or fire?

20   A    Right.  The ability to catch other combustible

21   materials or to destroy things with fire.

22   Q    Did you repeat any of these four steps so far,

23   four tests, if you will, with the same configuration

24   more than one time?  First of all, let me ask you

25   that.

1    A    There were some similarities in some of the

2    configuration, yes.

3    Q    To the extent based upon your training and your

4    experience and your ability, you had no flame occur,

5    does that lead you to conclude that each of these

6    various four step -- these four configurations would

7    never work?

8    A    Not that it would never work.  Again, these are

9    improvised tests.  We essentially did one test and

10   modified it slightly.  Again, it's very possible, in

11   fact, you know, again very possible that you could

12   get -- if you duplicated even the things that I did

13   that I didn't get the gasoline to ignite, on one of

14   those occasions it could because you're dealing with

15   improvised materials.

16        MR. ALLEN:  Objection, speculation.

17        THE COURT:  Overruled.

18   BY MR. HOFFER:

19   Q    You may continue, sir, if you want.

20   A    So it is possible that on one of the

21   demonstrations that I did if I were to have

22   replicated that multiple times at some point it would

23   have worked.

24   Q    Let's talk about the next step, the fifth, if

25   you, test number five.  Could you tell the jury, did

1    you perform a fifth test?  If so, what?

2    A    After four unsuccessful attempts, I back similar

3    to the configuration of test number one where we had

4    the device pointing down in this area here since we

5    were successfully able to burn a hole in the plastic

6    and have the gasoline come out.  We duplicated that

7    configuration and simply wrapped this fuse around the

8    circumference, the lower circumference of the gas

9    can.  We separately -- at the same time but separate

10    matches on the fuse and the PVC set up.  And when it

11    functioned, the explosion of hot gases burns a hole

12    in, gasoline comes out.  The fuse -- more than

13    likely, the fuse that was on the exterior of the can

14    did cause the gasoline to ignite.  So we had flowing

15    gasoline out on our demolition pad burning.

16    Q    And how would you characterize or how would you

17    describe that particular type of device since you had

18    that result?

19    A    Well, essentially, all of the configurations I

20    did I would characterize as a destructive device or

21    an incendiary device.  But obviously this one had

22    more success.

23    Q    And did that flame last for a long period of

24    time or what?

25    A    Well, it did last for a while.  I don't recall

1    recording the time.  But as long as you have gasoline

2    present, it's going to continue to burn.  I think it

3    eventually -- the surrounding flames around the

4    gasoline can did cause the gasoline can to melt.  As

5    it burned down, it melted most of the top of the

6    gasoline can and consumed all the gasoline that was

7    in the bottom of the can.

8    Q    Did you conduct any further tests on that day

9    beyond that?

10   A    We did.  Again, we duplicated that one, test

11   number five.  We duplicated and simply just put it in

12   a junk vehicle to show that the flames created from

13   the gasoline igniting would indeed ignite the

14   combustible materials in a car, like the upholstery,

15   the plastic, et cetera, and start a car on fire.

16   Q    What happened?

17   A    It was successful.  We duplicated it again, had

18   the gasoline pour out of the container.  The fuse

19   more than likely ignited the gasoline that had

20   spilled out and fire ensued and the car caught on

21   fire and burned for a short period of time until we

22   had the fire department, who was standing by,

23   extinguish the car.

24   Q    Now, over the course of the period of time you

25   performed these various tests, did you record the

1    results in any way?

2    A    Yes.  There was multiple sequential still

3    photography and I think two videos.  The one video

4    was of the device in a car catching on fire.  I don't

5    recall what the other video was that was recorded.

6         MR. HOFFER:  May I approach the witness, Your

7    Honor?

8         THE COURT:  You may.

9    BY MR. HOFFER:

10   Q    I'm going to show you what's marked for

11   identification as 63 C.  Take a look, sir, at

12   Government's Exhibit 63 C.  Ask you if you recognize

13   what's contained in that compilation there?

14   A    Yes.

15   Q    What's depicted or what's contained in that

16   exhibit, sir?

17   A    Photographs of the gasoline can that ignited in

18   test number five.

19   Q    Are those -- the contents of that Exhibit 63 C,

20   are they a fair and accurate depiction of some of the

21   test results and what occurred on that particular

22   day?

23   A    Yes.  Actually, I think there is a variety of

24   pictures here.  I can't necessarily tell which test

25   they came from looking at all of them here.

1    Q    But do each of the various component parts of

2    that exhibit, are they fair and accurate depictions

3    or photographs of what occurred during your testing

4    procedures on that day?

5    A    Yes.

6         MR. HOFFER:  Your Honor, at this point I'd offer

7    Government's Exhibit 63 C.

8         MR. ALLEN:  May I approach, Your Honor?

9         THE COURT:  You may.  Why don't you bring the

10    exhibit with you?

11         (At side bar, on the record.)

12         MR. ALLEN:  Your Honor, as the Court's reviewed

13    the lion's share, those photographs depict a car

14    burning.  I think it should not be admitted under 403

15    and 401.  Nobody's disputing that fire can burn a

16    car.  There is no evidence in this case that any

17    vehicle was going to be set on fire.  I had to use

18    the word, but it's an inflammatory photograph, no pun

19    intended, it doesn't serve any purpose to demonstrate

20    anything to the jury.  We will stipulate that a fire

21    will burn a car.

22         THE COURT:  Your objection is limited to the

23    parts of the exhibit that include the car?

24         MR. ALLEN:  The car burning, yes.

25         THE COURT:  That's all up to Page 6.  Looks like

1   about six or seven more.

2        Mr. Hoffer?

3        MR. HOFFER:  Your Honor, it does show -- those

4   last several pages do of course show how this could

5   be used and what effect it could have on a car.  They

6   could have picked a building or we could have picked

7   -- a car was what they picked.  I don't know that

8   it's prejudicial necessarily to show -- he's already

9   described them.

10       MR. ALLEN:  Which is why we don't need photos.

11       THE COURT:  Overruled.

12       (End of side bar discussion.)

13       THE COURT:  Exhibit 63 C is received on behalf

14  of the United States and overruling the objection of

15  the defense.

16       (Government's Exhibit No. 63 C is received into

17  evidence.)

18       MR. HOFFER:  I would like to, with the Court's

19  permission, publish one or two pieces of that

20  composite exhibit.

21  BY MR. HOFFER:

22  Q    I guess I'll just start with the -- I think you

23  have the originals up there, sir, do you not?

24  A    I don't know if these are the originals I have.

25  Q    But you have the exhibit.  I'll just start with

 1    the first photograph that's in this series of Exhibit

 2    63 C.  The first photo, what does that depict, sir?

 3    And what test, do you recall, if you can tell?

 4    A    I think this is test number five, but the device

 5    is placed on the handle.  The device has functioned.

 6    It's -- you've seen some smoke from the potassium

 7    nitrate and sugar igniting.

 8    Q    Now, let me ask you, sir, is this item and I'm

 9    circling here or sort of highlighting, what is that?

10    A    That's the PVC tube on the handle.

11    Q    And assuming this is test number five, as you

12    say you think, where is the fusing or --

13    A    Wrapped around the circumference of the bottom.

14    Q    Would it be in this area that I just

15    highlighted?

16    A    Yes.

17    Q    It's hard to see.  Let me sue if I can zoom in a

18    little bit.  Would it be that horizontal sort of area

19    there?

20    A    Yes.

21    Q    Let me just turn to the second page of

22    Government's 63 C.  Do you recall what's depicted

23    there?

24    A    Again, the gasoline has come out of the handle

25    and has been -- started to ignite by what I believe

1    to be the safety fuse wrapped around the bottom.

2    Q    This may be easier to see, but I'm not sure.  Is

3    that a depiction of the same or a different test or

4    what?

5    A    Yes.  That's a continuation of the gasoline

6    burning from that can.

7         THE COURT:  Mr. Hoffer, this seems cumulative.

8    Let's move along.

9         MR. HOFFER:  Yes, Your Honor.

10   BY MR. HOFFER:

11   Q    Did you also -- you've mentioned that there is

12   also some video footage or recording of the events

13   that took place that day?

14   A    Yes.

15   Q    Have you had a chance to review that recently?

16   A    Not recently.

17   Q    But you have seen it before?

18   A    I have.

19        MR. HOFFER:  May I approach the witness, Your

20   Honor?

21        THE COURT:  You may.  Mr. Stryker, was that what

22   you referred to as your detonation pad or something

23   that we were looking at a second ago?

24        THE WITNESS:  The whole area is a demolition

25   range.  It's an asphalt pad within the demolition

1     range that --

2          THE COURT:  Is surrounded by an earth and burum

3     and something?

4          THE WITNESS:  It's just a sloping hill.

5          MR. HOFFER:  May I approach the witness, Your

6     Honor?

7     BY MR. HOFFER:

8     Q     I've handed you, sir, an exhibit that is marked

9     for identification as Government's 63 D, as in David.

10    Have you had a chance to look at that or the contents

11    of that prior to today?

12    A     Yes.

13    Q     And do you recall -- what is that?  What is

14    contained on that disc?  It's a disc.

15    A     I'm not specifically certain of everything

16    that's on this disc.

17    Q     Well, do you recall what parts of it that you've

18    have seen that you do know?

19    A     It may be a disc that contains numerous still

20    photographs as well as videos or just videos, I'm not

21    certain.

22    Q     Well, we can deal with that.  Let me move on.

23    Let me ask you --

24          MR. HOFFER:  May I have a moment, Your Honor?

25          (Pause.)

1        MR. HOFFER:  If I may approach one more time?

2        THE COURT:  Yes, sir.

3    BY MR. HOFFER:

4    Q    Government's Exhibit 14 A in evidence.  I guess

5    my question to you, Mr. Stryker, is if you've seen

6    those kind of tools or have you had -- do you have

7    some familiarity with them?

8    A    Yes.

9    Q    Is a tool such as that, which is a drill I

10   guess, does that -- would it be useful in creating

11   any of these kind of configurations that you've been

12   talking about or with these PVC pipes?  Could you use

13   it in connection with that?

14   A    Yes.  This small cordless drill with a supplied

15   drill bit and a screw drill bit as well, Phillips

16   head type drill bit, would be sufficient to drill a

17   hole in the end of the PVC configuration to apply the

18   fuse.

19   Q    When you did your tests one through six or

20   whatever, did you have to make a hole in those PVC

21   tubings that you used?

22   A    Yes.

23   Q    How did you do so?

24   A    I used a cordless drill, but it was a bigger

25   drill than this one.

1  MR. HOFFER:  Finally, if I could approach one

2  more time?

3  THE COURT:  Yes, sir.

4  BY MR. HOFFER:

5  Q  Do you have, sir, 16 A?  Did I put that up there

6  in front of you?  I might have already done so, I'm

7  not sure.

