1              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                   TAMPA DIVISION

3      UNITED STATES OF AMERICA

4

5           vs.              CASE NO. 8:07-cr-342-T-23TBM
                             March 25, 2009
6                            Tampa, Florida

7

       YOUSSEF SAMIR MEGAHED,

8
            Defendant.
9
       _____/
10
            TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                (TESTIMONY OF JULIE KOPEC)
           BEFORE THE HONORABLE STEVEN D. MERRYDAY
12               UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     For the Government:   JAY HOFFER
                             ROBERT MONK
15                           Assistant U.S. Attorneys
                             400 N. Tampa Street, Suite 3200
16                           Tampa, Florida 33602
                             813/274-6000
17
       For the Defendant:   ADAM ALLEN
18                           DIONJA DYER
                             Assistant Federal Defenders
19                           400 N. Tampa Street, Suite 2700
                             Tampa, Florida 33602
20                           813/228-2715

21     Court Reporter:      Kerry Mercade
                             801 N. Florida Avenue
22                           Suite 15A
                             Tampa, Florida 33602
23                           813/301-5024

24

25     Proceedings recorded and transcribed by
       computer-aided stenography.

1          **INDEX**

2

**GOVERNMENT WITNESS JULIE KOPEC**
3    Direct Examination by Mr. Monk............3
     Cross-Examination by Ms. Dyer............16
4    Redirect Examination by Mr. Monk.........21

5

6              **GOVERNMENT'S EXHIBITS**

7

     **Number     Description                  Page**
8
     17 A - B    Seat covers....................15
9    18 A - B    Floor mats.....................14
     25          DHMSV registration (Camry).....10
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          GOVERNMENT WITNESS, JULIE KOPEC, SWORN

2          THE COURT:  State your name, please.

3          THE WITNESS:  Julie Kopec.

4          THE COURT:  Would you spell your last name?

5          THE WITNESS:  K-O-P-E-C.

6          THE COURT:  Ms. Kopec, just assume a comfortable

7     posture there in the chair and just ignore the

8     microphone.  You don't need to bend forward each

9     time.  If you'll just maintain sort of a constant

10    distance, we actually can fiddle with the controls a

11    little bit.

12         THE WITNESS:  Thank you.

13         THE COURT:  Mr. Monk, you're recognized for your

14    Direct Examination.

15                    DIRECT EXAMINATION

16    BY MR. MONK:

17    Q    Ma'am, how are you employed?

18    A    I work for the Federal Bureau of Investigation.

19    Q    Are you a Special Agent?

20    A    Yes.

21    Q    And how long have you worked for the FBI?

22    A    Approximately five and a half years.

23    Q    What is your present assignment?

24    A    I work at Washington field office.

25    Q    Back some time ago in 2007, were you assigned

1    the Tampa, Florida, FBI office?

2    A    Yes, I was.

3    Q    I want to direct your attention to the period

4    between roughly August 2007 and November of 2007, and

5    ask you whether during that period of time you

6    participated in the investigation that's now before

7    this court?

8    A    Yes, I did.

9    Q    Specifically, going back to I believe Sunday,

10   August 5th, 2007, did you have some responsibility or

11   assignment with respect to the investigation on that

12   date?

13   A    Yes, I did.

14   Q    And what was that?

15   A    I was assigned to conduct initially surveillance

16   at East Nedro Street, approximately around 2107 East

17   Nedro.

18   Q    And August 5th, that's the day after some

19   arrests occurred in Goose Creek, South Carolina,

20   correct?

21   A    Yes, it was.

22   Q    Were you basically on that day assigned to

23   canvas the neighborhood?

24   A    Yes.  We were initially brought out to conduct

25   some surveillance.  After that we canvassed the

1    neighborhood and spoke to residents.  Then we

2    specifically spoke to the resident at 2107 East

3    Nedro.

4    Q    Let's leave out the addresses, specific

5    addresses, okay?

6    A    Okay.

7    Q    Did you have contact with Paulette Poliquin on

8    that day?

9    A    Yes, I did.

10   Q    What was the nature of your contact initially?

11   A    Initially when we approached her, she was

12   outside gardening.  We approached her and identified

13   ourselves.

14   Q    Who were you with?

15   A    Special Agent Jason Kotara.

16   Q    Did you explain to Ms. Poliquin why you were

17   there?

18   A    Well, immediately after we identified ourselves,

19   her first response was, "Was this about my call to

20   the police about Ahmed?"  And we immediately showed

21   her a photograph of Ahmed Mohamed, which she

22   identified as a former resident.  And then we

23   informed her why we were there.

