UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.

CASE NO. 8:07-cr-342-T-23TBM
March 25, 2009
Tampa, Florida

YOUSSEF SAMIR MEGAHED,

Defendant.

_______________________________/

TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
(TESTIMONY OF GEORGE WIEHLE)
BEFORE THE HONORABLE STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JAY HOFFER
ROBERT MONK
Assistant U.S. Attorneys
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
813/274-6000

For the Defendant: ADAM ALLEN
DIONJA DYER
Assistant Federal Defenders
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
813/228-2715

Court Reporter: Kerry Mercade
801 N. Florida Avenue
Suite 15A
Tampa, Florida 33602
813/301-5024

Proceedings recorded and transcribed by computer-aided stenography.

# INDEX

**GOVERNMENT WITNESS GEORGE WIEHLE**
Direct Examination by Mr. Monk............3
Cross-Examination by Ms. Dyer.............

## GOVERNMENT'S EXHIBITS

| Number | Description | Page |
|---|---|---|

(None.)

GOVERNMENT WITNESS, GEORGE WIEHLE, SWORN

THE COURT: State your name, please.

THE WITNESS: George Wiehle.

THE COURT: W-I-L-E-Y?

THE WITNESS: W-I-E-H-L-E.

THE COURT: Please have a seat in the witness stand and I recognize Mr. Monk for your Direct Examination.

W-I-E-H-L-E?

THE WITNESS: Correct.

DIRECT EXAMINATION

BY MR. MONK:

Q Mr. Wiehle, how are you employed?

A I'm the operations manager at the Falkenburg Road Jail.

Q What do you do as the operations manager over there?

A I supervise quite a few of the civilian employees. I do most of the asset control. I do most of the video requests for public records and also all the requests for recording of the video visitation.

Q Were you employed in that same capacity and did you do the same things back in September of 2007?

A Yes.

Q And I think you just told us that one of the things that you do is you control the video recording?
A Correct.
Q What are you talking about when you say that?
A Well, we have a video visitation system.
Q Describe that, please.
A We have a large room with around 70 to 75 computers and each one has a monitor, a camera, and a handset. And at the cell end of the system, we have three of the same type of monitor. And in order to do a visitation, we have the person sitting inside the cell at the monitor, we have the visitors sitting at a monitor, and the computer system then connects at the correct time and they can see and hear each other.
Q Are these -- back in September of 2007, this system that was in place that you are describing, did it involve, say, someone who was incarcerated or in detention having a visit with a visitor through a transparent glass window?
A No. We don't record that.
Q You don't what?
A We don't record anything through glass windows. It's strictly via computer. You're not in the same

room with each other.

Q I should have asked that question. The visitor and the person being detained are not in the same room?

A Correct.

Q Are they in the same building?

A No.

Q They visit one another at some distance, is that correct?

A Correct.

Q Back in August, September, October, November of 2007, were there any signs or admonitions advising visitors and those who were being detained that their visits were subject to being monitored?

A Yes. We have signs on top of the video visitation booths stating in Spanish and English that all communications will be monitored.

Q Now, back in 2007, did a deputy, a Hillsborough County Sheriff's Office deputy by the name of Randy Hierlmeier, ask you to provide him with recordings that were made of visitations involving Youssef Megahed?

A Yes.

Q And did you do so?

A Yes.

Q The visitations at that time, were they routinely recorded?
A No. I get maybe one or two requests every month or two.
Q And in response to Deputy Hierlmeier's request, what did you do?
A He asked that I record all visits for Mr. Megahed no matter when they occurred.
Q What did you do?
A I physically every day would have to go in there and record the visits via computer.
Q And do you actually watch something on a computer screen to make sure that you knew what you were recording?
A Yes.
Q What did you watch?
A On my screen I can see exactly the same thing that the visitor sees.
Q Okay. And what did you do then with the recordings that you made for Deputy Hierlmeier?
A I would hold them in my office and Deputy Hierlmeier would actually pick them up every day or two.
Q Now, I've placed before you what's been marked as proposed Exhibit 65. Could you open that up and

take a look at it?
A (Witness complied.)
Q Okay. Now, that's a -- is that a DVD disc?
A Yes.
Q All right. On or about September 16th, did you provide Deputy Hierlmeier with a visitation recording between Mr. Megahed and one or more members of his family that occurred on that date?
A Yes.
Q Now, have you had a chance to review at least in part what's reflected on proposed Exhibit 65?
A Yes.
Q Do you recall whether -- well, do you recognize that as something?
A Yes.
Q What is that?
A That is a visit between an inmate in the jail and the visitors in the visitation room. It was the one I made. It is the video.
Q Well, more specifically, that's a DVD disc?
A Yes.
Q What you've turned over to Deputy Hierlmeier, was that a DVD disc or was that something else?
A No. That was on a VHS tape.
Q So is it accurate that proposed Exhibit 65 is a

copy of what you turned over?

A Yes.

Q And did you make that copy or did somebody else?

A Someone else made it.

Q And does this appear to you to be an accurate rendition?

A Yes.

MR. MONK: Nothing further.

THE COURT: Thank you, Mr. Monk.

Ms. Dyer, you are recognized for your cross-examination.

MS. DYER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. DYER:

Q Sir, you said you were requested by law enforcement to record every single visit that you Youssef Megahed had, correct?

A Yes.

Q Do you remember how many recordings you compiled?

A It would have been from around the mid of September through the time when he left the facility. He had one visit every day.

Q Do you remember how many that is?

A No, I don't.

Q And you gave them all to law enforcement?
A Yes, sir.

MS. DYER: Nothing else. Thank you, Your Honor.

THE COURT: Thank you, Ms. Dyer.

Any redirect examination?

MR. MONK: No, Your Honor.

THE COURT: In that case, Mr. Wiehle, you may step down and you're excused with our thanks.

(End of excerpt of proceedings.)

C E R T I F I C A T E

I, Kerry Mercade, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

S/Kerry Mercade

Kerry Mercade
Court Reporter