1        UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA
2              TAMPA DIVISION

3   UNITED STATES OF AMERICA

4

5        vs.              CASE NO. 8:07-cr-342-T-23TBM
                          March 26, 2009
6                         Tampa, Florida

7

    YOUSSEF SAMIR MEGAHED,
8
          Defendant.
9
    _____/
10
          TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11       (TESTIMONY OF STACY HOLTHUS - RECALLED)
          BEFORE THE HONORABLE STEVEN D. MERRYDAY
12               UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:   JAY HOFFER
                          ROBERT MONK
15                        Assistant U.S. Attorneys
                          400 N. Tampa Street, Suite 3200
16                        Tampa, Florida 33602
                          813/274-6000
17
    For the Defendant:    ADAM ALLEN
18                        DIONJA DYER
                          Assistant Federal Defenders
19                        400 N. Tampa Street, Suite 2700
                          Tampa, Florida 33602
20                        813/228-2715

21  Court Reporter:       Kerry Mercade
                          801 N. Florida Avenue
22                        Suite 15A
                          Tampa, Florida 33602
23                        813/301-5024

24

25  Proceedings recorded and transcribed by
    computer-aided stenography.

1                                    **INDEX**

2
**GOVERNMENT WITNESS STACY HOLTHUS**
3    Direct Examination by Mr. Hoffer..........3
     Cross-Examination by Ms. Dyer.............17
4    Redirect Examination by Mr. Hoffer........25

5

6                        **GOVERNMENT'S EXHIBITS**

7
     **Number     Description                     Page**
8
     87           Internet saved history.........6
9    88           Images of desktop paths........10

10                       **DEFENDANT'S EXHIBITS**

11
     27           Websites (sugar rockets).......23
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            GOVERNMENT WITNESS, STACY HOLTHUS, SWORN

 2            THE COURT:  State your name.

 3            THE WITNESS:  Stacy R. Holthus.

 4            THE COURT:  Ms. Holthus, I'll recognize Mr.

 5    Hoffer for your Direct Examination.

 6                      DIRECT EXAMINATION

 7    BY MR. HOFFER:

 8    Q    Ms. Holthus, good morning.

 9    A    Good morning.

10    Q    Following up on your testimony of the other

11    day --

12            MR. HOFFER:  If I could, let me approach the

13    witness, Your Honor, if I may?

14            THE COURT:  You may.

15    BY MR. HOFFER:

16    Q    Ms. Holthus, I've placed before you an exhibit

17    which is marked for identification as Government's

18    Exhibit 87.  Do you have that document there in front

19    of you?

20    A    I do.

21    Q    Have you seen that document before coming to

22    court this morning?

