1   UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF FLORIDA
2            TAMPA DIVISION

3   UNITED STATES OF AMERICA

4

5        vs.              CASE NO. 8:07-cr-342-T-23TBM
                          March 26, 2009
6                         Tampa, Florida

7

    YOUSSEF SAMIR MEGAHED,
8
         Defendant.
9
    _____/
10
         TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11         (TESTIMONY OF ALAN BROWN - RECALLED)
         BEFORE THE HONORABLE STEVEN D. MERRYDAY
12              UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:  JAY HOFFER
                        ROBERT MONK
15                      Assistant U.S. Attorneys
                        400 N. Tampa Street, Suite 3200
16                      Tampa, Florida 33602
                        813/274-6000
17
    For the Defendant:  ADAM ALLEN
18                      DIONJA DYER
                        Assistant Federal Defenders
19                      400 N. Tampa Street, Suite 2700
                        Tampa, Florida 33602
20                      813/228-2715

21  Court Reporter:     Kerry Mercade
                        801 N. Florida Avenue
22                      Suite 15A
                        Tampa, Florida 33602
23                      813/301-5024

24

25  Proceedings recorded and transcribed by
    computer-aided stenography.

1                            **INDEX**

2
**GOVERNMENT WITNESS ALAN BROWN**
3    Direct Examination by Mr. Monk...........3
     Cross-Examination by Ms. Dyer............21
4

5
                    **GOVERNMENT'S EXHIBITS**
6

7      **Number      Description                   Page**

8      15 E 1      Nokia cell phone records.......4
       15 E 2      Samsung cell phone records.....4
9      17 C - D    Seat cover boxes..............15
       67 A        Bag of twist ties.............9
10     67 B        Receipt (Harbor Freight Tools).9
       81          PVC pipe cutter and hammer.....21
11     84          Search warrant (Toyota Camry)..6

12
                    **DEFENDANT'S EXHIBITS**
13

14     1 E         Identification cards..........28
       33          X-ray of Toyota Camry.........24
15

16

17

18

19

20

21

22

23

24

25

1        GOVERNMENT WITNESS, ALAN BROWN, SWORN

2        THE COURT:  State your name.

3        THE WITNESS:  Alan Brown.

4        THE COURT:  Please have a seat in the witness

5  chair and I will recognize Mr. Monk for your Direct

6  Examination.

7               DIRECT EXAMINATION

8  BY MR. MONK:

9  Q   Special Agent Brown, you previously testified.

10  I want to focus your attention on just a couple of

11  discrete matters.

12        MR. MONK:  If I may approach the witness?

13        THE COURT:  You may.

14  BY MR. MONK:

15  Q   I'm handing you what's been marked as proposed

16  Exhibit 15 E 1 and 15 E 2.

17        MR. MONK:  Your Honor, may I take a moment to

18  remove some of the other exhibits that are up here?

19        THE COURT:  Yes, sir.

20  BY MR. MONK:

21  Q   Do your recognize proposed Exhibits 15 E 1 and

22  15 E 2?

23  A   Yes, sir, I do.

24        MR. MONK:  Your Honor, at this time I move for

25  admission into evidence of those proposed exhibits.

1      MS. DYER:  No objection.

2      THE COURT:  15 E 1 and 15 E 2 are received on

3   behalf of the United States.

4      (Government's Exhibit Nos. 15 E 1 and 15 E 2 are

5   received into evidence.)

6   BY MR. MONK:

7   Q    Let's take a look first at 15 E 1.  Can you tell

8   us, sir, whether those are phone records for a Nokia

9   cell phone?

10  A    Yes, sir, they are.

11  Q    What is the cell phone number?

12  A    The phone number is going to be (813)514-51 --

13  excuse me, 514-5154.

14  Q    According to the records that cell phone was

15  subscribed to by who?

16  A    Ahmed Mohamed.

17  Q    And then with respect to 15 E 2.  Is that a cell

18  -- are those records relating to a Samsung cell

19  phone?

20  A    Yes, sir, they are.

21  Q    And the cell phone number is what?

22  A    That number is (813)382-8010.

23  Q    Subscribed to by who?

24  A    Yahia Megahed.

25  Q    Did Mr. Yahia Megahed, if you know, actually

1    subscribe to a number of telephone numbers, one of

2    which was the phone number that ended in 8010?

