1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION

3      UNITED STATES OF AMERICA

4

5            vs.                    CASE NO. 8:07-cr-342-T-23TBM
                                    March 26, 2009
6                                   Tampa, Florida

7
       YOUSSEF SAMIR MEGAHED,
8
            Defendant.
9
       _____/
10
            TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
11                (TESTIMONY OF DANIEL MCTAVISH)
           BEFORE THE HONORABLE STEVEN D. MERRYDAY
12                UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     For the Government:   JAY HOFFER
                             ROBERT MONK
15                           Assistant U.S. Attorneys
                             400 N. Tampa Street, Suite 3200
16                           Tampa, Florida 33602
                             813/274-6000
17
       For the Defendant:    ADAM ALLEN
18                           DIONJA DYER
                             Assistant Federal Defenders
19                           400 N. Tampa Street, Suite 2700
                             Tampa, Florida 33602
20                           813/228-2715

21     Court Reporter:       Kerry Mercade
                             801 N. Florida Avenue
22                           Suite 15A
                             Tampa, Florida 33602
23                           813/301-5024

24

25     Proceedings recorded and transcribed by
       computer-aided stenography.

1                           **INDEX**

2
   **DEFENSE WITNESS DANIEL MCTAVISH**
3  Direct Examination by Mr. Allen...........3

4
                          **EXHIBITS**
5

6                          (None.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated, one and all.
2     Members of the jury, you will recall that just as we
3     recessed, the defense had called Daniel McTavish to
4     the stand.  There was a request to discuss a matter
5     at side bar.  We have discussed that matter, and
6     discussed it further, and in due course resolved it.
7          So now I recognize Mr. Allen for his Direct
8     Examination of Mr. McTavish.
9                    DIRECT EXAMINATION
10    BY MR. ALLEN:
11    Q    Good afternoon, sir.
12    A    Good afternoon.
13    Q    Agent McTavish, who are you currently employed
14    with?
15    A    The Federal Bureau of Investigation.
16    Q    How long have you been employed with the FBI?
17    A    Twelve and a half years.
18    Q    Are you a special agent?
19    A    Yes, currently a supervisory special agent.
20    Q    Didn't mean to demote you.  Were you working for
21    the FBI in August of 2007?
22    A    Yes.
23    Q    Specifically, on August 4TH, 2007, were you
24    stationed in the South Carolina area?
25    A    Yes, I was.

1  Q    And on August 4th, 2007, did you respond to a
2  traffic stop of a vehicle in Goose Creek, South
3  Carolina?
4  A    Yes.
5  Q    Do you recall approximately what time you
6  responded?
7  A    It was just beginning to get dark, prior to 8:50
8  p.m.  I don't know exactly what time I arrived on
9  scene.
10 Q    Would it be fair to say you had a lot of
11 different tasks going on that evening at the scene?
12 A    Not for me, sir.  I arrived, was given a quick
13 summary of what was going on, and preceded with my
14 task of interviewing.
15 Q    Was that task to interview both Ahmed Mohamed
16 and Youssef Megahed?
17 A    Yes, it was.
18 Q    And do you recall who you interviewed first?
19 A    Mr. Mohamed.
20 Q    Do you recall about what time that interview
21 started?
22 A    I'm not quite sure what time the interview
23 started.  I would speculate some time around nine
24 o'clock.
25 Q    And during that interview of Mr. Mohamed several

```
 1    issues were discussed, correct?
 2    A    Yes.
 3    Q    And during your questioning, isn't it true that
 4    Mr. Mohamed indicated that he knew there was safety
 5    fuse in the trunk of the Toyota?
 6    A    Yes.
 7    Q    Isn't it also true that he indicated that there
 8    were four to five small pieces of PVC pipe in the
 9    trunk of that Toyota?
10    A    That's correct.
11    Q    And isn't it also true that he indicated that
12    the substance inside the PVC pipe was potassium
13    nitrate and sugar or Karo syrup?
14    A    Yes, together with kitty litter.
15    Q    During your discussions with Mr. Mohamed, did
16    the issue of the hand drill which was in the Toyota
17    come up?
18    A    Yes, it did.
19    Q    During your discussions with Mr. Mohamed, did
20    the issue of a shooting range come up?
21    A    Yes.
22    Q    During your discussions with Mr. Mohamed, did
23    the issue of where Mr. Mohamed was employed come up?
24    A    Yes, it did.
25    Q    During your discussions with Mr. Mohamed, did
```

