```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

UNITED STATES OF AMERICA


         vs.                    CASE NO. 8:07-cr-342-T-23TBM
                                March 30, 2009
                                Tampa, Florida


YOUSSEF SAMIR MEGAHED,

         Defendant.
_____/

         TRANSCRIPT OF EXCERPT OF TRIAL PROCEEDINGS
                  (TESTIMONY OF ALAN BROWN)
          BEFORE THE HONORABLE STEVEN D. MERRYDAY
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:     JAY HOFFER
                        ROBERT MONK
                        Assistant U.S. Attorneys
                        400 N. Tampa Street, Suite 3200
                        Tampa, Florida 33602
                        813/274-6000

For the Defendant:      ADAM ALLEN
                        DIONJA DYER
                        Assistant Federal Defenders
                        400 N. Tampa Street, Suite 2700
                        Tampa, Florida 33602
                        813/228-2715

Court Reporter:         Kerry Mercade
                        801 N. Florida Avenue
                        Suite 15A
                        Tampa, Florida 33602
                        813/301-5024


Proceedings recorded and transcribed by
computer-aided stenography.
```

1                           **INDEX**

2

3  **DEFENSE WITNESS ALAN BROWN**
   Direct Examination by Ms. Dyer.............3
   Cross-Examination by Mr. Monk..............10

4

5                      **DEFENDANT'S EXHIBITS**

6  6 D    Copies (miscellaneous items).........6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              DEFENSE WITNESS, ALAN BROWN, SWORN
 2         THE COURT:  State your name, please.
 3         THE WITNESS:  Alan Brown.
 4         THE COURT:  Have a seat in the witness chair and
 5    I'll recognize Ms. Dyer for your Direct Examination.
 6                     DIRECT EXAMINATION
 7    BY MS. DYER:
 8    Q    Agent Brown, you previously testified that you
 9    have been working on this case since it's inception
10    in and around August of 2007?
11    A    Yes, ma'am, that is correct.
12    Q    And throughout that time you have become
13    familiar with the evidence in this case?
14    A    Yes.
15         MS. DYER:  May I approach, Your Honor?
16         THE COURT:  You may.
17    BY MS. DYER:
18    Q    I would show you what has previously been marked
19    as Defense Exhibit 6 D, as in delta.  Can you take a
20    look at that and let me know if you recognize it from
21    this case?
22    A    Yes.
23    Q    Yes, you recognize it as something from this
24    case?
25    A    I do.
```

1     MS. DYER:  Your Honor, at this point I would
2   move for admission of Defense Exhibit 6 D.
3     MR. MONK:  May we approach?  We've got an
4   objection.
5     THE COURT:  You may.
6     (At side bar, on the record.)
7     MR. MONK:  The objection is relevancy, Your
8   Honor, specifically in relation to the photos of Mr.
9   Megahed in the swimming suit.  One of the additional
10   foundational questions is going to be that he
11   recalled observing these in the U-Store-It facility.
12   There is no relevancy of the photos of Mr. Megahed in
13   the swimming suit.
14     MS. DYER:  Your Honor, it's been clear
15   throughout the Government's case that they are going
16   to argue there is no that way this was a trip to the
17   beach.  Those depict Mr. Megahed at the beach, and so
18   it goes to our theory to support that this could have
19   been an innocent trip to the beach.
20     THE COURT:  This is Clearwater Beach.  It says
21   Clearwater Beach.
22     MS. DYER:  Yes, Your Honor.  But that he likes
23   to go to the beach, so it is not out of the realm of
24   possibilities that he would have been on his way to
25   Jacksonville Beach, Tybee Island, and Sunset Beach,

1    North Carolina.  It's just like the trip to Key West

2    and the photos that the Government introduced in

3    relation to that trip.

4         THE COURT:  These pictures were taken after the

5    fact?

6         MS. DYER:  No, Your Honor.  They were found --

7         THE COURT:  04/07.  It says April of 07.

8         MS. DYER:  Yes, Your Honor.  That was a month

9    prior or several months prior.  They were found by

10   the Government in when they searched U-Store-It.  So

11   it's kind of reverse 404(b), where if he has been to

12   the beach before, he may have been going to the beach

13   now to contradict the Government's assertion that

14   there was no way he was going to the beach.

15        THE COURT:  Well --

16        MS. DYER:  It's at least marginally probative

17   with no prejudice.

18        THE COURT:  I guess it is.  Overruled, I guess.

19        MR. MONK:  Okay.

20        THE COURT:  It's just showing that he was at the

21   beach in April of 2007, therefore, he could have been

22   going to the beach in April of --

23        MS. DYER:  In August.

24        THE COURT:  In August of 2007.

25        MS. DYER:  Correct, Your Honor.