8  A  What is that item, do you remember?

9  Q  A container, a plastic container.  I'm sorry.  I

10  have it.  Hand you what has been marked and received

11  in evidence as Government's Exhibit 16 A and ask you

12  if you have seen that?

13  A  Yes, I have.

14  Q  Before today?

15  A  Yes.

16  Q  And when and where as best you remember?

17  A  It was submitted as evidence in this case, so it

18  came into the FBI laboratory.  I don't recall exactly

19  when.

20  Q  At the time you saw that item, was it empty or

21  did it have any contents inside?

22  A  No.  It had a brown material in there which

23  appeared to be similar to the material that was in

24  the pipes.  Mr. Kelly analyzed this, chemically

25  analyzed this material.

1    Q    And did you do anything with the contents of

2    that 16 A when you got it?

3    A    No.

4    Q    One other thing, if I may.  If I could approach

5    one more time and show you Government's 52 A.  Do you

6    recall having seen that item prior to your testimony?

7    A    Yes.

8    Q    And did you see that in connection with the

9    laboratory work you did in this case?

10   A    Yes.

11   Q    And do you recall -- did you examine that or

12   determine anything about the origins or the nature of

13   that item?

14   A    Yes.  These are little plastic tips which are

15   visually consistent with the tips if you were to

16   remove this green top on this Spectracide stump

17   remover.  It comes already sealed and you need to

18   take a razor knife or a pair of scissors to cut the

19   tip off so that you can pour it out.  Those are

20   consistent with having -- with that type of tip on

21   the stump remover.

22   Q    Finally, going back for a second.  I apologize.

23   I neglected to ask you this.  At the conclusion of

24   your six tests with respect to the gasoline can, the

25   gasoline as you described it some minutes ago, did

1    you reach any conclusion based on your experience,

2    your training, and all of that with respect to

3    whether any one or all of those configurations of the

4    parts constituted in your opinion a destructive

5    device as defined by the statutes?

6    A    Well, again, we had success with two of them.

7    But if they were found in that condition, in my

8    opinion they all would be destructive devices.

9    Q    When you say "they all," what do you mean by

10   "they all"?  The tests or what do you mean?

11   A    If they were configured in that way.

12        MR. HOFFER:  May I have a moment, Your Honor?

13        THE COURT:  You may.

14         (Pause.)

15        MR. HOFFER:  Thank you, Your Honor.  I have no

16   further questions of this witness at this point.

17        THE COURT:  Thank you, Mr. Hoffer.

18        Mr. Allen, have you cross-examination for Mr.

19   Stryker?

20        MR. ALLEN:  Yes, sir.

21        THE COURT:  You are recognized for that purpose.

22                        CROSS-EXAMINATION

23   BY MR. ALLEN:

24   Q    Afternoon, sir.

25   A    Good afternoon.

1    Q    Can you pull out from in front of you what the

2    FBI would have characterized as Q1, Q2, and Q3?

3    A    Is it all right if I move some of these items

4    down below here?

5         THE COURT:  Yes, sir.  Can we just remove some

6    of these items?

7         MR. ALLEN:  Let me assist you with that.

8         THE COURT:  Mr. Stryker is working his way

9    through heavy traffic.

10        MR. ALLEN:  It may end up there again.

11        THE COURT:  No doubt.  You now have the items

12   with the FBI tags Q1, Q2, and Q3?

13        THE WITNESS:  Yes, sir.

14        THE COURT:  Mr. Allen?

15   BY MR. ALLEN:

16   Q    If I could retrieve those from you.  Q1 is

17   Government's 4 A, which I'm holding in front of me.

18   You testified on Direct Examination that the

19   potassium nitrate and sugar mixture inside is a low

20   explosive, correct?

21   A    Yes, sir.

22   Q    And Mr. Kelly, whose testing you were relying

23   upon from the FBI, characterized that material as a

24   pyrotechnic, correct?

25   A    Yes.

1    Q    Scientifically, a pyrotechnic is a low

2    explosive, correct?

3    A    Yes.

4    Q    As to Government's Exhibit 5 A, which is FBI Q2,

5    a small piece of PVC pipe, you testified on Direct

6    Examination that the potassium nitrate and sugar

7    mixture in Q2 was a low explosive, correct?

8    A    Yes.

9    Q    And Mr. Kelly with the FBI in his reports

10    described that as a pyrotechnic, correct?

11    A    I know he used those words in his report.  I

12    don't recall if there is anything additional in

13    there, but he did use those words.

14    Q    That would be the same for Government's Exhibit

15    6 A, which is Q3, correct?

16    A    Correct.

17    Q    Now, when you talk about low and high

18    explosives, those are terms of art.  They're

19    scientific terms, correct?

20    A    They are scientific terms, yeah.

21    Q    They are used in the scientific community to

22    distinguish items that detonate when ignited, which

23    would be the high explosives, and items that burn

24    rapidly or deflagulate (ph), which is just burn even

25    more rapidly, correct?

1    A    Correct.  Well, you said burn more rapidly.

2    Deflagrate is a rapid burn.

3    Q    Right.  And low explosives could burn rapidly or

4    deflagate (ph), correct?

5    A    Low explosives deflagrate.

6    Q    Pyrotechnics can burn slowly or deflagate (ph),

7    correct?

8    A    They deflagrate.

9    Q    If they burn slowly, they are no longer a

10    pyrotechnic?

11    A    No, sir.  They are different rates of burn.

12    Q    Okay.  At what rate of burn does it take to

13    deflagate (ph)?

14    A    It is not defined.  There is no specific rate of

15    burn that has been published or otherwise that says

16    this is a deflagration.

17    Q    Okay.  So if I took a match and lit this book on

18    fire and it burned, would it be deflagating (ph) or

19    would it be burning slowing?

20    A    It would be burning slowly.

21    Q    Would it be a low explosive?

22    A    No, sir, because you don't have a fuel and an

23    oxidizer there in intimate contact with one another.

24    You would need ambient oxygen in that case to cause

25    that book to burn.

1    Q    At what point does a very, very slow burning --

2    like, for example, you had a bad mixture of oxidizer

3    and fuel but it still burned, although not very

4    rapidly, does it stop becoming a low explosive and

5    starts becoming a non explosive?

6    A    In my opinion when the material does not ignite,

7    when it doesn't successfully ignite with a proper

8    ignition source.  Or if it's of such a poor mixture

9    that it can't sustain its full reaction throughout

10   the material.

11   Q    If it cuffed out?

12   A    I'm not familiar with that term.

13   Q    Let's talk about -- you said you're familiar

14   with the CFR, correct, Code of Federal Regulations?

15   A    Yes.

16   Q    And that's part and parcel where you talked

17   about the potassium nitrate explosive mixture being

18   on the Attorney General's list, correct?

19   A    Correct.

20   Q    That's located in the CFR, as it's called,

21   correct?

22   A    It's called the Federal Register, I think.

23   Q    Now, once again, low and high explosive's

24   scientific definitions -- there's no legal

25   significance under the law between a low or high

1    explosive, correct?

2    A    I'm not certain.

3    Q    Okay.  Isn't it true that the Code of Federal

4    Regulations or the Federal Register defines an

5    explosive to mean, "Any chemical compound, mixture,

6    or device the primary or common purpose of which is

7    to function by explosion."

8    A    That's from 841?

9    Q    Yes, sir.  It's also in the statute.  Are you

10   familiar with that definition?

11   A    Yes.

12   Q    Isn't it true that the same Code defines a

13   pyrotechnic composition as, "A chemical mixture which

14   upon burning and without explosion produces visible

15   brilliant displays, bright lights, or sounds."

16   A    I don't know.  I'd have to see that.

17   Q    So what you've been testifying to as your

18   opinion about what an explosive is, a low or high

19   explosive, that's based on science not necessarily on

20   the legal definitions, correct?

21   A    It's based on the science and in the explosives

22   community.

23   Q    But not what the law may say, correct?

24        MR. HOFFER:  Objection, Your Honor.  May we

25   approach?

1          THE COURT:  What's the legal basis for your

2    objection?

3          MR. HOFFER:  I think it's calling for

4    speculation about this area which is beyond his

5    expertise from which he was tendered.

6          THE COURT:  Overruled.

7    BY MR. ALLEN:

8    Q    What you've testified to on Direct Examination

9    is based on scientific definitions and what's

10   understood within the scientific community, not

11   necessarily what the law says an explosive is,

12   correct?

13   A    I don't know if I can agree with that, sir.

14   Q    Do you disagree with my definition of what an

15   explosive is under the law?

16   A    There is many definitions of explosive under the

17   law.  There are various -- from what I understand

18   there are various ways that the law tries to describe

19   that.

20   Q    Okay.  Do you disagree with me -- strike that.

21   You indicated that you supervise one person at the

22   FBI?

23   A    Correct.

24   Q    Who is that?

25   A    Currently it's Travis McCrady (ph).

1     Q     So Ronald Kelly is not your subordinate,

2     correct?

3     A     No.

4     Q     And he has substantially more years experience

5     as an explosive expert than you do, is that correct?

6     A     He's an explosives chemist; I'm a hazardous

7     device examiner. In my discipline, no. Ron's been

8     doing explosive chemistry for a long time.

9     Q     Your specialty is really more the destructive

10     devices as opposed to the chemistry of explosives,

11     correct?

12     A     As far as running the analytical equipment that

13     determines what these compounds are, yes, Ron is the

14     expert in that. I have a general familiarity with

15     that, but I don't run those machines. I don't prep

16     the samples. So as far as the chemistry goes, Ron is

17     the chemist.

18     Q     In fact, he has a chemistry degree and you do

19     not, correct?

20     A     Yes.

21     Q     Now, you've expressed the opinion that the

22     potassium nitrate and sugar mixture within

23     Government's Exhibit 4 A, 5 A, and 6 A, which is

24     FBI's Q1, Q2, and Q3, as well as the potassium

25     nitrate/sugar pyrotechnic mixture in the coleslaw

1      container in your opinion is a potassium nitrate

2      explosive mixture, correct?

3      A    Yes.

4      Q    And that's because scientifically it's got

5      potassium nitrate and it's a low explosive, correct?

6      That's what you're basing that opinion on, correct?

7      A    It's got the proper balance of fuel and oxidizer

8      that gives off a very aggressive reaction when

9      properly initiated.

10     Q    A pyrotechnic, correct?

11     A    I wouldn't classify it as a pyrotechnic.  A

12     pyrotechnic has an end use, if you will, primarily to

13     produce light, sound, smoke.

14     Q    So you disagree with Agent Kelly's opinion that

15     this material is a pyrotechnic, the potassium nitrate

16     sugar mixture?

17     A    All pyrotechnics are low explosives.  He

18     wouldn't be wrong in saying that.  It's all part of

19     the same umbrella.