24   Q    Well, let me go back to her question to you and

25   ask you to answer that for us.  Was your visit there

1    with her that day about a call she had made some time

2    before your visit to the Tampa Police Department?

3    A     No.  That was -- actually, her comment was the

4    first I'd heard of the call.

5    Q     Did you explain to her why you were there more

6    specifically?

7    A     Yes, I did.

8    Q     What did you explain to her?

9    A     I explained to her that her former roommate or

10   the person who had formerly rented a room from her

11   had been arrested in Goose Creek, South Carolina, I

12   believe the day before.  And that we were here to

13   talk to her about him.

14   Q     Did she invite you inside?

15   A     Yes, she did.

16   Q     You've used the term "we," the pronoun we.  Who

17   was with you?

18   A     Special Agent Jason Kotara.

19   Q     When you went into -- accompanied Ms. Poliquin

20   into her house, did -- what did you discuss in

21   general?

22   A     In general, we asked her about Ahmed Mohamed:

23   How long he had lived with her, how she had come to

24   rent the room to him, whether he still was renting

25   the room, the circumstances of why he was no longer

1    renting the room, and about things she had noticed

2    regarding his personality or acquaintances.

3    Q    Did you ask her whether he had frequent

4    visitors?

5    A    Yes, we did.  She actually offered to us that

6    after she agreed to rent the room to Ahmed, she had

7    specifically asked him to not have visitors.  He had

8    asked her if he could have a few friends over just to

9    talk.  She advised us that there were actually two

10   friends of his that were over quite frequently,

11   sometimes spending the night.

12   Q    Let me show you what's been admitted in evidence

13   as Exhibit 71.

14       MR. MONK:  If I can approach the witness,

15   please?

16       THE COURT:  You may.

17   BY MR. MONK:

18   Q    Do you recognize Exhibit 71, and, if so, how?

19   A    Yes, I do.  These are black and white printouts

20   of the State of Florida driver vehicle information

21   database individual summary pages regarding the

22   driver's license information and photographs of Ahmed

23   Mohamed, Yahia Megahed, and Youssef Megahed.

24   Q    Did you have that document with you when you

25   went out and spoke with Ms. Poliquin on August 5th,

1    2007?

2    A    Yes, I did.

3    Q    Now, this was only a day after the arrests,

4    correct?

5    A    Yes, it was.

6    Q    How is it that one day after the arrests you

7    came to have and take out with you photographs of Mr.

8    Mohamed, Yahia Megahed, and Youssef Megahed?

9    A    The day of the arrests, Youssef Megahed and

10   Ahmed Mohamed were arrested and the vehicle they were

11   travelling in belonged to Yahia Megahed, if I recall

12   correctly.

13   Q    Okay.  Go ahead.

14   A    On August 5th, prior to going out to talk to

15   residents, I stopped into the office and picked up

16   those pages with the pictures so that we would have

17   something to show people and ask if they have seen

18   any of these individuals in the area.

19   Q    All right.  And the first page is a --

20        MR. MONK:  Your Honor, could we dim the lights

21   just a bit, please?

22        THE COURT:  You may or we may.

23   BY MR. MONK:

24   Q    The first page of the document you showed her

25   bears a photograph of Mr. Mohamed, correct?

1  A    Yes.

2  Q    Did she identify this as the photograph of her

3  tenant or renter?

4  A    Yes.  At the time they weren't stapled together.

5  They were three separate pages.

6  Q    Okay.

7  A    So --

8  Q    You referred to this as a DAVID photograph.  Is

9  that indicated here as shown on the top of the page?

10  A    Yes.  That's actually the database that we pull

11  the photographs from.

12  Q    DAVID is an acronym for Driver and Vehicle

13  Information Database?

14  A    Yes.

15  Q    The second page is a photo of Yahia Megahed, is

16  that correct?

17  A    Yes.

18  Q    Now, did Ms. Poliquin identify Yahia Megahed as

19  one of the frequent visitors?

20  A    Yes, she did.

21  Q    The third page, Youssef Megahed.  Did she also

22  identify Youssef Megahed in some manner?

23  A    Yes, she did.

24  Q    How?

25  A    She identified him as the other individual who

1     was a frequent visitor at her residence.

2     Q    When you showed her these photographs, did you

3     suggest in any way to her that she should select any

4     of these photographs?

5     A    No.  I just asked her if she had ever seen any

6     of these individuals around her residence or actually

7     at her residence.