23    A    Yes, I have.

24    Q    And do you recognize the contents of it or what

25    it is?
```

1    A    I do.

2    Q    Without telling us the specific contents in it,

3    can you tell us the general nature of what the

4    document contains as far as where it is from as far

5    as you know and -- where it's from, first of all?

6    A    These are files that were saved in a folder

7    named "bomb shock."

8    Q    Did you have occasion to recover or find those

9    files in the course of your employment as a forensic

10    examiner with the FBI?

11    A    I did.

12    Q    Do you recall where it was or from where you

13    located those particular documents in their original

14    form?

15    A    Yes, I do.  These files were in the folder bomb

16    shock.  And this folder bomb shock is in a folder

17    called my documents.  And this my documents folder is

18    associated with the main user of this computer.  So

19    it is the main user's folder named my documents and

20    then bomb shock resides within there.

21    Q    Now, the computer on which these items resided,

22    what computer is that?

23    A    That is that HP laptop from yesterday.

24    MR. HOFFER:  May I approach the witness again,

25    Your Honor?

1          THE COURT:  You may.

2     BY MR. HOFFER:

3     Q     Ms. Holthus, would that be this computer,

4     Government's 3 A?

5     A     Yes.

6     Q     And is that the computer you first contacted

7     when and where?  When is the first contact you had

8     with that computer?

9     A     On August 4th of 2007.

10    Q     And where was that?

11    A     In Goose Creek, South Carolina.

12    Q     How was it that you're able to tell or know that

13    the contents of 87 that you have before you came from

14    somewhere within that Government's 3 A, that HP

15    laptop?

16    A     I had previously verified that these were the

17    same files that I had found on that HP laptop.

18    Q     How did you verify that?

19    A     I verified that by exporting those files for the

20    agents and then they printed the files, and then I

21    compared the files they printed to the files that I

22    had provided them electronically.

23         MR. HOFFER:  Your Honor, at this point I would

24    offer Government's Exhibit 87.

25         MS. DYER:  Your Honor, I'd renew the relevancy,

1    401/403 objection.

2        THE COURT:  Overruled.  Exhibit 87 is received

3    on behalf of the United States.

4        (Government's Exhibit No. 87 is received into

5    evidence.)

6    BY MR. HOFFER:

7    Q    And would that mean, Ms. Holthus, then that the

8    information contained in Government's 87, would that

9    have been on that hard drive I think that we saw

10   yesterday, Government's Exhibit 3 B that was in that

11   laptop?

12   A    Yes, it was.

13   Q    Let me ask you a bit -- first of all, are you

14   able to tell based upon your experience and your

15   knowledge and training and the examination of the

16   laptop, it's hard drive, et cetera, do you know if

17   the person or persons who possessed that laptop, did

18   they create these documents themselves or can you

19   tell if they were created somewhere else?

20   A    The user of the laptop chose to save these files

21   onto their laptop from the Internet.

22   Q    And for those who may not be that familiar with

23   the terminology, when you say saving a file from the

24   Internet, can you explain a bit about what you mean?

25   A    At the time they were viewing these files on the

1    Internet and they took the time to do some file

2    clicking, and click on file and then click save as

3    and they deliberate chose to save these files to

4    their computer.

5    Q    And are you actually able to forensically tell

6    that this information, if you will, wasn't just typed

7    out by a person and put in their computer - that it

8    came from somewhere else?

9    A    I'm able to tell that these files were saved

10   from the Internet because I was also able to retrieve

11   the user's Internet history.  I was able to tell that

12   they first viewed the website on the Internet, and

13   then I saw whether they saved the file next.

14   Q    When a file is saved in that manner from

15   something out there on the Internet, does it change

16   the content of what is being viewed initially or in

17   any way?

18   A    No, it does not.

19   Q    Now, the area on the computer, on the laptop

20   computer in these files that you have in Government's

21   87 was located at -- the area on the laptop, where