3    A    Yes, sir, that's correct.

4    Q    And the Samsung cell phone, the number of which

5    ends in 8010, was that in Youssef Megahed's

6    possession when he was arrested on August 4th of

7    2007?

8    A    Yes, sir, it was.

9    Q    I'd like to ask you a few questions relating to

10   the Toyota Camry about which there has previously

11   been testimony, the car that was stopped by the

12   Berkeley County sheriff's deputies.  When was your

13   first contact with that vehicle?

14   A    That would have been I believe in September of

15   2007.

16   Q    And where was the vehicle when you had contact

17   with it?

18   A    It was at an impound storage lot near Goose

19   Creek, South Carolina.

20   Q    Did law enforcement agents acquire a search

21   warrant for that automobile?

22   A    Yes, sir.

23   Q    And was the automobile taken pursuant to that

24   warrant from South Carolina to Tampa?

25   A    Yes, it was.

1     MR. MONK:  If I may approach the witness, Your

2  Honor?

3     THE COURT:  You may.

4  BY MR. MONK:

5  Q    Please take a look at proposed Exhibit 84 and

6  tell us whether you recognize that, please.

7  A    Yes, sir, I do.

8  Q    How is it you recognize it?

9  A    This is the search warrant that was signed by a

10  magistrate judge in South Carolina for the search

11  warrant for the Toyota Camry.

12     MR. MONK:  I move for admission of proposed

13  Exhibit 84.

14     MS. DYER:  No objection.

15     THE COURT:  Exhibit 84 is received on behalf of

16  the United States.

17     (Government's Exhibit No. 84 is received into

18  evidence.)

19  BY MR. MONK:

20  Q    Now, was that car transported back to Tampa?

21  A    Yes, sir, it was.

22  Q    And how did that occur?

23  A    Myself and Special Agent French, we drove from

24  Tampa, Florida to South Carolina where we met with

25  Berkeley County detectives and the FBI, and we

1     removed the -- picked up the vehicle from the impound

2     storage lot, put it on a dolly trailer and pulled it

3     back to Tampa, Florida.

4     Q    And do you know the approximate mileage between

5     the location -- was it in Berkeley County, where the

6     car was acquired?

7     A    Yes, sir, I believe it was.

8     Q    The approximate mileage between that location

9     and the FBI offices in Tampa, Florida?

10    A    I would say approximately 500 miles.

11    Q    And approximately how long did it take to

12    transport that vehicle from that location in South

13    Carolina to Tampa?

14    A    Approximately six and a half hours.

15    Q    And has it remained since it was brought to

16    Tampa in the FBI's custody?

17    A    Yes.  It's in a locked area, actually a double

18    locked area within the FBI working space.

19    Q    Have you had occasion to go into that vehicle

20    and examine that car?

21    A    Yes, sir, I have.

22    Q    Have you determined whether there are within

23    that automobile any power sources that are capable of

24    accommodating electrical devices such as a Garmin

25    global positioning system or a power inverter?

1    A    Yes, sir.

2    Q    And how many such power sources are there?

3    A    When I looked in the vehicle in the passenger

4    compartment there was two power sources.

5    Q    Do you know whether they both work?

6    A    Yes, sir.  I tested both of the 12 volt power

7    receptacles and they both worked.

8    Q    Did they both work simultaneously?

9    A    Yes, sir.

10    Q    Can you describe for us the condition of the

11    seats within that car, specifically the driver and

12    the passenger front seats?

13    A    The front seats?  I would say they were fair to

14    good condition.

15    Q    Did you determine whether the gasoline gauge in

16    that automobile was in working condition?

17    A    Yes, sir, I did.

18    Q    And was it?

19    A    Yes, it was operating.

20    Q    At the time you brought the car back to Tampa,

21    did you observe what the gas gauge read?

22    A    Yes, sir, I did.

23    Q    And what was that?

24    A    It was at a half a tank of fuel.

25        MR. MONK:  If I may approach the witness?

1      THE COURT:  You may.

2    BY MR. MONK:

3    Q    Show you what's been marked as 67 A and 67 B.

4    Tell me whether you recognize those proposed

5    exhibits.  Don't tell me what they are, please, just

6    tell me whether you can recognize them and how?

7    A    Yes, sir.  I recognize both 67 A and 67 B.

8    Q    Were these items that were taken from that car?

9    A    Yes, sir, they were.

10      MR. MONK:  I move for admission of proposed

11    Exhibits 67 A and B.

12      MS. DYER:  No objection.

13      THE COURT:  67 A and 67 B are received on behalf

14    of the United States.