1   the issue as to where he had travelled outside of the
2   United States come up?
3   A   Yes.
4   Q   During your discussions with Mr. Mohamed, did
5   the issue of where his trip on August 4th, 2007 had
6   originated from come up?
7   A   Yes, it did.
8   Q   Did the issue of where he had stopped along the
9   way on his trip come up?
10  A   Yes.
11  Q   Did the issue of his final destination where he
12  was headed come up?
13  A   Yes.
14  Q   Did you ask him to provide you with any email
15  addresses he may have?
16  A   Yes, I did.
17  Q   Did you ask him the names of his roommates in
18  Tampa?
19  A   Yes.
20  Q   After you completed that interview, did you then
21  go interview Youssef Megahed?
22  A   Yes, I did.
23  Q   And while you were interviewing Mr. Mohamed, was
24  Youssef Megahed able to hear that interview?
25  A   No.

```
 1    Q    When you were interviewing Youssef Megahed, was
 2    Mr. Mohamed able to hear your interview with Youssef
 3    Megahed?
 4    A    No, he could not hear.
 5    Q    Was all of this taking place outside on St.
 6    James Avenue or 176 I think it is?
 7    A    Yes.  It was two different locations along 176.
 8    Q    During your discussions with Youssef Megahed,
 9    did the issue of the gas can in the trunk of the
10    vehicle come up?
11    A    Yes.
12    Q    To your knowledge did you or anyone else in law
13    enforcement investigate the answer Youssef Megahed
14    gave regarding the gas can?
15    A    Whether there was one?
16    Q    Yeah.
17    A    I don't know.
18    Q    Did the issue of an antifreeze container which
19    was in the trunk of the vehicle come up during your
20    discussions or interview with Youssef Megahed?
21    A    Yes.
22    Q    Did the issues of the two liter soda bottles in
23    the vehicle come up during your interview of Youssef
24    Megahed?
25    A    Yes, it did.
```

1   Q   Similar to your questions of Mr. Mohamed, did
2   you -- or did the issue come up where Youssef Megahed
3   had begun his trip from?
4   A   Yes.
5   Q   Did the issue come up of any stops that Youssef
6   Megahed had made along the way?
7   A   Yes.
8   Q   Did the issue come up of Youssef Megahed's
9   ultimate destination on that day?
10  A   Yes.
11  Q   Did the issue of why Youssef Megahed was in
12  Goose Creek, South Carolina on that day come up?
13  A   Yes.
14  Q   Did you ask Youssef Megahed about the laptop
15  computer in the car?
16  A   Yes.
17  Q   Did the issue of Youssef Megahed's religion come
18  up during the interview?
19  A   Yes, I learned of his religion.
20  Q   I forgot to ask.  During the interview of Mr.
21  Mohamed, did the issue of his religion come up?
22  A   Yes.
23  Q   After this interview were you aware that Youssef
24  Megahed and Mr. Mohamed were placed in the back of a
25  patrol car and their conversations were secretly

```
 1    recorded?
 2    A    Yes.
 3         MR. ALLEN:  If I could have a moment.  I don't
 4    have any further questions, Your Honor.
 5         MR. MONK:  May we approach the witness?
 6         THE COURT:  You may.
 7         (At side bar, on the record.)
 8         MR. MONK:  Your Honor, in a number of areas the
 9    responses given were lies, and I am --
10         THE COURT:  You mean this witness --
11         MR. MONK:  No, no, no.  I'm sorry, Judge.  No.
12    I am seeking guidance and perhaps it's guidance that
13    the Court won't give me.  I want to inquire in two
14    areas:  Number one, one of the questions asked --
15         THE COURT:  Let's begin with the premise that
16    the answers were lies.  I'm not sure I understand
17    what you mean.  We're all assuming for the purposes
18    of our discussion that the witness tells the truth
19    about the subjects that were raised.
20         MR. MONK:  Yes.
21         THE COURT:  And we don't know the substance --
22    owing to the United States' objection, we don't know
23    the substance of the answers because that went to the
24    truth of the answers, and it was the fact of the
25    topic that was received.  When you say it was a lie,
```