```
 1              THE COURT:  Well, I guess.  Overruled.
 2              (End of side bar discussion.)
 3              THE COURT:  6 D is received on behalf of the
 4     defense.
 5              (Defendant's Exhibit No. 6 D is received into
 6     evidence.)
 7              MS. DYER:  May I publish, Your Honor?
 8              THE COURT:  You may.
 9     BY MS. DYER:
10     Q    It's kind of hard to tell from this copy, Agent,
11     but is that a picture of Youssef Megahed in the
12     ocean?
13     A    Yes.
14     Q    Is this another picture of his standing on the
15     beach?
16     A    Yes.
17     Q    Agent, you testified last week about obtaining
18     some phone records on the phones that were located in
19     the Toyota on August 4th, 2007.  Do you remember
20     that?
21     A    Yes.
22     Q    Did you receive those records via a subpoena?
23     A    Yes.
24     Q    And in that subpoena did you also request the
25     cell tower locations of the phones?
```

1    A    Yes, I believe there was tower information.
2    Q    And can you explain to the jury what tower
3    information is?
4    A    Tower information is -- every cell tower has a
5    specific I believe it's going to a number or a
6    designator.  So when you are talking on a cell phone,
7    the cell phone company can tell which tower that your
8    signal is doing through and transmitting.  It's
9    usually the first tower that it hits.
10   Q    Now, does it only record the towers if you are
11   actually on the phone or just if the phone is
12   activated?
13   A    I'm not sure of that answer.
14   Q    And can you tell the jury what the purpose would
15   be of obtaining such information?
16   A    It would give an investigator the ability to
17   narrow down a particular area in which somebody might
18   be using a cell phone.
19   Q    A particular location?
20   A    Yes.
21   Q    You also testified that a review of those phone
22   records revealed over a hundred calls between Youssef
23   Megahed and Mr. Mohamed I believe between June 6,
24   2007 and August 3rd, 2007, is that accurate?
25   A    No, ma'am.  It was actually I believe 72 calls.

```
 1    Q    During that timeframe?
 2    A    Yes.  From June 5th to August 4th.
 3    Q    Do you remember how many of those calls lasted
 4    less than a minute?
 5    A    I do not recall exactly how many how long the
 6    duration was, but there was some that were less than
 7    a minute, yes.
 8    Q    Was a -- to your knowledge, was a summary
 9    produced on the analysis of those calls that would
10    refresh your memory as to how much lasted for a
11    minute or less?
12    A    Yes.  There was a summary report done but it was
13    -- that information was put together under -- using a
14    different application system, the FBI telephone
15    application system.  The report that I looked at is
16    -- I actually physically took the phone records and
17    physically counted every phone call.
18    Q    So that system that was used to create the
19    summary was inaccurate, is that --
20    A    I don't know whether it would be fair to say
21    that it's inaccurate.  It also has the possibility of
22    capturing numbers from two different phone records.
23    Like if you subpoena multiple records, it could
24    double count particular phone calls.  That's why it's
25    important to go through and physically check the
```

1    records that you get by subpoena to be sure that that

2    is accurate.  Really, the telephone applicable that

3    the FBI uses is just a tool.

4    Q    Do you remember the length of the longest call

5    that you reviewed?

6    A    Without looking at the record, no, ma'am, I

7    don't recall.

8    Q    Would the summary report be incorrect in that

9    factor as well?

10   A    I would say maybe the duration of the call would

11   be accurate, yes.

12   Q    So if you reviewed that summary, would it

13   refresh your recollection as to what the longest

14   call, how many minutes?

15   A    It might, yes.

16        MS. DYER:  Your Honor, may I approach?

17        THE COURT:  You may.

18   BY MS. DYER:

19   Q    Showing you what's previously been mark for

20   identification as Government's Exhibit 15 E.  If you

21   would review that, sir.

22   A    Yes, I have seen this summary before.

23   Q    Does that refresh your recollection as to the

24   length of the longest call between Mr. Megahed and

25   Mr. Mohamed?

1    A    Yes.

2    Q    And how long was that?

3    A    Five minutes.

4    Q    And does it also refresh your recollection at

5    least as far as the computer analyzed that the

6    majority of the calls made lasted less than a minute?

7    A    Yes.

8         MS. DYER:  I have nothing else, Your Honor.

9    Thank you.

10        THE COURT:  Thank you, Ms. Dyer.

11        Mr. Monk, you are recognized for any

12   cross-examination.

13                   CROSS-EXAMINATION

14   BY MR. MONK:

15   Q    May I see 6 D?  Do you have 6 D?  Now, 6 D, the

16   cover sheet indicates, and correct me if I'm wrong,

17   basically Wal-mart photos, correct?

18   A    Yes.

19   Q    The date on this appears to be in April of 2007,

20   correct?

21   A    Yes.

22   Q    Where were these photos located during the

23   course of this investigation?

24   A    I believe those photographs were in a storage

25   unit.