20     Q    In your opinion is it a pyrotechnic or is it

21     not?

22     A    It could be considered that.  I think it's a

23     better term to call it a low explosive.  I think it

24     better describes what it is.  I don't know what the

25     end use of this material is, per se.  You know, I

```
 1    don't know if it was, you know, specifically designed
 2    to create smoke, light, or heat.  I think that the
 3    terms are -- you know, I don't really want to speak
 4    for Ron, but, again, pyrotechnics are low explosives.
 5    Q    Okay.  Other than a pyrotechnic, what else is a
 6    low explosive?
 7    A    Proper mixtures of fuel and oxidizers that
 8    deflagrate.
 9    Q    Well, isn't that the definition of a
10    pyrotechnic?
11    A    That's the definition of a low explosive.
12    Q    Is that not also the definition of a propellant?
13    A    You could have pyrotechnics or propellants that
14    fall under the umbrella of a low explosive.
15    Q    Now, you said that in your opinion a pyrotechnic
16    produces smoke and colors, correct?
17    A    It's primary intent.  It's end use.  That's what
18    it was formulated for.  That's what it was designed
19    for.
20    Q    And you -- strike that.  At least in some of
21    your hypothetical testing, these items did produce
22    smoke, did they not?
23    A    Yes.
24    Q    Some of them, when they ignited into a flame,
25    produced colors, did they not?
```

```
 1    A     No.

 2    Q     Okay.  Some of them produced a sound, did they

 3    not?

 4    A     Yes.  I mean, the sound of escaping gases.

 5    Q     Like the sound of a bottle rocket when being

 6    launched into the air, correct?

 7    A     A what?

 8    Q     Bottle rocket?

 9    A     Bottle rocket?

10    Q     Yeah.

11    A     Similar.

12    Q     And that's a firework or a pyrotechnic, is it

13    not?

14    A     A bottle rocket?

15    Q     Yeah.

16    A     I don't know which -- they're not legal in

17    Virginia, but I guess you can buy them legally.  In

18    some states it would be considered a commercially

19    available firework.

20    Q     My question wasn't whether they're legal.  My

21    question was whether a bottle rocket is a

22    pyrotechnic.

23    A     I guess you could consider it that.

24          MR. ALLEN:  May I approach witness, Your Honor?

25          THE COURT:  You may.
```

```
 1    BY MR. ALLEN:

 2    Q    Showing you what's been marked as Defendant's

 3    Exhibit 20 for identification.  Sir, can you look at

 4    what that is?  Do you know what that is?

 5    A    This is a box of Sensodyne.

 6    Q    Toothpaste, correct?

 7    A    I suppose so.

 8         MR. ALLEN:  Your Honor, I'd move Defendant's

 9    Exhibit 20 into evidence.

10         THE COURT:  Is that the one he's --

11         MR. ALLEN:  Yes, Your Honor, the one he's

12    holding.  I have a picture that I can substitute at a

13    later point if necessary.

14         THE COURT:  Mr. Hoffer?

15         MR. HOFFER:  May I first see the exhibit?

16         MR. ALLEN:  Sure.

17         MR. HOFFER:  And then pose a relevance objection

18    to it.

19         THE COURT:  Mr. Stryker, while he's examining

20    proposed Defendant's Exhibit 20, let me ask you a

21    couple of questions.  These are in the form of is

22    every A also a B, okay?  Is every low explosive a

23    pyrotechnic?

24         THE WITNESS:  No, sir.

25         THE COURT:  Is every pyrotechnic a low
```

1    explosive?

2        THE WITNESS:  That's my understanding.

3        THE COURT:  Directing your attention to some

4    pyrotechnic that is not also a low explosive, what

5    attribute does that pyrotechnic lack in your view

6    that prevents it also -- prevents its also being a

7    low explosive?

8        THE WITNESS:  I'm not aware of a pyrotechnic --

9    things that I'm aware of as being pyrotechnics that

10   would lack anything that would preclude them from

11   being under the umbrella of a low explosive.

12       THE COURT:  But when I asked you if all

13   pyrotechnics -- if all low explosives were

14   pyrotechnics, you said no.

15       THE WITNESS:  Right.  There are other low

16   explosives which do not serve to function as a

17   pyrotechnic.  There are low explosives --

18       THE COURT:  What attribute is it -- referring to

19   a low explosive, that is, not a pyrotechnic, what

20   attribute does the low explosive have that the

21   pyrotechnic lacks that causes one not to be the

22   other?

23       THE WITNESS:  It would -- essentially, it's not

24   designed primarily for that use.  In other words,

25   smokeless powder that is in small arm's ammunition is

      1     low explosive.  That is not considered a pyrotechnic.

      2     Other people's people may consider that to be a

      3     propellant as well because it propels a bullet out of

      4     the barrel of a weapon, but it is not considered a

      5     pyrotechnic.

      6         THE COURT:  The distinction that you just made

      7     is not based upon the essential qualities of the

      8     object to which you refer, is it?  Is it based upon

      9     the intention of the user.

     10         THE WITNESS:  That's my understanding of

     11     pyrotechnic.

     12         MR. ALLEN:  Thank you, Your Honor.

     13         I don't know if the Government has an objection

     14     to Defense 20 or not.

     15         MR. HOFFER:  Yes, Your Honor, relevance.

     16         THE COURT:  This is to the Sensodyne?

     17         MR. HOFFER:  Yes.  May I be heard at side bar?

     18         THE COURT:  You may.

     19         (At side bar, on the record.)

     20         THE COURT:  Yes, sir?

     21         MR. HOFFER:  Your Honor, I don't see the

     22     relevance of any of these things.  If counsel wants

     23     to bring in a slab of corned beef and say, "Oh, it's

     24     potassium nitrate," I have no idea what relevance it

     25     has since there is not a sugar mixture with this that

```
 1    makes it an explosive.  What is the relevance of

 2    naturally occurring or a manufactured item containing

 3    potassium nitrate?

 4        MR. ALLEN:  I will be able to show the

 5    relevance.  The relevance is this is a mixture of

 6    substance that contains potassium nitrate and other

 7    ingredients.  I'm going to use it as an example to

 8    show why things are potassium nitrate explosive

 9    materials and why things are not.

10        THE COURT:  And you said this was 20?

11        MR. ALLEN:  Yes, sir.

12        THE COURT:  DX 20.  Was it on your exhibit list?

13        MR. HOFFER:  Yeah.

14        THE COURT:  This is maximum strength, so be

15    careful with it.

16        MR. ALLEN:  Yes, sir.

17        THE COURT:  Seems to me an item of small

18    importance.  I'm going to overrule the relevancy

19    objection.

20        (End of side bar discussion.)

21        THE COURT:  Defendant's Exhibit 20 is received.

22        (Defendant's Exhibit No. 20 is received into

23    evidence.)

24    BY MR. ALLEN:

25    Q    Agent Stryker, can you read the active
```

1    ingredients?  Go ahead and read the active

2    ingredients to yourself.

3    A    Okay.

4    Q    One of the active ingredients in that Sensodyne

5    toothpaste is potassium nitrate, correct?

6    A    That's correct.

7    Q    And then there is other substances included with

8    that potassium nitrate, correct?

9    A    Within the potassium nitrate?

10   Q    I'm sorry, within the Sensodyne toothpaste?

11   A    Since it only has five percent, I would assume

12   that it is 95 percent other things.

13   Q    So that Sensodyne toothpaste is a mixture of

14   substance containing potassium nitrate, correct?

15   A    It's a mixture of substances.

16   Q    Which contains potassium nitrate in it?

17   A    Correct.

18   Q    And you would agree with me that that thing of

19   Sensodyne toothpaste is not a low explosive, correct?

20   A    I would assume so, that it is not a low

21   explosive.

22   Q    And you can assume that because the common and

23   primary purpose of Sensodyne toothpaste is not to

24   function by explosion, correct?

25   A    No, sir.  The reason I would assume that is

1    because you only have five percent potassium nitrate

2    in there.  I don't know what the other material is

3    that's in there.  If it's not a suitable fuel, then

4    it wouldn't be a good explosive.  We'd really need to

5    up the ante with the percent of potassium nitrate to

6    get it to be a good low explosive.

7    Q    So you disagree with me that the common and

8    primary purpose of toothpaste is not to function by

9    explosion?

10   A    No, sir, I don't disagree with that statement.

11   Q    If you ignited that toothpaste, would it explode

12   based on your training and experience?

13   A    No.  It wouldn't ignite.

14   Q    Too wet probably, correct?

15   A    No, sir.  You just don't have the proper

16   ingredients for it to be classified as an explosive.

17   Q    If I could retrieve that from you.

18        MR. ALLEN:  May I approach the witness, Your

19   Honor?

20        THE COURT:  You may.

21   BY MR. ALLEN:

22   Q    Sir, I'm showing you what's been marked as

23   Defense Exhibit Number 22.  Can you look at what that

24   is, sir?

25   A    It states that it's Orchid food, plant food.

1    Q    Can you look at the ingredients in that?

2    A    Yes, I think so.

3    Q    And that plant food also contains some potassium

4    nitrate, correct?

5    A    Well, what it says is -- it lists a whole series

6    of items.  At the bottom it says that these items are

7    derived from urea, urea phosphate, ammonium

8    phosphate, potassium phosphate, potassium nitrate,

9    oric acid, copper sulfate, iron, EDTA, manganese

10   EDTA, ammonium malipate (ph), zinc EDTA.  So the

11   things up top are derived from those items on the

12   bottom according to this label.

13   Q    Would you agree with me that that container of

14   plant food is not an explosive?

15   A    I would assume so, sir.  I mean, it's not

16   classified as an explosive.  I don't know if it could

17   be a good ingredient in one without really taking a

18   closer look at it.  In and of itself, yes, it's not

19   an explosive that I'm aware of.

20   Q    And you know that potassium nitrate is regularly

21   used for plant food, correct?

22   A    That's what the label says, sir.

23   Q    Notwithstanding that label, based on your

24   training and experience, do you know whether or not

25   potassium nitrate is used as a fertilizer or plant

1    food?

2    A    No.

3    Q    You don't know?

4    A    I don't know that to be the case, sir.

5    Q    You would agree with me that the common and

6    primary purpose of plant food or fertilizer is not to

7    function by explosion, correct?

8    A    Of fertilizer?

9    Q    Yeah.

10   A    Not necessarily, sir.

11   Q    So the common and primary purpose of fertilizer

12   is to cause an explosion?

13   A    It depends on the fertilizer, sir, and how it's

14   manufactured.  Ammonium nitrate is a fertilizer,

15   which it's the same stuff that's made for fertilizing

16   plants as well as explosives.

17   Q    Just so I'm clear, are you saying that when the

18   fertilizer company makes the fertilizer, they are

19   making it for the purpose of being used as an

20   explosive?