8          MR. MONK:  Your Honor, at this time the

9     Government would move for admission into evidence a

10    certification by the State of Florida relating to the

11    Toyota Camry.

12         THE COURT:  Marked?

13         MR. MONK:  Proposed Exhibit 25.

14         MS. DYER:  No objection.

15         THE COURT:  Exhibit 25 is received on behalf of

16    the United States.

17         (Government's Exhibit No. 25 is received into

18    evidence.)

19         MR. MONK:  May I publish just two pages?

20         THE COURT:  You may.

21    BY MR. MONK:

22    Q    Please take a look at this.  This is the

23    certification page and Page 2.

24         Now, during the course of your visit with Ms.

25    Poliquin that day, did you ask her permission to

1    search her residence?

2    A    Yes, upon finding out that Ahmed Mohamed had

3    vacated the residence, I asked her if we had her

4    permission to search the residence and she granted

5    permission.

6         MR. MONK:  With the Court's permission, I would

7    like to show the witness what's been admitted in

8    evidence as Government's Exhibits 50 A and 50 B.

9         THE COURT:  Yes, sir.

10   BY MR. MONK:

11   Q    Are those -- do you recognize those consent to

12   search forms?

13   A    Yes, I do.

14   Q    Do they bear your signature and also Ms.

15   Poliquin's?

16   A    Yes, they do.

17   Q    Now, I notice that 50 A is dated on August 10th,

18   2007?

19   A    Yes, it is.

20   Q    And the next one, 50 B, is dated on August 13th?

21   A    Yes.

22   Q    Did you return to Ms. Poliquin's residence after

23   August 5th with those consent to search forms?

24   A    Yes, I did.

25   Q    All right.  Now, let's move up in time, if we

1    might --

2    A    Okay.

3    Q    -- to the period of April/May, 2008.  When were

4    you reassigned from the Tampa FBI office to -- is it

5    Washington, D.C.?

6    A    Yes.  I was reassigned in November of 2007.

7    Q    And did you return to Tampa after that

8    reassignment to assist for a while in the preparation

9    of this case?

10   A    Yes, I did.  I was assigned for a temporary duty

11   assignment to the Tampa Division from approximately

12   April 2008 to May 2008, for a one-month period.

13        MR. MONK:  If I may approach witness, Your

14   Honor?

15        THE COURT:  You may.

16   BY MR. MONK:

17   Q    Show you what has been marked as proposed

18   Exhibits 18 A and 18 B.  Do you recognize these?

19   A    Yes, I do.

20   Q    And how is it you recognize these?

21   A    On April 30th of 2008, I removed those floor

22   mats with the cardboard from a 2000 Toyota Camry that

23   had previously been entered into evidence.

24   Q    The Toyota Camry, where was that located at the

25   time?

1    A   It was secured in a secure level of -- double

2    secured, I guess.  It was in a secured level of the

3    FBI Tampa's parking garage.

4    Q   Let's take a look, if we might, at what has been

5    admitted in evidence as Government's Exhibit 24 D.

6        MR. MONK:  If I may publish this, Your Honor?

7        THE COURT:  You may.

8    BY MR. MONK:

9    Q   This may be a little bit difficult to make out,

10   Special Agent Kopec.  Take a look at this area right

11   there.  Is the floor mat visible?

12   A   Yes, it is.

13   Q   Are you able to see a little bit of what appears

14   to be light colored debris, sand, or something of

15   that nature on the mat?

16   A   Yes, I am.

17       MR. MONK:  Your Honor, if I may, can I please

18   pass these two floor mats among the jurors so they

19   can look at the --

20       THE COURT:  You may.  Mr. Watts?

21       MS. DYER:  Your Honor, I don't have an objection

22   but I don't believe he's admitted them in evidence

23   yet.

24       MR. MONK:  I'm sorry.  I move for their

25   admission.  I apologize.

1      THE COURT:  18 A and B are received on behalf of

2      the United States.

3          (Government's Exhibit Nos. 18 A and B are

4      received into evidence.)

5      THE COURT:  I'm not sure how we should -- can we

6      just lay them on the rail in front of the jurors look

7      and they can at it at their leisure?

8      MR. MONK:  Yes, Your Honor.

9      THE COURT:  Will that do?  I'm not sure what

10     we're looking for, so can Mr. Watts just hold it up

11     there a minute?

12     MR. MONK:  Just any debris as reflected on that

13     photo as it appears on the mats.

14     THE COURT:  Just hold those up there for a

15     minute, Mr. Watts.

16         (Pause.)