22   specifically again was that?  In what area?

23   A    It was in a folder named bomb shock, which was

24   in the my documents folder.

25   Q    Were either one of those two locations, the my

1    documents folder, if you will, and the folder named

2    bomb shock?

3    A    Bomb shock.

4    Q    Were either one of those subject based upon your

5    examination to any password protection or security

6    measures on the HP laptop computer?

7    A    No, they were not.

8    Q    And the absence of those measures that you

9    detected meant what as far as ability to get to them?

10   A    That anyone would be able to access those files.

11   Q    How difficult would it be to navigate from

12   starting up the computer, powering it up, and finding

13   these items on there?

14   A    It would be easy to get to these files.  There

15   are two and quick and easy ways.  The user can choose

16   to click on start and then a menu pops up.  There is

17   an icon for my documents.  You click on that and that

18   would open my documents.  Then you could see the bomb

19   shock folder and click on that.  Or the user simply

20   has to double click on my documents, which is on

21   their desktop, which is the first thing that they'll

22   see, and then after clicking on my documents, they'll

23   see the bomb shock folder.

24   Q    Now, let me also ask you to take a look at for a

25   moment the exhibit before you that is marked for

1    identification as Government's 88.  Do you have that

2    there, ma'am?

3    A    I do.

4    Q    And have you seen what's depicted in that

5    exhibit today prior to testifying?

6    A    Yes, I have.

7    Q    And without telling us the specific contents of

8    it, can you just tell us generally speaking what is

9    the nature of the content itself in this exhibit?

10   A    These are files and folders that were in the

11   bomb shock folder.

12   Q    And do you know from examining this whether this

13   material that is depicted in Government's 88 before

14   you also resided or was on the HP laptop computer, 3

15   A, on the evening of August 4th of 07?

16   A    Yes, it did.

17   Q    How do you know that?

18   A    Through the work of my forensic examination.

19   Q    Specifically, what type of work did you do to

20   determine that?

21   A    I was able to review all the files and folders

22   on the hard drive at that time and the dates and

23   times of those files and folders.

24        MR. HOFFER:  Your Honor, at this point I'd offer

25   Government's Exhibit 88.

1    MS. DYER:  No objection.

2    THE COURT:  88 is received on behalf of the

3    United States.

4    (Government's Exhibit No. 88 is received into

5    evidence.)

6    MR. HOFFER:  Request to publish, Your Honor.  I

7    would need to use the monitor for a few minutes.

8    THE COURT:  All right.  If we would pull down

9    the lights.

10   BY MR. HOFFER:

11   Q    Ms. Holthus, I have placed on the monitor -- let

12   me just make sure it's all there.  The first page of

13   Government's Exhibit 88, you have that there in front

14   of you.  Let me first ask you what is depicted here,

15   was that information that was contained specifically

16   on 3 A, the laptop computer, back on August 4th?

17   A    Yes, it was.

18   Q    Did the contents and the images and all that you

19   see on this first page appear in that same manner or

20   form on that evening when you did your examinations

21   initially?

22   A    Yes, it did with the exception of that dollar

23   I30 file.  The user would not have been able to see

24   that file.

25   Q    Where is that, ma'am?

1    A    (Witness indicated.)

2    Q    And you said yesterday something about that.

3    What kind of file or image is that?

4    A    That's a system file, so the user would not be

5    able to see that file.

6    Q    This Page 1 which contains these various yellow

7    images and white and blue images, the yellow images

8    represent what?

9    A    Those are folders which can contain more folders

10   or files.

11   Q    And the white images with the E in blue?

12   A    Those are HTML files which are related to the

13   Internet.

14   Q    When you see an image like that with that white

15   and blue E on it, what kind of an item is it

16   specifically?

17   A    It's an item that would be opened by the

18   Internet Explorer.

19   Q    Up at the very top, you've got this D bomb shock

20   in that white box at the very top, what does that

21   represent or mean if you can tell us?

22   A    This shows where the person was viewing these