15      (Government's Exhibit Nos. 67 A and 67 B are

16    received into evidence.)

17    BY MR. MONK:

18    Q    What is 67 A, sir?

19    A    67 A is a package of plastic wire ties.

20    Q    And where was that taken from in that vehicle?

21    A    This was taken out of the passenger compartment

22    of the Toyota Camry.

23    Q    What about 67 B?  What is that?

24    A    67 B is a sales receipt from Harbor Freight

25    Tools for August 1st for the wire cable ties.

1        MR. MONK:  If I may approach again?

2        THE COURT:  You may.

3    BY MR. MONK:

4    Q    May I have those, please?

5    A    Sure.

6    Q    Do you know based upon records, specifically

7    bank records, who purchased these ties from Harbor

8    Freight?

9    A    Yes, sir.  If I could refer to one of the

10   exhibits here?

11   Q    Is this an exhibit that is in evidence?

12   A    Yes, sir, I believe it is.  It's Exhibit 39 A.

13   This is the bank records from Bank of America for

14   Youssef Samir Megahed.  And after examining these

15   records I found a corresponding bank record from

16   Harbor Freight, which matched the day in which the

17   cable ties were purchased.

18       MR. MONK:  I'll just put these on the monitor

19   for a second, Your Honor.

20   BY MR. MONK:

21   Q    This is the package, is that correct?

22   A    Yes, sir, that is the packaging.

23   Q    This receipt, 67, reflects, does it not -- it's

24   really difficult to see this.  Can you make out the

25   purchase date on the receipt?  Could you tell what

1    that was?

2    A    Yes, sir.  It was August 1st, 2007.

3    Q    Now, were you in the courtroom during Deputy

4    Taylor's testimony?

5    A    Yes, sir, I was.

6    Q    Do you recall whether he testified that he -- as

7    he approached the vehicle he saw what he believed

8    were two Korans that Youssef Megahed was holding, do

9    you recall that?

10    MS. DYER:  Your Honor, I would object.

11    THE COURT:  What's the legal basis for your

12    objection, Ms. Dyer?

13    MS. DYER:  403, Your Honor.  Can we approach?

14    THE COURT:  You may.

15    (At side bar, on the record.)

16    THE COURT:  Is this your witness?

17    MR. ALLEN:  No, Your Honor.

18    THE COURT:  Then it's you and not you, according

19    to the local rules.  Yes, ma'am?

20    MS. DYER:  Your Honor, it's my understanding

21    that Mr. Allen and Mr. Monk had an agreement that

22    there would be no mention of Korans being in the

23    vehicle.

24    THE COURT:  We haven't mentioned them so far.  I

25    don't remember the other witness mentioning them.

1        MS. DYER:  Obviously the Court can view the

2   question.  I believe the question was --

3        THE COURT:  I'm sorry.  I know Mr. Monk

4   mentioned it.  His question technically was did this

5   witness recall the other witness' testimony.  I don't

6   remember the other -- that's just me though.  I may

7   be wrong.  I don't remember the other witness

8   testifying at any Korans, two Korans being seen.

9        MR. MONK:  Here is why I'm asking the question,

10   Your Honor.  Only because the defense has pointed out

11   that there were what appeared to be school texts in

12   the car.

13        THE COURT:  What texts?

14        MR. MONK:  School books.  And one was observed

15   in the back seat.  And I'm anticipating an argument

16   that --

17        THE COURT:  There was one on the photograph.

18   You could see the USF library book on the photograph.

19        MR. MONK:  Right.  And I'm anticipating an

20   argument that what he threw into the back seat was

21   one of the books that the deputy said he had in his

22   lap.  And for no purpose other than that.  And the

23   context of our discussion regarding the Korans was in

24   the context of Lamar Blakely's testimony.  And I

25   advised Mr. Allen -- Mr. Allen expressed a concern

1    that Blakely might testify that his suspicions were

2    peaked by the fact that they found Korans in the car.

3    I told him that it was my belief that based upon my

4    interview of Blakely that Blakely was not going to

5    testify to that effect, rather he was going to

6    testify that his suspicions were peaked by the

7    indicia of possible narcotics trafficking activity.

8    We did have an agreement but it was to the effect

9    that I just mentioned.  Again, it's for no other

10    reason than to point out that they weren't school

11    books on his lap.