1    you mean the substantive answer --
2         MR. MONK:  Yes.
3         THE COURT:  -- which is not now known is a lie.
4         MR. MONK:  Correct.  Specifically, when the
5    agent asked about the names of Mr. Mohamed's
6    roommates, Mr. Mohamed stated that he did not know
7    their names.
8         During an interview not terribly long
9    thereafter, Mr. Mohamed was asked again by the agent
10   why he had not told the truth in that regard about
11   knowing the names of his roommates and he said that
12   he didn't want to drag them into it, words to that
13   effect.
14        Second, the question with respect to -- that was
15   asked of Mr. Megahed was:  Did you ask him about the
16   laptop in the car?  Well, in fact, he did ask him
17   about the laptop in the car and Mr. Megahed falsely
18   stated, it's our position, that he hadn't used that
19   laptop.  The last time he had used that laptop was
20   four months prior thereto.
21        THE COURT:  But the jury doesn't know whether
22   the answer was true or false, only that the topic
23   came up.
24        MR. MONK:  Correct.
25        THE COURT:  For whatever value that that is.

```
 1          MR. MONK:  Correct.
 2          THE COURT:  Which is only probably contextual.
 3   Go ahead.  I interrupted you.
 4          MR. MONK:  Further, he was asked why he was
 5   fiddling around with the laptop and he provided an
 6   answer that we also assert is false.  I would like to
 7   go into those two areas on cross-examination of this
 8   witness without opening up the flood gates for
 9   everything else that was said.
10          THE COURT:  Hold on.  Mr. Allen, I know you're
11   not doing it on purpose, but I don't want you to make
12   facial gestures and I don't want you to nod and shake
13   your head whether you're at counsel table or at side
14   bar.
15          MR. ALLEN:  Yes, sir.
16          THE COURT:  That's an illicit form of
17   communication with the jurors.
18          MR. ALLEN:  I'm sorry, Your Honor.
19          THE COURT:  I wasn't born yesterday at 5:00.
20          MR. ALLEN:  I understand, Your Honor.
21          THE COURT:  Mr. Monk?
22          MR. MONK:  That's it, Your Honor.
23          THE COURT:  And your basis for being able to
24   explore the substantive component the exclusion of
25   which the United States just insisted upon is what?
```

1    MR. MONK: There is carried in the cadence
2    questions asked by Mr. Allen an implication that it
3    was cleared up. We found out. You know, they told
4    them. They were quite forthcoming about where they
5    had been --
6    THE COURT: Why don't I just instruct the jury
7    that the questions and answers that were just heard
8    were limited to the topics discussed, not to the
9    accuracy or inaccuracy of the information or to the
10   substance of the information and are fully -- because
11   in order to probe those subjects Mr. Mohamed would
12   need to be here and he's not.
13   MR. MONK: That's fine.
14   THE COURT: And the purpose of them offered by
15   the defense was to show that prior to the
16   tape-recorded conversation heard earlier that the
17   officer and Mr. Megahed and Mr. Mohamed just touched
18   those topics. The truth is a power weapon and that's
19   the truth. Why don't we just instruct the jury to
20   that effect?
21   MR. MONK: No objection.
22   MR. ALLEN: No.
23   THE COURT: Let's do it. I tell you, the truth
24   will almost always set you free.
25   (End of side bar discussion.)