```
 1    Q    The U-Store-It facility?
 2    A    Yes.
 3    Q    Mr. Youssef Megahed's U-Store-It facility?
 4    A    Yes.
 5    Q    And some of these photographs depict apparently
 6    Mr. Youssef Megahed in a bathing suit, correct?
 7    A    Yes.
 8    Q    Were there any bathing suits in this automobile,
 9    the Toyota Camry?
10    A    No.
11    Q    And you told us that -- you were asked questions
12    about the use of cell tower information.  Was the use
13    of the cell tower information as analytical tool
14    helpful in this case to the investigators?
15    A    I would say it was minimal because it just gives
16    you an area.  It's not a specific location.  I mean,
17    you don't know how far someone was from that tower
18    when the phone was used.  So it gives you an area.
19    Q    On Direct Examination you were asked a number of
20    questions with respect to calls, cell phone calls
21    between Mohamed and Youssef Samir Megahed.  Do you
22    recall those questions?
23    A    Yes.
24    Q    Why do you refer to the calls being between
25    Mohamed and Youssef Megahed if the cell phone that
```

```
 1      was acquired from Mr. Megahed during the traffic stop
 2      in Goose Creek was subscribed by Yahia Megahed?
 3      A    Could you repeat that question?  I don't whether
 4      I really understand what you --
 5      Q    Yes.  That cell phone was subscribed, I believe
 6      you testified in your previous testimony, to Yahia
 7      Megahed, is that correct?
 8      A    Yes.
 9      Q    Why do you then refer -- why did you refer in
10      your responses to defense counsel's questions to the
11      phone contacts being between Youssef Megahed and
12      Mohamed?
13      A    Well, there was probably multiple reasons.  The
14      cell phones were both taken from the Toyota Camry in
15      Goose Creek, South Carolina.  Yahia Megahed was not
16      in that car.  So that would be one reason we believe
17      that that was Youssef's phone.  Also, I believe in
18      Mohamed's cell phone directory, the address, I
19      believe that number was listed for Youssef Megahed.
20      I believe the last four digits were 8010.
21           MR. MONK:  That's all.  Thank you.
22           THE COURT:  Thank you, Mr. Monk.
23           Any redirect?
24           MS. DYER:  No, Your Honor.
25           THE COURT:  In that case, Mr. Brown, you may
```

1    step down and you are excused with our thanks.
2         THE WITNESS:  Thank you, sir.
3         (End of excerpt of proceedings.)
4
5
6              C E R T I F I C A T E
7         I, Kerry Mercade, certify that the foregoing is
8    a correct transcript from the record of proceedings
9    in the above-entitled matter.
10                                 S/Kerry Mercade
11                                 Kerry Mercade
                                   Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25