21   A    No, sir.  It's the same fertilizer.  It's the

22   same material, ammonium nitrate.  Actually, there may

23   be companies that -- they're simply going to make

24   ammonium nitrate.  Some are diverted to explosive

25   manufacturers and some goes to fertilizer.

1    Q    Correct.  And I'm not taking about ammonium

2    nitrate.  I'm talking about the fertilizer you can

3    buy at Home Depot.  Are we on the same page?  You

4    know what I'm talking about, the bag of fertilizer

5    you can buy at Home Depot?

6    A    There are all types of fertilizers, yes, sir, at

7    Home Depot.

8    Q    And the fertilizer at Home Depot, the primary

9    and common purpose of that fertilizer is -- when it

10   was made, the intended use was to fertilize plants,

11   correct?

12   A    Yes.

13   Q    People can use it for its unintended purpose and

14   make explosives, correct?

15   A    Not to get too technical, sir, but generally not

16   the stuff at Home Depot nowadays.  If it was pure

17   ammonium nitrate, you could.

18   Q    Let's talk about Government's Exhibit 52 B,

19   which is stump remover, correct?

20   A    Yes, sir.

21   Q    I believe you testified on Direct that this

22   stump remover was about -- I think you said, correct

23   me if I'm wrong, about 90 percent or so pure

24   potassium nitrate?

25   A    I think it's in the upper 90s.

1    Q    And it might be easier for the court reporter to

2    let me finish before you answer and I'll let you

3    finish before I ask.

4    A    I apologize.

5    Q    That's okay.  So that there is some percentage

6    of this that is not potassium nitrate, correct?

7    A    Yes, sir.

8    Q    So that this stump remover is a mixture of

9    substance containing potassium nitrate, right?

10   A    Possibly, sir.  I'm not really familiar with

11   what the label says.  If it was 98 percent, yes, that

12   would be case.  I'm not sure if it's a hundred

13   percent, but I think it's in the upper 90s.  So if it

14   were to be in the upper 90s, there would be a small

15   percent of other ingredients in that.

16   Q    And stump remover by itself is not a potassium

17   nitrate explosive mixture, correct?

18   A    No, sir.

19   Q    Because the common and primary purpose of stump

20   remover is not to cause an explosion, correct?

21   A    That is correct, sir.  It's not -- just an

22   oxidizer alone is not designed to cause --

23   Q    If you ignited it, it would not explode,

24   correct?

25   A    That's correct.

1      THE COURT:  I believe you got interrupted, Mr.

2   Stryker.  An oxidizer alone is not what?

3      THE WITNESS:  You have to have an oxidizer and a

4   fuel --

5      THE COURT:  I was just inviting you to complete

6   your sentence.  An oxidizer alone is not --

7      THE WITNESS:  Is not sufficient to cause a

8   detonation or an explosion.

9   BY MR. ALLEN:

10   Q    Now, I believe on Direct you gave a definition

11   of what an explosion was, correct?

12   A    Yes.

13   Q    I'm going to read a definition to you and let me

14   know if you agree with this definition, okay?  An

15   explosion is "the sudden expansion of contained gas

16   which creates a shockwave, an effect produced by a

17   sudden violent expansion of gases where some effects

18   of an explosion are loud noise and shockwaves which

19   can collapse walls and shatter windows."

20   A    That would meet a definition of an explosion.

21   You would not be incorrect in saying that.

22   Q    Now, showing you what's been marked as Defense

23   Exhibit Number 23, which is a box of matches which

24   contains some matches inside.  Do you see that?

25   A    Yes, sir.

1    Q    Now, the top of that match is a low explosive,

2    is it not?

3    A    Yes, it is.

4    Q    It's also a pyrotechnic, is it not?

5    A    Yes.

6    Q    And you would agree with me, would you not, that

7    the common and primary purpose of this match is not

8    to result in the sudden expansion of contained gas

9    which creates a shockwave?

10    A    Well, it doesn't create a shockwave, but you

11    have essentially a miniature explosion occurring on

12    that micro level.  Particle to particle transfer.

13    There's multiple definitions in reference manuals and

14    in texts, very reliable texts, that vary

15    considerably.  They all kind of have a common thread,

16    but certain definitions may leave out certain

17    criteria such as this shockwave that you mentioned.

18    There's several of them that don't account for that

19    when they try to define what an explosion is.  Also,

20    some of them use very different adverbs and

21    adjectives to describe the effects of the production

22    of heat, the production of pressure, the production

23    of gases, et cetera.  There is a variety of

24    definitions, but the commonality is that they react

25    rapidly, intimate mixture of fuel and oxidizer, and

1    produce a larger volume of gas than the volume of the

2    original material.

3        I would also offer this since you brought up the

4    fact of matches:  This is often one of the cases

5    where juveniles will take matches.  It's their

6    experimentation in explosive devices.  They will cut

7    off the match heads, put them in a small container,

8    and get a more traditional or classic explosion from

9    that.  It's the same reaction that's happening.  The

10   material, whether it's black powder, smokeless

11   powder, potassium nitrate and sugar, is the same type

12   of reaction.

13   Q    Okay.  I'm going to take that in two parts.  So

14   it would be illegal for anybody to drive from one

15   state to the other with this match in their car

16   because they would be unlawfully transporting

17   explosive materials --

18   A    Not to my knowledge, sir.  First of all, I don't

19   know the exact composition of that material.  Even it

20   if it were -- for example, it's my understanding that

21   ammunition, unless you possess ammunition while in

22   the commission of another felony, that's exempt from

23   the rules of having to transport it.  There are

24   certain things that are exempted.  I would have to

25   believe, although I haven't specifically seen matches

1    listed, that that would fall under some exemption.

2    Q    Now, let's talk about the second thing you

3    talked about which is where somebody takes the match

4    not for its intended purpose and takes all the heads

5    off and sticks it into a pipe bomb, so to say.  Now

6    that when ignited would cause the sudden expansion of

7    contained gas which would create a shockwave.

8    A    It wouldn't necessarily create a shockwave.  I

9    don't know.  I would have to get involved more with

10   what the material is, do some research on that, but

11   you're going to get an explosion on a larger scale.

12   Most of these things that are on that Attorney

13   General's list, I haven't gone over every one of

14   them, they all have the capacity if you change

15   something to produce what one may call a classic

16   explosion or a traditional explosion which has that

17   loud noise associated with it.

18   Q    In fact, you could probably go into anybody's

19   garage in America and use things for their non

20   intended purpose and create an explosive, correct?

21   A    It's possible that one could find materials in

22   people's homes to create an explosive device.

23   Q    And what's important, is it not, is whether it's

24   been used for its intended lawful purpose or whether

25   it's being used for an unlawful purpose like to cause

1    an explosion.  That's what most important, is it not?

2    A   Now, are you referring to an explosive device or

3    an explosive material?

4    Q   I'm referring to the use of things that have

5    perfectly lawful purposes being used for unlawful

6    purposes like making explosives.  What's important is

7    not whether or not you have a pack of matches; it's

8    what you do with that pack of matches.

9    A   In this specific case of matches, yes.  But not

10    as it pertains to all explosive materials.

11    Q   For example, high explosives.  TNT really only

12    has one common and primary purpose and that is to

13    explode things, correct?

14    A   To detonate, which is a form of explosion, yes.

15    Q   And pyrotechnics and propellants could be

16    converted into a destructive device, correct?

17    A   Yes.

18    Q   But they could also be used as propellants or

19    pyrotechnics?

20    A   Yes, sir.  If I may, sir.  To give another

21    example to illustrate that high explosive aspect that

22    you brought up.

23    Q   Um-hum?

24    A   If I take a block of C-4, Composition-4, and I

25    break a little piece of it off, if I ignite it with a

1    match, it will burn.  Troops often use or have used

2    in the past that to heat up cans of food.  That's not

3    functioning as designed.  It doesn't change the fact

4    that it's C-4, but it can be used for something other

5    than detonating.

6    Q    Correct.  But its common and primary function is

7    to work as C-4, an explosive.  They're just using it

8    for its non common purpose, correct?

9    A    Yes.  C-4 is specifically designed as a material

10    that detonates.

11    Q    Let's talk about the testing you did in your

12    attempts to replicate Q1, Q2, and Q3, which are the

13    PVC pipe items that were found in the truck of the

14    vehicle.

15    A    Yes, sir.

16    Q    In essence, you really did two separate types of

17    testing.  The first testing that you did was

18    hypothetical replicas of the PVC pipe items in the

19    trunk of the vehicle, correct?

20    A    Yes, sir.

21    Q    And that was done or at least your report on

22    that was in January of 08, correct?

23    A    Yes.

24    Q    And then you did a second set of testing April

25    4th of 2008, and that is the destructive device

1    attempts, correct?

2    A    Yes.

3    Q    Let's deal with the first set of testing.  Now,

4    you testified that what's critical in knowing whether

5    you have this pyrotechnic or low explosive, as you

6    call it, is the ratio between the oxidizer, which in

7    this case is the potassium nitrate, and the sugar,

8    correct?

9    A    That's correct.

10    Q    In fact, your testing revealed that if you had

11    an 80 percent oxidizer and 20 percent fuel -- 80

12    percent potassium nitrate, 20 percent sugar -- there

13    would be no reaction, correct?

14    A    In the manner that I had mixed it, I think that

15    perhaps some of the way that I had mixed it had some

16    contribution to the fact that it didn't react.

17    You're going to reach a point either on the high end

18    or the low end where you won't get a reaction.

19    Q    You have testified on Cross that if you get no

20    reaction, it's not a low explosive, correct?

21    A    If you try to ignite it as designed, it's --

22    it's not going to perform that reaction.  So it's

23    just an inert, if you will, mixture.

24    Q    No different than the Sensodyne toothpaste,

25    correct, in that situation?

         1       A    As far as what, sir?  It's very different from

         2       it as far as its chemical make up.

         3       Q    Of course.  But it's no more an explosive than

         4       the Sensodyne toothpaste if you ignite it and you get

         5       no reaction?

         6       A    It's a lot closer to an explosive, but it's the

         7       same as far as -- if I were to a put an electric

         8       match on a pile of Sensodyne, the same thing I would

         9       happen, I suppose, in that you wouldn't get a

        10       reaction.

        11       Q    You have no idea what the ratio of potassium

        12       nitrate and sugar was in Q1, Q2, Q3, or the stuff in

        13       the coleslaw container.  You don't know the exact

        14       ratios, do you?

        15       A    I don't.

        16       Q    If the exact ratio was 80/20, you would not be

        17       able to say in your professional opinion that this

        18       substance is a potassium nitrate explosive mixture,

        19       isn't that correct?