17     MR. MONK:  May I proceed?

18     THE COURT:  You may, sir.

19 BY MR. MONK:

20 Q    If I could approach the witness and show you

21 what has been marked as proposed Exhibits 17 A and 17

22 B, and I'll ask whether you recognize these.

23 A    I do recognize them.

24 Q    How is it you recognize those?

25 A    On April 30th of 2008, I removed -- these are

1    two car seats, black car seats.  I removed them from

2    the 2000 Toyota Camry that had been previously been

3    entered into evidence.

4    Q    Again, was the Camry at that time located from

5    the FBI Tampa Division's secured lot?

6    A    Yes, it was.

7         MR. MONK:  I would move for admission into

8    evidence of proposed Exhibits 18 A and 18 B.

9         THE COURT:  Any objection?

10        MS. DYER:  No.  I believe it's 17 A and 17 B.

11        MR. MONK:  I apologize.

12        THE COURT:  I believe it is 17 and I was going

13   to announce 17.  Exhibits 17 A and B are received.

14        (Government's Exhibit Nos. 17 A and 17 B are

15   received into evidence.)

16        MR. MONK:  Now, with the Court's permission, I'd

17   like to publish photographs of those car seats.

18        THE COURT:  Yes, sir.

19   BY MR. MONK:

20   Q    Can you tell us, ma'am, whether, if you recall

21   those car seats were of the same or of different

22   colors?

23   A    To the best of my recollection, I believe that

24   they were different.  But to be honest with you, I'm

25   not certain.

1    THE COURT:  Is this marked?  17 A and B, okay.

2  BY MR. MONK:

3  Q    17 A and 17 B.  Do they appear to be different

4  colors?

5  A    Yes, they do.

6    MR. MONK:  May I have just a moment, please?

7    THE COURT:  You may.

8     (Pause.)

9    MR. MONK:  Thank you, Your Honor.  No further

10  questions.

11    THE COURT:  Thank you, Mr. Monk.

12    Ms. Dyer, you are recognized for

13  cross-examination of Ms. Kopec.

14                    CROSS-EXAMINATION

15  BY MS. DYER:

16  Q    Agent Kopec, you testified that you interviewed

17  Ms. Poliquin on August 5th, 2007, correct?

18  A    Yes.

19  Q    And you showed her a photograph of Mr. Mohamed,

20  which she IDed?

21  A    Yes.

22  Q    And a photograph of Youssef Megahed, which she

23  IDed as somebody who frequented her residence with

24  Mr. Mohamed?

25  A    Yes.

1    Q    And a photograph of Yahia Megahed, who she also

2    IDed as somebody who frequented the residence,

3    correct?

4    A    Yes.

5    Q    And she also IDed Mr. Yahia Megahed as somebody

6    that she had more direct contact with than Youssef

7    Megahed, correct?

8    A    Yes.

9    Q    And during that interview she told you about an

10    event in early July where she saw Mr. Mohamed with

11    some type of rocket, correct?

12    A    Yes.

13    Q    And at that time she did not identify Youssef

14    Megahed as being present, correct?

15    A    She did not.

16    Q    During that interview she also -- well, you

17    testified that once you found out Mr. Mohamed had

18    vacated the residence, you then asked her for consent

19    to search, correct?

20    A    Yes, I did.

21    Q    And so at that time she also told you that she

22    was present when he vacated the residence, moved out

23    of the residence on August 3rd, correct?

24    A    Yes, she did.

25    Q    You testified that the consent forms, one was on

```
 1    August 10th and one on August 13th.  Signed on those
 2    dates, correct?
 3    A    Yes.
 4    Q    So you went back to the residence on August
 5    10th, 2007, correct?
 6    A    I did.
 7    Q    Was Ms. Poliquin present?
 8    A    Yes, she was.
 9    Q    You spoke to her?
10    A    Yes, I did.
11    Q    And then again on August 13th, 2007, you went
12    back to the residence?
13    A    Yes, I did.
14    Q    Ms. Poliquin was present?
15    A    Yes.
16    Q    And you spoke to her?
17    A    Yes.
18    Q    On neither of those dates did she identify
19    Youssef Megahed as being present on the day she saw
20    Mr. Mohamed with the rocket, correct?
21    A    I did not discuss that with her at those times.
22    Q    But she did -- I'm sorry.  Were you finished?
23    A    At those times I wasn't there to discuss that
24    with her, so it wasn't mentioned.
25    Q    She didn't bring it to your attention?
```

1  A    No.

2  Q    You also interviewed her on August 9th, 2007,

3  correct?