23   files from at the time.  In this case they were

24   viewing it from a CD that I had previously made for

25   them.

1    Q    As far as the appearance of these materials and

2    contents on the computer as it was the evening or

3    night of August 4th of 07, were these images and the

4    contents that they represent there on that computer

5    at that time?

6    A    Yes, they were.

7    Q    Well, let me ask you if you go -- well, maybe I

8    should ask it this way.  How does -- how would one

9    who received that laptop such as you did on the night

10    of August the 4th, assuming they starting it up if it

11    was turned off at the time, how would one get

12    specifically to this location with these folders and

13    these images?

14    A    Could you please clarify if you mean if I was

15    the user or I was the forensic examiner?

16    Q    If you are the user, someone just turning it on.

17    Assuming it's turned off and has to be turned on,

18    could you take us through the steps to get to this

19    location represented here on Page 1 of this exhibit?

20    A    The user would have to power on the laptop and

21    then they would have to click on the user name, and

22    then the computer would log the user in, and then

23    they could simply double click on the my documents

24    folder, which is on the desktop.  Then they would see

25    the bomb shock folder, and then they could double

1    click on the bomb shock folder and then you could see

2    what is displayed on the screen.

3    Q    By the way, when you looked at it yesterday, we

4    had an exhibit much like this, did -- the previous

5    screen that comes up before you get to this location,

6    was that contained in the exhibit you looked at

7    yesterday?

8    A    No, it was not.

9    Q    So how many steps would you have to take to get

10    to this location represented here in Page 1 of

11    Government's 88 once you turn the thing on?

12    A    After you get logged in, there's really on three

13    steps that you would have to take to get to this bomb

14    shock folder.

15    Q    How long would that take you?

16    A    I would say under a minute if you knew where the

17    files were.

18    Q    Now, the second page of this exhibit looks

19    somewhat similar but there is a slight difference

20    there.  Can you tell us what's represented in that

21    second page?

22    A    In this case the user has chosen to highlight

23    the folder called acetone peroxide files.

24    Q    And when you say highlight, what do you mean?

25    A    They've clicked on it with the mouse.

1    Q    And the purpose of doing that would be what?

2    What do you do when you highlight or click on it with

3    a mouse?  What happens?

4    A    Its will display information or your next step

5    may be to open that file or folder.

6    Q    Let's turn to Page 3 now.  What's represented on

7    Page 3, if you could tell us the sequence here?

8    A    In this screen you can see the files that were

9    in the acetone peroxide folder.

10    Q    Now there is one that has this blue again.  Does

11    that represent or show what would happen when

12    somebody clicked on that with the mouse to try to

13    gain access to it?

14    A    Yes.

15    Q    Based upon your knowledge of what the contents

16    of that computer, the next page has photographs.  Was

17    that something that would come up once you clicked on

18    the little figure that says acetone?

19    A    Yes, it is.

20    Q    In other words you just go from one page to

21    another and that's the progress you make to get to

22    those different component parts of the computer

23    files, right?

24    A    Yes, it is.

25         MR. HOFFER:  If I can have a moment, Your Honor?

1          (Pause.)

2     BY MR. HOFFER:

3     Q     Now, you were involved, were you not, in

4     actually preparing this exhibit or helping it to be

5     prepared, is that correct?

6     A     That is correct.

7     Q     For example, we're on I think Page 9 of

8     Government's Exhibit 88.  Just so I understand,

9     again, we're at the same initial site that we were on

10    Page 1 but now a different component part as been

11    highlighted with the blue box underneath?

12    A     That is correct.

13    Q     And based on your understanding of the contents

14    of that computer, once that happens, what happens as

15    far as -- Page 10 is the next entry here.  Is that

16    what actually comes up once that image is clicked on

17    or highlighted?

18    A     Yes, it is.

19    Q     So this is acetone peroxide.  For the record,