12    MS. DYER:  Your Honor, I can assure the

13    Government that that argument will not be made in

14    closing, that he threw anything other than what the

15    evidence has already established.

16    MR. MONK:  I'm not sure I know what that means.

17    MS. DYER:  We are not going to argue that he

18    threw a school book in the back seat of the car when

19    the officers pulled them over.

20    THE COURT:  What did he throw, do you know?

21    MS. DYER:  According to Mr. Blakely, it was the

22    power cord from the laptop.

23    THE COURT:  We've had that testimony.

24    MS. DYER:  Correct.

25    THE COURT:  Because I knew that.

1     MS. DYER:  Correct.

2     THE COURT:  But there was no book.

3     MS. DYER:  No.  And we're not going to argue

4  there was.

5     THE COURT:  Is that good enough for you, Mr.

6  Monk?

7     MR. MONK:  And they're also not going to argue

8  that the books that were on his lap were school

9  books.

10    MS. DYER:  We're not going to mention the book

11  on his lap.

12    MR. MONK:  That's fine.

13    THE COURT:  All right.  Resolved.

14    (End of side bar discussion.)

15    MR. MONK:  I'll move on to another subject.  If

16  I may approach the witness?

17    THE COURT:  You may.

18  BY MR. MONK:

19  Q    I'm handing the witness what's been marked as

20  Government's Exhibit 17 C and 17 D.  Please take a

21  look at those and tell me whether you recognize

22  those, and, if so, how?

23  A    Yes, sir, I do recognize 17 D and 17 C.

24  Q    Okay.  How so?

25  A    These are the plastic seat cover boxes in which

```
 1    a seat cover would be purchased in.  These items were
 2    in the trunk of the Toyota Camry car.  When it was
 3    here in Tampa, these items were removed.  I packaged
 4    them myself.
 5         MR. MONK:  I move for admission of those
 6    proposed Exhibits 17 C and D.
 7         MS. DYER:  No objection.
 8         THE COURT:  They are seat cover boxes?
 9         THE WITNESS:  Yes, sir, that's correct.  They
10    are the packaging.
11         THE COURT:  I understand.  17 C and D are
12    received on behalf of the United States.
13         (Government's Exhibit Nos. 17 C and 17 D are
14    received into evidence.)
15    BY MR. MONK:
16    Q    And you recovered them from where?
17    A    Those were from the trunk of the Toyota Camry.
18    Q    Now, I'd like to hand the witness what has been
19    admitted in evidence as Exhibit 43.  And do you have
20    your own copy of that, please?
21    A    Yes, sir, I do.
22    Q    If I may retrieve the original.
23         MR. MONK:  May I ask the witness a few questions
24    concerning Exhibit 43, Your Honor?
25    BY MR. MONK:
```

1     Q    Have you had occasion to review this summary I

2     believe testified to and introduced by, was it, Caren

3     Allen?

4     A    Yes, sir.  I have had an opportunity to review

5     this document.

6     Q    In fact, have you had the opportunity to

7     actually go out and purchase some of the items, the

8     specific items that are reflected on Exhibit Number

9     43?

10    A    Yes, sir, I have.

11    Q    Do you have a copy of Exhibit 87 before you?

12    A    No, sir, I don't believe I do.

13         MR. MONK:  Your Honor, with the Court's

14    permission, I would like to publish aspects of a

15    couple of pages.

16         THE COURT:  Yes, sir.

17    BY MR. MONK:

18    Q    First of all, this first page you see in this

19    text here that states, "Acetone peroxide is a primary

20    high explosive.  It is sensitive to shock, heat,

21    light, friction and most other things an explosive

22    can be sensitive to.  It isn't much of a problem if

23    you handle it with care and when you're making it,

24    you add the HCL in slowly drop wise."

25         Do you see that?

1    A    Yes, sir, I do.

2    Q    And on the second page of 87, probably

3    three-quarters of the way down or two-thirds of the

4    way down, "H202 can be purchased at any store.  H202

5    is also known as hydrogen peroxide, the stuff in the

6    brown bottle that you put on cuts to disinfect them."

7         Number two, "Acetone can be purchased Lowe's or

8    another hardware store as a paint remover or as nail

9    varnish remover, but the acetone in nail varnish

10    remove is diluted."

11         Do you see that?

12    A    Yes, sir, I do.

13    Q    And if we move on --

14         THE COURT:  Mr. Monk, we're not going to elicit

15    in this form any further testimony from this witness.