                                                                        13

 1            THE COURT:  Members of the jury, the questions
 2      and answers that you just heard from this witness
 3      were asked in a particularized way to bring to your
 4      attention the fact of discussions between the officer
 5      and Megahed and Mohamed at the time immediately
 6      preceding the audio conversation that was recorded in
 7      the back seat of the law enforcement vehicle.
 8      Neither the accuracy or the inaccuracy of the
 9      statements that Mohamed and Megahed made are part of
10      this testimony, nor the substance of the statements
11      that they made.  If the substance of those
12      conversations were -- or the substance of, for
13      instance, Mohamed's statements were to be the subject
14      matter, he would come testify about them and he is
15      not here.
16            The testimony that you have just heard is
17      offered by the defense to establish that before the
18      conversation that you heard on the audiotape, the
19      topics that were mentioned were also the topic of
20      communications between law enforcement and Megahed
21      and Mohamed.  They were offered for that purpose only
22      and you should consider them for that purpose only.
23      The substance and the accuracy or inaccuracy of
24      Megahed's and Mohamed's statements is not presented
25      for your consideration.  The fact that they discussed

```
 1   those topics before the audio conversation that you
 2   heard is presented for your consideration by this
 3   witness' most recent testimony.
 4          Any objection to that instruction, Mr. Monk?
 5       MR. MONK:  No, Your Honor.
 6       THE COURT:  Mr. Allen?
 7       MR. ALLEN:  No, Your Honor.  But can I approach
 8   regarding that instruction?
 9       THE COURT:  Well, yes.
10       (At side bar, on the record.)
11       MR. ALLEN:  I apologize if the Court said it and
12   I didn't hear it.  At least the first five questions
13   regarding the safety fuse and the PVC pipes and the
14   contents was offered to show knowledge by Mr.
15   Mohamed, not necessarily to give context to the
16   conversation.
17       MR. MONK:  Your Honor, before the Court gave its
18   instruction -- the instruction had to do with the
19   questions and the answers, that part of his
20   testimony, and not the other part of his testimony.
21   The other part of his testimony is what it is.
22       THE COURT:  I'll try to deal with both of these.
23   It's not the easiest thing in the world.  You are
24   distinguishing in the testimony before the series of
25   question about the topics.
```

15

1      MR. MONK:  Mr. Allen is.
2      THE COURT:  Your objection -- I mean, your
3 comment, Mr. Monk, was directed to the establishment
4 of a distinguish between the questions after the
5 topics?
6      MR. MONK:  Correct.  The Court's instruction.
7      THE COURT:  And the questions about what?  What
8 descriptor can I use?
9      MR. MONK:  The fuse.  The fuse.
10      MR. ALLEN:  I was just concerned that they may
11 have interpreted your instruction to apply to the
12 knowledge questions as well as the interview topic
13 questions.
14      MR. MONK:  I think they could have because your
15 instruction was limited to the questions and answers
16 that --
17      THE COURT:  I think that takes care of both of
18 your concerns.
19      MR. ALLEN:  I may not have heard it.
20      THE COURT:  They take care of both of your
21 concerns.  I instructed the jury that a series of
22 questions from the defense that had to do with topics
23 discussed and which was phrased to elicit the topics
24 were asked for a particular reason to be considered
25 only in a particular subject.  I think that takes

1    care of both of your comments.  It excludes questions
2    in other forms and excludes questions on other
3    subjects.
4         MR. ALLEN:  Yes, Your Honor.
5         THE COURT:  I'll say it again.  I think it
6    solves both of the issues.
7         MR. ALLEN:  Thank you.
8         (End of side bar discussion.)
9         THE COURT:  This brief supplement and then onto
10   other things.  The instruction I gave a moment ago
11   was directed to less than all of this witness
12   testimony.  The latter part of the testimony in
13   questions by Mr. Allen that called for him to state
14   what topics were discussed was the part of his
15   testimony to which I was directing my instruction,
16   not to the balance.  And as to those questions only,
17   that instruction applies.
18        If I am correct, the United States is due to be
19   recognized for cross-examination.
20        MR. MONK:  No further questions, Your Honor.
21        THE COURT:  In that case, Mr. McTavish, you may
22   step down and you are excused with our thanks.
23        THE WITNESS:  Thank you, Your Honor.
24        (End of excerpt of proceedings.)
25

1               C E R T I F I C A T E
2        I, Kerry Mercade, certify that the foregoing is
3   a correct transcript from the record of proceedings
4   in the above-entitled matter.
5                                    <u>S/Kerry Mercade</u>
6                                    Kerry Mercade
                                     Court Reporter
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25