        20       A    Again, I wouldn't hang my hat on the 80/20.

        21       Again, I can't speak for the similarities and

        22       homogeneity between the specimens that we examined

        23       and the mixtures that we tried to recreate.

        24       Q    If these items were ignited and did nothing, you

        25       would not be able to say that the potassium nitrate

1    and sugar inside these Q1, Q2, and Q3 items and the

2    coleslaw container were a potassium nitrate explosive

3    mixture?

4    A    I would say if you did not get a reaction with

5    an attempt to light it with a match or flame, that

6    there is a good chance it's not.

7    Q    Now, you testified that when you did the

8    destructive device testing, you videotaped it,

9    correct?

10   A    There was some -- I didn't personally.  We had

11   another unit out there.  There was some videoing that

12   occurred.

13   Q    And the FBI, your lab, has the ability to

14   videotape your testing, correct?

15   A    Yes.

16   Q    You or no one else videotaped any of the testing

17   of the hypothetical PVC pipe items, correct?

18   A    That's correct.

19   Q    I'm showing you what has been marked as

20   Government's Exhibit 64 A.  Do you see that, sir?

21   A    Yes.

22   Q    And this appears to be the 60/40 mixtures,

23   correct?

24   A    Yes.

25   Q    And that was the -- I believe you described it

1   as the violent-explosion-of-smoke test?

2   A    Yes.

3   Q    That violent expulsion of smoke is simply smoke

4   coming out of the end of the PVC pipe, correct?

5   A    It is smoke and gases.  Smoke is a particulate

6   matter that is suspended in the air because it's of a

7   sufficient size and/or temperature.

8   Q    It was not so violent that it ruptured the PVC

9   pipe, correct?

10  A    No, sir.

11  Q    And the smoke came out the hole that you drilled

12  into it for the ignitor cord, did it not?

13  A    That's correct.

14  Q    And I've noticed here that there is -- you put

15  duct tape on the third from the top, correct?

16  A    Correct.

17  Q    There was no duct tape found in that vehicle,

18  was there?

19  A    I don't believe so.

20  Q    So this was not really a realistic test because

21  you've altered what was in the trunk of the vehicle

22  by placing duct tape on it, correct?

23  A    Well, in my opinion it actually was.  What I

24  wanted to do was add something that's readily

25  available.  Even though duct tape perhaps wasn't in

1    the trunk, that's a readily available material.  I

2    wanted to see if with an additional minimal

3    confinement whether we would get a different

4    reaction.  Now, it is true that the duct tape wasn't

5    in the car.  So if the people in the car wanted to

6    get duct tape, they would have to stop at a store

7    that had it.

8    Q    At that same store they could buy a whole host

9    of things they could add to that, couldn't they?

10   A    Yes, sir.

11   Q    Showing you 64 B, correct?  Do you see that?

12   A    Yes, sir.

13   Q    And this is the 70/30 mixture?

14   A    Yes.

15   Q    Seventy percent sugar fuel, 30 percent potassium

16   nitrate?

17   A    Seventy percent potassium nitrate, 30 percent

18   powdered sugar.

19   Q    I'm sorry.  I apologize for having that

20   backwards.  You used duct tape on some of these tests

21   as well, right?

22   A    Yes, sir, on the bottom two.

23   Q    Showing you 64 C.  These are the 80/20 mixtures

24   where we got no reaction, correct?

25   A    Yes.  Well, 70 powdered sugar -- I think there

1   was smoke in that.

2   Q    This is the 80/20.

3   A    80/20 with powdered sugar?  Smoke.

4   Q    You also -- in addition to duct tape, you added

5   electrical tape, did you not?

6   A    Yes.

7   Q    There was no electrical tape found in this

8   vehicle either, was there?

9   A    I don't believe so.

10  Q    Showing you Government's Exhibit 64 F.  What are

11  these items next to the PVC pipes?

12  A    That's the unconsumed filler that was potassium

13  nitrate and Karo syrup in the 80/20 mixture that was

14  in that PVC pipe.

15  Q    So that wouldn't even burn during your testing.

16  That is the left over filler, correct?

17  A    The 80/20 in all the Karo syrup configurations

18  did not have any reaction.

19  Q    So at best your hypothetical testing showed that

20  depending on the mixture you could have an expulsion

21  of gas and smoke, the PVC pipe could get hot enough

22  to melt, or you could have no reaction at all,

23  correct?

24  A    Yes.

25  Q    And none of those tests showed the sudden

1     expansion of contained gas which created a shockwave,

2     correct?

3     A     There was no shockwave created.

4     Q     Which is the definition I gave you earlier of an

5     explosion which you said was one of many definitions

6     for an explosion, correct?

7     A     It's one of many, yes.

8           MR. ALLEN:  Let's shift gears.  May I approach,

9     Your Honor?

10          THE COURT:  You may.

11    BY MR. ALLEN:

12    Q     Showing you what's been marked as Government's

13    Exhibit 12 A, and this is the gas can that was found

14    in the back of the Camry, correct?  That's what I'm

15    showing you?

16    A     Yes.

17    Q     This is a standard five-gallon gas can that can

18    be bought at any hardware store or gas station,

19    correct?

20    A     Yes.

21    Q     Auto supply?  These gas cans are not just your

22    ordinary can.  I mean, they are designed to help

23    decrease the chance of their being a fire, correct?

24    A     As opposed to other containers, yes, sir.

25    Q     In the old days they had those metal gas cans,

1    right?  Remember when they used to be metal?

2    A    I remember.  They still make metal gas cans.

3    Q    This particular can is designed to prevent fumes

4    to the best possible ability, correct?

5    A    I suppose they are supposed to mitigate the

6    production of fumes.  I know in my garage I never

7    seem to seal them well enough and it always stinks

8    like gas in there.

9    Q    I have that same problem.  But that's when we

10   don't put the cap on probably correctly, correct?

11   A    Perhaps.

12   Q    And these containers are designed specifically

13   to transport gasoline from one place to another?

14   A    Yes.

15   Q    And it's perfectly lawful for a person to put

16   this in the trunk of their car and drive it back from

17   the gas station to their house and fill up their lawn

18   mower?

19   A    I would assume so.  I don't think any federal

20   laws are broken.

21   Q    You would agree with me, it would be hard to get

22   gas in your lawn mower if you couldn't do that,

23   correct?

24   A    Correct.  That's not how I transport it, but --

25   I don't transport it in the trunk.

1     Q    Okay. Have you ever seen the TV show MacGyver,

2   old TV show?

3     A    Been a long time, but I think I have.

4     Q    Part of the premise of that show was the main

5   character would take all kinds of objects and combine

6   them to together and make an explosive in order to

7   get out of the trouble that they were in, correct?

8     THE COURT: Mr. Hoffer, for what purpose do you

9   rise?

10     MR. HOFFER: Relevance and argumentative.

11     THE COURT: Sounds right to me. Do you want to

12   be heard on that, Mr. Allen?

13     MR. ALLEN: No, Your Honor. I'll move on to

14   something else.

15     THE COURT: Thank you.

16   BY MR. ALLEN:

17     Q    The task that you had approximately four months

18   after you had done the testing on the PVC pipe items

19   was to see if you could make an incendiary device out

20   of all of the items that you found in the trunk of

21   the car?

22     A    Out of some of the items.

23     Q    Out of any items that you could use out of the

24   trunk of the car?

25     A    I'm sorry. Could you repeat that?

1    Q   Let's me strike that.  Your task was to attempt

2    to make an incendiary device out of some of the items

3    out of the car?

4    A   I wanted to see if I could readily combine

5    things that were in the trunk to create an incendiary

6    device.

7    Q   And I believe you gave a definition of an

8    incendiary device was.  Can you restate that

9    definition?

10    A   An incendiary device is a device with a fusing

11    system and a material which can catch on fire for

12    purposes of destroying something.

13    Q   Okay.  I think you said that you could just take

14    the safety fuse and light it and put it in a trash

15    can and you've made an incendiary device, correct?

16    A   That's true.

17    Q   You could also take a match and light it and

18    throw it in the trash can and you will have made an

19    incendiary device, correct?

20    A   Well, it's a little different.  I don't really

21    consider a match a fusing system.

22    Q   Isn't the striking on the match container the

23    ignitor of the low explosive or pyrotechnic material?

24    A   I'm sorry.  Could you rephrase that or repeat

25    it?

1    Q    Sure.  Isn't the material on the match box that

2    you strike the match on to ignite the match similar

3    to the initiating device that you've talked about

4    that's necessary for an incendiary device?

5    A    I don't believe I would put it in the same

6    classification.

7    Q    What classification would you put it in?

8    A    It initiates a match.  In other words, if you

9    were to use that match, ignite the match on the

10    abrasive surface of that box and then have the match

11    burn down, you could have the match act as some

12    fusing system.  It's allowing some sort of a time.

13    You have a control over when that flame reaches

14    something else to cause something else to happen.

15    But even with the fuse, you have to initiate that

16    with a lighter, a match, a fuse igniter, something of

17    that nature.

18    Q    So you could stick the one match in the trash

19    can, light it with another one, and then that would

20    constitute an incendiary device?

21    A    Essentially it would.  It would be a very

22    primitive way of doing it, but it essentially meets

23    the elements of a fusing system.

24    Q    And it would meet your definition, scientific

25    definition, of an incendiary device, correct?

1     A    If your intent was to catch that trash can of

2    combustible material on fire, yes. It would give you

3    some measure of safety, perhaps not that great of a

4    one, in some time delay before the main combustible

5    material would ignite.

6    Q    Would you consider that example I just gave you

7    to be a bomb?

8    A    No, sir.

9    Q    Would you consider that example I just gave you

10   to be a grenade?

11   A    No, sir.

12   Q    Would you consider that example I just gave you

13   to be a rocket having a propellant charge of more

14   than four ounces?

15   A    No, sir.

16   Q    Would you consider that example I just gave you

17   to be a missile having an explosive or incendiary

18   charge of more than one quarter ounce?

19   A    No, sir.

20   Q    Would you consider that example to be a mine?

21   A    No, sir.

22   Q    Would you consider that example to be a similar

23   to a mine, a missile, a rocket, a grenade, or a bomb?

24   A    Yes, an incendiary bomb.

25   Q    Okay. That example would be an incendiary bomb?

1    A    It would be similar to that.  Again, as I

2    explained previously, in the case of incendiary, the

3    term "bomb" is perhaps not the best term to use.

4    Incendiary device would perhaps better describe that

5    because, again, with an incendiary the primary

6    purpose is to combust things, catch things on fire.

7    In fact, people use the term "fire bomb" all the

8    time.  It's not essentially a bomb as most of us

9    understand it to be, you know.

10    Q    Or what looking up the word "bomb" in a

11    dictionary would say, correct?