4  A    I don't remember that exact date, but yes.

5  Q    And do you remember whether or not she brought

6  it to your attention on that day that Youssef Megahed

7  was present on the day she saw Mr. Mohamed with the

8  rocket?

9  A    I do not recall.  I only recall the initial time

10  that I spoke to her about that incident with the

11  rocket.

12  Q    You then testified about some seat covers that

13  you removed from the Toyota Camry that was at the FBI

14  impound lot in Tampa, Florida, correct?

15  A    Yes.

16  Q    And were those seat covers, if you remember, on

17  the seats at the time?

18  A    To the best of my recollection, they were.

19  Q    And you removed them and took them to FBI

20  impound or an evidence room?

21  A    Yeah.  I took them to the evidence room, yes.

22  Q    As far as you know, they've been there ever

23  since April 30th, 2008?

24  A    I handed them over and that's my last knowledge

25  of what happened to them.

1     Q    As far as you know, they had been in the Toyota

2     Camry from the day it was impounded and taken to Gray

3     Street, Tampa, where the FBI impound lot is, and the

4     day you removed them on April 30th, 2008?

5     A    Yes.  To my knowledge they had always been in

6     the Camry.

7     Q    And the same goes for the floor mats that you

8     removed?

9     A    Yes.

10     Q    Now, the Government showed you Exhibit 24 D, and

11     you said you recognized the floor mat in that

12     picture, is that correct?

13     A    Yes, the floor mat is right there.

14     Q    And that's the floor mat that you removed and

15     that we're discussing right now, correct?

16     A    Yes, I believe it is.

17     Q    And Mr. Monk asked you if you could see some

18     brown debris there in the floor mat and you said yes?

19     A    Yes.

20     Q    Did you correct that debris?

21     A    I did not collect it separately.  I wrapped them

22     up so that I wouldn't lose anything when I put it

23     into the bag, but I didn't separately collect the

24     debris with swabs or anything.

25     Q    So you took care to remove the floor mats with

1    the debris still in place?

2    A     Yes, I tried my best.

3    Q     And you put that into a bag, an evidence bag?

4    A     I believe so, yes.

5    Q     And you turned it over to someone else in FBI

6    evidence control?

7    A     I checked it into evidence.

8    Q     As far as you know, it's been there ever since?

9    A     As far as I know, unless they removed it.  But

10   it would be on the evidence log.

11         MS. DYER:  Nothing else, Your Honor.  Thank you.

12         THE COURT:  Thank you, Ms. Dyer.

13         Has the United States any redirect examination?

14         MR. MONK:  Yes.

15         THE COURT:  You are recognized for that purpose.

16                     REDIRECT EXAMINATION

17   BY MR. MONK:

18   Q     When you visited Ms. Poliquin for the first time

19   on August 5th, 2007, did you -- were you collecting

20   information to your knowledge for the first time on

21   behalf of the FBI concerning --

22   A     Yes, I was.

23   Q     -- concerning Mr. Mohamed?

24   A     Yes, I was.

25   Q     And on that date when we -- let's address the

1    subject of the rocket --

2    A    Okay.

3    Q    -- that she told you about.  Did she tell you at

4    that time or did you ask her whether anyone was with

5    Mr. Mohamed when she saw the rocket?

6    A    I did not specifically ask her that and she did

7    not tell me.  She was more generally at the time

8    talking about Mr. Mohamed and some things he had

9    shown interest in, and that's how the subject of the

10    rocket came up.  So we were more focused on Mr.

11    Mohamed at the time.

12    Q    And when you spoke with her on subsequent

13    occasions, did you address the topic of that rocket?

14    A    No.  Every time I spoke to her, I was -- it was

15    always regarding Mr. Mohamed.  I was more focused on

16    information regarding Mr. Mohamed that we needed to

17    follow-up with her on.  To be honest with you, I

18    don't believe I spoke with her about either Yahia or

19    Youssef Megahed on my subsequent visits, but that's

20    to my best of my recollection.

21    MR. MONK:  Nothing further.  Thank you.

22    THE COURT:  Thank you, Mr. Monk.

23    If there is nothing further, you may step down

24    and you are excused with our thanks.

25    THE WITNESS:  Thank you very much.

1        (End of excerpt of proceedings.)

2

3               C E R T I F I C A T E

4        I, Kerry Mercade, certify that the foregoing is

5   a correct transcript from the record of proceedings

6   in the above-entitled matter.

7                        S/Kerry Mercade

8                        Kerry Mercade
                           Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25