20    it's Page 10 of the exhibit.

21          MR. HOFFER:  If I can have a moment, Your Honor?

22          THE COURT:  You may.

23          (Pause.)

24    BY MR. HOFFER:

25    Q     And just so it is clear right there, there are

1    various images.  Like we're on Page 10 and there is

2    two halves, top and bottom, and you've got this half

3    here now.  What does that mean as far as what you see

4    on the computer when you're into this file or into

5    this location?

6    A    Because this is an HTML web page, the user can

7    scroll down for a very long ways.  In this case the

8    first top of the page is the first half of the page

9    that the user would see on their computer screen.

10   Then what you see now is what the user would see if

11   they scroll down farther on that same page.

12   Q    The succeeding pages of that just show the rest

13   of the document as you scroll down or work down

14   through it?

15   A    That is correct.

16   Q    And you verified -- again, did you verify by

17   using the algorithms or some other way that this

18   material, this very data and information was on that

19   laptop on the evening of August 4th of 07?

20   A    I did two different things.  First, I exported

21   all the files and saved them to a CD.  Then I did MD5

22   those files on that CD to ensure they were exactly

23   the same as what was on the laptop.  Then after the

24   files were printed out, I visually verified them to

25   ensure that they matched what was on the CD.

1    Q    When you say MD5ed it, again, that was the

2    mechanical process you talked about yesterday?

3    A    Yes, it is.

4         MR. HOFFER:  If I could have one more moment,

5    Your Honor?

6         THE COURT:  You may.

7          (Pause.)

8         MR. HOFFER:  Thank you, Your Honor.  I have no

9    further questions of this witness at this point.

10        THE COURT:  Has the defense cross-examination

11   for this witness?

12        MS. DYER:  If I may, Your Honor?

13        THE COURT:  You are recognized for that purpose,

14   Ms. Dyer.

15                    CROSS-EXAMINATION

16   BY MS. DYER:

17   Q    Hello again, Ms. Holthus.

18   A    Good morning.

19   Q    Ma'am, you were just asked a series of questions

20   about Government Exhibit 88, which I'm showing on the

21   screen now, by Mr. Hoffer.  You said that these were

22   files that were on the laptop computer seized from

23   the car on August 4th of 2007, correct?

24   A    Correct.

25   Q    And when he turned to Page 2, he asked you what

1   this highlight meant and you said that that meant

2   somebody was double clicking on that specific folder?

3   A    Yes.  That's what they're trying to display in

4   this picture.

5   Q    Right.  "They" being somebody from your lab,

6   correct?

7   A    It was one of the agents working on this case.

8   Q    So this depicts that one of the agents was

9   clicking on this folder?

10  A    Yes.

11  Q    It doesn't show that at some time a user of the

12  laptop before it was seized was clicking on the

13  folder, correct?

14  A    That's not what it's currently displaying.

15  Q    So the process and the steps that Exhibit 88

16  goes through on each page is just what an agent did

17  in this case, correct?

18  A    It's showing how the -- all the different files

19  and folders that are nested together.

20  Q    You're aware, are you not, that a Sony thumb

21  drive was seized from the same car that the laptop

22  was in and submitted to your lab as QC05?

23  A    Yes, I am.

24  Q    Do you know a Phil Coughlin (ph)?

25  A    I do.

1    Q    Is he somebody that worked with you in the lab

2    in Columbia, South Carolina in August 2007?

3    A    He is.

4    Q    Did you submit that thumb drive to him for

5    analysis?

6    A    He was the case agent who reviewed the files on

7    that thumb drive for content.

8    Q    And a thumb drive is something that you can save

9    information on, correct?

10    A    Yes.

11    Q    And you're aware that that analysis showed that

12    a 1998 Toyota Camry automobile repair manual was

13    saved on that thumb drive?

14    A    I'm not aware of that.

15    Q    Would reviewing the analysis of that thumb drive

16    refresh your memory?

17    A    No.  Because -- he reviewed the contents of the

18    files, so I have not read the files.

19    Q    Now, you testified that the documents -- do you

20    still have Government's 87?

21    A    I do.

22    MS. DYER:  May I approach the witness, Your

23    Honor?

24    THE COURT:  You may.

25    BY MS. DYER:

```
 1    Q    You testified that the documents that make up
 2    Government's 87 were recovered from the my documents
 3    folder or file on the laptop, correct?
 4    A    Yes.
 5    Q    And that that my documents file -- is it a file
 6    or a folder?
 7    A    It is a folder.
 8    Q    Thank you.  Folder was associated with the main
 9    user of that laptop, correct?
10    A    That is correct.
11    Q    And that same string of information that gave
12    you that information shows that that person is Ahmad,
13    A-H-M-A-D, correct?
14    A    Yes.
15    Q    Now, you testified that this information was
16    initially viewed on the Internet, correct?
17    A    Yes, that is correct.
18    Q    And you testified that "they" viewed it on the
19    Internet.  You meant the main user, correct?
20    A    I did.
21    Q    And you said that you went and checked the
22    Internet history to confirm that it actually came
23    from the Internet, correct?
24    A    Yes.
25    Q    And when you did that, you were able to
```

1    determine that this was not viewed on the Internet on

2    August 4th, 2007, correct?

3    A    That is correct.

4    Q    And then you said that the main user Ahmad

5    downloaded it and saved it onto the laptop and that's

6    why it was there when you got the laptop, correct?

7    A    Yes.

8    Q    And you were able to determine that it was not

9    saved on August 4th, 2007, correct?

10    A    Correct.

11    Q    And you were also able to determine that these

12    files were never accessed on August 4th, 2007,

13    correct?

14    A    Correct.

15    MS. DYER:  May I approach the witness, Your

16    Honor?

17    THE COURT:  You may.

18    BY MS. DYER:

19    Q    I'm showing you what's been marked for

20    identification as Defense Exhibit 27.  Take a look at

21    that and see if you recognize it from this case.

22    A    I do.

23    Q    And how do you recognize it?

24    A    What is printed here is familiar to me from

25    viewing the contents of the laptop.

1    Q    So these items came from the laptop as well?

2    A    Yes.

3         MS. DYER:  At this time, Your Honor, I would

4    move into evidence Defense Exhibit 27.

5         MR. HOFFER:  May I see the exhibit, Your Honor?

6         THE COURT:  You may.

7         MR. HOFFER:  Objection, Your Honor, relevance.

8         THE COURT:  Well, then come to side bar and let

9    me resolve the objection.

10        (At side bar, on the record.)

11        THE COURT:  Ms. Dyer, what is the relevance of

12   the contents of Defendant's Exhibit 27?

13        MS. DYER:  Yes, Your Honor.  The relevance is

14   that if the items in Government Exhibit 87 are

15   relevant to show Mr. Mohamed's intent to make a

16   weapon, these show an alternative intent to make what

17   was actually in the car since the items in this

18   exhibit describe items in the car as opposed to

19   what's in Government's Exhibit 87.

20        THE COURT:  Mr. Hoffer?

21        MR. HOFFER:  I don't see how information about

22   someone's intimate knowledge about legal matters have

23   anything to do with information about illegal matters

24   and relating to possession of illegal materials.

25        THE COURT:  Overruled.  Exhibit 27 is received

1    on behalf of the defense.

2         MS. DYER:  Thank you, Your Honor.

3         THE COURT:  Wait, Ms. Dyer.

4         Were you finished?

5         MR. HOFFER:  I was.

6         THE COURT:  I didn't mean to cut you off.  I

7    realized I may have done that.

8         MR. HOFFER:  That's fine, Your Honor.  You got

9    the gist of what I was going to say.

10         (End of side bar discussion.)

11         THE COURT:  Exhibit 27 is received on behalf of

12    the defense.

13         (Defendant's Exhibit No. 27 is received into

14    evidence.)

15    BY MS. DYER:

16    Q    Ma'am, just to recap, you testified that Defense

17    Exhibit 27 came off the same laptop that Government

18    Exhibit 87 came off of, correct?

19    A    Yes.

20         MS. DYER:  Your Honor, if I may publish just a

21    few of the items?

22         THE COURT:  You may.  I think that exhibit is

23    not paginated consecutively, so it may be difficult

24    to identify what you are displaying.

25         MS. DYER:  I have a suggestion, maybe.

1        THE COURT:  Anything will do as long as it

2    will --

3        MS. DYER:  You are correct.  They are not in any

4    numerical order.  I'm only going to publish three and

5    I have them tabbed.  Then I'll go back and count and

6    designate.

7        THE COURT:  Or at least stick maybe a tap, a

8    subtab in there somewhere and just staple it that

9    says 27 A, 27 B and 27 C.

10        MS. DYER:  Yes, Your Honor.

11        THE COURT:  The A, B, and C being a distinct

12    page.  If we just do it that way, it'll be simple.