16         MR. MONK:  I would just like to show a photo,

17    Your Honor.

18         THE COURT:  All right.

19    BY MR. MONK:

20    Q    Also part of 87.  It's a photo of a can of

21    acetone.  Down below that on the same page, a bottle

22    of hydrogen peroxide.

23         My question to you, sir, now, if you'll return

24    to Exhibit Number 43, and specifically direct your

25    attention to Item 75, first of all.  Do you see Item

1    Number 75?

2    A    Yes, sir, I do.

3    Q    Do you know what that is?

4    A    Yes, that's a form of acetone.  I believe it's

5    going to be nail polish remover.

6    Q    Take a look, please, also at Items 78 and 79.

7    Do you know what that is?

8    A    Yes, sir, I do.

9    Q    What are those?

10   A    That is three percent hydrogen peroxide, which

11   is typically in a brown bottle that you would buy to

12   disinfect an injury.

13   Q    Correct me if I'm wrong, but according to this

14   summary, these purchases were made on July 31st,

15   2007, four or five days before the August 4th trip,

16   is that correct?

17   A    Yes, sir, that is correct.

18   Q    And the purchases were made by Mr. Mohamed, is

19   that correct?

20   A    That is correct.

21   Q    Let's take a look, if we can, on the first page

22   of Exhibit Number 43.  With respect to Item Number

23   1 -- I'm sorry, Item Number 2 --

24        THE COURT:  Mr. Monk, unless this witness knows

25   something independent, these matters are in evidence

1  and are susceptible of having the jurors' attention

2  called to them in a number of ways other than through

3  this laborious mechanism of a witness.

4      MR. MONK:  Yes, Your Honor.

5      THE COURT:  The questions are more than mildly

6  suggestive.  Go ahead.

7      MR. MONK:  All right.  I'll switch gears to

8  another topic.

9  BY MR. MONK:

10  Q    Now, have you had occasion to review the phone

11  records that are now in evidence relating to 15 E 1

12  and 15 E 2?

13  A    Yes, sir, I have.

14  Q    And specifically in connection with the

15  frequency of calls that occurred between those two

16  numbers between approximately June 5th of 2007 and

17  August 4th of 2007?

18  A    Yes, sir, I have.

19  Q    And how many calls occurred between the 8010

20  number and the 5154 number between those dates?

21  A    It was approximately 72 of varied duration.

22  Q    And what about between August 2nd of 2007 and

23  August 4th of 2007?  Were there any phone calls

24  between those two numbers between those dates?

25  A    Yes, sir, there was.

1    Q    How many?

2    A    I believe approximately eight.

3         MR. MONK:  If I may approach, Your Honor?

4         THE COURT:  You nay.

5    BY MR. MONK:

6    Q    Handing the witness what has been marked as

7    proposed Exhibit Number 81.  Do you recognize those

8    two items, sir?

9    A    Yes, sir, I do.

10   Q    And how is it that you recognize those?

11   A    These two items were purchased by the FBI.  We

12   purchased them as a demonstrative type piece of

13   evidence.  Based on the purchase records, we took the

14   product identification number from the receipt that

15   was purchased, went to the corresponding store and

16   purchased these two items, which would be exactly the

17   same as the ones that were purchased on the summary

18   of purchases.

19   Q    How do you know they would be exactly the same

20   items?

21   A    Well, the product what they call the skew

22   number, all the little hashes and numbers underneath,

23   those numbers are specific to each item.  So we went

24   through store management.  We gave them those

25   receipts and they were able to go to the shelf and

1   pull the item which matched the same item that was

2   purchased.

3       MR. MONK:  Your Honor, I move for admission of

4   proposed Exhibit 81.

5       MS. DYER:  No objection.

6       THE COURT:  Exhibit 81 is received on behalf of

7   the United States.

8       (Government's Exhibit No. 81 is received into

9   evidence.)

10      MR. MONK:  May I have a moment, please?

11      THE COURT:  You may.

12       (Pause.)

13      MR. MONK:  Nothing further, Your Honor.

14      THE COURT:  Thank you, Mr. Monk.

15      Has the defense cross-examination for this

16  witness?

17      MS. DYER:  Please, Your Honor.

18                     CROSS-EXAMINATION

19  BY MS. DYER:

20  Q    Good morning, Agent Brown.

21  A    Good morning.

22  Q    You testified that you went up to Berkeley

23  County, South Carolina to retrieve the Toyota Camry,

24  correct?