12    A    Perhaps.

13    Q    Now, let's talk about your attempts to make an

14    incendiary device.  Now, correct me if I'm wrong, the

15    first test involved one of the potassium nitrate

16    filled pipes, correct?

17    A    Yes.

18    Q    What ratio of potassium nitrate in fuel were you

19    using in test number one?

20    A    They were all -- all the pipes were a 70/30

21    mixture of 70 percent potassium nitrate, 30 percent

22    of the white powdered sugar.

23    Q    And you have no idea whether any of Q1, Q2 or Q3

24    had that mixture of potassium nitrate and sugar in

25    them, correct?

1    A    I don't know precisely what the mixture was.  I

2    do know that they violently reacted when Mr. Kelly

3    performed the flame susceptibility test.

4    Q    There was a violent reaction on an 80/20

5    mixture?

6    A    On the material that was out of Q1, Q2, and Q3,

7    the pipes.

8    Q    Now, if you'd used the 80/20 mixture, not only

9    would have your first three tests have failed, but

10   all of your tests would have failed, correct?

11   A    That's correct.

12   Q    And in test one you took the PVC pipe item and

13   affixed it with duct tape to the side handle of the

14   gasoline container, right?

15   A    Which test was that, sir?

16   Q    Test number one.

17   A    Yes.

18   Q    And once again, you just got your own duct tape

19   because there wasn't any duct tape in the trunk of

20   the car?

21   A    Yes.

22   Q    And when that happened you were not able to

23   ignite any of the gasoline, correct?

24   A    That's correct.

25   Q    So then you went to test number two, correct?

1    A    Yes.

2    Q    And that test involved the potassium nitrate

3    filled pipe.  And I assume you're using the actual

4    pipe that will get a reaction for that test as well?

5    A    I'm sorry.  You're assuming what, sir?

6    Q    That the PVC pipe that you used for test number

7    two was one of your hypothetical replicas that you

8    could actually get a smoke reaction from?

9    A    They were all -- all of the pipes had a 70/30

10   mixture of potassium nitrate, 70 percent and 30

11   percent powdered sugar.  All six tests were the same

12   formulation.

13   Q    Didn't use any of the 70/30 with Karo syrup,

14   correct?

15   A    That's correct.

16   Q    Why not?

17   A    Because it didn't function very well.

18   Q    So you're going to pick the one that has the

19   greatest opportunity to function, correct?

20   A    I picked something that would react because,

21   after all, the material that was analyzed by Mr.

22   Kelly reacted.  I wanted to pick something that

23   reacted.

24   Q    Now, in test number two you used duct tape

25   again, correct, to secure the PVC pipe to the --

1    A    Yes.

2    Q    -- to the spout of the gasoline container,

3    correct?

4    A    That's correct.

5    Q    And your duct tape failed, correct, and the PVC

6    pipe ejected --

7    A    Yes, sir.

8    Q    -- right?  So then you went to test number three

9    and you said, "Well, let me get some stronger tape

10   and you used the monofilament tape, correct?

11   A    Yes.

12   Q    There was no mala filament tape in the trunk of

13   that vehicle, was there?

14   A    I'm not aware of any being present.  I don't

15   recall everything that was in there, but probably

16   not.

17   Q    If it was sent to the lab -- I mean, you

18   reviewed everything that came to the lab, did you

19   not?

20   A    I do, sir.  I don't have a recollection off the

21   top of my head of everything that I examined.

22   Q    I don't want to trick you.  Why don't you

23   refresh your memory with your notes?

24   A    (Witness complied.)

25        THE COURT:  Is this a convenient time for our

1    afternoon recess, Mr. Allen?

2        MR. ALLEN:  It would be perfect, Your Honor.

3        THE COURT:  Then we will be in recess for a few

4    minutes and we will resume with Mr. Allen's

5    cross-examination of Mr. Stryker.

6        Mr. Watts?

7        THE COURT SECURITY OFFICER:  Rise for the jury,

8    please.

9        (Jury out at 3:48 p.m.)

10        THE COURT:  Mr. Stryker, you can step down when

11    you finish your examination there or refreshing look.

12        (Recess from 3:49 p.m. until 4:12 p.m.)

13        THE COURT:  Mr. Watts, if you'll return the

14    jurors to the courtroom?

15        THE COURT SECURITY OFFICER:  Yes, sir.

16        THE COURT:  How are we doing, Mr. Allen?

17        MR. ALLEN:  How much more time, Your Honor?  I

18    would say maybe 20 minutes, maybe ten.

19        MR. MONK:  Excuse me, Your Honor.  We have a

20    couple of witnesses whose testimony will be of short

21    duration that we would like to get in and out today.

22        THE COURT:  A couple of brief witnesses, okay.

23    We'll see if we can get them done.

24        (Jury in at 4:13 p.m.)

25        THE COURT:  Please be seated, one and all.  Mr.

1      Allen, you are recognized to resume your

2      cross-examination of Mr. Stryker.

3           MR. ALLEN:  Thank you, Your Honor.

4      BY MR. ALLEN:

5      Q    Agent Stryker, I believe when we left off you

6      were reviewing your notes to see if any monofilament

7      tape was found inside the vehicle?

8      A    Correct.  After reviewing that, I found one

9      specimen that does have duct tape on it.  However, I

10     am not able to discern specifically where it came

11     from because all my notes say is that with regards to

12     that item it was obtained pursuant to a search

13     warrant or consensual search and received at the FBI

14     laboratory on 10/16/2007 and were assigned the

15     following lab number.  I don't know, don't have the

16     capacity to know at this point where it came from.

17     Q    But there was no roll of duct tape?

18     A    No roll.

19     Q    No roll off monofilament tape?

20     A    That's correct.

21     Q    I believe we were on test number three.  That

22     test you believe failed because of your electronic

23     match igniting device?

24     A    Yes, sir.

25     Q    When you were shamming the PVC pipe into the

1   open spout of Government's Exhibit 12 A, you believe

2   you may have disrupted the ignitor mechanism,

3   correct?

4   A    Yes, sir.

5   Q    And so then you duplicated test four.  And then

6   that one, after ten seconds the top of the gasoline

7   container burst open and gasoline went spewing but

8   there was no ignition, correct?

9   A    Correct.  There really wasn't like a liquid

10  sloshing out.  I mean, it was kind of a mist of it,

11  if you will.  There was some gasoline that came out,

12  correct.

13  Q    And the goal that you are trying to accomplish

14  through all these tests is to ignite gasoline?

15  A    Ignite gasoline with it in that container.

16  Q    Because you could have just dumped the gasoline

17  out and through a match on it and ignited it?

18  A    Well --

19  Q    If you had fumes, right?

20  A    That could have caused a fire more than likely.

21  Q    And if you poured gasoline on a car back seat

22  and ignited it, that would cause the seat to catch

23  fire and everything else, correct?

24  A    If you ignited it, correct.

25  Q    And so then we go to test number four, correct?

1    I'm sorry, we just did test number four.

2        Then we go to test number five, correct?

3    A    Yes.

4    Q    That's the test where you basically took all 20

5    feet of safety fuse and wrapped it all the way around

6    the gas can below the level line where the gas was in

7    the canister, correct?

8    A    Yes.

9    Q    And you once again with monofilament tape taped

10   the PVC pipe, I think you said a rocket motor, into

11   the top of the gas can, ignited both the PVC pipe and

12   the 20 feet of safety fuse that you wrapped around

13   the gas can, correct?  Is that what happened?

14   A    I think in that case I put it again down by the

15   handle.  Test six was a replication of test five

16   which is simply in the vehicle.  Test five was

17   essentially a duplication of test one; however, I

18   added the safety fuse down at the bottom of the can.

19   Q    Okay.  So the safety fuse was down here?

20   A    Right.

21   Q    At the bottom below the gas line?

22   A    Yes.

23   Q    And on the fifth trial you actually were able to

24   ignite gasoline, right?

25   A    Yes.

1    Q    And the gasoline ignited not because the can

2    exploded or combusted but because ultimately the can

3    cracked, gasoline spilled out, and the still burning

4    safety fuse ignited the gasoline?

5    A    I think that was the likely cause of the

6    ignition.

7    Q    And test six really is just sticking the can in

8    a car?

9    A    Test five in a car, correct.

10    Q    Proving that gasoline will burn a car, ignited

11    gasoline will burn a car?

12    A    That it will in turn ignite the combustible

13    materials that are in a car, the upholstery, yes.

14    Q    So the upholstery is combustible?

15    A    Most of them are, yes.

16    Q    So I could just light the back seat without the

17    gasoline, correct?

18    A    If your intent was what, sir?

19    Q    To burn the car down?

20    A    Yes.

21    MR. ALLEN:  May I approach the witness?

22    THE COURT:  You nay.

23    BY MR. ALLEN:

24    Q    Show you what's been previously marked as

25    Defense Exhibit 15 A, 15 B, 15 C, and 15 H.  I

1    apologize.  Let me withdraw -- I apologize, let me

2    withdraw 15 H for now.  Take a look at 15 A, B, and

3    C.  Do you recognize those photographs?

4    A    Yes.

5    Q    What are they?

6    A    They are photographs of myself and others that

7    were out during the testing that we just covered.

8    Q    Do those photographs fairly and accurately

9    reflect the scene during some of that testing that

10    you were doing regarding the destructive devices?

11    A    Yes.

12         MR. ALLEN:  Your Honor, at this time I would

13    move into evidence Defense Exhibits 15 A, 15 B, and

14    15 C.

15         MR. HOFFER:  No objection, Your Honor.

16         THE COURT:  Exhibits 15 A, B, and C are received

17    on behalf of the defense.

18         (Defendant's Exhibit Nos. 15 A through C are

19    received into evidence.)

20         MR. ALLEN:  May I publish, Your Honor?

21         THE COURT:  You may.

22    BY MR. ALLEN:

23    Q    Sir, I'm showing you 15 A.  Is this you with the

24    hat?

25    A    Yes.

1   Q   Okay.  And there are one, two, three, four, five

2   other individuals there, correct?

3   A   Correct.

4   Q   Do you know the names of these other

5   individuals?

6   A   Not from that picture.  The person on the right

7   is from the fire department.  I don't know his name.

8   Q   This gentleman here?

9   A   Correct.

10  Q   Are all the other ones people in the explosives

11  unit department?

12  A   I can't really tell from that picture.  I think

13  it's better on some of the other ones.

14  Q   Before we do that, this is -- right down here is

15  the incendiary device you're attempting to make?

16  A   One of them, yes.

17  Q   That's the gas can, correct?

18  A   Yes.

19  Q   And all of that white stuff wrapped around that

20  nozzle, that's the monofilament tape, correct?

21  A   I believe that depicts it.

22  Q   Would you like to see the picture up closer?

23  A   It's either the monofilament or the duct tape.

24  From that depiction it looks more like the

25  monofilament.