13        MS. DYER:  Yes, Your Honor.

14        THE COURT:  Most of these exhibits that's not a

15    problem, but that one is sufficiently bulky that I

16    think it's a problem.

17        MS. DYER:  Yes, Your Honor.

18    BY MS. DYER:

19    Q     Showing what has now been admitted into evidence

20    as Defense 27 A.  This is a Wikipedia page on rocket

21    propellant?

22    A     It appears to be that.

23    Q     Showing you now Defense 27 B.  It's an article

24    on pyrotechnic devices?

25    A     Yes.

1    Q    And now Defense 27 C, an article on bottle

2    rockets?

3    A    Yes.

4    Q    And you would agree with me that all of this

5    information consisting of the total Defense 27 is

6    similarly related articles?

7    A    Yes.

8         MS. DYER:  I have nothing else, Your Honor.

9    Thank you.

10        THE COURT:  Thank you, Ms. Dyer.

11        Is there any redirect examination, Mr. Hoffer?

12        MR. HOFFER:  There is, Your Honor.

13                    REDIRECT EXAMINATION

14   BY MR. HOFFER:

15   Q    Ms. Holthus, you said a couple of seconds ago or

16   minutes ago that to get to any of these items either

17   in 87 or in Defendant's 27, you have to start out

18   going through the main user account, I think you

19   said, or something like that?

20   A    Yes, I did.

21   Q    And the main user account screen or where you

22   get in through that is the first thing you get when

23   the computer comes on, is that correct?

24   A    Yes, it is.

25   Q    Can anyone click on this on this particular

1    computer as opposed to having some special access or

2    security password?

3    A    Anyone can access this user's log-in because

4    there is no password.

5    Q    Is it also true, ma'am, that anyone with access

6    to that computer, since there is no password or

7    security, could use it to search for items on the

8    Internet?

9    A    That is correct.

10   Q    Is it also true, ma'am, that anyone with access

11   to that computer and having it could go on the

12   Internet, find an item, and download it?

13   A    Yes, it is.

14   Q    Can you tell now or could you tell back in

15   August of 07, as you analyzed the computer, who

16   specifically went onto the Internet with that

17   computer and found those -- that information and

18   downloaded it there?

19   A    No, I'm not.

20   Q    So anyone could who had -- was into that user

21   account?

22   A    Yes.  Anyone could have been using that account.

23   Q    Now, you also were able to tell whether things

24   were viewed on a specific day or not that were in the

25   computer in any manner, correct?

1    A    Yes.

2    Q    These items that were in Defendant's 27, were

3    they accessed on August 4th of 2007?

4    A    No, they were not.

5    Q    In fact, you were asked -- let me ask you how is

6    it that you can tell by looking at, for example, this

7    compilation, and it's a pretty thick packet of items

8    from Defendant's 27 -- how could you tell by looking

9    at it that it came off of that laptop?

10   A    I flipped through the pages of that document and

11   I recognized several of the pages.  Obviously, I did

12   not read it or look at every single page.

13   Q    For example, this I think is the first page of

14   the group and I have to zoom out.  This is on

15   KN-Sucrose fuel, that you recognize as being

16   something that was on the computer as of August 4th

17   of 2007?

18   A    I do.

19   Q    But you don't know when it was saved to the

20   computer?

21   A    I do not.

22   Q    You don't know who specifically did that?

23   A    I do not.

24   Q    So I understand it correctly, once an item such

25   as that or Government's 87, their contents, is

1    downloaded and in that computer, does it stay there
2    forever or what happens to it?
3    A    That file will stay on the computer until the
4    user chooses to delete it.
5    Q    Did you find any indication that any of this
6    stuff, 87, for example, or Defendant's 27 got deleted
7    prior to August 4th of 07?
8    A    I believe all these files were active files,
9    meaning they had not been deleted.
10        MR. HOFFER:  Can I have a moment, Your Honor?
11        THE COURT:  You may.
12        MR. HOFFER:  Thank you.  Your Honor.  I have no
13    further questions of this witness.
14        THE COURT:  If there is nothing further, Ms.
15    Holthus, you may step down and you are excused with
16    our thanks.
17        (End of excerpt of proceedings.)
18
19                C E R T I F I C A T E
20        I, Kerry Mercade, certify that the foregoing is
21    a correct transcript from the record of proceedings
22    in the above-entitled matter.
23                                S/Kerry Mercade
24                                Kerry Mercade
                                  Court Reporter
25