25  A    Yes, ma'am, I did.

1   Q    And that you -- well, you probably didn't but

2   somebody placed it on a trailer and you hauled it

3   back down here?

4   A    Actually, I did put it on the trailer and hauled

5   it back down here.

6   Q    You physically picked it up or you drove it onto

7   the trailer?

8   A    No.  It was a dolly type trailer.  We drove the

9   vehicle about 18 or 20 inches up onto the little ramp

10  and then secured it.

11  Q    You're also aware that at some point in the

12  investigation it was on a flatbed trailer, correct?

13  A    Yes, I am aware of that.

14  Q    While it was on that flatbed trailer, the FBI or

15  law enforcement took an x-ray of the car, correct?

16  A    I have been told that that was done, yes.

17       MS. DYER:  May I approach, Your Honor?

18       THE COURT:  You may.

19  BY MS. DYER:

20  Q    Showing you what's been marked as Defendant's

21  Proposed 33 and ask you if you recognize that.

22  A    I have seen these x-rays, but -- I don't know

23  for sure that this is the vehicle, but I have seen

24  these x-rays.

25  Q    Have you seen these x-rays in relation to this

1   case?

2   A    I have seen it within the paperwork of this

3   case, yes.

4       MS. DYER:  Your Honor, I would move Exhibit 33

5   into evidence.

6       MR. MONK:  Objection, hearsay.

7       THE COURT:  Well, let's come to side bar a

8   moment and let me look at that question.

9       (At side bar, on the record.)

10      THE COURT:  We're getting to the small potatoes

11  stage of this case, so you both should be aware the

12  jury is just -- let me have it.

13      MS. DYER:  Yes, sir.

14      THE COURT:  This is being offered for what

15  purpose, Ms. Dyer?

16      MS. DYER:  Your Honor, it's been offered to show

17  the extensive investigation that went on in this

18  case.  And it's also my understanding that the

19  Government had previously agreed to let me introduce

20  this through this witness.

21      MR. MONK:  With whom did you have that

22  agreement?

23      MS. DYER:  I don't know it was you or Mr.

24  Hoffer, but Mr. Brown was aware of it.  He was part

25  of it.

1          MR. MONK:  Okay, all right.

2          THE COURT:  I suggest if the Government is

3    withdrawing its objection, we'll admit Exhibit 33.

4          I think we need to move on here.  I'm not just

5    talking to you, Ms. Dyer.  We've got evidence in,

6    you're going to have plenty of time to argue and

7    point out to them what you want to point out to them.

8          MR. MONK:  Are you sure you had an agreement?

9          THE COURT:  There is no suggestion of under

10   investigation here.

11         MR. HOFFER:  If I may, I will withdraw my

12   investigation.

13         THE COURT:  And let's move on.

14         MS. DYER:  Yes, Your Honor.

15         THE COURT:  I have never see an automobile

16   x-ray.  It would be interesting to examine this with

17   care.  Can I keep this?

18         MS. DYER:  Sure.

19         (End of side bar discussion.)

20         MR. MONK:  Your Honor, I'm going to withdraw my

21   objection.

22         THE COURT:  Exhibit 33 is received on behalf of

23   the defense.

24         (Defendant's Exhibit No. 33 is received into

25   evidence.)

1          MS. DYER:  May I approach the evidence table,

2     Your Honor?

3          THE COURT:  You may.  You were right near it a

4     moment ago, Ms. Dyer, but go ahead.

5     BY MS. DYER:

6     Q    I can't seem to find the exhibit, but -- Agent,

7     you testified that this car when you picked it up had

8     a half a tank of gas?

9     A    That's correct.

10    Q    And during your investigation you determined

11    that the Toyota has a 20-gallon tank capacity?

12    A    I believe it was like 20.6 gallons, yes.

13    Q    And do you remember Government's Exhibit 24 S

14    being a picture of a Murphy Oil gas station receipt

15    from August 4th, 2007?

16    A    You know, what was the exhibit number again?

17    Q    24 S.

18    A    Yes, I do believe I remember seeing a gas

19    station receipt from Murphy Oil.

20    Q    And I believe on Government's -- the Government

21    that has the purchase summaries on it, do you still

22    have that in front of you?