1     MR. ALLEN:  May I approach the witness?

2     THE COURT:  You may.

3     THE WITNESS:  Yes, that is the monofilament.

4  BY MR. ALLEN:

5  Q     Sir, that looks like you almost used a whole

6  roll of monofilament tape to secure that PVC pipe

7  item in there.  Am I accurate in my observation

8  there?

9  A     No, sir.

10  Q     How many times did you wrap the monofilament

11  tape around the gas can to hold the PVC pipe on

12  there?

13  A     I do not recall.  Don't know how many times that

14  we did it on that occasion.

15  Q     More than once?

16  A     Yes.

17  Q     Let me show you Defense Exhibit 15 B.  Let me

18  clear that.  This is you in the center, correct?

19  A     Yes.

20  Q     And who is this?

21  A     That is Travis McCrady.

22  Q     And who is he?

23  A     On the left that's Tim Tarvin (ph).

24  Q     Who is Travis McCrady?

25  A     He is my technician.

1    Q    How many years as he worked at the FBI, roughly?

2    A    Five.

3    Q    Okay.  And the gentleman here on the left, who

4    is that?

5    A    Tim Tarvin.

6    Q    How many years as he worked at the FBI?

7    A    Approximately five years.

8    Q    And you have been there how many years?

9    A    With the FBI?

10   Q    Yeah.

11   A    A little over 11 years.

12   Q    So right there we have about 17 years of

13   experience, more than that, 21 years of experience,

14   correct?

15   A    Yes.

16   Q    And this is a picture of somebody handing you

17   duct tape, right?

18   A    Probably so.  Handing me some tape or holding it

19   out, yes.

20   Q    This is while you're trying -- the three of you

21   are trying to make this incendiary device, right?

22   A    Yes.  There is some assembly stage going on

23   there.  I don't know specifically what I'm

24   maneuvering or handling at that point.

25   Q    Let me show you Defense Exhibit 15 C.  This is

1    the same three individuals, you and the other two

2    individuals from the FBI, correct?

3    A    Correct.

4    Q    That's all three of you having to work together

5    to get that 20 feet of safety fuse taped around the

6    circumference of the gas can with the monofilament

7    tape, right?

8    A    Well, when you say "having to" I could have done

9    this by myself.

10    Q    Okay.

11    A    When you have enough people around, more than

12    hands are better than one.  If you have somebody to

13    assist by handing you things or handing you tape or

14    holding something down, it just makes it a little

15    easier.

16    Q    If you were working by yourself, you could not

17    have readily done it as easily, correct?

18    A    Not as easily, correct.

19    Q    Now, I believe you testified on Direct that

20    given all of your tests if you had found the gas can

21    with the component parts connected together at the

22    time you found them, you would have considered them

23    all to be incendiary devices?

24    A    I would have considered the configuration to be

25    an incendiary device.

1    Q    Nobody found in the trunk of this vehicle all of

2    these component parts together, correct?

3    A    That's correct.  Well, together assembled in the

4    way that I did, correct?

5    Q    Well, the --

6    A    They were all together in the trunk.

7    Q    Correct, but not assembled?

8    A    Correct.

9    Q    The component parts were separate, right?

10   A    That's right.  They were --

11   Q    You had to add a component part which was the

12   monofilament tape?

13   A    Yes.

14   Q    How long were you out there before you finally

15   got the gasoline ignited?

16   A    I don't recall the period of time that elapsed

17   from the time that we started test number one to test

18   number six.

19   Q    Was it longer than 30 minutes?

20   A    Yes, I would think it would be.  We had to wait.

21   Especially with test number five, we had to wait for

22   all the gasoline to burn off and that took a little

23   while.

24   Q    Was it longer than an hour?

25   A    I don't know if it was.

1    Q    I'm sorry.  I didn't hear your answer?

2    A    I don't know if that's the case, sir.  I don't

3    know if it was more than an hour.

4    Q    Would you have any notes that could refresh your

5    memory?

6    A    I don't believe I do.  I'm not aware of them.

7         MR. ALLEN:  May I approach the --

8         THE COURT:  You may.

9    BY MR. ALLEN:

10   Q    Sir, you were shown Government's Exhibit 57 A,

11   which is sulfur, correct?

12   A    Yes.

13   Q    There was no sulfur found in any of the items in

14   the trunk of the vehicle, correct?

15   A    Again, I'm not the best one to ask what was

16   found in the trunk.

17   Q    There was no sulfur found in Q1, Q2, Q3 or the

18   other potassium nitrate/sugar mixtures in the

19   coleslaw container?

20   A    That's correct.

21        MR. ALLEN:  May I approach the witness, Your

22   Honor?

23        THE COURT:  You may.

24   BY MR. ALLEN:

25   Q    Sir, I'm showing you what's been marked as again

1    Defense Exhibit 15 H.  Sir, do you recognize what 15

2    H is?

3    A    Appears to be a thumb drive.

4         MR. ALLEN:  Your Honor, I would move into

5    evidence Defense Exhibit 15 H.

6         MR. HOFFER:  Objection, relevance.  Come to side

7    bar?

8         MR. ALLEN:  Side bar, please.

9         THE COURT:  You may.  This is a photograph of a

10   thumb drive?

11        MR. ALLEN:  Yes, sir.

12        (At side bar, on the record.)

13        MR. ALLEN:  It's not relevant to what he has

14   been testified to, but we just entered a stipulation

15   over the break with the Government to introduce what

16   was found on that thumb drive, which was the

17   mechanics.  Since nobody had mentioned the thumb

18   drive being found in the vehicle, I was going to

19   introduce this photograph.

20        THE COURT:  What do you mean mechanics?

21        MR. ALLEN:  Youssef had brought in the car a

22   thumb drive --

23        THE COURT:  Right.

24        MR. ALLEN:  -- which had the manual for working

25   on the Toyota.

1        THE COURT:  Yes, okay.  I remember that.

2        MR. HOFFER:  Among other things.  I don't see

3   the relevance of any of that, quite frankly, to

4   either charge.

5        MR. ALLEN:  That's the reason for the trip.  I

6   mean, why there was a gasoline can.  He works on cars

7   and fixes cars.  We're going to tie it up in our

8   case.  I don't have to introduce it at this point.  I

9   can do it at a later time.

10       THE COURT:  Good.  Let's go.

11       (End of side bar discussion.)

12  BY MR. ALLEN:

13  Q    Sir, do you know what nitrocellulose is?

14  A    Yes.

15  Q    Oftentimes that's referred to as gun cotton?

16  A    Yes.

17  Q    That's a form of propellant, correct?

18  A    It's a low explosive propellant primarily used

19  as a propellant.

20  Q    And it's not made with potassium nitrate and

21  sugar, is it?

22  A    No.

23  Q    You just mentioned propellants.  You would agree

24  with me, would you not, that the common and primary

25  purpose of a propellant is not to explode the rocket

1    but to propel it into the air?

2    A    Propellants are not designed to breach the

3    containers of the things that they're propelling.

4    Q    So that would be a yes?

5    A    It's an explosion that's occurring.

6    Q    I understand.

7    A    But it's designed to propel via that explosive

8    event.

9    Q    I understand.  But when the space shuttle

10   launches into the air, the propellant in the space

11   shuttle's primary and common purpose is not to result

12   in the space shuttle exploding, correct?  It's to

13   propel the space shuttle into the air, right?

14   A    You don't want to explode the space shuttle.

15   Unfortunately, that's what happened on I forget the

16   name of the voyage that it did happen.  However, the

17   event of all those hot gases expelling out of the

18   solid rocket boosters is an explosive event.  That's

19   an explosion.

20   Q    How about when we're dealing with -- you're

21   familiar with candy propellants, correct?

22   A    I have heard that term.

23   Q    That's a common propellant used for model

24   rockets made out of potassium nitrate and sugar,

25   correct?

1    A    I would not necessarily say it's a common thing.

2    Q    Okay.

3    A    I know that -- I believe there are a group of

4    people that use them, but most model rockets, if you

5    will, my understanding are something that can be

6    purchased at a store like Wal-mart using Estes brand

7    model rocket motor.  But there are other clubs.

8    Q    And the Estes brand model rocket motor uses like

9    black powder, right?

10   A    Primarily black powder is the main ingredient.

11   Q    Now, you would agree with me that the primary

12   and common purpose of that store bought model rocket

13   motor propellant is to propel the little model rocket

14   off the ground, and its purpose is not to result in

15   an explosion of the rocket, correct?

16   A    In the classical sense, that's correct.  You

17   don't want the model rocket to explode.

18   Q    And when you ignite that store bought model

19   rocket propellant, there is no sudden expansion of

20   contained gas which creates a shockwave, correct?

21   A    There is a sudden expansion of gas.  There is no

22   shockwave.

23   Q    That's because the expansion of gas comes out of

24   the bottom nozzle of the rocket and propels the

25   rocket off of the earth's gravitational pull,

1    correct?  If you sealed the end of that motor on both

2    ends, capped it so to speak, it would not propel

3    because the gases would stay inside the rocket,

4    correct?

5    A    It depends.  They might violently rupture the

6    rocket.

7    Q    Resulting in a sudden expansion of contained

8    case which creates a shockwave.  The rupturing,

9    right?

10   A    There wouldn't be a shockwave there either.

11   Q    It would just be a rupturing?

12   A    A rupture with a loud noise.

13   Q    An explosion, correct?  A rupture with a loud

14   noise would be an explosion, correct?

15   A    You could also use that to describe an

16   explosion, yes, sir.

17   Q    That's not the function of that rocket motor,

18   right?  That's not what it's designed to do?

19   A    To react in the way you previously described?

20   Q    Yeah.

21   A    It's not designed to react in that way.

22        MR. ALLEN:  Thank you.  I don't have any further

23   questions.

24        THE COURT:  Mr. Hoffer, have you redirect

25   examination for this witness?

1          MR. HOFFER:  I do, Your Honor.

2          THE COURT:  You are recognized for that purpose.

3                    REDIRECT EXAMINATION

4    BY MR. HOFFER:

5    Q    Mr. Stryker, sir, to follow up on the last

6    couple of questions, your definition or the

7    definition you use in your testimony for an

8    explosion, does that require that there be this

9    shockwave as part of that to make something an

10   explosion?

11   A    No, I don't think that that needs to be present

12   to qualify as an explosion.

13   Q    What needs to be present in your opinion and

14   your training experience for something to be an

15   explosion?

16   A    Again, you have to have that fuel/oxidizer, no

17   ambient air, rapid conversion of that material into

18   gas, usually accompanied by heat.  Again, all these

19   things -- there are many variables involved.  You

20   don't necessarily have to have everything all in one

21   event to be classified as an explosion.

22   Q    Now, the shockwave that we heard a lot about on

23   Cross-Examination, is that what causes the loud noise

24   that we associate with the common term explosion?