23    A    Yes, ma'am, I do.

24    Q    And Item Number 2 is for $25 worth of gas on

25    August 4th, 2007 at 5:14 p.m.?

1    A    That was Item 30, you said?

2    Q    Item 2?

3    A    Item 2.  Are you going by the spreadsheet number

4    on the left-hand side of the purchase summary?  Is

5    that --

6    Q    Yes.  The very first purchase listed but the

7    last chronologically?

8    A    My list shows that it's cashews, not gasoline.

9    Q    It's Government's Exhibit 43?

10   A    I'm sorry.  I don't have the number on top.  Is

11   that the --

12        MS. DYER:  May I approach, Your Honor?

13        THE COURT:  Yes, ma'am.  This the

14   cashews/gasoline issue, right?

15        THE WITNESS:  Mine shows -- maybe we could get

16   the original one over there and I'll take a look at

17   that and be sure that --

18        THE COURT:  What is the overall issue, Ms. Dyer?

19        MS. DYER:  That there was -- the last purchase

20   on the summary.

21        THE COURT:  Do you know how much the last

22   purchase of gasoline was?

23        THE WITNESS:  Sir, I do show -- on August 4th at

24   5:14, I do see a gas purchase for $25.01.

25        THE COURT:  But your knowledge is limited to the

1 contents of the exhibit?

2  THE WITNESS:  Yes, sir.  I do remember seeing a

3 receipt, but I don't remember the exact amount on

4 that receipt.

5  THE COURT:  All right.

6 BY MS. DYER:

7 Q The items that --

8  THE COURT:  Ms. Dyer, I'm going to give you the

9 same advice I gave Mr. Monk.  If these contents of

10 these exhibits are in evidence, we don't need a

11 witness to simply publish.  You can refer the jurors'

12 attention to it in due course during your summation

13 or at other times.  Go ahead.

14  MS. DYER:  Yes, Your Honor.  Thank you.

15 BY MS. DYER:

16 Q The items that you said the FBI purchased, I

17 believe in Government's 81, do you still have that up

18 there?

19 A Yes, ma'am, I do.

20 Q The purchase summary shows those were purchased

21 by Mr. Mohamed, correct?

22 A That is correct, yes.

23 Q The items that Mr. Monk referred to from

24 Government's Exhibit 87, the acetone and peroxide --

25 A Yes.

1    Q    -- none of those were found in the car on August

2    4th, 2007, correct?

3    A    Not that I'm aware of, no.

4         MS. DYER:  May I approach, Your Honor?

5         THE COURT:  You may.

6    BY MS. DYER:

7    Q    I'm showing you what's been marked as

8    Defendant's Proposed 1 E.  Please take a look at that

9    and see if you recognize it from this case.

10   A    Yes, I do believe I do recognize these items.

11   Q    And do you recognize how -- do you know how you

12   recognize them?  Where the items came from?

13   A    Yes, ma'am.  I believe these items all came out

14   of the Toyota Camry.  I think I've seen photographs

15   of these items within the car during a search.

16        MS. DYER:  At this time I'd move proposed

17   Defendant's 1 E into evidence.

18        MR. MONK:  No objection.

19        THE COURT:  1 E is received on behalf of the

20   defense.

21        (Defendant's Exhibit No. 1 E is received into

22   evidence.)

23   BY MS. DYER:

24   Q    Agent, would you consider yourself one of the

25   main case agents in this case?

1    A    I am not technically a case agent for this case

2    listed on paper, but I have been involved with the

3    investigation since the beginning.

4    Q    And you're aware that prior to Mr. Mohamed and

5    Mr. Megahed being transported to the detention center

6    at around three or four o'clock in the morning on

7    August 5th that they had been interviewed by fellow

8    members of the FBI on scene, correct?

9    A    Yes, I am aware of that.

10    MS. DYER:  One moment, Your Honor.

11        (Pause.)

12    MS. DYER:  I have nothing else, Your Honor.

13    Thank you.

14    THE COURT:  Thank you, Ms. Dyer.

15    Any redirect by the United States?

16    MR. MONK:  No, Your Honor.

17    THE COURT:  In that case, Mr. Brown, you may

18    step down and resume your seat at counsel table.

19        (End of excerpt of proceedings.)

20                C E R T I F I C A T E

21    I, Kerry Mercade, certify that the foregoing is

22    a correct transcript from the record of proceedings

23    in the above-entitled matter.

24                            S/Kerry Mercade

25                            Kerry Mercade
                              Court Reporter