25   A    It can.  A shockwave is a rapid build up of

1  pressure.  Again, there is two types of shockwaves.

2  You have a shockwave in that material itself

3  travelling through that unreacted explosive, and then

4  usually with that force of an explosion that will

5  transition into a shockwave which you can see in the

6  air.  That has a very sharp rise in peak if you were

7  to look at it graphically.  Very short duration.  It

8  diminishes greatly with time.  Then it guess below

9  the normal line and actually creates a vacuum where

10  you have this pressure pulse pushing out and then

11  sucking back into the area where it occurred.  It all

12  happens shortly.

13      Nonetheless, even after that shockwave has

14  dissipated where you're not going to feel the force

15  of it, you're still going to hear an audible sound.

16  I am not acoustic engineer but essentially sound

17  waves are molecules in the air that are vibrated and

18  you're able to pick them up in your eardrum and you

19  can hear it.  That is simply what that noise is.  To

20  me, the noise is not something you need to hang your

21  hat on to qualify as explosion event.

22  Q   Have you consulted any reference materials in

23  your realm of knowledge and expertise that describe

24  explosions that do not contain in the definition this

25  requirement that there be the loud bang or boom or

1    report?

2    A    Yes.

3    Q    Do you remember any of them off the top of your

4    head as what you've consulted?

5    A    Not the specific references, but I've researched

6    perhaps between 10 and 15, and several of them didn't

7    have -- again, these definition varied greatly.

8    Again, when you're trying to describe what an

9    explosion is, it's not a precise term.  It doesn't

10   necessarily need to be in the realm of explosives.

11   Again, like I said before, we generally all know what

12   it is.  So I think that has to do with some of the

13   variances.  These are very well respected textbooks

14   and reference manuals, and they often don't have a

15   reference to noise that's produced as a result of

16   having to be qualified.  I think they actually just

17   discuss this term of explosion to give the novice or

18   the reader some general understanding of what this

19   event is.

20   Q    You mentioned that with the potassium nitrate

21   explosive mixture, when that's ignited or initiated,

22   to use your term, you do get some noise but it's a

23   different kind of noise than the boom or loud noise

24   that we associate with, say, high explosives, is that

25   correct?

1    A    Right.  Because it's -- it depends on the

2    configuration as to what noise you're going to get

3    out of it.

4    Q    That noise is created by what?  What creates

5    that noise?

6    A    Usually the overcoming of the container.  The

7    speed of the reaction again increases when it's

8    confined.

9    Q    Now, in the course of your work on the items in

10   this case, you consulted with and were familiar with

11   Ron Kelly's work and the results of his examinations,

12   correct?

13   A    Yes.

14   Q    And you reviewed his reports as well, correct?

15   A    Yes.

16   Q    You were asked on Cross about whether he

17   described some of these items contained in

18   Government's 4 A, 5 A, and 6 A as a pyrotechnic

19   mixture composed of potassium nitrate and sugar.  Do

20   you remember that?

21   A    Yes.

22   Q    Do you recall he also said in the next sentence

23   that this mixture is also considered a low explosive?

24   A    Yes.

25   Q    And do you concur with that opinion?

1    A    Yes.

2    Q    Now, sir, does the intent or what you do with an

3    item change it's characteristic as to whether it is

4    in your opinion a low explosive or not an explosive

5    or a high explosive or not?

6    A    Not to me.  It is what it is.  The material is

7    what it is.  And by the nature of it existing and

8    having been created, it's designed to function by

9    explosion.  That's why it was created.  Again, many

10   items that are on that Attorney General guideline --

11   I don't know why the Government specifically included

12   things and maybe excluded things, but they saw fit

13   that it needed to be regulated under that statute.

14   They all have the capacity to produce an explosion in

15   the traditional or classic sense.  Irregardless of

16   the semantics that we may have covered today, they

17   all have that capacity.

18   Q    But being familiar with the list, and I think

19   you saw the list earlier, do all the items on there

20   create that noise that we talk about, as a layman, as

21   an explosion if properly initiated or not?

22   A    They have the capacity to do so, yes, sir.

23   Q    But do they all do it every time?

24   A    No, sir.

25   Q    Now, you are aware, you said, talking about Mr.

1    Kelly again, Ron Kelly, that he did some tests on

2    whether the contents of 4 A, 5 A, and 6 A burned.  Do

3    you recall that?

4    A    Yes.

5    Q    And you are aware that -- were you aware that

6    his results were that it did burn?

7        MR. ALLEN:  Objection, leading.

8        MR. HOFFER:  I'll withdraw the question, Your

9    Honor.

10   BY MR. HOFFER:

11   Q    What were you aware of as far as what he

12   concluded from these tests?

13   A    I was aware that they burned energetically.  I

14   don't know which adverb he used to describe the burn,

15   but it was, you know, energetic-like.

16   Q    And what does that fact by itself tell you about

17   the composition or the nature of those mixtures that

18   he was looking at?

19   A    To me it indicates it's a viable low explosive.

20   That's what it's supposed to do.

21   Q    No, without going through them, let me just --

22   remember you were shown by Mr. Allen on Cross the

23   couple of photos of the various tests of the pipe and

24   the results, and you had the 60/40, 70/30, 80/20.

25   You mentioned that some of them, the bottom two in

1    some of those photos, had duct tape on the pipe?

2    A    Yes.

3    Q    Isn't it a fact that -- let me ask you, the two

4    at least in each of those photos, did they have duct

5    tape or tape on the outer exterior of the pipe?

6    A    No, sir.

7    Q    Talking for a moment about the incendiary

8    devices.  Are you familiar, sir, with what's commonly

9    sometimes referred to as a Molotov Cocktail?

10   A    Yes.

11   Q    What is that?

12   A    Traditionally, it's a container, usually a

13   breakable glass container.  There are --

14        MR. ALLEN:  Objection, outside the scope.

15        THE COURT:  Sustained.

16   BY MR. HOFFER:

17   Q    With respect to the various configurations that

18   you did, the six tests that we discussed with respect

19   to the incendiary device, was it your opinion --

20   well, let me ask you, is it your opinion that -- how

21   do these -- withdrawn.

22        Do the results of those six tests lead you to

23   any conclusions as to whether those configurations

24   were similar in any way to what might be called an

25   incendiary bomb?

1    A    Again, all of the configurations that I made

2    were incendiary devices.  Irregardless of whether

3    they functioned as -- produced a flame, they were

4    configured in that way.  The way that I configured

5    them, there was no reason for someone to configure

6    them in that manner.  If they were found in that way,

7    they're all devices, destructive devices.  We have a

8    saying that you don't need to be a good bomb builder

9    to be a bomb builder.  If you've built a bomb,

10    sometimes they don't go off, especially if they're

11    improvised.  Nonetheless, they're a bomb or the

12    device.

13    Q    My question was -- I apologize.  Are you

14    finished?

15    A    Yes.

16    Q    My question was simply were they in your opinion

17    similar to the term "incendiary bomb" as you

18    understand that term?

19    A    Yes.

20    Q    And as you understand or use the word bomb, I

21    guess it's the same question, how do you use that

22    term or what is your understanding of the meaning of

23    that terminology?

24    A    Well, as it applies to incendiaries?

25    Q    Yes, yes.

 1    A    Again, it's a term that -- an incendiary bomb is

 2    something that's simply designed to catch things on

 3    fire.  That's its primary focus.  It does not have to

 4    be -- when you're using the term "incendiary bomb"

 5    there does not have to be a pressure wave or an

 6    explosion on any realm, on any realm.  It's just

 7    simply igniting something else, burning it.

 8    Q    Couple of other things.  Mr. Allen asked you

 9    about the Code of Federal Regulations and he asked

10    you about rocket motors a minute ago.  My question to

11    you is are you familiar with how the regulations deal

12    with rocket motors as far as their legality?

13    A    I'm aware of a motor rocket exemption.  I don't

14    specifically know its applicability to an individual

15    statute.

16    Q    My question is that exemption, which means that

17    a rocket motor of a certain sort is not covered by

18    law as prohibiting transport or commerce, et cetera?

19    Are you familiar with that, generally speaking?

20    A    Yes.

21    Q    Do they have certain requirements to be exempt

22    that must be met?

23    A    Yes.

24    Q    Is one of them related to the content or the

25    weight --

1    MR. ALLEN:  Objection, leading.

2    THE COURT:  Sustained.

3    BY MR. HOFFER:

4    Q    With respect to the content or weight of a

5    rocket motor or propellant, does that play in at all

6    to the exemption?

7    MR. ALLEN:  Objection, leading.

8    THE COURT:  Overruled.  The question is I think

9    fairly stated:  What role, if any, does content or

10   weight play in establishing exemption?

11   THE WITNESS:  In I believe it's 27 CFR 555 point

12   something, there is a -- part of the exemption is if

13   the material in the rocket motor, the propellant or

14   low explosive, if that is 62.5 grams or less, it's

15   exempt.  If it's greater than 62.5 grams, it is not

16   exempt.

17   Q    Were any of the contents of either Government's

18   4 A, 5 A, or 6 A less than that amount?

19   A    No.  They were all over.

20   Q    Finally, I think you -- Mr. Allen asked you or

21   read to you this definition again from the same

22   source, the CFR, Code of Federal Regulations, for a

23   pyrotechnic composition, meaning -- or the term is a

24   chemical mixture which upon burning and without

25   explosion produces visible brilliant displays, bright

1    lights or sounds.  In your opinion, sir, did either

2    of the contents and in fact its casing as well in

3    Government's 4 A, 5 A, and 6 A create visible

4    brilliant displays, bright lights or sounds?

5    A    No, sir.  I mean, there was again the sound, but

6    it wasn't like a visible brilliant light.  There is a

7    sound when it exits the hole that was made.

8    Q    Can you describe what kind of a sound it was?

9    A    It's a hissing sound.  It's just a loud, you

10    know, forceful sound of gas escaping out of a small

11    hole.

12    MR. HOFFER:  May I have a moment, Your Honor?

13    THE COURT:  You may.

14    (Pause.)

15    MR. HOFFER:  Thank you, Your Honor.  I have no

16    further questions of this witness.

17    THE COURT:  Thank you, Mr. Hoffer.  If there is

18    nothing further from the defense --

19    MR. ALLEN:  Nothing further, Your Honor.

20    THE COURT:  Mr. Stryker, you may step down.

21    You're excused with our thanks.

22    THE WITNESS:  Thank you, sir.

23    (End of excerpt of proceedings.)

24

25

1                        C E R T I F I C A T E

2          I, Kerry Mercade, certify that the foregoing is

3     a correct transcript from the record of proceedings

4     in the above-entitled matter.

5                                      S/Kerry Mercade

6                                      Kerry Mercade
                                       Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25